## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL                    *
STAFFING, LLC
Park 80 West Plaza II, 9th Floor       *
Saddle Brook, NJ 07663
                                       *

Plaintiff,                             *

v.                                     *          Civil Action No.

                                       *

JOSHUA KUBICKI                         *
619 Gist Avenue
Silver Spring, MD 20910                *

and                                    *

KIMBERLY DANOWSKI                      *
702 Linden Grove Place, Apt. 302
Odenton, MD 21113                      *

and                                    *

JON POMYKALA                           *
1240 North Rolfe Street
Arlington, VA 22201                    *

Defendants.                            *

*       *       *       *       *       *       *

## **<u>COMPLAINT</u>**

Ajilon Professional Staffing, LLC ("Ajilon"), by its undersigned attorney,

hereby brings the following Complaint against Defendants Joshua Kubicki ("Kubicki"),

Kimberly Danowski ("Danowski") and Jon Pomykala ("Pomykala") for (i) violation of

the District of Columbia's Uniform Trade Secret Protection Act, D.C. Code § 48-501 *et

seq.*; (ii) breach of contract; (iii) tortious interference with business relations; (iv) tortious

interference with contractual relations; (v) breach of fiduciary duty; (vi) breach of duty of loyalty; (vii) civil conspiracy; and (viii) unjust enrichment, and in support thereof, avers as follows:

## THE PARTIES

1.      Ajilon is a Delaware limited liability company that maintains its principal place of business at Park 80 West Plaza II, 9th Floor, Saddle Brook, New Jersey 07663.  Ajilon regularly transacts business in the District of Columbia.

2.      Kubicki is a former Ajilon employee, who is currently employed by Solomon-Page Group, LLC ("Solomon-Page").  Upon information and belief, Kubicki presently resides in Maryland and is a citizen of that state.

3.      Danowski is a former Ajilon employee, who is currently employed by Solomon-Page.  Upon information and belief, Danowski presently resides in Maryland and is a citizen of that state.

4.      Pomykala is a former Ajilon employee, who is currently employed by Solomon-Page.  Upon information and belief, Pomykala presently resides in Virginia and is a citizen of that state.

## JURISDICTION AND VENUE

5.      Jurisdiction exists by virtue of diversity of citizenship, 28 U.S.C. § 1332.  This case involves a dispute between citizens of different states and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000), exclusive of interest and

costs. Ajilon's claims arise out of tortious actions by Defendants within the District of Columbia, which caused harm to Ajilon in the District of Columbia.

6.    Immediate injunctive relief is sought pursuant to Federal Rule of Civil Procedure 65(b).

7.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a)(2).

## FACTS

### Ajilon

8.    Ajilon is engaged in the legal staffing industry, and primarily focuses on providing contract attorneys on a temporary or permanent basis to law firms with offices throughout the United States.

9.    The legal staffing industry is highly competitive. Ajilon invests a great deal of time and money cultivating client contacts and developing professional relationships that rely upon mutual trust. For this reason, all of Ajilon's contract attorneys must sign an Employment Agreement. *See* Exhibit A. The Employment Agreement contains provisions for the protection of its confidential trade secret information and a covenant not to compete for a finite period of time. *See id.*

### Kubicki

10.    Kubicki became an Ajilon employee on April 22, 2004 and signed the standard Employment Agreement on the same date. A true and correct copy of Kubicki's Employment Agreement is attached as Exhibit B hereto. He recruited business

for Ajilon with the District of Columbia offices of various law firms through June of 2007.

11.    Kubicki acknowledged in his Employment Agreement that information regarding Ajilon and its clients was confidential and proprietary to Ajilon, and that maintaining the secrecy of these matters was of the utmost importance to the continued success of Ajilon in the legal staffing field.  Kubicki's Employment Agreement provided:

> The Employee recognizes and acknowledges that he/she has access to the list of *Employer's clients and applicants…. The above constitutes the Employer's "Confidential Information," which is a valuable, special and unique asset of the Employer's business.*
>
> *The Employee will not, during or after the term of his/her employment, use for his/her own purposes such list of the Employer's clients and applicants...*  In addition, the Employee will not disclose the above list…to any person, member of his family, firm, corporation, association, or other entity, for any reason or purpose whatsoever….
>
> In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from the following:
>
> > A.    Disclosing, in whole or in part, the list of the Employer's clients…; or
> >
> > B.    *Rendering any services to any person,… , firm, corporation, association, or other entity to whom such list…ha[s] been disclosed, in whole or in part, or [is] threatened to be disclosed.*

Exhibit B at pages 2-3 (emphasis added.)

12.    Kubicki's Employment Agreement also provides that, as Ajilon had expended a great deal of time and energy recruiting its employees, for a period of one (1) year after his termination from Ajilon, Kubicki would not act on behalf of another

4

entity or firm to solicit Ajilon's employees.  The Employment Agreement explicitly stated:

> Employee agrees that Employer has invested substantial time and effort in assembling its staff of regular personnel as well as its pool of temporary employees.  *During and for a period of one year immediately following the termination of employment with Employer, Employee shall not directly or indirectly solicit Employer's regular or temporary employees for employment with any person or firm other than for Employer*, except in connection with permanent placements made in the proper course of Employee's employment with Employer.

Exhibit B at page 3 (emphasis added.)

13.    Kubicki further agreed that Ajilon had an interest in protecting its relationship with clients, and as such, upon his termination with Ajilon, he would not "directly or indirectly solicit" Ajilon's clients or applicants for a period of one (1) year. Exhibit B at page 3.  Paragraph 10 of the Employment Agreement states, in part:

> *For a period of one year immediately following the termination of employment with Employer, Employee shall not directly or indirectly solicit Employer's customers* or Employer's applicants for temporary employee assignments or permanent employee placements.  This shall apply to all customers and applicants known to Employee to be Employer's, to those that have applied or done business with Employer within one year before Employee's termination of employment as well as those prospective customers and from whom Employee solicited business while in the employ of Employer.

Exhibit B at page 3 (emphasis added.)

## **Danowski**

14.    Danowski became an Ajilon employee on August 15, 2005 and signed the standard Employment Agreement on the same date.  A true and correct copy of Danowski's Employment Agreement is attached as Exhibit C hereto.

15.     Danowski acknowledged in her Employment Agreement that information regarding Ajilon and its clients was confidential and proprietary to Ajilon, and that maintaining the secrecy of these matters was of the utmost importance to the continued success of Ajilon in the legal staffing field.  *See* Exhibit C at pages 3-4.

16.     The Employment Agreement that Danowski signed explicitly prohibited engaging in "any competitive activities" for a period of one (1) year within thirty-five (35) miles from the office in which she worked over the previous twelve (12) month period.  Exhibit C at page 4.  The Employment Agreement defined "competitive activities" as:

> Directly or indirectly owning, managing, operating, controlling, participating in, being employed by consulting, advising or being connected with a similar Staffing Service.
>
> A Staffing Service is defined as a person or entity engaged in the recruitment of individuals for positions of temporary or permanent employment with other individuals or entities…. For employees with responsibilities relating to the Employer's Ajilon legal line of business, a similar Staffing Service shall be defined as a Staffing Service that places legal services personnel including but not limited to attorneys, paralegals, legal secretaries, legal assistants and compliance officers.

Exhibit C at page 4.

## Pomykala

17.     Pomykala became an Ajilon employee on October 28, 2005 and signed the standard Employment Agreement on the same date.  This Agreement was identical in all material respects to that signed by Danowski.  A true and correct copy of Pomykala's Employment Agreement is attached as Exhibit D hereto.

18.     Pomykala acknowledged in his Employment Agreement that information regarding Ajilon and its clients was confidential and proprietary to Ajilon, and that maintaining the secrecy of these matters was of the utmost importance to the continued success of Ajilon in the legal staffing field.  *See* Exhibit D at pages 3-4.

19.     Further, the Employment Agreement that Pomykala signed explicitly prohibited engaging in "any competitive activities" for a period of one (1) year within thirty-five (35) miles from the office in which for he worked for Ajilon over the previous twelve (12) month period.  Exhibit D at page 4.  The Employment Agreement defined "competitive activities" as:

> Directly or indirectly owning, managing, operating, controlling, participating in, being employed by consulting, advising or being connected with a similar Staffing Service.
>
> A Staffing Service is defined as a person or entity engaged in the recruitment of individuals for positions of temporary or permanent employment with other individuals or entities…. For employees with responsibilities relating to the Employer's Ajilon legal line of business, a similar Staffing Service shall be defined as a Staffing Service that places legal services personnel including but not limited to attorneys, paralegals, legal secretaries, legal assistants and compliance officers.

Exhibit D at page 4.

### The Misconduct

20.     Kubicki resigned from his position with Ajilon on or about June 22, 2007, and promptly began working for one of Ajilon's competitors, Solomon-Page. Danowski and Pomykala quickly followed suit, resigning on June 29, 2007 and beginning to work for Solomon-Page within days.  This activity was in direct violation of the

explicit non-compete provisions of their respective Employment Agreements, discussed *supra*.

21.    On information and belief, Kubicki recruited Pomykala and Danowski to resign their employment with Ajilon and to seek out positions with Solomon-Page.  This activity was in direct violation of Kubicki's, Pomykala's and Danowski's explicit contractual obligations to Ajilon.

22.    As an employee of Ajilon, Kubicki had regularly solicited business with the District of Columbia offices of several large national law firms, including Crowell and Moring ("Crowell").  The relationship that Ajilon had with Crowell was extremely profitable; in fact, Crowell was one of Ajilon's biggest clients.  Up to and including his date of resignation, Kubicki worked to solicit projects at Crowell and other firms. In breach of his Employment Agreement, within days of terminating his employment relationship with Ajilon, Kubicki continued to solicit business with Crowell, and other Ajilon clients, for Solomon-Page.

23.    As employees of Ajilon, Danowski and Pomykala supported Kubicki's solicitation and organization of Ajilon-staffed projects in the District of Columbia offices of a number of law firms, including Crowell.  In breach of their respective Employment Agreements, within days of terminating their employment relationships with Ajilon, Danowski and Pomykala became employed by Solomon-Page and began working on the projects Kubicki was soliciting for Solomon-Page with Ajilon's clients.

24.    On information and belief, Ajilon is not aware of any preexisting relationship between the Ajilon clients from whom Defendants are soliciting business, including Crowell, and Solomon-Page.  In fact, Solomon-Page lacked nearly any market presence in the District of Columbia legal staffing industry until Kubicki began working for Solomon-Page in late June of 2007.

25.    Kubicki has obtained a project with Crowell – an extremely important client with whom Ajilon had a lucrative relationship – on behalf of Solomon-Page within days of resigning from his position at Ajilon.

