## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

v.

JOSHUA KUBICKI, KIMBERLY DANOWSKI, and JON POMYKALA,

Defendants.

CASE NO. 1:07-cv-01281-RJL

## MEMORANDUM OF POINTS AND AUTHORITIES OF
## DEFENDANTS IN OPPOSITION TO AJILON'S MOTION
## FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Michael A. Schlanger (D.C. Bar No. 88849)
Anthony Herman (D.C. Bar No. 424643)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Counsel for Defendants Joshua Kubicki, Kimberly Danowski, and Jon Pomykala*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

     A.    Legal Staffing Industry. ............................................................... 3

     B.    Defendants' Restrictive Covenants. ............................................. 4

     C.    Mr. Kubicki's Relationship with Crowell & Moring ................ 5

LEGAL STANDARD ................................................................................................... 6

ARGUMENT ................................................................................................................ 7

I.    AJILON FACES NO THREAT OF IRREPARABLE INJURY. ..................... 7

II.    AJILON IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS. ............. 10

     A.    Ajilon's Customer Information Is Not a Trade Secret. ............ 11

     B.    Ajilon's Restrictive Covenants Are Unenforceable. ............... 14

III.    DEFENDANTS WOULD BE SUBSTANTIALLY INJURED BY AN INJUNCTION. ....... 18

IV.    THE PUBLIC INTEREST IS NOT FURTHERED BY AN INJUNCTION. ............... 19

CONCLUSION ............................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Berman v. DePetrillo*, 1997 U.S. Dist. LEXIS 3966 (D.D.C. 1997) ...............................8, 9

*Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212 (D.D.C. 1996) ..............................8

*Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F. Supp. 2d 49 (D.D.C. 2004) (Leon, J.)......................................................................................................6, 7, 11

*Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1 (D.D.C. 2004) ........................................................................................................ 11-13

*City of Tempe, Ariz. v. Fed. Aviation Admin.*, 239 F. Supp. 2d 55 (D.D.C. 2003)..............6

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ...............................................................6

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ........................................................6

*Godbey v. Frank E. Basil, Inc.*, 603 F. Supp. 775 (D.D.C. 1985) .....................................14

*HIRECounsel D.C. v. Thuemmler*, No. 05-2111 (D.D.C. filed Oct. 28, 2005) .........2, 9, 18

*Moore v. Summers*, 113 F. Supp. 2d 5 (D.D.C. 2000) .........................................................6

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001)........................13, 19

*Mylan Pharm. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000).............................................10

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)..........................................7, 8

### STATE CASES

*Abbott Laboratories v. Norse Chemical Corp.*, 147 N.W.2d 529 (Wisc. 1967)................14

*Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789 (N.J. Super. Ct. App. Div. 1992) ................................................................................. 16-19

*Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879 (N.J. 1988) ............................14, 15, 18, 19

*Ruesch v. Ruesch International Monetary Services*, 479 A.2d 295 (D.C. 1984).........13, 17

*Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970)....................................................15

*Subcarrier Commc'n Inc. v. Day*, 691 A.2d 876 (N.J. Super. Ct. App. Div. 1997).....15, 16

*Whitmyer Bros., Inc. v. Doyle*, 274 A. 2d 577 (N.J. 1971) ..........................................15, 16

## STATE STATUTE

D.C. Code Ann. § 36-401 *et seq* ........................................................................................11

Defendants Joshua Kubicki, Kimberly Danowski, and Jon Pomykala respectfully submit this Memorandum of Points and Authorities in opposition to the motion of plaintiff Ajilon Professional Staffing, LLC ("Ajilon") for a temporary restraining order and preliminary injunction.

## INTRODUCTION

Defendants are former employees of Ajilon, a job placement and staffing company.  At Ajilon, Mr. Kubicki solicited law firms, offering to provide attorneys or paralegals to meet the firm's temporary staffing needs; Ms. Danowski worked in an administrative position, handling accounting and billing matters; and Mr. Pomykala was responsible for staffing projects with contract attorneys.  All three left Ajilon in June 2007, and now work in similar positions for one of Ajilon's many competitors, Solomon-Page Group LLC ("Solomon-Page").

Ajilon seeks to prevent defendants from working for Solomon-Page.  In its papers, Ajilon quotes at length from the restrictive covenants found in its employee contracts, but it never attempts to show that these provisions are reasonable restraints of trade, as is its burden under New Jersey law.[1]  These provisions are patently unreasonable.  Ms. Danowski and Mr. Pomykala are, among other things, prohibited from working for any staffing agency within 35 miles of Washington D.C. for one year.  Mr. Kubicki's contract is substantially more restrictive. He cannot work for a staffing agency within 50 miles of Washington D.C. or any other city in which Ajilon has an office.  Because Ajilon has offices in every legal market with significant demand for temporary legal placement -- including New York, Chicago, Los Angeles, San

---

[1] New Jersey law applies based on the contracts' choice-of-law provisions.  *See infra* note 11.

Francisco, Atlanta, Dallas, and Houston -- the provision effectively prevents him from working in his chosen profession.

Ajilon further attempts to restrict defendants' ability to work in Washington's legal staffing market by claiming trade secret protection for information about its customers. Ajilon does not seek to protect its *list* of customers and their information because defendants do not have Ajilon's list and therefore could not have misappropriated it. Instead, Ajilon claims in a conclusory manner that the *information in the list* deserves trade secret protection, but this information is nothing more than the law firm names, addresses, telephone numbers, and contact information. Nonetheless, Ajilon alleges that Mr. Kubicki misappropriates its trade secrets every time he calls a law firm to inquire about its staffing needs, despite that a law firm's contact information is not secret in any way. If Ajilon is correct, which clearly it is not, defendants would be prevented from working in the Washington market permanently because they could not start divulging Ajilon's trade secrets after one year simply because they were no longer bound by covenants not to compete.

Ajilon is not entitled to injunctive relief because it is unlikely to succeed on the merits of its claims, it faces no irreparable injury, and the balance of harms clearly favor defendants. In a similar case pending in this Court, Judge Roberts denied a temporary restraining order and preliminary injunction for these reasons. *See HIRECounsel D.C. v. Thuemmler*, No. 05-2111 (D.D.C. Jan. 5, 2006) (order denying temporary restraining order and preliminary injunction). According to Judge Roberts, the employer -- a legal staffing company -- had "not offered persuasive evidence that any trade secrets or any confidential business information was inappropriately appropriated or converted"; "the sort of harm that HIRECounsel contemplates does appear to me to be of the nature that's regularly compensated with money

damages and is fairly easily translated into dollar amounts"; and the balance of equities favored

the former employee because "to lose his employment and to be barred from seeking a similar

position would certainly constitute a hardship." (Mosier Decl. Ex. A, at 46-49.)[2]  Ajilon's motion

should similarly be denied.

## BACKGROUND

### A.    Legal Staffing Industry.

Staffing companies, like Ajilon and Solomon-Page, place attorneys and paralegals

in temporary and permanent positions at law firms and corporate legal departments.  When a law

firm needs additional support for a large document review, it often hires a staffing company to

find attorneys to provide assistance.  Almost all of the larger law firms in Washington use

staffing companies; many firms use them on a regular basis and often use multiple staffing

companies on the same project.  (Kubicki Decl. ¶ 10.)

The legal staffing market in Washington is highly competitive.  No fewer than ten

companies compete for work from the dozens of law firms who regularly seek temporary help.

(*Id.* ¶ 8.)  Because law firms primarily contract with staffing companies on a project-by-project

basis, most law firms use multiple companies, with some firms using as many as five or six.  (*Id.*

¶ 8.)  For example, Solomon-Page recently obtained a project from Crowell & Moring, but

Crowell still uses Ajilon for other projects.  (*Id.* ¶¶ 13-14.)

Because law firms and staffing companies rarely, if ever, enter into long-term or

exclusive arrangements, staffing companies must constantly try to anticipate which firms need

---

[2] Similarly, New Jersey courts have denied injunctive relief to nearly identical claims, finding
that the staffing companies were unlikely to succeed in establishing that its customer lists were
entitled to protection.  (*See* Mosier Decl. Ex. C, at 19 (*P.C. Help Servs., Inc. v. Wein*, No. C-206-
96E (N.J. Super. Ct. Ch. Div. 1996)); *id.* Ex. B, at 44-45 (*Accounts on Call v. Silverberg*, No. C-
176-95, (N.J. Super. Ct. Ch. Div. 1995)).)

help.  As Mr. Kubicki explains, "To get work, I review publications such as Deal.com, the Wall Street Journal, the American Lawyer and other business publications to get leads on major litigation and mergers and acquisition activity."  (*Id.* ¶ 3.)  Staffing employees, of course, also routinely call their law firm contacts -- friends, former customers, and even law school classmates -- to see whether they know of anyone needing staffing assistance.  (*Id.*)  They also rely on customer information kept by their company.  For example, Solomon-Page maintains a database with information about its Washington customers.  (*Id.* ¶ 7.)

The staffing market is highly transparent.  Staffing companies know which law firms use temporary attorneys and which do not.  They also know which staffing companies are hired by which law firms.  In short, when a staffing company obtains a project from a law firm, everyone in the industry knows about it.  (*Id.* ¶ 10.)

**B.     Defendants' Restrictive Covenants.**

Defendants' contracts with Ajilon each contained a number of post-employment restrictive covenants.  The contracts for Ms. Danowski and Mr. Pomykala are identical.  Neither can work, for one year, for another staffing company within 35 miles of Washington.  (Compl. Ex. C ¶ 10.)  Nor can they solicit, for one year, any customer that conducted business with Ajilon's Washington office during the previous year, or any customer they had contact with during the previous two years.  (*Id.* ¶ 11.)  These provisions would require Ms. Danowski and Mr. Pomykala to quit their jobs with Solomon-Page, and either move to a different city or find a job in a different industry.

Mr. Kubicki's restrictive covenants go well beyond those of his co-defendants. His contract effectively prevents him from working in the staffing industry for one year.  The contract states: "For a period of one year after the termination of this Agreement, Employee will not, within a radius of fifty (50) miles from the present place of business of the Employer, *or any*

4

*other office of a company affiliated with the Employer* . . . [work for] any business similar to the type of business conducted by Employer."  (Compl.. Ex. B ¶ 10 (emphasis added).)  This provision would prevent Mr. Kubicki from working in any city with a significant market for temporary legal services, including New York, Chicago, Los Angeles, San Francisco, Orlando, Atlanta, Minneapolis, Charlotte, Austin, Dallas, Houston, and San Antonio.  (Kubicki Decl. ¶ 16.)

Mr. Kubicki's solicitation covenant is also significantly broader.  The provision not only prevents Mr.Kubicki from soliciting Ajilon's customers, but expressly prohibits him from soliciting "prospective customers from whom Employee solicited business while in the employ of Employer."  (*Id.* ¶ 10(A).)  Because he solicited every law firm in Washington that hires temporary attorneys, this covenant would prevent him from contacting any firm that might need his services.  (Kubicki Decl. ¶ 17.)[3]

### C.     Mr. Kubicki's Relationship with Crowell & Moring.

Ajilon names only one customer that Mr. Kubicki has solicited since he resigned: Crowell & Moring ("Crowell").[4]  According to the complaint, "[t]he relationship that Ajilon had with Crowell was extremely profitable; in fact, Crowell was one of Ajilon's biggest customers.  Up to and including his date of resignation, Kubicki worked to solicit projects at Crowell and other firms."  (Compl. ¶ 22.)  The complaint further alleges that Mr. Kubicki obtained a project for Solomon-Page shortly after he left Ajilon.  (*Id.*  ¶ 25.)

---

[3] The contracts also contain clauses precluding solicitation of Ajilon's temporary employees. Ajilon does not allege that defendants have contacted any of its temporary employees.

[4] There are no such allegations against Ms. Danowski or Mr. Pomykala.

Mr. Kubicki's ability to obtain work from Crowell is not a result of his working for Ajilon. Instead, Mr. Kubicki's contacts at the firm were likely a reason why Ajilon hired him in the first place. He was, after all, a staff attorney at Crowell before leaving to join Ajilon. (Kubicki Decl. ¶ 12.) He also has a number of close friends at the firm, including a law school classmate. (*Id.*) In fact, the project that Mr. Kubicki recently obtained for Solomon-Page resulted from a phone call made to Mr. Kubicki from his law school classmate; it was not based in any way on Ajilon's customer information. (*Id.* ¶ 13.)

## LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004); *see also Moore v. Summers*, 113 F.Supp. 2d 5, 17 (D.D.C. 2000) (preliminary injunction is an "extraordinary form of judicial relief").

This Court may issue a preliminary injunction only if Ajilon demonstrates: "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F.Supp.2d 49, 53 (D.D.C. 2004) (Leon, J.).

Although the court considers these factors on a "sliding scale," *id.*, "[i]t is particularly important for plaintiffs to demonstrate a substantial likelihood of success on the merits." *City of Tempe, Ariz. v. Fed. Aviation Admin.*, 239 F. Supp. 2d 55, 59 (D.D.C. 2003). Moreover, as this Court has explained, "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." *Carabillo*, 355 F.Supp.2d at 53 (Leon, J.).

6

Because Ajilon seeks to change the status quo by preventing defendants from continuing to work for Solomon-Page, it carries an even greater burden.  This Court has recognized that, "when a party seeks a mandatory injunction, *i.e.,* to change the status quo rather than to preserve it, the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction."  *id.*; *see also Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.").

## ARGUMENT

## I.    AJILON FACES NO THREAT OF IRREPARABLE INJURY.

Ajilon is not entitled to injunctive relief unless it shows that it will suffer irreparable harm if its motion is denied.  Indeed, this Court may deny Ajilon's motion based solely on its failure to prove such injury.  *See Carabillo*, 355 F.Supp.2d at 53.  Yet Ajilon claims irreparable injury based merely on the possibility that it will lose business or customer relationships as a result of defendants' employment with Solomon-Page.  Circuit precedent makes clear that the loss of business opportunity is insufficient for injunctive relief -- both because the injury is too speculative and because it can be adequately remedied by monetary damages.

In order to show irreparable injury, Ajilon must make a "clear showing" that the injury it will suffer is "certain and great," "actual and not theoretical," and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (citation omitted) (emphasis in original).  Because it is seeking a mandatory injunction, Ajilon must also show that "extreme or very serious damage will result from the denial of the injunction."  *Carabillo*, 355 F.Supp.2d at

7

53 (internal quotation marks omitted). Ajilon cannot come close to satisfying this substantial burden.

Ajilon's alleged injuries are too speculative to warrant injunctive relief. Ajilon claims that, without an injunction, its business will be hurt, it will lose its customers, and its employees will leave. Pl's Mot. at 6.[5] But to establish its losses, Ajilon must show "certain," and "actual" losses that are attributable to defendants' working for Ajilon. *Wisconsin Gas*, 758 F.2d at 674. Ajilon cannot satisfy this burden by showing that its revenue is less now than when defendants worked at Ajilon.[6] Instead, it must establish losses caused by defendants' working at Solomon-Page. That Solomon-Page obtained a project from Crowell & Moring establishes an injury to Ajilon only if Ajilon can show that it -- and not one of the many other staffing companies -- would have received the work if defendants resigned from Ajilon but did not join a competitor. Ajilon does not make any allegations of this sort.

Because the possible loss of future business opportunities is so speculative, it provides no basis for injunctive relief. As this Court has explained, "arguments of *possible* economic loss are clearly too speculative to be a proper basis upon which to find 'irreparable harm.'" *Carabillo*, 355 F.Supp.2d at 53; *see also Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996) (mere speculation about market share does not constitute

---

[5] Ajilon also asserts that it will lose goodwill and that its business reputation will be damaged, but it provides no explanation of how this might occur; nor does it cite any cases to support this claim. These vague, conclusory allegations cannot support injunctive relief. *See Berman v. DePetrillo*, 1997 U.S. Dist. LEXIS 3966, at *9 (D.D.C. 1997) ("The plaintiffs assert that they have lost "professional good will" and "credibility in the marketplace" and face "destruction of their reputations." The plaintiffs have cited no cases indicating that such harm is "irreparable.").

[6] Ajilon does not allege that defendants breached their contracts by resigning; as at-will employees, they were free to do so. Ajilon therefore cannot seek to recover for any losses attributable to defendants' leaving its company.

irreparable injury); *Berman v. DePetrillo*, 1997 U.S. Dist. LEXIS 3966, at *9 (D.D.C. 1997)

("[T]he loss of a business opportunity . . . is purely speculative.").

Even if its losses were not speculative, Ajilon cannot show irreparable injury

because monetary damages can remedy any loss that it might suffer.  Ajilion claims that

"[m]onetary damages alone cannot fully compensate a loss of this sort," Pl's Mot. at 6, but *its

supporting declaration monetizes its estimated losses.*  (DeMario Decl. ¶ 48 ("Their wrongful

conduct will continue to cause ever-increasing loss of revenue to Ajilon, estimated

conservatively at $250,000 per month.").)  A loss of business is precisely the type of harm that

can be compensated by monetary damages.  *See Berman,* 1997 U.S. Dist. LEXIS 3966, at *12

("a plaintiff deprived of the opportunity to make business deals has a remedy for money

damages."); *id.* at *9 ("[T]he loss of a business opportunity is a purely economic injury, and

economic loss alone, however substantial, does not constitute 'irreparable harm.'").

On facts similar to those presented here, Judge Roberts denied the employer's

request for injunctive relief because of the speculative nature of injury and the adequacy of

money damages.  *HIRECounsel D.C. v. Thuemmler*, No. 05-2111 (D.D.C. Jan. 5, 2006) (order

denying temporary restraining order and preliminary injunction).  According to Judge Roberts,

HIRECounsel had not established that the harm was certain or imminent; moreover, "the sort of

harm that HIRECounsel contemplates does appear to me to be of the nature that's regularly

compensated with money damages and is fairly easily translated into dollar amounts."  (Mosier

Decl. Ex. A, at 47.)  This reasoning applies equally here.

Ajilon's claim of irreparable harm especially rings hollow in light of its selective

enforcement of covenants not to compete and its delay in seeking injunctive relief.  As Ajilon

concedes, other employees have left to join competitors -- including Solomon-Page -- without

Ajilon enforcing its non-compete clause. (Mullenholz Decl. ¶¶ 9, 30-31.)  For example, Andrew

Perlin left Ajilon's Washington office to joined Solomon-Page's Washington office without

Ajilon taking any action to enforce his covenant not to compete.  (Kubicki Decl. ¶ 15.)  If its

customer information were truly "trade secrets," one would expect Ajilon to be more vigilant in

enforcing the terms of its employment agreements.

Moreover, Ajilon waited nearly a month after Mr. Kubicki left the company

before bringing this action, and when it finally filed suit, it was content to wait an additional nine

days before being heard on its motion for a temporary restraining order.  (*See* Pl.'s Mot. (filed

July 18, 2007) (requesting July 27, 2007 hearing date).)  "Though such a delay is not dispositive

of the issue, it further militates against a finding of irreparable harm."  *Mylan Pharm. v. Shalala*,

81 F. Supp. 2d 30, 44 (D.D.C. 2000) (finding no irreparable harm when movant waited two

months before seeking injunctive relief); *id.* at 43 (movant's "delay in bringing this action further

undercuts its allegation of irreparable harm").

Ajilon's failure to show irreparable injury provides sufficient grounds to deny its

request for injunctive relief.

## II.    AJILON IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

To be entitled to injunctive relief, Ajilon must show some likelihood that it will

succeed on the merits of its claim.  It attempts this showing in a single conclusory sentence,

citing no legal authority.  (Pl.'s Mot at 7.)  Ajilon presents no argument to show that a law firm's

name and telephone number are trade secrets.  Nor does Ajilon explain, as New Jersey law

requires, why its post-employment restrictive covenants are enforceable.  This Court should find

that Ajilon failed to meet its burden based on its failure to present any legal arguments to support

its claims.  In any event, Ajilon's trade secret and breach of contract claims have little chance of success.[7]

### A.    Ajilon's Customer Information Is Not a Trade Secret.

Ajilon will not succeed at using the District of Columbia Uniform Trade Secrets Act, D.C. Code Ann. § 36-401 *et seq.* ("Trade Secrets Act") to prevent defendants from competing with it.  In his declaration, Mr. Kubicki explains how he, and others in his field, solicit projects by searching the newspaper and trade journals for stories of major litigation and mergers and acquisition activity, and then following up on these leads by making phone calls to the firms involved in these matters.  (Kubicki Decl. ¶ 2.)  According to Ajilon, every time Mr. Kubicki sees a story in the Wall Street Journal and contacts a law firm to see if they need staffing assistance, he has misappropriated its trade secrets because the name and phone number of the law firm is in its customer list.  Such a theory finds no support in trade secret law.

The complaint's allegations with respect to the only "customer" that it actually names -- Crowell & Moring -- show just how far it attempts to stretch the Trade Secrets Act. Ajilon alleges that its trade secrets were misappropriated because Mr. Kubicki regularly solicited business from Crowell while he was at Ajilon, and now he has obtained a project from the firm for Solomon-Page.  But Mr. Kubicki has contacts at Crowell, not based on any trade secrets he misappropriated for Ajilon, but *because he was an employee at Crowell before he ever worked for either Ajilon or Solomon-Page*.  (*Id.* ¶ 12.)[8]  Ajilon cannot prevent Mr. Kubicki from

---

[7] The complaint also includes a number of tort claims.  Ajilon does not argue that any of these claims can support injunctive relief, and thus defendants do not address them.

[8] The complaint provides no basis for finding that Ms. Danowski or Mr. Pomykala misappropriated trade secrets because there are no allegations that either has taken the customer list or has used information from it to solicit a customer.

soliciting business from his friends and former co-workers -- nor can it prevent him from using Solomon-Page's contacts in the Washington market -- by claiming that the firm's name, address, and telephone number are trade secrets.

To succeed on its trade secret claim, Ajilon must first establish the existence of a trade secret. *See Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 8 (D.D.C. 2004) ("The threshold inquiry in every trade secret case is whether or not there is a trade secret to be misappropriated.") (internal quotation marks and alterations omitted). But to do this, Ajilon must show that the information it seeks to protect is *secret. Id.* Ajilon cannot make such a showing.

The complaint alleges that Ajilon is entitled to trade secret protection for its "clients' names, addresses, telephone numbers, and contact information." (Compl. ¶ 31.) It does not, however, claim that its *customer list* is a trade secret. Ajilon likely seeks trade protection for the data contained in its customer list but not for the list itself because defendants do not have Ajilon's customer list, and therefore cannot have misappropriated it. Indeed, the complaint -- instead of claiming that the customer list was misappropriated -- alleges only that defendants used "information contained in the confidential business records of Ajilon." (Compl. ¶ 27(a).) Ultimately, this distinction makes little difference; neither the customer list nor the information contained in it is a trade secret.

The information contained in Ajilon's customer list clearly cannot be a trade secret because it is publicly available and known to everyone in the industry. *See Catalyst*, 350 F. Supp. 2d at 8-9 ("Information that is generally known or readily ascertainable to the public cannot constitute a trade secret. Furthermore, information which is generally known within an industry, even if it is not generally known to the public, cannot constitute a trade secret.")

(internal quotation marks and citations omitted). Ajilon nonetheless seeks trade secret protection for the names and addresses of many of *the largest law firms in Washington*. This information -- which can be found easily in Martindale-Hubbell, the phone book, or on the internet -- is not secret and therefore cannot be considered a trade secret.

Ajilon's customer list similarly is not a trade secret because it is nothing more than a compilation of publicly available information. A list aggregating publicly available information can only qualify as a trade secret if "there is an added value to the combination over the value of the individual parameters, *i.e.,* when 'the whole is more than the sum of the parts.'" *Catalyst*, 350 F.Supp.2d at 10.[9] Ajilon makes no attempt to show that its customer list has any value beyond similar publicly available lists of firm names, addresses, and telephone numbers.

