## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL      *
STAFFING, LLC

     *

Plaintiff,

     *

v.                            Civil Action No.  07-cv-01281

     *

JOSHUA KUBICKI, et. al.      *

Defendants.      *

*    *    *    *    *    *    *

## PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
## ITS MOTION FOR INJUNCTIVE RELIEF

Plaintiff Ajilon Professional Staffing, LLC ("Ajilon") respectfully submits this Reply in Support of its Motion for Injunctive Relief.

**I.    There Is A Clear Factual Basis For Granting Injunctive Relief.**

Defendants signed limited, reasonable employment agreements, which are fully enforceable under both District of Columbia and New Jersey law.  Their actions, in direct violation of these agreements, did not simply involve taking a rolodex file of publicly available names and addresses, as in *Ruesch v. Ruesch International Monetary Services, Inc.*, 479 A.2d 295 (D.C. 1984).

Defendant Joshua Kubicki ("Kubicki") did not simply leave the employ of one employer and start a new job elsewhere.  Rather, he "sold" an entire package – a complete stand-alone, profitable D.C. office – to a competitor of Ajilon on a turnkey basis.  While working for Ajilon, he actively began plotting to work for a direct

1

competitor, Solomon-Page Group. While working for Plaintiff, he solicited two Ajilon employees, Defendants Kimberly Danowski ("Danowski") and Jon Pomykala ("Pomykala"), to leave Ajilon with him. After leaving Ajilon, Defendants then immediately began servicing accounts with clients that they had worked with – and developed relationship with – while working for Ajilon and at Ajilon's expense. Next, Defendants directly enlisted Ajilon contract attorneys for placement with those accounts. In furtherance of this scheme, Kubicki diverted 42 contract attorneys to Crowell and Moring in the last few days he was working for Ajilon.

Defendants exploited the relationships they cultivated with Ajilon clients, at Ajilon's expense, and converted the goodwill established by Kubicki for Ajilon to the benefit of Solomon-Page Group. This is not something that they could have done with simple, publicly-available contact information such as a telephone number or an e-mail address. This is not something a company based in New Jersey would be powerless to prevent, as Defendants appear to argue in their opposition. New Jersey courts have protected companies in circumstances similar to Ajilon's by enforcing reasonable restrictive covenants. *See, e.g., Platinum Management, Inc. v. Dahms*, 285 N.J.Super. 274, 295, 666 A.2d 1028 (Law Div. 1995); *A.T. Hudson & Co v. Donovan*, 216 N.J. Super. 426, 434, 524 A.2d 412 (1987).

## II.    The Restrictive Covenants Are Fully Enforceable.

In order to protect an employer's customer relationships with an enforceable restrictive covenant, New Jersey courts do not require that "misappropriated information…rise to the level of the usual trade secret"; in fact, the information may

otherwise be publicly available. *Platinum Management, Inc.*, 285 N.J.Super. at 295. The "validity and enforceability of the covenant is fact-sensitive and must be determined in light of the facts" of the case. *Id.* at 294. So long as the plaintiff has a defensible interest in the information it seeks to protect, the plaintiff's restrictive covenant is enforceable under New Jersey law. Ajilon meets this standard.

In accordance with New Jersey law, the customer information at issue "was developed on [plaintiff's] payroll." *Id.* Defendants' assertion that Kubicki had a readymade client base because of a few well-placed friends at certain law firms completely misses the mark. This is not a case of a seasoned individual who had a roster of numerous clients and several decades of experience. *Cf. Coskey's Television & Radio Sales & Service, Inc. v. Foti*, 542 A.2d 879 (N.J. Super. Ct. App. Div. 1992) (the defendant in this case had over twenty-five years of experience in the industry and had developed a large network of contacts that the plaintiff was "merely rent[ing] during the period of employment."). Rather, Kubicki was a novice contract attorney with no experience on the sales or management side of a staffing organization when he was hired by Ajilon.

Kubicki, on behalf of Ajilon and at Ajilon's expense, cultivated client relationships that allowed Ajilon to be attuned to specific firms' needs and preferences, and placed Ajilon in a position to staff multiple projects at certain firms over the course of years. Ajilon provided the support for and assisted in the development of these client relationships; therefore these relationships may be protected by a restrictive covenant. *See* 253 N.J. Super. at 638-39.

The fact that Ajilon spent a "substantial [amount of] energy and money, either through [defendants] or otherwise, in soliciting the actual customers involved herein [is] a matter 'worthy of protection.'" *Id.* at 296 (quoting *A.T. Hudson & Co v. Donovan*, 216 N.J. Super 426, 434, 524 A.2d 412 (1987).) This right is threefold because Ajilon not only did so with regard to its customers, but also its employees, and contract attorneys – all of whom Defendants saw diverted to Solomon-Page Group, in direct violation of their employment agreements. The facts of this case closely parallel the facts of *A.T. Hudson*, in which the New Jersey court enforced a comparable restrictive covenant, recognizing that relationships between consulting firms and their clients were ongoing and depended on relationships of trust. *See id.*

## III.    Defendants Will Not Suffer Undue Hardship.

The second consideration under New Jersey law is whether the restrictive covenant imposes an undue hardship on the employee, which it does not. In analyzing this issue, the reason for the termination of the parties' relationship is highly relevant. *A.T. Hudson*, 216 N.J. Super at 434. If the employee defendant is responsible for terminating the relationship, the court is less likely to find undue hardship as the employee put himself in the position of bringing the restriction into play. *Id.* That is precisely what occurred in this case. All three Defendants chose voluntarily to sever their employment relationships with Ajilon, without notice, in order to pursue positions at Solomon-Page Group. They cannot now argue that Ajilon is barred from imposing the reasonable employment agreements they all signed because they chose to terminate their relationships with Ajilon. If they find themselves unable to work for Solomon-Page

Group because they flagrantly violated reasonable restrictions in a contract with Ajilon, they cannot complain that Ajilon placed them in that position. Furthermore, Danowski and Pomykala should easily be able to find jobs in the Washington, D.C. market, which allow them to utilize their skills and work for employers where there would be no question of a contract violation.

**IV.    This Court Has Imposed Injunctive Relief In Similar Circumstances.**

Unlike in *HIRECounsel D.C.  v. Thuemmler*, No. 05-2111 (D.D.C. filed Oct. 28, 2005), which was cited at length by Defendants, this case does not involve a recruiter alleged to have contacted a single contract attorney. Rather, the facts of this case closely parallel those of *Merrill Lynch v. Wertz et al.* and *Morgan Stanley DW Inc. v. Rothe*, in which employees signed reasonable, limited non-solicitation agreements with their employers; resigned from their positions; and then embarked upon wholesale solicitations of their former employer's entire client bases, in direct violation of their employment agreements. 298 F.Supp.2d 27 (D.D.C. 2002); 150 F.Supp.2d 67 (D.D.C. 2001). In fact, Kubicki's declaration alleges not only that he intends to do likewise, but that he needs to be able to poach his entire client base from Ajilon in order to make a living. (Kubicki Decl. ¶ 17.)  This admission alone readily distinguishes the facts of this case from those in *HIRECounsel.*

In *Merrill Lynch*, Judge Leon held that on these facts, that the plaintiff "demonstrated a substantial likelihood of success on the merits." *Id.* at 31. As in *Merrill Lynch*, the information that Plaintiff is seeking to protect involves client information – not merely a list containing that information – which is fully protected under the District

of Columbia Trade Secrets Act.  Plaintiff is not alleging that Defendants simply "brought tools to [their] employer and upon separation [left] with them." *Coskey's*, 602 A.2d at 795.  Rather, Defendants – without any prior experience in the legal staffing industry – became employees of Ajilon, and were provided with the resources to build client relationships on behalf of Ajilon in exchange for signing a limited, reasonable employment agreement.

Therefore, the terms of the agreements should now be enforced and injunctive relief should be properly granted.

Respectfully submitted,

Schnader Harrison Segal & Lewis LLP

By:    __/s/__ Benjamin W. Hahn_____
Benjamin W. Hahn (Bar No. 446270)
2001 Pennsylvania Ave. N.W., Suite 300
Washington, DC 20006-1825
Telephone: (202) 419-4242
Email: bhahn@schnader.com

Counsel for Plaintiff Ajilon Professional Staffing, LLC

## CERTIFICATE OF SERVICE

The foregoing, Plaintiff's Reply Brief, was served by electronic means, through the Court's Electronic Case Filing System, on Defendants' counsel of record on July 25, 2007.

_____/s/ Benjamin W. Hahn_____
Benjamin W. Hahn

Case 1:07-cv-01281-RJL    Document 11-2    Filed 07/25/2007    Page 1 of 6

Ruesch v. Ruesch Intern. Monetary Services, 479 A.2d 295 (DC, 1984)

Page 295
479 A.2d 295
Verena RUESCH, Appellant,
v.
RUESCH INTERNATIONAL MONETARY SERVICES, INC., Appellee.
No. 82-764.
No. 83-742.
District of Columbia Court of Appeals.
Argued September 7, 1983.
Decided May 18, 1984.

Carlos M. Recio, Washington, D.C., with whom Patrick J. Moran and Karl W. Pilger, Washington, D.C., were on the brief, for appellant.

Collister Johnson, Jr., Washington, D.C., for appellee.

Before FERREN and TERRY, Associate Judges, and PAIR, Associate Judge, Retired.

TERRY, Associate Judge:

In this case we are confronted with a question of first impression in the District of Columbia: whether a list containing the names of potential customers is a trade secret entitled to equitable protection. We hold that the customer list here at issue was not a trade secret and that the trial court erred in granting appellee's motion for a preliminary injunction.

I

In 1980 appellant went to work for appellee Ruesch International, a newly formed corporation providing financial services in the field of foreign exchange and dealing in precious metals. Appellant became a member of the board of directors and as senior vice president was responsible for servicing and developing existing and prospective clients for the corporation. Before joining

Page 296

Ruesch International, appellant had worked for Deak-Perera, another company providing similar services. Because of a restrictive covenant in her employment contract with Deak, appellant was not permitted to compete with it for two years after her departure. When she left Deak, however, appellant took with her a list of some of the clients with whom she had done business there (the "Deak list") and contacted them during her two-year hiatus, reassuring them that she would soon be back in business. Appellant brought the Deak list with her when she went to work for Ruesch International, where it became the nucleus of Ruesch International's initial client list.

After working for Ruesch International for two years, appellant resigned. She took with her a Rolodex card file which she kept on her desk containing the names of Ruesch International's travel agent clients. This file contained between 800 and 1000 names, including all the names on the Deak list.1

In the meantime, appellant's father founded Euro-Transfer, Inc., another new company providing foreign exchange services. Appellant became its president and sole employee. She solicited three of Ruesch International's clients, at least two of whom were also on the Deak list, and received $5,500 for her services. Five days later Ruesch International obtained a temporary restraining order which directed appellant to return the Rolodex file along with all other materials and documents taken by her, as well as restraining her from soliciting Ruesch International's clients or disclosing any information contained in those materials and documents. Ruesch International's motion for a preliminary injunction was subsequently granted.



Case 1:07-cv-01281-RJL     Document 11-2     Filed 07/25/2007     Page 2 of 6

Ruesch v. Ruesch Intern. Monetary Services, 479 A.2d 295 (DC, 1984)

## II

A trade secret has been authoritatively defined as "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound . . . or a list of customers." 4 RESTATEMENT OF TORTS § 757, comment b, at 5 (1939).2 In determining whether given information should be afforded trade secret protection, many courts have considered the six factors listed in the Restatement:

(1) [T]he extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id. at 6.

The cases are legion in which customer lists have "been held to be property in the nature of a `trade secret' for which an employer is entitled to protection, independent

Page 297

of a non-disclosure contract, either under the law of agency or under the law of unfair trade practices." Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 623, 136 A.2d 838, 842 (1957) (footnote omitted); see Annot., 28 A.L.R.3d 7 (1969).3 Equally true, however, is that the results vary from jurisdiction to jurisdiction, so that abundant authority may be found on either side of the issue. See 1 R. MILGRIM, TRADE SECRETS § 2.09[7], at 2-120 through 2-140 (1982). Nevertheless, as Milgrim points out:

Although the results in different jurisdictions may be contrary to one another, some basic distinctions are usually considered. In the case of retail or route-customer lists, emphasis can be placed upon the nonavailability of an informative source which tends to divulge likely prospects. Thus, although almost every potential milk or laundry customer might be listed in the telephone book, all persons listed in the telephone book are not necessarily good customer prospects. With reference to lists of wholesale customers, however, a trade publication or a certain section(s) of the classified telephone directory may list a relatively limited number of potential purchasers, all of whom might be considered likely prospects. Thus, protection of customer lists might be more readily granted on a trade secret or analogous theory to certain types of retail customer lists than wholesale ones.

Id. at 2-121 (emphasis in original; footnote omitted). Keeping this distinction in mind, together with the factors listed in the Restatement, we examine the list at issue in this case.

## III

Otto J. Ruesch, president and chairman of the board of Ruesch International,4 testified that out of the approximately 115,000 travel agents and tour operators solicited through mailing lists, trade shows, and other promotional activities by the company since its inception, the company has acquired 800 to 900 clients. In the process the company expended a minimum of $100,000. The Rolodex card file containing the names and addresses of these clients was kept by appellant, who was responsible for maintaining present clients and developing prospective ones, but it was also available to other employees. Besides the Rolodex file, the company maintained a "transaction book" which recorded the type of transaction performed for each client, together with the client's name, address, and telephone number.

Turning to the factors outlined in the Restatement, we first consider the extent to



Case 1:07-cv-01281-RJL    Document 11-2    Filed 07/25/2007    Page 3 of 6

Ruesch v. Ruesch Intern. Monetary Services, 479 A.2d 295 (DC, 1984)

which the names and addresses of travel agents found in the Rolodex file were known outside of Ruesch International's offices. See, e.g., American Institute of Chemical Engineers v. Reber-Friel Co., 682 F.2d 382, 387-388 (2d Cir.1982). The

Page 298

record demonstrates that they came primarily from mailing lists and other publicly available sources.5 With regard to the second and third factors, the availability of the file to other employees and the measures undertaken to guard the secrecy of its contents, the record shows that some of the cards contained in the Rolodex were prepared by employees of Ruesch International other than appellant as new customers were acquired. Otto Ruesch testified that "[i]f a new customer came in, a Rolodex card had to be made immediately and put into [appellant's] Rolodex, because that was the central focus point of the whole address keeping." Thus other employees had access to the names in the Rolodex, and it does not appear from the evidence that any measures were taken to ensure that the list was kept secret.

The fourth factor to consider is the value of the Rolodex customer list to Ruesch International. Mr. Ruesch testified that after two years of being in business, he expected that the company would break even or perhaps earn a slight profit in the near future. The revenue generated by doing business with the clients on the list was undoubtedly of some value to the company. However, the Rolodex file itself contained only a "bare bones listing of customers . . . [with] no complicated marketing data which attempted to project the marketing needs of a customer or the customer's marketing habits." Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis.2d 202, 211, 267 N.W.2d 242, 247 (1978); see Burroughs Corp. v. Cimakasky, 346 F.Supp. 1398, 1400 (E.D.Pa.1972). Indeed, as Mr. Ruesch recognized, "the only way you get business [is] if you are more competitive with your rates, if you are better with the service." Even if the Rolodex list was of substantial value to Ruesch International (as it

may well have been), that fact would not entitle it to trade secret protection because, with a little time and effort, anyone knowledgeable in the business could compile such a list from commonly available sources.

This leads directly to our examination of the fifth Restatement factor, which is the amount of money and effort expended by Ruesch International in creating the Rolodex file. Ruesch International asserts that it spent a great deal of money to develop the lsit of names in the Rolodex file and places great reliance on this fact in arguing that appellant should not now have access to that list. Appellant responds by arguing in her brief that Ruesch International should not be permitted to "use its advertising budget to justify classifying the Rolodex file as a trade secret." We agree with appellant on this point.

The time and money which a business spends in building up a customer list is an important consideration in determining whether the list is entitled to trade secret protection. See, e.g., American Loan Corp. v. California Commercial Corp., 211 Cal.App.2d 515, 27 Cal.Rptr. 243 (1963). However, when the prospective clients are commercially conspicuous, see Annot., supra, 28 A.L.R.3d at 42-44, courts have characterized the expenditure of time, money, and resources undertaken by businesses to acquire prospective clients as "simply widespread canvassing of an obvious and highly competitive market," Leo Silfen, Inc. v. Cream, 29 N.Y.2d 387, 394, 278 N.E.2d 636, 641, 328 N.Y.S.2d 423, 429 (1972), or "merely the outgrowth of . . . normal marketing endeavors. . . ." Gary Van Zeeland Talent, Inc. v. Sandas, supra, 84 Wis.2d at 217, 267 N.W.2d at 250; see Corroon & Black-Rutters & Roberts, Inc. v. Hosch, 109 Wis.2d 290, 325 N.W.2d

Page 299

883 (1982). The same can be said about Ruesch International's expenditure of time and money in the creation of the Rolodex file. The names found in the file were culled from public sources, mostly mailing lists, in an effort to



Ruesch v. Ruesch Intern. Monetary Services, 479 A.2d 295 (DC, 1984)

develop a market for a type of business which Otto Ruesch described as "very highly competitive." The Supreme Court of Wisconsin has said in response to a similar argument:

[Plaintiff] argues that it spent substantial time and money on its customer list. In reality that time and money was spent on the development of the market which the customer list represents. [Defendant] is only attempting to sell to this market and [plaintiff's] customer information, in view of its public nature, should not be protected to prevent such competition.

Abbott Laboratories v. Norse Chemical Corp., 33 Wis.2d 445, 468, 147 N.W.2d 529, 541 (1967).

Finally, we consider the ease or difficulty with which the information contained in the Rolodex file could be acquired by others. See General Business Services, Inc. v. Rouse, 495 F.Supp. 526 (E.D.Pa.1980). The record shows that mailing lists containing the names of travel agents can be bought by anyone. Permitting appellant to keep a copy of the Rolodex file would be of some benefit to her, in that she would not have to purchase such mailing lists herself. However, the fact that appellant may have the names and addresses of some of Ruesch International's clients does not guarantee that she will get their business. To do that she will have to provide better service at the same price or equal service at a lower price, as Otto Ruesch acknowledged in his testimony.6

IV

In addition to the factors enumerated in the Restatement, the cases which discuss the difference between route and non-route customer lists provide further support for our decision not to grant trade secret protection to the Rolodex file in this case.

"A nonroute customer is one whose demand varies, and who is likely to purchase from several suppliers. Courts have been less prone to give relief in this area because there is no particular relationship developed between a customer and a salesman which is enduring.

Thus, contact of a customer by a former employee is not as unfair as in the area of a route salesman whom customers know and have come to depend on." Abbott Laboratories v. Norse Chemical Corp., supra, 33 Wis.2d at 467, 147 N.W.2d at 540; accord, Corroon & Black-Rutters & Roberts, Inc. v. Hosch, supra, 109 Wis.2d at 298, 325 N.W.2d at 887; Gary Van Zeeland Talent, Inc. v. Sandas, supra, 84 Wis.2d at 214, 267 N.W.2d at 248. In his treatise Milgrim points out another reason why, in the absence of a restrictive covenant, courts for the most part have denied trade secret protection to wholesale or nonroute customer lists:

In the case of a milk or laundry or bakery route driver, the extent of the injunction would normally only preclude him from engaging in a competitive activity for a reasonable time and within a limited geographical area. Assuming, therefore, that he wishes to continue in the same (generally unskilled) occupation, the major burden that will be imposed upon him is the requirement that he work in another community. If he wishes to work in the same community, he need only find other work to replace the unskilled route job. On the other hand, a salesman in almost any industry is generally faced with competition and must become well-informed in his field. And, if that field is a reasonably complex one, the salesman's training and preparation to enable him to be effective may require many years of education and experience. Enjoining a departing sales

Page 300

man from continuing to call upon his former employer's customers might amount to enjoining him from using his skills. In the absence of a restrictive covenant the courts appear reluctant to deny the salesman the opportunity to compete in the field of his "expertise."

R. MILGRIM, supra at 2-131 (emphasis in original; footnotes omitted).

Otto Ruesch testified that there was "nothing personal involved in [the foreign exchange service] at all," and that "the only way you get business [is to be] more competitive



with . . . rates [and] better with the service." Customer loyalty, when it exists, is to the company rather than to a particular employee. Thus, he stated, when clients called and were told that appellant was no longer employed by the company, they simply asked to speak to someone else.

Given the impersonal relationship which existed between appellant and Ruesch International's clients, the nature of the demand for the company's services, and appellant's professional background, we conclude that the Rolodex file is comparable to a non-route or wholesale customer list. Most courts have denied trade secret protection to such lists. See R. MILGRIM, supra at 2-134 through 2-143. We adopt the majority rule.

For all of these reasons we hold that the Rolodex card file at issue in this case was not a trade secret entitled to equitable protection. The trial court's order granting appellee's motion for a preliminary injunction is therefore

Reversed.7

---------------

Notes:

1. The record is unclear as to the exact number of names on the Deak list. Appellant testified that there were 120, while another witness counted 329. One possible explanation for this discrepancy is that out of 319 prospective clients, appellant was able to bring in approximately 120 actual clients.