26.    When Kubicki secured this project with Crowell for Solomon-Page, he wrongfully provided Pomykala and Danowski with positions working on staffing and organizing this project.  A widely distributed advertisement lists Pomykala as the person for contract attorneys to contact if they are interested in working for Solomon-Page on document review projects, which presumably include the Crowell project.  On information and belief, Danowski is also working to staff and organize the Crowell project for Solomon-Page.  Therefore, all three defendants are engaged in activity which directly violates the terms of their Employment Agreements.

27.    While employed by Ajilon and/or immediately thereafter, Ajilon believes and therefore avers that Defendants are prepared to engage in, engaged in, and continue to engage in, *inter alia*, the following acts:

    (a)    Converting for their own use, and for the use of Solomon-Page, information contained in the confidential business records of Ajilon, specifically including contact information for Ajilon's clients, described *supra*;

(b)     Soliciting Ajilon employees to leave Ajilon, in violation of the express terms of their Employment Agreements;

(c)     Breaching the terms of their reasonable, geographically- and time-limited non-compete agreements; and

(d)     Other such acts contrary to the terms, conditions and provisions of their Employment Agreements and their duty of loyalty to Ajilon.

28.     Defendants' conduct was and is in furtherance of a scheme to obtain and convert to their personal use and gain the information contained in the records of Ajilon, including but not limited to Ajilon's client names, addresses, telephone numbers and contact information, and to convert the Ajilon business model for Solomon-Page's benefit.

29.     Ajilon believes and, therefore, avers that:

(a)     Defendants have possession or control of confidential Ajilon client information, Ajilon proprietary information, and Ajilon trade secrets;

(b)     Defendants have used and will continue to use this information to solicit Ajilon clients and to divert the business of Ajilon clients from Ajilon to Solomon-Page; and

(c)     Defendants will otherwise continue to engage in acts constituting a breach of the terms of their Employment Agreements, a breach of their duty of loyalty, and other tortious conduct, including conversion of trade secrets and confidential information, and unfair competition.

## COUNT I

## VIOLATION OF DISTRICT OF COLUMBIA UNIFORM

## TRADE SECRET PROTECTION ACT

## D.C. Code § 48-501 *et seq.*

30.    The allegations of Paragraphs 1 through 29 are incorporated herein by reference with the same force and effect as if set forth in full below.

31.    Ajilon's clients' names, addresses, telephone numbers, and contact information, which constitute trade secrets subject to protection under the District of Columbia Uniform Trade Secret Protection Act, D.C. Code § 48-501 *et seq.* Ajilon has devoted substantial time, effort and money in acquiring, developing and protecting its client base.

32.    Ajilon has taken more than adequate measures under the circumstances to protect the secrecy of this information, such as requiring its employees to sign Employment Agreements, as described *supra*.

33.    Ajilon believes, and therefore avers, that Defendants are presently using Ajilon's confidential and trade secret information in furtherance of their employment with Solomon-Page and in direct violation of their binding contractual agreements not to do so.

34.    At the time Defendants misappropriated Ajilon's trade secrets for their own benefit and to the detriment of Ajilon, Defendants acted willfully and maliciously because they knew or should have known that they were using Ajilon's trade secrets for improper purposes.

35.    The foregoing conduct constitutes a misappropriation and misuse of Ajilon's confidential, trade secret information, by Defendants, in violation of District of Columbia law.

11

Case 1:07-cv-01281-RJL    Document 1    Filed 07/18/2007    Page 12 of 19

36.     As a consequence of the foregoing, Ajilon has suffered, and will continue to suffer, irreparable harm and loss.  Unless enjoined as requested herein, Defendants will persist in his wrongful and unlawful activities, and Ajilon will continue to be irreparably harmed.

## COUNT II

## BREACH OF CONTRACT

37.     The allegations of Paragraphs 1 through 36 are incorporated herein by reference with the same force and effect as if set forth in full below.

38.     Defendants have violated the terms of their Employment Agreements with Ajilon.  Specifically, Kubicki sought out and garnered business from one of Ajilon's clients for one of Ajilon's competitors.  *See* Exhibit B at page 3.  That he was willing to breach his Employment Agreement indicates the likelihood that he will breach it again by soliciting work for Solomon-Page from other Ajilon clients.  Danowski and Pomykala began working for a Solomon-Page, a direct competitor of Ajilon, and have unlawfully staffed projects with Ajilon's clients through Solomon-Page.

39.     Upon information and belief, Defendants are continuing to violate their contractual obligations under their Employment Agreements.

40.     As a consequence of the foregoing, Ajilon has suffered irreparable harm and loss.  Unless enjoined as requested herein, Kubicki will persist in his wrongful and unlawful activities in soliciting Ajilon's clients, Danowski and Pomykala will continue to be employed by a direct competitor, and Ajilon will continue to be irreparably harmed.

## COUNT III

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

41.    The allegations of Paragraphs 1 through 40 are incorporated herein by reference with the same force and effect as if set forth in full below.

42.    Ajilon has valid and continuing present and prospective business relationships with its clients.

43.    Defendants knew and continue to know of the existence of these valid business relationships, and are now in possession of Ajilon's customer list.

44.    Upon information and belief, Defendants have used this customer list to solicit various Ajilon clients to terminate or reduce their prospective business relationships with Ajilon.  Defendants have done so with the specific intent to harm these existing business relationships, and to erode Ajilon's goodwill with its clients.

45.    Defendants' actions were and are without privilege or justification, and were engaged in through improper means, namely misappropriation of Ajilon's confidential, proprietary and trade secret client lists.

46.    Upon information and belief, as a result of Defendants' conduct, Ajilon's goodwill with its clients has been diminished, and Defendants have diverted – and will divert – future business to Solomon-Page that would have gone to Ajilon.

47.    The foregoing conduct by Defendants constitutes a tortious interference with Ajilon's business relationships with its clients.

48.     As a consequence of the foregoing, Ajilon has suffered and will continue to suffer irreparable harm and loss in the form of lost business and diminished goodwill with its clients.  Unless enjoined as requested herein, Defendants will persist in their wrongful and unlawful activities, and Ajilon will be irreparably harmed.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

## (AGAINST KUBICKI)

49.     The allegations of Paragraphs 1 through 48 are incorporated herein by reference with the same force and effect as if set forth in full below.

50.     Pomykala and Danowski owed valid contractual obligations to Ajilon following their resignations, including non-recruitment, non-solicitation, and confidentiality obligations.  *See* Exhibits C and D.

51.     Kubicki knew, and continues to know, of the existence of these valid contractual obligations.

52.     Despite this knowledge, Kubicki induced and continues to permit Pomykala and Danowski to breach their contractual obligations to Ajilon.  Kubicki did this with the specific intent to harm Ajilon and interfere with the contractual relationship between Ajilon and Pomykala and Danowski.  Kubicki has accepted the benefits of Pomykala's and Danowski's breaches by using them to help garner business opportunities for Solomon-Page.

53.     Kubicki's actions were and are without privilege or justification.

54.     As a result of Kubicki's conduct, Pomykala and Danowski breached their contractual obligations to Ajilon and continue to do so in the manner described above, thereby causing irreparable harm to Ajilon.

55.     The foregoing conduct constitutes tortious interference by Kubicki with Ajilon's contractual relationships with Pomykala and Danowski.

56.     As a consequence of the foregoing, Ajilon has suffered and will continue to suffer irreparable harm and loss.   Unless enjoined as requested herein, Kubicki will persist in his wrongful and unlawful activities, and Ajilon will continue to be irreparably harmed.

## COUNTS V AND VI

## BREACH OF FIDUCIARY DUTY AND BREACH OF DUTY OF LOYALTY

57.     The allegations of Paragraphs 1 through 56 are incorporated herein by reference with the same force and effect as if set forth in full below.

58.     As employees of Ajilon, Defendants owed a duty of loyalty to Ajilon to act in the best interests of Ajilon, to use their best efforts on behalf of Ajilon, and to avoid any conflict between the interests of Ajilon and their own self-interest.

59.     As described fully above, Defendants violated the common law duty of loyalty and the fiduciary duty arising under their relationships with Ajilon in that, while still employed by Ajilon, they misappropriated Ajilon's confidential trade secret information, and provided it to Solomon-Page, the competitor for whom they promptly began working.

60.    As a consequence of the foregoing, Ajilon has suffered and will continue to suffer irreparable loss.

## COUNT VII

## CIVIL CONSPIRACY

61.    The allegations of Paragraphs 1 through 60 are incorporated herein by reference with the same force and effect as if set forth in full below.

62.    Defendants formed an agreement and jointly participated in unlawful acts, including violating Ajilon's contractual, statutory and common law rights, as described *supra*.

63.    The foregoing conduct of Defendants was performed with the intent to injure Ajilon, and was without justification or privilege.

64.    Defendants engaged in overt unlawful acts and conduct that violated Ajilon's contractual and common law rights.  This caused actual harm to Ajilon.

65.    By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above described wrongful conduct and harm caused to Ajilon thereby, each Defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-articulated acts committed by each Defendant/co-conspirator.

66.    As a consequence of the foregoing, Ajilon has suffered and will continue to suffer irreparable harm and loss.  Unless enjoined as requested herein,

Defendants will persist in their wrongful and unlawful activities, and Ajilon will continue to be irreparably harmed.

## COUNT VIII

### UNJUST ENRICHMENT

67.    The allegations of Paragraphs 1 through 66 are incorporated herein by reference with the same force and effect as if set forth in full below.

68.    The foregoing conduct of Defendants has resulted in Defendants being unjustly enriched by possessing and utilizing Ajilon's confidential trade secret information.

69.    As a consequence of the foregoing, Ajilon has suffered, and will continue to suffer, irreparable harm and loss. Unless enjoined as requested herein, Defendants will persist in their wrongful and unlawful activities, and Ajilon will continue to be irreparably harmed.

WHEREFORE, unless Defendants are temporarily and permanently enjoined from the foregoing conduct, Ajilon will be irreparably harmed by:

(a)    The disclosure of trade secrets, client lists, and other confidential information which are solely the property of Ajilon;

(b)    The loss of confidentiality of the information contained in Ajilon's records and of Ajilon's trade secrets, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(c)    The threat to enforcement of reasonable contracts; and

(d)     Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

WHEREFORE, Ajilon respectfully requests that this Court grant the following relief:

(a)     Issue Preliminary and Permanent Injunctions of the type requested;

(b)     Award compensatory damages to Ajilon in an amount to be determined at trial;

(c)     Award attorneys' fees and costs of this action to Ajilon, in accordance with the terms of Defendants' Employment Agreements.  Exhibit B at page 4; Exhibits C and D at page 6.