The D.C. Court of Appeals has held that customer information of a foreign exchange business cannot be protected as a trade secret. *Ruesch v. Ruesch Int'l Monetary Servs.*, 479 A.2d 295 (D.C. 1984).[10] The court noted that "when the prospective clients are commercially conspicuous, courts have characterized the expenditure of time, money, and resources undertaken by businesses to acquire prospective clients as simply widespread canvassing of an obvious and highly competitive market . . ., or merely the outgrowth of . . . normal marketing endeavors." *Id.* at 298 (internal quotation marks and citations omitted).

---

[9] A customer list may be entitled to trade secret protection if it contains confidential information about the customers. *See, e.g., Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 71 (D.D.C. 2001) (treating customer list, which defendant had taken and that included "taxpayer information, margin papers, correspondence, and check receipts, among other vital and confidential information regarding the client," as a trade secret). No such confidential information is involved in this case, and even if it were, defendants have not misappropriated any confidential information on Ajilon's customer list because they do not have the list.

[10] Because this case was decided before the Trade Secrets Act was adopted, the court applied general common law principles to resolve the claim. The court's reasoning is instructive nonetheless.

Like Ajilon, Ruesch alleged that it spent considerable time and money to build its customer list.  The court, however, recognized that this claim confuses efforts to develop customer relationships and steps taken to put together a customer list.  According to the court,

> "[Plaintiff] argues that it spent substantial time and money on its customer list. In reality that time and money was spent on the development of the market which the customer list represents. [Defendant] is only attempting to sell to this market and [plaintiff's] customer information, in view of its public nature, should not be protected to prevent such competition."

*Id.* at 299 (quoting *Abbott Laboratories v. Norse Chemical Corp.*, 147 N.W.2d 529, 541 (Wisc. 1967) (alterations in original).  Ajilon's customer list similarly deserves no trade secret protection.

### B.    Ajilon's Restrictive Covenants Are Unenforceable.

Because New Jersey law[11] disfavors restraints of trade, an employer bears the burden of establishing the enforceability of post-employment restrictive covenants. *See Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 894 (N.J. 1988).   Ajilon never acknowledges that New Jersey law governs its contract, much less attempts to show that its restrictive covenants are enforceable.  They clearly are not.  It is well established under New Jersey law that an employer cannot enforce restrictive covenants merely to protect itself from competition or to prevent an employee from taking a job with its competitor.  *Id.* at 892.

Ajilon's contract provisions are unenforceable because they unreasonably restrict defendants' ability to work.  Under New Jersey law, only "reasonable" restrictive covenants are

---

[11] New Jersey law applies to the breach of contract claim based on the contracts' choice-of-law provision.  (Compl. Ex. A at ¶ 16 ("This agreement will be governed by the laws of the State of New Jersey.").)  Because New Jersey has a substantial relationship to the transaction—Ajilon maintains its principle place of business there (Compl. ¶ 1)—and applying New Jersey law does not contradict a fundamental policy of the District of Columbia, this choice-of-law provision should be enforced.  *See Godbey v. Frank E. Basil, Inc.*, 603 F.Supp. 775, 776 (D.D.C. 1985).

enforceable.  *Id.*  A restrictive covenant is reasonable only if the employer can show that the restraint is necessary to protect its "'legitimate interests'" and that it does not cause an "'undue hardship'" on the employee.  *Id.* (quoting *Whitmyer Bros., Inc. v. Doyle*, 274 A. 2d 577 (N.J. 1971); *Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970).)  Ajilon can show neither.

Ajilon's contract provisions are not necessary to protect its "legitimate interests." The New Jersey Supreme Court has long held that lessening competition is not a legitimate interest.  *See Whitmyer Bros.*, 274 A. 2d at 581 ("The employer has no legitimate interest in preventing competition.").  This is true even where, as here, an employer seeks to limit competition from its former employees.  According to the New Jersey Supreme Court,

> knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person.  They belong to him as an individual for the transaction of any business in which he may engage, just the same as any part of the skill, knowledge and information received by him before entering the employment.  An employee can use those skills in any business or profession he may choose, including a competitive business with his former employer. Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee. Ultimately, the consuming public would suffer from judicial nurturing of such naked restraints on competition.

*Ingersoll-Rand*, 542 A.2d at 892 (internal quotation marks and citations omitted); *Subcarrier Commc'n Inc. v. Day*, 691 A.2d 876, 882 (N.J. Super. Ct. App. Div. 1997) (in response to claim of harm from competition with former employee: "that sort of harm is not actionable; it is called free enterprise").

Ajilon's conclusory claim of misappropriated trade secrets and confidential information does not establish that its restrictive covenants are necessary to protect its legitimate interests.  Although New Jersey law recognizes that protecting trade secrets and confidential information is a legitimate interest, the case law is clear that Ajilon's customer information is

15

neither a trade secret nor sufficiently confidential to establish the reasonableness of the restrictive covenants.

New Jersey courts are unwilling to treat customer information like Ajilon's as confidential. One court, for example, decided that a list of customers, which consisted of "the names, addresses, phone numbers and contact persons," was not a trade secret. *Subcarrier*, 691 A.2d at 881. The court concluded that customer lists do not deserve trade secret protection "[w]here customers are known in an industry or are easily discernible *and personal contacts are taken from job to job*." *Id.* (emphasis added.) In refusing to recognize the list as a trade secret, the court noted that the customers' "identities and locations are a matter of common knowledge in the industry. We cannot understand how their identity or *plaintiff's relationship with them* would be deserving of protection." *Id.* (emphasis added); *see also Whitmyer Bros.*, 274 A. 2d at 581 ("matters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection").

Nor can Ajilon enforce its covenants not to compete on the grounds that it is necessary to protect its customer relationships. *See Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789, 795 (N.J. Super. Ct. App. Div. 1992). Ajilon alleges that, when Mr. Kubicki worked for it, Crowell was its biggest customer; that Mr. Kubicki has already obtained work from Crowell for Solomon-Page; and thus he must be enjoined to protect its relationship with Crowell. (Compl. ¶¶ 22, 25.) But Mr. Kubicki's ability to obtained work from Crowell is not based on contacts formed while he was at Ajilon. (*See* Kubicki Decl. ¶ 12.) Indeed, Mr. Kubicki obtained a project from Crowell for Solomon-Page, not by soliciting Crowell, but because his long-time friend contacted him. (*Id.* ¶ 13.) New Jersey law is clear that this is not the sort of customer relationship that a restrictive covenant can protect.

A New Jersey appellate court vacated a preliminary injunction issued under similar circumstances. *See Coskey's*, 602 A.2d at 789. In that case, the trial court enjoined the defendant, a former employee whose contract included a non-compete provision, from soliciting his former customers. In vacating the injunction, the court explained:

> What [the employee] brought to his employer, he should be able to take away. This is little different than the tradesman who brings his tools to his employer and upon separation leaves with them, or a scientist who has entered into an employment relationship with a head full of scientific data which he used for the benefit of his employer and then may use for the benefit of another upon reemployment. . . .*[The employee's] relationships within the industry were not bought and paid for; they were merely rented during the period of employment.*

*Id.* at 795 (emphasis added). Ajilon similarly did not purchase Mr. Kubicki's relationships within the industry.

Even if Ajilon had a legitimate interest to protect, its covenants not to compete are unenforceable because they cause an "undue hardship" for defendants. *Ingersoll-Rand*, 542 A.2d at 894. Defendants' contracts prevent each of them from working in the staffing industry in Washington. Mr. Kubicki's contract prevents him from accepting similar jobs in, among other cities, New York, Chicago, Los Angeles, San Francisco, Dallas, or Houston. Preventing defendants from working for a year in their chosen profession clearly imposes an "undue hardship." *See Coskey's*, 602 A.2d at 794 (finding undue hardship where employee was "free to uproot his family and move elsewhere to continue his employment, giving up the contacts that he had personally developed . . . [because] this was neither a fair nor a viable alternative").

This Court should follow the lead of New Jersey trial courts, which deny preliminary injunctions seeking enforcement of non-competition clauses in the professional staffing industry. In *Accounts on Call v. Silverberg*, No. C-176-95, (N.J. Super. Ct. Ch. Div. 1995), the plaintiff -- a staffing company that is affiliated with Ajilon -- sought to prevent two of

its former employees from working for Solomon-Page.  The court denied a preliminary

injunction, finding that the staffing agency was unlikely to succeed in enforcing its covenant not

to compete.  Refusing to treat the employer's customer information as confidential, the court saw

"nothing different between the plaintiff's operation from any cold calling solicitation in a

number of industries.  Potential customers are readily ascertainable and public information. . . .

There is nothing in the record to demonstrate plaintiff's likelihood of success in establishing the

confidential or proprietary nature of that customer list."  (Mosier Decl. Ex. B, at 43-44.)

Similarly, in *P.C. Help Servs., Inc. v. Wein*, No. C-206-96E (N.J. Super. Ct. Ch. Div. 1996), the

court denied a preliminary injunction, finding that the a staffing company was unlikely to

succeed in enforcing its covenant not to compete because its customer list was not a trade secret.

(*See* Mosier Decl. Ex. C, at 19.)  This Court should do the same.

## III.   DEFENDANTS WOULD BE SUBSTANTIALLY INJURED BY AN INJUNCTION.

The harm to defendants is clear.  If the Court grants Ajilon's request for

injunctive relief, defendants must quit their jobs.  If immediate unemployment were not injury

enough, defendants must either move to a different city to find work in the staffing industry or

stay in Washington and try to find work in an unfamiliar job.  These injuries are substantial and

irreparable.  Even if defendants ultimately prevail in this case, they cannot recover for losses

sustained for their period of unemployment between the time the injunction is granted and the

decision on the merits.

Courts recognize that the harm caused by enjoining an employee from working in

his chosen profession outweighs any threatened harm to the employer.  In *HIRECounsel*, Judge

Roberts found the balance of harms to favor the employee, noting that "to lose his employment

and to be barred from seeking a similar position would certainly constitute a hardship." (Mosier

Decl. Ex. A, at 49.)  In *Coskey's*, the court -- in vacating an injunction -- acknowledged the harm that the injunction had caused:  " The preliminary injunction in this case had obvious devastating effects upon [the employee], and only limited (and mainly financial) effects upon [the employer]." 602 A.2d at 796.

The harm to defendants, who would be forced to quit their jobs, clearly weighs against granting injunctive relief.

## IV.    THE PUBLIC INTEREST IS NOT FURTHERED BY AN INJUNCTION.

Ajilon fails to show that the public interest is furthered by an injunction.  Ajilon claims that the public interest is furthered "because the public has a deeply rooted interested in protecting trade secret client lists and other confidential information."  (Pl's Mot. 7.)  This interest, according to Ajilon, includes "'preventing unfair competition, commercial piracy, [and] misleading solicitations.'"  (*Id.* (quoting *Morgan Stanley*, 150 F. Supp. 2d at 79).)  But the only information at issue in this case is law firm names, addresses, and telephone numbers.  The public has no interest in keeping publicly available information secret.  The information at issue in this case is not secret -- primarily because the law firms themselves publicize it.

Ajilon also claims that the public has an interest in seeing contracts enforced. (Pl's Mot. 7.)  Although this is generally true, it certainly does not apply to contractual provisions that are unenforceable on public policy grounds.  The public interest is not furthered by an injunction based on unenforceable restrictive covenants.  Instead, the public interest is furthered by not enforcing the unreasonable restraints of trade found in defendants' contracts. *Ingersoll-Rand*, 542 A.2d at 892 ("Ultimately, the consuming public would suffer from judicial nurturing of such naked restraints on competition.").

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Motion for

Temporary Restraining Order and for Preliminary Injunction.


Respectfully submitted,


____/s/  Anthony Herman_____
Michael A. Schlanger (D.C. Bar No. 88849)
Anthony Herman (D.C. Bar No. 424643)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291


*Attorneys for Defendants Joshua Kubicki,*
July 24, 2007                                    *Kimberly Danowski, and Jon Pomykala*


20

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of defendants' Opposition to Ajilon's

Motion for Temporary Restraining Order and for Preliminary Injunction was served upon:

      Benjamin Hahn, Esq.
      SCHNADER HARRISON SEGAL & LEWIS LLP
      2001 Pennsylvania Ave N.W., Suite 300
      Washington, DC 20006-1825

by First Class mail under the Rules of this Court on July 24, 2007.


                        /s/  Anthony Herman
                     Anthony Herman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

         v.

JOSHUA KUBICKI, KIMBERLY DANOWSKI,
and JON POMYKALA,

Defendants.

CASE NO. 1:07-cv-01281-RJL

## <u>DECLARATION OF JOSHUA KUBICKI</u>

I, Joshua Kubicki, hereby declare as follows:

1.     I am a resident of Maryland, residing at 619 Gist Avenue, Silver Spring, MD 20910. I am a defendant in the above-captioned matter. I make the following declarations based upon my personal knowledge.

2.     I was hired by Ajilon Professional Staffing, LLC on April 22, 2004. I worked at Ajilon until I resigned on June 20, 2007.

3.     At Ajilon, I was responsible for generating new projects for Ajilon's temporary legal staff division. My principal focus was to obtain project document review work from law firms and corporations. To get work, I would review publications such as Deal.com, the Wall Street Journal, the American Lawyer and other business publications to get leads on major litigation and mergers and acquisition activity. I also regularly called my contacts at firms and companies—lawyers and non-lawyers many of whom I have known for years—to ask if they or their colleagues need temporary staff, or knew who did. I also called department heads,

managing partners, paralegal coordinators, office administrators and others at firms and companies for this same purpose.

4.      I do not have a copy of Ajilon's customer list.  Nor do I have any other Ajilon documents relating to its customers or contract attorneys.  On my last day at Ajilon, Keith Minn, an Ajilon employee, checked the items I took with me and confirmed they contained only my personal belongings.

5.      I am currently employed by Solomon-Page Group LLC ("Solomon-Page") in its Washington office.  My job responsibilities are substantially similar to my responsibilities at Ajilon.

6.      Solomon-Page is a full service staffing company that specializes in the placement of individuals in temporary and permanent jobs in various industries and specialty niches.  Among the industries and niches in which Solomon-Page operates are Accounting & Finance, Administrative Services, Banking, Benefits & Insurance, Clinical Research, Compliance, E-Commerce, Financial Services, Fashion Services, Human Resources, Healthcare & Life Sciences, IT, Educational New Media, Publishing as well as the temporary and permanent placement of lawyers.

7.      Solomon-Page started placing legal professionals on a permanent basis in 1993 and has been in that business since that time.  Solomon-Page has also been in the temporary legal staffing business for several years.  Based on its prior experience in the temporary and permanent legal staffing business, Solomon-Page has a large database of customers and potential customers.  In addition to this database, its recruiters can obtain the names and contact information of potential customers by reviewing the Directory of Corporate Counsel, Law Firm Yellow Book, NALP Directory, National Directory of Legal Employers, Directory of American

Business, Martindale Hubbell (on-line and in hard copy), Crain's magazine, local law journals and various websites.

8.      The legal staffing industry is highly competitive. The market in Washington alone includes: Solomon-Page, Ajilon, Hudson, Special Counsel, Compliance, Legal Source, Kelly, Update, HIRECounsel, Spherion, and Clutch Legal. New companies come and go from the market on almost a monthly basis.

9.      All staffing companies have access to the same universe of obvious customers and there is nothing secret about the identity of the users of temporary legal services. The customers—primarily many of the largest law firms in Washington—are all widely known in the industry and readily available from Martindale Hubbell, trade journals, trade directories, the Yellow Pages and the Internet. All of these places are publicly known. Even client information such as the types of cases a customer handles, growth areas of certain customers, the types of temporary employees a particular customer uses or the type of candidate a customer likes is not a secret. One phone call to a law firm will get you the name of a contact person who will readily tell all staffing firms what their temporary help needs are, the profile of candidates they require, and what they are willing to pay.

10.     Almost every medium- and large-sized law firm in Washington uses staffing companies. Firms generally hire staffing companies only for a specific project. As a result, firms usually work with many staffing companies with whom they disclose their needs to ensure that they get the best price. Most law firms have relationships with at least two or three staffing companies, but some use as many as five or six. Some law firms even use multiple staffing companies on the same project. This information is generally known within the industry. People in the industry know which law firms use temporary attorneys, as well as which

- 3 -

staffing companies are hired by which law firms. Whenever a new project is staffed, everyone in my field knows about it.

11.     When I worked at Ajilon, many of my projects came from contacts that I had before joining Ajilon. Crowell & Moring ("Crowell") became a user of Ajilon's services as a result of my relationship with the firm. Mayer, Brown, Rowe & Maw hired Ajilon based on my relationship with Sherman Lambert, a former co-worker of mine. Similarly, Dickstein Shapiro gave me work as a result of my relationship with Chris Wood, another former co-worker. Fannie Mae gave us work because of my relationship with yet another former co-worker, Steven McPherson.

12.     I have an long relationship with Crowell, which has helped me get work from them. Two of my law school classmates, Michael Van Arsdall and Matt Hans, joined Crowell after graduating from law school. I remained friends with them and got to know many of their co-workers as a result. After law school, I began working in the General Counsel's office at Bell Atlantic. Crowell served as our outside counsel in a matter that I worked on, and as a result, I worked closely with a number of other lawyers at the firm. After I took time off from the practice of law, I used my contacts at Crowell to obtain a staff attorney position at the firm in May 2003. As an attorney at Crowell, I worked closely with a large number of people— both lawyers and nonlawyers. After nine months working for Crowell, I left to join Ajilon.

13.     I recently obtained a project from Crowell for Solomon-Page. I did not solicit Crowell for this work. The project came to me as a result of a phone call I received from my law school classmate, Michael Van Arsdall, who is still at the firm.

14.     Since I have left Ajilon, I have not interfered in any way with its existing contracts with Crowell. Ajilon still has work from Crowell. I have no intention of interfering

with Ajilon's existing relationship. I hope only to use my contacts, all of which were developed before I worked at Ajilon, to compete for new projects.

15.     I did not expect my contract with Ajilon to prevent me from joining Solomon-Page. I was aware of numerous Ajilon employees who left the company to join rivals with Ajilon trying to stop them. For example, Andrew Perlin left Ajilon about 18 months ago and joined Solomon-Page's Washington office and continued working in the legal staffing business. Many others left to join other competitors while I worked at Ajilon, including Andrew Jewell, who left Ajilon's legal staffing division in D.C. for Hudson Legal's D.C. office without being sued. In addition, Ajilon hired a number of employees -- including Steve Gomez and Scott Baker -- from its competitors, whom I believe also had similar non-compete clauses.

16.     My contract with Ajilon would prevent me from working in the staffing industry in any city that has a significant market for my services. The contract prevents me from working anywhere that Ajilon has an office, which includes New York, Chicago, Los Angeles, San Francisco, Orlando, Atlanta, Minneapolis, Charlotte, Austin, Dallas, Houston, and San Antonio.

17.     The contract also prevents me from soliciting any of my former clients. This list includes many major law firms in the city: Crowell & Moring; Mayer, Brown, Rowe & Maw; Dickstein Shapiro; Sidley Austin; McKee Nelson; Skadden, Arps, Slate, Meagher, & Flom; Baker & McKenzie; and Hogan & Hartson. The contract also prevents me from soliciting any *potential* customer I ever contacted. That list includes every firm in the city that uses staffing companies.

18.     These restrictions will cause me significant hardship. I support myself and help support my father by earning a living in the staffing industry. If the injunction is issued, I

do not have the ability to obtain meaningful employment as I have effectively abandoned the practice of law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23th of July, 2007, in Washington, D.C.

_____
Joshua Kubicki

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

v.

JOSHUA KUBICKI, KIMBERLY DANOWSKI,
and JON POMYKALA,

Defendants.

CASE NO. 1:07-cv-01281-RJL

## DECLARATION OF KIMBERLY DANOWSKI

I, Kimberly Danowski, hereby declare as follows:

1.      I am a resident of Maryland, residing at 702 Linden Grove Place, Apt.
302, Odenton, MD 21113.  I am a defendant in the above-captioned matter.  I make the
following declarations based upon my personal knowledge.

2.      I was hired by Ajilon Professional Staffing, LLC on August 15, 2005.  I
worked at Ajilon until I resigned on June 29, 2007.

3.      Originally, I worked in Ajilon's office division, but in March 2006, I
moved to the legal division where I was in charge of the payroll.  I would pull reports of the
hours each attorney had worked, made sure their timecards were submitted properly, and that
they received their paychecks.  When a new project began, I made sure that the attorneys'
personal information was entered into the system so they could be placed on the payroll.

4.      Because my position for Ajilon's legal division was strictly administrative, I did not solicit law firms or any other potential customers. My only contact with customers occurred if there was an issue with a billing matter. These contacts were infrequent.

5.      I do not have a copy of Ajilon's customer list. Nor do I have any other Ajilon documents relating to its customers or contract attorneys. On my last day at Ajilon, Lange Carter, an Ajilon employee, checked the items I took with me and confirmed they contained only my personal belongings.

6.      I am currently employed by Solomon-Page Group LLC ("Solomon-Page") in its Washington office. My job responsibilities are substantially similar to my responsibilities at Ajilon. I have not solicited any law firms or other potential customers or contract attorneys while working at Solomon-Page.

7.      I will suffer significant hardship if I cannot continue working for Solomon-Page. I have not worked in any other industry for over two years. I support myself and need this job to pay my rent, student loans, car loan, and insurance.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23th of July, 2007, in Washington, D.C.

Kimberly Danowski

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

v.

JOSHUA KUBICKI, KIMBERLY DANOWSKI,
and JON POMYKALA,

Defendants.

CASE NO. 1:07-cv-01281-RJL

## DECLARATION OF JON POMYKALA

I, Jon Pomykala, hereby declare as follows:

1.       I am a resident of Virginia, residing at 1537 28th St South, Apt. # 4, Arlington, VA 22206. I am a defendant in the above-captioned matter. I make the following declarations based upon my personal knowledge.

2.       I was hired by Ajilon Professional Staffing, LLC on October 25, 2005. I worked at Ajilon until I resigned on June 29, 2007.

3.       My job at Ajilon required me to find qualified personnel to fill legal staffing projects. For most projects, the customer—usually a law firm—would specify the number of attorneys and/or paralegals needed for the assignment. I was in charge of placing individuals in these positions. Once the project began, my responsibilities often, but not always, required me to ensure that the personnel were performing adequately, including firing attorneys and seeking replacements as necessary.

4.    I did not solicit law firms or any other potential customers for Ajilon.  My involvement in a project began once Ajilon had already secured the job.

5.    I do not have a copy of Ajilon's customer list.  Nor do I have any other Ajilon documents relating to its customers or contract attorneys.  On my last day at Ajilon, Lange Carter checked the items I took with me and confirmed they contained only my personal belongings.

6.    I am currently employed by Solomon-Page Group LLC ("Solomon-Page") in its Washington office.  My job responsibilities are substantially similar to my responsibilities at Ajilon.  I have not solicited any law firms or other potential customers while working at Solomon-Page.

7.    I will suffer significant hardship if I cannot continue working for Solomon-Page.  I support myself and need this job to pay my rent, car loan, and credit card bills.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23th of July, 2007, in Washington, D.C.

_____
Jon Pomykala

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AJILON PROFESSIONAL STAFFING, LLC,<br><br>Plaintiff<br><br>                        v.<br><br>JOSHUA KUBICKI, KIMBERLY DANOWSKI,<br>and JON POMYKALA,<br><br>Defendants. | CASE NO. 1:07-cv-01281-RJL |

**<u>DECLARATION OF MARK W. MOSIER</u>**

I, Mark W. Mosier, declare as follows:

1.      I am an associate at the law firm of Covington & Burling LLP, counsel to defendants in the above-captioned matter.  I have personal knowledge of and am competent to testify to the matters set forth herein.

2.      Attached hereto at Exhibit A is a true and correct copy of a hearing transcript of the U.S. District Court for the District of Columbia in *HIRECounsel D.C., LLC v. Thuemmler*, No. 05-2111 (D.D.C.), dated January 5, 2006, denying plaintiff's motion for a temporary restraining order and preliminary injunction.