2. The drafters of the Second Restatement decided to omit those sections of the First Restatement dealing with unfair competition and trade practices, since in their view the law in these areas was "no more dependent upon Tort law than it [was] on many other general fields of the law and upon broad statutory developments, particularly at the federal level." RESTATEMENT (SECOND) OF TORTS, Division Nine, Introductory Note (1979). The definition of a trade secret in the First Restatement, however, continues to be widely

accepted. See, e.g., Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 474, 94 S.Ct. 1879, 1882, 40 L.Ed.2d 315 (1974); Public Citizen Health Research Group v. Food & Drug Administration, 227 U.S.App.D.C. 151, 154, 704 F.2d 1280, 1283 (1983); Ashland Oil, Inc. v. FTC, 409 F.Supp. 297, 303 (D.D.C.), aff'd, 179 U.S.App. D.C. 22, 548 F.2d 977, (1976).

3. Under the RESTATEMENT (SECOND) OF AGENCY § 396(b) (1958), in the absence of an agreement to the contrary,

[an agent] has a duty to the principal not to use or to disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent is entitled to use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent. . . .

See National Chemsearch Corp. v. Hanker, 309 F.Supp. 1278 (D.D.C.1970); 4 RESTATEMENT or TOMS § 757, comment c, at 8 (1939). In this regard, once a customer list is afforded trade secret protection, it is immaterial whether the list was taken or copied or whether it was memorized. Velo-Bind, Inc. v. Scheck, 485 F.Supp. 102, 107 (S.D.N.Y.1979); Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972); Central Plastics Co. v. Goodson, 537 P.2d 330, 334 (Okla.1975); Morgan's Home Equipment Corp. v. Martucci, supra, 390 Pa. at 624-625, 136 A.2d at 843; J.L. Cooper & Co. v. Anchor Securities Co., 9 Wash.2d 45, 64, 113 P.2d 845, 854 (1941).

4. Otto Ruesch is not related to appellant Verena Ruesch.

5. There was testimony at the hearing on the motion for a preliminary injunction that a few of the Rolodex cards contained "spread" information. In our view, this information was not confidential. The so-called "spread" was nothing more than Ruesch International's



Ruesch v. Ruesch Intern. Monetary Services, 479 A.2d 295 (DC, 1984)

standard commission for any given customer transaction, which was determined by the price of foreign currency in the market and the amount of the transaction. Thus the commission charged, although it would vary from transaction to transaction, could be readily ascertained by anyone researching the market.

6. See page 298, supra.

7. Appellant also argues that the trial court abused its discretion under Super.Ct.Civ.R. 65(c) by not requiring appellee to post a security bond before granting its motion for a preliminary injunction. Our disposition of the case renders this collateral issue moot. L'Enfant Plaza Properties, Inc. v. Fitness Systems, Inc., 354 A.2d 233, 237-238 (D.C.1976). Likewise, appellant's motion filed in this court to terminate the no-solicitation part of the injunction because of changed circumstances is denied as moot.

Finally, because of our holding that the entire Rolodex file is not entitled to protection as a trade secret, we need not consider whether the Deak list should be treated differently from the remainder of the Rolodex file.

---------------



**Page 274**
**285 N.J.Super. 274**
**666 A.2d 1028**
**PLATINUM MANAGEMENT, INC., d/b/a Embrace, Plaintiff,**
**v.**
**Brian DAHMS, Morton M. Rosenberg, Great American Fun Corp.,**
**and John Does # 1-5, Defendants.**
**Superior Court of New Jersey, Law Division,**
**Bergen County.**
**Decided April 11, 1995.**

**Page 282**

[666 A.2d 1032] Gladys W. Orr, Florham Park, for plaintiff (Bressler, Amery & Ross, attorneys).

Eric L. Brown of the Ohio Bar, Columbus, OH (Eric L. Brown Co., attorneys) and Richard E. Kummer, Parsippany (Kummer, Knox & Naughton, attorneys), for defendants.

KOLE, J.A.D., Retired and Temporarily Assigned on Recall.

[This is an abridged version of the opinion on file]

Platinum Management, Inc., d/b/a Embrace (PMI, Embrace or plaintiff), sued defendants Brian Dahms (Dahms), Great American Fun Corporation (GAF or GAF Ohio), and Morton M. Rosenberg (Rosenberg) for damages. The claims by PMI presently in issue are as follows:

1. Dahms breached his employment agreement with PMI, through soliciting PMI's customers and misappropriating PMI's confidential information after accepting employment with GAF.

2. Dahms failed to discharge his duty of loyalty to PMI, as an employee and an officer, in that he neglected his duties to PMI in the critical weeks before his resignation, which was timed on the eve of the most important sales event of PMI's year, the 1992 Hong Kong Toy Fair.

3. Dahms and GAF misused Dahms' inside knowledge and misappropriated PMI's confidential information, including its sales strategy, customer identities, and pricing policy to unfairly compete with PMI.

4. Dahms and GAF tortiously interfered with PMI's prospective economic advantage through the misuse of PMI's confidential information and the use of false and misleading statements about

Page 283

PMI's financial condition and ability to ship its products, to divert business from PMI's customers.

5. Rosenberg breached his duty of employee loyalty to PMI by inducing Dahms to accept employment with GAF prior to Rosenberg's own resignation from PMI, and by divulging confidential information entrusted to him by PMI to GAF.

6. GAF and Rosenberg tortiously interfered with Dahms' employment relationship with PMI by inducing Dahms to leave PMI without divulging Rosenberg's own association with GAF.

Dahms has counterclaimed against PMI for a bonus allegedly due him as computed under the employment agreement. It is PMI's contention that Dahms has forfeited any claim to this payment, as he has both breached the



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

agreement upon which it is based and repudiated it.

Defendants have asserted a number of defenses which will be discussed during the course of this opinion.

Based on the credible evidence and reasonable inferences therefrom, I make the findings that follow.

PMI, with the trade name of Embrace, is a manufacturer, designer and seller of plush toys. Plush toys are three dimensional soft and squeezy products, which are cut, stuffed and sewn with or without accessories or with or without devices for music or sound. PMI's line includes musical toys which operate by way of an electronic pressure sensitive chip battery. PMI began its business through the introduction, in 1987, of its bear bag product. This became a very popular new product.

Jerry Auerbach (Auerbach) is the President of PMI and has been affiliated with it since he and his wife, Linda Auerbach, started the business out of their home in June 1986.

In its early years, the business of PMI focused on mass market direct import business. This business concentrated on selling to very large retailers on a letter of credit basis. In order to get the best and competitive price, these customers would take delivery in

Page 284

the Orient and assume the financial responsibility of bringing the merchandise over by ocean freight.

In 1991, PMI had almost 50 active mass market letter of credit customers. Most of PMI's customers have been purchasing from it for several years, in many cases since it [666 A.2d 1033] began in 1986. Once a customer relationship is established, it is likely to continue for many years, provided, of course, the

products sold by PMI are deemed to be saleable by the customer.

PMI utilizes both direct sales agents and independent sales agents to sell its products. It makes sales presentations to its customers by a telephone appointment or by arranging to meet with the customer at a trade show. The most important trade show is the Hong Kong Toy Fair, held in Hong Kong each January. On average, approximately fifty-five percent of PMI's annual sales revenue is derived from its presentations at the Hong Kong Toy Fair. An additional twenty to twenty-five percent is derived from presentations at the New York Toy Fair, held in February each year.

Dahms contacted PMI regarding a sales position after he had been dismissed from his prior employment at Spencer Gift.

In early 1988, Dahms was employed by PMI in the capacity of Vice President of Sales. He was the first full-time sales person hired by PMI. PMI considered this a significant move in the company's growth.

When Dahms joined PMI, he had no direct experience selling toys to retailers. From the beginning of his association with PMI, he was given a broader scope of responsibility for the running of PMI than any other employee. He was a key person, privy to the innermost secrets of the company.

For the first year of his employment with PMI as Vice President of Sales, Dahms lived in the Auerbachs' home. Auerbach undertook to train Dahms so that he could make effective sales presentations. Auerbach also introduced Dahms to PMI's customers and familiarized him with their buying habits and personal

Page 285

attributes. This customer information was considered by PMI to be confidential.



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

Dahms was advised by PMI of the need to keep all of the foregoing information in confidence.

When Dahms joined PMI, he executed an employment agreement (the Agreement), which included an unusual non-competition covenant to meet Dahms' suggested changes in the original draft. It provided that, during its term and, for one year after its termination for reasons other than its mere expiration, Dahms would not solicit or accept business from any PMI customers for anyone other than PMI; or disclose the names of any such customers to any other person. The Agreement commenced on April 18, 1988 and was to continue for three years. It would automatically be renewed for additional one-year periods unless either party elected not to renew by notifying the other in writing thereof at least sixty days prior to commencement of a renewal period. A resignation would trigger the applicability of the non-competition provision. The Agreement also required Dahms to devote his entire business time and attention to PMI's business and to serve PMI faithfully.

In September 1989, Auerbach and Dahms agreed to a written amendment to the Agreement by providing for the computation of a sales override bonus for Dahms on certain PMI sales. Dahms did not receive his 1991 override bonus.

On March 13, 1991, Auerbach received a memorandum dated March 1, 1991, from Dahms which stated:

Per section 9 of ... the [Agreement], I am notifying you that I do not wish to renew this specific agreement for an additional one-year period. However, ... do not interpret that this means I am self-terminating our employer-employee relationship on April 18, 1991.

I think we would both feel much better with an agreement, effective April 18, 1991, that just details compensation for the upcoming year and is renewable by both parties each year.... I will submit my proposal to you on or about April 1, 1991 for your review. Hopefully, we can agree on something by April 18, 1991.

Auerbach understood this memorandum to mean that Dahms wanted more money. In the past, Dahms and Auerbach resolved

Page 286

questions concerning Dahms' compensation under the Agreement when they met in Hong Kong in January.

Immediately after receiving the memorandum, Auerbach had a telephone call from [666 A.2d 1034] Dahms in which Dahms indicated that he wanted to continue his employment under a new package and asked Auerbach not to consider the memorandum as a resignation.

The Agreement does not provide for its termination unless Dahms' employment were also to be terminated. Auerbach reasonably did not understand the memorandum to be either a termination of Dahms' employment or of the Agreement.

The Agreement requires sixty days' advance notice of nonrenewal before April 18, 1991--the commencement of its renewal date. Dahms did not send the March 1 memorandum to Auerbach sixty days in advance of such renewal date.

After sending the notice purporting to terminate the Agreement, in memoranda to Auerbach Dahms nevertheless continued to rely on it for the payment of his override bonus.

Dahms contended that he later resigned by reason, among others, of the fact that the 1991 line of PMI was "weak" and bear bags were "tired." Notwithstanding this assertion, soon after he resigned from PMI, Dahms presented GAF's bear bags to the customers he saw at the 1992 Hong Kong Toy Fair.

By late 1991, Dahms had principal responsibility for overseeing the mass market division or trade at PMI. Part of his duties involved prodding PMI's sales representatives to



make appointments with the buyers for the Toy Fair.

Prior to January 1992, Dahms attended the Hong Kong Toy Fair with Auerbach. Auerbach relied upon Dahms to make the appointments for the Fair and to handle the necessary paperwork to prepare quotes for the buyers. Dahms frequently also would make the presentations to the buyers on behalf of PMI.

In mid-1990, PMI employed defendant Rosenberg as Vice President of Marketing. His contract contained no covenant not to

Page 287

compete. Among other things, Rosenberg had responsibility to make Toy Fair appointments for a group of customers.

I find that Rosenberg was treated shabbily by PMI while he was employed there. He properly felt that PMI was not using his talents, did not appreciate his efforts for the company, and had treated him unfairly when it fired him in April 1991, (after a leg injury) and then rehired him part time at a substantially reduced salary.

Defendant GAF, an importer and wholesaler of toys, was founded by H. Brian Haney (Haney) in October, 1981. Haney remains the sole owner and president of GAF Corp. He is also the sole owner of Great American Fun Hong Kong Limited (GAF Hong Kong) an exporter of toys located in Hong Kong.

There is a history of a bad relationship between PMI and GAF. Sometime in 1988, PMI entered into an exclusive distribution agreement with GAF granting exclusive distribution rights for PMI's designs for domestic sales, with some exclusions. Under the agreement, PMI manufactured products which were sold by GAF. When the exclusive distribution agreement was entered into, the primary focus of GAF had been mechanical battery-operated toys.

GAF had few plush toys and did not sell bear bags.

In the spring of 1989, Auerbach discovered that GAF was using an Indonesian factory to manufacture bear bags designed and copyrighted by PMI without PMI's authorization. PMI brought a federal court action against GAF. It was settled in April 1991 pursuant to a written agreement. Under the settlement, GAF continued to sell its own bear bags but agreed to change the design thereof.

Haney appears to have had actual animosity toward PMI and Auerbach. This may have stemmed from the federal litigation or may have been the result of personal dislike or of competitiveness.

In June or July 1991, Haney raised the possibility of hiring Dahms to work at GAF in order to assist in creating an increase

Page 288

in the direct import business of GAF. Haney viewed Dahms as having significant knowledge of customers with whom GAF had no previous substantial involvement and, thus, as able to add to GAF's business.

[666 A.2d 1035] It should be noted that until 1991, GAF's growth in the development of mass market accounts, comprising a significant portion of PMI's business, in Haney's words, had been "stifled." Its business basically related to gift accounts, since the person in charge of sales, was of the view that selling to discounters or mass market type of accounts would have a serious deleterious effect on GAF's other business.

Before submitting their resignations to PMI in December 1991, Dahms and Rosenberg attended meetings at GAF in Ohio which, I find, included discussions of PMI accounts that Dahms and Rosenberg might be able to bring in to GAF for the purpose of increasing its business, particularly its mass market letter of



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

credit operation. In October, November and December 1991, Haney aggressively pursued Rosenberg and Dahms and finally, in December, they were employed by GAF pursuant to written agreements. Rosenberg assisted in inducing Dahms to be employed by GAF.

Rosenberg was hired by GAF pursuant to a letter from GAF dated December 2, 1991. Dahms was hired on December 5, 1991. Neither had informed PMI of his intention to resign prior to any of their meetings with GAF or his employment by GAF.

GAF requires virtually all its employees to sign very restrictive confidentiality and noncompetition agreements. Despite Haney's testimony to the contrary, I find that he did not ask Dahms during any interview whether he had such an agreement with PMI. In view of GAF's own employee restrictive covenants practice, the failure to ask can reasonably be interpreted as intentional or at least a form of recklessness-- namely, a desire to hire Dahms, irrespective of any such agreement with PMI. It was a form of willful blindness. Haney and GAF are chargeable with knowledge of the existence of Dahms' restrictive covenant with PMI and that

Page 289

he was violating it when he disclosed PMI customer information to GAF and sold to such customers for GAF. 1

On or around December 12, 1991, Dahms called Ronald Banafato (Banafato), a sales agent at PMI, and advised him that he was terminating his employment with PMI. In that conversation, Dahms indicated that he called Banafato instead of Auerbach, because Auerbach was on a plane en route to the Hong Kong Toy Fair at the time. At Dahms' suggestion, Banafato called Rosenberg, who advised him that he, too, was submitting his resignation to PMI.

When Auerbach arrived in Hong Kong on December 14, 1991, he received an emergency message from his office, as a result of which he

learned that both Dahms and Rosenberg had tendered their resignations to PMI.

Dahms formally tendered his written resignation to PMI by letter dated December 12, 1991, the day after he started at GAF, effective that same day.

Neither Dahms nor Rosenberg could offer a plausible reason for the delay in informing PMI after they had accepted employment with GAF.

At the time that Auerbach learned of Dahms' resignation on December 12, 1991, Dahms had not completed any of the preparations for the January 1992 Hong Kong Toy Fair which Auerbach had relied on him to make. 2 Because of this and Rosenberg's

Page 290

resignation, Auerbach immediately instructed Banafato to telephone PMI's mass market customers to make appointments for the Hong Kong Toy Fair. Despite being disadvantaged by lateness and lack of mass market experience, Banafato telephoned approximately forty customers, and received approximately eight to ten toy fair appointments as a result of those calls.

[666 A.2d 1036] As of December 14, 1991, PMI had a total of nine toy fair appointments, eight of which had been made by its independent representatives, and one by Dahms. In previous years, PMI typically had forty to forty-five Toy Fair appointments. Dahms did not recall making any toy fair appointments for PMI during the significant first fifteen days of December.

Dahms had sent several memoranda to PMI's sales representatives to prod them to make appointments for the 1990 and 1991 Hong Kong Toy Fairs. He sent out only one such memorandum for the 1992 Hong Kong Toy Fair.

When Rosenberg and Dahms submitted their resignations to PMI, they did not advise PMI whether or with whom they had other



employment. Subsequently, Auerbach learned they were working for GAF.

Dahms and Rosenberg, as former high-level employees of PMI, were in a position to do serious damage to PMI while working for GAF.

On or about December 17, 1991, Dahms sent Auerbach a letter requesting a resolution of the terms of his departure. It stated that he had been making Hong Kong appointments for PMI through the prior week; that he could either give negative reports to customers as to why he left PMI or, if he were paid what he was owed, reports that were positive; and that he was leaving because PMI could not "ship."

At the 1992 Hong Kong Toy Fair, Dahms kept appointments with several of PMI's customers on behalf of GAF. Dahms also met with PMI's customers at the February 1992 New York Toy Fair on behalf of GAF.

Page 291

Shortly after submitting his resignation to PMI, and immediately after he began working for GAF, Dahms wrote letters to several customers he had dealt with at PMI soliciting them for toy fair appointments on behalf of GAF. Thus, in a letter dated December 16, 1991, to a buyer at Nicotoy, Dahms stated as follows:

First, of all, I sincerely hope you remember me. I used to work with Embrace and directly with Jerry Auerbach. I am no longer associated with Embrace. Their problems with late shipping caused me great problems.

Prior to his resignation on December 12, 1991, Dahms had telephoned at least six PMI customers. He also called on these customers on behalf of GAF at the Hong Kong Toy Fair in January 1992. PMI did not have 1992 toy fair appointments with any of them, with the possible exception of Boscov's. Dahms called these customers to make appointments on behalf of GAF while he was still employed by PMI.

Under the Agreement between Dahms and PMI, PMI's "customers" were defined as "customers at the time of the employee's termination of employment" or "who are customers within a year of termination or who are being solicited as customers within a year of termination."

Dahms had contact and communication with forty-five listed customers (the "diverted customers") while employed at PMI that he later sold on behalf of GAF. A substantial proportion of the accounts assigned to Dahms by GAF were developed by him while he was at PMI. Shortly after Dahms' employment by GAF, Haney borrowed Dahms' contact file to develop a computer database.

GAF had a licensed patented product in 1991, squeeze pets, an electronic plush product, for which it had an exclusive license. Its sales in 1991 were very small, but very strong in 1992 and 1993.

As to the forty-five customers at issue, GAF's products, including squeeze pets, were competing for the same customer dollar as PMI's products. Thus, a customer could transfer dollars budgeted

Page 292

for the purchase of a plush product, such as bear bags, to squeeze pets.

In 1992, Dahms or GAF participated in international sales of plush products to the diverted customers totalling $991,541.28. That same year, Dahms or GAF also participated in domestic sales of plush products to the diverted customers totalling $340,015.05.

A comparison of the 1991, 1992 and 1993 sales information indicates continued encroachment on PMI's customers by GAF. PMI was particularly vulnerable to competition[666 A.2d 1037] from GAF because of its similar products. After Dahms and Rosenberg were



employed by GAF, PMI lost sales from several of its regular customers.

GAF contends that its introduction of squeeze pets was the primary reason for its increase in sales in 1992. But its sales to four of the five customers it had been selling in 1991 actually declined in 1992, after the introduction of squeeze pets, a result inconsistent with this assertion.

PMI listed the products that it claims as competitive products for the purpose of establishing its damages. These are plush toys. As already stated, noisemaking plush products, such as GAF's squeeze pets, compete for the same buyers' dollars as products which do not make noise, such as bear bags.

PMI claims as damages the net profits of both GAF Ohio and another Haney corporation, Great American Fun Hong Kong (GAF Hong Kong), from sales to the forty-five diverted customers for 1992 and 1993.

GAF Hong Kong was established as the Great American Fun (H.K.) Buying Office Limited on December 14, 1982. GAF Hong Kong is the principal supplier of GAF Ohio. Haney described GAF Hong Kong as a company which invoices customers on a fee basis on behalf of GAF Ohio. These customers included customers called on by Dahms.

Page 293

Haney always controlled GAF Hong Kong. He is the beneficial owner of all of the shares.

GAF Hong Kong and GAF Ohio have several customers in common, including several of the customers on the list of accounts at issue, and sell some of the same products. GAF maintains invoices from GAF Hong Kong in its files in the event a customer requires additional product to be restocked domestically by GAF. Although GAF has an exclusive license for the sale of its squeeze pets, GAF Hong Kong sells

squeeze pets without any written sub-license from GAF Ohio.