(d)     Award such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable as of right.


Respectfully submitted,

Schnader Harrison Segal & Lewis LLP


By:     _____/s/____Benjamin W. Hahn_____
Benjamin W. Hahn (Bar No. 446270)
2001 Pennsylvania Ave. N.W., Suite 300
Washington, DC 20006-1825
Telephone: (202) 419-4242
Email: bhahn@schnader.com

Counsel for Plaintiff Ajilon Professional Staffing, LLC

07 cv 1281
RJL

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Ajilon Professional Staffing, LLC | Joshua Kubicki <br> Kimberly Danowski <br> Jon Pomykala |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF <br> (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT <br> (IN U.S. PLAINTIFF CASES ONLY) ___Montgomery, MD___ <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF <br> LAND INVOLVED |
|---|---|

30803
Bergen, N.J.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Benjamin W. Hahn
Schnader Harrison Segal & Lewis LLP
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 20006-1825
202-419-4242

Case: 1:07-cv-01281
Assigned To : Leon, Richard J.
Assign. Date : 7/18/2007
Description: TRO/PI

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ● 2 | Incorporated and Principal Place of Business in Another State | ● 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ● D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury <br> ☐ 362 Medical Malpractice <br> ☐ 365 Product Liability <br> ☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act <br><br> **Social Security:** <br> ☐ 861 HIA ((1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g) <br> **Other Statutes** <br> ☐ 891 Agricultural Acts <br> ☐ 892 Economic Stabilization Act <br> ☐ 893 Environmental Matters <br> ☐ 894 Energy Allocation Act <br> ☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment. <br><br> *(If Antitrust, then A governs)* |

| ○ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent, Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property <br><br> **Personal Property** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | **Bankruptcy** <br> ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br><br> **Prisoner Petitions** <br> ☐ 535 Death Penalty <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br><br> **Property Rights** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 840 Trademark <br><br> **Federal Tax Suits** <br> ☐ 870 Taxes (US plaintiff or defendant <br> ☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty** <br> ☐ 610 Agriculture <br> ☐ 620 Other Food &Drug <br> ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 630 Liquor Laws <br> ☐ 640 RR & Truck <br> ☐ 650 Airline Regs <br> ☐ 660 Occupational Safety/Health <br> ☐ 690 Other <br><br> **Other Statutes** <br> ☐ 400 State Reapportionment <br> ☐ 430 Banks & Banking <br> ☐ 450 Commerce/ICC Rates/etc. <br> ☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 490 Cable/Satellite TV <br> ☐ 810 Selective Service <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 875 Customer Challenge 12 USC 3410 <br> ☐ 900 Appeal of fee determination under equal access to Justice <br> ☐ 950 Constitutionality of State Statutes <br> ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

3

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 USC Section 1332, Diversity; Defendants have misappropriated Trade Secrets and Breached Employment Contracts

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** Over 75,000<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>YES ☒   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐   NO ☒    If yes, please complete related case form.

DATE  7/17/07    SIGNATURE OF ATTORNEY OF RECORD  _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

## EMPLOYMENT AGREEMENT
### DATED:

Ajilon Professional Staffing, LLC. doing business as Ajilon Finance, Ajilon Office, and Ajilon Legal (hereinafter referred to as "AJILON" or "Employer"), and _____ (hereinafter referred to as "Employee"), currently residing at _____ hereby agree to the following:

**1. EMPLOYMENT:** The Employer hereby employs the Employee, and the Employee hereby accepts employment upon the terms and conditions hereinafter set forth.

**2. EMPLOYMENT AGREEMENT:** The Employee expressly represents that he/she agreed to enter into an Employment Agreement with AJILON when he/she accepted AJILON's offer of employment. In the event that the Employment Agreement is executed subsequent to the Employee's commencement date, the Employee hereby acknowledges and agrees that the restrictions imposed upon him/her herein shall nevertheless relate to the Employee's entire employment period notwithstanding the fact that the Agreement is executed subsequent to the Employee's commencement date. The Employee acknowledges and agrees that he/she hereby enters and executes this Agreement of his/her own volition, intending to be legally bound hereby, and in consideration of continued employment with Employer, pursuant to and in accordance with the terms of this Agreement.

**3. TERM:** Starting _____, I will be employed by AJILON in the position of Recruiter. If my position changes, this agreement shall continue to apply. I understand that my employment is **employment-at-will** which means that my employment can be terminated with or without notice, and with or without cause or for no cause, at any time at my option or the option of AJILON.

**4. INTRODUCTORY PERIOD:** The first 180 days of continuous employment by AJILON shall constitute an introductory period.

**5. FRINGE BENEFITS:** The Employee shall receive fringe benefits as described on the Company's Flex Website and Group Plan Booklet then in effect, and the other terms and conditions of employment exclusive of those specified in this Employment Agreement, are set forth on the company's intranet. The Employee acknowledges that provisions of the Company intranet and Flex Website may be changed by the Employer on written notice to the Employee and such changes will modify this Agreement accordingly.

**6. CODE OF CONDUCT:** Employee is expected at all times to conduct him/herself in a professional manner, to promote the reputation and interest of AJILON. Employee shall make true reports as required from time to time by AJILON. Employee shall make available to AJILON any information relevant to AJILON's operations and planning and make suggestions that can benefit AJILON.

**7. SERVICES:** Employee shall loyally and conscientiously perform the duties assigned Employee in accordance with AJILON's policies and procedures, including without limitation the duties set forth for your position. Employee will not engage in any other business activity without the prior written consent of AJILON, which consent will not be unreasonably withheld.

Employee may invest in any enterprise providing such investment does not require Employee's services. If that enterprise is in competition with AJILON, Employee may not own directly or indirectly (through relatives, for example) more than one percent (1%) interest in such enterprise.

**8. AUTHORITY:** Employee shall have no authority to impose any obligation upon AJILON or to bind AJILON to the performance of any acts without AJILON's written permission.

**9. ACCESS TO, DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION:** The Employee recognizes and acknowledges that s/he has access to the identity of and information concerning the Employer's Clients and Candidates, including specifically, but not limited to, data contained in the Employer's secured databases and Web portals (including but not limited to Searcher, Ajility, A-Zone, Adecco CRMS, C-Net, MAD, and KPI). The Employee also recognizes that s/he has access to the Employer's specific marketing and training methods, techniques and guides, as well as the Employer's pricing, forms and internal operating systems and procedures.

The above constitutes the Employer's "Confidential Information," which is a valuable, special and unique asset of the Employer's business.

**Clients** are defined as individuals or entities that the Employer is assisting or has assisted with filling or attempting to fill a permanent or temporary employment vacancy.

**Candidates** are defined as individuals that the Employer has communicated with and secured information on that the Employer has placed or may place into positions of temporary or permanent employment with the Employer's clients.

The Employee will not, during or after the term of his/her employment, use the Employer's Confidential Information for his/her own purposes. In addition, the Employee will not disclose the Employer's Confidential Information to any person, firm, corporation, association, or other entity, for any reason or purpose whatsoever.

The Employee will not during the term of his/her employment, without the express written consent of the Employer, place the Employer's Confidential Information into personal computers or other personal data collection and storage devices that are not owned by the Employer. The Employee understands and agrees that s/he is not in any event permitted to copy any or all of the Employer's Confidential Information or to provide access to the Employer's Confidential Information to any other person except for another current employee of the Employer. The Employee shall, within a period of not more than two (2) business days, return any and all copies of the

Employer's Confidential Information to the Employer in the event the employment relationship between the Employer and the Employee is terminated by either party or at the specific request of the Employer at any time during the term of such employment.

The Employee hereby authorizes the Employer to inspect the Employee's personal computer(s) or other personal data collection and storage devices upon termination of the employment relationship between the parties or at any time during the term of such employment relationship in order to allow the Employer to determine whether the Employee has any of the Employer's Confidential Information. In the event of the termination of the employment relationship, the Employee agrees to fully cooperate with the Employer's effort to retrieve all of its Confidential Information from the Employee and the Employee agrees to allow the Employer to permanently remove any of the Employer's Confidential Information that exists on the Employee's personal computer(s) or other personal data collection and storage devices.

Upon termination of the employment relationship, the Employee also agrees that the Employer shall have the right to inspect any and all materials the Employee seeks to remove from the Employer's premises.

In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from:

    A.   disclosing the Employer's Confidential Information; or

    B.   rendering any services to any person, firm, corporation, association, or other entity to whom the Employer's Confidential Information has been disclosed, in whole or in part, or is threatened to be disclosed, by the Employee.

**10. LIMITATION ON COMPETITIVE ACTIVITIES:** For a period of one (1) year after the termination of his/her employment with the Employer, the Employee will not engage in any competitive activities within thirty-five (35) miles from the present office(s) of the Employer at which the Employee is employed or from any other office where the employee was employed over the last twelve (12) months of employment.

Competitive activities are specifically defined as directly or indirectly owning, managing, operating, controlling, participating in, being employed by consulting, advising or being connected in any way with a similar Staffing Service.

A Staffing Service is defined as a person or entity engaged in the recruitment of individuals for positions of temporary or permanent employment with other individuals or entities or the placement of individuals into positions of temporary or permanent employment with other individuals or entities.

For employees with responsibilities relating to the Employer's Ajilon Finance line of business, a similar Staffing Service shall be defined as a Staffing Service that places financial personnel including but not limited to Chief Financial Officers, Controllers, other financial executives, accountants, bookkeepers, and accounting clerks. For employees with responsibilities relating to the Employer's Ajilon Office line of business, a similar Staffing Service shall be defined as a Staffing Service that places administrative, support and/or customer service personnel including but not limited to executive assistants, administrative assistants, executive receptionists, customer service specialists, project managers, and other executive support personnel. For employees with responsibilities relating to the Employer's Ajilon legal line of business, a similar Staffing Service shall be defined as a Staffing Service that places legal services personnel including but not limited to attorneys, paralegals, legal secretaries, legal assistants and compliance officers.

The Employee acknowledges that s/he may have responsibilities relating to more than one of the Employer's lines of business and the above restriction on competitive activities applies to any lines of business that s/he had responsibilities in during the eighteen (18) months prior to the termination of his/her employment.

**11. LIMITATION ON SOLICITATION OF CLIENTS:** The Employee agrees that the Employer has invested substantial resources, time and effort to identify, obtain, and retain the Employer's Clients, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Clients.

Therefore, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Clients that conducted business with the office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

Moreover, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Clients that the Employee had contact with during the two (2) years preceding the termination of his/her employment.

The Employee agrees that a written statement by any Client stating that the Employee solicited him/her/it shall be conclusive evidence of a breach of this Paragraph 11.