3.      Attached hereto at Exhibit B is a true and correct copy of a hearing transcript of the Superior Court of New Jersey, Hudson County, in *Accounts on Call v. Silverberg*, No. C-176-95 (N.J. Super. Ct. Ch. Div.), dated October 24, 1995, denying plaintiff's motion for a preliminary injunction.

4.      Attached hereto at Exhibit C is a true and correct copy of a hearing transcript of the Superior Court of New Jersey, Bergen County, in *P.C. Help Servs., Inc. v. Wein*, No. C-206-96E (N.J. Super. Ct. Ch. Div.), dated July 11, 1996, denying plaintiff's motion for a preliminary injunction.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23th of July, 2007, in Washington, D.C.

Mark W. Mosier

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HIRECOUNSEL D.C., LLC,                    )
                                          )
          Plaintiff,                      )    Docket No. CA 05-2111
                                          )
     v.                                   )
                                          )
RICHARD THUEMMLER,                        )    Washington, D.C.
LEGAL ESTAFFING, INC.,                    )    Thursday, January 5, 2006
               et al.,                    )    9:45 a.m.
                                          )
          Defendants.                     )

TRANSCRIPT OF TRO/PRELIMINARY INJUNCTION MOTION HEARING
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

     For the Plaintiff:          LATHAM & WATKINS, LLP
                                 Allen M. Gardner, Esq.
                                 Marguerite Sullivan, Esq.
                                 555 Eleventh Street, N.W.
                                 Suite 1000
                                 Washington, D.C.  20004-1304
                                 202.637.2200


     For Defendant:             DAVIS & CAMPBELL, LLC
     Richard Thuemmler          Carlos M. Recio, Esq.
                                 1828 L Street, N.W.
                                 Suite 660
                                 Washington, D.C.  20036-5104
                                 202.293.5690


     For Defendant:             FRIEDLANDER, MISLER, SLOAN, KLETZKIN
     Legal e-Staffing,          & OCHSMAN, PLLC
     Inc.                       Robert E. Greenberg, Esq.
                                 1101 17th Street, NW
                                 Suite 700
                                 Washington, D.C.  20036-4704
                                 202.872.0800

```
    Court Reporter:              Scott L. Wallace, RDR, CRR
                                 Official Court Reporter
                                 Room 6814, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.326.0566
```

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>MORNING SESSION, JANUARY 5, 2006</u>

(9:48 a.m.)

THE DEPUTY CLERK:  Civil action 05-2111, Hirecounsel D.C., LLC, versus Richard Thuemmler, et al.

Counsel, please state your names and who you represent for the record.

MR. GARDNER:  Good morning, Your Honor.  Allen Gardner, Latham & Watkins, on behalf of Hirecounsel D.C., LLC, and with me is Marguerite Sullivan also from Latham & Watkins.

THE COURT:  All right.  Good morning.

MR. RECIO:  Good morning, Your Honor.  I'm Carlos Recio. I'm counsel for Defendant Richard Thuemmler, who's here to my right this morning.

THE COURT:  All right.  Good morning.

MR. GREENBERG:  Good morning, Your Honor.  May it please the Court, Robert Greenberg of Friedlander Misler, on behalf of Legal e-Staffing, Inc., and with me is the representative of the company, Ms. Jeanette Derby.

THE COURT:  All right.  Thank you.  Good morning.

What I thought I would do is offer 20 minutes to each side unless you all have come to some other arrangement.  Will that do?

MR. GARDNER:  Certainly fine from plaintiff, Your Honor.

MR. RECIO:  Sounds fine, Your Honor.

THE COURT:  All right.  Why don't we offer the

plaintiff -- I'm sorry -- I'm sorry -- the plaintiffs their

opportunity to go first as the movants.

　　　　MR. GARDNER:   Okay.   By way of background, Your Honor, my

client Hirecounsel D.C. LLC -- and I'll just refer to them as

Hirecounsel from here on out -- is a temporary legal staffing

agency.   What they do is they take temporary attorneys,

paralegals, people interested in doing temporary work in the

litigation staffing industry, and they place them with clients,

large law firms, government agencies, corporate law departments,

who have need for temporary staffing.   This happens quite often

as I'm sure the Court is well aware, and large scale discovery is

probably the main part of their work.

　　　　Because they don't make anything, they don't make -- they

don't make cars, they don't make widgets, all they do is find

qualified applicants, temporary attorneys, temporary paralegals,

and they place them with clients.   That's really the only product

they have, and as a result, they're constantly, because of the

nature of the business and the turnover, as you can imagine,

sometimes, you know, people want to be temporary for a while.

Then they find a permanent job; they relocate.   There are lots of

reasons why people want to be temporary, but temporary is not

always a satisfying career.

　　　　So few people stay in the temporary business forever and

there's constant turnover.   And as a result, my client, as well

as any other temporary staffing agency, spends a lot of its time

mining, finding, recruiting qualified applicants to fill the needs of their clients.

And that's where the database that we talk about in our papers comes into play. They keep detailed information on each applicant and on each client as to their background, educational history, their -- each one of their contacts with Hirecounsel, they come in for initial interview, they do screening, they make -- they get ratings as far as, you know, their professional demeanor, their attitude, their presentation, so that when materials come in from clients -- jobs come in from clients, they can swiftly then find the 10 or 15 or 20 temporary attorneys or temporary paralegals that fit their needs and place them.

So they're constantly doing that, and that's why really the most valuable asset my client has is this database of information that they spend time and money and effort collecting from applicants and from clients.

Now --

THE COURT: Is there something special and different about the way that the data has been organized or assessed that allows the company to be able to respond quickly to a request from a client to match up applicants?

MR. GARDNER: Absolutely, Your Honor. It has clients that they've worked with in the past; they have prior experience with them. They've done, you know, large-scale document productions in a specific substantive area, has their prior history as far as

you know non-temporary jobs that they've had as well as temporary jobs, so that if Arnold & Porter, for example, comes in and says, "We need 20 temporary attorneys for a massive document review for a products liability case," Hirecounsel can then go to the database, do products liability, can do the specific industry they're looking at, can look for applicants who have worked for Arnold & Porter in the past. All of these terms are searchable, and attached to our papers, we put in a couple of sample applicants and their database history, and they're six pages long with -- and I apologize for the print, little teeny, tiny print containing all of this information, and that's what makes it so valuable and so searchable because this is nonpublic information.

You can't go to Martindale Hubble and find a list of all the qualified temporary attorneys in the area; they're just not there. You have to go out and get it through hard work and money. You have to place ads, you have to do interviews, you have to do background checks, you have to use word-of-mouth among temporary attorneys and temporary paralegals in order to find these people.

THE COURT: But is there some special way that you have trained the people who staff your company to either store or code the data to make it quickly searchable as you describe it?

MR. GARDNER: It is -- yes, Your Honor. One, it's searchable electronically, and there's also the added benefit of each applicant has a management person at Hirecounsel that is

specifically responsible for them.  They maintain the
relationship, they speak with them, you know, when they come in;
they place them with clients.  And so there's also the personal
knowledge of the, you know, at least one person at Hirecounsel
for each applicant in the database.  So there's also -- it can
also be searched that way, Your Honor, just by, "Hey, I think
John would be good for this job," or "I think Susan has done this
before."  So it's not just the database and electronic search,
but it's also the management personnel that has responsibility
for each applicant.

     THE COURT REPORTER:  Slow down a little bit.

     MR. GARDNER:  All right.  I apologize.

     It's also -- and I hope that's the only time you have to
tell me that.

     There's also the management person that is primarily
responsible for each applicant, that has the knowledge and the
relationship with that applicant that knows, "Hey, we could put,
you know, John or Susan on this job," and there's also a ranking
that Hirecounsel does for each of their candidates as far as
their, you know, their qualifications and whether they would be a
superior candidate or whether they're not such a great candidate,
and of course there are gradations in-between.

     That's what Mr. Thuemmler, the primary defendant, and the
only defendant in on our motion for preliminary injunction,
that's what he did when he worked at Hirecounsel for two, two and

a half years.  He had the relationships; he interviewed

applicants.  There were many that he had primary responsibility

for.  He contacted clients; he worked with clients to place

applicants.  He checked the references on applicants; he

interviewed applicants.  He did all of the things that are

necessary to build the database into the asset that is necessary

for Hirecounsel to be able to serve the needs of its clients when

jobs come in.  And his -- the relationships that he built and the

access that he had to all this information is the reason why,

one, Hirecounsel relied on him to evaluate the applicants to, you

know, decide is this a quality applicant, is this somebody we

want to send to our valuable clients?  Is this somebody who will

bring our clients back to us?

But he also had access not just to those that he was

primarily responsible for, Your Honor.  He had access to the

entire database, to those that other management employees at

Hirecounsel were responsible for, and that's why upon joining

Hirecounsel, Mr. Thuemmler was required as a condition of his

employment, to sign an employment agreement, and the employment

agreement contained some provisions that are the reason we're

here today.

There was a non-solicitation agreement for one year after

Mr. Thuemmler left -- or leaves.  At the time it was prospective;

now, of course, it's happened.  But one year after leaving, he

cannot solicit any applicant, any of the temporary employees, or

clients that the Hirecounsel office had worked with in the preceding 12 months.

There were other provisions that required Mr. Thuemmler not to disclose any of the information -- any of the confidential information that was in the database and not to use it for personal gain or for the use of any prospective employer or really for anybody else.  The confidential database was to stay the property of Hirecounsel and to stay with Hirecounsel regardless of where Mr. Thuemmler went.

THE COURT:  Well, is it correct that there were approximately 3500 applicants in the database, or at least applicants with whom the company had worked in the year before Mr. Thuemmler left?

MR. GARDNER:  No.  That number is higher than the number that had actually been used in the preceding 12 months.  I believe in defendant's papers, he meant to say that there were that many people in the database, but not that many people who had been actively worked with in the preceding 12 months.

THE COURT:  Is there some reliable way that a staff member or employee of the company would know how many people or which people among the 3500 in the database fell within that 12-month prohibition?

MR. GARDNER:  Absolutely, Your Honor.  It would be very easy to search that, and I could provide the Court -- confidentially, obviously -- the list of names and contact

information because every time the person is contacted or every time the person is sent out on a job, an entry is made in the database. It's constantly updated, otherwise it quickly becomes far less useful.

THE COURT: So the way for you to know that is to do some request of the database.

MR. GARDNER: I could have my client run that. I could have that this afternoon, Your Honor.

THE COURT: I'm not interested in seeing it. I'm asking principally because how is Mr. Thuemmler or anyone in his position supposed to know, among the 3500 or so people in the database, the thousand or so that have been worked with in the company in the past year unless he actually does an inquiry in a database he no longer has access to, or prints out something and takes it with him, and I assume he's prohibited from doing.

MR. GARDNER: He was prohibited from doing, Your Honor. I would suggest two things: One, it would be -- he certainly knows that anybody he worked with and he had primary responsibility for, for example, Mr. Corliss Von Adams, that we submitted a declaration from, because Mr. Thuemmler contacted him his very first day at Legal e-Staffing and solicited him to come work for his new employer at Legal e-Staffing. Mr. Thuemmler had primary responsibility for Mr. Adams. There was -- he could not have not known, Your Honor, excuse my grammar, that he was prohibited from soliciting Mr. Adams.

The only way he could have gotten that information was one, the relationship that he had with Mr. Adams because he had, as I explained earlier, he had primary responsibility for Mr. Adams in the database, and I believe it was an exhibit to our reply memorandum has a redacted copy of Mr. Adams' entry in the database. We redacted it to take out a lot of the personal information because there's an evaluation and that kind of stuff, contact information and those kinds of things.

But Mr. Thuemmler had primary responsibility for him. And the very first thing he did when he got to Legal e-Staffing, literally that first day, was he called and solicited Mr. Adams and said, "Hey, I'm now at Legal e-Staffing. Why don't you come work for me?" There cannot be a more clear violation of the contract that Mr. Thuemmler willingly signed as a condition of his employment, and he had to have known because he had worked with him just in the months prior, literally May of '05. So May, June, July, three months before he left, he had worked and placed Mr. Adams on behalf of Hirecounsel.

THE COURT: So if you were to get an injunction, would your injunction then be limited to those people that Mr. Thuemmler can be shown to have known to have been among the people that the firm had worked with for the prior year?

MR. GARDNER: I would think at an absolute minimum, yes, Your Honor. I think another way that it could be done is that we could submit the names of those people who had worked in the

preceding 12 months that fit within the definition of the

contract to the Court or to a third party, and then as they -- as

Legal e-Staffing, without Mr. Thuemmler's help -- and we can talk

about that later -- but if Legal e-Staffing chooses to continue

in this business and to recruit temporary attorneys, the names

could be checked against the list, and it could be easily done by

a third party with just a phone call or an e-mail, Your Honor.

THE COURT:  And how would Mr. Thuemmler be complying with

the order if he doesn't have the list of names?

MR. GARDNER:  Well, that's why it would require a third

party, although I will say, Your Honor, that we believe he does

have the list of names, that he does have the contact

information, and that's how he called people like Mr. Adams.

THE COURT:  And what, if any, evidence do you have that he

took the list of names?

MR. GARDNER:  Well, one --

THE COURT:  Aside with the contact with Mr. Adams.

MR. GARDNER:  We don't, Your Honor.  At this time without

the aid of discovery, we don't, other than he contacted Mr. Adam

on the very first day, and that suggests to us, and I would argue

that it should certainly suggest to the Court, that that was the

plan when he left Hirecounsel.

THE COURT:  So if, as Mr. Thuemmler claims, he is

responding to some inquiry to his new employer, is he then

supposed to, before responding, call this third party and say,

"Here's who I'm planning to call.  Is it okay?" and wait for that third party to say, "No, that's one of the people that had been worked with -- that's an applicant that the firm had dealt with within the prior year," or "Yes, you can go ahead and call."  Is that how he's supposed to do his job?

MR. GARDNER:  I think that would be the easiest, and given the confidential nature of the list and the information contained, the safest way to do it, Your Honor.  I understand it's not perfect, but certainly we could get a third party at our -- at our expense to go ahead and control the list and to respond quickly so that no time is lost.

THE COURT:  And what do you anticipate the new employer's concerns would be about revealing to Hirecounsel who as applicants are now coming to them?

MR. GARDNER:  That's why it has to be a third party.  We assume they don't want us to know any more than we want them to know.  That's why we said a third party that could be chosen together or suggested by the Court.  That's the theory there. The Court's exactly right, we assume that they want to keep that information as confidential as we do.

Because the database took so much time -- well, took -- takes, because it's a continuing effort, Your Honor, takes so much time and so much effort and so much money to continually update and to continually put together, we believe there's really no argument that it is a protectable -- it's a protectable asset,

that it is something that is entitled to injunctive relief, the

protection of that.  That's why Hirecounsel goes to the lengths

that it goes to to protect that list, including having management

people, people who have access to the database sign employment

agreements.  It's password protected.  It has limited, carefully

limited printing capabilities so only a certain group of people

can print it only in the office.  It cannot be accessed from

employees' homes; not every employee has access to the database

and the information.

THE COURT:  Well, let me ask you this:  If the only

evidence you have of the defendant's having taken either

proprietary information from the database or taken the database

in some other form is the contact between him and Mr. Adams, what

other actual harm or injury are you claiming that the firm is

suffering from now or is about to suffer from in some imminent

fashion?

MR. GARDNER:  Several things, Your Honor, and I think

these are -- this case is very similar to the *Morgan Stanley* case

that Judge Urbina had a few years ago.  In that case, they only

had sworn testimony related to one unauthorized contact, just

like we have here, without the aid of discovery.  In that case,

Judge Urbina found -- and it's the same here, there was a

customer list here.  It's detailed information about applicants

and clients, not unlike a customer list at an investment bank or

brokerage house.  It's the loss of customer goodwill, the loss

of -- and when I say "customer," I mean both clients, law firms, and applicants, who believe when they give this information that it's being kept confidential, that it's not being spread on the street, that it's not being kept by everybody.  I mean, when you interview for a job, there are things that you will provide your employer that you expect will be kept confidential, and that's one of the -- that's one of the values and the harms that Judge Urbina recognized in the *Morgan Stanley* case.

Some of the other harms that have been found by the D.C. courts that are also found here, Your Honor, is --

THE COURT:  Well, before we move off that have harm --

MR. GARDNER:  Go ahead, Your Honor.

THE COURT:  If we're in the environment of temporary lawyers or paralegals looking to be placed in legal environments or law firms looking for temporary legal workers, how is that the same relationship as the relationship of someone who is an investor sharing private capital or investment information with a broker?

If applicants are looking for work, it's unlikely they're going to look for work through only one placement organization. If a law firm is looking for workers, it's unlikely that the legal workers -- they're going to confine themselves to only one placement location.  Correct me if I'm wrong on that, but if I'm not, how is that similar to the kind of relationship that Judge Urbina faced with a broker-dealer and investor?

MR. GARDNER:  Let me answer the first part of the Court's question and then the second part.  It is true that some temporary people in the temporary industry, be it temporary attorneys or paralegals looking for temporary placement, do apply to more than one place.  I would also suggest that that's true with brokerage houses.  Many people have more than one account. The point is the person whose information is being used and being shared gets to decide who gets it, what they get, and what they get to do with it, not the other way around.

In other words, brokerage houses -- obviously for financial reasons or business reasons, but also for confidentiality reasons don't share that kind of information. Neither do temporary staffing agencies.  We don't pass, you know, our applicants' information to other staffing agencies, and that's because if -- if the applicant wants to give the information -- this involves criminal background checks, reference checks.  It's more in depth than what a lot of employers do, and the information is a lot more detailed than a lot of employers do in hiring somebody on a permanent basis, and you can see that in the sample that we sent in, and if the Court wanted an unredacted copy of the database, we would be happy to provide that on an under-seal or confidential basis.

Some of the other harms I wanted to go through, Your Honor, is the harm -- and this was pointed out in both the *Deutsche* case and in the *Smith Bucklin* case that we cite in our

papers.   There's the risk that an employee will take a valuable asset of the employer and then use it to compete against the employer, which is precisely what happened here.

The *Deutsche* case talked about -- I believe the term they used was "risk-free entry into the market."  If you go and you look at Legal e-Staffing's Website, prior to Mr. Thuemmler being hired, there's no reference to the hiring or placement of temporary attorneys, and that's because when Mr. Thuemmler showed up, he comes in ready-made.  He's got the training which he didn't have prior to working for Hirecounsel; he never worked in the industry before.  He has contacts with temporary attorneys, temporary paralegals that he didn't have before, and the *Smith Bucklin* case goes on to point that it's this, using your asset, taking it, and then using it against you is also a protectable interest and an irreparable harm worthy of an injunction.  That was another harm I wanted to point out to the Court that we are suffering here because of Mr. Thuemmler's solicitation and competition in violation of his employment agreement.

THE COURT:  Well, help me understand why you claim that the harm is not reparable if the agreement itself contains a liquidated damage clause that says any contractual violation can be remedied by payment of -- I think the paragraph said something close to $40,000.  How can you then claim also that this is an irreparable harm if you've got a liquidated damages provision in the agreement?

MR. GARDNER:  Because the harm is more than just the lost placements.  One, it's difficult to calculate lost placements, lost applicants.  That's why the liquidated damages provision is in there, and as the Court knows, liquidated damage provisions are put in contracts when damages by their nature are difficult to calculate.  That's the purpose the liquidated damages serve.

It also doesn't -- the liquidated damages provision does not purport to cover for lost goodwill or the fact that there's an employee that's taken a valuable asset, used it to compete against the employer at a loss of goodwill and reputation in the industry which is just incalculable, and that was recognized both by *Morgan Stanley*, the *Merrill Lynch* case and the *Smith Bucklin* case that we with cite in our papers.

THE COURT:  Well, these broker-dealer cases that you rely upon, isn't it the fact that most of them end up, even when there's an injunction or temporary restraining order issued, isn't it a fact that most of those cases end up going to arbitration under an agreement anyway, and they result in some payment of money and the parties just go on with their work?

MR. GARDNER:  They do, Your Honor, and Judge Urbina, I thought, handled that very nicely saying there are two analyses going on.  One is whether an injunction needs to issue to preserve or to return to the status quo while you settle the dispute so that more ground isn't lost.  It's not the party doing it, so it's not really a mitigation of damages, but it's a

preserving of harm, stopping the harm, stopping the bleeding, if you will, until discovery can be had and issues decided on the merits. So the fact that it was going to arbitration, binding arbitration under the broker-dealer agreements didn't affect the court's ability or responsibility in examining the provisions and the standards for injunctive relief and going ahead and issuing it until the arbitration could happen, and I would suggest that it's the same thing here, Your Honor.

Whether it's an arbitration or whether it's a trial, the purpose of the injunctive relief is to stop the harms until it can be decided on the merits.

So I don't see any -- I don't see any difference whether it's an arbitration or whether it's a trial in Federal Court, Your Honor.

THE COURT: What, by the way, have you done to pursue arbitration?

MR. GARDNER: At this point we have not discussed it, Your Honor. There have been some settlement negotiations which frankly didn't go very far. The parties are still fairly far apart, and unless I misrecollect, there has been no discussion of arbitration, Your Honor. But that's certainly something that I can talk to my client about, and we'd be -- we're interested in an expedited resolution of these issues, and if arbitration is the way to go, I'll certainly talk to my client about that.

THE COURT: All right. Do you want to wrap up?

MR. GARDNER:  Yes, Your Honor.

On the balance of equities which is the last factor that the Court will need to consider in issuing an injunction, I would ask that the Court look to the *Merrill Lynch* and the *Morgan Stanley* cases and also the *Deutsche* case that suggest that when an employee comes in, learns the trade, is trained by the employer, no previous experience, gets the benefit of the compensation, support, the contacts and learning the industry, the balance of equity tips in favor of the employer in enforcing the contract, protecting the trade secrets and issuing the injunctive relief.

And unless the Court has any other questions, I'll take a seat.

THE COURT:  Thank you.

MR. GARDNER:  Thank you, Your Honor.

MR. RECIO:  There is one document which I shared with counsel that the Court has not seen that I may refer to, and with the Court's permission, I'll handle it up -- or two documents, actually.

May it please the Court, this is not a contract attorney database suit.  At least I didn't think it was until I heard the argument.

Your Honor, it's undisputed that -- in Richard Thuemmler's affidavit, they have not disputed it that these contract attorneys sign up with agencies all over town.  It's in paragraph

7 of the affidavit, and that makes a lot of sense.  They post

their résumés all over town, and they're looking for work, and it

makes sense, as Your Honor observed.  And Your Honor has

independent expertise because of Your Honor's background as a

private practitioner and as a judge, in this area.

And we would urge that this Court use that expertise in

this case, given the fact that this is a legal industry case.

Analogy is judges have expertise on attorneys' fees and what they

are, and you don't need expert testimony on that issue as a

result, and I cited the law on that.

Your Honor, the only evidence that we've done anything

wrong or remiss is that, well, we supposedly solicited Corliss

Von Adams.  That's in dispute.  Mr. Adams said there was this

call in early October, the 1st or the 2nd.

Mr. Thuemmler says in his affidavit that Mr. Adams,

typical, sent a résumé to him, and Thuemmler, my client,

responded and called, and he wasn't interested.  We didn't place

Mr. Adams anywhere; we didn't do anything with him.  He's not in

the new database.  And Your Honor --

THE COURT:  Well --

MR. RECIO:  -- that's the document I just handed up where

on October 19th, Mr. Adams sent his résumé to Mr. Thuemmler.

THE COURT:  Okay.  And you gave me two documents.  Which

one should I look at?