Dahms acts as both a direct employee of GAF Ohio and a sales representative of GAF Hong Kong. He sells products for the latter. Rosenberg and other persons also provide sales support for GAF Ohio and GAF Hong Kong.

Notwithstanding the fact that Dahms' sales efforts on behalf of GAF Hong Kong may benefit GAF Ohio, the sales are invoiced through GAF Hong Kong. The allocation of overhead expenses between the two corporations involves the exercise of discretion.

GAF increased its letter of credit mass market business substantially after Rosenberg and Dahms became employed there.

Breach of Non-Competition Restrictive Covenant

PMI claims that Dahms breached the post-employment restrictive covenant not to compete (paragraph 7) in the Agreement by soliciting PMI's customers and misappropriating PMI's confidential information, including its sales strategy, customer identities, and pricing policy, thus competing unfairly and wrongfully with PMI, after accepting employment with GAF.

A post-employment restrictive covenant is enforceable to the extent it is "reasonable under the circumstances." Karlin v. Weinberg, 77 N.J. 408, 417, 390 A.2d 1161 (1978); Solari Indus. v. Malady, 55 N.J. 571, 585, 264 A.2d 53 (1970). Among other matters, the court must consider the circumstances in which it was executed and in which it is to apply. To be enforceable, the

Page 294

covenant must satisfy a three-prong test: it must be reasonably necessary to protect the employer's legitimate interests, must not cause undue hardship on the employee and must not impair the public interest. Solari, supra. The validity and enforceability of the covenant is



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

fact-sensitive and must be determined in light of the facts of this case.

GAF contends that the non-competition provision is unenforceable. I am satisfied that, except as hereafter stated, the restrictions in the provision are reasonable in view of all of the circumstances of this case and the applicable law. See Solari, supra, 55 N.J. at 576, 264 A.2d 53; see also Karlin, supra, 77 N.J. at 412, 390 A.2d 1161; Whitmyer Bros. v. Doyle, 58 N.J. 25, 274 A.2d 577 (1971); Schuhalter v. Salerno, 279 N.J.Super. 504, 653 A.2d 596 (App.Div.1995); Mailman,[666 A.2d 1038] Ross, Toyes & Shapiro v. Edelson, 183 N.J.Super. 434, 440-42, 444 A.2d 75 (Ch.Div.1982).

The restrictive covenant here was designed to protect two legitimate interests of PMI: its proprietary and confidential information; and its customer relationships. These interests are legitimately protectable through restrictive covenants. Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 626, 542 A.2d 879 (1988); A.T. Hudson & Co. v. Donovan, 216 N.J.Super. 426, 432-33, 524 A.2d 412 (App.Div.1987).

When Dahms joined the staff of PMI in April 1988, he came into a key position which of necessity would expose him to PMI's most sensitive corporate information. Unlike other sales agents who PMI employed or with whom it contracted, Dahms had access to customer information of the entire sales force. As Vice President of Sales, he had access to PMI's pricing policy and sales strategy, and assisted in the areas of new product development. Additionally, unlike many sales agents, he did not arrive with his customers; virtually all of his customer relationships were developed on the payroll of PMI. The non-competition covenant which PMI asked Dahms to sign was in recognition of his unique employee status and the damage he could inflict on PMI through the misuse of the knowledge he had acquired there.

Defendants contend that PMI has not proven that they misappropriated its customer confidential information. They assert that the information was not protectable because it was publicly available and not exclusively that of PMI; and that there is no showing that defendants used the information. I find this contention to be without merit.

Under New Jersey law, to be judicially protected, misappropriated information need not rise to the level of the usual trade secret, and indeed, may otherwise be publicly available. The key to determining the misuse of the information is the relationship of the parties at the time of disclosure, and its intended use. Zippertubing Co. v. Teleflex, Inc., 757 F.2d 1401, 1407-10 (3rd Cir.1985) (citing Kamm v. Flink, 113 N.J.L. 582, 175 A. 62 (E & A 1934)); see also Sun Dial Corp. v. Rideout, 16 N.J. 252, 257, 108 A.2d 442 (1954).

The information which PMI seeks to protect is not readily obtainable from trade directories and other publications, as GAF argues. Although the customers' names may be listed in those publications, the fact that they are customers of PMI is not. Their identity is entitled to protection when divulged in confidence to a key employee such as Dahms, where he is a party to a covenant not to compete. See Kamm, supra, 113 N.J.L. at 588-89, 175 A. 62; see also Ingersoll-Rand, supra, 110 N.J. at 628, 542 A.2d 879. The fact that such information may be available from public sources does not mean that the information is not confidential as between the parties. Zippertubing, supra, 757 F.2d at 1410. It should be noted that GAF itself seeks to protect the identity of its customers from disclosure by the noncompetition provision required of its employees, evidencing its recognition of the value of this information.

Additionally, the knowledge which PMI sought to protect through the Agreement went beyond merely the identity of PMI's customers. It sought to protect Dahms' knowledge of the customers' buying habits, PMI's mark-up structure, merchandising plans, sales projections

Page 295



and product strategies. A competitor's knowledge

Page 296

of a particular customer's pricing and packaging requirements actually gives the competitor the ability to design for that customer's needs and to obtain an advantage over competitors who do not have this information. Thus, all of the foregoing information is clearly confidential and proprietary as to PMI, and protectable through a restrictive covenant. See Sun Dial, supra, 16 N.J. at 257, 108 A.2d 442; Restatement (Third) of Unfair Competition section 39, comment d (Tentative Draft No. 4, March 25, 1993), cited in Trump's Castle Assoc. v. Tallone, 275 N.J.Super. 159, 162, 645 A.2d 1207 (App.Div.1994) ("A trade secret can also relate to ... aspects of business operations such as pricing and marketing techniques or the identity and requirements of customers.")

[666 A.2d 1039] As in A.T. Hudson, supra, 216 N.J.Super. 426, 524 A.2d 412, PMI expended substantial energy and money, either through Dahms or otherwise, in soliciting the actual customers involved herein--a matter "worthy of protection." Id. at 434, 524 A.2d 412. That the customers may have been available from trade periodicals and the like does not change the fact that they were actually divulged by Dahms to GAF, a competitor, in violation of a confidence established by the covenant. Knowledge thereof, was, in fact, acquired by GAF in violation of the covenant--not through any such periodicals. See Kamm, supra, 113 N.J.L. at 588-89, 175 A. 62.

The fact that GAF had known, dealt with or solicited many, if not all, of the accounts at issue in this case before hiring Dahms is of no consequence. It is evident that the sales to these customers increased after Dahms was employed, through the use of his knowledge of information as to his and PMI's relationships with such customers. Dahms and Rosenberg, PMI's key employees, were hired by GAF in order for it to make use of such knowledge, information and

relationships so as to increase GAF's business in the mass market field, at PMI's expense, and, as to Dahms, in violation of his restrictive covenant. Clearly, Dahms' sharing of the customer knowledge and relationships he had gained from his

Page 297

experiences at PMI with his new employer and selling to such customers on behalf of GAF were in breach of the covenant.

Dahms has admitted the use of such confidential information in discussing accounts with GAF generally, and in preparation for the Hong Kong Toy Fair. GAF plainly misappropriated PMI's confidential customer information through Dahms' disclosure to it of such customers and solicitation of them on its behalf. Even if Dahms did not disclose to GAF any of PMI's confidential information relating to such customers, he violated the covenant not to compete by disclosing to GAF PMI's existing customers and selling to them for GAF.

Dahms immediately began soliciting PMI's existing customers, and selling GAF's products to the customers he had dealt with at PMI after he resigned, if not before. Indeed, of the more than one hundred customers Dahms was assigned to service at GAF, all but twelve were customers he had dealt with at PMI. The introduction of these customers to a competitor and sales to them by that competitor violated the covenant not to compete and proximately caused damage to PMI.

In any event, the relationships PMI had with its customers are clearly protectable under the law. A.T. Hudson, supra, 216 N.J.Super. at 433, 524 A.2d 412. As in Solari, Dahms had a high executive position with PMI. By the covenant, he is barred from dealing with PMI's actual customers with which he had substantial dealings on PMI's behalf while in its employ, or actual customers of PMI of whom he acquired knowledge while in that employ. The relationships which Dahms had with PMI's



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

customers were developed and nurtured at PMI's expense.

GAF claims that it solicited all of the diverted customers (those PMI customers to which it sold plush toys after hiring Dahms) for years prior to hiring Dahms (with one exception); that it had sold merchandise to virtually all of these accounts prior to hiring Dahms; and that in 1992 its sales to them were largely of copyrighted and licensed squeeze pets. But solicitation does not equate with sales. Additionally, in 1991, GAF sold domestically to

Page 298

only five of the diverted customers; and after Dahms' employment by GAF, this number increased to twenty-three such customers in 1992 and to thirty-two of them in 1993.

Further, although squeeze pet sales may have increased in 1992 and 1993, as I have found, squeeze pets were indeed competitive with products sold by PMI. There is no question but that Dahms' solicitation and acquisition of the diverted customers proximately caused the increase of sales to them by GAF, and the resulting profit to GAF, even of squeeze pets.

The prohibition in the covenant, however, to the extent it covers prospective customers that were only solicited by PMI, is overbroad and, thus, unenforceable. See [666 A.2d 1040] Coskey's T.V. & Radio Sales and Service v. Foti, 253 N.J.Super. 626, 638-39, 602 A.2d 789 (App.Div.1992). Such overbreadth does not make the entire covenant unenforceable. The covenant is simply modified to delete that prohibition. See Solari, supra. Thus, those customers on the diverted customer list that were merely solicited and not sold by PMI while Dahms was employed--e.g., Drug Emporium--will not be considered in awarding PMI damages. See United Board & Carton Corp. v. Britting, 63 N.J.Super. 517, 524, 530, 164 A.2d 824 (Ch.Div.1959), aff'd, 61 N.J.Super. 340, 160 A.2d 660 (App.Div.), certif. denied, 33 N.J. 326, 164 A.2d 379 (1960).

PMI is not precluded from protecting its customer relationships simply because they are nonexclusive, as defendants claim. There is nothing in the Solari line of cases that in any wise suggests that the customers protected must be exclusively those of the employer. See Solari, supra; Hogan v. Bergen Brunswig Corp., 153 N.J.Super. 37, 42, 378 A.2d 1164 (App.Div.1977).

Thus, the covenant, as modified, is reasonably necessary to protect PMI's legitimate interests.

The restrictive covenant does not cause undue hardship on Dahms. It does not impose any limitations on his ability to work for a competing business nor does it prevent him from

Page 299

engaging in his livelihood. 3 He has not been forced to move; he is free to do business on an international and domestic basis, and to work for anyone in the toy industry, even GAF, as long as he does not exploit the customer relationships and other confidential information, relating thereto, he acquired through PMI. Coskey's, supra, 253 N.J.Super. at 636-40, 602 A.2d 789; A.T. Hudson, supra, 216 N.J.Super. at 428-29, 524 A.2d 412. All of the customer relationships which Dahms took with him to GAF were acquired through his employment with PMI. Accordingly, PMI's use of the restrictive covenant to keep such customer relationships protected from competitive use by Dahms is reasonable and does not result in undue hardship on him.

The time restraint here as to such competition is also reasonable--one year; and the failure to restrict the geographical area is not significant, since the provision essentially sought to protect existing customer relationships rather than a territorial sphere of influence. Schuhalter, supra, 279 N.J.Super. at 511, 513, 653 A.2d 596 (citing Mailman, supra ).



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

Further, contrary to GAF's contention, the mass market customers for the toys involved here are not so limited in number or generally known in the trade as to preclude protection against GAF's dealing with them during that one-year period, provided they were existing customers of PMI before Dahms left its employ. Their patronage had to be developed by PMI or Dahms, often as a result of a personal relationship. This situation is not in any wise similar to the finite group of customers dealt with by all competitors in the field, as in Coskey's, supra, 253 N.J.Super. at 638-39, 602 A.2d 789. Nor is it at all like that in Whitmyer, supra, where the plaintiff's customers were governmental entities and public bidding was involved. The Court there held that "[t]he industry as a whole is fully aware when public work is available

Page 300

and the determining factor is generally price rather than personal consideration." 58 N.J. at 38, 274 A.2d 577.

Finally, defendants have not presented any reason peculiar to Dahms' circumstances or the industry which makes Dahms' covenant void as against public policy. It does not, as GAF contends, effectively stifle competition in the mass market for toy customers. That market is not limited. Nothing in the covenant prohibits the customers from seeking out GAF and purchasing GAF's toys, as long as such customers were not existing customers of PMI for plush toys when Dahms was employed by it. The one-year anti-competition restriction is reasonable, has no potential for any harmful consequences for Dahms, and is clearly necessary[666 A.2d 1041] to protect the legitimate interests of PMI.

I hold, therefore, that the covenant, measured by the Solari- Whitmyer factors, as modified above, is valid and enforceable.

I find that GAF, through Haney, was aware of, or chargeable with knowledge of, the

existence of the restrictive covenant and its viability in December 1991, when he first met with Dahms, a significantly important and knowledgeable managerial key employee of PMI. This conclusion is based on the finding, heretofore made, of Haney's wilfull blindness as to the existence of the covenant, particularly since he, himself, required such a covenant of his employees. Thus, GAF is properly liable for the proximate consequences of the breach of that covenant which enured to its benefit, even though it might otherwise have acquired the increased business from the customers by its own efforts. See Raven v. A. Klein & Co., 195 N.J.Super. 209, 215, 478 A.2d 1208 (App.Div.1984) (quoting A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 250, 66 A.2d 319 (1949)).

Dahms endeavored to free himself from the non-competition provision in the Agreement by giving a notice in March 1987 that he did not wish to renew the Agreement for any period beyond its termination date of April 17, 1991, but wished to continue his employment with PMI without the Agreement. This

Page 301

unilateral attempt to divest himself of the covenant's burden by endeavoring to create an employment relation not covered by the existing Agreement, was legally ineffective.

Although paragraph 9 of the Agreement provided that it "may" be renewed for additional one-year periods upon the same terms and conditions, after its initial three-year term, it obviously must have contemplated an automatic renewal for such periods; for, it provides only the method to express an intent not to renew, rather than the steps a party must take to renew the Agreement. 4 Clearly, to preclude an automatic one-year renewal of the Agreement, a written notice to PMI of at least sixty days prior to April 18, 1991, was required. The word "may" is not at all ambiguous. See Otis Elevator Co. v. George Washington Hotel Corp., 27 F.3d 903 (3rd Cir.1994). Dahms' purported notice of



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

non-renewal was submitted only thirty-five days prior to the above date.

The crux of Dahms' problem was not that he did not understand that he needed to take action because of an ambiguity, but rather that there were no longer the required sixty days left for him to give notice. Clearly, it was Dahms' own oversight that created this timing difficulty and not any ambiguity.

Dahms' attempt by his late notice of non-renewal to terminate the Agreement without termination of employment was, as stated, without any legal effect.

The construction urged by defendants, which would permit Dahms unilaterally to terminate the Agreement while maintaining his employment, is contrary to the Agreement's purpose--to regulate the terms and conditions of Dahms' employment. Such a construction also would deprive plaintiff of any opportunity to protect itself either by having advance notice of the employee's termination of the contract as required by paragraph 9, or by having the benefit of the post-employment restrictions therein.

Page 302

It should be noted that Dahms, himself, in his private memoranda, continued to refer to the Agreement for the override bonus benefits due him. A construction of the Agreement which would permit Dahms to thus have the best of both worlds, without PMI's consent, is fundamentally unfair and does not comport with a reasonable interpretation of the Agreement. He cannot repudiate the Agreement relative to his obligations, and continue to rely on its benefits.

Accordingly, the notice not to renew may be fairly read as a proposal for modification of the Agreement, conditioned upon Dahms' presentation of a later proposal for Auerbach's review. Auerbach reasonably interpreted the notice, after receipt of a simultaneous telephone call from Dahms, as Dahms' wanting to continue his employment, but under[666 A.2d 1042] a new contract with proposed terms that Dahms was to submit, including increased compensation. Dahms never submitted the proposed new contract terms.

Thus, the covenant not to compete continued as part of Dahms' non-terminated Agreement and was effective before and after his resignation on December 12, 1994.

GAF's argument of waiver or acquiescence by PMI is without substance. Such waiver or acquiescence would occur only if PMI knew or should have known that the notice was intended to terminate the Agreement and the provisions applicable to Dahms' employment, such as the noncompetition covenant. See West Jersey Title and Guar. Co. v. Industrial Trust Co., 27 N.J. 144, 152, 141 A.2d 782 (1958). But PMI reasonably had no such understanding, and indeed, Dahms in his telephone conversation with Auerbach could be said to have discouraged such an understanding.

The delay in giving notice was not slight; and there is no evidence of fraud, surprise, honest mistake or other equitable considerations warranting relief from the untimely notice. Here, forgetfulness was the reason for the delay in sending the termination notice. This does not suffice to excuse the lack of timeliness.

Page 303

Brick Plaza, Inc. v. Humble Oil & Ref. Co., 218 N.J.Super. 101, 526 A.2d 1139 (App.Div.1987); Sosanie v. Pernetti Holding Corp., 115 N.J.Super. 409, 414, 279 A.2d 904 (Ch.Div.1971). PMI cannot be said to have waived its rights to be given timely notice of non-renewal, when it reasonably did not realize that such notice was intended.

Further, the failure to pay the bonus override to Dahms is not so material a breach as to warrant his failure to perform the covenant not to compete. See Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990).



Breach of Duty of Loyalty

PMI claims that, in addition to his breach of the covenant not to compete, Dahms breached his duty of loyalty as an officer and employee of PMI. It further claims that Rosenberg, who had no covenant, also breached his duty of loyalty. These claims have merit.

Although an employee has the right to make preparations to go into a competing business even while he is still employed, he may not breach the undivided duty of loyalty he owes his employer while still employed, by soliciting his employer's customers or other acts of secret competition. Auxton Comp. Enter. v. Parker, 174 N.J.Super. 418, 423, 416 A.2d 952 (App.Div.1980).

At one of the meetings held at GAF prior to his resignation, Dahms discussed the accounts he was calling on for PMI. Subsequently, he began to contact customers on behalf of GAF prior to submitting his resignation to PMI. Such conduct constituted proscribed acts of secret competition.

Courts have recognized the damage a former disloyal employee is able to inflict on his employer, even in the absence of a covenant, where he has launched or assisted a competing business while he is employed. See United Board, supra, 63 N.J.Super. at 527, 164 A.2d 824.

Page 304

It is undisputed that both Dahms and Rosenberg had meetings with GAF, and that they accepted employment with GAF some days before they gave PMI notice of their resignations. I find that GAF actively wooed these two key executives of PMI, engaged in sales, at least as early as October 1991; and that Dahms and Rosenberg attended at least two meetings at GAF for the purpose of discussing the reassignment of PMI's customers before they had submitted their resignations. Both

Rosenberg and Dahms breached the duty of loyalty to PMI by so doing.

Like the salesman in United Board, Dahms concealed his intentions from his employer until he could inflict severe damage. While Dahms was so involved with GAF, he was neglecting his duty to PMI to make Toy Fair appointments during the critical period in early December. In fact, on one day--December 11, 1991--Dahms was actually employed by both PMI and GAF.

It may be reasonably inferred from Dahms' conduct that he deliberately delayed making appointments for PMI, hoping instead[666 A.2d 1043] that he would be able to convert them to GAF. I find that his telephone calls to customers of PMI were actually for Toy Fair appointments for GAF, not PMI. Additionally, Dahms wrote letters, immediately after he went to work for GAF, to PMI customers criticizing PMI. Further, the surreptitious manner in which Dahms and Rosenberg acted in resigning immediately before the Toy Fair and not advising PMI that they were going to work for GAF, supports the foregoing conclusion. Since almost fifty-five percent of PMI's annual sales revenue is derived from its presentations at the Hong Kong Toy Fair, the resulting decline in its appointments for the January 1992 Hong Kong Toy Fair caused it severe damage.

Dahms and Rosenberg defected to GAF, a bitter competitor of PMI, which had previously been charged in a law suit with unfairly competing with PMI by using its proprietary information. The day after Dahms announced his resignation from PMI, he immediately began telecopying PMI's customers to make the toy fair appointments on behalf of GAF that he should have made for

Page 305

PMI. He thus sought to convert the goodwill established by him for PMI to the benefit of GAF. Dahms' conduct plainly violates the covenant not to compete and, to the extent it



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

occurred prior to his resignation, violates as well his duty of loyalty to PMI.

Further, Rosenberg's conduct in assisting GAF's efforts to solicit Dahms, PMI's key sales executive, as an employee, was a violation of his duty of loyalty to PMI. See Wear-Ever Alum., Inc. v. Townecraft Indus., 75 N.J.Super. 135, 182 A.2d 387 (Ch.Div.1962); see also Trans Am. Truck. Serv. v. Ruane, 273 N.J.Super. 130, 641 A.2d 274 (App.Div.1994) (defendant had solicited a customer of his employer as well as several fellow employees for a proposed new business while still employed; the court referred to such conduct as "wrongful" acts).