**12. LIMITATION ON SOLICITATION OF CANDIDATES:** The Employee agrees that the Employer has invested substantial time, resources and effort to identify, obtain and retain the Employer's Candidates, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Candidates.

Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that had contact with the branch office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

Moreover, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that the Employee had contact with during the two (2) years preceding the termination of his/her employment.

The Employee agrees that a written statement by any Candidate stating that the Employee solicited him or her shall be conclusive evidence of a breach of this Paragraph 12.

**13. LIMITATION ON SOLICITATION OF EMPLOYEES:** The Employee agrees that the Employer has invested substantial resources, time and effort in assembling and training its staff of regular employees as well as its pool of temporary employees. Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's regular or temporary employees for employment with any person or entity.

**14. EFFECT OF BREACH ON TERMS OF LIMITATIONS:** Any month in which a breach of a limitation contained in Paragraphs 10, 11, 12 or 13 occurs shall not count toward the one (1) year term of limitation contained in Paragraphs 10, 11, 12 and 13.

**15. INJUNCTIVE RELIEF:** In the event of an actual or threatened breach by the Employee of the provisions of Paragraphs 9, 10, 11, 12 or 13, the Employer shall be entitled to an injunction enforcing the terms of Paragraphs 9, 10, 11, 12 or 13 and restraining further violations thereof. Nothing herein stated shall be construed as prohibiting the Employer from pursuing any other remedies available to the Employer arising from such breach or threatened breach, including the recovery of damages from the Employee.

**16. NOTICE TO SUBSEQUENT EMPLOYERS:** The Employee hereby authorizes the Employer to provide a copy of this Agreement to any and all future employers of the Employee, and to notify any and all such future employers of the Employee that the Employer intends to exercise its legal rights arising out of or in connection with this Agreement and/or any breach or any inducement of a breach thereof.

**17. PARTIAL INVALIDITY:** If any provision of this agreement is held illegal, invalid or unenforceable, and cannot be revised to be made legal, valid or enforceable in accordance with Paragraph 24 below, the parties agree that the remaining provisions of the Agreement shall remain in full force and effect.

**18. USE OF EMPLOYEE'S NAME IN ADVERTISING:** Employee agrees to allow the Employer to use his/her name in direct mail advertising during the period of employment and if employment is terminated until such time as the remaining printed materials on hand bearing the Employees name are used up, but not to exceed a period of two years following termination of employment.

**19. DRIVER'S RELEASE:** The Employee hereby represents and warrants that he/she will maintain adequate automobile liability coverage in the event that he/she is required to drive his/her own automobile in connection with his/her job. The Employee understands that the Employer does not provide insurance coverage for any damage which may occur to Employee's automobile, the property of another or to another individual in the course of the Employee driving his/her own vehicle for business purposes.

**20. EMPLOYMENT-AT-WILL/TERMINATION:** Employment may be terminated at any time, with or without cause and with or without notice, at the option of either AJILON or the Employee. Upon termination, the Employee will immediately deliver to AJILON all material and monies which may be in his/her possession or control and which belong to AJILON or were created in the course of AJILON's business. In the event of an Employee's voluntary or involuntary termination, commissions due from temporary billings will be paid through date of termination and commissions due from outstanding permanent billings will be paid on a cash-in basis ninety (90) days from the placement(s) start date(s), in the next commission cycle, provided the following criteria are met. Commissions from permanent billings will only be paid on placements with start dates prior to the Employee's termination date and based upon applicable cash-in received during the 30 days immediately subsequent to the Employee's termination date. As an example, if employment terminates on December 10th, commissions will only be paid on placements that started before December 10th and would be based upon cash-in received during the period beginning December 11th and ending January 11th (30 days thereafter). Therefore, no commissions will be paid at any time on any cash-in received subsequent to thirty days after the Employee's termination. Additionally, no permanent placement commissions will be paid based upon any "fall-offs" (placements who do not complete the Employer's guarantee period). Subsequent to Employee's termination, Employee agrees to refrain from the wrongful use of Employers name as well as any trade names used by the Employer, such as, but not limited to, AJILON FINANCE, AJILON OFFICE, and AJILON LEGAL; Employee therefore shall not indicate on any stationery, business card or advertising, solicitation or other business materials that he/she is or was formerly an Employee of Employer or of any division or subsidiary of Employer except in the bona fide submission of resumes and the filling out of applications in the course of seeking employment.

**21. ARBITRATION:** All disputes arising from termination of employment, including the attempted application of any federal, state or local statute, law, ordinance, rule or regulation thereto (including but not limited to statutes, laws, ordinance, rules or regulations dealing with employment or other discrimination) shall be resolved by binding arbitration under the auspices of the Federal Mediation and Conciliation Service, if available, and if not available, then under the American Arbitration Association's Model Employment Arbitration Procedures. The decision of the arbitrator shall be final and binding upon both the Employer and the Employee. Disputes other than those arising from termination of employment, are not arbitrable. It is specifically agreed that any actions to enforce the provisions of Paragraphs 10 and 11 of this Employment Agreement are not subject to Arbitration.

**22. NOTICES:** All notices shall be in writing. If to Employee at employee's last known address: if to AJILON, at the company headquarters (Park 80 West – Plaza II, 9th Floor, Saddle Brook, NJ 07663, Attention: President) with a copy to Employee's manager.

**23. GOVERNING LAWS:** This Agreement is governed by, and shall be interpreted in accordance with, the laws of the State of New Jersey.

**24. BLUE LINING:** If, at the time of enforcement of Paragraphs 9, 10, 11, 12, or 13, a court holds that the restrictions stated herein are unreasonable under the circumstances or contrary to law then existing, the parties agree that the maximum time-period, scope or geographic area reasonable under such circumstances or allowable under law then existing shall be substituted for the stated time-period, scope or geographic area, and that the court shall be allowed to revise the restrictions contained herein to the maximum period, scope and area permitted by law.

**25. LEGAL EXPENSES:** In the event that legal action is instituted by either party to enforce this Agreement against the other, the prevailing party will be entitled to be reimbursed for all reasonable legal and other costs incurred in such action.

**26. DETERMINATION:** Final decisions or interpretations in connection with the intent of this Agreement shall be made by AJILON.

**27. CONFIDENTIAL AGREEMENT:** Employee agrees to keep the content of this Agreement confidential and to only discuss it with his/her management.

**28. SUCCESSORS:** The rights and/or duties under this Agreement may be assigned or delegated to any successor of AJILON, but none of the Employee's rights or duties hereunder shall be assigned by Employee to any third party.

**29. COMPLETE AGREEMENT:** This is the complete and exclusive statement of the terms of the Agreement between the Employer and the Employee concerning employment and there are no other express or implied agreements or representations, either written or oral. No one on behalf of the Employer other than a Vice President, Chief Operating Officer, or President of the Division is authorized to modify this Agreement, enter into any other agreement, or make any representation to the Employee concerning the Employee's employment. All modifications to this Agreement must be in writing signed by the Employee and a Vice President, Chief Operating Officer or Division President. This Agreement cancels and supersedes any previously dated Employment Agreement with AJILON or any of its associated companies and the Employee expressly represents and warrants that he/she has not previously entered into any Agreements with any other company or assumed any obligations inconsistent with those of this Agreement. No one is authorized to waive any provision of this Agreement except by way of a writing signed by a Vice President, Chief Operating Officer or President of the Division.

I hereby agree to all of the provisions
of this Agreement:

Date

*Ajilon Professional Staffing, LLC. doing business as*
*Ajilon Finance, Ajilon Office, and Ajilon Legal*

Human Resources

Date

Sept-04                                          6

## EMPLOYMENT AGREEMENT
### DATED: April 22, 2004

Ajilon Professional Staffing, LLC. doing business as Ajilon Finance, Ajilon Office, and Ajilon Legal (hereinafter referred to as "AJILON" or "Employer"), and Joshua Paul Kubicki (hereinafter referred to as "Employee"),  currently residing at 1714 North Quincy Street, Arlington, VA 22207, hereby agree to the following:

**1. EMPLOYMENT:** The Employer hereby employs the Employee, and the Employee hereby accepts employment upon the terms and conditions hereinafter set forth.

**2. EMPLOYMENT AGREEMENT:** The Employee expressly represents that he/she agreed to enter into an Employment Agreement with AJILON when he/she accepted AJILON's offer of employment. In the event that the Employment Agreement is executed subsequent to the Employee's commencement date, the Employee hereby acknowledges and agrees that the restrictions imposed upon him/her herein shall nevertheless relate to the Employee's entire employment period notwithstanding the fact that the Agreement is executed subsequent to the Employee's commencement date. The Employee acknowledges and agrees that he/she hereby enters and executes this Agreement of his/her own volition, intending to be legally bound hereby, and in consideration of continued employment with Employer, pursuant to and in accordance with the terms of this Agreement.

**3. TERM:** Starting May 10, 2004, I will be employed by AJILON in the position of Branch Manager. If my position changes, this agreement shall continue to apply.  I understand that my employment is **employment-at-will** which means that my employment can be terminated with or without notice, and with or without cause or for no cause, at any time at my option or the option of AJILON.

**4. INTRODUCTORY PERIOD:** The first 180 days of continuous employment by AJILON shall constitute an introductory period.

**5. FRINGE BENEFITS:** The Employee shall receive fringe benefits as described on the Company's Flex Website and Group Plan Booklet then in effect, and the other terms and conditions of employment exclusive of those specified in this Employment Agreement, are set forth on the company's intranet.  The Employee acknowledges that provisions of the Company intranet and Flex Website may be changed by the Employer on written notice to the Employee and such changes will modify this Agreement accordingly.

**6. CODE OF CONDUCT:** Employee is expected at all times to conduct him/herself in a professional manner, to promote the reputation and interest of AJILON. Employee shall make true reports as required from time to time by AJILON. Employee shall make available to AJILON any information relevant to AJILON's operations and planning and make suggestions that can benefit AJILON.

**7. SERVICES:**  Employee shall loyally and conscientiously perform the duties assigned Employee in accordance with AJILON's policies and procedures, including without limitation the duties set forth in Schedule B attached hereto and incorporated herein by reference. Employee will not engage in any other business activity without the prior written consent of AJILON, which consent will not be unreasonably withheld.

Employee may invest in any enterprise providing such investment does not require Employee's services. If that enterprise is in competition with AJILON, Employee may not own directly or indirectly (through relatives, for example) more than one percent (1%) interest in such enterprise.

**8. AUTHORITY:** Employee shall have no authority to impose any obligation upon AJILON or to bind AJILON to the performance of any acts without AJILON's written permission.