MR. RECIO:  Well, one was the ad in the *Washington Post*,

just so you can see the text, and the other one is from the
*Washington Post* where Mr. Adams posted his résumé and sent it by
e-mail to rich@legalestaffing.com:  "Here's my résumé."  And
there is Mr. Adams's résumé on October 19th, which is consistent
with Mr. Thuemmler's affidavit that, yeah, he talked to Adams,
but it was later on, maybe around the 19th in response to a
résumé that Mr. Adams sent.  And that's logical because these
contract attorneys, they send their résumés all over town.
They're looking for work; they want to keep their options open;
they're not dumb.

        Just like this law firm client, the real clients are the
law firms, and they're not dumb either.  So, Your Honor --

        THE COURT:  May I interrupt you for one moment.  Forgive
me.

        Can you guide me a little bit about the dates.  Your
client left Hirecounsel, was it September 30th?

        MR. RECIO:  Yes, Your Honor.

        THE COURT:  All right.  And then give me the dates of the
documents I'm looking at here.  The e-mail that you've copied
appears to be an e-mail sent on October 19th?

        MR. RECIO:  Correct, Your Honor.

        THE COURT:  And that's from whom?

        MR. RECIO:  From Mr. Adams to Mr. Thuemmler --

        THE COURT:  All right.

        MR. RECIO:  -- with the résumé in response to the ad on

washingtonpost.com, and I attached a copy of the text of the ad just for this Court's interest.  That's the other document I gave you.

THE COURT:  On what date was the *Washington Post* ad posted?

MR. RECIO:  I'm not certain, Your Honor.  It was early October.

THE COURT:  If the résumé was sent by e-mail on the 19th, I understand the allegation to have been that the call from Mr. Thuemmler to Mr. Adams occurred on October 3rd.

MR. RECIO:  Well, that's what Mr. Adams says, but Mr. Thuemmler disputes it and says, "No.  I called only in response to the résumé that Mr. Adams sent."  That's where there's a dispute between the parties, and that corroborates my client's side of that dispute.

My point is you can't grant an injunction based on something that is as contested as that, even assuming that this is sufficient evidence to sustain irreparable injury, which we don't think it is.  We never placed Mr. Adams, and it's in dispute that we actually solicited him.  And that's the big difference.

Judge Urbina limited the relief in the cases that they strongly rely upon to solicitation.  They want to prevent my client, Mr. Thuemmler, from working in the business at all.  Your Honor --

THE COURT:  Well, I think you said in your papers, your
memorandum I think at the third page, that your client would be
effectively precluded from making a living for a period of
one year?

MR. RECIO:  Correct.

THE COURT:  Isn't that overstated?

MR. RECIO:  Your Honor, living in his chosen profession of
recruitment, I suppose he could try to get a law clerk job or
something, which is their argument but, Your Honor, this is the
profession that he has come to know and come to work in, and he
would be precluded for a year.  75 miles from -- he can't work
75 miles from any office of Hirecounsel.  That's the northeastern
corridor and major cities in the United States.  I attached a
copy of their list of offices.

THE COURT:  You mean he can't work in competition with
Hirecounsel.

MR. RECIO:  No.  They go beyond that.  He can't work at
all in the business.  We have no trouble with a no-solicitation
limitation, and it's undisputed.  He's never solicited the lawyer
firm clients.  And the most they say is that he solicited one
contract attorney, and that's in dispute.

THE COURT:  Well, if he moved to Dubuque, Iowa, and
solicited people who are clients or applicants within a 5-mile
radius of Dubuque, Iowa, he could do that.

MR. RECIO:  I don't think Hirecounsel has offices in

Dubuque, Iowa.

THE COURT:  Right.  So he could -- your client could do that.

MR. RECIO:  He would have to sell his house, his wife would have to get a new job, and he would have to relocate.

THE COURT:  He could also stay right where he is with his law degree and be a contract attorney and be hired by Hirecounsel.

MR. RECIO:  I suppose so, but is it a proper use of this Court's injunctive power based on a flimsy case like this to prevent someone from working in his chosen profession when he's not soliciting or interfering with the business of the prior employer?

THE COURT:  Well, I was raising the questions just to test whether your claim that he'd be precluded from making a living for over a year was an overstatement.  It seems that it was.

MR. RECIO:  I will concede that that is an overstatement in the sense that he could always do something.  It would be an unjust interference with his right to make a living on the facts of this case.  So I stand corrected on my statements in my briefs, Your Honor.

Your Honor, the -- he's not solicited and will not solicit any of the clients that he worked with, the law firms.  That's undisputed, and they haven't contended otherwise.  They don't lose sight of have.  He's sworn over oath he didn't take any of

this database information or any confidential information
whatsoever.  We have Mr. Adams, and it's the only affidavit, and
that's in dispute.

      And, Your Honor, it's interesting.  Look at Exhibit B to
their reply brief.  That is the excerpt -- and this was cited by
my colleague.  Exhibit B are the -- it's from the database on
Mr. Adams, and it's Exhibit B to their reply brief.  They really
didn't put substantive stuff here until the reply, but, okay.  If
you look on page 4, you will see that the database lists contact,
you know, when someone at Hirecounsel contacted --

      THE COURT:  Hold on one moment and let me make sure I have
the right exhibit.

      MR. RECIO:  Of course.

      MR. GARDNER:  I have another copy if that would be
helpful, Your Honor.

      THE COURT:  This is page 4 as numbered at the bottom
right-hand corner?

      MR. RECIO:  It's Exhibit B and it's page 4 on the
right-hand corner.  It says, "October 27th, 2005, 10:31 a.m."

      THE COURT:  Go ahead.

      MR. RECIO:  If you look on page 4, Your Honor, they've --
these are every contact that someone at Hirecounsel had with
Mr. Adams, and they carry them in the database.  It's sort of
like a rolling list of contacts.

      Notice the initials.  "R T" is Richard Thuemmler.  And

you'll notice that the last time that Mr. Thuemmler had contact with Mr. Adams was actually on page 5, was July 1, 2004, "HC conversation," Hirecounsel conversation on --

THE COURT:  What happened to page 3 at the bottom?

MR. RECIO:  It's on page 5, Your Honor, of Exhibit B, the next page you'll see.

THE COURT:  I'm asking you about page 3, the bottom of the page, 13th of June, 2005, R T.

MR. RECIO:  It was a reference check; it wasn't a contact.

THE COURT:  Okay.

MR. RECIO:  My point is that the last time that there was a contact between Richard Thuemmler and Mr. Adams was actually July 1, 2004.  That's on page 5.

THE COURT:  I see.  All right.

MR. RECIO:  And there was another contact on May 11th, 2004.  So, I mean, this -- and Mr. Adam was -- Mr. Thuemmler was not principally in charge of dealing with Mr. Adams in any event. I don't think they've said or made that contention.  The point of the matter is that we had -- we didn't place Mr. Adams.  We didn't do anything with Mr. Adams, and the nature of the contact is disputed.

We've made the Rule 5.6 professional responsibility argument in the supplemental brief, and I think that has a lot of power, but that's a legal issue for this Court to consider.  Even assuming that this Court -- because indirectly they're preventing

these attorneys from being hired by Legal e-Staffing, so if you apply the rule and how broadly it's been applied, the ethics rule, this is all void.  They can't prevent us from contacting and soliciting these contract attorneys.

Leave that to one side.  Assume that we can; we're not doing it.  We're taking general ads out, and we're doing what we should.  We're recreating our own database, and that's how Mr. Adams' résumé came to be found.

And, Your Honor, they say this information is confidential as to their background.  These guys give you their résumé and it's all on there.  It's right on Mr. Adams' résumé.  He's worked for McGuire Woods; he's worked for various other law firms.  It's all there, his assignments.  He gives that out to anybody because it helps him look for work; it shows his qualifications.

THE COURT:  Suppose I accept your argument that the plaintiff has not shown a likelihood of success on the merits of the claim that the -- that your client misappropriated trade secrets, walked out with a database, took a list of applicants or clients and so on, aren't we still left with their contract claim in Count 2 that your client violated the agreement not to work for a competitor in the industry within a year?

MR. RECIO:  Within 75 miles.

THE COURT:  Right.

MR. RECIO:  Yes, he has, and this Court should not enforce that agreement, not on these facts presented.  Number one,

because there's no protectable trade secret interest that
warrants his being barred from working in his chosen field within
the 75 miles.  The *Reusch International* case, which is
controlling in D.C., says that wherever you have commercially
conspicuous clients, all this effort you make to canvas and deal
with the clients, is not protectable trade secret -- is not a
protectable trade secret information as opposed to the broker
cases where you have the individualized relationships.

Nowhere do they contend that Richard Thuemmler
individually had these tremendous relationships with either the
clients or with the contract attorneys that was built up on
company time and that is protectable, and that's what you usually
see in these cases, and you do see that issue in the broker
cases.  That's not true.  All that they're saying in their
affidavit on Hirecounsel is that they spent all these marketing
efforts to become known among the law firms.  You have to do good
work -- you have to do good work and you have to be prompt in
response.  It's service and price, and these law firms are
sophisticated and so are the contract attorneys, and given the
nature of the market, there's no protectable interest.  Don't
lose sight of the standard.  It was never cited.

Brief statement standard says that a restraint is
unreasonable if it is greater than is needed to protect the
promisees, Hirecounsel's, legitimate interests.  The restraint is
greater than is needed.  Don't forget that the standard applies

here, and they're saying, "Oh, the contract says -- this contract

says irreparable injury, the contract says this, blindly enforce

the contract." That's not the law in D.C. or anywhere else. You

apply the law and it's unreasonable, and an unnecessary restraint

and simply trying dampen competition, to absolutely bar

Mr. Thuemmler from working within 75 miles of any of their

offices. And that's what they really want. This isn't about

contract databases.

THE COURT: Help me with this: Why isn't the restraint in

the contract a legitimate interest in not letting your client

come back essentially to bite the hand that trained it and fed it

for the while in the staffing business? Why isn't it a

special -- why isn't the plaintiff's special methods it has

developed, whatever they are, for quickly matching a client's

needs with qualified and available applicants a protectable

interest?

MR. RECIO: Those needs, and they admitted it -- and

commendable Mr. Gardner admitted it -- those needs are constantly

changing. These assignments come up, they change, and they vary

from time to time. Generally learning how the business works and

how to do your job, that's not a protectable interest. That's an

employee's skill that he develops, and, Your Honor, it is

disputed, the background. They're claiming that this guy didn't

know a darn thing about the recruiting industry. Look at

Mr. Thuemmler's affidavit. No, he hadn't work as a recruiter,

but he worked for LexisNexis, and he had extensive contact and knowledge about the business of recruiting enough that. He wanted to get into it.

And let's face it, Your Honor, any of us here as attorneys have a general working knowledge of how recruiting works because we've all either been contacted over the years or had friends or dealt with legal recruiting. It's part of being a lawyer. So the notion that he's received some special, super-duper training, they haven't seriously pursued it, and I don't think they can seriously make that argument. He was a lawyer. He did have a background through LexisNexis, did know about staffing and how this business works.

No, he learned how they operate their business, but he's not using -- he's using his general skills and knowledge. That's okay, and he's entitled to do that. But what he's not entitled to do is interfere with their legitimate interest, but their legitimate interest is very limited. Sure, if we stole the whole database, I will concede that that is entitled to protection and is enjoinable or otherwise sanctionable under contract, et cetera, but maybe even under the Uniform Trade Secrets Act.

But we didn't take the database. All we're doing is, we're taking out general ads and recreating our own database, and if what he learned of how they do their database is being used to recreate the new database, that's just general knowledge. He's allowed to do that. No, it's not a legitimate protectable

interest to actually bar him from working as opposed to

solicitation -- the no solicitation that Judge Urbina ordered,

and he was careful to note clients can contact these brokers; the

brokers can't just solicit away the clients that they developed

personal relationships with.

But there's nothing like that here.  There's no personal

relationship between Richard Thuemmler and 3500 contract

attorneys, and no personal relationship with these people at the

various law firms.  That wasn't even commented during Mr.

Gardner's argument before this Court.  And he's gone out of his

way not to solicit the law firms that he's worked with.  He's

working with other people and building up the database.  So, Your

Honor, they're trying to put him out of business altogether, and

that's not warranted under the law --

THE COURT:  Out of this business.

MR. RECIO:  Out of this business, that's right.  But it's

the business that he has chosen and that he has learned, and it's

not warranted under a showing of irreparable injury.  It's not

warranted under the reasonableness of these kind of contracts

under D.C. law whatsoever.  And the burden is on them.  They have

failed to meet that burden in any way, shape, or form.

Your Honor, this solution -- I think Your Honor commented

that a third party has a list and we have to call up and see if

we're permitted.  Your Honor, that's not workable as any kind of

a solution.  Even assuming that -- we're not actively soliciting

any contract attorneys, and the one example they have is in

dispute, and you can see that Mr. Adams did send his résumé on

the 19th to Mr. Thuemmler, which is inconsistent with Mr. Adams'

affidavit and consistent with Mr. Thuemmler's.

    But be that as it may, we don't have any trouble -- that

we're not going to solicit anyone we know that's in the database,

but if they contact us in response to a blind ad, and these guys

do it all the time because they're looking out there for what's

out there, what's wrong with that, and why is that hurting any

interest?  And keep in mind what they're really seeking in this

case and the fact that they're the not entitled to it.

    Your Honor, correctly commented, they've got these

Draconian liquidated damages provisions in the contract, but --

    THE COURT:  "Draconian" wasn't my word.

    MR. RECIO:  Pardon me?

    THE COURT:  "Draconian" was not my word.

    MR. RECIO:  Yes, Your Honor, that is true.  It is my --

the point of the matter is, if you want to put that stuff in a

contract and try to get this Court to enforce it, then you've got

a heavier burden than average when you come in here and ask for

an injunction on top of that.  They haven't come close to meeting

that burden.

    Your Honor, he's a young attorney.  He's starting out in

this business.  No one has -- they have not contended nor can

they show that it's these personal relationships he had with

either the law firms or with these contract attorneys that

they're trying to protect.  Those are the broker cases.  These

clients are all sophisticated, so are the contract attorneys.

These are the kind of clients adverted to in the *Reusch* case

which is all this money and effort you spend in developing this

relationship is to show that you do good work and that the law

firms should give you an opportunity to show that you can place

good candidates.  You have to prove yourself every day.

Their affidavit, Mr. Schwartz's, which is Exhibit D on

their reply brief, essentially says that, and we agree.  But

that's not the broker cases where you have this personal

relationship that's been built up on company time that a court

will protect as a trades -- as trade secret protectable.

So, Your Honor, given the market, the sophistication of

these clients, the sophistication of the contract attorneys, all

that Mr. Thuemmler needs to succeed at his new employer, he has

to produce good work, have his own database, and show that he can

respond, and that's legitimate.  He is not poaching on any

information.  He is not infringing on any legitimate interests,

and that's the standard under each statement that the plaintiff

has.  The plaintiff just wants to put a potential competitor out

of business.  That's what the case is about.  This Court should

not use its awesome injunctive power, which as this Court noted

should be used sparingly in any event, to do that.

There's been no showing of irreparable injury.  He hasn't

hurt them.  We didn't even place Von Adams anywhere.  All they're

saying is we contacted him once, and as I say, that's in dispute.

So, Your Honor, there's no irreparable injury.  None of these

standards for injunction relief is met, and this covenant not to

compete -- and the word that I would use is "Draconian" -- should

not be enforced by this Court, certainly to its full extent.  If

anything, it should be limited to solicitation, and they haven't

even made a case that warrants that relief at all, but that's the

most that they should be entitled to, which is what Judge Urbina

did in the broker cases.

THE COURT:  Well, one of the other interests that has to

be considered is the public interest, and this proceeding before

me now has me sitting as a court of equity, and I guess I'm

wondering, why should the public interest favor having the

defendant benefit from the advantages of a contract that he

willingly entered into while attempting to escape its obligations

when he willfully breaks the contract by deceiving his old

employer and going quickly to a new employer that he agreed not

to go to?

MR. RECIO:  Well, Your Honor, the public interest favors

competition and letting someone use the skills and make a living

in his chosen field.  That public interest is what they're

violating.  If what Your Honor is saying and what they're arguing

is a contract is a contract and it must be enforced regardless,

that's certainly not true in this area because courts recognize

the interest in competition.  They understand that employers write the contracts, and employees are, if not compelled, they are under enormous pressures to sign them.  These are contracts of adhesion in the classic sense of the word, and that a court has to take great care in enforcing a contract like this, and it's only done where there's a legitimate protectable interest and the limitation is no more than is necessary.

And that's precisely why the case law developed because, Your Honor, if a contract is a contract and they are to be blindly enforced what it says, then every employer would have contracts similar to this and employees would not be able to leave and use the fruits of their labor, and we don't like that as a society.  We like competition, and we like people going around and working for different people, and only if there's a protectable interest, only if the restraint is reasonable and only if there is irreparable injury does a court use its awesome injunctive power to prevent someone from earning a living that he has chosen.

That's what they're seeking in this case, and they haven't come close to making any of the showings necessary.

THE COURT:  All right.  You actually used up most, if not all, of the 20 minutes.

Did you have something you wanted to contribute, Mr. Greenberg, or not?  You're not required to but . . .

MR. GREENBERG:  Good morning, Your Honor.

May it please the Court, my interest is fairly limited in this case.  We were served recently with a complaint after the briefing in this injunction matter had concluded.

I would simply point out to the Court that my client made sure that Mr. Thuemmler did nothing to violate what we thought were the legitimate and reasonable provisions in the employment contract.  That is, they only put blind ads in the *Washington Post*; Mr. Thuemmler was prohibited by my client from contacting old applicants unless they contacted the company via the blind ad; he did not solicit any of the law firm clients that he worked with while he was at Hirecounsel.

That to me is a reasonable restriction.  That is the restriction my client imposed on Mr. Thuemmler before hiring him.

Your Honor, geography is androgenous in this business. You can be anywhere and put ads on the Internet and receive a résumé.  The problem I have with my brother's argument as far as the legal staffing company representative is if I post my résumé on monster.com, any recruiter in the country, regardless of where they're physically located can pull it and use it.  If the applicant is in Dubuque, to use Your Honor's example, he may want to move to Washington.

I believe that under the contract as written by Hirecounsel, that might violate the rather all-encompassing prohibition.  In my limited review of the cases, and I stand behind Mr. Recio's representations to the Court that there has

not been a showing of the four prongs necessary for injunctive relief. But if you are going to enter any injunctive relief, which obviously we don't support, it should be blue-penciled very carefully so that Mr. Thuemmler can continue to work, so that there is competition, which I believe is the public interest.

I suspect that I disagree with the Court's notion of the public interest prong in a private contract case because my recollection in all the injunctive work I've done over the years is that when you're dealing with private contracts, the courts typically say the public interest prong is the least -- I hate to use the word "important," but on short notice I'm going to use the word "significant," one for the Court to consider. It's irreparable harm and success on the merits.

I think Mr. Recio has addressed the public interest, but I want the Court to know that my client has gone out of its way so as not to implicate the same interests it would want to be protected if the roles were reversed; that is, don't solicit, don't take what property you shouldn't have taken, and we went out of our way to make that happen. And accordingly, my client's interest is that the Court not enter an injunction, but allow Mr. Gardner and his client, if they want to -- they have an arbitration remedy. They haven't demanded it. They have a right to demand it. It's not Mr. Thuemmler's responsibility nor my client's responsibility to do that. They should not be in this courtroom seeking injunctive relief on this record.

Thank you.

THE COURT:  All right.  Thank you.

Mr. Gardner.

MR. GARDNER:  Very briefly.

THE COURT:  All right.

MR. GARDNER:  First, I would like to start off with a point that the Court recognized.  The e-mail and the documents that Mr. Recio handed up are dated October 19th.  The Court was correct:  Mr. Thuemmler left Hirecounsel on September 30th, and he contacted Mr. Adams on his very first morning.  He quit on a Friday; October 3rd was a Monday.  He contacted, in the first instance, Mr. Adams from a Legal e-Staffing phone.  After Mr. Adams spoke with us, he went back and checked his caller I.D., and that call in fact originated from Legal e-Staffing and occurred on October 3rd.  That's in his declaration.

I would also point out that he's a third party.  He has no dog in this fight, as they would say, and I think that his declaration is worth far more credence at this point --

THE COURT:  Let's assume I agree with you.  What harm has befallen your company as a result of that contact?

MR. GARDNER:  I think it's the same harm that Judge Urbina found.  I think it's the -- Mr. Thuemmler claims, "I didn't have contact with him in the last year I was there."  Then where did he get the information?  Where did he get the contact information?  How did he know Mr. Adams was rated as a superior

candidate in Hirecounsel's database?  He knows because he either

took the database, or he jotted down the information, or he knows

it based on the fruits of his labor when he was with Hirecounsel.

It was no accident that he solicited Mr. Adams, a superior

candidate, on the very first day he was at his new employer.

THE COURT:  Take me back to the evidence that shows he

knew that Adams was a superior candidate?

MR. GARDNER:  Yes, Your Honor, if I could step back.  If

we could go back to Exhibit B to the reply, Mr. Adams' entry.

THE COURT:  I know that the database reflects him as a

superior candidate, but what's the evidence that shows that

Mr. Thuemmler knew at the time that he contacted Mr. Adam of that

rating or remembered it.

MR. GARDNER:  For a couple things, Your Honor.  One,

Mr. Thuemmler, if you look under "Responsibility," which is the

heading on the bottom of page 2, that is the management person at

Hirecounsel who is assigned responsibility for developing and

maintaining the relationship with the applicant, interviewing the

applicant and rating the applicant, and if you look at the bottom

of page 2, that's "R T," which Mr. Recio has already conceded is

Mr. Thuemmler.  He had over five specific contacts with

Mr. Thuemmler during the -- excuse me.  Mr. Thuemmler had five

specific contacts with Mr. Adams during the time he was employed

with Hirecounsel, and he placed him at clients.  He was the

person -- Mr. Thuemmler was the person at Hirecounsel with

responsibility for Mr. Adams.  It's no accident that he was at

least one of the people that he chose to call the very first day

he was at Legal e-Staffing.  He didn't call somebody rated poor

or rated marginal; he contacted a superior -- rated by himself,

superior applicant.

THE COURT:  Where does that rating appear?

MR. GARDNER:  Page 3 on the bottom, I'm told, Your Honor.

There it is.  You can see it throughout.  It's also up above on

page 3 in brackets.  It says "superior," which is one of the

rankings that Hirecounsel gives its applicants.

THE COURT:  And you said the bottom of page 2 where the

left-hand column shows the initials "RT" is evidence that the

defendant was the rater, the one who evaluated this --

MR. GARDNER:  He did both --

THE COURT:  -- the interview?

MR. GARDNER:  Yes, Your Honor.  And he had -- this section

on bottom of page 2 is responsibility.  This was the management

person described in the Gittleman declaration, and also in our

papers as being in charge of the relationship with that

candidate, and that was Mr. Thuemmler.  It wasn't one of the

other management people at Hirecounsel's D.C. office.

And I think the Court obviously saw the two-week, 16-day

difference between the e-mail, and the caller I.D. confirmed

solicitation by the third party, Mr. Adams, so I won't belabor

that point.

Another thing I wanted to address, Mr. Recio makes it sound as though the skills Mr. Thuemmler learned, anybody could learn, they're nothing, he wasn't trained in anything valuable. If that's true, then why does Legal e-Staffing so want him to continue working this business for them?

A couple of points here:  One, Mr. Thuemmler can continue to work, not only in his chosen provision but for his current employer as long as he places people that aren't in competition with my client, Hirecounsel.  There are several people -- they place -- excuse me, Your Honor -- legal secretaries.  That's not a violation; that's not in competition with my client. Information systems personnel, again, not in competition, not a violation; accounting, billing, not a problem; librarians, not a problem.  Administrative people, receptionists, not a problem; docketing specialists, office services, not a problem.

Legal e-Staffing can also decide to jump in the temporary attorney and paralegal staffing business on their own without the help of Mr. Thuemmler, not a problem.  Not hurting competition. There 's a reason that Mr. Thuemmler is the subject of the motion for the preliminary injunction and the temporary restraining order and not Legal e-Staffing because there's a difference.