The solicitation here by Rosenberg, a fellow key employee of PMI, for a competing business, GAF, is a breach of the duty of employee loyalty. This activity deprived PMI of the ability to take any counter-measures, thereby resulting in the loss of Dahms, a key employee, and many of its customers.

Thus, Dahms and Rosenberg, while still employed by PMI and enjoying its trust and the benefits of their employment, in effect went into secret competition with their employer. United Board, supra, 63 N.J.Super. at 530, 164 A.2d 824. In view of the intense competition between PMI and GAF, their conduct furthered GAF's competitive advantage while they were still employed by PMI, a clear breach of their duty of loyalty to PMI. Id. at 524, 164 A.2d 824.

Tortious Interference with Economic Advantage

PMI correctly contends that Dahms, Rosenberg and GAF also tortiously interfered with PMI's prospective economic advantage. As set forth in Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751, 563 A.2d 31 (1989), the elements of a cause of action for tortious interference are: (1) plaintiff must have a reasonable expectation of economic advantage (i.e., plaintiff was "in pursuit of business"); (2) the interference and harm

inflicted must be done intentionally and with "malice," not necessarily in the sense of ill will, but in the sense of conduct that is wrongful and without justification or excuse under all the circumstances; (3) the interference must have caused a lost prospective gain; and (4) the loss or injury caused damage. Plaintiff must show that if there had been no interference, there was a reasonable probability that it would have received the anticipated economic benefits.

The question of "malice," or "improper means" is factual, to be determined on a case-by-case basis. "The standard must be flexible and must focus on a defendant's actions in the context of the case presented." The ultimate question is whether a defendant's conduct is sanctioned by the "rules of the game." Sustick v. Slatina, 48 N.J.Super. 134, 144, 137 A.2d 54 (App.Div.1957).

I find that there was a deliberate plan on the part of GAF, Dahms and Rosenberg to cause damage to PMI through the diversion of its customers at a time critical to PMI in selling to these customers.

Only a few months after the settlement with PMI of contested litigation, GAF contemplated[666 A.2d 1044] the expansion of its mass market division--the area where most of PMI's sales are made--utilizing key members of PMI's sales force. GAF diligently pursued employment of Rosenberg. Dahms and Rosenberg, while still on PMI's payroll, met with GAF to discuss GAF's plans of expanding into the mass market, starting with the 1992 Hong Kong Toy Fair. GAF intentionally sought to hire Dahms and Rosenberg away from PMI in order to seriously impair PMI's business while increasing its own.

Dahms neglected his duty to PMI to make 1992 Toy Fair appointments, depriving PMI of the ability to meet with its customers at the principal sales event of the year. The announcement to PMI of the planned departures and resignations of Dahms and Rosenberg was delayed until PMI's principal, Auerbach, was

Page 306



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

Page 307

en route to Hong Kong, making it difficult for PMI to contact customers and find substitute sales help for the Toy Fair. Dahms immediately began the solicitation of PMI's customers, and, in the process, made negative statements about PMI.

The foregoing pattern of conduct demonstrates not only legal, but actual malice. See Printing Mart, supra, 116 N.J. at 756-60, 563 A.2d 31. The acts of GAF to increase its business by intentionally seeking out and employing PMI's key sales employees, so that it could sell to PMI's existing customers by reason of the customer information they had, constituted intentional wrongful acts committed without justification or excuse. That conduct is not sanctioned by the rules of the game. It is not justified merely because GAF is a competitor motivated by profit. Additionally, GAF acted out of ill will towards PMI with the actual intent to harm its business. Its actions were predatory in nature. The addition of ill will exacerbates the nature of the wrong. See Middlesex Concrete Prod. and Excav. Corp. v. Carteret Indus. Ass'n, 37 N.J. 507, 519, 181 A.2d 774 (1962).

The employment of Dahms and Rosenberg and their conduct in assisting GAF were certainly not routine business activities, as claimed by defendants. See Wear-Ever, supra, 75 N.J.Super. at 145, 182 A.2d 387.

GAF cannot be said to have acted "in the exercise of an equal or superior right" when it interfered with PMI's economic advantage by seeking out and hiring PMI's two key employees, misusing the customer information Dahms was bound to keep confidential, and taking advantage of Dahms' wrongful conduct at a crucial time in the business year--in order for GAF to increase its business at PMI's expense. See Kamm, supra, 113 N.J.L. at 588-89, 175 A. 62.

The activities of defendants were clearly tortious. They proximately caused PMI damage and loss. As a direct result thereof, PMI lost business from its existing customers that was

diverted to GAF. The interference caused the loss of prospective gain by PMI and damages to it.

Page 308

Rosenberg and GAF also tortiously interfered with Dahms' employment relationship with PMI. GAF's tactics here were similar to those used in Wear-Ever, supra, 75 N.J.Super. 135, 182 A.2d 387. Rosenberg was recruited by GAF; then, without disclosing his new affiliation to PMI, he was used to recruit Dahms. This deception permitted Rosenberg to persuade Dahms to resign, and deprived PMI of the opportunity to counteract the hidden influence that emanated from GAF.

Damages

Damages to PMI proximately resulting from defendants' wrongs, measured by an accounting of profits to GAF on sales made to the diverted customers after Dahms was hired by GAF, are appropriately allowed in this case, involving essentially unfair competition--a wrongful acquisition of PMI's customers in violation of a covenant not to compete and by intentional interference with PMI's prospective economic advantage. Imperial Fur, supra, 2 N.J. at 250-51, 66 A.2d 319; A. Hollander & Son v. Philip A. Singer & Bro., 119 N.J.Eq. 52, 69-72, 180 A. 671 (Ch.1935), aff'd, 120 N.J.Eq. 76, 183 A. 296 (E & A 1936); see also Zippertubing, supra, 757 F.2d at 1411; Adolph Gottscho, Inc. v. American Marking Corp., 26 N.J. 229, 237, 139 A.2d 281 (1958). This form of relief represents compensation computed and measured by the same rule that applies to cases [666 A.2d 1045] of a trustee who has wrongfully used the trust property for his own advantage. Philip A. Singer, supra, 119 N.J.Eq. at 69, 180 A. 671. It has also been described as a remedy consistent with constructive trust principles, the accounting for profits being a special form of constructive trust. It effects the policy of discouraging tortious or wrongful conduct by depriving the wrongdoer of the opportunity to profit from wrongdoing. Zippertubing, supra.



Here, the real harm to PMI is the unfair advantage gained by GAF in competing for customers. The profits to GAF from such sales are a reliable indication of the value of that unfair advantage.

Page 309

PMI has supplied evidence sufficient to estimate damages with a reasonable degree of certainty. Wong v. Mercado, 248 N.J.Super. 215, 232, 590 A.2d 723 (Law Div.1991). The report and testimony of its expert, Barry Pierce, essentially satisfied its burden of proving damages.

There is a substantial rise in the number of the customers at issue (the diverted customers) to which GAF sold products in 1992 and 1993, after Dahms began his employment for GAF. This cannot be explained away by reason of the advent of GAF's new product--squeeze pets. It is not at all improbable that squeeze pets may have been sold to the diverted customers through the efforts of Dahms.

PMI claims that GAF Hong Kong's profits on plush sales in 1992 should be considered in calculating its damages. Defendants, however, maintain that GAF Hong Kong is a separate entity from GAF Ohio and, thus, it would be inappropriate to consider GAF Hong Kong's profits. GAF Hong Kong is not a party to this action.

As heretofore discussed, Haney is the sole beneficial owner of the shares of both corporations. GAF Ohio exercises complete corporate dominance over GAF Hong Kong. They use common agents, common sales representatives, including Dahms and Rosenberg, and have common products and customers. It is some significance that the method of allocating overhead expenses between the two companies is entirely discretionary and their relationship is very informal.

It is a reasonable inference from the findings, heretofore made, as to the relationship between GAF Ohio and GAF Hong Kong that, for the purpose of determining profits on sales to the diverted customers, sales made or invoiced by GAF Hong Kong are properly imputed to GAF Ohio, assuming the same profit

Page 310

margin of Ohio applied to Hong Kong. 5 Dahms acted as a sales representative of GAF Hong Kong in effecting sales to the diverted customers in violation of PMI's rights. Both Dahms and Rosenberg provide sales support for both GAF Hong Kong and GAF Ohio. Despite their being separate corporations, both corporations were run by Haney as one enterprise with respect to the services of Dahms, as well as Rosenberg.

Thus, GAF Hong Kong was an agent of GAF Ohio, acting on behalf of the latter, in wrongfully violating PMI's rights. Further, for the purpose of computing damages sustained by PMI, under the circumstances of this case, it is entirely appropriate to consider GAF Hong Kong to be the alter ego of GAF Ohio and to pierce the corporate veils of both entities for a just and equitable result. Stochastic Dec., Inc. v. DiDomenico, 236 N.J.Super. 388, 393-95, 565 A.2d 1133 (App.Div.1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990); cf. Adolph Gottscho, supra, 26 N.J. 229, 139 A.2d 281.

With respect to PMI's claim against GAF, I find that the Hong Kong corporation was a mere instrumentality of Haney's other corporation--GAF Ohio; and that a refusal to consider GAF Hong Kong's sales here would permit an independent corporation to be used to defeat the ends of justice. See State, Dep't of Environmental Prot. v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983); O'Neal & Thompson, O'Neal's Close Corp. section 1.10, p. 48 (3rd ed.) (piercing the corporate veil is an equitable doctrine that is applied to particular fact situations; that a corporation's separateness is disregarded in one situation does not mean that its separateness[666 A.2d 1046] will not be respected in other situations.)



GAF's reliance on Sandler v. Lawn-A-Mat Chem. & Equip. Corp., 141 N.J.Super. 437, 454-57, 358 A.2d 805 (App.Div.), certif. denied, 71 N.J. 503, 366 A.2d 658 (1976), is misplaced. The fact pattern there is very different from that here. Through GAF

Page 311

Hong Kong and Dahms, GAF Ohio converted Dahms' relationships with PMI's customers to its advantage.

PMI's computation of net profit is flawed, since it does not take into account GAF's general overhead costs or administrative expenses, and included international sales to customers not on the diverted customer list.

It has been predicted in federal cases that the New Jersey Supreme Court would hold that where the plaintiff's overhead or fixed expenses are not affected by the defendant's breach, no deduction therefor should be made in calculating the net profits plaintiff would have made but for the breach; for while these items are all paid from the proceeds of the business, they do not necessarily bear such a direct relationship to any individual transaction to be considered a cost in ascertaining lost profits.

The same rule applies where a wrongdoer is asked to disgorge profits. "The wrongdoer should not be permitted, by misappropriating another's opportunity, to use that opportunity in order to help absorb fixed expenses of its own business." Zippertubing, supra, 757 F.2d at 1412 ("[I]t is apparent that the fixed expenses of a business must be paid out of profits remaining after all direct costs have been paid. Unless damages restore the latter amount to plaintiff, it will not be fully compensated for the breach.")

Of course, I have no quarrel with the prediction of these federal cases as to New Jersey law, and their rationale. But New Jersey cases have emphasized the need to guard against allowing the computation of profits without regard to deduction of applicable operating and

other expenses. See Wasserman's Inc. v. Township of Middletown, 137 N.J. 238, 254-58, 645 A.2d 100 (1994); Cromartie v. Carteret Sav. & Loan, 277 N.J.Super. 88, 103, 649 A.2d 76 (App.Div.1994); J.L. Davis & Assoc. v. Heidler, 263 N.J.Super. 264, 275-77, 622 A.2d 923 (App.Div.1993); see also Apex Metal Stamping Co. v. Alexander & Sawyer, Inc., 48 N.J.Super. 476, 482-87, 138 A.2d 568 (App.Div.1958).

Page 312

There is evidence from GAF that its overhead expenses are not fixed, but vary with sales volume; and that to the extent that the addition of the diverted customers increased general administrative expenses, it is appropriate to deduct a portion of those costs.

In view of the foregoing New Jersey cases, caution dictates that a reasonable amount be deducted for GAF's overhead in determining the net profits obtained by GAF from sales to diverted customers to which PMI is entitled. GAF has indicated, through expert testimony, that eighteen and one-half percent of the sales is an appropriate deduction. I am not bound by that testimony. In re Guardianship of J.C., 129 N.J. 1, 24, 608 A.2d 1312 (1992); County of Middlesex v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979).

After a review of all of the evidence relating to damages based on such net profits and a careful analysis of GAF's selling, general and administrative expenses from 1988 to 1992, I am satisfied that eighteen and one-half percent is much too high. Considering, among other things, an averaging of general and administrative expenses (less commissions) as a percent of total sales during this five-year period, I find that a reasonable overhead figure should be no more than twelve percent of the sales involved. That is the amount that will be deducted.



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)

PMI chose a measure of damages based not on its loss of net profits by reason of defendants' wrongdoing but, rather, based on an accounting of net profits made by GAF as a proximate result thereof. This is, as indicated, an appropriate measure of damages in this type of case.

PMI, however, is only entitled to one year's net profits--1992--and not for 1993 as well. The period of the covenant not to compete is for one year after Dahms' resignation[666 A.2d 1047] in December 1991. The significant harm done to PMI occurred in the first year after the January 1992 Hong Kong Toy Fair. Moreover, it was the failure of Dahms to set up customer appointments for the Fair

Page 313

and, instead, to deal with PMI customers, immediately before, during and after the Fair, on behalf of GAF, that constituted the essential wrong encompassed by PMI's tortious interference claim. GAF's profit for one year suffices reasonably to compensate PMI in damages for that wrong.

PMI's damages based on GAF's 1992 net profits on plush sales are calculated, after allowing for all of the foregoing adjustments, to be $121,832. [Actual calculations are omitted.] The amount of damages awarded against GAF is thus $121,832.

Non-Liability of Rosenberg

I have already found that PMI treated Rosenberg shabbily while he was employed there. Rosenberg had no covenant not to compete. However, had he been bound by such a covenant, it would not be enforceable by reason of PMI's inequitable conduct towards him. See Solari, supra, 55 N.J. at 586, 264 A.2d 53 (if the employer deals with the employee unworthily or in an inequitable manner, it is disqualified from relief in enforcing the covenant not to compete). Although he violated his duty of loyalty to PMI in disclosing customer information to GAF and in assisting it to hire Dahms away from PMI,

and was a party to the tortious interference involved herein, I find that PMI's unfair treatment of Rosenberg while he was employed there bars PMI from any relief against him for such wrongful conduct. A judgment of no cause for action will be entered in favor of Rosenberg.

Rosenberg's personal defense does not in any wise relieve GAF of liability for damages.

Dahms' Counterclaim

Dahms is entitled on the counterclaim to recover from PMI the $21,340 incentive bonus override due him for 1991. It was compensation for work he had already earned before he committed a material breach of the Agreement or his duty of loyalty to PMI, or became involved in tortiously interfering with PMI's economic advantage. The method of computing the bonus

Page 314

had been agreed upon by PMI and Dahms. It was fully earned. See Imperial Fur, supra, 2 N.J. at 251, 66 A.2d 319 (in denying the employee the retention of salary paid to him, the Court stated that these "payments were made at a time when he was actively pursuing outside business activities contrary to the employment agreement"); In re Estate of Gregoriou, 153 N.J.Super. 44, 45-46, 378 A.2d 1168 (App.Div.1977), (where the bonus had not been earned or vested.) See also Joseph Toker, Inc. v. Cohen, 67 N.J.Super. 68, 169 A.2d 838 (App.Div.1961). Under the circumstances of this case, the rule that a party's material breach excuses the other party from performing a contractual duty due thereafter is not applicable. See Nolan, supra, 120 N.J. at 472, 577 A.2d 143; Duall Bldg. Rest., Inc. v. 1143 East Jersey Ave. Assoc., 279 N.J.Super. 346, 365-66, 652 A.2d 1225 (App.Div.1995).

Dahms' Secondary Liability

Dahms is liable for the $121,832 in damages awarded against GAF, less the $21,340



due on his counterclaim for the override bonus from PMI. Thus, the net amount for which he is liable is $100,492.

GAF was the aggressor in inducing Dahms and Rosenberg, the two key employees of PMI, to leave PMI and work for GAF, in order to increase its mass market sales and customers at PMI's expense and with the desire to harm PMI. Such predatory unfair competitive tactics make GAF primarily liable to PMI for the damages assessed. The judgment against Dahms shall be payable only if GAF fails to pay or otherwise satisfy the judgment against it. This liability will be deemed secondary to that of GAF. Cf. Mandelbaum v. P & D Printing Corp., 279 N.J.Super. 427, 440, 652 A.2d 1266 (App.Div.1995); Moss v. Jones, 93 N.J.Super. 179, 184, 225 A.2d 369 (App.Div.1966) (citing Pennsylvania Greyhound Lines v. Rosenthal, 14 N.J. 372, 385, 102 A.2d 587 (1954) and Losito v. Kruse, 136 Ohio St. 183, 24 N.E.2d 705 (Ct.1940)). Dahms may not collect[666 A.2d 1048] on his counterclaim until GAF pays or

Page 315

otherwise satisfies its judgment. The judgment entered herein will so provide.

CONCLUSION

Predicated on the foregoing findings of facts and conclusions of law, judgment will be entered today as follows:

1. Judgment against defendant, Great American Fun Corp., and in favor of plaintiff, Platinum Management, Inc., d/b/a Embrace, in the sum of $121,832.

2. Judgment against defendant, Brian Dahms, and in favor of plaintiff, Platinum Management, Inc., d/b/a Embrace, in the sum of $100,492; but such judgment may only be enforced against Dahms in the event that Great American Fun Corp. does not pay or otherwise satisfy the judgment against it by July 1, 1995. Liability on this judgment against Dahms shall

be deemed secondary to that of Great American Fun Corp. on the judgment against it. This judgment against Dahms reflects a recovery on a counterclaim in his favor of $21,340. He may not collect on this counterclaim until Great American Fun Corp. pays or otherwise satisfies its judgment as hereinabove provided.

3. Judgment of no cause for action against plaintiff, Platinum Management, Inc., d/b/a Embrace in favor of defendant, Martin M. Rosenberg.

No costs will be allowed to any party.

---------------

1 Dahms was employed by GAF pursuant to "An Agreement of Confidentiality and Noncompetition" dated December 6, 1991. The agreement contained the following clause:

It is specifically understood by employee that all customer lists, invoices, and any other records of whatever nature and kind pertaining to customers of employer are trade secrets and proprietary information and are the exclusive property of employer.

2 PMI begins its preparations for the Hong Kong Toy Fair by starting to make appointments with buyers in October. The majority of those appointments are made within the first fifteen days of December.

3 Nor is there any evidence that he was dealt with by PMI so unworthily or in such inequitable manner as to disqualify PMI from enforcing the noncompetition provision. The matter of the debt due Dahms based on the 1991 override bonus is not such a disqualifying factor. See discussion hereafter.

4 Paragraph 10 provides that employment shall terminate upon the happening of the earliest of three events, the only one applicable here being the resignation of Dahms as an employee.

5 This assumption made by PMI's expert has not been rebutted by any proofs submitted by GAF.



Platinum Management, Inc. v. Dahms, 285 N.J.Super. 274, 666 A.2d 1028 (N.J.Super.L., 1995)



Case 1:07-cv-01281-RJL    Document 11-4    Filed 07/25/2007    Page 1 of 4

A.T. Hudson & Co., Inc. v. Donovan, 524 A.2d 412, 216 N.J.Super. 426 (N.J. Super. A.D., 1987)

**Page 426**
**216 N.J.Super. 426**
**524 A.2d 412**
**A.T. HUDSON & CO., INC., Plaintiff-Appellant, Cross-Respondent,**
**v.**
**William E. DONOVAN, Defendant-Respondent, Cross-Appellant,**
**and**
**John Gugliemotti and Citizens First National Bank of New**
**Jersey, Defendants.**
**Superior Court of New Jersey,**
**Appellate Division.**
**Argued Jan. 12, 1987.**
**Decided Feb. 2, 1987.**

[524 A.2d 413]

Page 428

Joseph F. Kelly, Jr., Hazlet, for appellant, cross-respondent.

No appearance on behalf of pro se respondent, cross-appellant, William E. Donovan (Respondent relied upon the brief filed by Antonio D. Favetta of the firm of Lamb, Hartung, Gallipoli & Coughlin, Jersey City).

Before Judges MORTON I. GREENBERG, J.H. COLEMAN and R.S. COHEN.

The opinion of the court was delivered by

COLEMAN, J.H., J.A.D.

This is an appeal by plaintiff A.T. Hudson & Co., Inc., a management consulting firm, from a judgment which nullified a post-employment restrictive covenant ancillary to an employment contract between defendant William E. Donovan and plaintiff. The trial judge held that the anti-competition clause in the employment contract violated the public policy of this State. We disagree and reverse.