**9. ACCESS TO, DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION:** The Employee recognizes and acknowledges that he/she has access to the list of Employer's clients and applicants (i.e., client companies and Accountants/Bookkeepers, etc.) as it may exist from time to time, the Employer's specific advertising and marketing techniques (including Direct Mail pieces, Yellow Page Advertising, and Cold and Warm Calling Techniques), as well as the Employer's forms and internal operating systems and procedures. The above constitutes "Confidential Information", which is a valuable, special and unique asset of the Employer's business.

The Employee will not, during or after the term of his/her employment, use for his/her own purposes such list of the Employer's clients and applicants, the Employer's specific advertising and marketing techniques, or the Employer's forms and internal operating systems and procedures. In addition, the Employee will not disclose the above list, advertising and marketing techniques, or the Employer's forms and internal operating systems and procedures to any person, member of his family, firm, corporation, association, or other entity, for any reason or purpose whatsoever.
The employee will not during the term of his/her employment, without the express written consent of the employer, place company confidential information as defined herein, including client names, addresses, contacts, and candidate information, into personal computers or other data collection mechanisms that are not owned and operated by the employer. Employee understands and agrees that he/she is not in any event permitted to copy any or all of such company confidential information or to provide access to that information to any other person

1/03

2

except for another AJILON Employee. Employee shall within a period of not more than two (2) business days return any and all copies of such company confidential information to the Employer in the event the employment relationship as between Employer and Employee is terminated by either party or at the specific request of the Employer at any time during the term of such employment.

Employee hereby authorizes the Employer to take possession of the Employee's said equipment upon termination of the employment relationship as between the parties hereto or at any time during the term of such employment relationship in order to allow the Employer to retrieve its said company confidential information; Employee agrees to fully cooperate with Employer in terms of a cooperative effort to enable the Employer to effect the retrieval of all of its said company confidential information.

In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from the following:

A)   Disclosing , in whole or in part, the list of the Employer's clients and applicants, the Employer's specific advertising and marketing techniques or the Employer's forms and internal operating systems and procedures; or
B)   Rendering any services to any person, member of his family, firm, corporation, association, or other entity to whom such list, advertising and marketing techniques or forms and internal operating systems and procedures have been disclosed, in whole or in part, or are threatened to be disclosed.

**10. RESTRICTIVE COVENANT-LIMITATION ON COMPETITION AFTER EMPLOYMENT TERMINATION:** For a period of one year after the termination of this Agreement, Employee will not, within a radius of fifty (50) miles from the present place of business of the Employer, or any other office of a company affiliated with the Employer, such as, but not limited to a franchise, authorized representative, etc., directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of any business similar  to the type of business conducted by Employer. Similar is specifically defined as another Employment Agency or Temporary Help Service placing primarily Temporary and/or Permanent Financial Personnel, i.e., Financial Executives, Accountants, Bookkeepers, Accounting Clerks, etc., or a General Employment Agency or Temporary Help Service by whom Employee is employed to place primarily Temporary and/or Permanent Financial Personnel. For employees of Employer's Office placement division, similar shall also specifically be defined as another Employment Agency placing primarily temporary and/or permanent administrative, support and/or creative services personnel. For employees of Employer's Legal division, similar shall also specifically be defined as another Employment Agency placing primarily temporary and/or permanent legal services personnel.

**A. LIMITATION ON SOLICITATION OF CUSTOMERS AND APPLICANTS:** For a period of one year immediately following the termination of employment with Employer, Employee shall not directly or indirectly solicit Employer's customers or Employer's applicants for temporary employee assignments or permanent employee placements. This limitation shall apply to all customers and applicants known to Employee to be Employer's, to those that have applied or done business with Employer within one year before Employee's termination of employment as well as those prospective customers from whom Employee solicited business while in the employ of Employer. All customers, prospective customers and applicants with whom Employee had any personal contact during his/her employment with Employer will be conclusively deemed to be known to Employee as customers, prospective customers and applicants of the Employer. Solicitation of Employer's customers, prospective customers and applicants shall be conclusive if Employee refers to his/her affiliation with Employer in any communication to actual or prospective customers or applicants of any other personnel service, regardless of whether the communication is directed solely or primarily to Employer's customers or applicants. Employee agrees that a written statement by any customer, prospective customer or applicant of the Employer stating that Employee solicited him/her/it shall be conclusive evidence of a breach of this Paragraph 10A.

**B. LIMITATION ON SOLICITATION OF EMPLOYEES:**  Employee agrees that Employer has invested substantial time and effort in assembling its staff of regular personnel as well as its pool of temporary employees. During and for a period of one year immediately following the termination of employment with Employer, Employee shall not directly or indirectly solicit Employer's regular or temporary employees for employment with any person or firm other than for Employer, except in connection with permanent placements made in the proper course of Employee's employment with Employer.

**C. EFFECT OP BREACH ON TERMS OF LIMITATIONS:** Any month in which a breach of a limitation contained in this Paragraph 10 occurs shall not count toward the one year term of that limitation.
In the event of an actual or threatened breach by Employee of the provisions of this Paragraph 10, Employer shall be entitled to an injunction restraining Employee from owning, managing, operating, controlling, being employed by, participating in, or being in any way so connected with any business similar to the type of business conducted by Employer at the time of the termination of this Agreement. Nothing herein stated shall be construed as prohibiting

1/03

3

Employer from pursuing any other remedies available to Employer from such breach or threatened breach, including the recovery of damages from Employee.

In the event a court of competent jurisdiction should conclude that the specific time and/or distance parameters specified above are unreasonable under the circumstances and therefore unenforceable, then and in that event the parties agree to be bound by those distances and/or time parameters or restrictions which the court should ultimately determine to in fact be reasonable under the circumstances.

**D. NOTICE TO SUBSEQUENT EMPLOYERS:** Employee hereby authorizes Employer to provide a copy of this Agreement to any and all future employers of Employee, and to notify any and all such future employers of Employee that Employer intends to exercise its legal rights arising out of or in connection with this Agreement and/or any breach or any inducement of a breach thereof.

**11. USE OF EMPLOYEE'S NAME IN ADVERTISING:** Employee agrees to allow the Employer to use his/her name in direct mail advertising during the period of employment and if employment is terminated until such time as the remaining printed materials on hand bearing the Employees name are used up, but not to exceed a period of two years following termination of employment.

**12. DRIVER'S RELEASE:** The Employee hereby represents and warrants that he/she will maintain adequate automobile liability coverage in the event that he/she is required to drive his/her own automobile in connection with his/her job. The Employee understands that the Employer does not provide insurance coverage for any damage which may occur to Employee's automobile, the property of another or to another individual in the course of the Employee driving his/her own vehicle for business purposes.

**13. EMPLOYMENT-AT-WILL/TERMINATION:** Employment may be terminated at any time, with or without cause and with or without notice, at the option of either AJILON or the Employee. Upon termination, the Employee will immediately deliver to AJILON all material and monies which may be in his/her possession or control and which belong to AJILON or were created in the course of AJILON's business. In the event of an Employee's voluntary or involuntary termination, commissions due from temporary billings will be paid through date of termination and commissions due from outstanding permanent billings will be paid on a cash-in basis ninety (90) days from the placement(s) start date(s), in the next commission cycle, provided the following criteria are met. Commissions from permanent billings will only be paid on placements with start dates prior to the Employee's termination date and based upon applicable cash-in received during the 30 days immediately subsequent to the Employee's termination date. As an example, if employment terminates on December 10th, commissions will only be paid on placements that started before December 10th and would be based upon cash-in received during the period beginning December 11th and ending January 11th (30 days thereafter). Therefore, no commissions will be paid at any time on any cash-in received subsequent to thirty days after the Employee's termination. Additionally, no permanent placement commissions will be paid based upon any "fall-offs" (placements who do not complete the Employer's guarantee period). Subsequent to Employee's termination, Employee agrees to refrain from the wrongful use of Employers name as well as any trade names used by the Employer, such as, but not limited to, AJILON FINANCE, AJILON OFFICE, and AJILON LEGAL; Employee therefore shall not indicate on any stationery, business card or advertising, solicitation or other business materials that he/she is or was formerly an Employee of Employer or of any division or subsidiary of Employer except in the bona fide submission of resumes and the filling out of applications in the course of seeking employment.

**14. ARBITRATION:** All disputes arising from termination of employment, including the attempted application of any federal, state or local statute, law, ordinance, rule or regulation thereto (including but not limited to statutes, laws, ordinance, rules or regulations dealing with employment or other discrimination) shall be resolved by binding arbitration under the auspices of the Federal Mediation and Conciliation Service, if available, and if not available, then under the American Arbitration Association's Model Employment Arbitration Procedures. The decision of the arbitrator shall be final and binding upon both the Employer and the Employee. Disputes other than those arising from termination of employment, are not arbitrable. It is specifically agreed that any actions to enforce the provisions of Paragraphs 10 and 11 of this Employment Agreement are not subject to Arbitration.

**15. NOTICES:** All notices shall be in writing. If to Employee at employee's last known address: if to AJILON, at the company headquarters (Park 80 West - Plaza II, 9th Floor, Saddle Brook, NJ 07663, Attention: President) with a copy to Employee's manager.

**16. GOVERNING LAWS:** This Agreement is entered into and executed in the County of Bergen, State of New Jersey. This Agreement will be governed by the laws of the State of New Jersey.

**17. LEGAL EXPENSES:** In the event that legal action is instituted by either party to enforce this Agreement against the other, the prevailing party will be entitled to be reimbursed for all reasonable legal and other costs incurred in such action.

1/03

**18. DETERMINATION:** Final decisions or interpretations in connection with the intent or this Agreement shall be made by AJILON.

**19. CONFIDENTIAL AGREEMENT:** Employee agrees to keep the content of this Agreement confidential and to only discuss it with his/her management.

**20. PARTIAL INVALIDITY:** If any provision of this Agreement is held illegal, invalid, or unenforceable, the remaining provisions of the Agreement shall remain in full force and effect. If necessary, the Agreement will then be amended to restore the original intended purposes and rights of the parties.

**21. SUCCESSORS:** The rights and/or duties under this Agreement may be assigned or delegated to any successor of AJILON, but none of the Employee's rights or duties hereunder shall be assigned by Employee to any third party.

**22. COMPLETE AGREEMENT:** This is the complete and exclusive statement of the terms of the Agreement between the Employer and the Employee concerning employment and there are no other express or implied agreements or representations, either written or oral. No one on behalf of the Employer other than a Vice President, Chief Operating Officer, or President of the Division is authorized to modify this Agreement, enter into any other agreement, or make any representation to the Employee concerning the Employee's employment. All modifications to this Agreement must be in writing signed by the Employee and a Vice President, Chief Operating Officer or Division President. This Agreement cancels and supersedes any previously dated Employment Agreement with AJILON or any of its associated companies and the Employee expressly represents and warrants that he/she has not previously entered into any Agreements with any other company or assumed any obligations inconsistent with those of this Agreement. No one is authorized to waive any provision of this Agreement except by way of a writing signed by a Vice President, Chief Operating Officer or President of the Division.