As far as the entire Eastern seaboard being out of bounds, Your Honor, that was not the subject of the motion for preliminary injunction.  It is, as the Court pointed out, one year, 75 miles.  The agreement not to compete is with

Mr. Thuemmler and Mr. Thuemmler alone, and that's pointed out in our papers.

I would also say as far as the hurting competition, Legal e-Staffing is free to place all the temporary attorneys and temporary paralegals they want to place so long as they do so without Mr. Thuemmler's help.  Competition is not being hurt. It's Mr. Thuemmler -- the only harm that would be suffered here is Mr. Thuemmler living up to the contractual obligations that he has, as a trained attorney and formerly law clerk willingly entered into in for -- in exchange for a job, compensation, and the chance to learn and be trained in this industry.  And as the Court pointed out, that's what the courts in this district, in the District of Columbia, look to when their looking at the public interest in these kinds of disputes, living up to the contractual obligations.

As far at *Reusch* case that Mr. Recio mentioned, that was a case where somebody took a Rolodex that had names and phone numbers that the court pointed out were all publicly available. That's not at all what we've got in our database here.  This information is not publicly available.  Mr. Recio will not argue that it's publicly available.  It's through hard work, and that's the reason Legal e-Staffing hired Mr. Thuemmler, to try to short-circuit the time, effort and money that it takes to build this up.  You can't -- you can't make any money in this business and satisfy a client's staffing needs until you do the legwork

and the hustle that it takes to find qualified applicants to send
to the client.  That takes time.  There's an initial buildup.
Legal e-Staffing hopes that by hiring Mr. Thuemmler out from
underneath Hirecounsel.

        And as the Court knows, he left under false pretenses.  He
said he was going to Wire Homes which is simply not true.  They
hoped to jump-start this temporary attorney business, and if it's
so easy to do this, then why hire Mr. Thuemmler in clear
violation of his employment agreement?  Why not just do it on
your own?  Legal e-Staffing's already in the temporary staffing
business.  It's just this piece they don't have.  If it's so easy
and anybody on the street can do it, why not do it without him?
Or do it during the year that he would have to sit as a result of
his contract agreement.

        One other point that I would point out:  The -- in the
contract, there's a specific agreement to the precise injunctive
relief that we're seeking here, in the employment contract.  That
was found important in at least two cases in this district; in
the *Morgan Stanley* case that's cited in our papers and also the
*Smith Bucklin* case.  The court found it important that the people
signing the agreements agreed to the injunctive relief ahead of
time and acknowledged the employer's right to seek that specific
remedy in result if a breach resulted.

        And the only other thing I would say is, as I actually --
I heard Mr. Recio say "contract of adhesion," and Mr. Thuemmler

was forced to sign the contract.  He's an attorney; he's a former law clerk.  I can't -- of all the cases that I've read in this district and elsewhere, you can't find somebody that was better qualified to know exactly what he was doing when he signed the contract.  It was not a contract of adhesion.  That argument has been tried in this district, and it's been shot down, and with good reason particularly in case, Your Honor.

So unless the Court has other questions, that's all I have.

THE COURT:  All right.  Thank you.

All right.  We're here today on a motion by Hirecounsel, the plaintiff in this case, for a temporary restraining order, and/or a preliminary injunction against Richard Thuemmler, one of the defendants sued in the amended complaint.

Of course I have to follow the case law in this district concerning the standards that govern decisions about preliminary injunctions and temporary restraining orders, and in those cases, the movant is required to demonstrate first that irreparable harm will result absent an injunction being issued; second that Hirecounsel is likely to succeed on the merits of the underlying amended complaint; third, that any harm to other parties that would be caused by granting the injunction doesn't outweigh the equities in favor of granting the injunction; and last that granting the injunction serves the public interest.

These factors all interrelate on a sliding scale so that

particularly strong equities on one or some factors may balance weak equities on another.

The irreparable harm prong requires that the injury be imminent, and it be both great and certain and injuries that legal remedies cannot repair.

As this circuit said quite some time ago, "Mere injuries, however substantial in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date in the ordinary course of litigation weighs heavily against a claim of irreparable harm."

The circuit said that in the *Virginia Petroleum Jobbers* case in 1958.

The circuit has also said that "A preliminary injunction is an extraordinary and drastic remedy and one that should not be granted unless the movant," here Hirecounsel, "by a clear showing carries the burden of persuasion."

With respect to the irreparable harm prong, Hirecounsel alleges that it will be irreparably harmed by disclosure of its trade secrets by Mr. Thuemmler or use of them.

On this record, though, I don't find that Hirecounsel has established that harm is certain or imminent. Hirecounsel has offered speculation that Mr. Thuemmler has misappropriated trade secrets or other confidential information, but there's no

evidence at all in the record that he is engaging in this sort of conduct that could produce the kind of irreparable harm that Hirecounsel identifies.

There is a significant argument with respect to the question of whether the contract that he signed itself contains unreasonable restraints on trade, but more particularly, with respect to the irreparability of the harm that Hirecounsel complains of.

The sort of harm that Hirecounsel contemplates does appear to me to be of the nature that's regularly compensated with money damages and is fairly easily translated into dollar amounts. It is noteworthy to me and important in my assessment that the agreement itself provides for a $40,000 liquidated damages amount for any breach in the noncompete or confidential information provisions of the agreement. That strongly suggests to me that noncompete violations could very well be compensated by money damages.

That's not disputed, that the noncompete clause was violated. The Hirecounsel has, indeed, with respect to likelihood on the merits, alleged that the defendant has violated the contract, at least as to Mr. Thuemmler, and there's little dispute that he did breach the terms of his employment contract by accepting employment within 75 miles of Hirecounsel's D.C. office before 12 months had elapsed after his separation from that company.

And it's also clear that he had communications with an
individual who had been an applicant at Hirecounsel, presumably
one whom the defendant had personally had some contact with or
knowledge of while the defendant Thuemmler did work there.  So
there is a substantial likelihood that Hirecounsel would be able
to demonstrate those two breaches.

But on the other hand, Hirecounsel, as I may have averted
to before, has not offered persuasive evidence that any trade
secrets or any confidential business information was
inappropriately appropriated or converted.  It is clear that
there was a contact between someone who had been an applicant
that Mr. Thuemmler knew about while working at Hirecounsel.

There's a factual dispute that would presumably have to be
resolved at a trial or some evidentiary hearing, but I don't find
that the Hirecounsel has established persuasively at this point
that it would win that factual dispute at the moment.  I do note
the absence of a date from the ad that is printed out on the
document handed to me, purported to be the one placed in the
*Washington Post* to which Mr. Adams responded, but those and other
matters would be the subject of some kind of a hearing that would
have to resolve credibility questions and factual disputes
concerning sort of chicken-and-egg issues concerning Mr. Adams'
and Mr. Thuemmler's contact when Mr. Thuemmler got to the new
employer.

But aside from that, I don't find that Hirecounsel has

persuaded me that it's likely at this point to show that

Mr. Thuemmler had misappropriated trade secrets or other

confidential information at the moment.

So I don't find that Hirecounsel is substantially likely

to prevail on the breach of contract claim that's related to the

provisions concerning the confidential information or trade

secrets, or in any of their remaining counts with respect to

Legal e-Staffing at all.

The balance of hardships to the parties, it appears to me

that Hirecounsel has not shown any harm so far or that any harm

is likely to occur that's imminent or certain.  Hirecounsel would

suffer at this point, as far as I can tell, little apparent

hardship if the injunction were denied, but Hirecounsel does seek

to enjoin Mr. Thuemmler from continuing in his current employment

with Legal e-Staffing, and I guess to lose his employment and to

be barred from seeking a similar position would certainly

constitute a hardship to Mr. Thuemmler.

On the other hand, he did consent to being enjoined in the

event of a breach of the noncompete provisions in his contract,

and he did voluntarily and deliberately breach that provision of

his contract.  Whatever the equities granting the injunction it

would appear to me would impose a greater hardship on

Mr. Thuemmler than denying the injunction would impose on

Hirecounsel.

With respect to the public interest, the public does have

an interest in enforcing a voluntary contract, but also there's a public interest in limiting preliminary injunctions to cases where the movant has demonstrated the threshold irreparable harm. It appears to me that the public interest prong, therefore, is essentially a wash.

Now, although it's -- the plaintiff I think is likely to succeed on a portion of its contract claim, its injury without an injunction is conjectural and certainly not irreparable by legal remedies, and the harm to the defendant Thuemmler with an injunction is greater than any harm to the plaintiff without one, and the public interest doesn't weigh in favor of an injunction.

For those reasons I'm going to deny the application for a temporary restraining order or for a preliminary injunction.

But I do want to discuss with the parties the arbitration clause that appears in the agreement.  It appears to me that this is the time for the parties to begin to discuss invoking, if the case does need to go forward, the arbitration clause, or discuss any procedures that might be warranted short of actually going to full-blown arbitration before this case proceeds to discovery, to dispositive motions, and to pretrial conference and trial.

Let me just ask each counsel for your views with respect to that.  My inclination is to have the parties proceed either to arbitration under the agreement or to at least engage in some period before doing that discussions that might provide some resolution of the case short of that full-blown, sort of quasi

litigation.  Let me hear from the parties with respect to that contemplation.

MR. GARDNER:  Certainly, Your Honor.  First of all, the arbitration clause as I recall, and I did not really plan on speaking to it today, but I do not believe it is part of the agreement as amended.  It's part of the original employment agreement, but it was amended out in the amended agreement, so I don't believe there is any binding arbitration provision in the contract.

Now, setting that aside, I also hear what the Court is saying.

THE COURT:  Can I just ask you if the amendment explicitly read out the arbitration, or it simply has no terms in the amendment that refer to arbitration?

MR. GARDNER:  This is going on memory, but I believe it's the latter, Your Honor.

THE COURT:  Go ahead.

MR. GARDNER:  But I also hear what the Court saying about is there some way to make this go away short of a full-blown trial and action, and I would say I'm always open to the possibility of short-circuiting this, whether it be through mediation, informal settlement negotiations or an arbitration.

But I would also suggest that, for the reasons that the Court pointed out, we don't have the information that we're entitled to yet, and I would not want to slow down discovery

while we were discussing these other options because frankly,

Your Honor, some of the information we've gotten from

Mr. Thuemmler has not been honest, and the representations that I

get from his side I don't fully trust, and for that reason, I

want to conduct some of our own discovery while we're discussing

settlement or mediation or arbitration or whatever the parties

can agree on.

     But I'm certainly open to any and/or all of those options,

subject to confirming it with my client, Your Honor.

     THE COURT:  Well, you can't be faulted for having that

distrust.  It's got a basis.  I would think that even if you did

choose either to go to arbitration or to go into the mediation

program, those processes both contemplate some kind of

information exchange, and that the data that you think you might

need would be forthcoming during those processes anyway, and to

have a discovery track set by this Court on a scheduling order,

parallel to any kind of arbitration proceedings or mediation

proceedings or settlement discussions of some kind, might really

not be the kind of thing we need to put in place.

     If you are going to be going full-bore with trying to

resolve the matter, I think it best not to distract the parties

with a parallel scheduling order that also contemplates

timetables and deadlines for exchange of information in its own

track leading up to some deadline for dispositive motion.  That's

time consuming and costly, and part of my job is to obviously

decide, but also to help parties get their resolution in as
cost-free a manner as possible.  It seems to me that setting a
scheduling order with the beginning of discovery would
potentially multiply the exposure to increased costs in a way
that might not be the wisest way to proceed.

But in any event, I take it I hear you saying subject to
your conferring with your client, you would be open to at least
some period of discussion with the other side, potentially in
preparation for opening up either arbitration or mediation.  Is
that a fair recap?

MR. GARDNER:  That is a fair recap, Your Honor, but I
would just add one caveat because I would look at it a little bit
the in the reverse of what the Court said.

I don't want unfruitful settlement negotiations in
whatever form to slow down the lawsuit.  We have had some
settlement negotiations; they have not been fruitful.  I think
Mr. Recio would probably agree with me they haven't been close to
being fruitful, and I don't want more time to elapse than has
elapsed already before we start getting some information in what
I see to be the more likely outcome; and that is that there will
not be an informal resolution of this matter.

My client is angry, and occasionally when emotion comes
in, things get a little more complicated, and my client feels
like "They tied in the business.  He lied to us.  He left and
immediately started using what we taught against us."  So just to

give the Court some perspective, but I don't ever say no to

mediation, arbitration or informal settlement negotiations, and

I'm not saying no here.  I just want to give the Court a flavor

of where we're coming from.

THE COURT:  It sounds to me that there might be greater

interest, then, in moving right into arbitration, at least on the

part of your client.  I can't speak for your client, obviously,

but that might be the more satisfactory route to your client.

MR. GARDNER:  And that may well be, Your Honor.  I need to

have those discussions with my client.

THE COURT:  All right.  Let me hear from counsel.

MR. RECIO:  Your Honor, we -- there is an arbitration

clause.  We didn't think it was applicable, and we think in any

event they waived it by filing this suit here.  We already filed

counterclaims.  We would just as soon at this point resolve the

case in this Court.  We have no problem with this Court's

suggestion of early mediation.  Perhaps the goals of both parties

could be met with perhaps some limited discovery in light of the

distrust, and then an early mediation or other form of attempted

resolution that this Court could direct or oversee in some way.

The -- I guess my only other comment is that as attorneys,

we all run into emotional clients from time to time, but it

should not be driving this case at all.  This is business, and,

you know, this is what -- an objective, reasonable resolution, I

believe is possible.  So we're not -- we don't think that a

formal arbitration remedy is applicable, if it ever was in this

case.  We are more than interested in a procedure that this Court

could help devise which might include limited discovery to keep

the costs down and perhaps promote an early resolution of the

case, and if not, then, you know, so be it.  I mean a final trial

on the merits, I suppose.

But I just wanted to share our views, Your Honor.  We're

certainly open to the principles that this Court espouses, and

there is not a lot of emotion on our side.  We view this as very

businesslike, and we're prepared to proceed in that vein.

MR. GREENBERG:  May it please the Court, on behalf of

Legal e-Staffing, I have my own view of who the real target in

this litigation is.  Be that as it may, I think the Court's

comments were sobering and should be to both sides, and I would

urge both sides to get the transcript, read it.  I, too, have had

difficult clients over the years.

My suggestion is early ADR under the court's ADR mediation

program.  I would like a scheduling order because I believe the

case against us is going to be disposed by motion, and I just

don't want it dragging on.  We're not subject to any arbitration

clause; we're not going to consent to arbitration.

I'm happy to have a cooling-off period.  I'm happy to

negotiate some kind of limited discovery with Mr. Gardner.  I'm

happy to engage in settlement discussions with Mr. Gardner.  Up

until this point my client has had a very hands-off,

in-the-background role in this case, but since the amended
complaint was filed, I've been asked to take a very active role,
so my hand will be all over this case now.

THE COURT: Let me do this: Let me suggest that you all
confer in the next 10 days, file a joint status report with the
suggestion about how the case ought to proceed. In the next
10 days, I would ask you to confer. It may be that you can come
to some meeting of the minds concerning whether the case ought to
go to our mediation program, whether you might want some early
neutral evaluation of the case, or some other means; or you might
agree that the easiest and quickest way to resolve some of the
claims might be arbitration argument, at least between one
defendant and the plaintiff.

I'm not trying to propose or suggest any of those, but I
do want you all to confer to see if you can come to some
agreement about the best process that should be followed. I
think giving you about 10 days ought to be enough. Let me hear
from you if you don't think it's enough, but unless I hear from
you otherwise, what I propose is to have you all file a joint
status report within 10 days. I guess that would be the 17th, if
Monday is Dr. King's holiday. Why don't you all file a joint
status report by the 17th of January with whatever proposal you
have about how the case ought to proceed.

Best case scenario, obviously, is that you will agree on
some either period of settlement discussions, agree to have the

matter referred to mediation, you may decide to have it go to arbitration.

Worst case scenario, I guess, is that the fight continued, nobody agreed about anything, and that we need to have a scheduling conference.  If you know that that's where you're going to end up, that the fight's got to go on, then please confer under Rule 16.3 and prepare a Rule 16.3 report, and I'll schedule eventually an initial scheduling conference to put a scheduling order in place.

I do hope, though, that having heard and seen very able counsel in this case, you all will be able to use your abilities not only among yourselves but with your clients to reach a joint proposal that is short of having to just go full-bore into a fought-out litigation because I do think the case is one that can be successfully disposed of in some alternative dispute resolution mode.

All right.  So we'll order that the parties file by January 17th a joint status report reflecting a proposal about the way in which the case ought to proceed.

Is there anything else we should take up?

MR. GARDNER:  Nothing from us.

MR. RECIO:  Nothing.

THE COURT:  Anything else?

MR. RECIO:  No.

THE COURT:  All right.  Thank you very much for coming in.

I appreciated the arguments, and you all may be excused.

(Proceedings adjourned at 11:14 a.m.)


## C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

------------------------------
Scott L. Wallace, RDR, CRR
Official Court Reporter

# EXHIBIT B

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION - HUDSON COUNTY
DOCKET NO. C-176-95

ACCOUNTS ON CALL, A DIVISION
OF ADIA SERVICES, INC.,

        Plaintiff,

vs.

ALISA SILVERBERG, SHARI RIMBERG MOE,
and SOLOMON-PAGE GROUP, LTD.,

        Defendants.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT
OF
MOTION

Date:
  October 24, 1995
Place:
  Hudson County Courthouse
  Jersey City, New Jersey

BEFORE:

    THE HONORABLE MARTIN L. GREENBERG, P.J. CH.

APPEARANCES:

    CHARLES X. GORMALLY, ESQ.
    Attorney for the Plaintiff

    REGINA A. McGUIRE, ESQ.
    Attorney for the Plaintiff

    ALAN KRAUS, ESQ.
    Attorney for the Defendant

    CAROL T. WORTMANN, ESQ.
    Attorney for the Defendant

STEVEN M. KOSKINEN, C.S.R.
OFFICIAL COURT REPORTER
HUDSON COUNTY COURTHOUSE
JERSEY CITY, NEW JERSEY, 07306

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

1    (Appearances are entered.)

2    THE COURT:  This is the return date of an Order to

3    Show Cause pursuant to which the plaintiff seeks temporary

4    restraints against the defendants Solomon-Page Group and the

5    two individual defendants, Alisa Silverberg and Shari Rimberg

6    Moe, essentially seeking the enforcement of certain

7    restrictive covenants executed by the individual defendants

8    which would impact on the corporate defendant and, in essence,

9    that relief is to terminate the employment of Miss Moe and

10   restraining the corporate defendant from employing any of the

11   plaintiff's employees or seeking to employ them and also

12   restraining the individual defendants from divulging certain

13   alleged confidential information.  And also restraining the

14   individual defendants from soliciting plaintiff's clients and

15   applicants as well as seeking to restrain the individual

16   defendants from using knowledge and information that they have

17   regarding the plaintiffs, regarding the plaintiffs' customers

18   or their confidential information to be obtained by them while

19   they were in the employ of the plaintiff.

20   All right.  This matter was brought on initially by

21   an Order to Show Cause which I signed on September 27, 1995,

22   which contained certain temporary restraints which, for the

23   record, are numbered three, four, five of that Order to Show

24   Cause which, in essence, restrains the defendants from

25   directly or indirectly contacting any of plaintiff's current

Colloquy                                            3

1    employees for recruitment purposes and also restraining the

2    defendants individually from disclosing certain information,

3    including the identity of the client or applicants.  All

4    right, Mr. Gormally.

5         MR. GORMALLY:  Thank you, your Honor.  Your Honor,

6    we've sought your equitable intervention to enjoin the

7    predatory conduct of Solomon-Page and the breach of the trust

8    that reposed in our former employees Silverberg and Rimberg.

9    As an overview, your Honor, because I know the papers are

10   voluminous that have been submitted to the Court, but as an

11   overview, the defendant's position and their argument that

12   they are asking the Court to accept flies in the face and is

13   directly contrary to their own business practice.  And in at

14   least three particular areas.

15        On one hand, the defendants would have you believe

16   that the training and experience that was nurtured and

17   developed by MIS Search and evidenced by the success of the

18   individual defendants doesn't matter, it's non-proprietary.

19   And on the other hand, this business and this company will

20   hire only those that are experienced and have at least

21   $125,000 of existing client relationships.

22        The defendants would also have the Court believe

23   through supplemental certifications that the volumes of

24   information that they copied between the time that they were

25   hired by Solomon-Page and the time they decided to let their

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Colloquy

4

1    current employer know that they were leaving, that that

2    written form information is irrelevant and is stale.  That

3    information and that argument is belied by the fact that they

4    took the trouble to copy it.  They themselves tell the Court

5    in certifications these are security blankets that it provides

6    information better than a cold call.  And yet, the basis of

7    their argument is that the written form information which they

8    copied and took with them is vastly greater than that .

9    represented to the Court in the original certifications filed

10   by these defendants, is of no value whatsoever.

11           And finally, your Honor, and perhaps most egregious

12   is the position of the defendant, the corporate defendant,

13   that restrictive covenants in this industry really aren't even

14   used, that restrictive covenants are of no value when you are

15   talking about in the recruitment business, because this is a

16   free for all competitive atmosphere where everybody steals

17   information that's developed by their former employers and

18   goes to the next employer to profit and benefit from that

19   information.  That is belied by the fact the key principals of

20   Solomon-Page all have restrictive covenants strikingly similar

21   to the covenants we are seeking to enforce here.

22           THE COURT:  And you don't buy the argument that that

23   was to satisfy the needs on the initial public offering?

24           MR. GORMALLY:  I absolutely accept it, your Honor, I

25   think it points to the importance of having restrictive

Colloquy                                    5

1   covenants, on the one hand defendants are saying restrictive

2   covenants are important --

3          THE COURT:  But their position was that was necessary

4   to demonstrate continuity and it was meaningless beyond that.

5          MR. GORMALLY:  Well, I think, your Honor, it is

6   important to demonstrate continuity, it is important to

7   demonstrate to the investing public that there's an asset for

8   them to invest in, that the principals of this company aren't

9   taking information that is developed and going across the

10  street and working for a competitor, that belies exactly

11  what --

12         THE COURT:  What are the assets of these companies?

13         MR. GORMALLY:  Well, I think the assets in this

14  company are numerous, your Honor.

15         THE COURT:  When you say this company, you are

16  referring to which company?

17         MR. GORMALLY:  I am talking about my client.

18         THE COURT:  Okay, all right, let's talk about your

19  client.

20         MR. GORMALLY:  In the instance of development of

21  existing client relationships, the company in the first

22  instance will hire somebody who has little or no experience in

23  the field and train them, so therefore, the company has made

24  an investment in training.  One in which Solomon-Page doesn't

25  have.  That training is belittled by the defendants at this

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Colloquy                                    6

1    juncture, but it involves scripting out actual call scenarios,

2    cold calling techniques, closing techniques, billing,

3    overcoming objections, all of which lead into success to be

4    enjoyed by our heretofore, inexperienced employee.

5          The second investment that the company makes is

6    through advertisement of the availability of its services,

7    that's done through the Yellow Pages ads, through ads in

8    general circulation, there is an office that's provided for

9    the employee, all of these are investments of the corporation

10   in the work effort of the employee.

11         The employee is also provided with publicly available

12   information about companies as well as its existing database

13   regarding companies that might need the services that are

14   being promoted.  In this case all of these tools are available

15   to the individual, the training is given to the individual,

16   and admittedly the individual has to succeed or fail based on

17   their own commitment to do the job.  But the employer gives

18   them whatever support they need in that regard.

19   Through their efforts, and you can take a -- the argument

20   that's made throughout that case that these are publicly

21   available resources, you can look up Dean Witter in the phone

22   book, after all, and you can naturally assume that they use

23   data processing and therefore you can make a sale, but the

24   reality is that even the defendants admit when they look at

25   the information they took with them, that it is better than a

Colloquy                                         7

1    cold call, this information contains client and customer

2    information, it contains contact individuals with their home

3    and business telephones, it contains a complete directory of

4    the types of technologies that are in use at various employers

5    and that candidates are familiar with.