Plaintiff corporation was formed in 1975 by James Conneen, Richard Cain and defendant William Donovan. Each owned one-third of the corporation. At the inception of the corporation

the three principals agreed to have anti-competition clauses as part of their contracts of employment. The anti-competition clause in the employment contract provided:

5. For a period of two (2) years after you leave the employ of the Company, you will not directly or indirectly, for yourself or for any other Business Entity, solicit any business from, or render any services to:

(a) Any Business Entity which has been a Customer of the Company at any time or from time to time during the two (2) year period prior to the date of termination of your employment with the Company....

Page 429

As a management consulting firm, plaintiff was engaged primarily in reorganizing the management of its clients' businesses. Plaintiff would solicit customers and if retained it would determine the weaknesses in the client's organization and then work with managers to help the client improve the work product. This objective was undertaken primarily through on-the-job work with the managers of the client's business.

Soon after the formation of the plaintiff corporation, Cain started contacting Bank of America with the intention of soliciting its business. Cain made numerous telephone calls to



A.T. Hudson & Co., Inc. v. Donovan, 524 A.2d 412, 216 N.J.Super. 426 (N.J. Super. A.D., 1987)

different people at the bank, and it took him approximately 15 to 18 months to reach the right person, Tony Matthews, the head of the bank's Internal Methods Department. Following Cain's contact with Matthews, the bank engaged plaintiff to perform a productivity improvement program for its data center in San Francisco at a cost of $260,000. Plaintiff did additional work for the bank in California and in England.

Donovan ended his association with plaintiff on September 28, 1980. In early 1981 he formed a partnership with two others to develop and acquire oil and gas producing properties; at that time he was not doing any business as a management consultant. He did, however, form a corporation called William E. Donovan Associates, Inc., anticipating that he might start doing management consulting again.

Donovan Associates did not become active until about May 1981 when defendant hired Viola Swihart to begin making telephone[524 A.2d 414] calls to the Buffalo/Rochester, New York area to solicit business. Swihart was an experienced telemarketer and used the standard directories to find potential clients. Swihart, who worked from her California home, would contact defendant to tell him if she had made an appointment for him with an interested party. Defendant was living in both Bradford, Pennsylvania and Denver, Colorado at the time; he was not present when Swihart made her calls and had very little actual contact

Page 430

with her. Except for those companies with which Swihart had made appointments, defendant did not know whom she had contacted.

As of September 28, 1980, the date that defendant left plaintiff's employ, Bank of America was plaintiff's customer; plaintiff was either in the process of performing under a contract or soliciting one. At that time, Joseph Hartley was working both as a salesman and director of operations for plaintiff. He was assigned to work on Bank of America's account

and, during 1982, was actively soliciting more of the bank's business.

On February 23, 1982, Hartley made a sales call on plaintiff's behalf to R.A. Lemos, a vice-president of Bank of America. As Hartley explained the nature of his consulting services to Lemos, Lemos told him that he knew about plaintiff because he had been visited recently by defendant, who tried to sell his management consulting services to Bank of America. Defendant gave as references the names of Whit Connelly, an executive at Bank of America, and the Imperial Bank, both clients that defendant had served while working for plaintiff. Subsequently, on March 3, 1982, Hartley also met with Elizabeth Strohl, another vice-president at Bank of America. Strohl told Hartley that defendant had called her and that she was going to meet with him to discuss doing a consulting project.

Defendant's telephone records substantiated Hartley's assertions that defendant and his agent, Viola Swihart, had telephoned Lemos at Bank of America on August 3, 4, 8, and 20, 1982. Swihart had also placed calls to Elizabeth Strohl on August 4 and 24, 1982. She had called Fran Wetzel at Bank of America on August 20 and 23, 1982. The parties stipulated that by a contract dated January 1983 and the subsequent consulting contract, defendant agreed to render services to Bank of America which were of a nature generally similar to the services that plaintiff had rendered. Defendant admitted contacting R.A. Lemos of Bank of America to perform consulting

Page 431

work for the Business Services Marketing Department. He denied soliciting the Business Service Division prior to September 28, 1982. In December 1982 defendant was hired to perform services for the Business Service Division. Defendant's analysis was completed in February 1983 and the consulting project was commenced in March 1983.



A.T. Hudson & Co., Inc. v. Donovan, 524 A.2d 412, 216 N.J.Super. 426 (N.J. Super. A.D., 1987)

On March 19, 1982, plaintiff filed a two count complaint alleging that Donovan had breached the anti-competition clause in his employment contract with plaintiff by forming his own consulting firm and soliciting business from Bank of America, one of plaintiff's customers. Plaintiff sought damages, costs and an order enjoining Donovan from soliciting business from plaintiff's customers or divulging confidential secrets. The Citizens First National Bank and John Gugliemotti, a bank officer, were named as defendants because they were custodians of some of Donovan's assets. Plaintiff has heretofore dismissed its claim against that bank and its officer.

The trial was conducted over a four-day period. During the trial the parties stipulated that the gross amount of defendant's contract with Bank of America was $195,000. Defendant's salary was $18,300, and the profit after deducting his salary was $22,362. Adding the net profit to defendant's salary, the total was $40,662, and the parties agreed that plaintiff's damages would not exceed that amount.

At the end of the trial the judge issued a letter opinion dated October 9, 1985 in which he made detailed factual findings and conclusions of law. He found that defendant breached the restrictive covenant by soliciting plaintiff's customers [524 A.2d 415] within the prohibited two year period. The judge rejected defendant's contention that Bank of America, because of its size, could not be considered one single customer but was instead various discrete departments and divisions. The judge also concluded that Swihart was defendant's agent regardless of whether she was defendant's employee or an independent contractor. He further found that the employment contract, which included the

Page 432

restrictive covenant clause, had been supported by adequate consideration. Finally, the judge found that Donovan and his agent Swihart had solicited Bank of America in violation of the

restrictive covenant. He found that plaintiff was not entitled to any relief, however, because the covenant was void under the public policy of this State.

Based on our careful study of the record we are completely satisfied that all of the factual findings set forth in the letter opinion are supported by sufficient credible evidence in the record as a whole and we will not disturb those findings. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). We therefore find that the cross-appeal is clearly without merit. R. 2:211-3(e)(1)(A) and (E).

The real issue in this appeal is whether the anti-competition covenant violated our public policy. We begin our analysis with the seminal case of Solari Industries, Inc. v. Malady, 55 N.J. 571, 264 A.2d 53 (1970). Solari teaches that an anti-competition agreement in a commercial setting is enforceable to the extent that it is reasonable under the circumstances. Id. at 585, 264 A.2d 53. Solari establishes a three pronged test for determining whether the agreement is reasonable: (1) it must be necessary to protect the parties legitimate interests; (2) it must cause no undue hardship on the former employee, and (3) it must not impair the public interest. Ibid. The trial judge found that the first two prongs of the test were satisfied in the present case. Those findings are supported by the record and we will not disturb them. Rova Farms Resort, supra, 65 N.J. at 484, 323 A.2d 495.

The trial judge concluded that the third prong of the Solari test had not been established because the commercial public has the right to an unrestricted choice of management consultants. He reasoned that the relationship between consulting firms and their clients is of a highly personalized nature so that the right of the customer (the commercial public) to choose its consultants should not be restricted. The judge agreed that "a covenant which attempts to 'protect' the clients from contact

Page 433



A.T. Hudson & Co., Inc. v. Donovan, 524 A.2d 412, 216 N.J.Super. 426 (N.J. Super. A.D., 1987)

with the former employee operates to restrict the solicitation rights of the public. Such a covenant, in effect, binds those who were never parties to the agreement." Mailman, Ross, etc. v. Edelson, 183 N.J.Super. 434, 442, 444 A.2d 75 (Ch.Div.1982). While acknowledging that the relationship between plaintiff, defendant and their customers was not the same as the confidential and fiduciary relationship which exists between lawyers and clients or doctors and patients, the judge nonetheless found "that the nature of the customers' interests is such that it should not be restricted." In so finding, he granted absolute protection to the interest of the customers to the total disregard of the interest of the employer.

Our disagreement with the decision declaring the restrictive covenant void is based upon the trial judge's failure to balance the competing interest of the customers against plaintiff's business interest. The judge gave too little consideration to the significant business interest of plaintiff which the covenant was designed to protect. While an employer may not prevent competition as such, he does have a legitimate interest in protecting his customer relationships. Karlin v. Weinberg, 77 N.J. 408, 417, 390 A.2d 1161 (1978); Whitmyer Bros., Inc. v. Doyle, et al., 58 N.J. 25, 33, 274 A.2d 577 (1971). In Solari, the employer complained that the former employee represented a substantial risk to its relationships with its customers. Although the Supreme Court did not grant a preliminary injunction, it remanded the matter for full exploration of the material facts, suggesting that upon development of the record, the appropriate remedy might be "a limited restraint against [the employee's] dealing [524 A.2d 416] with any of Solari's actual customers or prospective customers in the United States with whom he had substantial dealings on Solari's behalf while in Solari's employ." Solari, supra, 55 N.J. at 586, 264 A.2d 53.

We recognize that the nature of the consulting business involves close contact between the consultants and the management employees of the client. It is a personalized service giving rise to an interest in the public to choose among competing providers. But the record in the present case contains a

Page 434

great deal of evidence indicating that consulting firms expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff is able to attract represents a significant investment of time, effort and money which is worthy of protection. On the other hand, the record does not indicate that customers experienced any real difficulty locating other consulting firms capable of rendering the same services as Donovan. Unlike the relationship that exists between an attorney and client, Dwyer v. Jung, 133 N.J.Super. 343, 336 A.2d 498 (Ch.Div.), aff'd o.b. 137 N.J.Super. 135, 348 A.2d 208 (App.Div.1975), or a doctor and patient, Karlin, supra, 77 N.J. 408, 390 A.2d 1161, or an accountant and client, Mailman, supra, 183 N.J.Super. 434, 444 A.2d 75, the commercial standard set forth in Solari controls this case. Application of that standard compels the conclusion that the covenant in this case was not unreasonably injurious to the public.

The judgment dismissing the complaint is reversed. The matter is remanded to the Law Division for the entry of an appropriate judgment in favor of plaintiff. We do not retain jurisdiction.



Case 1:07-cv-01281-RJL    Document 11-5    Filed 07/25/2007    Page 1 of 8

Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)

**Page 626**
**253 N.J.Super. 626**
**602 A.2d 789**
**COSKEY'S TELEVISION & RADIO SALES AND SERVICE, INC., d/b/a**
**Coskey's Electronic Systems, Plaintiff-Respondent,**
**v.**
**Ronald J. FOTI and Systems Sales, Inc., Defendant-Appellants.**
**Superior Court of New Jersey,**
**Appellate Division.**
**Argued Jan. 29, 1992.**
**Decided Feb. 19, 1992.**

[602 A.2d 790]

Page 628

Alan J. Karcher, Edison, for defendant-appellant Ronald J. Foti (Donington, Karcher, Leroe, Salmond, Luongo, Ronan, & Connell, attorneys; John C. Castellano, of counsel, and on the brief).

Guy P. Ryan, Middletown, for defendant-appellant Systems Sales, Inc. (Giordano, Halleran & Ciesla, attorneys; Guy P. Ryan, on the brief).

Page 629

Ronald Reich, New Brunswick, for plaintiff-respondent (Miller & Littman, attorneys; Arthur H. Miller, on the brief).

Page 628

Before Judges KING, DREIER and BROCHIN.

Page 629

The opinion of the court was delivered by

DREIER, J.A.D.

Defendant, Ronald J. Foti appeals by leave granted from an amended preliminary injunction entered against him in the Chancery Division. The injunction was based upon a restrictive covenant ancillary to an employment agreement signed by Foti in favor of plaintiff, Coskey's Television & Radio Sales and Service, Inc., d/b/a/ Coskey's Electronic Systems (Coskey's). Codefendant, System Sales, Inc., Foti's subsequent employer, has joined in his application. We here determine that the preliminary injunction was overbroad and, considering the apparent extreme hardship worked upon Foti in the months pending this review, fairness dictates that it should be substantially vacated forthwith.

Coskey's sells and services communication systems in New Jersey, with annual sales of between three and four million dollars. Most of its customers are public institutions, but a substantial number of sales are with private companies. Its business is generated through contacts with architects, engineers and other professionals who specify Coskey's products in proposed projects. Furthermore, Coskey's sales personnel often help with the design aspects of the proposed systems in the hope of receiving orders from the contractor, should the contractor win the bid on the pending project. The codefendant, Systems Sales, and most other competitors in the industry operate in the same manner.

Prior to July 1987 Foti was an employee of and a 10% shareholder in High Fidelity Sound Center Corp., then a competitor of Coskey's and



Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)



System Sales, and similarly operating. Foti at that time had over 25 years of experience in the industry and had built up a network of contacts with most of the architects, engineers and contractors designing structures requiring

Page 630

substantial sound systems. While the moving papers before the trial judge did not quantify the precise number of individuals or entities with whom Foti had personal contacts, we were informed at oral argument that the list which was prepared to implement [602 A.2d 791] the eventual restraining order enumerated well over 100 prohibited contacts.

The contracts of sale under which Coskey's purchased High Fidelity Sound Center Corp. revealed that the assets of the seller were purchased, and Coskey's retained certain employees of High Fidelity Sound Center Corp. and two principals (Harold Ducore and Bernard Martin) as consultants. The initial agreement of July 1, 1987 was superseded by two agreements of November 16, 1987, which although slightly different in form, have the same effect upon Foti. In the consulting agreement to which Foti was not a signatory, Coskey's as the "Employer," agreed as follows:

10. Employer agrees to make the following payments to the following individuals:

* * * * * *

C. $11,250.00 to Ronald J. Foti upon his signing of an employment agreement and waiver of his right to first refusal to purchase High Fidelity Sound Center.

The agreement further provided that Ducore and Martin were each to receive $45,000 upon their signing the principal agreements which contained a covenant not to compete. A fourth principal, Arthur Thompson, was to receive $11,250, to be held in escrow and distributed quarterly during his employment with Coskey's over a five-year period,

contingent upon his signing a waiver of his right of first refusal to purchase High Fidelity Sound Center. At the time the purchase and employment agreements were signed to transfer High Fidelity Sound Center Corp., Foti had already on November 12, 1987 signed his waiver of first refusal which stated:

I, Ronald J. Foti, hereby waiver [sic ] right of first refusal for purchase of High Fidelity Sound Center. In consideration thereof, Coskey's Electronic Systems will pay $11,250.00 to me.

Page 631

Foti had on October 27, 1987 already signed an employment contract with Coskey's. It covered a five-year period commencing October 1, 1987 and provided for an annual salary of $53,000 plus commissions and benefits. It contained extensive covenants not to compete:

6. During the term of this agreement the Employee shall not, directly or indirectly, either as an employer, employee, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of the Employer.

7. The Employee covenants and agrees as follows:

On the termination of employment, whether by termination of this agreement, by wrongful discharge, or otherwise, the Employee shall not directly or indirectly within the existing marketing area of the Employer, or any future marketing area of the Employer begun during the employment under the terms of this agreement, enter into or engage generally in direct competition with the Employer either as an individual on his own, or as a partner or joint venturer, or as an employee or agent for any person, or as officer, director or shareholder or otherwise, for a period of three (3) years after the date of termination of his employment under



Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)

this agreement. This covenant on the part of the Employee shall be construed as an agreement independent of any other provision of this agreement; and the existence of any claim or cause of action of the Employee against the Employer, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by the Employer of this covenant.

8. This agreement shall be construed to allow Employee, after termination of employment with Employer, to act as a consultant in the sound engineering field provided any consulting services performed by Employee shall not be for persons who are competitors of Employer and provided further Employees consulting services are not in competition with the consulting services performed and or provided by Employer.

On January 4, 1991, after dissatisfaction with his treatment at Coskey's, Foti asserted by letter that Coskey's had breached its [602 A.2d 792] agreement with him, and resigned. Five days later Coskey's replied, contending that there had been no breach on its part. It informed Foti that it would enforce its covenant not to compete, and demanded that Foti comply with the provisions of the employment agreement. On February 1, 1991, Coskey's attorneys applied for and received an order to show cause incorporating a preliminary injunction prohibiting Foti:

(a). from directly or indirectly either on his own behalf or on behalf of any other person or firm contacting for business purposes any of the architects, engineers, contractors, or customers with whom he dealt with [sic ] on behalf of

Page 632

Plaintiff between October 27, 1987 and January 4, 1991 in the State of New Jersey.

By order dated October 22, 1991 the preliminary injunction was amended so that Foti was



restrained from and hereby forbidden to have, directly or indirectly, either on his own behalf or on behalf of any other person or firm, any contact, including but not limited to, contact by telephone, telefax, in person, mail, telegraph, video or radio transmission, or by any other means of communication, regardless of who initiates or requests said contact, with all or any architects, engineers, designers, contractors, subcontractors, customers, clients, or other business persons or companies with whom Foti had "meaningful contact" (as hereinafter defined in paragraphs 2, 3 and 4 of the within Order), during the period of October 27, 1987 through January 4, 1991 when Foti was employed by plaintiff.

The term "meaningful contact" was defined in the order as contacts "which at a bare minimum led to the submission of bids to those business entities or consummation of contracts with those business entities." The term excluded mass mailings, telephone or mail solicitations, meetings at trade shows or conventions or like incidental contacts. The October order further specifically noted that Foti could participate in competitive public bidding by preparing specifications or supporting documents provided that Foti did not have personal contact with individuals at the public entities. As to nonpublic entities, he was also permitted to prepare specifications, bids and supporting documents without personal contact. The scope of the order was limited to the State of New Jersey.

At the time of the enforcement proceedings, Foti had 31 years of experience in the field. While not a graduate engineer, Foti had built up a personal reputation for working with customers to design the components of commercial sound systems. Plaintiff claims that Foti has not been deprived of his livelihood by this injunction, since it permits him to work as a "inside man." He could draft specifications and prepare bidding documents. Foti was not trained by experience nor inclined to do this type of work, and during the period of the



Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)

Page 633

injunction it yielded nowhere near the remuneration of his regular employment. The issue before us, therefore, is whether, given the background of the parties to this transaction, Foti should have been deprived by a preliminary injunction of his principal livelihood pending the resolution of this dispute. 1

[602 A.2d 793] Plaintiff contends that we should treat the covenant in this case as one ancillary to the purchase of a business, rather than ancillary to an employment contract. Such covenants ancillary to the sale of a business are accorded far more latitude. For example, if a retail store is purchased at a particular location, the seller receives payment for the good will generated at that location, recognizing that customers would be inclined to continue shopping at the facility. See Heuer v. Rubin, 1 N.J. 251, 256, 62 A.2d 812 (1949). For the seller to thereafter trade on that good will by reopening within the competitive area would destroy the essence of the transaction.

Restrictive covenants ancillary to an employment contract are different and far more complex. Our courts have only enforced such contracts insofar as they are reasonable under the circumstances. Solari Industries, Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970). Solari is the seminal case

Page 634

establishing the modern New Jersey enforceability standards concerning covenant not to complete in the employment setting. It established a three-prong test of reasonableness. To be enforceable the covenant must protect a legitimate interest of the employer; it may impose no undue hardship on the employee; and it must not impair the public interest. Id. at 576, 585, 264 A.2d 53. Even if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity. Id. at 585, 264 A.2d 53.

In this case, the trial judge did trim or "blue pencil" the covenant in its scope of activity and area of enforceability. We determine, however, that a full analysis of the legitimate interest of the employer and the harm visited upon the employee required substantially narrower enforcement.

We will first dispose of Foti's argument that since many of his contacts involved preparing bids for public agencies, depriving him of input had the potential of raising the costs to these public agencies. He contended at oral argument that he had a special reputation for devising less expensive ways to provide desired results. Thus he asserted that the trial court failed adequately to consider the "public interest" factor of the Solari test. We reject this view. While it is always possible that any individual working on the specifications to be incorporated in a bid for a public job could devise ways to hold down costs, such nebulous possibilities would generally be insufficient to satisfy the public interest test.

Since we see no major public component in this case, we refrain from an extended discussion of those cases primarily concerned with the rights of the public to have free access to the advice of professionals licensed by the State. See Karlin v. Weinberg, 77 N.J. 408, 390 A.2d 1161 (1978) (physicians); Dwyer v. Jung, 133 N.J.Super. 343, 336 A.2d 498 (Ch.Div.1975), aff'd o.b., 137 N.J.Super. 135, 348 A.2d 208 (App.Div.1975) (attorneys); Mailman, Ross, Toyes & Shapiro v. Edelson, 183

Page 635

N.J.Super. 434, 444 A.2d 75 (Ch.Div.1982) (certified public accountants). All of these cases recognize that the employer had legitimate patient or client relationships at stake, yet balancing these against the needs of the public required treatment in each situation tailored to the particular profession. We are also not here dealing with the direct submission of public bids where the only question is which applicant is the



Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)

lowest responsible bidder. See Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 38, 274 A.2d 577 (1971). In such a case absent other trade secrets of the employer to be protected, restrictive covenants are seldom enforced. Id. at 33-34, 274 A.2d 577. We therefore will concentrate on the other two Solari factors.