I hereby agree to all of
the provisions of this
Agreement.

_____
Employee

_____
4/28/04        Date

*Ajilon Professional Staffing, LLC. doing
business as Ajilon Finance, Ajilon Office,
and Ajilon Legal*

_____
Human Resources

_____
5/21/04        Date

1/03

5

## EMPLOYMENT AGREEMENT
### DATED: August 15, 2005

Ajilon Professional Staffing, LLC. doing business as Ajilon Finance, Ajilon Office, and Ajilon Legal (hereinafter referred to as "AJILON" or "Employer"), and Kimberly Danowski (hereinafter referred to as "Employee"), currently residing at 8510 16th Street, Apt. 401, Silver Spring, MD 20910 hereby agree to the following:

**1. EMPLOYMENT:** The Employer hereby employs the Employee, and the Employee hereby accepts employment upon the terms and conditions hereinafter set forth.

**2. EMPLOYMENT AGREEMENT:** The Employee expressly represents that he/she agreed to enter into an Employment Agreement with AJILON when he/she accepted AJILON's offer of employment. In the event that the Employment Agreement is executed subsequent to the Employee's commencement date, the Employee hereby acknowledges and agrees that the restrictions imposed upon him/her herein shall nevertheless relate to the Employee's entire employment period notwithstanding the fact that the Agreement is executed subsequent to the Employee's commencement date. The Employee acknowledges and agrees that he/she hereby enters and executes this Agreement of his/her own volition, intending to be legally bound hereby, and in consideration of continued employment with Employer, pursuant to and in accordance with the terms of this Agreement.

**3. TERM:** Starting Monday, August 15, 2005 I will be employed by AJILON in the position of Account Executive. If my position changes, this agreement shall continue to apply. I understand that my employment is **employment-at-will** which means that my employment can be terminated with or without notice, and with or without cause or for no cause, at any time at my option or the option of AJILON.

**4. INTRODUCTORY PERIOD:** The first 180 days of continuous employment by AJILON shall constitute an introductory period.

**5. FRINGE BENEFITS:** The Employee shall receive fringe benefits as described on the Company's Flex Website and Group Plan Booklet then in effect, and the other terms and conditions of employment exclusive of those specified in this Employment Agreement, are set forth on the company's intranet. The Employee acknowledges that provisions of the Company intranet and Flex Website may be changed by the Employer on written notice to the Employee and such changes will modify this Agreement accordingly.

**6. CODE OF CONDUCT:** Employee is expected at all times to conduct him/herself in a professional manner, to promote the reputation and interest of AJILON. Employee shall make true reports as required from time to time by AJILON. Employee shall make available to AJILON any information relevant to AJILON's operations and planning and make suggestions that can benefit AJILON.

**7. SERVICES:** Employee shall loyally and conscientiously perform the duties assigned Employee in accordance with AJILON's policies and procedures, including without limitation the duties set forth for your position. Employee will not engage in any other business activity without the prior written consent of AJILON, which consent will not be unreasonably withheld.

Employee may invest in any enterprise providing such investment does not require Employee's services. If that enterprise is in competition with AJILON, Employee may not own directly or indirectly (through relatives, for example) more than one percent (1%) interest in such enterprise.

**8. AUTHORITY:** Employee shall have no authority to impose any obligation upon AJILON or to bind AJILON to the performance of any acts without AJILON's written permission.

**9. ACCESS TO, DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION:** The Employee recognizes and acknowledges that s/he has access to the identity of and information concerning the Employer's Clients and Candidates, including specifically, but not limited to, data contained in the Employer's secured databases and Web portals (including but not limited to Searcher, Ajility, A-Zone, Adecco CRMS, C-Net, MAD, and KPI). The Employee also recognizes that s/he has access to the Employer's specific marketing and training methods, techniques and guides, as well as the Employer's pricing, forms and internal operating systems and procedures.

The above constitutes the Employer's "Confidential Information," which is a valuable, special and unique asset of the Employer's business.

**Clients** are defined as individuals or entities that the Employer is assisting or has assisted with filling or attempting to fill a permanent or temporary employment vacancy.

**Candidates** are defined as individuals that the Employer has communicated with and secured information on that the Employer has placed or may place into positions of temporary or permanent employment with the Employer's clients.

The Employee will not, during or after the term of his/her employment, use the Employer's Confidential Information for his/her own purposes. In addition, the Employee will not disclose the Employer's Confidential Information to any person, firm, corporation, association, or other entity, for any reason or purpose whatsoever.

The Employee will not during the term of his/her employment, without the express written consent of the Employer, place the Employer's Confidential Information into personal computers or other personal data collection and storage devices that are not owned by the Employer. The Employee understands and agrees that s/he is not in any event permitted to copy any or all of the Employer's Confidential Information or to provide access to the Employer's Confidential Information to any other person except for another current employee of the Employer. The Employee shall, within a period of not more than two (2) business days, return any and all copies of the

Employer's Confidential Information to the Employer in the event the employment relationship between the Employer and the Employee is terminated by either party or at the specific request of the Employer at any time during the term of such employment.

The Employee hereby authorizes the Employer to inspect the Employee's personal computer(s) or other personal data collection and storage devices upon termination of the employment relationship between the parties or at any time during the term of such employment relationship in order to allow the Employer to determine whether the Employee has any of the Employer's Confidential Information. In the event of the termination of the employment relationship, the Employee agrees to fully cooperate with the Employer's effort to retrieve all of its Confidential Information from the Employee and the Employee agrees to allow the Employer to permanently remove any of the Employer's Confidential Information that exists on the Employee's personal computer(s) or other personal data collection and storage devices.

Upon termination of the employment relationship, the Employee also agrees that the Employer shall have the right to inspect any and all materials the Employee seeks to remove from the Employer's premises.

In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from:

    A.  disclosing the Employer's Confidential Information; or

    B.  rendering any services to any person, firm, corporation, association, or other entity to whom the Employer's Confidential Information has been disclosed, in whole or in part, or is threatened to be disclosed, by the Employee.

**10. LIMITATION ON COMPETITIVE ACTIVITIES:** For a period of one (1) year after the termination of his/her employment with the Employer, the Employee will not engage in any competitive activities within thirty-five (35) miles from the present office(s) of the Employer at which the Employee is employed or from any other office where the employee was employed over the last twelve (12) months of employment.

Competitive activities are specifically defined as directly or indirectly owning, managing, operating, controlling, participating in, being employed by consulting, advising or being connected in any way with a similar Staffing Service.

A Staffing Service is defined as a person or entity engaged in the recruitment of individuals for positions of temporary or permanent employment with other individuals or entities or the placement of individuals into positions of temporary or permanent employment with other individuals or entities.

For employees with responsibilities relating to the Employer's Ajilon Finance line of business, a similar Staffing Service shall be defined as a Staffing Service that places financial personnel including but not limited to Chief Financial Officers, Controllers, other financial executives, accountants, bookkeepers, and accounting clerks. For employees with responsibilities relating to the Employer's Ajilon Office line of business, a similar Staffing Service shall be defined as a Staffing Service that places administrative, support and/or customer service personnel including but not limited to executive assistants, administrative assistants, executive receptionists, customer service specialists, project managers, and other executive support personnel. For employees with responsibilities relating to the Employer's Ajilon legal line of business, a similar Staffing Service shall be defined as a Staffing Service that places legal services personnel including but not limited to attorneys, paralegals, legal secretaries, legal assistants and compliance officers.

The Employee acknowledges that s/he may have responsibilities relating to more than one of the Employer's lines of business and the above restriction on competitive activities applies to any lines of business that s/he had responsibilities in during the eighteen (18) months prior to the termination of his/her employment.

**11. LIMITATION ON SOLICITATION OF CLIENTS:** The Employee agrees that the Employer has invested substantial resources, time and effort to identify, obtain, and retain the Employer's Clients, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Clients.

Therefore, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Clients that conducted business with the office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

Moreover, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Clients that the Employee had contact with during the two (2) years preceding the termination of his/her employment.

The Employee agrees that a written statement by any Client stating that the Employee solicited him/her/it shall be conclusive evidence of a breach of this Paragraph 11.

**12. LIMITATION ON SOLICITATION OF CANDIDATES:** The Employee agrees that the Employer has invested substantial time, resources and effort to identify, obtain and retain the Employer's Candidates, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Candidates.

Sept-04                                    4

Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that had contact with the branch office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

Moreover, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that the Employee had contact with during the two (2) years preceding the termination of his/her employment.

The Employee agrees that a written statement by any Candidate stating that the Employee solicited him or her shall be conclusive evidence of a breach of this Paragraph 12.

**13. LIMITATION ON SOLICITATION OF EMPLOYEES:** The Employee agrees that the Employer has invested substantial resources, time and effort in assembling and training its staff of regular employees as well as its pool of temporary employees. Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's regular or temporary employees for employment with any person or entity.

**14. EFFECT OF BREACH ON TERMS OF LIMITATIONS:** Any month in which a breach of a limitation contained in Paragraphs 10, 11, 12 or 13 occurs shall not count toward the one (1) year term of limitation contained in Paragraphs 10, 11, 12 and 13.

**15. INJUNCTIVE RELIEF:** In the event of an actual or threatened breach by the Employee of the provisions of Paragraphs 9, 10, 11, 12 or 13, the Employer shall be entitled to an injunction enforcing the terms of Paragraphs 9, 10, 11, 12 or 13 and restraining further violations thereof. Nothing herein stated shall be construed as prohibiting the Employer from pursuing any other remedies available to the Employer arising from such breach or threatened breach, including the recovery of damages from the Employee.

**16. NOTICE TO SUBSEQUENT EMPLOYERS:** The Employee hereby authorizes the Employer to provide a copy of this Agreement to any and all future employers of the Employee, and to notify any and all such future employers of the Employee that the Employer intends to exercise its legal rights arising out of or in connection with this Agreement and/or any breach or any inducement of a breach thereof.

**17. PARTIAL INVALIDITY:** If any provision of this agreement is held illegal, invalid or unenforceable, and cannot be revised to be made legal, valid or enforceable in accordance with Paragraph 24 below, the parties agree that the remaining provisions of the Agreement shall remain in full force and effect.