6            On the other side of the coin, there's candidate

7    resumes, these are assets of the corporation because a

8    candidate in response to solicitation by the company or in

9    response to an ad of the company sends a resume to the

10   company.

11           THE COURT:  Go back to the clients for a second,

12   other than the fact that a call was made and information was

13   obtained, in that sense it is better than a cold call, what

14   else is in there that's better than a cold call?

15           MR. GORMALLY:  Well, at the bare minimum, your Honor,

16   it would result in a cold call and a contact which would show

17   up in the database.  If the employee is successful in making a

18   placement or getting a job order and filling that job order,

19   there is a an invoice that is prepared and that person, in all

20   senses, becomes a customer, they have generated revenue for

21   the company to which the employee has shared by sharing in a

22   commission.

23           THE COURT:  Is there something confidential about who

24   is a customer as opposed to information about that customer?

25           MR. GORMALLY:  I think the identity of the customer

Colloquy                                    8

1    is ascertainable in terms of the sense of I can find out Dean

2    Witter's phone number in the phone book, the fact that they

3    are a customer is confidential information known to the

4    company and known to the employee who successfully made that

5    placement within that company.  So, to that extent, it is

6    confidential.

7              THE COURT:  What is the interest of your client in

8    not disclosing who its customers are, per se?

9              MR. GORMALLY:  Well, I think that is --

10             THE COURT:  That leads to why is that a protectable

11   interest?

12             MR. GORMALLY:  It is a source of existing business,

13   it's a strong source of potential repeat business, admittedly

14   the defendants can say that once I've filled the job order,

15   this information is useless because after all, the need has

16   been temporarily filled.  But the reality is in business,

17   whether you are talking about the extermination business as in

18   Abilene, or in this business, your customer today is very

19   likely to be your customer tomorrow.  And in that case the

20   identity of successful placements, the identity of people who

21   have hired us to fill job orders is highly confidential to

22   this customer, even if they are using other companies to fill

23   those needs.  Because we admit that we are competitive within

24   this industry, we are not exclusive.  But the fact that we

25   have an existing customer relationship, that these two

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1    defendants enjoyed that customer relationship and exploited it

2    on behalf of this company for six years, that is a protectable

3    asset, your Honor.  I think that has been recognized by the

4    courts, that the identity of customers, the identity of

5    potential customers is a protectable asset.

6        Stepping away from it, even these employees

7    acknowledge in writing that those are protectable assets.  And

8    now they come to court and ask the Court to ignore the written

9    agreement to the contrary and that this is a basically free

10   for all industry.

11       Your Honor, the utilization of restrictive covenants

12   in this industry is not -- I think is further belied by the

13   fact that this company, when it is engaged in its predatory

14   conduct in hiring away from Source Services, in hiring away

15   from the Group Consortium, when hiring away from Brandon

16   Systems, has all generated litigation alleging that

17   Solomon-Page has interfered with their contractual

18   relationships.  That belies their position that restrictive

19   covenants really aren't used in this industry whatsoever.

20       In the Source Services case, we haven't been supplied

21   with any of the documents surrounding that pending action, in

22   the Consortium case in large measure the division that's

23   involved in this lawsuit was en masse hired away from

24   Consortium, Consortium instituted a lawsuit against those

25   individuals, defended by Solomon-Page, and settled on behalf

LASER STOCK FORM FAU

THE CORBY GROUP 1-800-255-5040

Colloquy                                              10

1    of their now employees.  In Brandon Systems, that lawsuit is

2    currently pending, in none of them were injunctions sought, so

3    although counsel suggests that no court has visited the

4    draconian remedy of injunction upon them, conversely, no

5    defendant -- I'm sorry, no plaintiff has sought that relief

6    from any court.  I think it points to the integrity of this

7    company in the manner in which they are doing business.  And

8    in the manner in which they are asking the Court to

9    participate now in their own corporate philosophy that

10   training of your resources, that development of your own

11   customer relationships through your own energies, through your

12   own efforts, through your own utilization of publicly

13   available resources is not the business that Solomon-Page

14   engaged in.  Solomon-Page is dedicated to identifying top

15   producers within top competitive companies and hiring those

16   individuals away to take advantage of their existing customer

17   relationships.  On those levels, your Honor, their actions

18   belie the argument that they are asking the Court to accept.

19            The Court is focusing, I believe, in terms of its

20   questioning to me, on the area that I believe we need the most

21   protection, and that is the area of customer relationships.

22   Without regard to the restrictive covenant that these

23   individuals signed, without regard to their acknowledgment,

24   that injunctive relief is the only appropriate remedy if they

25   violated their employment agreement, without regard to their

Colloquy                                    11

1   written acknowledgement that customer relationships are a

2   protectable asset of MIS Search, without regard to any of

3   that, it is as if the agreement doesn't exist.  The asset of

4   the customer relationships that these individuals have enjoyed

5   is a protectable asset of this company, one in which the Court

6   can fashion injunctive relief to protect the company.

7           Now, we are not asking for a permanent, in the sense

8   of permanent marketplace restraint, this is all guided by

9   principles of reasonableness.  But what these individual

10  employees have done and what Solomon-Page has allowed and

11  asked the to do is to trade on relationships that we have

12  invested in at our expense and developed at their profit for,

13  in this case, four and six years.  We are asking for a

14  reasonable period of time of protection.

15          The agreement points us to the direction of what a

16  reasonable period of restraint is.  We are not asking that

17  they be permanently restrained for all time in dealing with

18  customers.  We recognize that the marketplace changes, we

19  recognize that it is a non-exclusive marketplace, but there is

20  a period of protection to which MIS Search is entitled and the

21  agreement speaks in terms of one year.  That period of

22  protection would provide an opportunity for MIS Search to be

23  able to recapture that asset which they built, that asset

24  which walked out the door with Silverberg and Rimberg.

25          Your Honor, their actions belie their argument.  All

Colloquy

1   of the data that they've taken and we have submitted to the

2   Court under seal so that the Court could be sensitive to the

3   sheer volume of it, amounts to a protectable asset.  Do these

4   documents amount to the Coca Cola formula, as counsel suggest

5   it must?  They don't, they clearly don't.  What they evidence

6   is that this corporation has invested in a database, this

7   corporation has invested in these employees to develop that

8   database, and we can gain an advantage by utilizing and

9   materializing on our investment.

10          The defendants themselves have admitted, your Honor,

11  that these lists that they took, this information that they

12  took, although they left a copy of it behind at the company,

13  gives them something better than a cold call.  This is not

14  something that they look up in the phone book or the blue book

15  and obtain an immediate access to the individual information

16  provided there, and it was developed with the utilization of

17  company assets, whether it be the company computer database or

18  whether it be administrative assistants who write this

19  information into the tickler logs, as was suggested.

20          With reference to the solicitation, your Honor, that

21  has occurred in this case, the depositions that were taken in

22  this case confirm to the defendants and substantiate the

23  defendants' position in this case that everyone lines up and

24  says, Miss Rimberg and says I wasn't solicited by Silverberg.

25  You know, I was getting a little unhappy that last month and,

Colloquy                                        13

1    gee, that opportunity presented itself to me and I pursued it.

2    And although there is some disagreement about Schuctman,

3    whether or not they were interested in him after they flied

4    him in from California, had three meetings with him, they say

5    they weren't going to hire him, Schuctman said they were going

6    to hire him, but he took another opportunity.   The reality is,

7    your Honor, none of these individuals had ever expressed any

8    dissatisfaction with their employment.   Silverberg never

9    expressed dissatisfaction with her employment.   There were

10   normal disagreements about compensation that were adjusted.

11   But the reality is when it comes to Rimberg in particular, she

12   never complained.   She was never soliciting employment from

13   any other source.   Silverberg never sent out a resume, never

14   hired anybody to look for a job for her.   None of the

15   individuals were looking for employment.   And now show up on

16   the payroll of Solomon-Page as a result of their own

17   recruiter's efforts.   It's going to be very difficult to

18   present evidence in this court in the form of certification or

19   testimony that says I was solicited by Solomon-Page from the

20   individuals who are now employed by them.   After all, all they

21   have to testify to is that, you know, I just -- I was unhappy

22   and decided to leave.   But the reality is and the totality of

23   the circumstances are these individuals had enjoyed tremendous

24   increases in compensation, in Silverberg's case, ten times

25   increase in compensation.

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Colloquy                                                          14

1      THE COURT:  Hold it a second, what are you seeking

2   today with regard to Miss Rimberg Moe is a termination of her

3   employment with the corporation defendant and a restraint

4   against her working for it, among other things, against her

5   working for it or its employment of her, and you premise that

6   relief -- and that is for one year, correct?

7      MR. GORMALLY:  That's correct.

8      THE COURT:  Just as the duration of non-use of

9   confidential information is for one year, correct?

10      MR. GORMALLY:  That's correct.

11      THE COURT:  And you premise that relief upon the

12   existence of the contract she signed agreeing not to work in

13   the industry within a radius of whatever, 50 miles, for a

14   period of one year.  I would like to discuss with you or you

15   with me the significance, if any, of the fact that that

16   restriction was not uniformly pursued in agreements among your

17   employees, not only insofar as Miss Silverberg is concerned,

18   but with others as well, you could negotiate certain aspects

19   of those agreements, the depositions show, including the

20   restriction of employment with competing employers within the

21   radius set forth, we know it's a fact that that's true.  My

22   question to you is what is the significance, if any, insofar

23   as enforcing it against some employees who happen to sign

24   without negotiating and others who did not even know they

25   could negotiate or, in fact, did not, whether they knew it or

Colloquy                                    1

1    not, what's the significance, should it be important in the

2    decision in this case on a preliminary restraint?

3            MR. GORMALLY:  Well, candidly, Judge, would I love to

4    be before your Honor with everyone with the identical

5    restrictive covenant?  Of course.

6            THE COURT:  I would like to be playing golf, we can't

7    all be doing what we like to do, my question is the

8    significance.

9            MR. GORMALLY:  Factually, your Honor, the difference

10   between the employees who have the non-compete and those that

11   don't are generally those employees that came to the company

12   with some exposure to the exact area that they were going to

13   be placing in when they came to MIS Search, in Silverberg's

14   case --

15           THE COURT:  You mean you are going to distinguish

16   that there is a logical distinction between those who did sign

17   such a covenant and those who did not that you can

18   demonstrate?

19           MR. GORMALLY:  Factually, your Honor, if the employee

20   came to MIS Search and had previous experience placing data

21   processing personnel in the exact same marketplace that we

22   were dealing with and requested that they not be bound by our

23   restrictive covenant, that was negotiated between the

24   principals of MIS Search and the employee involved and they

25   were allowed, as the agreement was interlineated to an

Colloquy

1   exception to the restrictive covenant in that area.

2           THE COURT:  I don't get that sense from the

3   deposition extracts that I have read.  I get the sense that if

4   you can negotiate it, well, you can get relief from that.

5           MR. GORMALLY:  Well, it was negotiated for those

6   individuals, your Honor, that had previous experience in this

7   particular marketplace.  It was not negotiated for anyone who

8   didn't.  It wasn't a question of skill in negotiating or

9   anything else, it was a question of the company acknowledging

10  that, hey, if you had experience in the same marketplace that

11  you are coming on board with us and you've requested not to be

12  restrained, in all probability they are going to give it up.

13          THE COURT:  Well, isn't what you really want the

14  restriction against the disclosure of confidential

15  information?

16          MR. GORMALLY:  Yes.

17          THE COURT:  As opposed to preventing somebody from

18  working someplace?

19          MR. GORMALLY:  Your Honor, we have in filing this

20  application requested that she be restrained from being

21  employed, particularly in this case, with a competitor in such

22  -- in the exact same marketplace, because there is no hardship

23  that is demonstrated by this employee having elected herself

24  to voluntarily separate from employment.  If your Honor is

25  asking me to prioritize where I think our stronger legal

1    positions are, I think we have a stronger legal position

2    relative to protecting our confidential customer information

3    than we do relative to this disparate treatment in restrictive

4    covenant areas.

5            THE COURT:  Very well.

6            MR. GORMALLY:  I say that, your Honor, but I don't

7    mean to concede by saying that the utilization of restrictive

8    covenants in this industry is non-existent.  Counsel would

9    suggest in his papers that it is just these principles because

10   of the public offerings that have restrictive covenants and

11   yet, every competitor that they have hired away, key employees

12   from, whole divisions from, three and four individuals at a

13   clip from, that has resulted in litigation, have all alleged

14   that they have done that in the face of restrictive covenants

15   that prevented those individuals from seeking that employment.

16   I don't think we've come to a point where restrictive

17   covenants on their face in this industry are, per se, non-

18   enforceable.  And by prioritizing our interest in this case I

19   am not meaning to suggest that the restrictive covenants that

20   these employees have signed are deemed to be non-enforceable,

21   in our judgment, we believe they are.

22           THE COURT:  I don't understand, my problem, frankly,

23   my threshold problem was the fact that there are widespread

24   exemptions from it within your own ranks.

25           MR. GORMALLY:  And your Honor expressed that concern

Colloquy                                    18

1    on the original hearing, just as it related to the

2    differentiation between Silverberg and Rimberg.

3              THE COURT:  I have a problem with that.

4              MR. GORMALLY:  I understand.

5              THE COURT:  Okay, what else?

6              MR. GORMALLY:  That's all, your Honor.

7              THE COURT:  Mr. Kraus.

8              MR. KRAUS:  Your Honor, we start with the proposition

9    that under New Jersey law restrictive covenants are

10   disfavored.  They are enforceable only if and to the extent

11   reasonably necessary to protect legitimate trade secrets and

12   confidential information.

13             THE COURT:  Tell me why these are not protectable

14   secrets and information that is confidential and protectable.

15             MR. KRAUS:  Because there aren't any trade secrets or

16   confidential information in this business, your Honor.  We

17   came before you on the temporary restraining order --

18             THE COURT:  I remember.

19             MR. KRAUS:  And we said that, your Honor.

20             THE COURT:  I remember.

21             MR. KRAUS:  And the discovery has confirmed it from

22   both sides.  I think, your Honor, what you ought to look at

23   here is not what MIS Search says when it is trying to restrain

24   these defendants, you are to look at what MIS Search does, if

25   you look at what we have developed through the expedited

Colloquy                                    19

1   discovery, the history shows a number of things, it shows

2   first that in this industry the customer names are all

3   publicly available.  The information that Mr. Gormally

4   described, their telephone numbers, the contact names, the

5   technologies, they are all publicly available.

6         I would like to hand up to your Honor a copy of the

7   data processing blue book which is a directory that's sold and

8   regionalized throughout the country.  And you will see·if you

9   look in it, your Honor, that it lists all the major

10  corporations.  This one happens to be southern New Jersey.  It

11  lists their telephone numbers, it lists their businesses, it

12  lists what hardware they use, what operating systems they use,

13  what databases they use, what languages they use, what

14  software they use.  And then it lists all of the key data

15  processing contacts.  The manager of programming, the director

16  of programming, the head of personnel.  The project leaders,

17  the assistant directors, they are all in this book, your

18  Honor.  And with your permission I would like to hand it up to

19  you so that you can see that.

20        THE COURT:  I assume your adversary has a copy?

21        MR. KRAUS:  They have testified, your Honor, that

22  they have the very same books in their offices.

23        THE COURT:  Right here.

24        MR. KRAUS:  The customers in this industry, your

25  Honor, are all non-exclusive.  There is nothing proprietary

Colloquy                                        20

1   about having a relationship with a particular customer.  Your

2   Honor asked at the temporary restraining order hearing whether

3   there was anything proprietary or useful in knowing what

4   company has used search firms in the past.  What the record

5   shows, your Honor, is that all of the companies in this

6   business use search firms.  And there is nothing particularly

7   useful about knowing that a company used a search firm in the

8   past.  What counts is are they using a search firm now and

9   that is information that you get only by calling and finding

10  out, and anyone can make that call.  And there are scores of

11  competitors in this business, your Honor, and the companies

12  that use search firms use multiple search firms at the very

13  same time.  They don't hire MIS Search to find them a key

14  programmer or a head of a particular project, they have five,

15  six, 10, 15 search firms out there looking for that same

16  individual.  And what counts in this business, your Honor, is

17  not getting the contact with the company to know that they are

18  looking, what counts is presenting to the company the best

19  qualified applicant and making the placement.  You only get

20  paid, your Honor, when you make the placement.  And these

21  individuals were very successful at MIS Search, that is true.

22  But what they were successful by was the result of their own

23  efforts, their own diligence, their own hard work.  And

24  frankly, their good luck in timing in calling people when they

25  needed the kinds of applicants that they knew.

1    Every case, every court, your Honor, to look at the

2    question of whether or not a restrictive covenant ought to be

3    enforced in this industry has said uniformly no, we cited to

4    your Honor four cases from other jurisdictions that looked at

5    this industry, specifically, and each one of them has said

6    because the customer names are publicly available, because the

7    customer contacts are publicly available, because the

8    relationship are non-exclusive, there are no trade secrets at

9    issue here and there is no legitimate reason to enjoin a

10   former employee from competing fairly and effectively with the

11   former employer.

12    Even applicants, your Honor, routinely use multiple

13   search firms, that is what the record shows. And I think,

14   your Honor, we have to keep in mind that there are three kinds

15   of information that we are talking about here. We are talking

16   about customer names, and that is all well known to the

17   public. We are talking about applicants, people who are

18   currently looking for a job, but frankly, your Honor, that is

19   a false issue because there is no proof in this record that

20   the defendants took with them the names of any applicants who

21   are currently looking for a job, nor have they tried to place

22   any applicants that were currently looking for a job through

23   MIS Search. And finally, we have what are known as referral

24   sources or ticklers and that is the information that

25   Mr. Gormally was talking about that the defendants brought

Colloquy

22

1    copies of with them.  Those are simply lists of names of

2    people who work in the industry, they are the results of cold

3    calling.  There is nothing on that list, and Mr. Violette of

4    MIS Search himself conceded this, there is nothing on that

5    list that wouldn't be replicable by cold calling.  There is

6    nothing on that list that isn't publicly known and available.

7    Yes, if they go to that list they don't have to make a cold

8    call to do it, because the cold call was already  made:  But

9    if they made the cold call, they would get the identical

10   information.  So, there is nothing secret about that

11   information.  And they didn't steal the information, they, to

12   use the pejorative word that Mr. Gormally used, they took

13   copies of names of referral sources that they had developed

14   during the years they worked at MIS Search, and they left the

15   very same information behind.  There is no reason why MIS

16   Search can't compete with them, to call those very same

17   referral sources and network.  MIS Search doesn't own people's

18   names.  But that is what they're trying to say to this court,

19   that they own the names of the people who work in the business

20   that were acquired by the cold calling.  They don't.

21        So, let's look, your Honor, at the best evidence of

22   what's really proprietary in this business.  The best evidence

23   is what MIS Search has itself done.  You know, we all say to

24   our children, you know, listen to what I say, not what I do,

25   and we are all wrong when we say that.  Let's look at MIS

Colloquy

23

1  Search, let's look at what they do, not what they say.

2        What they do, your Honor, and we are not using this

3  to say that they are guilty of inequitable conduct or unclean

4  hands, we are looking at it to say to your Honor what really

5  is proprietary in this business, but their conduct shows you

6  that the information that we are talking about is not

7  proprietary. When they started this business, they hired

8  Mr. Violette from a competitor, A.J. Paul Associates. ·

9  Mr. Violette significantly has a written employment agreement

10  with MIS Search. His written employment agreement includes

11  not only an exclusion from the non-compete, but his employment

12  agreement does not bar him from soliciting customers when he

13  leaves. They said in their brief that there are no exceptions

14  to that issue, that is not true. The key employee in that

15  division, the founder of the division, has such an exclusion,

16  he is free to contact employees if he leaves. And that, your

17  Honor, speaks volumes about how important this really is and

18  whether or not MIS Search is doing this to prevent competition

19  as opposed to protecting real proprietary information.

20        When Mr. Violette came to MIS Search, he brought with

21  him customer names, applicant names, referral sources from his

22  prior employer. And he continued to work with those customers

23  at MIS Search. Obviously, he did not regard the customer

24  relationship as being proprietary and belonging to his prior

25  employer. He claimed at his deposition that he was able to do

Colloquy                                                    24

1   that because his superior at A.J. Paul, Mr. Multzer, had

2   expressly agreed to let him go talk to customers.  We have

3   supplied to your Honor the certification of Mr. Multzer saying

4   that no such agreement was ever reached.

5          Far more significantly, though, your Honor, what

6   Mr. Multzer shows you is that we are not saying this all

7   alone.  Mr. Multzer is a competitor of Solomon-Page and MIS

8   Search and he said that the reason he is not upset that Mr.

9   Violette took those customer relationships and names with him

10  is that he doesn't regard that information as proprietary.

11  So, here we have an outsider in the business, someone not

12  involved in this litigation, confirming that all of this

13  information is publicly available and fair game.

14         Then we have, your Honor, the fact that

15  Mr. Violette went off and he wanted to hire experienced

16  recruiters, that was his first choice.  And he wasn't

17  concerned that they might know customer names and have

18  customer relationships, he regarded that as a potential plus.

19  But MIS Search wasn't, for whatever reason, willing to pay for

20  real successful recruiters.  So, he ended up hiring people who

21  had some experience but not yet established track records.

22  But for each of those people, your Honor, that he hired from a

23  competitor, they brought with them one of the customer names,

24  customer relationships, referral sources, even applicant

25  names.  And when they came, Mr. Violette did not say to them

1    don't use that information, he said, "Lay low, don't get

2    caught using it, but go ahead and use it."  And we know, your

3    Honor, from the deposition of Brian Wiseltier, one of their

4    current recruiters, that Mr. Violette gave him an express

5    instruction, take that customer list, that referral source

6    list that you have of your prior employer and put it in our

7    database.  Now, I am not accusing Mr. Violette of doing

8    anything wrong, I want to be perfectly clear about that, what

9    I am saying, though, is that MIS Search's conduct shows that

10   this information is not, in fact, proprietary, that people in

11   the industry routinely change jobs and when they change jobs

12   they bring this sort of information with them.

13            THE COURT:  So, why lay low?

14            MR. KRAUS:  Why lay low, your Honor?  Because unlike

15   Solomon-Page, he doesn't have the courage of his convictions,

16   he doesn't want to get into a fight over it.  MIS Search would

17   have you believe that this is a conflict between the good,

18   ethical MIS Search and evil, the pirate, Solomon-Page.

19   Nothing could be further from the truth, your Honor.  This is

20   a conflict between a company, MIS Search, that adopted one

21   strategy of paying less money up front, hiring inexperienced

22   or relatively inexperienced recruiters, trying to tie them up

23   with restrictive covenants and then as they get successful,

24   reaping the benefits of their increasing success.  Solomon-

25   Page took the opposite route.  Solomon-Page says we are going

Colloquy                                                    26

1    to put our money up front, we are going to go out and hire

2    experienced recruiters, we are going to give them substantial

3    guarantees, we are going to make big investments in our people

4    from the beginning and we are going to do exactly the same

5    thing MIS Search did, we are going to make use of the fact

6    that our people have knowledge of the business.

7            THE COURT:  No, do you encourage them to bring their

8    lists with them?

9            MR. KRAUS:  Your Honor, we neither encourage nor

10   discourage it, because it is not, in fact, a guarantee of

11   success, your Honor, do we expect them to continue working

12   with the same customers?  Yes, we do.

13           THE COURT:  Then they would need to know who they

14   are.

15           MR. KRAUS:  That's all information they have in their

16   heads, your Honor.  It is all information that they could get

17   from a telephone book.