The question of whether the enforcement of this covenant imposed an undue hardship on Foti is one of the primary factors supporting our decision. We distinguish the case before us from one where a proprietor of or stockholder in a business has sold his interest for a substantial purchase price and has only an incidental ensuing[602 A.2d 794] employment agreement with the new entity. The Heuer standard discussed earlier does not apply here. The $11,250 received by Foti was paid to him for his right of first refusal to purchase the business and for his employment contract which contained the covenant not to compete. 2 If we assume that Foti's annual salary at Coskey's was fair, and we see no indication to the contrary, it would be unreasonable for us to say that the parties intended that an $11,250 payment was to compensate Foti for the potential three-year loss of a $53,000 per year salary, plus commissions and benefits.

Page 636

Of course Foti was always free to uproot his family and move elsewhere to continue his employment, giving up the contacts that he had personally developed over 31 years, but this was neither a fair nor a viable alternative. Enforceability of such a covenant would make Foti little more than a highly-paid indentured servant. Substantially all of Foti's contacts were built up over the years before he was plaintiff's employee, and at one time or another during the years he worked with plaintiff they would have contacted him or he would have approached them in order to provide information concerning jobs. Under the trial judge's view of the agreement, with each contact during these few years with Coskey's, Foti would have eroded his

ability to earn a living after he left plaintiff's employ. He would be bound to plaintiff by a golden handcuff.

Enforcement of this agreement clearly imposed a hardship upon Foti. The question remains, however, whether this hardship was "undue," when balanced against the legitimate interest of the employer. What rights could Coskey's legitimately protect? The cases principally deal with trade secrets, confidential business information and customer relationships. See Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 628, 542 A.2d 879 (1988); Whitmyer Bros. v. Doyle, supra 58 N.J. at 33, 274 A.2d 577; Raven v. A. Klein & Co., Inc., 195 N.J.Super. 209, 213-214, 478 A.2d 1208 (App.Div.1984); Mailman, Ross, Toyes & Shapiro v. Edelson, supra, 183 N.J.Super. at 440, 444 A.2d 75. However, the principal thrust of an enforceable covenant may not be its anticompetitive effect. As noted in Ingersoll-Rand:

[I]n cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable.

110 N.J. at 635, 542 A.2d 879.

Certainly, there are no trade secrets involved in this case. The solicitation of bids for major projects is known generally throughout the industry. The products available are similarly known and it is the skill in combining the two and

Page 637

presentation of the material that determines to whom contracts will be awarded. An employer may not prevent an employee from using the general skills in an industry which have been built up over the employee's tenure with the employer. Whitmyer Bros., Inc. v. Doyle, supra 58 N.J. at 33-34, 37, 274 A.2d 577. What then are the "customer relationships" that can be



Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)

protected by plaintiff? It is fair to say that if Foti successfully negotiated a contract for a particular engineer whose proposals were accepted in a public works or private industrial project, and if there was to be a subsequent modification of that project, Foti's employer would have a right to protect its contractual relationship. Foti takes no issue with this proposition. His counsel at oral argument stated that he would voluntarily accept such a limitation. Furthermore, if Foti had not previously dealt with a particular engineer, architect, or entity prior to his employment with plaintiff, and plaintiff was instrumental in cementing the relationship between Foti and his new contact,[602 A.2d 795] it might be fair to prevent Foti from utilizing this contact during the covenant period. 3

Foti worked on hundreds of proposals which resulted in unsuccessful bids. Such efforts were part of the everyday work not only of plaintiff, but also of all its competitors, and it was unfair to make such contacts the triggering actions to warrant injunctive relief. The trial judge's definition of "meaningful contact" placed too great a restriction on Foti's actions. What Foti brought to his employer, he should be able to take away. This is little different than the tradesman who brings his tools to his employer and upon separation leaves with them,

Page 638

or a scientist who has entered into an employment relationship with a head full of scientific data which he used for the benefit of his employer and then may use for the benefit of another upon reemployment. "Princeton is not to have the exclusive right to Einstein's services just because he is Einstein." Corbin, Contracts, § 1391B, at 610 (Supp.1989). Foti's relationships within the industry were not bought and paid for; they were merely rented during the period of employment. Barring any additional facts that may be disclosed at the eventual trial of this case, we see no basis for the broad restrictions imposed upon Foti.

Our conclusion in this case does not depart from the well-reasoned opinion of A.T. Hudson & Co., Inc. v. Donovan, 216 N.J.Super. 426, 524 A.2d 412 (App.Div.1987), where the employee was prohibited from soliciting business from a customer of a consulting firm. There we determined that the trial judge had given "too little consideration to the significant business interest of plaintiff which the covenant was designed to protect." Id. at 433, 524 A.2d 412. Further, we noted that the record presented considerable "evidence indicating that consulting firms expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff was able to attract represents a significant investment of time, effort and money which is worthy of protection." Id. at 434, 524 A.2d 412.

What is significant, however, is that the consulting and sales businesses in A.T. Hudson and in the case before us are significantly different, as were the industry relationships already possessed by Donovan (the employee in A.T. Hudson) and Foti in our case. In A.T. Hudson, the consulting firm effected reorganization of the management of its clients' businesses. The relationships were ongoing, and involved "close contact between the consultants and the management employees of the client." Id. at 433, 524 A.2d 412. The business in the case before us involves discrete projects, with many bids and proposals being developed which the parties realize may

Page 639

never result in a contract, and where the customers are a finite group dealt with by all competitors in the field. The employee in A.T. Hudson, a management consultant, could have dealt with any entity in the country, yet chose a division of his former employer's major customer. The circumstances here are therefore eminently distinguishable. In fact, in accordance with A.T. Hudson, we have indicated that we would sustain so much of the order that restrains Foti from interfering with any ongoing contract,



Coskey's Television & Radio Sales and Service, Inc. v. Foti, 602 A.2d 789, 253 N.J.Super. 626 (N.J. Super. A.D., 1992)

including any modifications thereof, in which he had participated on behalf of Coskey's during his employment.

We have not lost sight of the fact that we are reviewing this matter by an interlocutory appeal of a preliminary injunction. In such a situation plaintiff must be threatened with irreparable harm if the injunction does not issue. Crowe v. DeGioia, 90 N.J. 126, 132-133, 447 A.2d 173 (1982); Citizens Coach Co. v. Camden [602 A.2d 796] Horse R.R. Co., 29 N.J.Eq. 299, 303-304 (E. & A. 1878); R. 4:52-1, 2. Furthermore, the plaintiff must demonstrate that there is a reasonable probability of eventual success on the merits. Zoning Bd. of Adj. of Sparta Tp. v. Service Elec. Cable Television of New Jersey, Inc., 198 N.J.Super. 370, 379, 487 A.2d 331 (App.Div.1985). "An interlocutory injunction is an extraordinary equitable remedy utilized primarily to forbid and prevent irreparable injury, and it must be administered with sound discretion and always upon consideration of justice, equity, and morality in a given case." Ibid.

The preliminary injunction in this case had obvious devastating effects upon Foti, and only limited (and mainly financial) effects upon plaintiff. See Crowe v. DeGioia, supra, 90 N.J. at 132-133, 447 A.2d 173. As noted earlier, some areas of competition may have required protection. During what should have been a brief period between the initial order and eventual trial, it appears that the maximum relief to which plaintiff would be entitled, based upon the documents before us, is an order protecting Foti's interference with 1) successful contracts which

Page 640

he negotiated on the part of plaintiff, 2) current outstanding bids of plaintiff in which he participated, and 3) plaintiff's relationships with particular individuals or entities where plaintiff was instrumental in providing the contact for Foti. 4

Even though such a permissible area of injunctive relief may later be included in an eventual permanent injunction after a full consideration of the merits of this case, we cannot lose sight of the fact that Foti has spent months under the burden of an overbroad preliminary injunction that has reduced him from a well-paid employee of System Sales to a recipient of unemployment benefits. Thus, rather than force both Foti and System Sales to await the terms of an eventual preliminary injunction, we direct Foti's counsel to prepare a form of preliminary injunction limited to the protected areas outlined in this opinion and submit the same to the trial judge under the five-day notice provisions of R. 4:42-1(c). If there is an objection to the form of order, it shall be resolved by the trial judge. 5 Thereafter the trial judge shall enter an order supervising the completion of discovery on an expedited basis and schedule the matter for prompt trial, unless the matter is otherwise resolved by the parties.

---------------

1 Foti had claimed that after the filing of the complaint in this matter he was dismissed by System Sales. Just prior to oral argument plaintiff moved to supplement the record to indicate that Foti had in fact submitted a bid on a job on behalf of Systems Sales, and furthermore had been observed at a site inspection and bid meeting. Plaintiff attached a copy of a September 20, 1991 quotation on behalf of System Sales, signed by Foti, and noted that at a November bid meeting and at an early December site inspection Foti had accompanied an employee of System Sales. In a responsive certification, System Sales claimed that Foti remained at the corporation without a salary agreement from mid-September to early December and for that period was paid one-seventh of his regular compensation for the months of October and November, with no payment being made for December. At oral argument it was represented to us that Foti has recently been receiving only unemployment compensation.



Since we are reviewing a preliminary injunction and the current status of the parties is of particular relevance, we will grant the motion and consider the submitted certifications of all of the parties, realizing of course that matters of credibility and the like must eventually be resolved by the trial judge.

2 It has not been lost upon us that Foti received 10% of the total consideration paid ($112,500), and that he previously owned 10% of the stock in the corporation. Thus it might be viewed that the option had no value. Yet we also note that a minority interest in a closely held corporation might be thought of as having little real value. We are not, however, precluded from looking at the relatively small amount of the payment, even assuming that all of it had been paid for his share in the business.

3 Extrapolation of such a principle to other cases might be dangerous. For instance, if a young employee joins a company and for 20 years establishes all of his contacts within an industry, but has signed a similar restrictive covenant, such a principle could require that the employee leave the industry or at least the geographical area if he wished to change employers. We therefore limit our discussion of this point to particular individuals with whom Coskey's had a special relationship that was shared with Foti because of his employment by Coskey's.

4 This does not mean that if Foti had a long-standing relationship with a particular architectural or engineering firm, and the personnel within that firm changed during the period of his employment, the firm or personnel would be subject to the injunction. There must be some favored, personal or other special relationship that plaintiff had with the individual or firm before this injunctive relief could be considered effective.

5 Although we do not retain jurisdiction of this matter, either party may apply by way of motion for clarification directly to this Part to the end that the parties may proceed with their business and personal lives as soon as possible without uncertainty.



298 F.Supp.2d 27
**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, Plaintiff,**
v.
**Thomas C. WERTZ, et al., Defendants.**
**No. CIV. 01-2415(RJL).**
**United States District Court, District of Columbia.**
**December 13, 2002.**
Page 28
**COPYRIGHT MATERIAL OMITTED**
Page 29

Alan M. Freeman, Lead Attorney, Blank Rome LLP, Washington, DC, for Plaintiff.

William M. Sullivan, Jr., Lead Attorney, Coudert Brothers, LLP, Washington, DC, for Defendants.

MEMORANDUM OPINION

LEON, District Judge.

Now before the court is the plaintiff's, Merrill Lynch, Pierce, Fenner & Smith Inc., ("Merrill Lynch"), motion for temporary restraining order and preliminary injunction. Merrill Lynch brought these motions on December 9, 2002, to enjoin six of its former financial advisors, Thomas C. Wertz, Donald M. Smyles, Gary M. Sinderbrand, Michael C. Wertz, Denny M. Goforth, and Christopher R. Jackson, from soliciting any business from the clients they had while working at Merrill Lynch, or clients they learned of while working at Merrill Lynch, and from using confidential client lists and records obtained during their employment with Merrill Lynch.

After careful consideration of the arguments presented to the Court at the hearing held December 10, 2002, the plaintiff's motion and complaint, the defendants' opposition thereto, and supplemental memoranda filed by both the plaintiff and defendants, the Court hereby GRANTS plaintiff's motion for temporary restraining order as to defendants Thomas C. Wertz, Donald M. Smyles, Michael C. Wertz, and Denny M. Goforth, and DENIES the motion as to defendants Gary M Sinderbrand and Christopher R. Jackson.1

I. BACKGROUND

Each of the defendants were employed as financial advisors at the Washington, D.C. office of Merrill Lynch for various periods of time.2 On Thursday, December 5, 2002, plaintiff alleges, and defendants do not dispute, that all six defendants resigned from Merrill Lynch without advance notice and immediately joined UBS PaineWebber Inc., ("PaineWebber"), a Merrill Lynch competitor. See Aff. Paul

Page 30

Moulden ("Moulden Aff.") at ¶ 8. Paul Moulden, the administrative manager of Merrill Lynch's Washington, D.C. office, estimates that defendants had "acquired access" to Merrill Lynch accounts representing $500 million in assets. See id. at ¶ 7.

At the outset, or during the defendants' employment with Merrill Lynch, plaintiff maintains that each defendant signed various types of employment agreements, including confidentiality agreements and non-disclosure agreements, that contain restrictions on post-employment solicitation of Merrill Lynch customers and the use of Merrill Lynch documents and records. See id. at ¶ 4. However, the defendants' employment agreements with Merrill are not identical either in form or in substance. Thomas Wertz and Donald Smyles each signed Account Executive Agreements, but the language of those agreements differs slightly.3 Defendants Goforth and Michael Wertz each signed the "Financial Consultant Employment Agreement and Restrictive Covenants."4 As to defendants Jackson and



Sinderbrand, however, Merrill Lynch offers no evidence that either defendant signed any employment agreement at the outset or during their employment. Instead, Merrill Lynch offers "Conflict of Interest" forms signed by Jackson and Sinderbrand which state that each agree not to "use or disclose to another any confidential information or business secrets relating to Merrill Lynch," during or after their employment with Merrill Lynch.5 Defendants Jackson and Sinderbrand also acknowledged receiving, reading, and accepting an obligation to adhere to the "Guidelines for Business Conduct."6

Whatever the substance of each defendant's agreement with Merrill Lynch, Merrill Lynch now argues that the defendants are "actively and deliberately violating the terms of their employment agreements" by soliciting their former clients, Merrill Lynch customers, through telephone calls and mailings paid for by their new employer, PaineWebber. Moulden Aff. at ¶ 10. Merrill Lynch also contends that the defendants are violating their employment agreements by disclosing to PaineWebber client lists; customers' names, addresses, telephone numbers; and other confidential and proprietary information of Merrill Lynch regarding client accounts, in order to persuade those customers to transfer their accounts from Merrill Lynch to PaineWebber. See Moulden Aff. at ¶ 15. Defendants, in turn, argue that the recently publicized allegations regarding Merrill Lynch's violations of securities laws, rules, and regulations forced them to pursue other job opportunities, because their clients questioned whether these problems would adversely affect their accounts.

## II. DISCUSSION

The four factors which courts in this Circuit consider when determining whether a plaintiff is entitled to injunctive relief are whether: 1) there is a substantial likelihood that the plaintiff will succeed on the



merits of its claims; 2) that the plaintiff would suffer irreparable injury if the defendants are not enjoined; 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest favors issuing an injunction. See CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.Cir. 1995); Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C.Cir. 1998).

In regard to the first prong of the test for injunctive relief under CityFed, the Court finds that plaintiff has demonstrated a substantial likelihood of success on the merits with respect to the actions of Thomas C. Wertz, Donald M. Smyles, Michael C. Wertz, and Denny M. Goforth. The employment agreements of these defendants each provided that he was not to solicit Merrill Lynch clients whom he served, or whose names became known to him through his employment with Merrill Lynch. For example, the Account Executive Agreement of Thomas Wertz stated that:

In the event of termination of my services with Merrill Lynch for any reason, I will not solicit any of the clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch in any community or city served by the office of Merrill Lynch, or any subsidiary thereof, at which I was employed at any time for a period of one year from the date of termination of my employment.

Donald M. Smyles also signed an Account Executive Agreement, but the terms of his non-solicitation provision differ slightly:

In the event of termination of my services with Merrill Lynch for any reason, I will [] not solicit, for a period of one year from the date of termination of my employment, any of the clients of Merrill Lynch whom I served or other clients whose names became known to me while in the employ of Merrill Lynch in the office of Merrill Lynch in which I was employed, and who reside within one hundred miles of the Merrill Lynch office in which I was employed.

Finally, Michael Wertz and Denny Goforth each signed identical Financial Consultant Employment Agreements and Restrictive Covenants, with the following provision pertaining to non-solicitation (emphasis added):

If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose names became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

a) to transfer from Merrill Lynch to me or to my new employer, or

b) to open a new account with me or with my new employer, or

c) to otherwise discontinue its patronage and business relationship with Merrill Lynch.

By the express terms of their employment agreements with Merrill Lynch, Thomas Wertz, Donald Smyles, Michael Wertz, and Denny Goforth each agreed not to solicit their clients, or Merrill Lynch clients whose names they became aware of through their Merrill Lynch employment, for a period of one year from the date of

Page 32

their termination. Merrill Lynch has provided adequate proof to this Court that Thomas Wertz, Donald Smyles, and Denny Goforth have, in fact, engaged in written solicitation of Merrill Lynch clients since they resigned from Merrill Lynch last week.7 In particular, Thomas Wertz's letter informed his former client of his decision to leave Merrill Lynch for PaineWebber, a description of the services PaineWebber could offer his client, as well as enclosing a transfer of account form, and closing with the prayerful "hope that you will choose to continue our relationship at UBS PaineWebber."8 While Thomas Wertz's employment agreement does not contain a definition of solicitation, as Michael Wertz's and Denny Goforth's employment agreements did, his statement that he hopes their relationship will continue and the fact that the letter was accompanied by account transfer firms can only be construed as a solicitation.9

Merrill Lynch has also produced a letter signed by Donald Smyles and Denny Goforth that similarly describes their decision to leave Merrill Lynch and join PaineWebber, a description of PaineWebber services, and the statement that "we would be honored to have you join us at UBS PaineWebber. Please sign the enclosed [transfer] forms ... and return in the enclosed postage-paid envelope as soon as possible."10 This conduct by Mr. Smyles and Mr. Goforth clearly constitutes the type of contact with a client for the proscribed purpose of encouraging or inviting that client to transfer his account from Merrill Lynch to his new employer, PaineWebber, that is a patent violation of the employment agreement he signed with Merrill Lynch. While, as defendants point out, the solicitation was to a client who presumably lives more than one hundred miles from the Washington, D.C. office where Smyles was employed, and Smyles' employment agreement confines his non-solicitation agreement to those clients who reside within one hundred miles of the Merrill Lynch office where Smyles worked, the Court, based on this evidence, has good cause to believe that Smyles is either prepared to engage, or has already engaged, in similar solicitations of clients who live within one hundred miles of Washington, D.C. Again, the language of the letter clearly solicits the client and encourages him to sever his relationship with Merrill Lynch and transfer his account to PaineWebber. The Court therefore concludes that defendant Donald Smyles, too, has breached his employment agreement with Merrill Lynch.11



The Court also concludes that Michael Wertz is in breach of his employment agreement with Merrill Lynch. The terms

Page 33

of Michael Wertz's employment agreement could hardly be more clear: it provided a detailed definition of solicitation and stated that he was not to initiate any contact "of any kind" for the purpose of solicitation. Like Smyles, Merrill Lynch has reason to believe that Michael Wertz has placed telephone calls to Merrill Lynch clients for the purpose of encouraging those clients to transfer their accounts to PaineWebber. Paul Moulden, the administrative manager of the Washington D.C. Merrill Lynch office, stated in his supplemental affidavit that he personally spoke to two Merrill Lynch customers whom Michael Wertz had contacted, and that each of these customers told him that Michael Wertz had urged them to bring their business to PaineWebber.12 Such communication is clearly prohibited under the terms of the Financial Consultant Employment Agreement and Restrictive Covenants signed by Michael Wertz.

Due to the evidence of solicitations that Thomas Wertz, Donald Smyles, Michael Wertz, and Denny Goforth have engaged in after their resignation from Merrill Lynch, the Court concludes that Merrill Lynch has a substantial likelihood of success on the merits of its breach of contract claims against these defendants.13 The Court, however, is unable to conclude the same in regard to defendants Sinderbrand and Jackson. Merrill Lynch was unable to provide to the Court copies of employment agreements signed by either Mr. Sinderbrand or Mr. Jackson that included non-solicitation provisions. Although both Mr. Jackson and Mr. Sinderbrand signed a Conflict of Interest form that stated that the signee agreed not to "use or disclose to another any confidential information or business secrets relating to Merrill Lynch,"14 the form never mentions a duty not to solicit. Furthermore, Merrill Lynch has offered no proof that either Mr. Sinderbrand or Mr. Jackson are using or disclosing confidential information or

business secrets to PaineWebber following their resignation. The mere fact that the administrative manager, Mr. Moulden, in his supplemental affidavit to the Court, has stated that both Mr. Jackson and Mr. Sinderbrand have solicited clients by telephone or letter and has provided a list of those clients is irrelevant absent an employment agreement. Messrs. Jackson and Sinderbrand are not prevented from doing so by any agreement with Merrill Lynch, and the record in no way shows that Mr. Jackson and Mr. Sinderbrand used confidential information, such as customer lists or other Merrill Lynch records, to do so.15

The Court also rejects the defendants' argument that their conduct is excusable as Merrill Lynch has, in the past, used customer lists of brokers who have transferred from another brokerage firm to Merrill Lynch. While the Court acknowledges

Page 34

that this conduct is not uncommon in the securities industry, the Court finds it to be an inadequate basis for invalidating the defendants' duties under valid employment agreements. The defendants do not maintain that the employment agreements are unconscionable, or entered into under fraudulent circumstances. Indeed, Merrill Lynch, and brokerage firms like it, execute these contracts with their brokers in order to "prevent potentially harmful interference with its crucial client base." Morgan Stanley DW Inc. v. Rothe, 150 F.Supp.2d 67, 74 (D.D.C.2001). Moreover, the defendants cannot deny that Merrill Lynch, in providing them an office, secretaries, operational support, sales assistants, Merrill Lynch advertising, goodwill, and name recognition, assisted their efforts to obtain clients and build their book of business. Defendants accepted these benefits and the terms of their employment agreements when they joined Merrill Lynch, and Merrill Lynch has every right to expect the defendants to honor it. See id.