**18. USE OF EMPLOYEE'S NAME IN ADVERTISING:** Employee agrees to allow the Employer to use his/her name in direct mail advertising during the period of employment and if employment is terminated until such time as the remaining printed materials on hand bearing the Employees name are used up, but not to exceed a period of two years following termination of employment.

**19. DRIVER'S RELEASE:** The Employee hereby represents and warrants that he/she will maintain adequate automobile liability coverage in the event that he/she is required to drive his/her own automobile in connection with his/her job. The Employee understands that the Employer does not provide insurance coverage for any damage which may occur to Employee's automobile, the property of another or to another individual in the course of the Employee driving his/her own vehicle for business purposes.

**20. EMPLOYMENT-AT-WILL/TERMINATION:** Employment may be terminated at any time, with or without cause and with or without notice, at the option of either AJILON or the Employee. Upon termination, the Employee will immediately deliver to AJILON all material and monies which may be in his/her possession or control and which belong to AJILON or were created in the course of AJILON's business. In the event of an Employee's voluntary or involuntary termination, commissions due from temporary billings will be paid through date of termination and commissions due from outstanding permanent billings will be paid on a cash-in basis ninety (90) days from the placement(s) start date(s), in the next commission cycle, provided the following criteria are met. Commissions from permanent billings will only be paid on placements with start dates prior to the Employee's termination date and based upon applicable cash-in received during the 30 days immediately subsequent to the Employee's termination date. As an example, if employment terminates on December 10th, commissions will only be paid on placements that started before December 10th and would be based upon cash-in received during the period beginning December 11th and ending January 11th (30 days thereafter). Therefore, no commissions will be paid at any time on any cash-in received subsequent to thirty days after the Employee's termination. Additionally, no permanent placement commissions will be paid based upon any "fall-offs" (placements who do not complete the Employer's guarantee period). Subsequent to Employee's termination, Employee agrees to refrain from the wrongful use of Employers name as well as any trade names used by the Employer, such as, but not limited to, AJILON FINANCE, AJILON OFFICE, and AJILON LEGAL; Employee therefore shall not indicate on any stationery, business card or advertising, solicitation or other business materials that he/she is or was formerly an Employee of Employer or of any division or subsidiary of Employer except in the bona fide submission of resumes and the filling out of applications in the course of seeking employment.

**21. ARBITRATION:** All disputes arising from termination of employment, including the attempted application of any federal, state or local statute, law, ordinance, rule or regulation thereto (including but not limited to statutes, laws, ordinance, rules or regulations dealing with employment or other discrimination) shall be resolved by binding arbitration under the auspices of the Federal Mediation and Conciliation Service, if available, and if not available, then under the American Arbitration Association's Model Employment Arbitration Procedures. The decision of the arbitrator shall be final and binding upon both the Employer and the Employee. Disputes other than those arising from termination of employment, are not arbitrable. It is specifically agreed that any actions to enforce the provisions of Paragraphs 10 and 11 of this Employment Agreement are not subject to Arbitration.

**22. NOTICES:** All notices shall be in writing. If to Employee at employee's last known address: if to AJILON, at the company headquarters (Park 80 West - Plaza II, 9th Floor, Saddle Brook, NJ 07663, Attention: President) with a copy to Employee's manager.

**23. GOVERNING LAWS:** This Agreement is governed by, and shall be interpreted in accordance with, the laws of the State of New Jersey.

**24. BLUE LINING:** If, at the time of enforcement of Paragraphs 9, 10, 11, 12, or 13, a court holds that the restrictions stated herein are unreasonable under the circumstances or contrary to law then existing, the parties agree that the maximum time-period, scope or geographic area reasonable under such circumstances or allowable under law then existing shall be substituted for the stated time-period, scope or geographic area, and that the court shall be allowed to revise the restrictions contained herein to the maximum period, scope and area permitted by law.

**25. LEGAL EXPENSES:** In the event that legal action is instituted by either party to enforce this Agreement against the other, the prevailing party will be entitled to be reimbursed for all reasonable legal and other costs incurred in such action.

**26. DETERMINATION:** Final decisions or interpretations in connection with the intent of this Agreement shall be made by AJILON.

**27. CONFIDENTIAL AGREEMENT:** Employee agrees to keep the content of this Agreement confidential and to only discuss it with his/her management.

**28. SUCCESSORS:** The rights and/or duties under this Agreement may be assigned or delegated to any successor of AJILON, but none of the Employee's rights or duties hereunder shall be assigned by Employee to any third party.

**29. COMPLETE AGREEMENT:** This is the complete and exclusive statement of the terms of the Agreement between the Employer and the Employee concerning employment and there are no other express or implied agreements or representations, either written or oral. No one on behalf of the Employer other than a Vice President, Chief Operating Officer, or President of the Division is authorized to modify this Agreement, enter into any other agreement, or make any representation to the Employee concerning the Employee's employment. All modifications to this Agreement must be in writing signed by the Employee and a Vice President, Chief Operating Officer or Division President. This Agreement cancels and supersedes any previously dated Employment Agreement with AJILON or any of its associated companies and the Employee expressly represents and warrants that he/she has not previously entered into any Agreements with any other company or assumed any obligations inconsistent with those of this Agreement. No one is authorized to waive any provision of this Agreement except by way of a writing signed by a Vice President, Chief Operating Officer or President of the Division.

I hereby agree to all of the provisions of this Agreement:

_Kimberly Danowski_

8/15/05

Date

*Ajilon Professional Staffing, LLC. doing business as*
*Ajilon Finance, Ajilon Office, and Ajilon Legal*

Human Resources

10/05

Date

Sept-04                                   6

**EMPLOYMENT AGREEMENT**
**DATED: October 28, 2005**

Ajilon Professional Staffing, LLC. doing business as Ajilon Finance, Ajilon Office, and Ajilon Legal (hereinafter referred to as "AJILON" or "Employer"), and Jon Pomykala (hereinafter referred to as "Employee"), currently residing at 312 G Street, NE, Washington, DC 20002 hereby agree to the following:

**1. EMPLOYMENT:** The Employer hereby employs the Employee, and the Employee hereby accepts employment upon the terms and conditions hereinafter set forth.

**2. EMPLOYMENT AGREEMENT:** The Employee expressly represents that he/she agreed to enter into an Employment Agreement with AJILON when he/she accepted AJILON's offer of employment. In the event that the Employment Agreement is executed subsequent to the Employee's commencement date, the Employee hereby acknowledges and agrees that the restrictions imposed upon him/her herein shall nevertheless relate to the Employee's entire employment period notwithstanding the fact that the Agreement is executed subsequent to the Employee's commencement date. The Employee acknowledges and agrees that he/she hereby enters and executes this Agreement of his/her own volition, intending to be legally bound hereby, and in consideration of continued employment with Employer, pursuant to and in accordance with the terms of this Agreement.

**3. TERM:** Starting Monday, November 07, 2005, I will be employed by AJILON in the position of Recruiter. If my position changes, this agreement shall continue to apply. I understand that my employment is **employment-at-will** which means that my employment can be terminated with or without notice, and with or without cause or for no cause, at any time at my option or the option of AJILON.

**4. INTRODUCTORY PERIOD:** The first 180 days of continuous employment by AJILON shall constitute an introductory period.

**5. FRINGE BENEFITS:** The Employee shall receive fringe benefits as described on the Company's Flex Website and Group Plan Booklet then in effect, and the other terms and conditions of employment exclusive of those specified in this Employment Agreement, are set forth on the company's intranet. The Employee acknowledges that provisions of the Company intranet and Flex Website may be changed by the Employer on written notice to the Employee and such changes will modify this Agreement accordingly.

**6. CODE OF CONDUCT:** Employee is expected at all times to conduct him/herself in a professional manner, to promote the reputation and interest of AJILON. Employee shall make true reports as required from time to time by AJILON. Employee shall make available to AJILON any information relevant to AJILON's operations and planning and make suggestions that can benefit AJILON.

**7. SERVICES:** Employee shall loyally and conscientiously perform the duties assigned Employee in accordance with AJILON's policies and procedures, including without limitation the duties set forth for your position. Employee will not engage in any other business activity without the prior written consent of AJILON, which consent will not be unreasonably withheld.

Employee may invest in any enterprise providing such investment does not require Employee's services. If that enterprise is in competition with AJILON, Employee may not own directly or indirectly (through relatives, for example) more than one percent (1%) interest in such enterprise.

**8. AUTHORITY:** Employee shall have no authority to impose any obligation upon AJILON or to bind AJILON to the performance of any acts without AJILON's written permission.

**9. ACCESS TO, DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION:** The Employee recognizes and acknowledges that s/he has access to the identity of and information concerning the Employer's Clients and Candidates, including specifically, but not limited to, data contained in the Employer's secured databases and Web portals (including but not limited to Searcher, Ajility, A-Zone, Adecco CRMS, C-Net, MAD, and KPI). The Employee also recognizes that s/he has access to the Employer's specific marketing and training methods, techniques and guides, as well as the Employer's pricing, forms and internal operating systems and procedures.

The above constitutes the Employer's "Confidential Information," which is a valuable, special and unique asset of the Employer's business.

**Clients** are defined as individuals or entities that the Employer is assisting or has assisted with filling or attempting to fill a permanent or temporary employment vacancy.

**Candidates** are defined as individuals that the Employer has communicated with and secured information on that the Employer has placed or may place into positions of temporary or permanent employment with the Employer's clients.

The Employee will not, during or after the term of his/her employment, use the Employer's Confidential Information for his/her own purposes. In addition, the Employee will not disclose the Employer's Confidential Information to any person, firm, corporation, association, or other entity, for any reason or purpose whatsoever.

The Employee will not during the term of his/her employment, without the express written consent of the Employer, place the Employer's Confidential Information into personal computers or other personal data collection and storage devices that are not owned by the Employer. The Employee understands and agrees that s/he is not in any event permitted to copy any or all of the Employer's Confidential Information or to provide access to the Employer's Confidential Information to any other person except for another current employee of the Employer. The Employee shall, within a period of not more than two (2) business days, return any and all copies of the

Employer's Confidential Information to the Employer in the event the employment relationship between the Employer and the Employee is terminated by either party or at the specific request of the Employer at any time during the term of such employment.

The Employee hereby authorizes the Employer to inspect the Employee's personal computer(s) or other personal data collection and storage devices upon termination of the employment relationship between the parties or at any time during the term of such employment relationship in order to allow the Employer to determine whether the Employee has any of the Employer's Confidential Information. In the event of the termination of the employment relationship, the Employee agrees to fully cooperate with the Employer's effort to retrieve all of its Confidential Information from the Employee and the Employee agrees to allow the Employer to permanently remove any of the Employer's Confidential Information that exists on the Employee's personal computer(s) or other personal data collection and storage devices.