18           THE COURT:  Or written down on a piece of paper.

19           MR. KRAUS:  Doesn't change anything, your Honor.

20           THE COURT:  It wouldn't be meaningful.  The

21   distinction between whether it is in their heads or on a piece

22   of paper is not --

23           MR. KRAUS:  It is not a meaningful distinction, your

24   Honor, if Miss Silverberg comes over from MIS Search or from

25   Source Services or from A.J. Paul and she knows that Simon and

Colloquy                                    27

1   Schuster is a company that she has worked with and she knows

2   that the person she has worked with at Simon and Schuster is

3   John Smith, whether she wrote it down or she has it in her

4   head makes no difference.   The truth is that if she wanted to

5   go call Simon and Schuster and speak to John Smith and see if

6   he needs a placement, she could have picked up the DP blue

7   book and gotten the identical information anyway.

8           THE COURT:   Once you contend that a restrictive

9   covenant is not enforceable with regard to the solicitation of

10  one's customers, then there would naturally be an inducement

11  or encouragement to bring as much information as you can bring

12  so you can produce the same three or 400 or $500,000 a year as

13  you were doing before.

14          MR. KRAUS:   I don't think that that's anything more

15  than fair competition, your Honor.

16          THE COURT:   Right, and my question to you, then, is

17  wouldn't you expect and encourage them to bring that

18  information with them?

19          MR. KRAUS:   We certainly expect they are going to

20  bring the information, your Honor.

21          THE COURT:   Why do you hesitate at the word

22  "encourage"?

23          MR. KRAUS:   I don't, your Honor.

24          THE COURT:   I wouldn't think you would.

25          MR. KRAUS:   I don't, your Honor.

Colloquy                                              28

1       THE COURT:  If you were going to have the courage of

2  your convictions, you wouldn't hesitate.

3       MR. KRAUS:  So, I don't, your Honor.

4       THE COURT:  All right.

5       MR. KRAUS:  I will bite the bullet and say we

6  encourage them to bring that information, but your Honor has

7  to understand that bringing that information is no guarantee

8  of success.  Let's assume your Honor were to do something that

9  we would regard as incorrect and enjoin them from contacting

10  customers that they knew of from MIS Search, that would not

11  guarantee that MIS Search would be making placements of those

12  customers.  It wouldn't even provide a significant probability

13  that MIS Search would get placements of those customers.  All

14  it would mean is that MIS Search wouldn't have to compete with

15  these two talented recruiters who are now working with a

16  competitor.  This is not a situation where there are exclusive

17  relationships and in which a substantial investment has been

18  made by MIS Search.

19       Your Honor, their case is long on generalities and

20  short on facts.  Where is the evidence before your Honor that

21  there are customer relationships that are worthy of being

22  protected?  What customer relationships are we talking about?

23  They have not identified a single particular customer to your

24  Honor.  What investment are we talking about?  They have not

25  identified dollar one that they invested in customer

Colloquy                                29

1    relationships.  That fact is, your Honor, that what they do is

2    they provide a desk and a telephone to these recruiters and

3    then they pay them if, as and when they make placements.  They

4    don't invest anything in this business in terms of trying to

5    get customers relationships.  They pay their telephone bills

6    and they pay commissions.

7           We gave you, your Honor, as one of our submissions

8    their budget from last year, their travel and entertainment

9    budget was less than $4,000.  This is not a business like the

10   A.T. Hudson case, where a substantial investment is made to

11   establish exclusive relationships, that belongs to the

12   employer and will stay with the employer if the employee

13   leaves and is not allowed to solicit the relationship.  All

14   that's going on here is the good luck and good timing of

15   calling people with whom you've established some kind of

16   personal relationship and then presenting to them the best

17   qualified applicant.  If Simon and Schuster is looking for a

18   local area network planner and Miss Silverberg presents to

19   them a candidate and Mr. Violette of MIS Search presents to

20   them a candidate and his candidate is better qualified, his

21   candidate is going to get hired, Simon and Schuster's hiring

22   person is not going to hire a less qualified candidate just

23   because they like Miss Silverberg.  Who is going to put their

24   neck on the line for an outside recruiter that way?  It is the

25   hiring person's job to hire the best qualified person and the

Colloquy                                          30

1    recruiter who presents the best qualified person is going to

2    win. And that's what competition is all about and that's what

3    this Court ought to encourage, not discourage.

4         We are not standing here before your Honor and saying

5    restrictive covenants are not enforceable anywhere, any time.

6    I've argued the other side of this case, your Honor, for

7    companies that had real proprietary interests, who had secret

8    formulas, who had real customer relationships at issue. What

9    we are saying, your Honor, is that this is an industry where

10   all the information was publicly available and in such an

11   industry, as the courts have routinely held, restrictive

12   covenants are an impediment to competition, not a genuine

13   protective device for truly secret information. And I think,

14   your Honor, if you look at the New Jersey cases that deal with

15   customer relationships, you can see that distinction. In the

16   Whitmyer case, your Honor, the Supreme Court held that in a

17   situation where the customers were publicly known and

18   determined, the award of business based on public bidding,

19   that the customer relationship was not protectable.

20        THE COURT: That was because there was public bidding

21   specifically, that's a distinction, is it not?

22        MR. KRAUS: I don't think so, your Honor, I think the

23   distinction is that the customers in that business are

24   publicly known and it is all fair game. It is awarded based

25   upon who makes the best bid. In this industry the customers

Colloquy                                                    31

1   are all well known and the placements are made based on who

2   provides the best applicant.

3           THE COURT:  You think if there were not bidding in

4   that case there would not have been a restraint?

5           MR. KRAUS:  Yes, your Honor, I think that's exactly

6   right, and I think if you look at the Abilene case, you can

7   see that distinction.  The Abilene case was the exterminator

8   case, that's what's known in the trade, your Honor, as the

9   route case, like the milk route kind of cases.  The

10  exterminator there had a list of customers who used

11  exterminator services, and that fact was something that you

12  couldn't know by looking at the Yellow Pages.  And that fact

13  gave you a leg up on a competitor, because you knew when you

14  called Charles Gormally or Alan Kraus or Carol Wortmann, that

15  they had used exterminator services.  And you also had an

16  exclusive relationship.  People don't use multiple

17  extermination companies.

18          But what the Court held in Abilene is very

19  interesting.  What the Court held in Abilene is that because

20  of those facts they would enforce the restrictive covenant and

21  then it went on to say but if the information had been

22  publicly available, like a list of wholesalers or jobbers, we

23  would not have enforced the restrictive covenant.  So, they

24  made the very distinction we are talking about here, your

25  Honor.

Colloquy                                                      32

1        And I think, your Honor, the TV supply company case,

2   the Coskey's TV case, your Honor, is another very good example

3   of that.   In that case the trial court had entered an

4   injunction prohibiting any contact with customer relationships

5   established by the former employer and the Appellate Division

6   reversed.   The Appellate Division said that that was far too

7   broad a restraint, that the evidence didn't support it.   The

8   Appellate Division held that there were only two kinds of

9   restraints, two kinds of customer relationships that were

10  protectable in that instance.   Open job orders, which are not

11  an issue in this case, and relationships with the plaintiff,

12  former employer, could prove that the employer had made a

13  significant investment in establishing the relationship, and

14  then had just handed it to the former employer.   And what the

15  Appellate Division said was a relationship that the former

16  employee had established by his own efforts, either before or

17  during his employment, was not protectable.   And that is all

18  we are talking about in this case.   We are talking about

19  relationships that these people established before they went

20  to work at MIS Search and that they established by their own

21  efforts while they were at MIS Search.

22        THE COURT:   So, distinguish the Wear-Ever case for

23  me.

24        MR. KRAUS:   The Wear-Ever case, your Honor, has

25  nothing to do with restrictive covenants.   It is not a

1   restrictive covenant case at all.

2          THE COURT:  It is a post-employment covenant not to

3   continue.

4          MR. KRAUS:  Your Honor, what the Wear-Ever case is

5   about is that it is about a breach of faith and duplicitous

6   conduct by the faithless employee.  In the Wear-Ever case,

7   your Honor, first of all, that's more like a milk route case,

8   you had a group of door-to-door salesmen who went to homes to

9   sell pots and pans and they had a route and they knew a

10  certain number of people who had bought from them in the past.

11  The head of the sales effort was secretly hired by a

12  competitor and he then called a meeting of his sales people

13  without telling them that he had been hired by a competitor

14  and in the course of that meeting he recruited them to go work

15  for the competitor, all without telling them his own

16  affiliation.  And Judge Pashman was understandably offended by

17  that kind of breach of faith and that kind of duplicitous

18  conduct.  And he held that because of that wrongful conduct,

19  he would enjoin the hiring of that whole sales force.  And

20  that was, in fact, a raid, your Honor, they took the whole

21  sales force.  And there was evidence in that case that they

22  did it intentionally, to injure the competitor, rather than to

23  further their own business.  There is none of that evidence

24  here, your Honor, none.

25          THE COURT:  There was in that case an indication, was

Colloquy                                                    34

1    there not, that the success of the employer was really

2    premised upon the conduct and activities of the employees and

3    what you had was a service oriented industry similar to what

4    you have here.

5          MR. KRAUS:  That's true, your Honor.

6          THE COURT:  And where the product is services as

7    opposed to what you normally think of when you deal with trade

8    secrets and restrictions, and service, depending on how it is

9    created and developed, can be protected where the raiding of

10   it is destructive to the company, even if that is not the

11   motivation.

12         MR. KRAUS:  I think, your Honor, that there was

13   discussion of the fact that service can be protected when

14   there is raiding combined with that kind of duplicitous,

15   wrongful conduct, and the Avtec case by the Appellate Division

16   later held that hiring away a skilled employee, even in the

17   service business, is not against the law.  Why should we say,

18   your Honor, that there is a rule that says that Silverberg and

19   Rimberg are bound to work for MIS Search for the rest of their

20   lives?

21         THE COURT:  No, no, no, we are not talking about

22   something being against the law, we are talking about whether

23   or not there is a protectable interest that the employer has,

24   so long as the restriction, if any, is reasonable, it's

25   allowed.

Colloquy                                                        35

1        MR. KRAUS:  Your Honor, I don't think that Wear-Ever

2   says in any way that a service business has a protectable

3   interest in its customer relationships and that that was the

4   genesis of the order in Wear-Ever.  That had nothing to do,

5   your Honor, with Justice Pashman's decision in Wear-Ever.

6        THE COURT:  Maybe.  But he went out of his way to

7   point out that it is upon the employee's shoulders that the

8   success of the company is based.

9        MR. KRAUS:  That was, your Honor, the evidence that

10  there was harm to Wear-Ever.  And from the fact that their

11  whole employee force had been raided in that sense.  That is

12  not the same as saying there is a protectable interest that

13  you ought to enjoin in a situation where only two employees

14  are taken.

15       THE COURT:  No question he was outraged at the

16  conduct of the defendants in that case, query; what would have

17  happened if there were not the type and extent of the raid

18  that existed?  He doesn't reach that subject.

19       MR. KRAUS:  He doesn't ever reach that issue, your

20  Honor, we know from later cases in the Appellate Division and

21  in the Supreme Court what would happen in that instance.  We

22  know from the Whitmyer case, we know from the Coskey's TV

23  case, we know even from the Karlin case, your Honor, that the

24  Court is not going to hold that just because it's a service

25  business that you have a protectable interest.

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

Colloquy                                    36

1          Consider the Karlin case, your Honor, that was the

2   physician/patient relationship.  Obviously, a much closer,

3   more exclusive, more protectable relationship than we have

4   between recruiters who cold call and companies.  But in the

5   Karlin case, your Honor, all that the Court held was that a

6   geographical restriction was enforceable, the Court went out

7   of its way to point out that the restriction at issue in the

8   Karlin case did not prevent the junior physician from

9   soliciting business from patients that he had worked with

10  while he was an employee of the senior physician.  All he was

11  prohibited from doing was opening an office within 10 miles.

12  If he opened an office 10 miles and 1/10 of a mile away from

13  the former office where he worked, he was perfectly free to go

14  after those patients if he wanted to, if they wanted to come

15  see him.  And what that indicates, your Honor, is that even in

16  an instance where there is a much closer relationship than

17  there is here, the Court found that a blanket restriction on

18  soliciting former customers was not justified.

19          There is no case, your Honor, no case that has been

20  cited by the plaintiff, and, in fact, there is no case of

21  which we are aware where you had non-exclusive relationships,

22  like this, with generally publicly available information,

23  where there was an injunction issued against soliciting the

24  business of customers.  The only case, your Honor, in fact, in

25  New Jersey, in recent history where a court has enjoined the

Colloquy                                          3?

1    soliciting of former customers is the A.T. Hudson case.   In

2    that case the Appellate Division went out of its way to say

3    that there was "a great deal of evidence" submitted below to

4    establish that significant monies and effort have been

5    expended by the former partnership to solicit and obtain the

6    business of Bank of America.  And that the former employee had

7    just gone in and piggybacked on that effort to get the

8    business of Bank of America.  And in that circumstance.where

9    you had an exclusive close relationship between a company and

10   its consultant, the Court found it protectable, but it went

11   out of its way to say that you require that kind of a showing.

12   there is no such evidence of anything approaching that here.

13        What we have here, your Honor, is a phony customer

14   database claim, they say in a verified complaint that they've

15   got a customer database with all of this confidential

16   information in it and the truth is, as discovery has revealed,

17   it doesn't exist.  There is a simple list of customers, their

18   names of which could be replicated from the blue book, from

19   the Yellow Pages, from a directory of corporate affiliations,

20   and probably a hundred other ways.  There is no evidence of

21   any expenditure of their time and money to establish customer

22   relationships.  There is no identification of customers at

23   issue.  There are frank admissions by all of the MIS Search

24   employees that they are perfectly free to compete with

25   Silverberg and Rimberg for the business of the customers with

Colloquy                                    3§

1    whom they are working.  And the recruiter who comes up with

2    the best applicant is going to make the placement.

3         Plain and simple, what they are asking you to do is

4    to enjoin competition from two talented recruiters who left

5    and that they are not entitled to.

6         THE COURT:  Okay, thank you.  Counsel?

7         MR. GORMALLY:  Judge, just briefly, we couldn't have

8    two positions that are further apart, from my client's.

9    standpoint --

10        THE COURT:  Yes, you could, you come here on another

11   day, you will see that you're further apart than this.

12        MR. GORMALLY:  Well, at least as it relates to

13   customer relationships, your Honor, the defendant's reading of

14   the law, contrary to what the Wear-Ever case found, where the

15   product was as important and the customer relationship was

16   important as the product in that case, that's the position

17   that these plaintiffs are in, the customer relationship that

18   we've nurtured that the defendants have grown is entitled to

19   protection.  The defendants don't see that as a protectable

20   asset in this business.

21        The other interesting observation that I would make,

22   your Honor, is that despite counsel's position, even

23   throughout the papers and up to today's oral argument that

24   these weren't protectable assets, he never, until your Honor

25   prodded him, took the position that his client, in fact,

Colloquy                                                    3?

1    encourages people to come on board with all this information.

2    And that really points to really the business ethic argument

3    that we've made in our papers, in no instance have we

4    encouraged individuals who we were hiring, whether they be

5    experienced or inexperienced, to take information with them.

6    The instances cited by counsel are all contradicted in the

7    deposition record.  Wiseltier's database was never put into

8    our database, Mr. Violette never took his Rolodex with him,

9    the certifications that defendants submit even indicate that.

10   Nothing was expropriated from other employers to the benefit

11   of MIS Search.  And although counsel may want to say that he's

12   not trying to say that MIS Search comes into court with

13   unclean hands or MIS Search is really just doing business like

14   everybody else does, in this business the reality is this

15   company has done business in a manner consistent with

16   everybody's restrictive covenant, respecting individuals'

17   restrictive covenants and respecting confidential information

18   that that person may have had privy to.

19          Counsel even suggests in a sort of offhanded way, he

20   says that they were told to lay low, then he summarized it by

21   saying that means don't get caught, that is precisely not what

22   was told to employees, they were told to lay low, meaning not

23   use that information whatsoever, and there is no instance that

24   counsel can point to where this company used information that

25   they obtained through a lateral hiring from another firm.

Colloquy                                              40

1    That information was never put into this database.

2           The reality is, your Honor, that the information that

3    counsel hands up to the Court today in the form of a blue book

4    is strikingly different from the volumes of information that

5    these people took with them.  Look in the blue book, does it

6    have anybody's existing salary?  Does it have their home phone

7    number, does it tell them whether MIS Search has ever placed

8    that customer before?  That is what makes the customer

9    relationship.  That is what makes this closer to a milk route

10   case than a phone book case.

11          Counsel is trying to suggest that these are public

12   resources.  The reality is they are resources that were

13   developed by MIS Search, the existing customer relationship is

14   a valuable asset.  The Court has to be troubled with the fact

15   that Solomon-Page has made it their corporate business to

16   acquire only those individuals that have customer

17   relationships.  If they weren't valuable, why do they want to

18   buy them?  If they weren't valuable, why do they pay more than

19   anybody else to get the 200, $300,000 book of business that

20   these individuals bring with them when they go across the

21   river?  They wouldn't be paying the big bucks if they didn't

22   think they were going to be getting the big bucks.  That is

23   not appropriate and a protectable way of doing business,

24   particularly where individuals have acknowledged the

25   confidentiality of the information they now bring to their new

Colloquy                                    41

1    employer.

2            MR. KRAUS:  Just one brief response, your Honor,

3    contrary to what -- I'm sorry, shall I proceed, your Honor?

4            THE COURT:  Not yet.  Yes?

5            MR. KRAUS:  Contrary to what Mr. Gormally just said,

6    there is ample evidence in this record that MIS Search has,

7    indeed, profited from the business that its recruiters have

8    brought with them.  Mr. Violette himself testified that when

9    he was at A.J. Paul he had established relationships with

10   Hoffman-LaRoche and Shearing Plow and Haagen Dasz and a number

11   of other customers.  And that he continued to work with those

12   customers and make placements at those customers after he came

13   to MIS Search.  When we talked about the recruiter to whom he

14   said lay low, I asked him point blank did you tell Miss

15   Capolongo not to use the information that he knew she was

16   using, and he said no, I never told her that.  When we talk

17   about whether or not they made placements as a result of

18   information brought with them, there was testimony by

19   Mr. Wiseltier that he brought an applicant name with him, with

20   him from his prior employer, a current looking applicant, and

21   that Mr. Violette himself tried to place that applicant with

22   one of MIS Search's clients, Ralph Lauren.  There is ample

23   evidence in this record, your Honor, that MIS Search in its

24   own business practices has routinely regarded this kind of

25   information as non-proprietary, as fair game to be worked

Colloquy                                                42

1    with.  And look, as I said, your Honor, look at what they do,

2    not at what they say.

3         THE COURT:  The Court will take a 20 minute recess.

4         (Recess.)

5         THE COURT:  First I want to thank both counsel for

6    their very helpful briefs and arguments.  The Court has been

7    assisted by the very professional manner in which the issues

8    have been presented and the Court appreciates it.

9         Secondly, I want to point out that while there has

10   been reference to the policies of the parties, plaintiff and

11   defendant with regard to the hiring of, treatment of employees

12   in this industry, and protestations that such argument and

13   references are not intended to serve as a basis for any

14   suggestions of unclean hands, the Court has, in fact, taken

15   those arguments at face value and has not considered any

16   equitable concepts of unclean hands, but instead viewed the

17   references to the customs and policies of the respective

18   employers for what they are; an indication of what is the

19   practice, if not in the industry, at least with regard to

20   these two employers and others who have been referenced.

21        Now, the Court is satisfied that the plaintiff is not

22   likely to succeed on the merits of its claim that Rimberg

23   Moe's post-employment covenant not to compete is enforceable

24   because of the absence of a legally recognizable reason for

25   such a restriction, and because of the widespread exclusion of

Colloquy                                                43

1    other employees from such a covenant.  The plaintiff's

2    argument that the distinction among employees is drawn between

3    those who come with experience and those who do not, the Court

4    finds is not supported by the record, and further, is an

5    acknowledgment of its policy to waive post-employment

6    restrictions in exchange for successful experience and,

7    undoubtedly, the use of prior contacts with customers despite

8    the admonition to "lay low," which, to this Court, means use

9    it but quietly and surreptitiously.

10           In regard to this post-employment restriction

11   covenant of the defendant Rimberg Moe, the courts and the law

12   look with disfavor upon enforcement of such covenants and will

13   do so only where a recognizable and protectable interest of

14   the employer requires.  What interest is there here?  In

15   essence, the plaintiff contends that this individual defendant

16   has confidential information.  That is really the basis of the

17   support, alleged legal support for the restriction.  And

18   that's really, in addition, the heart of the case, not only

19   with regard to Miss Rimberg Moe, but also with regard to the

20   other individual defendant, and frankly, with regard to the

21   corporate defendant as well.

22           Is there proprietary information that's protectable

23   under New Jersey law in this matter?  This Court does not

24   believe that there is.  This Court sees nothing different

25   between the plaintiff's operation from any cold calling

Colloquy                                               44

1   solicitation in a number of industries.  Potential customers

2   are readily ascertainable and public information.  And it is

3   clear from the record that customers use multiple search firms

4   and it is obvious from the logic of the situation that they

5   will hire the best available applicant, irrespective of who

6   calls.

7          There is nothing in the record to demonstrate

8   plaintiff's likelihood of success in establishing the

9   confidential or proprietary nature of that customer list that

10  would be required in order for the restraints requested in

11  this matter to be entered.

12         The blue book which was handed up to me during

13  argument lists target companies, the Yellow Pages and the

14  stock exchanges list target companies, and the plaintiff does

15  not, nor does any entity in this field, in this Court's

16  opinion, own those names.  And more importantly, or as

17  importantly, there is no evidence of those exclusive

18  relationships between the individual defendants and those

19  customers which plaintiff alludes to.  None has been shown to

20  overcome the compelling logic that it doesn't matter who

21  calls, a customer will hire the best available applicant

22  irrespective of who calls or what company that person works

23  for.  As a consequence, the Court is not satisfied that the

24  plaintiff is likely to succeed on the merits of its claim that

25  the individual defendants possess protectable confidential

LASER STOCK FORM FMU

THE CORBY GROUP 1-800-255-5040

Colloquy                                          45

1    information and therefore the preliminary restraints are

2    dismissed, are dissolved, rather, and the request for

3    temporary restraints is denied.

4         Counsel, is there any reason why this proceeding

5    should not be dispositive of this matter?  Is my question

6    understood?

7         MR. GORMALLY:  Yes, your Honor, I can't articulate

8    any reason that it wouldn't be, Judge.

9         MR. KRAUS:  Nor can I, your Honor.

10        THE COURT:  Then prepare an order, counsel.

11        MR. KRAUS:  We will do so, your Honor, there is one

12   issue that will have to be resolved, your Honor.

13        THE COURT:  What's that?

14        MR. KRAUS:  The employment agreements with Silverberg

15   and Rimberg provide that the prevailing party gets attorneys'

16   fees, so we will make an application for attorneys' fees.

17        THE COURT:  You know that any agreements are not

18   binding on this Court with regard to the issue of counsel

19   fees.

20        MR. KRAUS:  I understand that, your Honor, but I also

21   understand that there is law that provides that where the

22   parties have contractually allocated that risk, that the Court

23   can award attorneys' fees.

24        THE COURT:  Well, apply for it and brief it.

25        MR. KRAUS:  We will do so, your Honor.

Colloquy                                           46

1          THE COURT:  And your adversary, when will you have

2    that in?

3          MR. KRAUS:  Would two weeks be sufficient, your

4    Honor?

5          THE COURT:  Fine.  And your adversary will have a

6    week to respond and then you can have a few days to reply, put

7    that in the form of your order.

8          MR. KRAUS:  We will do that, your Honor.

9          THE COURT:  And I will make a decision, if I need

10   your arguments, I will ask you, otherwise I will do it on the

11   papers.