The Court also finds that Merrill Lynch has made an adequate showing of irreparable harm,



even though its showing is not as substantial as its showing of the likelihood of success on the merits. Plaintiff alleges that defendants had responsibility for and access to accounts representing nearly $500 million in assets, and generating $4.1 million in revenues for Merrill Lynch. See Pl.'s Compl. at ¶ 20. However, as defendants argue, and plaintiff acknowledges, irreparable injury does not exist where money damages will compensate a complainant. Defendants contend that the lost commission income from defendants' accounts can be easily determined. See Defs.'s Opp'n at 23. While this may be so, the Court does not believe that plaintiff's injury is confined to the lost commission from the accounts attributed to defendants at the time of their resignation. As the Fourth Circuit recognized in Merrill Lynch v. Bradley, 756 F.2d 1048, 1055 (4th Cir.1985), Merrill Lynch has suffered "irreparable non-compensable harm in the loss of its customers." Moreover, it is impossible to calculate the investments that would have flowed from the customers' accounts. See Merrill Lynch v. Stidham, 658 F.2d 1098, 1102 (5th Cir.1981). While the Court does not believe that the departure of six brokers will "throw into turmoil" the Washington D.C. office, the Court concurs with plaintiff's argument that the loss of confidential customer information and the loss of customer goodwill and trust that has been established through the dealings of Merrill Lynch customers with their brokers is a concrete harm that cannot be compensated with money damages. See Morgan Stanley DW Inc. v. Rothe, 150 F.Supp.2d at 78.

Finally, the Court does not believe that a temporary restraining order preventing the four defendants ____ Thomas Wertz, Donald Smyles, Michael Wertz, and Denny Goforth ____ from engaging in conduct that they specifically agreed to avoid when they signed their employment agreements does not cause substantial injury to them. The temporary restraining order entered by the Court does not prohibit the customers of these brokers from transferring their accounts to PaineWebber. Also, it does not stop the defendants from informing their former clients of their new positions or from placing an advertisement in a newspaper or trade paper stating that they have joined PaineWebber. It merely holds the defendants to the promise they made when they voluntarily entered their employment agreements with Merrill Lynch. Moreover, the Court believes the public interest is served by protecting confidential business information and trade

Page 35

secrets, and enforcing valid contractual provisions, to which parties have voluntarily entered.

For the reasons set forth above, the Court will grant the plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction as to defendants Thomas Wertz, Donald Smyles, Michael Wertz, and Denny Goforth, which will remain in effect for ten (10) days.

SO ORDERED.

---------------

Notes:

1. The Court does not adopt the proposed temporary restraining order submitted by the plaintiff with its complaint and motion for temporary restraining order. After reviewing the employment agreements between the individual defendants and Merrill Lynch, the Court finds that the proposed order is not appropriate and has crafted an order that provides more limited relief than the relief requested by plaintiffs.

2. Thomas C. Wertz began working for Merrill Lynch in 1980; Donald M. Smyles started with Merrill Lynch in 1978, left for a period of fourteen months in 1984 and 1985, and resumed working for Merrill Lynch in 1985; Gary M. Sinderbrand was employed with Merrill Lynch from 1980 until 1999, and again beginning in August 2001; Michael C. Wertz joined Merrill Lynch in 1996; Denny B. Goforth joined Merrill Lynch in 1999; and Christopher R. Jackson started with Merrill Lynch in 1991.



3. See Pl.'s Ex. A (Thomas C. Wertz agreement) and Ex. B (Smyles agreement).

4. See Pl.s' Ex. C (Michael Wertz agreement) and Ex. D (Goforth agreement). The employment agreements of Michael Werth and Goforth are identical.

5. See Pl.'s Ex. G. Goforth signed an identical "Conflict of Interest" agreement.

6. See Pl.'s Ex. F (Jackson's signed acknowledgment) and G (Sinderbrand's signed acknowledgment). The "Guidelines for Business Conduct" state that Merrill Lynch's assets include client lists. See Pl.'s Ex. F (an excerpt from the "Guidelines for Business Conduct.").

7. See Pl.'s Supp. Ex. 1 (letter from Thomas Wertz to an unidentified client on PaineWebber letterhead accompanied by PaineWebber account transfer forms) and Pl.'s Supp. Ex. 2 (letter from Donald Smyles and Denny Goforth on PaineWebber letterhead to an unidentified former client).

8. Id.

9. This solicitation falls under the non-solicitation provision of Thomas Wertz's contract as it was addressed to a Washington D.C. address.

10. Pl.'s Supp. Ex. 2.

11. Merrill Lynch has also provided to the Court a list of additional Merrill Lynch clients whom Smyles has contacted by telephone or letter, or both. It is unclear, however, whether these letters were solicitations as copies of the letters sent to those clients were not provided. In regard to the telephone calls placed by Mr. Smyles, Paul Moulden, in a supplemental affidavit to this Court, claims that he has spoken to each of the clients identified in this list, and each stated that Smyles had encouraged him to transfer his accounts to PaineWebber. See Pl.'s Supp. Ex. 3.

12. See Pl.'s Supp. Ex. 3.

13. The Court also notes that three of these defendants (i.e., Mr. Smyles, Mr. Michael Wertz, and Mr. Goforth) additionally consented to the issuance of a temporary restraining order or preliminary injunction in the event that they breached the non-solicitation and non-disclosure provisions of their employment agreements. See Pl.'s Exs. B, C, and D (the respective employment agreements of Smyles, Michael Wertz, and Goforth).

14. See Pl.'s Ex. G.

15. See Prudential Securities., Inc. v. Plunkett, 8 F.Supp.2d 514, 518 (E.D.Va.1998)(in regard to a non-disclosure provision in a broker's employment agreement, the Court noted that "[w]hile certain facts may support Court-ordered protection of Prudential's customer list, there is authority that an employee who merely recalls customer information from memory has not violated his employment agreement.").

---------------



Page 67

150 F.Supp.2d 67

**MORGAN STANLEY DW INC., Plaintiff,**

v.

**John E. ROTHE, Defendant.**

**No. Civ.A. 01-1065(RMU).**

**United States District Court, District of Columbia.**

**May 22, 2001.**

Page 68

David B. Hamilton, Ober, Kaler, Grimes & Shriver, Baltimore, MD, E. John Steren, Ober, Kaler, Grimes & Shriver, Washington, DC, for plaintiff.

Neil Lawrence Henrichsen, Henrichsen & Siegel, P.L.L.C., Washington, DC, for defendant.

MEMORANDUM OPINION

URBINA, District Judge.

GRANTING THE PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

I. INTRODUCTION

On May 11, 2001, John Rothe resigned effective immediately from his job as a financial advisor at Morgan Stanley DW Inc. ("the plaintiff" or "Morgan Stanley"). Mr. Rothe ("the defendant") immediately accepted a job with a rival company, CIBC Oppenheimer ("Oppenheimer"), thus setting the stage for a textbook employer-employee dispute about a covenant-not-to-compete.

On May 16, 2001, the plaintiff filed a verified complaint and a motion for a temporary restraining order and a preliminary

Page 69

injunction.1 The plaintiff, a Delaware corporation maintaining its principal place of business in New York City, brings this suit in federal court under diversity jurisdiction pursuant to 28 U.S.C. § 1332. The plaintiff

alleges that on July 7, 1998, the defendant signed an Account Executive Trainee Employee Agreement ("the Agreement") as a condition of his initial and continuing employment with Morgan Stanley. The plaintiff now claims that the defendant has violated that agreement by taking files with him after resigning from Morgan Stanley and by contacting Morgan Stanley's clients to persuade them to sever their relationship with Morgan Stanley and transfer their accounts to the defendant's new employer, Oppenheimer.

The plaintiff asks for temporary and preliminary injunctive relief pending an expedited hearing on the merits before a panel of arbitrators pursuant to paragraph 10335(g) of the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure.

The defendant counters that injunctive relief is inappropriate for four main reasons: (1) this matter belongs in arbitration; (2) the plaintiff is unlikely to prevail on the merits in arbitration; (3) enforcement of the agreement would violate NASD rules by denying public customers the right to exercise their own investment decisions; and (4) money damages can adequately address the purported harms suffered by the plaintiff. See Opp'n to Pl.'s Mot. for Injunctive Relief ("Opp'n") at 19. Accordingly, the defendant argues that the court should deny the plaintiff's motion for preliminary-injunctive relief.

For the reasons that follow, the court will grant the plaintiff's motion for a temporary restraining order.

II. BACKGROUND



In 1996, while he was in college, Mr. Rothe, 26, began working at Morgan Stanley's Washington office as an intern. See Rothe Decl. at 2. After graduating from the University of Maryland in 1997, he Joined Morgan Stanley as a full-time sales assistant. See id. While he was a sales assistant, he obtained his securities licenses and registrations. See id. On June 1, 1998, Morgan Stanley gave Mr. Rothe a promotion and he joined the financial advisor training program. See id. About one month later, on July 7, 1998, he signed the Account Executive Trainee Employment Agreement. See id.

Several of the material facts in this case are not in dispute. The parties agree that on July 7, 1998, John Rothe signed and executed the Agreement. See Compl., Ex. A; Decl. of John E. Rothe dated May 17, 2001 ("Rothe Decl.") at 2. The parties also acknowledge that Mr. Rothe resigned from his position as a financial advisor at Morgan Stanley's Washington, D.C. office "effective immediately" on May 11, 2001. See Compl., Ex. B (Def.'s resignation letter to Mr. Jerry Castro, Branch Manager, dated May 11, 2001). As Yohannes Tilahun, the sales manager of the Washington office, states, "On May 11, 2001 at 5:15 p.m., Defendant resigned from Morgan Stanley without prior notice to join the Washington, D.C. office of CIBC Oppenheimer ..., a direct Morgan Stanley competitor." See Pl.'s Mot. for a T.R.O. and Prelim. Inj. ("Pl.'s TRO Mot."), Ex. A. (Aff. of Yohanes Tilahun ("Tilahun Aff.")) at 2 (emphasis in original).

In addition, although the parties disagree about how the Agreement should be

Page 70

interpreted, applied, and enforced, they agree that its key provisions guaranteed the confidentiality of Morgan Stanley's records. They also concur that the Agreement prohibited Mr. Rothe from, among other things, communicating to third parties the contents of any records belonging to Morgan Stanley, and from soliciting customers he served at Morgan Stanley for a period of one year following termination of his employment with Morgan

Stanley and within a radius of 100 miles from Morgan Stanley's Washington office. See Mem. in Support of Pl.'s Mot. for a T.R.O. and Prelim. Inj. Relief ("Pl.'s Mem.") at 2; Compl., Ex. A.

Beyond these points, the parties find little to agree on.

The plaintiff seeks a temporary restraining order to prevent what it calls the "unlawful misappropriation by Defendant John Rothe ... of confidential information pertaining to hundreds of Morgan Stanley accounts, representing in excess of $10 million in assets under Morgan Stanley management and over $250,000 in Morgan Stanley commissions over the last 12 months, and Defendant's effort to divert these accounts, assets and commission revenues" to Oppenheimer. See Pl.'s Mem. at 1. According to the plaintiff, Mr. Rothe, while still employed by Morgan Stanley, prepared to engage in, and now continues to engage in, the following acts that violate the terms of the Agreement: (1) removing, retaining, and/or copying confidential information pertaining to Morgan Stanley customers, and/or customer lists, including the names and/or addresses of hundreds of Morgan Stanley accounts formerly served by Defendant at Morgan Stanley; (2) disclosing and producing this confidential customer information to Oppenheimer; and (3) using this confidential customer information to solicit Morgan Stanley customers. See id. at 2; see also Ex. A (Tilahun Aff.).

Morgan Stanley claims that Mr. Rothe has committed the torts of conversion, unfair competition and breach of the duty of loyalty. The plaintiff also charges that Mr. Rothe has misappropriated Morgan Stanley's trade-secret customer lists and breached the express terms of the Agreement he signed as a condition of his employment. See Pl.'s Mem. at 2.

Morgan Stanley points out that in addition to containing the restriction on Mr. Rothe's future employment, the Agreement also called for the issuance of a temporary restraining order and a preliminary injunction to preserve the status quo pending the outcome of arbitration if



the defendant breached the terms of his agreement. See Compl., Ex. A.

In consideration for Mr. Rothe's signing the agreement and becoming an employee, Morgan Stanley asserts that it agreed to, and in fact did, register and compensate Mr. Rothe, give him training and a job as a financial consultant and provide him with Morgan Stanley operational and sales systems, research and development, sales assistants and support, as well as the benefit of its reputation and goodwill. See Pl.'s Mem. at 3. Moreover, the company alleges that it provided Mr. Rothe with Morgan Stanley customers through: (1) "walk-ins"; (2) "call-ins"; (3) reassignments; (4) clients from Morgan Stanley-sponsored seminars; (5) leads from lists purchased from mail-order firms; (6) leads from Morgan Stanley national advertising campaigns; (7) leads from customer responses to national television campaigns; (8) leads responding to Morgan Stanley newspaper coupons; (9) leads calling Morgan Stanley's toll-free telephone number; (10) leads from blanket mailings to zip codes; and (11) other customer leads and sales advantages resulting from Morgan Stanley's

Page 71

goodwill, reputation, and name recognition in the securities industry. See id.

Furthermore, the plaintiff claims that before the defendant joined Morgan Stanley, Mr. Rothe "had no experience as a financial consultant in the securities brokerage industry." See Pl.'s TRO Mot., Ex. A, Tilahun Aff. at 2. Mr. Tilahun also alleges that the company gave Mr. Rothe on-the-job training throughout his employment and, at all times, paid his annual registration fees with the NASD, the New York Stock Exchange, and the American Stock Exchange. See id. In addition, Mr. Tilahun makes the following specific allegations:

7. Despite Defendant's contractual and other obligations to Morgan Stanley, and despite the fact that Morgan Stanley is informing its customers where to reach Defendant, we have learned that immediately upon his resignation late May 11, 2001, Defendant began initiating

contact with clients he formerly serviced at Morgan Stanley to solicit them to transfer their accounts to Oppenheimer.

8. In particular, our investigation has indicated so far that at least one client received a package of solicitation materials on Saturday, May 12, 2001 (the day after Defendant resigned), requesting that the client transfer its accounts to Oppenheimer.

9. In addition, our investigation has revealed that Defendant removed all of the original files of one significant Morgan Stanley client. That client maintained eight Morgan Stanley accounts with assets in excess of five million dollars. The original documents missing include account and taxpayer information, margin papers, correspondence, and check receipts, among other vital and confidential information regarding the client.

Id. at 2-3. The plaintiff asserts that all these alleged actions constitute violations of Mr. Rothe's agreement. Accordingly, Morgan Stanley seeks injunctive relief pending an expedited hearing on the merits before a panel of arbitrators in accordance with Rule 10335(g) of the NASD Code of Arbitration Procedure.

Countering that a temporary restraining order is not the appropriate remedy in this case, Mr. Rothe states that Morgan Stanley should seek relief from the arbitration process alone. He asks the court to deny the plaintiff's motion with prejudice and to direct Morgan Stanley to proceed promptly to arbitration of this matter on the merits before the NASD. See Opp'n at 4.

Mr. Rothe also argues that even if an injunction were proper in this case, Morgan Stanley's proposed order would violate the rules of the NASD. See Opp'n at 3. That is, the company's proposed order would include a restriction on Mr. Rothe's right to accept business from the customers at issue. See id. The NASD's Board of Governors, however, "just last week approved the publication of a rule interpretation making clear that the NASD rules prohibit `any member firm [such as Morgan Stanley] from taking any action that interferes



with [a] customer's right to transfer his or her account.'" See id.; Ex. 2 (NASD news release dated May 7, 2001).

Next, Mr. Rothe argues that the Agreement that Morgan Stanley asked him to sign was "overly broad." See Opp'n at 3. In addition, he attempts to cast doubt on the enforceability of the Agreement, which, he says, he "was forced to execute without discussion or negotiation several years after becoming employed by the firm...." See id. Moreover, Mr. Rothe states that "he developed the vast majority of his "book of business" through his

Page 72

friends and family." See Rothe Decl. at 2-3. Thus, he takes issue with Morgan Stanley's claim to have a proprietary interest in these clients.

In sum, the defendant argues that the plaintiff has failed to make a showing strong enough to justify the issuance of injunctive relief. The court disagrees. Accordingly, the court will grant the plaintiff's motion for a temporary restraining order.

III. DISCUSSION

A. Legal Standard for Injunctive Relief

The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction. See Vencor Nursing Ctrs., L.P. v. Shalala, 63 F.Supp.2d 1, 7 n. 5 (D.D.C.1999) (Urbina, J.); National Football League Properties, Inc. v. Coniglio, 554 F.Supp. 1224, 1226 (D.D.C.1983). This court may issue a temporary restraining order or a preliminary injunction only when the movant demonstrates that:

(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction.



Davenport v. International Bhd. of Teamsters, 166 F.3d 356, 361 (D.C.Cir.1999); see also World Duty Free Americas, Inc. v. Summers, 94 F.Supp.2d 61, 64 (D.D.C. 2000). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. See CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.Cir.1995). Rather, the factors "interrelate on a sliding scale and must be balanced against each other."2 Davenport, 166 F.3d at 361 (citing Serono Labs. v. Shalala, 158 F.3d 1313, 1317-18 (D.C.Cir.1998), on remand, 35 F.Supp.2d 1 (D.D.C.1999)); see also WMATA v. Holiday Tours, Inc., 559 F.2d 841, 842-43 (D.C.Cir.1977) (court "examines each requirement in light of the others to determine whether an injunction would be proper").

Thus, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. See Serono Labs., 158 F.3d at 1318. For instance, as to the first factor, "[t]he court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [the court] may grant [an injunction] even though its own approach may be contrary to [the movants'] view of the merits. The necessary `level' or `degree' of possibility of success will vary according to the court's assessment of the other factors." New Mexico v. Richardson, 39 F.Supp.2d 48, 50 (D.D.C. 1999) (quoting Holiday Tours, 559 F.2d at 843).

A strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing

Page 73

on the other three factors. See Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n, 259 F.2d 921, 925 (D.C.Cir.1958) ("injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits.");



National Wildlife Fed'n v. Andrus, 440 F.Supp. 1245, 1256 (D.D.C. 1977) (enjoining further construction on dam power plant, despite dispute over irreparable injury, because "the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury ...").

If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." See Taylor v. RTC, 56 F.3d 1497, 1506 (D.C.Cir.), amended on other grounds on reh'g, 66 F.3d 1226 (D.C.Cir. 1995). It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. Cf. Benten v. Kessler, 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) (per curiam); University of Texas v. Camenisch, 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); Doran v. Salem Inn, Inc., 422 U.S. 922, 934, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). If the plaintiff fails to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." Davenport, 166 F.3d at 367; see, e.g., National Pharm. Alliance v. Henney, 47 F.Supp.2d 37, 41 (D.D.C.1999) ("Here, because the likelihood of success is slim, plaintiffs would have to make a very substantial showing of severe irreparable injury in order to prevail on their motion."). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." American Bankers Ass'n v. National Credit Union Admin., 38 F.Supp.2d 114, 141 (D.D.C.1999) (quoting Holiday Tours, 559 F.2d at 843).

In addition, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. See National Treasury Employees Union v. Yeutter, 918 F.2d 968, 977 (D.C.Cir.1990) (citation omitted).

Finally, because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. See Mylan Pharms., Inc. v. Thompson, 139 F.Supp.2d 1,



2001 WL 273073, *13 (D.D.C. March 13, 2001) (Urbina, J.); Moore v. Summers, 113 F.Supp.2d 5, 17 (D.D.C.2000). Although the trial court has the discretion to issue or deny a preliminary injunction, it is not a form of relief granted lightly. See Ambach v. Bell, 686 F.2d 974, 979 (D.C.Cir.1982). As the Supreme Court has said, "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997).

## B. Injunctive-Relief Analysis

In this case, the court concludes that the plaintiff makes a strong showing on all four factors that the court must consider in the injunctive-relief analysis. In short, the plaintiff has shown that it has a good likelihood of success on the merits of the case, it would suffer irreparable harm if an injunction is not issued, the balance of the equities favors the plaintiff and issuance of a temporary restraining order would serve the public interest.