Upon termination of the employment relationship, the Employee also agrees that the Employer shall have the right to inspect any and all materials the Employee seeks to remove from the Employer's premises.

In the event of a breach or threatened breach by the Employee of the provisions of this paragraph, the Employer shall be entitled to an injunction restraining the Employee from:

    A.  disclosing the Employer's Confidential Information; or

    B.  rendering any services to any person, firm, corporation, association, or other entity to whom the Employer's Confidential Information has been disclosed, in whole or in part, or is threatened to be disclosed, by the Employee.

**10. LIMITATION ON COMPETITIVE ACTIVITIES:** For a period of one (1) year after the termination of his/her employment with the Employer, the Employee will not engage in any competitive activities within thirty-five (35) miles from the present office(s) of the Employer at which the Employee is employed or from any other office where the employee was employed over the last twelve (12) months of employment.

Competitive activities are specifically defined as directly or indirectly owning, managing, operating, controlling, participating in, being employed by consulting, advising or being connected in any way with a similar Staffing Service.

A Staffing Service is defined as a person or entity engaged in the recruitment of individuals for positions of temporary or permanent employment with other individuals or entities or the placement of individuals into positions of temporary or permanent employment with other individuals or entities.

For employees with responsibilities relating to the Employer's Ajilon Finance line of business, a similar Staffing Service shall be defined as a Staffing Service that places financial personnel including but not limited to Chief Financial Officers, Controllers, other financial executives, accountants, bookkeepers, and accounting clerks. For employees with responsibilities relating to the Employer's Ajilon Office line of business, a similar Staffing Service shall be defined as a Staffing Service that places administrative, support and/or customer service personnel including but not limited to executive assistants, administrative assistants, executive receptionists, customer service specialists, project managers, and other executive support personnel. For employees with responsibilities relating to the Employer's Ajilon legal line of business, a similar Staffing Service shall be defined as a Staffing Service that places legal services personnel including but not limited to attorneys, paralegals, legal secretaries, legal assistants and compliance officers.

The Employee acknowledges that s/he may have responsibilities relating to more than one of the Employer's lines of business and the above restriction on competitive activities applies to any lines of business that s/he had responsibilities in during the eighteen (18) months prior to the termination of his/her employment.

**11. LIMITATION ON SOLICITATION OF CLIENTS:** The Employee agrees that the Employer has invested substantial resources, time and effort to identify, obtain, and retain the Employer's Clients, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Clients.

Therefore, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Clients that conducted business with the office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

Moreover, for a period of one (1) year following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Clients that the Employee had contact with during the two (2) years preceding the termination of his/her employment.

The Employee agrees that a written statement by any Client stating that the Employee solicited him/her/it shall be conclusive evidence of a breach of this Paragraph 11.

**12. LIMITATION ON SOLICITATION OF CANDIDATES:** The Employee agrees that the Employer has invested substantial time, resources and effort to identify, obtain and retain the Employer's Candidates, as defined in paragraph 9 above, and that the Employer has a protectable interest in its relationships with its Candidates.

Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that had contact with the branch office(s) at which the Employee was employed during the twelve (12) months preceding the termination of his/her employment.

Moreover, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's Candidates that the Employee had contact with during the two (2) years preceding the termination of his/her employment.

The Employee agrees that a written statement by any Candidate stating that the Employee solicited him or her shall be conclusive evidence of a breach of this Paragraph 12.

**13. LIMITATION ON SOLICITATION OF EMPLOYEES:** The Employee agrees that the Employer has invested substantial resources, time and effort in assembling and training its staff of regular employees as well as its pool of temporary employees. Therefore, for a period of one (1) year immediately following the termination of his/her employment with the Employer, the Employee agrees that s/he will not directly or indirectly solicit the Employer's regular or temporary employees for employment with any person or entity.

**14. EFFECT OF BREACH ON TERMS OF LIMITATIONS:** Any month in which a breach of a limitation contained in Paragraphs 10, 11, 12 or 13 occurs shall not count toward the one (1) year term of limitation contained in Paragraphs 10, 11, 12 and 13.

**15. INJUNCTIVE RELIEF:** In the event of an actual or threatened breach by the Employee of the provisions of Paragraphs 9, 10, 11, 12 or 13, the Employer shall be entitled to an injunction enforcing the terms of Paragraphs 9, 10, 11, 12 or 13 and restraining further violations thereof. Nothing herein stated shall be construed as prohibiting the Employer from pursuing any other remedies available to the Employer arising from such breach or threatened breach, including the recovery of damages from the Employee.

**16. NOTICE TO SUBSEQUENT EMPLOYERS:** The Employee hereby authorizes the Employer to provide a copy of this Agreement to any and all future employers of the Employee, and to notify any and all such future employers of the Employee that the Employer intends to exercise its legal rights arising out of or in connection with this Agreement and/or any breach or any inducement of a breach thereof.

**17. PARTIAL INVALIDITY:** If any provision of this agreement is held illegal, invalid or unenforceable, and cannot be revised to be made legal, valid or enforceable in accordance with Paragraph 24 below, the parties agree that the remaining provisions of the Agreement shall remain in full force and effect.

**18. USE OF EMPLOYEE'S NAME IN ADVERTISING:** Employee agrees to allow the Employer to use his/her name in direct mail advertising during the period of employment and If employment is terminated until such time as the remaining printed materials on hand bearing the Employees name are used up, but not to exceed a period of two years following termination of employment.

**19. DRIVER'S RELEASE:** The Employee hereby represents and warrants that he/she will maintain adequate automobile liability coverage in the event that he/she is required to drive his/her own automobile in connection with his/her job. The Employee understands that the Employer does not provide insurance coverage for any damage which may occur to Employee's automobile, the property of another or to another individual in the course of the Employee driving his/her own vehicle for business purposes.

**20. EMPLOYMENT-AT-WILL/TERMINATION:** Employment may be terminated at any time, with or without cause and with or without notice, at the option of either AJILON or the Employee. Upon termination, the Employee will immediately deliver to AJILON all material and monies which may be in his/her possession or control and which belong to AJILON or were created in the course of AJILON's business. In the event of an Employee's voluntary or involuntary termination, commissions due from temporary billings will be paid through date of termination and commissions due from outstanding permanent billings will be paid on a cash-in basis ninety (90) days from the placement(s) start date(s), in the next commission cycle, provided the following criteria are met. Commissions from permanent billings will only be paid on placements with start dates prior to the Employee's termination date and based upon applicable cash-in received during the 30 days immediately subsequent to the Employee's termination date. As an example, if employment terminates on December 10th, commissions will only be paid on placements that started before December 10th and would be based upon cash-in received during the period beginning December 11th and ending January 11th (30 days thereafter). Therefore, no commissions will be paid at any time on any cash-in received subsequent to thirty days after the Employee's termination. Additionally, no permanent placement commissions will be paid based upon any "fall-offs" (placements who do not complete the Employer's guarantee period). Subsequent to Employee's termination, Employee agrees to refrain from the wrongful use of Employers name as well as any trade names used by the Employer, such as, but not limited to, AJILON FINANCE, AJILON OFFICE, and AJILON LEGAL; Employee therefore shall not indicate on any stationery, business card or advertising, solicitation or other business materials that he/she is or was formerly an Employee of Employer or of any division or subsidiary of Employer except in the bona fide submission of resumes and the filling out of applications in the course of seeking employment.

**21. ARBITRATION:** All disputes arising from termination of employment, including the attempted application of any federal, state or local statute, law, ordinance, rule or regulation thereto (including but not limited to statutes, laws, ordinance, rules or regulations dealing with employment or other discrimination) shall be resolved by binding arbitration under the auspices of the Federal Mediation and Conciliation Service, if available, and if not available, then under the American Arbitration Association's Model Employment Arbitration Procedures. The decision of the arbitrator shall be final and binding upon both the Employer and the Employee. Disputes other than those arising from termination of employment, are not arbitrable. It is specifically agreed that any actions to enforce the provisions of Paragraphs 10 and 11 of this Employment Agreement are not subject to Arbitration.

**22. NOTICES:** All notices shall be in writing. If to Employee at employee's last known address: if to AJILON, at the company headquarters (Park 80 West - Plaza II, 9th Floor, Saddle Brook, NJ 07663, Attention: President) with a copy to Employee's manager.

**23. GOVERNING LAWS:** This Agreement is governed by, and shall be interpreted in accordance with, the laws of the State of New Jersey.

**24. BLUE LINING:** If, at the time of enforcement of Paragraphs 9, 10, 11, 12, or 13, a court holds that the restrictions stated herein are unreasonable under the circumstances or contrary to law then existing, the parties agree that the maximum time-period, scope or geographic area reasonable under such circumstances or allowable under law then existing shall be substituted for the stated time-period, scope or geographic area, and that the court shall be allowed to revise the restrictions contained herein to the maximum period, scope and area permitted by law.

**25. LEGAL EXPENSES:** In the event that legal action is instituted by either party to enforce this Agreement against the other, the prevailing party will be entitled to be reimbursed for all reasonable legal and other costs incurred in such action.

**26. DETERMINATION:** Final decisions or interpretations in connection with the intent of this Agreement shall be made by AJILON.

**27. CONFIDENTIAL AGREEMENT:** Employee agrees to keep the content of this Agreement confidential and to only discuss it with his/her management.

**28. SUCCESSORS:** The rights and/or duties under this Agreement may be assigned or delegated to any successor of AJILON, but none of the Employee's rights or duties hereunder shall be assigned by Employee to any third party.

**29. COMPLETE AGREEMENT:** This is the complete and exclusive statement of the terms of the Agreement between the Employer and the Employee concerning employment and there are no other express or implied agreements or representations, either written or oral. No one on behalf of the Employer other than a Vice President, Chief Operating Officer, or President of the Division is authorized to modify this Agreement, enter into any other agreement, or make any representation to the Employee concerning the Employee's employment. All modifications to this Agreement must be in writing signed by the Employee and a Vice President, Chief Operating Officer or Division President. This Agreement cancels and supersedes any previously dated Employment Agreement with AJILON or any of its associated companies and the Employee expressly represents and warrants that he/she has not previously entered into any Agreements with any other company or assumed any obligations inconsistent with those of this Agreement. No one is authorized to waive any provision of this Agreement except by way of a writing signed by a Vice President, Chief Operating Officer or President of the Division.

I hereby agree to all of the provisions
of this Agreement:

_Jon Pomykala_
Jon Pomykala

11/1/05
Date

*Ajilon Professional Staffing, LLC. doing business as*
*Ajilon Finance, Ajilon Office, and Ajilon Legal*

Human Resources

12/05
Date

Sept-04                                    6