12         MR. KRAUS:  Thank you, your Honor.

13         THE COURT:  Thank you again, counsel.

14         MR. GORMALLY:  Thank you, your Honor.

15         (Court is adjourned.)

16

17

18

19

20

21

22

23

24

25

LASER STOCK FORM FMU

THE CORBY GROUP  1-800-255-5040

1

2

3

4

5                        C E R T I F I C A T I O N

6

7

8          I, STEVEN M. KOSKINEN, C.S.R., License Number 828, an

9    Official Court Reporter in and for the State of New Jersey, do

10   hereby certify the foregoing to be prepared in full compliance

11   with the current Transcript Format for Judicial Proceedings

12   and is a true and accurate transcript of my stenographic notes

13   taken in the above matter to the best of my knowledge and

14   ability.

15

16

17   _____

18              STEVEN M. KOSKINEN, C.S.R.

19

20

21   Date:  _____

22

23

24

25

# EXHIBIT C

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIV. - EQUITY PART
BERGEN COUNTY
DOCKET NO. C-206-96E
APP. DIV. NO.

P.C. HELP SERVICES, INC., a    :
New Jersey corporation,

                              :

        Plaintiff,        :             TRANSCRIPT

              vs          :               OF

                       :            HEARING

JEFFREY WEIN,          :

        Defendant.
-----------------------------:

               Place:  Bergen County Courthouse
                     10 Main Street
                     Hackensack, NJ 07601

              Date:   July 11, 1996

BEFORE:

    HONORABLE KEVIN M. O'HALLORAN, P.J. Ch.

TRANSCRIPT ORDERED BY:

    ALAN E. KRAUS, ESQ.
    (Riker, Danzig, Scherer, Hyland & Perretti)

APPEARANCES:

    ROBERT A. SMITH, ESQ.
    (Smith, Luhn & Doran)
    Attorney for the Plaintiff

    ALAN E. KRAUS, ESQ. and
    JOEL E. KLARRICH, ESQ. (New York Bar)
    (Riker, Danzig, Scherer, Hyland & Perretti)
    Attorney for the Defendant

                     Patricia E. Funicelli, C.S.R.
                     Official Court Reporter
                     Bergen County Courthouse
                     10 Main Street
                     Hackensack, New Jersey 07601


CONFIDENTIAL

Colloquy                                          2

July 11, 1996

1

2          THE COURT:  All right, put your appearances on the

3  record.

4          MR. SMITH:  Robert A. Smith for the plaintiff.

5          MR. KRAUS:  Alan Kraus, Riker, Danzig for the

6  defendant.  Your Honor, with me is Joel Klarrich, a member of the

7  New York Bar.  We submitted yesterday motion papers to admit Mr.

8  Klarrich pro hac vice.  I will be arguing, however, your Honor.

9          THE COURT:  Okay, fine.  Let me hear your argument.

10         MR. SMITH:  Sure, your Honor.  These types of cases

11 which I am sure, your Honor, this is not the first action to

12 enforce a restrictive covenant the Court has entertained, are

13 always difficult.  The employer comes before the Court and asks

14 that an agreement be enforced which in effect would require the

15 defendant to stop working for his present employer.

16      In most cases the employee comes before the Court with

17 certain objections or defenses to the agreement either that he

18 didn't understand the agreement, that he was forced to sign the

19 agreement, that the agreement is somehow too broad in scope or in

20 duration, that the employer breached the agreement himself

21 through a failure of consideration, that the agreement is

22 ambiguous, that the employee was hired and has to earn a living.

23      The uniqueness here is that none of these apply in this

24 case.  What we have here is Mr. Wein who was by his own

25 certification, the sur-reply certification which I received

CONFIDENTIAL

1  yesterday, admittedly sophisticated business person. He had

2  international responsibilities with a software company prior to

3  coming with P.C. Help. He enters into an agreement with P.C.

4  Help Services, Inc. on March 24, 1994. Conspicuously absent from

5  any of the arguments of the defendant in this case is a real

6  attack on that agreement.

7      The agreement I would respectfully submit, Judge, is very

8  clear and very unambiguous. It is also very fair. It says, Mr.

9  Wein, we will hire you and we will provide to you a list of

10 customers, our method of doing business, we well give you lists

11 of the employees that we put out into the work place, we will

12 give you a manual. We will teach you how to sell our services

13 and we're going to pay you for doing all these things and in

14 consideration for that you have to promise us that you are not

15 going to go out for one year after you have left our employ and

16 compete with us. You are not to use this confidential and

17 proprietary information which you have agreed in writing is in

18 effect proprietary, confidential and our trade secrets.

19     Mr. Wein voluntarily terminated his relationship with P.C.

20 Help Services, Inc. after 2 years of receiving the benefits of

21 that agreement. He learned how P.C. Help Services, Inc.

22 operates. He learned who to contact, who it had contacted

23 through those years in order to place the employees out into the

24 marketplace. It provided him with a manual on exactly how to do

25 it. It taught him how to do it.

CONFIDENTIAL

Colloquy                                4

1    He doesn't refute that he was successful during this period

2  of time using the methodology and the contacts provided to him

3  and obviously his job is to develop other contacts.  That's what

4  we hired him to do and we hired him to do that.  We trained him

5  to do that and we gave him everything that we promised we would

6  in the agreement and Mr. Wein doesn't say we did not give him

7  everything in this agreement.

8    We provided to him all of the proprietary information that

9  we agreed to.  We taught him how to do it.  He did it.  He worked

10  for 2 years.  He was paid very well for doing it and he decided

11  that he was going to leave.   And he snuck out the back door, did

12  not let us know what he was doing and I think that is evidenciary

13  of something.  I think implicit is a knowledge by Mr. Wein that

14  he knew that there was an agreement out there that he was in

15  breach of.  He is right down the street.  He is in what he

16  characterizes as a fiercely competitive business and he is in

17  competition with us.

18    I provided the Court with a copy of the advertisement that

19  Mr. Wein placed in the New York Times.  If you compare it to the

20  advertisement utilized by P.C. Help Services it kind of jumps out

21  how similar it is.

22    As I understand the defendant's argument it is that we have

23  not met the prong of damages.  We don't have to show at this

24  point, Judge, as I understand the law that we have today lost a

25  customer.  The reason we're here is we don't want to lose


CONFIDENTIAL

1  customers.  The reason we're here asking for a preliminary

2  injunction, the reason we signed the agreement is we all knew

3  that after he learned how to do this business that he would be

4  out there competing with us and the potential for irreparable

5  injury by taking our customers, customers who we have built over

6  a long period of time and which he obviously is going to try to

7  develop a relationship with.

8        He has contacted by his own admission 15 already.  I got to

9  believe it isn't to say hi.  He admits he called 15 customers.

10 Why is he doing that?   I would suggest, your Honor, the only

11 reasonable inference as to why he's doing it he wants those

12 customers to know that he's now in the same business, that if

13 they want to use his services they're obviously free to do it.

14       Your Honor, we have an agreement.  It was freely and

15 voluntarily entered into.  It was for good and valuable

16 consideration.  The four prongs recited in both in our brief and

17 in the brief of the defendant are all met here which would allow

18 the plaintiff to obtain the relief sought, that being a

19 preliminary injunction enjoining Mr. Wein from continuing to

20 violate the clear language of the agreement.

21       I think there is a reasonable probability of ultimate

22 success by P.C. Help Services here.  I don't see any reason nor

23 do I read anything in the defendant's papers to give me any pause

24 in saying I feel we will be ultimately successful in enforcing

25 this agreement.  The threat of irreparable injury was not only



CONFIDENTIAL

1  recited in the agreement, it has been documented in the papers

2  that we have submitted in support of our application.

3      And I would refer the Court to National Starch versus Parker

4  Chemical recited in our brief which basically states that we, the

5  movant in this application, only needs to show the implicit

6  threat of irreparable harm.

7      The legal right is well settled.  I think the legal right is

8  clearly set forth in an unambiguous and detailed agreement

9  between the parties and the relative hardship, Judge, if there is

10  a hardship imposed here, it is by Mr. Wein's own doing.  He was

11  well paid.  He was offered a management position.  He elected to

12  walk out on P.C. Help Services and for him now to say, well, gee,

13  you're not going to let me work, I am not going to be able to

14  support my family.

15      Well, P.C. Help Services has a stake here.  They had a stake

16  that they recognized when they hired him and when they put this

17  agreement together and when they signed it they knew what they

18  were going to have to do for him and they did it and he

19  understood because he hasn't said otherwise in any of his papers

20  what he was responsible for, what the limitations were that were

21  imposed upon him when that relationship terminated.  He

22  terminated the relationship not P.C. Help Services.

23      Judge, the status quo in this case can only be preserved

24  respectfully, your Honor, if he is not allowed to continue to

25  compete with us and to clearly violate the terms of this

CONFIDENTIAL

1  agreement until such time as the Court is allowed to hear the

2  testimony of the respective parties and witnesses and make a

3  final determination.

4         THE COURT:  Is there any way to do that short of

5  telling him he can't work for his new employer at all?

6         MR. SMITH:  Judge, he can work for Sloan as long as he

7  is not working within 50 miles of where he worked before or 25

8  miles of the 3 offices of P.C. Help Services, Inc.  That's the

9  geographical limitation.  If he goes out of the New York City New

10 York New Jersey area the 50 mile radius within which he was

11 working or the 25 miles of Cherry Hill, Chicago and Virginia

12 that's fine, but other than that I don't see it.

13        THE COURT:  Does Sloan have offices that would be

14 outside that geographical area?

15        MR. SMITH:  I've no idea, Judge.  I don't know anything

16 about Sloan.

17        THE COURT:  Okay, thanks.

18        MR. KRAUS:  It is Black letter law in New Jersey that

19 restrictive covenants are discourageed.  A restrictive covenant

20 is enforceable under New Jersey law only to the extent reasonably

21 necessary to protect genuine trade secrets and proprietary

22 information.  A restrictive covenant is not enforceable in order

23 to protect a former employer from fair competition from a

24 talented employee who leaves his business.

25        It is Black letter law in New Jersey that customer lists are


CONFIDENTIAL

1 not trade secrets when the information on that list can be

2 readily ascertained from publicly available sources.

3      It is Black letter law in New Jersey that a preliminary

4 injunction may issue only upon convincing showing of probability

5 of success on the merits, imminent threat of irreparable injury,

6 a balancing of the equities that favors the plaintiff

7 significantly and a showing that the material facts are all

8 uncontroverted.

9      This application falls on all of those counts.  First and

10 most significantly, this is not a business that has genuine trade

11 secrets or proprietary information.  The undisputed facts show

12 that what this business is about is soliciting customers, all of

13 whose names are well known to everyone in the business, all of

14 whose names can be ascertained from the telephone yellow pages,

15 all of whose names can be ascertained from lists that are

16 publicly available from vendors.  Those lists that are publicly

17 available from vendors include such information as what kind of

18 computer equipment hardware and software that the company

19 customers use.  They include such information as who are the

20 contact persons within the companies, who are in charge of the

21 data processing information.  They include such information as

22 what kind of services those companies need.

23      It is also undisputed that this business is driven by cold

24 calling.  It is the kind of business where salesmen make their

25 money by getting on the telephone, dialing and finding out what



CONFIDENTIAL

1  options are available.

2      It is also the kind of business that is hotly competitive.

3  Job openings are by customers are sent to a number of search

4  firms and those search firms get the business and get the order

5  filled only to the extent that they are successful in presenting

6  the most qualified candidate most quickly to the customer.  This

7  is not a business that is driven by proprietary or secret

8  information.

9      This case is distinguishable from the very few cases in New

10 Jersey where post employment restrictions have been imposed by

11 the fact that there are no real proprietary categories of

12 information at issue here.

13     If you took the National Starch case, for example, that was

14 cited by the plaintiff, it is readily distinguishable from this

15 case.  Our firm did the National Starch case and we're very

16 familiar with it and we did it for the plaintiff.  In that case

17 the job switching employee knew customers' specific adhesive

18 formulas and he went and he solicited the business of those

19 specific customers, used those trade secret formulas.  That's not

20 this case.

21     If Mr. Wein wants to call up A T & T or Chemical Bank or any

22 one of the brokerage houses and ask them do you need any

23 temporary help he's going to get that business only to the extent

24 that he is able to satisfy their needs.  And if he gets that

25 business he is no different from any other competitor of P.C.

CONFIDENTIAL

1 Help. He has no leg up by the fact that I once worked at P.C.

2 Help.

3     The other reason that this case is distinguishable from any

4 case, any one of the few cases where a post employment

5 restriction has been enforced, is that we have the sworn

6 testimony in this case from Mr. Wein that he took nothing with

7 him. So putting aside the fact that there was nothing

8 proprietary to take, he didn't take it.

9     THE COURT: Did he take the training manual or any

10 other document?

11     MR. KRAUS: No, he did not and he said so under oath.

12 He took nothing at all with him.

13     THE COURT: Well, what's the significance of this

14 agreement he signed? Nothing?

15     MR. KRAUS: In law? There is no significance to this

16 agreement because it is not enforceable in law and, your Honor,

17 it may be down the road if this case goes on we will present

18 argument of adhesion, contract and unconscionable practice and

19 will be able to present evidence that the plaintiff has been

20 entirely inconsistent in how they have tried to use these

21 agreements.

22     But you don't need to ever reach those points because the

23 law is clear in New Jersey that if genuine trade secrets are not

24 being protected by the agreement, the agreement is unenforceable

25 per se and this is just such an agreement.

CONFIDENTIAL

Colloquy                                     11

1       THE COURT:  Does Sloan have offices outside the

2  geographical area mentioned in the agreement?

3       MR. KRAUS:  No, it does not and furthermore, your

4  Honor, to the extent that they try and enforce these geographical

5  restrictions, that is an extraordinary hardship on Mr. Wein

6  because what they're saying to him you can't work in your chosen

7  profession in the metropolitan area of New York and the

8  metropolitan area of Philadelphia.  You basically got to move out

9  of the middle Atlantic states to keep working in your chosen

10  business.  They have no right to do that.  They particularly have

11  no right to do that because they're not protecting anything that

12  is protectable.

13       And, your Honor, I submit that you don't have to take my

14  word for that.  We litigated this exact same issue before Judge

15  Greenberg in the A O C case and Judge Greenberg held not just

16  that the employment covenant was unenforceable in the context of

17  preliminary injunction but at the preliminary injunction hearing

18  he sua sponte dismissed the case entirely holding in this

19  industry these types of covenants are not enforceable.  That

20  finding was exactly correct.

21       Furthermore, your Honor, what showing have they made that

22  they will really have any kind of proprietary information at

23  stake.  They have given you conclusory assertions.  Where is the

24  customer list?  Where is the manual?  Where is the proprietary

25  information for you to evaluate and for us to explain and


CONFIDENTIAL

1 dispute?  Without seeing that customer list, you have nothing

2 before you on which you could grant preliminary injunctive

3 relief.   In truth, your Honor, I suspect and indeed expect that

4 if as and when we ever see this supposed customer list we're

5 going to be able to show that the exact same information is

6 available from public vendors and available from the yellow pages

7 and available from cold calling.

8        When we see this much wanted sales manual I submit you're

9 going to find it at best common sense and that there are no

10 proprietary techniques here.   If there were proprietary

11 techniques they would have shown them to you and to us.

12 Conclusory assertions are not enough.

13       Then, your Honor, you have the fact besides the balancing of

14 the equities that a preliminary injunction is designed to

15 preserve the status quo.   The status quo here is that Mr. Wein

16 has been working for Sloan for more than two months.   They're not

17 trying to preserve the status quo.   They're trying to disturb the

18 status quo.   They're asking you to take this gentleman and throw

19 him out of his current existing position.   They haven't offered

20 to pay him while they're doing that for the year they want him

21 not working in his chosen profession.   They want you to throw him

22 out on the streets and they have no right to do that.

23       Finally, your Honor, if all of that isn't enough to convince

24 you we have the fact that they have not shown any imminent threat

25 of irreparable injury.   They haven't shown any competition from

CONFIDENTIAL

Colloquy                                                13

1  Sloan for P.C. Help customers.  They haven't shown any

2  diminishment in their business.  They haven't shown any

3  applicants that they lost because they have gone to work for

4  Sloan instead.  They haven't shown any applicants that have even

5  considered leaving them to go work with Mr. Wein at Sloan.

6       And I think, your Honor, that you can see most clearly the

7  intellectual weakness of their case when you realize they

8  complain about an advertisement in the New York Times and claim

9  that Mr. Wein is ripping off some proprietary method of

10 advertising.  Well, I urge you to take a look at the

11 advertisement.  The advertisement is a listing of what kind of

12 people they want and what kind of qualifications they want and on

13 the very same page in the New York Times they gave you there are

14 many other examples of temporary help services with exactly the

15 same kind of advertisement.  This is just not an industry that

16 has trade secrets at issue.

17      And last and most certainly least we have the fact that

18 Crowe versus DeGioia tells you that you are not supposed to grant

19 the extraordinary relief of a preliminary injunction when the

20 material facts are controverted.  Frankly, with the material

21 facts are undisputed that there really are no trade secrets.

22 That there is really no eminent threat of irreparable injury but

23 the bear minimum one can say it's very strongly controverted on

24 the facts that any of that evidence is before the Court.

25           THE COURT:  All right, thanks very much.



Colloquy

1   MR. SMITH:  Can I respond briefly?

2   THE COURT:  No, I gave you both a fair chance and we

3   analyzed all your papers and you both certainly argued very

4   well.

5   Plaintiff P.C. Help Services has brought this action and

6   today's application seeking a preliminary injunction enjoining

7   former employee, the defendant Jeffrey Wein, from continuing his

8   employment with Sloan Staffing Services, his new and current

9   employer or any other competitor of plaintiff for that matter

10  within certain geographical areas and for a period of one year as

11  specified in the employment agreement entered into by the

12  parties.

13  Plaintiff is a New Jersey corporation.  It is engaged in the

14  employee search business and specializes in computer technical

15  services and it has offices in Clark, New Jersey, Cherry Hill,

16  which is in the Phildelphia area, New York City and Chicago.

17  Defendant as I said is one of their former employees of

18  their New York office and he's presently working for Sloan also

19  in New York City and Sloan is definitely a competitor of the

20  plaintiff.

21  The complaint alleges that on March 24, 1994 the parties

22  entered into what they call a sales employee agreement pursuant

23  to which the plaintiff agreed to hire the defendant as an account

24  executive on an at will basis in exchange for among other things

25  defendant's promise to abide by the term of a post employment

CONFIDENTIAL

1  restrictive covenant.

2      As an account executive the plaintiff solicited large

3  companies which required temporary help in their technical

4  service area.  When a temporary job opening was identified, the

5  defendant would notify the tech recruiter who was then

6  responsible for matching the available job with the candidates

7  that had submitted resumes to the plaintiff.  According to

8  defendant he never dealt directly with any of the candidates.

9      Defendant also claims that he was given no formal training

10 nor was he given a confidential customer list from which to

11 solicit customers.

12     Plaintiff on the other hand claims that while defendant was

13 under its employ, he was provided with confidential customer

14 lists as well as training and various business methods including

15 advertising and interview techniques.

16     It was on May 6, 1996 that defendant resigned from his

17 position with plaintiff and was immediately escorted from

18 plaintiff's premises.  He immediately began working for Sloan as

19 the managing director of its technical support division and in

20 this capacity he is responsible for interviewing tech candidates,

21 contacting clients, setting division policies and creating

22 advertisements and, of course, it's his employment with Sloan

23 that gives rise to the various breaches of contract claims that

24 the plaintiff is asserting here.

25     Plaintiff asserts that defendant, in entering into the

CONFIDENTIAL

Colloquy                                            16

1 employ of Sloan, has breached the agreement that I referred to

2 before particularly the covenant that says that the employee will

3 not directly or indirectly, within a 50 mile radius of his

4 assigned work location or within a 25 mile radius of any city in

5 which plaintiff does business he will not whether as proprietor

6 or partner, employee, et cetera, engage in a business which

7 provides similar services to the plaintiff's.

8      The second count of the complaint alleges that he's

9 disclosed trade secrets and confidential information including

10 customer lists.

11      And counts three and four allege that he has disclosed

12 confidential data in violation of paragraph 7 of the agreement by

13 failing to deliver certain materials to the plaintiff upon

14 termination.

15      The preliminary injunction remedy as we all know is an

16 extraordinary remedy and because of that the plaintiff has to

17 show certain conditions before it can obtain that relief

18 including immediate and irreparable harm, likelihood of ultimate

19 success in the case, balancing of equities in its favor and if

20 it's appropriate that the public welfare would be served by the

21 relief afforded by the Court.

22      Post employment restrictive covenants will be given effect

23 where they're reasonable under New Jersey law and reasonableness

24 generally requires a finding that the covenant, one, protects

25 legitimate interests of the employer; second, imposes no undue


CONFIDENTIAL

1  hardship on the employee; and third, is not injurious to the

2  public.    That test is set forth in the Solari case and has been

3  repeated ever since in these cases.

4        As to the first condition the employer does have a

5  legitimate interest in protecting its trade secrets.

6  Confidential business information and customer relationships and

7  in deciding about trade secrets there are a number of factors

8  that the Court will consider.    They're all set forth in the

9  Ingersol Rand case and I think the Rideout case.

10        But it's important in considering trade secrets it's

11  important to note that professional skills and expertise

12  developed during the employment are considered general skills

13  that are largely unprotected.    And the employer has the burden of

14  differentiating between general skills and trade secrets.

15        As to customer lists, it's recognized that an employee whose

16  duty it was to develop customer relations may in certain

17  instances be restrained from soliciting those same customers upon

18  termination.

19        And in the present case plaintiff asserts that its list of

20  potential employees and its business methods and matching

21  employees to clients all represent trade secrets and confidential

22  information.

23        With respect to the business methods, plaintiff I think has

24  made conclusory assertions as to the allegedly proprietary nature

25  of its unique sales strategies as reflected in its manual.

CONFIDENTIAL

Colloquy                                    18

1   Plaintiff claims that defendant had no sales experience upon

2   joining its employ and was given extensive training and it

3   further claims that the defendant did not return its manual which

4   defendant denies.

5       Defendant alleges that the plaintiff actually provided no

6   formal training.  As I indicated plaintiff has the burden of

7   demonstrating that its business methods represented trade secrets

8   and not just general skills developed by the former employee.

9   Aside from conclusory assertions, I feel that the plaintiff has

10  failed to demonstrate how its business methods are distinguished

11  from skills and considering this failure together with

12  defendant's denial of such specialized training it's not likely

13  it seems to me at this point that the plaintiff will ultimately

14  prove the existence of trade secrets.

15      And as far as the customers lists are concerned, plaintiff

16  again generally claims that he expended substantial time, effort

17  and money in developing them and that, in fact, defendant

18  conceded in the agreement that these lists were protectable.

19      In response, defendant contends that the lists do not

20  represent trade secrets or confidential information.  He says

21  that they were provided to him or what was provided to him was

22  publicly available.  In fact, they were publicly available lists

23  purchased by plaintiff from vendors.

24      He further notes that most of the customers that he dealt

25  with were found by combing through publicly available materials

CONFIDENTIAL

1  such as the New York Times and the Wall Street Journal and much

2  of the business developed was by what's called cold calling.

3      For the purpose of this application it seems to me that it's

4  not likely that the plaintiff will ultimately succeed in

5  establishing that the customer lists represent a trade secret or

6  proprietary information that's protectable.

7      In short, it appears to me at this point in time that the

8  plaintiff has not demonstrated a reasonable probability of

9  ultimately convincing the Court that this covenant in the

10 agreement is enforceable and at the very least the material facts

11 with respect to its enforceability are controverted.  Therefore I

12 don't have to pass on the other conditions for a preliminary

13 injunction based on the lack of probability of success at this

14 point.

15     The preliminary injunction is denied and I see I have an

16 order that says that so I'll sign that later this morning.

17                    (Hearing concluded)

18

19

20

21

22

23

24                                        CONFIDENTIAL

25