Page 74

### 1. The Plaintiff Has a Strong Likelihood of Success on the Merits3

The plaintiff makes three main arguments in support of its contention that it would be likely to succeed on the merits in this case: (1) the non-solicitation covenant is fully enforceable against the defendant; (2) Morgan Stanley's customer list and information is entitled to trade-secret protection under the District of Columbia Uniform Trade Secrets Act; and (3) the defendant's agreement to the issuance of injunctive relief pending a resolution at arbitration must be enforced. The court will examine each argument in turn.

#### a. The Defendant's Non-Solicitation Covenant Is Fully Enforceable

Citing a spate of case law to support its position, the plaintiff contends that its non-



Morgan Stanley Dw Inc. v. Rothe, 150 F.Supp.2d 67 (D.C., 2001)

solicitation agreement with the defendant is fully enforceable. See, e.g., Morgan Stanley v. Weiss and Sandoe, Dkt. No. 01-0816(RCL) (D.D.C. April 16, 2001); Merrill Lynch v. Schultz, Dkt. No. 01-0402(TFH) (D.D.C. Feb. 26, 2001). For example, the Agreement calls for a one-year covenant not to compete, unless the defendant works more than 100 miles away from Washington, D.C. See Compl., Ex. A. Pointing out that the Agreement contains only modest restrictions, the plaintiff argues that the agreement is fully enforceable under District of Columbia law.

The court agrees. There is nothing in the two-page Agreement that smacks of an unconscionable contract provision. And the defendant has raised no defenses of fraud or duress, for instance, in the making of the contract. Rather, the court views the agreement as a fair-minded contract that Morgan Stanley designed to prevent potentially harmful interference with its crucial client base. Chief Judge Norma Holloway Johnson of this court upheld a similar covenant against the former employee of the stock brokerage firm in Citicorp Investment Services v. Mason: "Plaintiff has also shown likelihood of success on the merits in that defendant may have breached the terms of the Registered Principal Agreement. Case law supports the issuance of injunctive relief in situations such as the present one, and plaintiff has cited numerous cases to this effect. ..." Dkt. No. 96-0353(NHJ) at ___ (D.D.C.1996) (emphasis in original).

The defendant argues that the Agreement is enforceable because the company never "discussed with me that Morgan Stanley was going to require me to sign a training contract or that Morgan Stanley interpreted that contract as abandoning my right to talk to my friends and family if I ever chose to leave Morgan Stanley." See Rothe Decl. at 2. This statement evades by exaggeration the clear import of the agreement as written. The agreement in no way forces the defendant to sever all ties with his friends and family.4 In addition, the agreement does not prevent the defendant's former Morgan Stanley clients who wish to continue working with the

defendant from contacting him and choosing to move their accounts to Oppenheimer. The reasonable, limited Agreement is meant to ensure only that the defendant himself does not reach out to his former

Page 75

clients. Nothing prevents them from reaching out to him. Indeed, Morgan Stanley is forwarding the defendant's incoming calls to his new number at Oppenheimer. Thus, the Agreement in no way prevents the defendant's former clients from transferring their accounts to Oppenheimer.

Moreover, the Agreement does not prevent the defendant from working for his new employer and from competing with Morgan Stanley for the patronage of the public at large. Rather, the plaintiff seeks only to block the defendant from "diverting" Morgan Stanley customers, a condition to which he specifically agreed. The court determines that the plaintiff is likely to prevail on its claim that these conditions of the Agreement are eminently reasonable.

Next, the defendant seems to imply that Morgan Stanley somehow coerced him into signing the Agreement. The defendant, however, presents no evidence in support of this proposition. Nothing indicates that the defendant was forced to execute the Agreement. Aside from the defendant's flimsy statement that he was asked to sign the Agreement very quickly after becoming a financial advisor, the defendant presents no evidence of undue influence or any other problem that would render the contract invalid.

For his part, the defendant makes an adroit attempt to frame the likelihood-of-success-on-the-merits test as hinging on whether the plaintiff can demonstrate "that it will success on the merits in the NASD arbitration." See Opp'n at 5. Contending that "Morgan Stanley strangely relies on a series of decisions by courts at the temporary restraining order and preliminary injunction stage," the defendant states that the plaintiff "cites no arbitration decisions in its





favor." Id. The defendant then indicates that the plaintiff took this approach because it knows that it has "almost no likelihood of success on the merits." See id.

Candidly, the court discerns that the defendant framed the test for likelihood of success on the merits in this manner because the defendant itself is hardpressed to establish on this record that it is likely to succeed on the merits. In short, the defendant intentionally creates a test that it thinks would allow it to win. The issue for this court, however, is not to predict what the NASD will do at the arbitration hearing. Rather, the issue for this court is to decide whether the plaintiff has sufficiently met its burden of showing potential actions by the defendant that would violate the terms of the Agreement, thereby justifying the granting of the temporary restraining order to prevent any irreparable harm to the plaintiff in the interim period until the NASD arbitration hearing can occur. Based on the two main allegations against the defendant—that he has already begun soliciting former clients and that he removed at least one file from Morgan Stanley—the plaintiff has demonstrated a likelihood of success on the merits in that it has already shown that the defendant's alleged actions would violate the terms of the Agreement. The issue before the court concerns whether the defendant has violated the terms of his contract, not whether the plaintiff would prevail at an NASD arbitration hearing.

In what borders on a desperate effort to justify the conduct at issue, the defendant maintains that "what Morgan Stanley is complaining of here is nothing more than standard industry practice." Opp'n at 9. On the face of the present record, the defendant appears to advance the notion that standard industry practice in the financial-services industry involves routinely breaching contracts. Hopefully, this is not the case. Instead, the court expects that

Page 76

when an employee signs a contract agreeing not to solicit his former clients for one year upon leaving his old firm, the employee will honor it.

b. The Plaintiff's Customer List and Information is Entitled to Trade-Secret Protection under the District of Columbia Uniform Trade Secrets Act

The plaintiff's second principal theory for why it would be successful on the merits is that the District of Columbia's Uniform Trade Secrets Act, D.C.Code §§ 48-501 to 509, expressly provides for injunctive relief to protect an employer's trade secrets. See D.C.Code § 48-502. The D.C.Code defines a trade secret as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and

(B) Is the subject of reasonable efforts to maintain its secrecy.

D.C.Code § 48-501(4)(A), (B). Pointing to this provision, the plaintiff argues that many courts have granted customer lists trade-secret status under other states' Uniform Trade Secrets acts and under the corresponding Restatement standards. See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Zimmerman, 1996 WL 707107, *2 (D.Kan.1996); IDS Financial Servs., Inc. v. Smithson, 843 F.Supp. 415, 418 (N.D.Ill.1994). To the extent that this district has not had occasion to address the issue, this court now holds that the customer lists of a financial-services firm deserve trade-secret status under D.C.Code § 48-501.

In its brief, the defendant never responds to this argument by the plaintiff. The court determines that the plaintiff has a substantial chance of succeeding on this line of reasoning.



c. The Agreement Contains an Injunctive-Relief Provision Pending a Resolution of Arbitration

Lastly, the plaintiff submits that the defendant expressly agreed to the entry of a temporary restraining order and a preliminary injunction to preserve the status quo pending the outcome of any arbitration hearing that may be initiated. See Pl.'s Mem. at 9; Compl., Ex. A., ¶ 3. The plaintiff states that this is a specifically enforceable term of the Agreement. Once again, the defendant offers no response.

In conclusion, at this initial stage, the court determines that the plaintiff has a strong likelihood of success on the merits of all three of their principal arguments. When considering a party's motion for a preliminary injunction, the court must pay special attention to the first prong of the injunctive-relief test, for it is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. Cf. Benten v. Kessler, 505 U.S. 1084, 1085, 112 S.Ct. 2929, 120 L.Ed.2d 926 (1992) (per curiam); University of Texas v. Camenisch, 451 U.S. 390, 394, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); Doran, 422 U.S. at 934, 95 S.Ct. 2561.

2. The Plaintiff Will Suffer Irreparable Harm If the TRO Is Not Granted

The plaintiff alleges that the defendant misappropriated, or is about to misappropriate, Morgan Stanley's trade-secret information and has violated the express provisions of his Morgan Stanley employment agreement. See Pl.'s TRO Mot at 1. Thus, the plaintiff claims that it will be

Page 77

irreparably harmed "unless Defendant is enjoined from converting Morgan Stanley's property to his own use and from soliciting Morgan Stanley's clients...." See id. at 2.

In response, the defendant maintains that the supposed irreparable harm that the plaintiff seeks to protect here cannot constitute irreparable harm since "D.C. Circuit law clearly

holds that economic loss alone does not constitute irreparable harm." See Opp'n at 10 (citing Barton v. District of Columbia, 131 F.Supp.2d 236, 247 (D.D.C.2001) (Urbina, J.)). The defendant also contends that Morgan Stanley's "purported injury" can be adequately addressed by compensatory damages, which is exactly what Morgan Stanley seeks at an arbitration proceeding.

In pressing its argument, the plaintiff lists three reasons why it would suffer irreparable damage if the court did not grant the motion for the temporary restraining order. First, Morgan Stanley suggests that it will suffer incalculable damages without injunctive relief. The plaintiff points out that the defendant serviced hundreds of Morgan Stanley accounts, representing in excess of $10 million in assets under Morgan Stanley management and generating more than $250,000 in Morgan Stanley commissions during the past 12 months. "It is impossible to determine at this time the number of Morgan Stanley clients who will be `pirated away' by Defendant. Nor is it possible to determine with any degree of certainty the commissions each of these Morgan Stanley clients will generate not only this year, but 5, 10 or 20 years in the future." See Pl.'s Mem. at 12 (emphasis in original). In support of this assertion, the plaintiff presents the affidavit by Mr. Tilahun, who declares that the day after the defendant resigned from Morgan Stanley, he began soliciting his former clients by sending at least one of them a package of materials designed to lure the client away from Morgan Stanley. See Pl.'s Mem., Ex. A., Tilahun Aff. at 3.

Second, Morgan Stanley suggests that it will suffer irreparable harm from the loss of the confidentiality of customer information and the concomitant loss of customer trust and goodwill. As the plaintiff says, "Morgan Stanley clients expect their financial information, their market transactions, and their investment assets to be known only to themselves, Morgan Stanley, and Morgan Stanley employees." See Pl.'s Mem. at 12. In this case, the defendant allegedly removed all the original files of a significant Morgan Stanley client, who maintained accounts with



Morgan Stanley Dw Inc. v. Rothe, 150 F.Supp.2d 67 (D.C., 2001)

more than $5 million of assets. See id., Ex. A at 3. In addition, the plaintiff urges that if the defendant is allowed to continue this conduct, each client's sensitive financial information would be stripped of its confidentiality.

The court deems both of these arguments persuasive. In particular, the court shares the view of Mr. Tilahun, who states that "Morgan Stanley's customer list is the lifeblood of its business ..." and that the company spends millions of dollars each year to build and retain its clients. The plaintiff and other financial-services firms do not make cars or sell food. Their business involves collecting extremely private and sensitive data about their clients and then providing them with the best possible financial advice and services based on that information. Although a major reason that firms have employees sign non-compete agreements is to protect their business interests, another objective is surely to protect their clients' privacy. Specifically, the Agreement seeks to keep the names, personal contact information, and perhaps most importantly, the personal financial

Page 78

information of the plaintiff's clients confidential by ensuring that if an employee goes from Morgan Stanley to another company, the other company will not suddenly have access to the clients' personal financial data without the clients' permission. If clients begin to feel that their personal information is not safe with the plaintiff, this development might well lead to a loss of trust and goodwill.

Finally, the plaintiff maintains that it needs immediate injunctive relief to protect the stability of its Washington D.C. office, where the defendant worked. The plaintiff states that an injunction will help discourage competitor firms, such as Oppenheimer, "from conspiring with and inducing Morgan Stanley's employees to breach their contractual commitments and to divert Morgan Stanley's trade secret client lists to a competitor." See Pl.'s Mem. at 13.

The court does not credit this argument with the same strength as the plaintiff's other arguments. The plaintiff has not persuasively demonstrated that its entire Washington office would be thrown into turmoil by the defendant's actions. Nevertheless, the plaintiff's other arguments are compelling. The plaintiff has persuaded the court that it would likely suffer irreparable harm in the loss of its customers and by the possibly permanently damaged relationships with its customers. See Merrill Lynch v. Bradley, 756 F.2d 1048 (4th Cir.1985).

### 3. The Balance of the Equities

Like the previous two factors, the balance-of-harms prong strongly militates in favor of granting injunctive relief.

For its part, the plaintiff asserts that an injunction would protect its goodwill, business reputation, methods of business operation, and contract rights. In contrast, the plaintiff argues, the defendant has no equity since he intentionally breached his contractual commitments and misappropriated the plaintiff's trade-secret property.

The defendant counters that "the injunction Morgan Stanley seeks would substantially injure Rothe's career." See Opp'n at 12-13. "Simply put, Rothe has a right to earn a living, and Morgan Stanley's assertion of some entitlement to the clients Rothe developed through his own family and friends would be an unwarranted intrusion on the right." See id. at 13.

In this regard, the defendant's position falters in the face of the governing realities. The Agreement calls only for a modest one-year restriction. Nothing in the record suggests that the defendant's "right to earn a living" is substantially put at risk. Indeed, the plaintiff emphasizes that it "does not seek to prevent Defendant from earning his living as a stockbroker, even though he will be doing so with a rival area company." See Pl.'s Mem. at 7. Moreover, the defendant's former clients are still allowed to contact him and to continue their business relationship; he just cannot contact or solicit them. As the plaintiff acknowledges, the



Morgan Stanley Dw Inc. v. Rothe, 150 F.Supp.2d 67 (D.C., 2001)

defendant is free to develop new clients at Oppenheimer from the same client pool that the plaintiff taps into for business. Furthermore, the court's Order dated May 18, 2001 specifically makes an exception that allows the defendant to contact and keep the files of his family members.5

Finally, the defendant says he "had no obligation to remain at Morgan Stanley. ... Morgan Stanley has absolutely no legitimate interest in prohibiting me from contacting my clients, the vast majority of whose accounts I developed through my

Page 79

friends and family." Rothe Decl. at 4. This statement simply does not wash. The court agrees with the defendant that he had no obligation to remain at Morgan Stanley. But that is not the question in this case. Rather, the defendant is incorrect that Morgan Stanley has no legitimate interest in prohibiting him from contacting his former clients at Morgan Stanley. In fact, the terms of the agreement that the defendant himself signed state otherwise. Indeed, as explained above, the plaintiff has several very good reasons for wanting to prevent the defendant from contacting his clients. The court holds that the balance of the equities favors the plaintiff.

4. Granting the Injunction Serves the Public Interest

The court agrees with the plaintiff that by issuing an injunction, the court serves the public interest in protecting trade-secret client lists and other confidential information, an interest reflected by the adoption of the D.C. Uniform Trade Secrets Act. As another district court held: "[t]he public has an interest in preventing unfair competition, commercial piracy, misleading solicitations, and in safeguarding the confidentiality of financial records." See IDS Life Ins. Co. v. Sunamerica, Inc., 958 F.Supp. 1258, 1282 (N.D.Ill.1997). "Consequently, the public's interest has been disserved by defendants' actions. The public has no interest in destroying contracts, rewarding theft, and

encouraging unethical business behavior." See id.

The defendant replies that "it is the public that will in reality be restrained." See Opp'n 14. Contending that the plaintiff cannot assert an interest in preventing the customers at issue from deciding where to invest their assets, the defendant argues that "it is the customer's decision alone as to where to invest his or her money." See id. (emphasis in original). Accordingly, the defendant argues that by issuing an injunction, the court would harm and inconvenience the customers as they wait for an end to this dispute. The defendant also cites the rules of the NASD and the New York Stock Exchange, which state that public customers have a right to decide for themselves with whom they will do securities business. See id.

In this case, however, the plaintiff is not eliminating or even impairing the customers' decision-making ability. Clearly, Morgan Stanley is not seeking to tell the customers that they must do business with Morgan Stanley. Rather, it appears that Morgan Stanley endeavors to enforce the Agreement made with its former employee to ensure that he does not reach out to these customers to lure their business away from Morgan Stanley. An injunction will in no way intrude on customer-initiated contact.

Moreover, the defendant selectively cites the language of the NASD news release dated May 7, 2001. See Opp'n, Ex. 2. While the defendant notes that the NASD rule interpretation prohibits "any member firm from taking any action that interferes with a customer's right to transfer his or her account," unfortunately the defendant omits the language stating that "The interpretation does not restrict employment contracts that may prevent brokers from soliciting a previous employer's customers. It also does not prevent a firm from seeking a court order when a former employee violates an employment contract." See id.

A final factor tipping the public-interest scales to the plaintiff's side is the court's desire



to see the terms of a reasonable contract enforced.

In sum, the plaintiff would like a temporary restraining order pending an expedited hearing on the merits before a panel of arbitrators in accordance with Rule 10335(g) of the NASD Code of Arbitration

Page 80

Procedure. The court concludes that the plaintiff has met its burden of showing that it deserves injunctive relief. The plaintiff has made a compelling showing with regard to all four factors. It has demonstrated that it has a strong likelihood of success on the merits, that it would suffer irreparable harm if the court did not issue an injunction, that the balance of the harms favors the plaintiff, and that the court would further the public interest by granting injunctive relief. Accordingly, the court grants the plaintiff's motion for a temporary restraining order.

C. The Defendant's Alternative Arguments

In addition to opposing the issuance of an injunction on the ground that the plaintiff does not pass the four-factor test, the defendant also raises two other arguments. First, it insists that an NASD arbitration hearing is the appropriate forum in which to resolve this dispute. As the court has explained above, however, while an arbitration hearing will be the appropriate forum in which to mediate the details of the dispute, this court is the appropriate forum to determine whether the defendant's alleged breach of his contract justifies granting the plaintiff a temporary restraining order. The defendant's argument, therefore, fails.

Second, the defendant charges that Morgan Stanley itself has "unclean hands" since it allegedly engaged in similar conduct in trying to lure away clients when it hired new employees from other firms. See Opp'n at 19. "Morgan Stanley's supposedly indignant attitude toward Rothe's alleged conduct is all the more absurd given that it had directed Rothe to assist in the preparation of solicitation packets for other

brokers when Morgan Stanley recruited them from competitors." See id.; Ex. 5 (Doss v. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dean Witter Reynolds, Inc., NASD No. 95-02079 (1995)).

Once again, the plaintiff makes the prevailing point. In its Reply brief, it explains that Mr. Rothe "identifies not a single fact to demonstrate that Morgan Stanley has undertaken any wrongful conduct with regard to Mr. Rothe's employment at Morgan Stanley." See Reply at 4. Indeed, the Supreme Court has held that a party asserting an unclean-hands defense must show an "immediate and necessary relation" between the instant case and the alleged misconduct. See Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). In short, since the defendant has not shown wrongdoing that has any "relation to anything involved in the suit" at bar, this argument also fails. See id.

D. A Return to the Status Quo

In sum, the plaintiff seeks to return to the status quo, which would require the defendant to return all confidential data it has allegedly wrongfully diverted from the plaintiff. This would also require the defendant to be enjoined from further solicitation of the plaintiff's customers. The court agrees, and grants the plaintiff's motion.6

IV. CONCLUSION

For all these reasons, the court grants the plaintiffs' motion for a temporary restraining order. An order directing the parties in a fashion consistent with this

Page 81

Memorandum Opinion was separately issued on May 18, 2001.

---------------

Notes:



Morgan Stanley Dw Inc. v. Rothe, 150 F.Supp.2d 67 (D.C., 2001)

1. On May 17, the defendant filed an opposition to the plaintiff's motion, and the plaintiff filed a reply the next day. The court issued an order granting the plaintiff's motion for a temporary restraining order on May 18.

2. When a party seeks an injunction to reverse policies that are already in place, "the moving party must meet a higher standard than in the ordinary case by showing `clearly' that he or she is entitled to relief or that `extreme or very serious damage' will result from the denial of the injunction." See Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi, Ltd., 15 F.Supp.2d 1, 4 (D.D.C.1997) (citation omitted), aff'd, 159 F.3d 636, 1998 WL 203110 (D.C.Cir.1998) (table, text in Westlaw); see also Alaska Excursion Cruises, Inc. v. United States, 595 F.Supp. 14, 18 (D.D.C. 1984) (attempt to alter status quo, rather than preserve it, must be supported by showing that "the facts and law clearly support" such a change).

3. The first component of the likelihood of success on the merits prong usually examines whether the plaintiff has standing in a given case. See, e.g., Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 101, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Because the defendant does not raise this issue, the court will assume arguendo that the plaintiff's standing in this case.

4. In fact, the Order accompanying this Memorandum Opinion makes an exception for the defendant's family members.

5. In terms of the defendant's friends whom he says he brought to Morgan Stanley as clients, the arbitration hearing will presumably address this matter.

6. For a detailed listing of the court's instructions, see the Order accompanying this Memorandum Opinion dated May 18, 2001.

---------------

