## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

v.

JOSHUA KUBICKI, KIMBERLY DANOWSKI,
and JON POMYKALA,

Defendants.

CASE NO. 1:07-cv-01281-RJL

## SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES
## OF DEFENDANTS IN OPPOSITION TO AJILON'S MOTION
## <u>FOR PRELIMINARY INJUNCTION</u>

Michael A. Schlanger (D.C. Bar No. 88849)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Counsel for Defendants Joshua Kubicki, Kimberly
Danowski, and Jon Pomykala*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 4

I.      Ajilon Has Not Shown Irreparable Injury, Nor Could It: The Speculative Loss of
        Several Hundred Thousand Dollars from the Departure of One At-Will Salesman
        and His Two Assistants Cannot Establish "Irreparable Injury" to a Company with
        $26 Billion in Annual Sales. ....................................................................... 4

        A.      Economic Loss Is Not "Irreparable Injury" Unless It "Threatens the Very
                Existence" of the Company. ............................................................... 4

        B.      The Brokerage Cases, Which Focus on the Protection of Client Privacy,
                Are Wholly Inapposite. ..................................................................... 5

        C.      Injunctive Relief Cannot Help Ajilon Regain or Maintain Customer
                Relationships. ................................................................................. 7

II.     Ajilon's Restrictive Covenants Are Unenforceable on Numerous Grounds. ..................... 8

        A.      Ajilon Does Not Need to Protect Trade Secrets or Confidential
                Information Because There Are None in This Industry, and New Jersey
                Law Denies Protection of Customer Relationships in Industries with a
                Finite Number of Customers Whose Identities Are Public Knowledge. ................ 8

        B.      Given That Competition Here Is for Business from a Limited Number of
                Commercially Conspicuous Customers, Ajilon's Restrictive Covenants
                Impose Undue Hardship on Defendants. .............................................. 10

III.    Ajilon Is Not Entitled to Injunctive Relief Based on Defendants' Alleged Conduct
        While at Ajilon Because Diverted Business Opportunities Can Be Compensated
        by Money Damages, and Because Defendants No Longer Owe Ajilon a Duty of
        Loyalty. ................................................................................................ 12

IV.     The Balance of Harms Favors Defendants Because Defendants Will Be Prevented
        from Working in Their Chosen Professions if the Injunction Is Granted, and
        Ajilon Will Suffer No Irreparable Harm if the Injunction Is Denied. ........................... 14

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212 (D.D.C. 1996) .............................5

*Capitol Paving of D.C., Inc. v. Dist. of Columbia*, No.07-113, 2007 WL. 1541498 (D.D.C. May 23, 2007) ................................................................................5

*Carabillo v. ULLICO Inc. Pension Plan & Trust*, 355 F. Supp. 2d 49 (D.D.C. 2004) ....................................................................................................4

*Equal Rights Center v. Post Properties, Inc.*, No. 06-1991, 2007 WL. 2128232 (D.D.C. July 25, 2007) ...........................................................................4

*Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028 (N.D. Ohio 2003) ...................................................................................................13

*HIRECounsel D.C. v. Thuemmler*, No. 05-2111 (D.D.C. Jan. 5, 2006) .....................10, 12

*Humane Soc'y v. Johanns*, No. 06-265, 2007 WL 1120404 (D.D.C. Apr. 13, 2007) ......................................................................................................5

*Iron Mountain Information Management, Inc. v. Taddeo*, 455 F. Supp. 2d 124 (E.D.N.Y. 2006) ........................................................................................13, 14

*Merrill Lynch v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002) .......................................5, 6, 14

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) .....................5, 6,14

*Smith, Bucklin & Associates, Inc. v. Sonntagg*, 83 F.3d 476 (D.C. Cir. 1996)...............7–9

## STATE CASES

*Accounts on Call v. Silverberg*, No. C-176-95 (N.J. Super. Ct. Ch. Div. 1995) ...............11

*A.T. Hudson & Co. v. Donovan*, 524 A.2d 412 (N.J. Super. Ct. App. Div. 1987) ............11

*Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789 (N.J. Super. Ct. App. Div. 1992) .....................................................................3, 8, 10, 11

*Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879 (N.J. 1988) ..............................................12

*Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028 (N. J. Super. Ct. Law Div. 1995) ..8, 9, 11

*Subcarrier Commc'n Inc. v. Day*, 691 A.2d 876 (N.J. Super. Ct. App. Div. 1997).........8, 9

Defendants Joshua Kubicki, Kimberly Danowski, and Jon Pomykala respectfully submit this Supplemental Memorandum of Points and Authorities in opposition to the motion of plaintiff Ajilon Professional Staffing, LLC ("Ajilon") for a preliminary injunction. On July 25, 2007, the Court denied Ajilon's request for a temporary restraining order on the grounds that "[i]rreparable harm is too much in question, the harm to the Defendants too great, and likelihood of success is too in question." (TRO Hr'g Tr. 30:5-7.) Ajilon's motion for preliminary injunction should be denied for the same reasons.

## **<u>INTRODUCTION</u>**

This case presents the question whether a legal staffing company -- "one of the biggest companies in the world"[1] -- can use post-employment restrictive covenants to prevent its sales employees from working for a competitor within the industry. Ajilon claims that it must impose these restraints of trade to protect its "trade secrets" and confidential customer information. But the evidence shows that legal staffing companies operate in a highly transparent market with no barriers to entry, few transaction costs, and in which the market participants -- law firms, staffing companies, and contract attorneys -- operate with complete information of the demand for projects and the supply of contract attorneys. In the legal staffing industry, restraints on employee movement are designed only for their anti-competitive effect and therefore are unenforceable.

Legal staffing companies play an important role in the efficient functioning of the legal market. Law firms benefit by having access to a pool of attorneys that can be used when a particularly project -- often document review -- requires a large number of attorneys for a short

---

[1] *See* TRO Hr'g Tr. 17:22-18:3. What Ajilon's counsel meant was that Ajilon's parent corporation, Adecco S.A., is one of the highest grossing companies in the world ($26 billion in sales), and by far the largest temporary staffing company in the world.

period of time.  The law firms' clients benefit by paying less for the document review than if the project was completed by the firms' permanent lawyers.  The contract attorneys benefit from the creation of additional jobs in the legal industry.

      The legal staffing industry operates efficiently because it is transparent.  Staffing companies know when a competitor receives a project from a law firm; they usually even know how much the staffing company is charging the law firm.  (Kubicki Decl. ¶ 10; Kubicki Dep. 24:16-21.)  As Mr. Kubicki explained, "Most of my competitors and all the competitors in this market know what the other one is charging . . . .  The pay rate is no secret.  The bill rate is often dictated by our clients."  (Kubicki Dep. 24:16-21.)  The labor market is equally transparent.  Contract attorneys can use a number of websites to see what projects are available, how long the project will last, and how much they can earn by working on the project.  (Kubicki Supp. Decl. ¶ 12.)  Contract attorneys increase their likelihood of being staffed at any given time by submitting their resumes to multiple staffing companies.  (*Id.* ¶ 11.)

      As in any industry, for a salesman to be successful in the legal staffing market, he must be able to differentiate his product from his competitors'.  This can be difficult in the legal staffing market where the price is often set by the customer and salesmen are essentially selecting contract attorneys from the same pool.  (*See id.* at  38:20-39:1.)  But as Mr. Kubicki explains, a salesman can become successful by learning "the nature of the business the client is doing, their level of sophistication and  . . . [by] pick[ing] candidates that are better suited  . . . to the specific client needs."  (*Id.* at 40:3-8; *see also* Kubicki Supp. Decl. ¶ 3.)

      If a legal staffing salesman, like other at-will employees, is permitted to accept a job with a competitor, then market forces will cause his salary to approach his market value because, in an efficient market, an underpaid employee can find a competitor willing to pay him

more. The legal staffing industry generally accounts for these market forces by basing a salesman's income on the revenue he generates. (Kubicki Supp. Decl. ¶ 4.) A successful salesman, like Mr. Kubicki, earns significantly more in commissions than his base salary. (*Id.* ¶ 5.) By paying commissions, a staffing company ensures that its salesmen's income reflect their impact on the company's bottom line.

By 2006, Mr. Kubicki had established himself as a successful salesmen in Washington's legal staffing industry. (*Id.* ¶ 2.) As Ajilon informed the Court, Mr. Kubicki generated over $4 million in revenue in 2005 and over $3 million in 2006. (TRO Hr'g Tr. 16:2-6.) As a result, Mr. Kubicki was rewarded handsomely through his commission checks. Yet, despite his increasing value to Ajilon, the company informed Mr. Kubicki in Fall of 2006 that it intended to restructure his contract to reduce his commissions. (Kubicki Supp. Decl. ¶ 4.)

Whether Ajilon's desire to reduce the income of one of its most successful salesmen was economically rational depends entirely on the enforceability of its restrictive covenants. Without a restrictive covenant, the decision to reduce Mr. Kubicki's pay is irrational because it will cause Ajilon to lose a top salesman -- and the millions of dollars he generates annually -- to a competitor. But if Ajilon's restrictive covenants are enforceable, Ajilon can force Mr. Kubicki to choose between working at Ajilon for whatever salary it chooses to pay him and finding a job in an unfamiliar industry. A New Jersey court refused to enforce a restrictive covenant in a similar situation because to do otherwise would cause the employee "to be bound to [his former employer] by a golden handcuff." *Coskey's Television & Radio Sales & Serv., Inc. v. Foti*, 602 A.2d 789, 794 (N.J. Super. Ct. App. Div. 1992).

This is a case about money. Mr. Kubicki became dissatisfied with Ajilon for wanting to reduce his income despite the revenue he was generating. Fed up with this treatment,

Mr. Kubicki left Ajilon to join a competitor, Solomon-Page, who was willing to pay his market value. If Mr. Kubicki and his co-defendants are guilty of any wrongdoing in leaving Ajilon, then a jury can make Ajilon whole by awarding it monetary damages to compensate for its losses.

Ajilon, of course, seeks more. Ajilon needs to prevent defendants from working in the legal staffing industry -- not because they somehow possess "trade secrets" -- but to strengthen its bargaining position with respect to all of the other Ajilon employees whose contracts have similar restrictive covenants. Ajilon needs to enforce its restrictive covenants to send the message to its employees that, when we seek to renegotiate your salary, your only options are to accept our offer or find employment in a different industry. Such naked restraints of trade are unenforceable.

## ARGUMENT

I. **Ajilon Has Not Shown Irreparable Injury, Nor Could It: The Speculative Loss of Several Hundred Thousand Dollars from the Departure of One At-Will Salesman and His Two Assistants Cannot Establish "Irreparable Injury" to a Company with $26 Billion in Annual Sales.**

A. **Economic Loss Is Not "Irreparable Injury" Unless It "Threatens the Very Existence" of the Company.**

As this Court recently observed, the D.C. Circuit "has set a high standard for irreparable injury." *Equal Rights Center v. Post Properties, Inc.*, No. 06-1991, 2007 WL 2128232 (D.D.C. July 25, 2007) (Leon, J.). This Court can deny Ajlion's request for a preliminary injunction based solely on its failure to establish any irreparable injury. *See Carabillo v. ULLICO Inc. Pension Plan and Trust*, 355 F.Supp.2d 49, 53 (D.D.C. 2004) (Leon, J.) ("if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.").

Ajilon cannot meet this "high standard" because the alleged injury to its business is too speculative and can be adequately remedied by monetary damages. (*See* Defs.' Opp. at 7-

4

10.)  This Court has explained that "economic loss does not, in and of itself, constitute irreparable harm *unless the loss threatens the very existence of [the movant's] business.*" *Capitol Paving of D.C., Inc. v. Dist. of Columbia*, No.07-113, 2007 WL 1541498, \*2 (D.D.C. May 23, 2007) (Leon, J.) (emphasis added); *see also Humane Soc'y v. Johanns*, No. 06-265, 2007 WL 1120404 (D.D.C. Apr. 13, 2007) ("'Courts within this Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share.'") (quoting *Mylan Pharma., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42-43 (D.D.C. 2000)).

Ajilon's existence clearly is not at stake in this case.  At the hearing on the temporary restraining order, Ajilon conceded that it is part of "one of the biggest companies in the world."  (TRO Hr'g Tr. 17:24).  Ajilon's parent corporation, Adecco S.A., employs more than 30,000 people in 6,700 offices located in 70 countries.  (Mosier Supp. Decl. Ex. A at 86.)  It places 700,000 temporary employees with more than 150,000 clients, and enjoys annual revenues of approximately $26 billion.  (*Id.* at 2, 86.)  Based on these facts, Ajilon cannot plausibly argue that it faces irreparable harm from losing three employees, a handful of customers, and -- by its estimation -- $250,000 per month in revenue. (*See* DeMario Decl. ¶ 48.) Ajilon's loss of .01 percent of its annual revenue clearly does not threaten its existence.  *See Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 221 (D.D.C. 1996) ("a loss of less than 1 percent of total sales is not irreparable harm").

**B.    The Brokerage Cases, Which Focus on the Protection of Client Privacy, Are Wholly Inapposite.**

Ajilon attempts to support its claim for irreparable harm by analogizing its situation to that of a brokerage firm seeking to enjoin its former employees from soliciting its clients.  (*See* Pl.'s Reply at 5 (citing *Merrill Lynch v. Wertz*, 298 F. Supp. 2d 27 (D.D.C. 2002); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001).)  But Ajilon's alleged

injuries are nothing like those faced by a brokerage firm, which could lose its clients' trust if it failed to protect their private information.  Investors provide brokerage firms with their most sensitive personal data.  When a former employee misappropriates this information, he may use it to lure the investor to a rival brokerage firm or he could have more sinister motives -- no investor enjoys being exposed to the risk of identity theft because her brokerage firm failed to protect her private information.  As Judge Urbina explained:

> [Morgan Stanley's] business involves collecting extremely private and sensitive data about their clients and then providing them with the best possible financial advice and services based on that information. Although a major reason that firms have employees sign non-compete agreements is to protect their business interests, another objective is surely to protect their clients' privacy. Specifically, the Agreement seeks to keep the names, personal contact information, and perhaps most importantly, the personal financial information of the plaintiff's clients confidential by ensuring that if an employee goes from Morgan Stanley to another company, the other company will not suddenly have access to the clients' personal financial data without the clients' permission.  If clients begin to feel that their personal information is not safe with the plaintiff, this development might well lead to a loss of trust and goodwill.

*Morgan Stanley*, 150 F. Supp. 2d at 77-78.  This Court similarly recognized Merrill Lynch's need to protect its clients' confidential information to maintain their trust.  *Merrill Lynch*, 298 F. Supp. 2d at 34.

The relationship between law firms and staffing companies does not involve any similar private information.  Law firms' relationships with staffing companies are generally known within the industry.  (Kubicki Decl. ¶ 10.)  These firms have not entrusted staffing companies with any private and sensitive data, which must be kept secret to maintain the law firms' trust.  If Mr. Kubicki approaches a law firm to solicit business for Solomon-Page, there is no threat that Ajilon's reputation will suffer because it has failed to protect the firm's sensitive data.  Because Ajilon faces no threat that its customer relationships will be hurt by its failure to

protect the customers' private information, *Merrill Lynch* and *Morgan Stanley* offer no support for Ajilon's claim of irreparable harm.

### C.    Injunctive Relief Cannot Help Ajilon Regain or Maintain Customer Relationships.

Even if Ajilon suffers the same harm as Merrill Lynch or Morgan Stanley, it is entitled to injunctive relief only if an injunction will help it regain or maintain its customer relationships.  Otherwise, the injunction is ineffective and should not be granted.  *See Smith, Bucklin & Assocs., Inc. v. Sonntagg*, 83 F.3d 476 (D.C. Cir. 1996).  In that case, the district court denied a preliminary injunction because the employer was unlikely to succeed in enforcing a covenant not to compete against its former employee.  On appeal, the D.C. Circuit did not need to resolve whether the district court correctly analyzed the merits of the case because the employer could no longer show irreparable harm.  *Id.* at 481.  Although the employer alleged that its former employees had obtained business from one of its clients, NAMF, no irreparable harm was shown because the employer had not "explained how a preliminary injunction would help regain NAMF as a client or maintain any current dealings with NAMF."  *Id.*  Moreover, "whatever damage has been inflicted on its relationship with NAMF would likely remain unchanged by a preliminary injunction," and thus injunctive relief was inappropriate.  *Id.*

Ajilon similarly fails to explain how an injunction would help it regain the customer relationships that defendants have allegedly destroyed.  Indeed, Ajilon readily admits that Mayer Brown has ended its relationship with Ajilon, but has not suggested any reason why an injunction will restore its relationship.  (TRO Hr'g Tr. 25:15-16 (Ajilon employee "was told that Mayer Brown was no longer going to use Ajilon").)  Ajilon claims that Mr. Kubicki should not have begun working for Solomon-Page so that Ajilon would have had a chance to "cement [its] relationship" with its clients. (*Id.* at 26:23-27:19.)  But regardless of whether this argument

had any merit before Mr. Kubicki began working at Solomon-Page, what should have happened

then cannot make injunctive relief appropriate now.  Ajilon must show that injunctive relief will

help it regain any lost clients or maintain any current dealings.  *See Smith, Bucklin*, 83 F.3d at

481.  Ajilon has not made this showing.

**II.    Ajilon's Restrictive Covenants Are Unenforceable on Numerous Grounds.**

**A.    Ajilon Does Not Need to Protect Trade Secrets or Confidential Information Because There Are None in This Industry, and New Jersey Law Denies Protection of Customer Relationships in Industries with a Finite Number of Customers Whose Identities Are Public Knowledge.**

Ajilon's restrictive covenants are unenforceable because they are not necessary to

protect Ajilon's legitimate interests and because they impose undue hardship on defendants.

Ajilon cannot enforce its restrictive covenants to protect its trade secrets or confidential

information because no confidential information is at issue in this case.  (*See* Defs.' Opp. at 15-

16.)  Ajilon, instead, seeks protection for its customer *relationships* even in the absence of

confidential information.  But New Jersey law does not protect customer relationships in

industries with a finite number of customers who are known to everyone in the industry.  *See*

*Subcarrier Commc'n Inc. v. Day*, 691 A.2d 876, 880 (N.J. Super. Ct. App. Div. 1997); *Coskey's*,

602 A.2d at 795.

Under New Jersey law, whether an employer has a "legitimate interest" in

protecting its customer relationships depends on the nature of the industry in which it operates.

The cases cited both by defendants and by Ajilon make clear that an employer may have a

protectable interest in its customer relationships only if its customers are "drawn from the

general population, and not easily discernible to competitors."  *Subcarrier*, 691 A.2d at 880; *see*

*also Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1040 (N. J. Super. Ct. Law Div. 1995)

(enforcing restrictive covenant because customers "here are not so limited in number or

generally known in the trade"). But New Jersey law recognizes that, "where customers are known in an industry or are easily discernable and personal contacts are taken from job to job, the rule is different." *Subcarrier*, 691 A.2d at 881; *see also Platinum Mgmt.*, 666 A.2d at 1040 (distinguishing cases like *Coskey's* in which there is a "finite number of customers dealt with by all competitors in the field").

This distinction based on industry composition results from the differing interests at stake for both the employer and the former employee. When customers are drawn from the general public and are not discernable to competitors, the employer's interest in protecting its customer relationships is at its peak. A brokerage firm, for example, can create a potential customer list by looking in the phonebook. But this "customer list" is unmanageably long, and the company has no way to identify good customers because the firm knows neither the person's net wealth nor whether the person is currently an investor. Moreover, once a broker attracts a customer to its firm, the relationship is unknown to the firm's competitors. As a result, the firm faces competition for an existing customer only if a competing brokerage firm undertakes a similar search to identify the customer. A brokerage firm therefore has a substantial interest in protecting its customer relationships based on the difficulty in identifying viable customers and its competitors' inability to discover the relationship. *Cf. Subcarrier*, 691 A.2d at 880; *Platinum Mgmt.*, 666 A.2d at 1040.

But when an employer competes for business from a limited number of commercially conspicuous customers, its relationships have no proprietary value. *Subcarrier*, 691 A.2d at 880 (with regard to customers whose "identities and locations are a matter of common knowledge in the industry," the court "cannot understand how their identity *or plaintiff's relationships with them* would be deserving of protection") (emphasis added). A legal

staffing company, for example, can identify viable customers with little effort. The customers are not only known within the industry, but even outsiders -- including any lawyer in Washington -- could easily create a list of likely customers. Unlike the start-up brokerage firm, which has a difficult time determining whom to solicit, a new legal staffing company knows exactly where to look for work. And even if a legal staffing company obtains a project from a new law firm, the company has little chance of keeping the relationship secret. Its competitors will quickly learn of the new customer, and the companies will compete for future projects.

### B. Given That Competition Here Is for Business from a Limited Number of Commercially Conspicuous Customers, Ajilon's Restrictive Covenants Impose Undue Hardship on Defendants.

The hardship placed on the employee also varies depending on the nature of the industry. In an industry with virtually unlimited potential customers, prohibiting an employee from soliciting his former employer's existing customers only marginally shrinks the pool of potential business. As a result, the employee's ability to work in his chosen profession is only slightly impaired. But when companies compete on a project-by-project basis from a limited number of customers, preventing an employee from competing for future projects based on the former employer's relationship with the customer creates a much greater hardship because it effectively shuts him out of the market. *See, e.g., Coskey's*, 602 A.2d at 794 (finding undue hardship where employee was "free to uproot his family and move elsewhere to continue his employment, giving up the contacts that he had personally developed . . . [because] this was neither a fair nor a viable alternative"); *HIRECounsel D.C. v. Thuemmler*, No. 05-2111 (D.D.C. Jan. 5, 2006) ("to lose his employment and to be barred from seeking a similar position would certainly constitute a hardship").

Ajilon does not cite any cases involving the staffing industry to support the claim that its customer relationships are a protectable interest. Instead, Ajilon seeks to protect its

customer relationships by relying on cases from industries with an unlimited number of indiscernible customers, notwithstanding that the legal staffing industry is comprised of a finite number of known customers.  (*See* Pl.'s Reply at 2 (citing *Platinum Mgmt.*, 666 A.2d at 1028; *A.T. Hudson & Co. v. Donovan*, 524 A.2d 412 (N.J. Super. Ct. App. Div. 1987).)  In *A.T. Hudson*, the court enforced a non-solicitation agreement, but the same court later acknowledged that it did so because the former employee "could have dealt with any entity in the country." *Coskey's*, 602 A.2d at 795.  The *Coskey's* court made clear that the result in *A.T. Hudson* would have been different if the industry "involve[d] discrete projects, with many bids and proposals being developed which the parties realize may never result in a contract, and where the customers are a finite group dealt with by all competitors in the field." *Id.*[2]

New Jersey trial courts recognize that whether customer relationships are protectable depends on the nature of the industry, and have held that a legal staffing company cannot enforce a covenant not to compete to protect its customer relationships because the legal staffing industry is comprised of a limited number of known customers,. *See Accounts on Call v. Silverberg*, No. C-176-95 (N.J. Super. Ct. Ch. Div. 1995) (denying injunction because the court saw "nothing different between the plaintiff's operation from any cold calling solicitation in a number of industries.  Potential customers are readily ascertainable and public information.").[3]

---

[2] Nor does *Platinum Management* provide support for Ajilon's claim.  There, too, the court enforced a non-solicitation provision only after it concluded that the employer did not operate in an industry with a limited number of known customers.  The potential customers at issue in that case were "not so limited in number or generally known in the trade as to preclude protection" of the employer's customer relationships.  666 A.2d at 1040  The court therefore concluded that "[t]his situation is not in any wise similar to the finite group of customers dealt with by all competitors in the field, as in *Coskey's*." *Id.*

[3] A transcript of this proceeding was attached to defendants' opposition to the temporary restraining order.  (*See* Mosier Decl. Ex. B.)  According to an Ajilon website, the staffing agency (continued…)

This Court should also conclude that Ajilon's restrictive covenants are likely unenforceable because the nature of the legal staffing industry precludes finding that Ajilon has a proprietary interest in its customer relationships. *See Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (N.J. 1988) ("in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable").[4]

### III.   Ajilon Is Not Entitled to Injunctive Relief Based on Defendants' Alleged Conduct While at Ajilon Because Diverted Business Opportunities Can Be Compensated by Money Damages, and Because Defendants No Longer Owe Ajilon a Duty of Loyalty.

Ajilon alleges that, while still employed by Ajilon, Mr. Kubicki breached his duty of loyalty by diverting business to Solomon-Page and by recruiting Ms. Danowski and Mr. Pomykala. (*See* Pl.'s Reply at 1-2; TRO Hr'g Tr. 28:5-8 ("there were active concerted efforts by Mr. Kubicki to divert business before he left Ajilon. These would be things where there would be a duty of loyalty that was breached").) But even if Ajilon is likely to succeed on this claim, it is not entitled to injunctive relief. Monetary damages can remedy any injury, and the alleged wrongdoing is unlikely to continue because defendants no longer are employed by Ajilon and thus no longer owe it a duty of loyalty.

---

in that case -- Accounts on Call -- is now part of Ajilon's finance division. (*See* Mosier Supp. Decl. Ex. B.)

[4] The same analysis applies with respect to soliciting contract attorneys. The pool of contract attorneys is generally known within the industry because the attorneys register with numerous staffing agencies. Contract attorneys can also be easily located simply by placing an advertisement on any of a number of online message boards. (*See* Kubicki Supp. Decl. ¶ 12.) And a recruiter would face undue hardship if he was prevented from contacting attorneys simply because they were in his former employer's database. In a similar case, Judge Roberts denied the preliminary injunction because HIRECounsel was unlikely to establish that its list of contract attorneys was a trade secret or otherwise protectable -- not to mention that staffing company could not show irreparable harm.

Courts deny injunctive relief when a former employee has likely breached her duty of loyalty, but the employer has not established that it is likely to succeed on its trade secret claim or in enforcing its restrictive covenants.  *See, e.g., Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124 (E.D.N.Y. 2006); *Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028 (N.D. Ohio 2003).  Diverted business opportunities, like any economic loss, can be remedied by monetary damages.  *See Iron Mountain*, 455 F. Supp. 2d at 142 ("If Iron Mountain successfully demonstrates at trial that business was diverted, which it will likely do, then Iron Mountain's loss can be addressed by money damages."); *Extracorporeal Alliance*, 285 F. Supp. 2d at 1044 ("if Alliance can prove that it did lose the St. Elizabeth contract as a result of defendant's wrongdoing, it would be entitled to monetary damages for their loss").

These courts also recognize a more fundamental problem with seeking injunctive relief in these circumstances: there is no likelihood of continued wrongdoing because the employee no longer owes a duty of loyalty to his former employer.  As the *Extracorporeal Alliance* court explained:

> an injunction would not be appropriate in this case because the plaintiff has not demonstrated the likelihood of a future violation. The purpose of an injunction is to prevent future violations rather than remedy past harms. The only claim that plaintiff is substantially likely to prevail on, breach of [the employee's] duty of loyalty, is a past violation. Since [the employee] is no longer subject to this duty of loyalty, the plaintiff does not need to be protected from future violations although it may be entitled to damages if it can prove [the employee's] past wrongdoing.

285 F. Supp. 2d at 1045 (internal citation omitted); *see also Iron Mountain*, 455 F. Supp. 2d at 142 (diverting business while still employed by plaintiff "cannot be remedied by the grant of injunctive relief as it is not continuing conduct").

Ajilon cannot obtain injunctive relief by combining elements of its different claims.  Instead, it must establish all four necessary elements with respect to a single claim. *See*

*Iron Mountain*, 455 F. Supp. 2d at 141 (court need only examine irreparable harm for claims in which movant has shown a likelihood of success). For example, Ajilon cannot seek an injunction based on the irreparable harm that would be caused by trade secret misappropriation unless it shows that it is likely to succeed on its trade secrets claim. Similarly, injunctive relief is not warranted on the grounds that Ajilon will likely establish a breach of the duty of loyalty unless it can show irreparable harm resulting from that breach. Ajilon cannot establish all four elements with respect to any of its claims.

**IV.    The Balance of Harms Favors Defendants Because Defendants Will Be Prevented from Working in Their Chosen Professions if the Injunction Is Granted, and Ajilon Will Suffer No Irreparable Harm if the Injunction Is Denied.**

The balance of harms weighs against granting a preliminary injunction. Defendants would suffer significant hardship if they were prevented from working in Washington's legal staffing industry. (*See* Pl.'s Proposed Order for Prelim. Inj., at 2 (enjoining defendants from "engaging in the business of legal staffing within a 35-mile radius of Plaintiff's Washington, D.C. office located at 1150 Connecticut Avenue, NW.").) Ajilon, on the other hand, will suffer no irreparable harm if the injunction is denied.

The competing interests in this case are considerably different than *Merrill Lynch* or *Morgan Stanley*. In those cases, the brokerage firms had a strong interest in protecting the privacy of its customers' confidential information. And the employees faced lesser harm because they were not prevented from working as financial advisers in Washington. Moreover, as this Court noted, the brokers' former clients were not prohibited from transferring their accounts to the brokers' new company; nor were the brokers prohibited "from informing their former clients of their new positions or from placing an advertisement in a newspaper or trade paper." *Merrill Lynch*, 298 F. Supp. 2d at 34; *see also Morgan Stanley*, 150 F. Supp. 2d at 78

("the defendant's former clients are still allowed to contact him and to continue their business relationships").

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in defendants' opposition to Ajilon's motion for temporary restraining order, the Court should deny Ajilon's motion for preliminary injunction.

Respectfully submitted,

_____/s/  Michael A. Schlanger_____
Michael A. Schlanger (D.C. Bar No. 88849)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Attorneys for Defendants Joshua Kubicki,*
August 6, 2007                              *Kimberly Danowski, and Jon Pomykala*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of defendants' Supplemental

Opposition to Ajilon's Motion for Preliminary Injunction with attachments was served upon:

Benjamin Hahn, Esq.
SCHNADER HARRISON SEGAL & LEWIS LLP
2001 Pennsylvania Ave N.W., Suite 300
Washington, DC 20006-1825

by electronic mail prior to 9:00 a.m. and by First Class mail under the Rules of this Court on

August 6, 2007.


    /s/  Michael A. Schlanger
Michael A. Schlanger

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

                  v.                                   CASE NO. 1:07-cv-01281-RJL

JOSHUA KUBICKI, KIMBERLY DANOWSKI,
and JON POMYKALA,

Defendants.

---

## SUPPLEMENTAL DECLARATION OF JOSHUA KUBICKI

I, Joshua Kubicki, hereby declare as follows:

1.      I am a defendant in this case.  I make the following declarations based upon my personal knowledge.

2.      I have been a salesman in the legal staffing industry for more than four years.  From 2004 through June 22, 2007, I was a productive salesman for Ajilon.[1]  I believe that my success results from my willingness to provide better, more thorough service that other salesmen.  Most salesmen view the contract negotiation and placing of contract attorneys as the entirety of their job.  As a result, many salesmen have little contact with the customer once the contract is signed and their commission is earned.

3.      I view the contract negotiation and attorney placement as just the beginning.  Even after my commission is earned, I continue to work with the customer to make

---

[1] Ajilon is a wholly-owned subsidiary of Adecco S.A., which has more than 6,700 offices in 70 countries.  (*See* Mosier Supp. Decl., Ex. A, at 86.)

sure the project is proceeding as planned.  I often serve as the project manager, which requires

me to find temporary office space, furnish the space, and oversee operations on a daily basis.

Other times I work directly with the law firm and perhaps the firm's client to develop the most

efficient approach to completing the project.  If a problem arises, the client knows that I am

available 24 hours a day, 7 days a week to fix it.  In my opinion, I am successful because clients

trust me and know that I make it my personal responsibility to ensure their satisfaction.  Nothing

that I do is secret or even complicated, but it does require hard work and a level of commitment

not always found within the industry.

4.      I became frustrated with Ajilon in Fall of 2006 when my supervisor, Mark

Davies, informed me that Ajilon intended to alter my compensation plan.  Up to that point, I had

the same compensation plan as every other salesman at the company.  In addition to my base

salary, I received commissions starting at 10 percent but which increased to 20 percent once I

generated more than $1 million in revenue for the year.

5.      Under this compensation schedule, I earned substantial commissions.  But

my commissions were the result of my hard work and they generated tremendous profits for

Ajilon.  In Spring of 2005, I received a large commission check from a project with Crowell &

Moring.  My involvement in that project went well beyond negotiating the contract and

recruiting contract attorneys.  I also personally managed the project -- which involved

approximately 400 contract attorneys -- from start to finish.  I oversaw the contract attorneys,

making sure they arrived on time and performed their assigned tasks.  I had to fire a number of

attorneys who were not performing and replace them with new contract attorneys.  I was

contacted repeatedly by Crowell attorneys with urgent issues that I needed to address at all hours,

days and nights.  I essentially worked all my waking hours for more than two months to make

sure that the project was a success.   Because of Ajilon's standard commission schedule, both Ajilon and I were well compensated for this large project.

6.      Under the compensations plan proposed in Fall and Winter of 2006, I would earn roughly one-third of the commissions I earned before.  And to earn this amount, I had to increase the profit margin on my projects by 50 percent and have 75 percent of this revenue come from new business.  These requirements are impossible to meet.   This plan was being designed specifically for me and, to my knowledge, would have applied only to me.

7.      I refused each proposed changed to my compensation plan.  I told Mark Davies that I wanted to keep my existing compensation plan, which was the same as every other Ajilon salesman.  By the end of 2006, no agreement was reached on my compensation.  Early in 2007, I informed Mark Davies that I expected to stay on my current compensation plan for 2007.  Although my compensation was never changed, I was never told that Ajilon had decided against changing my compensation.

8.      In late May 2007, I contacted Bill DeMario, Ajilon's Chief Operating Officer, and told him that I was prepared to resign.  In that conversation, I informed him that a primary reason for my leaving was my frustration with Ajilon's attempts to reduce my commission rate.  He told me not to resign but to give him at least ten days to fix the situation.  I stayed at Ajilon for another four weeks, but my compensation issues were not resolved.

9.      Under my current agreement with Solomon-Page, I receive a larger base salary, but the commissions are less favorable than my Ajilon plan.  On balance, I do not expect my income to be substantially different at Solomon-Page from what I earned at Ajilon.  Of course, my current income will be significantly greater than what it would have become under Ajilon's proposed plans.

10.     When I worked at Ajilon, I did not instruct any law firms to delay projects until I joined Solomon-Page.  I could not have done so even if I tried.  When law firms need temporary attorneys, they always have a deadline to meet and their requests are always urgent.  Law firms do not take my schedule into consideration when closing a deal or completing a merger.  If a firm needed staffing and I asked it to wait until the following week, the firm would take its business to a different staffing company.

11.     Finding contract attorneys in the Washington market is not difficult.  There are hundreds of contract attorneys who send their resumes to staffing companies.  Contract attorneys do not have exclusive relationships with staffing companies.  They send their resumes to multiple staffing companies to increase the chance of finding a project they want.  As a result, Solomon-Page -- like Ajilon -- has a database full of contact information for contract attorneys.

12.     Recruiting contract attorneys almost always requires placing advertisements for a given project.  Although a database is helpful, it cannot stay current with the attorneys' availability.  When a project needs staffing, contract attorneys are needed immediately, but many are unavailable because they are already on a project for a different staffing company.  By placing an online advertisement at Craig's List, the Posse List, or D.C. Metro Contract Attorneys, a recruiter can receive as many as a hundred resumes from available attorneys within a day or two.  These websites are invaluable for finding immediate help.

13.     Neither I nor Solomon-Page has relied on any of Ajilon's contract attorney lists to staff my projects at Solomon-Page.  These projects have been staffed through online advertisements and by contacting attorneys listed in Solomon-Page's database.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th of August, 2007, in Washington, D.C.

Joshua Kubicki

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL STAFFING, LLC,

Plaintiff

v.

JOSHUA KUBICKI, KIMBERLY DANOWSKI,
and JON POMYKALA,

Defendants.

CASE NO. 1:07-cv-01281-RJL

## SUPPLEMENTAL DECLARATION OF MARK W. MOSIER

I, Mark W. Mosier, declare as follows:

1.     I am an associate at the law firm of Covington & Burling LLP, counsel to defendants in the above-captioned matter.  I have personal knowledge of and am competent to testify to the matters set forth herein.

2.     Attached hereto at Exhibit A is a true and correct copy of excerpts from the 2006 Annual Report of Adecco S.A. -- the parent corporation of Ajilon Professional Staffing, LLC.  The complete annual report is available at http://www.adecco.com/ar/2006/index.htm.

3.     Attached hereto at Exhibit B is a true and correct copy -- as of August 5, 2007 -- of a job listing on Ajilon Finance's website showing that it was formerly known as Accounts on Call.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5th of August, 2007, in Washington, D.C.

_____
                    Mark W. Mosier

# EXHIBIT A



better work, better life



## Mission

We inspire individuals and organisations to create greater efficiencies, effectiveness, and choice in the domain of work, for the benefit of all stakeholders. As the world's largest employment services group, a business that positively impacts millions of people every year, we are conscious of our global role and mission.

# Key figures

| For the fiscal years (in million EUR)[1] | 2006 | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|---|
| **Statement of operations data** | | | | | |
| Revenues | 20,417 | 18,303 | 17,239 | 16,226 | 17,085 |
| Gross profit | 3,546 | 3,086 | 2,874 | 2,757 | 3,039 |
| Operating income[2] | 816 | 614 | 530 | 509 | 454 |
| Net income | 611 | 453 | 332 | 305 | 242 |
| **Other financial indicators** | | | | | |
| Cash flow from operating activities | 747 | 298 | 542 | 453 | 442 |
| Free cash flow[3] | 662 | 230 | 475 | 401 | 342 |
| Net debt[4] | 556 | 424 | 299 | 924 | 1,411 |
| **Key ratios (as % of revenues)** | | | | | |
| Gross margin | 17.4% | 16.9% | 16.7% | 17.0% | 17.8% |
| SG&A ratio | 13.3% | 13.5% | 13.6% | 13.9% | 15.1% |
| Operating income margin | 4.0% | 3.4% | 3.1% | 3.1% | 2.7% |
| **Per share figures** | | | | | |
| Basic EPS in EUR[5] | 3.28 | 2.43 | 1.77 | 1.63 | 1.30 |
| Diluted EPS in EUR[6] | 3.14 | 2.34 | 1.69 | 1.61 | 1.28 |
| Cash dividend in CHF | 1.20[7] | 1.00 | 1.00 | 0.70 | 0.60 |
| **Number of shares** | | | | | |
| Basic weighted-average shares | 186,343,724 | 186,599,019 | 187,074,416 | 186,744,214 | 186,527,178 |
| Diluted weighted-average shares | 196,532,960 | 196,546,937 | 201,328,174 | 195,777,267 | 193,469,123 |
| Outstanding (year end) | 184,836,462 | 186,097,645 | 187,330,240 | 186,989,728 | 186,697,162 |

1 For 2006, the Company's fiscal year included the full calendar year ending December 31, 2006. In 2005 and 2004, the Company's fiscal year contained 52 weeks ending December 31, 2005 and 53 weeks ending January 2, 2005, respectively. In 2003 and 2002, the Company's fiscal year contained 52 weeks ending December 28, 2003 and December 29, 2002, respectively.

2 Operating income includes amortisation of intangibles of EUR 12, EUR 3, EUR 1, EUR 6, and EUR 4 for 2006, 2005, 2004, 2003, and 2002, respectively.

3 Free cash flow is a non-U.S. GAAP measure and is defined herein as cash flow from operating activities minus capital expenditures, net.

4 Net debt is a non-U.S. GAAP measure and comprises short-term and long-term debt, and off-balance sheet debt of EUR 36 and EUR 59, in 2003 and 2002, respectively, relating to the securitisation of receivables, less cash and cash equivalents, and short-term investments. There was no off-balance sheet debt at the end of 2006, 2005, and 2004.

5 Basic earning per share including the impact of discontinued operations of EUR 0.16, EUR (0.01), and EUR (0.04) in 2004, 2003, and 2002, respectively, and the cumulative effect of change in accounting principle of EUR (0.02) in 2003. There were no discontinued operations in 2006 and 2005.

6 Diluted earning per share including the impact of discontinued operations of EUR 0.15, EUR (0.01), and EUR (0.04) in 2004, 2003, and 2002, respectively, and the cumulative effect of change in accounting principle of EUR (0.01) in 2003. There were no discontinued operations in 2006 and 2005.

7 Proposed by Board of Directors.

Board and CEO message

For Adecco Group, 2006 was a year of transition and positive results. The company delivered a strong performance across the board, posting robust increase in income, improved margins and revenue growth.

We welcomed a new CEO and CFO who continued our strategy of expanding our professional and specialised business offering, consolidating our brand portfolio and delivering on our vision of "better work, better life" for all our associates.

Net income increased by 35% in 2006, a significant improvement over the previous year, and organic revenue grew by a strong 9%. Operating margins improved 60 basis points to 4.0% as a result of the growing contribution from professional staffing, as well as acquisitions, better temporary staffing margins for the Office and Industrial businesses, permanent placements and better cost management.

At the beginning of 2006, Adecco acquired DIS AG, the leader in professional staffing in Germany. This investment has further increased our professional and specialised business and given us a leading position in the expanding German market. Professional and specialised staffing represents the highest-margin and fastest-growing market segment in the industry. With this acquisition and our organic growth, Adecco is positioned to expand its competence in high-value services including engineering, finance and IT.

Dieter Scheiff became Adecco's CEO in August 2006 and is implementing our winning business strategy, while Klaus J. Jacobs remains Chairman of the Adecco Group. Our new CFO, Dominik de Daniel, is overseeing the roll-out of the Economic Value Added programme to give our decision-makers the right tools to generate sustainable growth as well as greater value for the Group and our shareholders.

In Western Europe, we are witnessing a period of unprecedented flexibility in workplace culture. In the UK, for example, where temporary help comprises 4% of the total labour market, the unemployment rate is approximately 5%, whereas in Germany, where temporary work is just 1% of the market, the unemployment rate is approximately 8%. We believe this inverse relationship in Germany reflects the need for further

each assignment. These important elements are at the core of our leading position in staffing markets around the world.

### Expertise and innovation

Our roots span almost half a century and our experience in the global HR services industry is second to none. At Adecco, we are focused on the requirements of the world of work every day and have long been committed to designing innovative solutions for our clients and associates. We have the scope and insight to understand employment and labour market issues around the world. We have long-established relationships with thought leaders and opinion formers that allow us to discuss and test new and different approaches to address productivity and business challenges. We have experienced the cyclical nature of work and understand how fast-moving economies affect the labour market. This understanding of industry trends, best practice and new labour and training initiatives gives us greater market knowledge and allows us to maintain a stronger local presence than our competitors.

### Network

We leverage our global reach and critical mass to create real advantages for our clients and associates. Our network of relationships brings us close to governments, organised labour, employers, employees and universities. We have organised ourselves and used our strengths to build and improve the skills of the human capital we provide. Our commitment to using our network successfully helps associates

find the work they want but cannot find on their own and helps our clients find talented associates they would never have met without Adecco.

### Passion

We have a unique environment at Adecco. Our employees are passionate entrepreneurs who understand that the people they work with seek solutions and need our support in order to be successful. Adecco's people are focused on creating real advantages that will enhance the opportunities their clients and associates have in work. They are committed to using their industry knowledge and experience to anticipate their requirements. We sustain our position as a leader in labour markets around the world by continually working to attract the best employees and rewarding their creativity, entrepreneurship and flexibility at all levels of the organisation.

**Geographies sales**
In percent



| 1 | France | 33% |
|---|---|---|
| 2 | USA & Canada | 18% |
| 3 | UK & Ireland | 9% |
| 4 | Japan | 7% |
| 5 | Italy | 6% |
| 6 | Iberia | 5% |
| 7 | Benelux | 5% |
| 8 | Germany | 4% |
| 9 | Nordics | 4% |
| 10 | Switzerland | 2% |
| 11 | Australia & New Zealand | 2% |
| 12 | Emerging Markets | 5% |

Professional Business Lines

Adecco has Professional Business Lines dedicated to areas of professional expertise that are of high relevance to our clients. These fast-moving units keep us close to the most important occupational fields and the people that work in them.

**Strategic focus**

Our Professional Business Line approach enables us to concentrate and increase industry insight, best practice and to launch new initiatives on a global scale. It perfectly complements our Office and Industrial businesses.

In 2006, the sum of revenues from our Professional Business Lines grew by 17%, partly as a result of the acquisition of DIS AG, with the strongest growth coming from Engineering & Technical, and Finance & Legal. Our Professional Business Lines contributed 18% of revenues in 2006 and 26% to the Group's gross profits. It was and is our goal to increase revenues from our Professional Business Lines from 17% in 2005 to 21% in 2009.

The Professional Business Lines are based on the "experts talk to experts" concept: high-level, specialist points of contact with clients and longer-lasting assignments for associates, along with different pricing points to the general staffing business. The Professional Business Lines supply a range of products to clients and associates, from short-term to long-term projects with specific competencies in project secondment, permanent placements, temporary recruitment solutions, and managed solutions.

**Engineering & Technical**

Adecco Engineering & Technical is an international engineering business in this rapidly-changing sector. It has dedicated teams for several key industries, including aeronautics, automotive and railroad, nuclear, oil and gas, and others.

In 2006, the Engineering & Technical business grew revenues by 19% and contributed 5% to the Group's revenues and 4% to the Group's gross profit.

**Finance & Legal**

This Professional Business Line provides temporary and permanent placements of premier accounting and finance professionals, as well as consulting services in areas such as management, compliance, internal audit, finance and Mergers and Acquisitions (M&A).

The Finance & Legal business line achieved revenue growth of 20% in 2006 and represents 2% of Adecco's revenues, but 5% of the Group's gross profit.

**Human Capital Solutions**

We are one of the global leaders in a range of restructuring and talent solutions for organisations aiming to optimise their human capital. Under the established brand names of Lee Hecht Harrison (US), Altedia (France) and Adecco Human Capital Solutions (globally), we provide consulting services to companies and organisations while helping individuals develop their career potential and improve their employability.

The Human Capital Solutions business grew revenues by 13% in 2006 mainly due to the 2005 acquisition of Altedia. The business line generated 1% of the Group's revenues, but 6% of the Group's gross profit.

Adecco Group –
Operating and financial review and prospects

In millions, except share and per share information

## 1. Introduction
The information in this discussion and analysis should be read in conjunction with the Company's consolidated financial statements and the notes thereto that are prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") and are included elsewhere in this Annual Report and with the disclosure concerning forward-looking statements at the end of this section.

Statements throughout this discussion and analysis using the term "the Company" refer to the Adecco Group, which comprises Adecco S.A., a Swiss corporation, its majority-owned subsidiaries and other affiliated entities.

### 1.1 Business and industry background
The Company is the global leader in human resource services including temporary staffing and permanent placement, outsourcing, and career services consulting and outplacement. The Company's network of over 6,700 branches and over 35,000 full-time equivalent employees in over 70 countries and territories at the end of 2006 connects over 700,000 associates with approximately 150,000 clients. Registered in Switzerland and managed by a multinational team with expertise in markets worldwide, the Company delivers a broad range of human resource services to meet the needs of small and large business clients as well as those of qualified associates.

The staffing industry is fragmented and highly competitive. Customer demand is dependent upon the overall strength of the labour market as well as an established trend towards greater workforce flexibility. More liberal labour market laws, particularly for temporary staffing, are beneficial for the industry and have been a driver for greater workforce flexibility. The business is also strongly influenced by the macroeconomic cycle, which typically results in growing demand for employment services during periods of economic expansion and, conversely, contraction of demand during periods of economic downturn. Due to the sensitivity to the economic cycle and the low visibility in the temporary staffing sector, forecasting demand for staffing and human resource services is difficult. Typically, customers are not able to provide much advance notice of changes in their staffing needs. Responding to the customer's fluctuating staffing requirements in a flexible way is a key element of the Company's strategy, which it addresses through its diverse staffing and human resource services network.

Anticipating trends in demand is also important in managing our internal cost structure. This coupled with our ability to maximise our overall resources and to enhance competitive advantage through our wide variety of services and locations while maintaining standards of quality to both our clients and associates are key components to achieving profitability targets during any part of the economic cycle.

### 1.2 Organisational structure
Since January 2006, the Company is organised in a geographic structure (which corresponds to the primary segments) complemented by newly introduced global business lines, through which the professional services are now marketed. The heads of the main geographic areas – consisting of France, USA & Canada, UK & Ireland, Japan, Italy, Iberia, Benelux, Nordics, Germany, Australia & New Zealand, Switzerland, and Emerging Markets – directly manage the Office and Industrial businesses, while co-leading together with the professional business line heads the professional business lines in the country. The professional business lines are Adecco Finance & Legal; Adecco Engineering & Technical; Adecco Information Technology; Adecco Medical & Science; Adecco Sales, Marketing & Events, and Adecco Human Capital Solutions. The classification of branches in business lines is determined by the largest business line revenue share generated in a specific branch. In 2005, the Company was managed through three divisions: Adecco Staffing, Ajilon Professional, and LHH Career Services.

### 1.3 Service lines
Revenues and gross profits derived from temporary staffing totalled 93% and 80% in 2006 of the respective consolidated totals compared to 94% and 81% in 2005, respectively. Temporary staffing billings are generally negotiated and invoiced on an hourly basis. Temporary associates record the hours they have worked and these hours, at the rate agreed with the customer, are then accumulated and billed according to the agreed terms. Temporary staffing service revenues are recognised upon rendering of the service. The temporary associate is paid the net hourly amount after statutory deductions on a daily, weekly, or monthly basis. Certain other employer

Financial Review

**Business line performance**

The business line breakdown of revenues is presented below:

| In EUR | 2006 | 2005 | Variance % EUR | Variance % Constant Currency |
|---|---|---|---|---|
| **Revenues** | | | | |
| Office | 4,788 | 4,436 | 8 | 9 |
| Industrial | 10,859 | 9,799 | 11 | 11 |
| **Total Office & Industrial** | **15,647** | **14,235** | **10** | **10** |
| | | | | |
| Information Technology | 1,419 | 1,229 | 15 | 15 |
| Engineering & Technical | 921 | 772 | 19 | 19 |
| Finance & Legal | 487 | 405 | 20 | 20 |
| Medical & Science | 220 | 191 | 15 | 15 |
| Sales, Marketing & Events | 429 | 379 | 13 | 15 |
| Human Capital Solutions | 242 | 215 | 13 | 12 |
| **Total Professional Business Lines** | **3,718** | **3,191** | **17** | **16** |
| | | | | |
| **Emerging Markets** | **1,052** | **877** | **20** | **20** |
| | | | | |
| **Adecco Group** | **20,417** | **18,303** | **12** | **12** |

**Office & Industrial**

The Company's Office & Industrial businesses grew 10% (9% when excluding acquisitions) to EUR 15.6 billion in 2006, which represents 77% of the Company's revenues.

In the Office business, revenue additions were strong in the UK & Ireland and Japan. In the USA & Canada, revenues declined slightly as demand softened. Japan, the USA & Canada, and the UK & Ireland generated almost two-thirds of the business line's revenues.

Revenue growth further accelerated in the Industrial business compared to 2005, which reflects the current favourable economic environment. There has been particularly good demand in France, Iberia, and Italy. Revenues declined slightly in the USA & Canada as demand softened. France accounted for approximately half of the revenues in the Industrial business.

**Information Technology**

In Information Technology, the Company increased revenues by 15% (13% when excluding acquisitions) compared to 2005, experiencing continued strong demand in the UK & Ireland, while revenues declined slightly in the USA & Canada. These two regions contributed about three quarters of the business line's revenues.

**Engineering & Technical**

The Company's Engineering & Technical business line grew revenues by 19% (6% when excluding acquisitions). Demand continued to be good in the UK & Ireland. In the USA & Canada revenues remained stable. Approximately 70% of the business line's revenues were generated in the USA & Canada and UK & Ireland.

**Finance & Legal**

In Finance & Legal, the Company achieved revenue growth of 20% (14% when excluding acquisitions). Demand for finance and legal professionals continued to be strong in the USA & Canada. The USA & Canada were responsible for almost 60% of revenues in the business line Finance & Legal.

**Medical & Science**

Medical & Science grew revenues 15%, with the strongest revenue growth in the Nordics. France accounted for approximately half of the business line's revenues.

# EXHIBIT B



**ACCOUNTING & FINANCIAL STAFFING SPECIALISTS** **CALL 1.866.GO**

CAREER CENTER | EMPLOYERS | ABOUT US | CONTACT US

# CAREER CENTER: Register with Ajilon Finance

**JOB SEARCH** | **BRANCH LOCATOR** | **LOG IN**

HANDPICK YOUR CAREER

**Job Title**
(Select)

**Job Type**
(Select)

**Branch**
(Select)

**Job Number**

**GO**

CAREER CENTER
JOB SEARCH
SUBMIT RESUME
SALARY GUIDE
CAREER ADVICE
BENEFITS
JOB DESCRIPTIONS
FAQs
REFER A FRIEND

## Job Details

**Job Description**

Ajilon Finance is currently working with a company very well known in the entertainment industry trying to find a Controller for their very busy New York Office. The right candidate should possess 2-4 years in the related industry, strong knowledge of the accounting and revenue process with concentration in P/L, variance and budget analysis. Also Great Plains is a must and a CPA is preferred!! This is a great opportunity for the right person!!

All interested candidates should e-mail resumes in Word format to
nick.napolitano@ajilonfinance.com

Ajilon (formerly known as Accounts on Call) is a global leader specializing in Finance and Accounting with over 100 offices throughout North America and Europe. Ajilon is an international temporary staffing division while Ajilon Financial Executive Search places financial professionals on a direct-hire basis.

| | |
|---|---|
| **Job Posting #** | **Date Posted** 1/18/2005 |
| **Work Location** New York City, NY - USA | |
| **Job Class** Accounting/Finance | **Job Title** Controller |
| **Position** Controller | |
| **Job Type** Temp to Perm | **Job Experience** Entry Level |
| **Start Date** Feb 7 2005 | **Length of Job** Temporary to Direct-Hire |
| **Education** BA - Bachelor of Arts | **Certification** |
| **Salary/Pay Rate** $65k-$70k + Bonus | **Nearest Branch** New York City |

**Contact Information:**

Nick

nick.napolitano@ajilonfinance.com

No Phone Calls Please

sitemap   privacy

©2002 Ajilon

home  ■  career center  ■  employers  ■  about us  ■  contact us  ■  ajilon global

privacy policy  ■  ©2002 Ajilon

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


AJILON PROFESSIONAL            )

STAFFING, LLC                  )

    Plaintiff               ) Civil Action No.

        vs.                  ) 1:07-CV-01281-RJL

JOSHUA KUBICKI, et al          )

    Defendants              )




Deposition of Joshua P. Kubicki

Washington, D.C.

August 2, 2007




Reported by:  Bonnie L. Russo

JOB NO. 182490

| Page 2 |
| --- |

```
 1
 2
 3
 4
 5                 August 2, 2007
 6                   2:54 p.m.
 7
 8
 9   Deposition of Joshua P. Kubicki held at:
10
11        Schnader, Harrison, Segal & Lewis, LLP
12        2001 Pennsylvania Avenue, N.W.
13        Washington, D.C.
14
15
16
17
18
19
20
21   Pursuant to notice, before Bonnie L. Russo,
22   Notary Public
```

| Page 3 |
| --- |

```
 1   APPEARANCES:
 2   For the Plaintiff
 3        BENJAMIN W. HAHN, Esq.
          JOLEEN OKUN, Esq.
 4        SCHNADER, HARRISON, SEGAL & LEWIS, LLP
          2001 Pennsylvania Avenue, N.W.
 5        Suite 300
          Washington, D.C. 20006
 6        202-419-4242
 7
     For the Defendant
 8
          MICHAEL A. SCHLANGER, Esq.
 9        MARK W. MOSIER, Esq.
          COVINGTON & BURLING, LLP
10        1201 Pennsylvania Avenue, N.W.
          Washington, D.C. 20004
11        202-662-5435
12
13
14
15
16
17
18
19
20
21
22
```

| Page 4 |
| --- |

```
 1              C O N T E N T S
 2   EXAMINATION OF JOSHUA P. KUBICKI        PAGE
 3   BY MR. HAHN                               5
 4
 5
 6
 7   EXHIBITS
 8   1      Compilation of Documents           6
 9   2      Deposition Notice                  7
10   3      Kubicki Resume                    29
11   4      Kubicki Offer Letter             29
12   5      E-Mail                            66
13   6      E-Mail String                    67
14   7      E-Mail String                    90
15   8      E-Mail                            90
16   9      Staffing Partnership Development 102
17   10     Document dated 7-27-04           105
18   11     Letter dated 7-27-04             107
19   12     Mayer Brown Proposal             108
20   13     Draft Agreement dated 6-19-07    109
21   14     Invoice dated 6-17-07            110
22   (Exhibits retained by counsel.)
```

| Page 5 |
| --- |

```
 1        P-R-O-C-E-E-D-I-N-G-S
 2   JOSHUA P. KUBICKI,
 3   being first duly sworn, to tell the truth, the
 4       whole truth and nothing but the truth,
 5            testified as follows:
 6        EXAMINATION BY COUNSEL FOR PLAINTIFF
 7           BY MR. HAHN:
 8        Q.    Would you state your name for the
 9   record, please.
10        A.    Joshua Kubicki.
11        Q.    Mr. Kubicki, my name is Ben Hahn.  I
12   am a partner with Schnader, Harrison, Segal &
13   Lewis.  This firm represents Ajilon
14   Professional Staffing, LLC in the litigation
15   currently pending in the United States District
16   Court for the District of Columbia in Ajilon
17   versus Kubicki.
18        With me today is Joleen Okun who is
19   an associate in our office.  Also present today
20   is your counsel -- well, both your counsel, Mr.
21   Schlanger and Mr. Mosier.  And we do have a
22   limited time today.  The agreement with respect
```

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Joshua Kubicki

Page 6

1 to the depositions in this case is that we are
2 taking limited depositions for purposes of
3 preparing for a hearing on the plaintiff
4 Ajilon's motion for a preliminary injunction on
5 Monday, the 6th.
6         For that reason, I am going to be
7 limiting the scope of the questions that I ask
8 and we have agreed to be done at 5:00 today.
9         Is that your understanding as well?
10   A.    Yes.
11        (Deposition Exhibit No. 1 was marked
12 for identification.)
13        BY MR. HAHN:
14   Q.    I am going to show you Exhibit 1,
15 which is a compilation of many different
16 documents.  These documents have been numbered
17 pages JK 1 through JK 369 and I would ask you
18 if those are documents that you provided to
19 your counsel in response to a deposition notice
20 for your deposition today?
21   A.    They appear to be.
22   Q.    Thank you.

Page 7

1        MR. HAHN:  And Exhibit 2 is the
2 deposition notice for your deposition.
3        (Deposition Exhibit No. 2 was marked
4 for identification.)
5        BY MR. HAHN:
6   Q.    If you could look specifically at
7 the last two pages of that document can you
8 tell me if the documents that you provided that
9 are now Exhibit 1 are the documents that you
10 assembled understandably on relatively short
11 notice for your counsel in response to the
12 requests listed on Exhibit A?
13   A.    Yes.
14   Q.    Thank you.  Are you aware of any
15 documents that you believe to exist that would
16 have been responsive to Exhibit A that you were
17 not able to assemble for your counsel, just in
18 broad categories?
19   A.    That were in my possession?
20   Q.    Correct?
21   A.    No.
22   Q.    Before you answer that question,

Page 8

1 counsel have had discussions about both
2 privilege issues and about whether there are
3 documents that you may have access to in your
4 capacity as an employee of Solomon Page but
5 that which you are not obviously the custodian
6 of and you may have restrictions on your rights
7 to produce them.  Okay?  Because of the short
8 fuse I am getting back to the court on this
9 litigation and because Solomon Page is not a
10 party to this litigation we are just seeing
11 whether real problems arise in that and so I
12 don't want to spend a lot of time on close
13 calls you may have had to make as an executive
14 at Solomon Page about what you could or
15 couldn't produce.
16        I am talking now only about
17 documents that are in your mind are your
18 documents that you were at liberty to disclose
19 to your counsel but that you could not put your
20 hands on at this time.
21   A.    I provided everything that was in my
22 possession but for those documents you just

Page 9

1 reflected as Solomon Page property or in my
2 role as executive.
3   Q.    Are there documents that it's your
4 understanding you are not at liberty to
5 disclose because they are Solomon Page
6 documents?
7   A.    Yes.
8   Q.    Can you describe documents that you
9 are aware of that you would have access to at
10 Solomon Page but that you did not understand
11 you were at liberty to disclose them?
12   A.    Well, I would point to Exhibit 2 and
13 this is probably in response to specific
14 numbers of billed hours and monies and invoices
15 and all that.
16   Q.    Okay.  And what is your
17 understanding of why that information is not
18 being disclosed today?
19   A.    I don't have an understanding.
20   Q.    Do you have access to that
21 information at Solomon Page?
22   A.    Partial.

3 (Pages 6 to 9)

Joshua Kubicki

Page 10

1    Q.    Okay.  If you are at your office at
2  Solomon Page can you access which contract
3  attorneys are currently placed at what clients?
4    A.    Yes.
5    Q.    That is something at your computer?
6  You can get to that information directly,
7  correct?
8    A.    Yes.
9    Q.    Can you get at the contract
10  documents relating to specific accounts at, for
11  example, Crowell & Morin and Mayer Brown?
12    A.    To the extent there is written
13  contracts?
14    Q.    Yes.
15    A.    With clients specific with whom I do
16  business?
17    Q.    Correct.
18    A.    Yes.
19    Q.    Do you have files in your office,
20  paper files that have those documents?
21    A.    I mean, I haven't been there long
22  enough to amass any files so to speak.

Page 11

1    Q.    Do you have a Crowell folder?
2    A.    No.
3    Q.    Mayer folder?
4    A.    No.
5    Q.    Do you have any documents, physical
6  paper documents related to those two accounts
7  in your personal office?
8    A.    What dates are we referring to?
9  Present day?
10    Q.    Well, say from June 23rd to the
11  present at any time did you have those
12  documents?
13    A.    Yes.
14    Q.    Okay.  Are there some that you don't
15  have now that you have had at some point?
16    A.    No.
17    Q.    Okay.  Are there any of the
18  documents that you have access to on your
19  computer or paper files that you believe are
20  confidential or proprietary Solomon Page
21  documents?
22    A.    Yes.

Page 12

1    Q.    Can you give me an example of those?
2    A.    The bill rates of certain clients,
3  the names of clients to the extent that they
4  are doing business with other aspects of
5  Solomon Page business.
6    Q.    Okay.  Are the names and any
7  background information of contract attorneys
8  that you have placed at Solomon Page or
9  currently have placed at Solomon Page would you
10  consider that proprietary?
11    A.    No.
12    Q.    Would you be at liberty to disclose
13  that to me then?
14    A.    Yes.
15    Q.    Did you give us that information in
16  your compilation here?
17    A.    No.
18    Q.    Can you provide that to us?
19        MR. SCHLANGER:  The lawyers made the
20  determination of what documents were in the
21  quote possession, custody or control of the
22  witness and his co-defendants.  He did not make

Page 13

1  the determination of what documents were in his
2  possession, custody and control.  These are
3  legal terms that are defined by the cases and
4  authorities decided under federal discovery
5  rules.
6        So if you have questions concerning
7  which documents are or are not in his
8  possession, custody or control those are
9  questions that ought to be directed to us as
10  his counsel.  He is not testifying here as his
11  own lawyer.  We are his lawyers.
12        MR. HAHN:  Thank you, Counsel, and I
13  think we are entirely on the same page here.
14        BY MR. HAHN:
15    Q.    Let me ask you this:  Did you
16  provide more documents to your counsel than the
17  ones that are in this compilation without
18  describing in any respect what it is that you
19  provided?  I don't want you to say that.
20        Did you give more documents to your
21  counsel than the ones that are here?
22    A.    Yes.

4 (Pages 10 to 13)

Joshua Kubicki

## Page 14

1    Q.    And is it -- I take Mr. Schlanger's
2 comments -- let me just say what I think Mr.
3 Schlanger described is exactly what I would
4 have expected to have happened given the state
5 of our discovery understanding.  We have not
6 had a court tell us what has to be turned over
7 and doesn't so counsel has to make a call as to
8 that.
9         But we may ask the court at some
10 point to do an in camera view of what documents
11 were called out and which ones were not
12 depending --
13        MR. SCHLANGER:  Of course.
14        BY MR. HAHN:
15    Q.    But getting back to my questions
16 which I believe have independent relevance, is
17 it your personal understanding as Joshua
18 Kubicki that the information that you were just
19 describing that you have access to at Solomon
20 Page that that information is proprietary to
21 Solomon Page?
22    A.    If I provided you the database in

## Page 15

1 which we keep that information and in a form
2 and you see all the numbers and calculations
3 that go into that and presented the database to
4 you, absolutely.  The information alone I don't
5 consider proprietary confidential.
6    Q.    Okay.  So do you know most of that
7 information because you assembled it?
8    A.    I'm sorry.  I need clarification.
9 What information?
10    Q.    This database that you are
11 describing about say the specifics of the
12 contractual relationship with a client does
13 that contain information that you contributed
14 to?
15    A.    Now it does.  It existed prior to my
16 joining Solomon Page.
17    Q.    Okay.  Is any of the information
18 that you contributed to it proprietary?
19    A.    Again, I am more than happy to
20 discuss that information.  I guess if I was to
21 provide you again with the database that to me
22 is proprietary.  The information alone I don't

## Page 16

1 view as and am more than willing to discuss.
2    Q.    Okay.  What information is in the
3 database?
4    A.    Name of clients, billing address,
5 bill rates, pay rates, then of course our
6 overhead, our margins, our profit.
7    Q.    Is the name of the contact person
8 there?
9    A.    It depends.
10    Q.    Is that a field you can fill in
11 the database?
12    A.    Yes.
13    Q.    Is there anything in there about
14 projects that you have historically had with
15 the client?
16    A.    Myself personally?
17    Q.    No.  I am talking about the
18 database.  Picture -- I am assuming this is
19 something you can open up this database on the
20 computer and add things to it or modify things;
21 is that correct?
22    A.    Yes.

## Page 17

1    Q.    And you are familiar with that
2 database?
3    A.    I am getting familiar with it.
4    Q.    What is the name of it?
5    A.    I believe Solomon Page's database is
6 called BCS.
7    Q.    Is that proprietary software that
8 they have developed or is that a vendor
9 software that they use?
10    A.    I don't know.
11    Q.    Does the database include active
12 projects with a client?
13    A.    Active billing, yes.
14    Q.    Does it include which either
15 contract attorneys or other temps assigned to
16 that -- to a particular project with that
17 client?
18    A.    Yes.
19    Q.    As I understand your testimony the
20 individual data items that go into that you
21 don't believe are proprietary but the composite
22 of it in the databases in the computer you

**Esquire Deposition Services**
D.C. - 1-800-441-3376

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

Page 18

1 believe is proprietary.  Is that a fair
2 characterization?
3     A.    Yes.
4     Q.    Is there any individual aspect of
5 the database that you believe is proprietary or
6 is all of the -- all of it separated out from
7 the database itself not proprietary?
8     A.    Considering my limited experience
9 with the database in my short tenure with
10 Solomon I can't adequately answer that question
11 because I have just recently been given access
12 to it and have yet to receive training.
13    Q.    Has anyone told you at Solomon that
14 the database is proprietary?
15    A.    No.
16    Q.    Have you signed anything saying you
17 won't disclose anything in the database?
18    A.    To my recollection, no.
19    Q.    Is it your understanding that
20 anything from that database is in the
21 compilation of documents that you gave me
22 today?

Page 19

1     A.    There may be information discussed
2 in those documents which may be reflected to
3 some degree in the database but there is
4 nothing from the database that are in those
5 documents.
6     Q.    That was a very accurate answer.  I
7 wish all answers were accurate.  Thank you.
8 That's what I was trying to ascertain.
9         When you were at Ajilon was there a
10 similar database that you used at Ajilon?
11    A.    Similar as far as the information
12 within it, contained in it?
13    Q.    Yeah.  I guess what I am getting at
14 is at Ajilon if we were talking now about you
15 at Ajilon would you say there was a similar
16 type of electronic database, that composite of
17 information in it you would regard as
18 proprietary?
19    A.    Again, the database itself, yes.
20 There was a database at Ajilon.
21    Q.    And was it your understanding while
22 you were at Ajilon that the individual items of

Page 20

1 information, the data point, if you will, were
2 not in and of themselves proprietary but when
3 you put it all together it was proprietary?
4     A.    By put it all together if you mean
5 in the electronic database itself?
6     Q.    That's what I mean.
7     A.    Everything I would consider that,
8 yes.  The individual information or the
9 information in the populated fields themselves,
10 no.
11    Q.    Okay.  In your mind is there a
12 difference between the information that is in
13 the database actually compiled in the database
14 and just having the people who know all the
15 information in the database?  I mean, if I got
16 it from the database or I got it from the
17 people who knew what was in this database and
18 just wrote it down is there a difference in
19 your mind as to whether it's proprietary or
20 not?
21    A.    Yes.
22    Q.    Okay.  Is it proprietary if it's in

Page 21

1 the database?
2     A.    If we are speaking specifically
3 about the Ajilon database, yes.
4     Q.    If we are speaking about Solomon
5 Page's database?
6     A.    Yes.
7     Q.    If I have all of the people together
8 who know in their heads all of the information
9 that is in the database and I just ask each of
10 them for what they know and then I write down
11 all down is what I wrote down proprietary?
12    A.    I would not consider it to be.
13    Q.    Okay.  And why do you distinguish
14 between the two?
15    A.    The way a database is set up in my
16 experience a company sets it up a very specific
17 way with the information that it deems
18 important for business reasons.  With the
19 amount of access given to different level
20 managers and executives and the way the
21 information is displayed and accessed I think
22 that's what defined it as proprietary, and you

6 (Pages 18 to 21)

Page 22

1 are gathering all of that data and can access
2 it specific ways as opposed to if it is in
3 someone's head it is knowledge.  It is
4 knowledge gained and it is not an electronic
5 record that is going to be 100 percent
6 accurate.  Nor can you -- not to be silly --
7 but punch in on a keyboard in someone's brain
8 and extract information.  You are relying on
9 someone's experience, knowledge learned and
10 whatnot.
11     Q.     Do Jon Pomykala and Kimberly
12 Danowski work for you currently at Solomon
13 Page?
14     A.     Yes.
15     Q.     Just as a hypothetical, if I called
16 you to find out who the clients were and what
17 the contractual relationship was and you told
18 me over the phone and I called Jon Pomykala and
19 asked him who the contract attorneys who were
20 assigned and what the projects were and then I
21 called Kim and asked her what each of them is
22 being paid and what the billing rate is and

Page 23

1 they just told me that over the phone and I put
2 all of that together and I put that in my
3 database would I then have a proprietary
4 database?  Forget that question.
5          Using that hypothetical, have I
6 gotten anything that you would consider to be
7 proprietary to your operation at Solomon Page
8 or is that all fair game?
9     A.     If you -- I'm just trying to
10 understand your hypothetical.  If you called
11 myself, Jon Pomykala, Kimberly Danowski I think
12 you would gain some information.  I don't know
13 what information.  I don't know how much they
14 know about specific clients or specific
15 projects so what information you would solicit
16 and what you would get I can't adequately
17 answer.
18     Q.     You wouldn't have a problem if
19 somebody from Hudson called your folks and
20 asked those questions and they give them
21 answers?
22     A.     By problem -- I would certainly be

Page 24

1 upset because I would discourage that.
2     Q.     Why?
3     A.     Why?
4     Q.     Isn't that just information like, I
5 mean, you can get that say out of a phone book
6 or on the Internet or something like that?
7 Isn't it all just immediately available?
8     A.     You are speaking about bill rates
9 and margins.  That stuff though is information
10 -- it's not information that I deem protected,
11 but it's certainly not information that I would
12 want to be discussing openly in any social
13 arena.
14     Q.     Do you have a problem with your
15 competitors knowing that information?
16     A.     Most of my competitors and all the
17 competitors in this market know what the other
18 one is charging and the other one -- pay rates
19 are set in this market for 90 percent of the
20 work.  The pay rate is no secret.  The bill
21 rate is often dictated by our clients so if you
22 say work with firm A and five other agencies

Page 25

1 are working with firm A, firm A more than
2 likely has said you can charge me X amount of
3 dollars for this work.  There is no secret
4 there.  To those clients that agencies work
5 with exclusively again to be competitive in
6 this market the bill rate range is a very
7 rather narrow one.  So specific dollars and
8 cents, you know, no, I don't think our
9 competitors -- we know each other's billing,
10 but we certainly can nail it down pretty close.
11     Q.     It sounds like you are saying there
12 really isn't anything that I would have gotten
13 by making those phone calls that you think of
14 as being competitively sensitive or
15 proprietary?
16     A.     You would have more than likely
17 gotten similar information by making other
18 phone calls.
19     Q.     But you as far as you are concerned
20 there is no restriction on Jon Pomykala or
21 Kimberly Danowski giving that information to
22 anyone who calls up; is that correct?

7 (Pages 22 to 25)

Joshua Kubicki

| Page 26 | Page 28 |
|---|---|

**Page 26**

1          MR. SCHLANGER:  Objection.  That's
2 not what he testified to.
3          MR. HAHN:  I didn't say that is what
4 he testified to.  That's a new question,
5 Counsel.
6          BY MR. HAHN:
7     Q.    **Can you answer the question?**
8          MR. SCHLANGER:  Read the question
9 back.
10         (The record was read as requested.)
11         MR. SCHLANGER:  Which information?
12         MR. HAHN:  The information that can
13 be gotten by calling Mr. Pomykala, Ms. Danowski
14 or Mr. Kubicki.
15         MR. SCHLANGER:  There is all sorts
16 of information that has been talked about.  If
17 you want to ask about specific kinds of
18 information that's fine, but "this information"
19 you had this long discussion.  Rephrase.
20         MR. HAHN:  If you want to object I
21 have to live with what answer he gives or
22 doesn't give.  I don't want you formulating my

**Page 27**

1 question and I don't want you coaching the
2 witness.
3          MR. SCHLANGER:  I am not doing
4 either.  It is not a fair question.  I'm not
5 objecting to the form.  It's not a fair
6 question.  You have had an exchange back and
7 forth about all sorts of different kinds of
8 information and then you say "this
9 information."  It's not object to form.  It's
10 not a fair question.
11         MR. HAHN:  I am not going to
12 reformulate it.  Are you directing him not to
13 answer it?
14         MR. SCHLANGER:  I am asking you to
15 withdraw it.
16         MR. HAHN:  I'm not withdrawing.  Are
17 you directing him not to answer?
18         MR. SCHLANGER:  No.
19         MR. HAHN:  You are not directing him
20 not to answer?
21         MR. SCHLANGER:  I am stating once
22 again it's an unfair question and you shouldn't

**Page 28**

1 be asking it.  No, I won't direct him not to
2 answer.
3          MR. HAHN:  I think it's a perfectly
4 fair question.  I understood it both times and
5 I was looking at the witness and he didn't have
6 a problem with it.  Only you do.
7          MR. SCHLANGER:  It's not a question
8 whether you understand your question.
9          MR. HAHN:  You are not the
10 gatekeeper on my question.  You can direct him
11 or say objection.  I don't think there is
12 anything else you get to do.
13         MR. SCHLANGER:  Nor are you.
14         BY MR. HAHN:
15    Q.    **Mr. Kubicki?**
16    A.    I would just -- I'm not quite sure
17 what you mean by restriction.
18    Q.    **Well, do you believe that it is**
19 **perfectly within Kim's and Jon's and your right**
20 **to give that information to competitors of**
21 **Solomon Page?**
22    A.    Yes.

**Page 29**

1    Q.    **Thank you.  Do you believe that you**
2 **have the right to give similar information to**
3 **competitors while you were working at Ajilon?**
4    A.    Yes.
5          MR. SCHLANGER:  I just need a
6 one-minute break.
7          (A short recess was taken.)
8          (Deposition Exhibit Nos. 3 and 4
9 were marked for identification.)
10         BY MR. HAHN:
11    Q.    **We have marked two more exhibits.**
12 **One is a Joshua Paul Kubicki resume that is**
13 **Exhibit 3 and the next is a one-page offer**
14 **letter dated April 22, 2004 that is marked**
15 **Exhibit 4.**
16         **If you could just identify the**
17 **resume, Mr. Kubicki.  Is that your resume from**
18 **back in the 2003/2004 time frame?**
19         **I guess I should state for the**
20 **record attached to the resume is, I believe,**
21 **it's an evaluation of Mr. Kubicki by an ALJ.**
22 **Let's just identify the first two pages.**

8 (Pages 26 to 29)

**Joshua Kubicki**

Page 30

1        Is that your resumes?

2    A.    It appears to be at that time, at

3 that date.

4    Q.    Do you recall whether that's a

5 resume that you prepared?

6    A.    It appears to be.

7    Q.    Regarding the second two pages which

8 are not your resume, it's a form that has some

9 handwritten notes on it, do you have any idea

10 who ALJ might be?

11    A.    My educated guess would be Andrew

12 Jewell, the regional vice president for the

13 east coast for Ajilon Legal at this time, the

14 person who hired me.

15    Q.    Do you recall ever seeing this

16 document?

17    A.    I have not seen it.

18    Q.    So you don't -- with respect to

19 Exhibit 3 you cannot identify pages 3 and 4 but

20 pages 1 and 2 are a resume that you prepared?

21    A.    Correct.

22    Q.    Okay.  And Exhibit 4 is an April 22

Page 31

1 offer letter from Ajilon to you.  Is that your

2 -- a copy of your signature at the bottom?

3    A.    It appears to be.

4    Q.    Looking at your resume on Exhibit 3

5 it looks as though ending in June of 2003 you

6 left the position where you were doing legal

7 recruiting?

8    A.    Correct.

9    Q.    And were you under any kind of a

10 restriction with Legal Source where you were

11 employed from February '02 to June of '03?

12    A.    No.

13    Q.    So you were not waiting out a

14 noncompete period?

15    A.    No.

16    Q.    Okay.  What were you doing from June

17 '03 to April '04?

18    A.    I was doing a number of things.  I

19 had, as reflected on my resume, had a filming

20 company that I started and was engaged in a

21 number of film making projects after June '03.

22 I was also -- at that time I became a contract

Page 32

1 attorney direct hire for the law firm of

2 Crowell & Moring here in D.C..

3    Q.    And who placed you with Crowell?

4    A.    I obtained the job myself.

5    Q.    Okay.  So that was something where

6 there was a posting by Crowell and you

7 responded to that and you were hired at

8 Crowell?

9    A.    No.  I have colleagues and friends

10 there and contacted them, let them know I was

11 available, and they directly hired me.

12    Q.    Who did you contact, if you recall?

13    A.    A gentleman by the name of Miguel

14 Rodriguez.

15    Q.    What was his position there?

16    A.    He was an associate.

17    Q.    Is he still there?

18    A.    No.

19    Q.    Did you contact anyone else there at

20 that time?

21    A.    I don't recall.  I'm sure I -- as I

22 mentioned, socially I knew many of the Crowell

Page 33

1 & Moring attorneys and staff so I may have had

2 conversations with them during that time

3 period.  Specific to joining Crowell, I

4 honestly can't recall.

5    Q.    In April of 2004 you joined Ajilon?

6    A.    I believe that is the date and year,

7 yes.

8    Q.    And you signed an agreement with

9 Ajilon; is that correct?

10    A.    An employment agreement?

11    Q.    Correct.

12    A.    Yes.

13    Q.    And your base salary is reflected in

14 Exhibit 4; is that correct?

15    A.    Yes.

16    Q.    And do you remember whether that is

17 what you were being paid when you joined

18 Ajilon?

19    A.    I believe it was.

20    Q.    Do you know approximately how much

21 money you received as remuneration from Ajilon

22 during 2006?

9 (Pages 30 to 33)

**Joshua Kubicki**

Page 34

1    A.    During 2006?

2    Q.    Just in round numbers what was on

3 your W2?

4    A.    Somewhere in the range of 600 to

5 $650,000, I believe.

6    Q.    Okay.  So between April of 2004 --

7 well, do you remember about how much you made

8 in 2004 from Ajilon?

9    A.    I honestly can't recall without

10 looking at my W2.

11    Q.    Was it over a hundred thousand?

12    A.    I am not sure.

13    Q.    Could it have been under a hundred

14 thousand?

15    A.    It could have.

16    Q.    And in 2005 again just within a

17 range?

18    A.    Somewhere in the range of 7 to

19 $800,000.

20    Q.    Okay.  Did you bring any active

21 business with you to Ajilon the day you

22 started?

Page 35

1    A.    By active business what do you mean?

2    Q.    An active book of business.  Actual

3 accounts where there were attorneys working who

4 were in place and you could turn those accounts

5 over to Ajilon and Ajilon would start billing

6 them?  The day you started?

7    A.    I had no ongoing business that I

8 transitioned to Ajilon, no.

9    Q.    Did you have anything in the

10 pipeline, accounts you could tell Ajilon, you

11 hire me, I will be able to deliver this

12 business within a month or six weeks?

13    A.    Not that I recall.

14    Q.    Did you tell Ajilon at the time that

15 you were hired that you had actual clients that

16 had committed to doing work with you?

17    A.    No.

18    Q.    Did you negotiate with Ajilon for

19 pay based on your ability to deliver actual

20 business within six months?

21    A.    The expectation was that I would

22 deliver business within six months so I am not

Page 36

1 quite sure how to answer that question.

2    Q.    Did Ajilon ask you whether you had

3 any kind of restrictive covenant that would

4 affect your ability to go to work for them?

5    A.    No.

6    Q.    You didn't have one though, did you?

7    A.    No.

8    Q.    Now, you made a lot more money

9 during 2005 and 2006 with Ajilon than you did

10 in 2004; is that correct?

11    A.    Correct.

12    Q.    Was that increase in your pay a

13 result of you actually generating a very large

14 volume of legal business in D.C.?

15    A.    Yes.

16    Q.    And were those clients that you

17 developed relationships with on behalf of

18 Ajilon?

19    A.    I had relationships with certain

20 clients prior to joining Ajilon.  While there

21 they gave Ajilon and myself business.

22    Q.    Did you spend any of Ajilon's money

Page 37

1 to develop those relationships?

2    A.    Yes.

3    Q.    Give me an example of money that you

4 spent that was Ajilon's money to develop those

5 relationships?

6    A.    Cab rides to the client's sites,

7 lunches, dinners, your typical business

8 entertainment expenses.  That is all I can

9 really articulate.

10    Q.    So it was entertainment and just the

11 expense that you would associate with going and

12 meeting with the client?

13    A.    Yes.

14    Q.    Did you put together any kind of

15 presentations for clients?

16    A.    What time frame are we speaking of?

17    Q.    After you joined Ajilon?

18    A.    Sure, yes.

19    Q.    And was there time and expense

20 associated with putting those presentations

21 together?

22    A.    My personal time, yes.

10 (Pages 34 to 37)

Page 38

1    Q.    Was anyone else involved?
2    A.    90 percent of the time, no.
3    Q.    Did you ever involve other Ajilon
4  people in your client presentations or
5  meetings?
6    A.    Infrequently, but yes.
7    Q.    In your mind is there any difference
8  between the service that is provided by one
9  competitor in the legal staffing industry and
10  another or are they all the same?
11    A.    It depends on the person within the
12  competitor.  You say competitor.  There is many
13  salespeople, recruiters, project managers.  I
14  don't view my competitors as just the company.
15  It's an individual.
16    Q.    Well, do they all pretty much
17  provide the same contract attorneys if you need
18  a document review done?  Is it pretty much --
19  whoever you go to you will get the same people?
20    A.    The pool of contract attorneys
21  specific to D.C. is generally known to all
22  competitors and they all pool from generally

Page 39

1  the same pool, yes.
2    Q.    So if I go to Solomon Page or Hudson
3  or Hire Counsel or Special Counsel or Ajilon I
4  should be completely indifferent which of those
5  I use with respect to who the attorneys that
6  are actually going to be doing work?
7    A.    No.
8    Q.    They might be different?
9    A.    They might be different depending on
10  the function they are going to perform for that
11  client.
12    Q.    Okay.  Why would I pick one of those
13  -- with respect to the contract attorneys that
14  I would get why would I pick one of those
15  companies over another?
16    A.    Well, because one of those companies
17  may know what -- may be better at picking
18  candidates, more appropriate candidates than
19  say another company for whatever work you as
20  the client would have.
21    Q.    And how would they be better at
22  picking the candidates than another company?

Page 40

1    A.    It depends on the people in the
2  company and what they know of the client, what
3  they know of the nature of the business the
4  client is doing, their level of sophistication
5  and understanding in order to sort of pick
6  candidates that are better suited from a skill
7  set, from a personality set to the specific
8  client needs.
9    Q.    That is from the client side.  Does
10  it make a difference from the candidate side?
11  Does it help to know the candidates?  Are they
12  different or are all contract attorneys the
13  same?
14    A.    No.
15    Q.    So if you know the contract
16  attorneys based on experience would that be a
17  valuable asset to you if you were trying to
18  place people with a specific client?
19    A.    Yes.
20    Q.    And do people in your industry who
21  have years of experience in dealing with the
22  pool of candidates in the D.C. area get to know

Page 41

1  dozens, maybe hundreds of contract attorneys
2  and distinguish between ones that have certain
3  skill sets and ones that don't?
4    A.    Yes.
5    Q.    Is that an important thing for a
6  company like Solomon Page or Ajilon or one of
7  the other competitors to have that knowledge
8  base?
9    A.    It helps.
10    Q.    Does it make one company different
11  from another company as far as a law firm is
12  concerned?
13    A.    It's one of the many assets that
14  differentiates.
15    Q.    If you are trying to sell Solomon
16  Page's services to Crowell & Moring or Mayer
17  Brown or Sidley & Austin do you want to be able
18  to say that you're recruiting people, know the
19  pool of candidates from years of experience or
20  would you be just as happy saying I just hired
21  a new person that is really good, doesn't know
22  anybody?

11 (Pages 38 to 41)

Page 42

1    A.    Well, it doesn't take much to get to
2 know them.  You have to spend the time which is
3 why a recruiter's sole job is to recruit and
4 get to know candidates.  They have no other
5 responsibilities generally.  And it just takes
6 time and commitment to getting new contract
7 attorneys in, to get their paperwork taken care
8 of, interview them, meet them and all that.
9    Q.    Does it help if you have had years
10 of actual work experience with people that you
11 have placed in certain assignments and seen
12 whether the clients like them, whether they
13 have been really good performers, top
14 producers?  Is that something that goes into
15 the mix?
16    A.    Yes.
17    Q.    Does that get tracked at Solomon
18 Page whether somebody does that?
19    A.    I can't answer.  I don't know if
20 that's tracked.
21    Q.    Are you tracking it?
22    A.    By track you mean like in a formal

Page 43

1 system?
2    Q.    What do the people that work for you
3 at Solomon Page do to evaluate contract
4 attorneys who have been placed?
5    A.    Well, I guess can I ask for
6 clarification is a contract attorney we're
7 going to place or is working or contract
8 attorney that walks in the door that we haven't
9 worked with?  Are you asking how we evaluate
10 that person or job performance?
11    Q.    Somebody who is actually on the job
12 how you -- and what their performance is.  Do
13 you have a mechanism for tracking that?
14    A.    No.
15    Q.    Did you have a mechanism for
16 tracking that at Ajilon?
17    A.    There was a general field in the
18 database which I think less than 25 percent of
19 Ajilon employees used.
20    Q.    But 25 percent did?
21    A.    I believe so.  That is a very rough
22 guess.

Page 44

1    Q.    Okay.
2    A.    It was generally not used.
3    Q.    If somebody's performance is
4 unacceptable was that noted?
5    A.    It depends.
6    Q.    Did you have people that were either
7 do not use or do not replace where people
8 actually checked off if they respond to a
9 posting we don't want them?
10    A.    Yes.
11    Q.    Is that an important thing to know
12 that somebody doesn't work very well?
13    A.    Again, it is helpful.
14    Q.    When you were working at Ajilon did
15 you expect Jon Pomykala to know a certain
16 baseline of candidates that would be people he
17 could reach out to if you had a specific
18 assignment that you wanted to put good people
19 on?
20    A.    By know do you mean know personally?
21 I am not trying to be cute but what do you mean
22 by know?

Page 45

1    Q.    Let me give you an example.  If you
2 were to call me at my law firm and say Ben, I
3 need the following done in the next three
4 weeks, do you have anybody that can do it, I
5 might have in my head four or five attorneys
6 that I know personally, whether I have met them
7 or not, I mean it is a big law firm, I haven't
8 meet everyone, but I might know I have people
9 that can do the capacity and I can say Josh, I
10 got you covered.  We can take care of this.  I
11 am not putting out a posting saying can anybody
12 handle this.
13        Similarly, if you said to Jon
14 Pomykala, Sidley & Austin needs five people
15 starting next Monday for three weeks to do this
16 kind of a document review and these are the
17 kinds of conflicts that we are worried about,
18 would you expect Jon to have a certain number
19 of people that he could go to specifically as
20 candidates for that as opposed to just putting
21 a posting out on, you know Posse's List or
22 Craig's List or whatever, D.C. Metro Attorneys

12 (Pages 42 to 45)

Joshua Kubicki

Page 46

1 to try to get candidates? Would you expect him
2 to be able to do that?
3      A.    I would expect him to have some idea
4 on who has worked there in the past perhaps
5 depending on the client.  Some are more
6 valuable than others as far as who they like,
7 who they would welcome back.  It depends on the
8 situation.  I would not expect him to rely
9 solely on his memory only because you don't
10 know if these people are available.  So, you
11 know, he may have an idea of who works there.
12 He may -- or who would work there.  And so he
13 may call them but he would also more than
14 likely post.
15     Q.    Have you ever represented either at
16 Ajilon or at Solomon Page to clients or
17 prospective clients if you worked with them on
18 a project and you staffed it with 40 attorneys
19 that if they have follow on business that you
20 are in a position just to carry through with
21 it?  That they are already up and running, they
22 have already got the people signed up with

Page 47

1 them, they are familiar with their specific
2 requirements within the firm, you have done
3 conflict checks to some degree, they know that
4 these are people that are getting the work done
5 on an acceptable level, isn't that an advantage
6 to try to get new business with an existing
7 client?
8      A.    You said carry on or carry over.  I
9 guess I am confused by your question.  What do
10 you mean by that?
11     Q.    Let's say Crowell & Moring had 40
12 people doing a document review and you were
13 supplying the attorneys.  And that project
14 ended.  But they knew that a week after that
15 project ended they were going to need 50
16 attorneys to do a similar kind of project for a
17 different client.  Wouldn't the fact that you
18 already had something -- you might even have
19 space available, the whole thing is basically
20 in place and you just have to hold your breath
21 for a week.  Would you tell the candidates,
22 look, I can place you on this project that is

Page 48

1 going to last for three months and you can tell
2 Crowell look, we can keep most of this team
3 together.  Is that anything you have ever done
4 before?  Have you marketed that as an advantage
5 to existing clients?
6      A.    That specific situation, no.
7      Q.    Anything like that?
8      A.    I am kind of reworking your
9 hypothetical in my head.  The only scenario
10 would be if a client has temps working billing
11 and another matter comes up at the same time,
12 while I was at Ajilon clients would say can we
13 roll them over on to another project.  Then we
14 would change the billing and invoice and PO
15 number and all that on invoices.
16     Q.    That's the term that is used.
17 Rolling over, rolling a temp or contract
18 attorney over with the same client?
19     A.    I have heard it referred to that and
20 other things.
21     Q.    But that is the term you would use
22 as well?  Isn't that what Ajilon calls it is

Page 49

1 rolling someone over?
2      A.    I don't know if it is Ajilon or the
3 term of the industry.  I'm not sure.
4      Q.    That is what I have heard everyone
5 in the industry calling it.  Transitioning,
6 rolling over?
7      A.    Right.
8      Q.    But it has a name for a reason,
9 correct, because it's something you want to be
10 able to do to keep the temp employed and keep
11 the client as an active client.  Isn't that the
12 best of all worlds is you just keep that person
13 rolling over on projects at the same client?
14     A.    That would be a nice situation, yes.
15         MR. HAHN:  If we could take a
16 five-minute break, I just want to identify some
17 specific documents out of Exhibit 1.
18         MR. SCHLANGER:  Sure.  That's fine.
19         (A short recess was taken.)
20         BY MR. HAHN:
21     Q.    Mr. Kubicki, the Solomon Page D.C.
22 office now has two short-term leased office

13 (Pages 46 to 49)

Page 50

1  spaces, is that correct, at 1201 Penn and 1250
2  Connecticut?
3      A.    No.
4      Q.    1120 Connecticut?
5      A.    No.
6      Q.    All right.
7      A.    Yes.  Our offices, Solomon Page's
8  offices are also on short-term lease space.
9      Q.    What is the arrangement -- what is
10 the lease arrangement for Solomon Page's main
11 office, your headquarters office in D.C.?
12     A.    I don't really know the details.
13 That is our CFO's job to take care of that.
14     Q.    Is it an executive suite arrangement
15 or do you have first position lease?  Is it a
16 sublease?
17     A.    I have no idea.
18     Q.    Okay.  What about the space at 1201
19 Pennsylvania?  Do you have any idea what the
20 relationship is there?
21     A.    Yes.
22     Q.    Did you negotiate that?

Page 51

1      A.    No.
2      Q.    What is the other location?  Is it
3  1120 Connecticut?  You have another space where
4  attorneys do document reviews, things like
5  that?
6      A.    1250.
7      Q.    1250?
8      A.    1250 Connecticut.
9      Q.    And at 1250 Connecticut do you know
10 what the relationship is with the landlord?
11     A.    Yes.
12     Q.    Did you negotiate that lease or that
13 arrangement?
14     A.    No.
15     Q.    Do you know who the -- do you know
16 who the negotiations occur with on the other
17 side, what the name of the landlord or the
18 management agent?
19     A.    At 1250?
20     Q.    Yes.
21     A.    Metro Offices.
22     Q.    How about at 1201?

Page 52

1      A.    Regis HG.
2      Q.    And who did those negotiations for
3  Solomon Page?
4      A.    Which one would you be referring to?
5      Q.    Either, both?
6      A.    For 1201 real estate broker Numark
7  helped to negotiate that along with my CFO Eric
8  Davis.
9      Q.    Do you know when those negotiations
10 started?
11     A.    Shortly after I joined Solomon.
12     Q.    How about with 1250?  Was that also
13 through Numark?
14     A.    No.
15     Q.    How was that done?
16     A.    That was with Eric, my CFO.
17     Q.    And who -- where is Eric?  New York?
18     A.    Yes.
19     Q.    How did Eric find out about 1250?
20 Was that through you?
21     A.    Yes.
22     Q.    You knew the space was available?

Page 53

1      A.    Our offices are in Metro Offices as
2  well and so we asked them what space they may
3  have available in the city and that was one of
4  them.
5      Q.    Who is we?
6      A.    Me.
7      Q.    Okay.  And who did you ask there?
8      A.    Where, at Metro Offices?
9      Q.    Yes.
10     A.    A woman by the name of Kelly.  I can
11 get you your last name but I don't know it off
12 the top of my head.
13     Q.    Is she the person you deal with for
14 your other space?
15     A.    Yes.
16     Q.    Did you initiate that contact?
17     A.    I'm confused.  For what?
18     Q.    For additional space?
19     A.    Yes.
20     Q.    You told Solomon Page, Eric,
21 whatever, we need additional space?  I want to
22 talk to Kelly and he approved that or did you

14 (Pages 50 to 53)

Page 54

1 just make the contact with Kelly first and then
2 tell Eric that you did it?
3    A.    I don't honestly recall.
4    Q.    Do you remember when you first
5 contacted Kelly about getting additional space?
6    A.    Probably two weeks ago.
7    Q.    Okay.  Did you tell anyone at
8 Solomon Page before you started working for
9 Solomon Page that you needed to line up
10 additional space?
11    A.    Additional space?
12    Q.    Well, you needed -- do you
13 understand that there was any contact with
14 Numark about getting additional space for
15 Solomon Page's legal group here in D.C. while
16 you were still working for Ajilon?
17    A.    Yes.
18    Q.    And what was going on there?  What
19 contact did you have with Solomon Page about
20 that?
21    A.    I believe I communicated with Lloyd
22 Solomon the need to have project space quite

Page 55

1 quickly after I joined Solomon Page.
2    Q.    And that occurred May, June?
3    A.    That communication with Lloyd?
4    Q.    Yes.
5    A.    I believe it's mid June.
6    Q.    Okay.  So you were still working at
7 Ajilon when you were talking with Lloyd Solomon
8 about getting space in D.C. for when you came
9 over to Solomon Page; is that correct?
10    A.    I was still employed by Ajilon, yes.
11    Q.    And what happened?  Did you have any
12 communications with Numark about getting the
13 additional space while you were still employed
14 at Ajilon?
15    A.    I may have.  There may have been a
16 phone call.
17    Q.    And was that in your capacity as a
18 manager for Ajilon?
19    A.    Was what in my capacity?
20    Q.    That phone call?
21    A.    I am confused.  I was still managing
22 director of Ajilon when I had that phone call.

Page 56

1    Q.    Right.  So what were you calling
2 Numark about?
3    A.    Space for Solomon Page.
4    Q.    Okay.  Did you let the people at
5 Numark know that you were getting the space for
6 Solomon Page or talk about getting it for
7 Ajilon?
8    A.    I did not initiate that phone call.
9 Numark was already aware of the relationship
10 with Solomon Page.
11    Q.    So they called you?
12    A.    Yes.
13    Q.    At whose suggestion did they call
14 you?
15    A.    I can't -- I don't know.
16    Q.    Did you talk with the representative
17 of Numark -- who was that representative, do
18 you know?
19    A.    A gentleman by the name of Barry
20 Bank or Banks.
21    Q.    Okay.  Let's call him Larry.
22 Anyway, Larry called you at someone's

Page 57

1 initiation, correct?
2    A.    Correct.
3    Q.    But it was not at your initiation?
4    A.    Correct.
5    Q.    And what conversation did you have?
6    A.    This is guessing because there is a
7 lot going on and I don't -- I can't recall
8 accurately but I believe the conversation was
9 basically about what type of space would be
10 workable for the D.C. market for project space.
11    Q.    How much space -- did you tell Larry
12 how much space you thought you needed?
13    A.    I believe so.
14    Q.    How much space did you tell him you
15 needed?
16    A.    Probably somewhere on the range of
17 10 to 15,000 square feet.
18    Q.    Did you need it in downtown D.C.?
19    A.    Ideally, yes.
20    Q.    Did he get you the space at 1201
21 Penn?
22    A.    Yes.

15 (Pages 54 to 57)

Joshua Kubicki

Page 58

1    Q.    What did you need that space for?

2    A.    Well, to be competitive in the D.C.
3  market any staffing agency needs project space.
4  It sort of goes with the business now.

5    Q.    Is there anyone in that space right
6  now?

7    A.    Yes.

8    Q.    When did people first go in that
9  space?

10    A.    I believe July 16th.

11    Q.    Okay.  How many people went in?

12    A.    By people --

13    Q.    How many -- how many thousand square
14  feet is it?

15    A.    I think it's roughly 13,000 square
16  feet.

17    Q.    And does it have furniture in it?

18    A.    Yes.

19    Q.    How is it configured?  One big room,
20  many rooms?

21    A.    Combination.

22    Q.    Okay.  Today what is your

Page 59

1  understanding of how many people were actually
2  sitting in it, meaning August 2, how many
3  people were sitting in it?

4    A.    Between 80 and 90.

5    Q.    And who do they work for?

6    A.    Combination of people.

7    Q.    Okay.

8    A.    Some work for Solomon Page, some
9  work for Crowell & Moring.

10    Q.    How many work for Solomon Page?

11    A.    At any given time between four and
12  eight people.

13    Q.    Okay.  And how many work for Crowell
14  & Moring?

15    A.    Roughly 75 to 80.

16    Q.    And what are they working on?

17    A.    A document review.

18    Q.    For what client?

19    A.    For my client or for the ultimate
20  client?

21    Q.    Well, Crowell & Moring is your
22  client, correct?

Page 60

1    A.    Correct.

2    Q.    And Crowell & Moring is using
3  Solomon Page's space; is that correct?

4    A.    Correct.

5    Q.    Are they -- is Crowell & Moring
6  paying Solomon Page for that space?

7    A.    Yes.

8    Q.    Is that relationship embodied in a
9  document?  Is there a written document that
10  says what Solomon Page is receiving for Crowell
11  & Moring to use that space?

12    A.    Yes.

13    Q.    Is it based on square foot?  Is it a
14  lease?

15    A.    No.

16    Q.    What is it?

17    A.    It's a basic agreement providing a
18  fee for among other things use of physical
19  space.

20    Q.    And within the schedule of fees one
21  of the fees is an amount for the use of space?

22    A.    There isn't a specific hard number

Page 61

1  associated with the physical space usage.

2    Q.    How is it computed?

3    A.    By looking at the project and the
4  project services Solomon Page is rendering and
5  providing to Crowell, a combination of those
6  services, a level of those services, that is
7  project specific a fee was calculated, agreed
8  to, that kind of represents the value of all
9  those services combined.

10    Q.    Do you have a copy of that
11  agreement?

12    A.    Yes.

13    Q.    Did you negotiate that agreement?

14    A.    Alone, no.

15    Q.    Were you on the negotiation team for
16  Solomon Page?

17    A.    Yes.

18    Q.    When was the agreement inked?

19    A.    Yesterday.  As far as signed off on,
20  yesterday.

21    Q.    When was it first proposed?

22    A.    Probably my first week of my

16 (Pages 58 to 61)

Page 62

1  employment with Solomon Page.  Or it might have
2  been the July 4th week.  I'm not sure.  It was
3  the second week I was there at Solomon.
4       Q.    Were you aware of Crowell & Moring's
5  need for this space while you were still at
6  Ajilon?
7       A.    Was I -- specifically, no.
8       Q.    Did you discuss -- while you were
9  still working at Ajilon did you discuss the
10  work that is now being done for Crowell &
11  Moring by Solomon Page with anyone at Crowell?
12       A.    I discussed the current, then
13  current Ajilon business that Ajilon was doing
14  with Crowell & Moring while I was at Ajilon.
15       Q.    Okay.  The attorneys that are
16  working in the current Solomon Page 1201 Penn
17  space but they are working for Crowell, are any
18  of those attorneys attorneys that Crowell did a
19  direct hire from Ajilon?
20       A.    Yes.
21       Q.    How many?
22       A.    I don't know offhand because they

Page 63

1  are Crowell's employees.  I would -- thus we
2  don't keep track of them necessarily in real
3  time, anywhere from 20 to 35.
4       Q.    So you were aware at the time that
5  Crowell did the direct hire of some attorneys,
6  I think was 42 attorneys in mid June from
7  Ajilon, that they were hiring, doing a direct
8  hire of those attorneys through Ajilon,
9  correct?
10       A.    Correct.
11       Q.    Did you know the project that they
12  were hiring for?
13       A.    At that -- yes.
14       Q.    What was that project called?
15       A.    There were multiple projects.
16       Q.    Do you know the names of the Crowell
17  clients for those projects?
18       A.    Yes.
19       Q.    Are they still working on the same
20  Crowell projects in Solomon Page's space?
21       A.    No.
22       Q.    They have -- those projects are all

Page 64

1  closed down?
2       A.    No.
3       Q.    Some of them are still open?
4       A.    Yes.
5       Q.    Are any of the attorneys that
6  Crowell did a direct hire through Ajilon in the
7  Solomon Page space still working on those open
8  projects?
9       A.    No.
10       Q.    Where are those open projects being
11  done?
12       A.    I believe, though I don't have
13  firsthand knowledge, in Crowell & Moring's law
14  firm.
15       Q.    So the direct hire attorneys are
16  just wherever they need to be within Crowell's
17  own space?
18       A.    Correct.
19       Q.    When did -- when did you first have
20  that 1201 Penn space available for Solomon Page
21  clients to use?
22       A.    It wasn't available for use until

Page 65

1  the 16th of July.
2       Q.    Okay.  And when did the attorneys
3  first start going in there to work?
4       A.    July 16th.
5       Q.    Where were they before that?
6       A.    Which attorneys?
7       Q.    The ones that came in on July 13th?
8       A.    Well, they came from multiple
9  sources.  Some were new.  I don't know where
10  they were working prior.
11       Q.    Did Solomon Page provide any of the
12  attorneys who are Crowell direct hires who are
13  working in the 1201 space?
14       A.    Yes.
15       Q.    How many?
16       A.    I don't know exact numbers.  I would
17  say in a range of 30 to 60.
18            MR. HAHN:  Counsel, can we get a
19  copy of the agreement between Solomon Page and
20  Crowell & Moring reflecting the relationship
21  that underlies the work that is being done in
22  the 1201 space?

17 (Pages 62 to 65)

## Page 66

1    Just for the record, if you say no I
2 will make a proffer to the court what is going
3 on here, which is that Solomon Page is being
4 paid under that agreement basically a margin
5 that is similar to what they would have gotten
6 had the Crowell & Moring attorneys not been
7 direct hires but they had been contracted
8 attorneys engaged through Solomon Page.
9    MR. SCHLANGER: My response to the
10 question has nothing whatsoever to do with what
11 use, if any, you intend to make of the
12 document. It will have to do with my
13 reflection on whether the document is properly
14 requested under the rules that the court sets
15 for the preliminary injunction. I will take it
16 up after this deposition is concluded.
17    MR. HAHN: Thank you, Counsel.
18    Let's mark this as Exhibit 5.
19    (Deposition Exhibit No. 5 was marked
20 for identification.)
21    BY MR. HAHN:
22 Q.    Mr. Kubicki, I am showing you an

## Page 67

1 exhibit that has been marked Exhibit 5 and it
2 is a two page e-mail that has at the top of it
3 a date of June 22 and it's from you to Bill
4 Demario with copies. Is that an e-mail that
5 you prepared to Bill Demario on June 22?
6 A.    It appears to be.
7 Q.    Do you remember preparing that
8 document?
9 A.    Yes.
10 Q.    And did you have an actual
11 face-to-face transition meeting with Bill
12 Demario?
13 A.    That is a difficult question to
14 answer. I resigned in person with Bill and
15 discussed outstanding items and brought him up
16 to speed which this e-mail was a followup to
17 that discussion.
18 Q.    Okay. Thank you.
19    MR. HAHN: Let's mark this as
20 Exhibit 6.
21    (Deposition Exhibit No. 6 was marked
22 for identification.)

## Page 68

1    BY MR. HAHN:
2 Q.    This is a three-page document. It's
3 an e-mail string actually. The last it says at
4 the top "Re: Resignation."
5    Is this an e-mail string that you
6 had with Bill Demario on June 21st?
7 A.    It appears to be.
8 Q.    If you look at the second page there
9 is a message from Wednesday, June 20 at 9:15
10 a.m. from you to Bill Demario. And there is a
11 third short paragraph in there that says "In an
12 effort to make this transition as smooth as
13 possible I have prepared a list of projects,
14 customers, upcoming commitments, et cetera for
15 us to review together and look forward to doing
16 so as soon as schedules permit."
17    Is that list reflected in the June
18 22 document? I didn't see an attachment or
19 anything to this June 20th so I am just asking
20 you whether the action items are -- well, let
21 me ask you this. Was there a different
22 document other than the one that is reflected

## Page 69

1 in the June 22 e-mail, which is Exhibit 5, or
2 is the June 22 e-mail what you had prepared to
3 go over with Bill?
4 A.    I believe the June 22 is the only
5 document that I created.
6 Q.    Okay. So it's your recollection
7 right now that what you are referring to when
8 you say in your June 20th e-mail "I have
9 prepared a list" the list is the June 22
10 e-mail?
11 A.    I was probably referring to
12 something that was going to look like this that
13 I later created. Yes, that was my intention.
14 Q.    So you created a list and you
15 actually sent a list and the list that you
16 intended to send and did send is Exhibit 5, the
17 June 22 e-mail?
18 A.    As best I recall, yes.
19 Q.    So you kept faith with Bill. You
20 told him you would send him some stuff and you
21 did send it to him?
22 A.    That was my intention.

18 (Pages 66 to 69)

Joshua Kubicki

Page 70

1    Q.    Did you keep a copy of that list?
2    A.    Well, on my personal e-mail, my G
3 mail I did CC myself.
4    Q.    That is your personal e-mail.  Not
5 your business e-mail, correct?
6    A.    Correct.
7    Q.    So that document is still on your
8 personal e-mail?
9    A.    Yes.
10   Q.    Are there any -- would it be fair to
11 say that any Ajilon documents that were sent to
12 your personal e-mail are still on your personal
13 e-mail?  Have you deleted any Ajilon documents
14 that are on your personal e-mail?
15   A.    In preparation for this, no.  While
16 I was receiving them over the past several
17 months perhaps I did.  I don't recall.
18   Q.    When was the last time you deleted
19 any Ajilon documents from your personal e-mail?
20   A.    I cannot recall but I would
21 certainly say not within the last two months.
22   Q.    So anything that existed at the time

Page 71

1 that you were still working for Ajilon is still
2 there as the time you left Ajilon?  On that
3 snapshot date you haven't deleted anything
4 since June 22?
5    A.    I can't honestly say for certain
6 that I haven't deleted.  I clean out my inbox
7 from time to time.  It gets overcrowded and I
8 delete so I don't want to testify that I
9 haven't for sure because I just don't know.
10 You check a bunch of boxes next to e-mail
11 messages and click delete.
12   Q.    In your personal e-mail do you have
13 subfolders for e-mail messages?  Do you have
14 ones from mom and --
15   A.    Yes.
16   Q.    Do you have a folder for Ajilon?
17   A.    No.
18   Q.    Have you deleted anything in your
19 personal e-mail since you received notice of
20 this lawsuit?
21   A.    I am sure I have.  In regard to
22 specific information regarding this lawsuit,

Page 72

1 no, but I have deleted e-mail I receive.  It's
2 my personal account.  I receive hundreds of
3 e-mails.
4    Q.    To your knowledge, have you deleted
5 any documents that were related to Ajilon since
6 you received notice of this lawsuit?
7    A.    To my knowledge, no.
8    Q.    Have you deleted any documents
9 related to Crowell?
10   A.    To my knowledge, no.
11   Q.    How about documents related to
12 Solomon Page?
13   A.    To my knowledge, no.
14   Q.    When you deleted documents from your
15 personal e-mail did you do it by date?  Did you
16 just get rid of or did you select specific
17 documents?
18   A.    Sometimes.  It depends.  It depends
19 on how I want to delete them.  Again, I'm not
20 trying to be cute.  It depends.
21   Q.    Do you recall ever going back into
22 your personal e-mail and specifically looking

Page 73

1 for documents relating to your work for
2 whomever that you wanted to delete?
3    A.    No.
4    Q.    That has never happened?
5    A.    Going back, no.  I am still going
6 off the qualifier subsequent to this lawsuit
7 being filed.
8    Q.    Let's start with that.  Subsequent
9 to the lawsuit being -- your receiving notice
10 of a lawsuit you never did that?
11   A.    Could you repeat.
12   Q.    You never went back and deleted
13 e-mails looking for ones that were related to
14 your work?
15   A.    No.
16   Q.    Okay.  Prior to the filing of this
17 lawsuit did you ever go back and look for
18 documents related to communications with either
19 Brunkhorst or Solomon Page and delete them from
20 your personal e-mail?
21   A.    No.
22   Q.    Have you deleted any from your

19 (Pages 70 to 73)

Page 74

1 personal e-mail related to either of those
2 after the lawsuit?
3    A.    No.  Deliberately, no.
4    Q.    Why did you qualify that with
5 "deliberately"?
6    A.    Again, because sometimes I will
7 select a whole page that looks like junk or
8 spam or stuff from all the other e-mail people
9 I get, select all on a page, it selects 20 or
10 25 and click delete.  So I don't want to
11 testify that for certain I have not deleted any
12 e-mails relating to what you are speaking of.
13 I just can't 100 percent say that.
14    Q.    Okay.  Do you recall any instances
15 in 2007 where you went back into your personal
16 e-mail specifically looking for communications
17 with a particular person or entity and selected
18 those to delete?
19    A.    I will qualify that in relation to
20 business, no.
21    Q.    What about in relation to -- without
22 giving me any names, in relation to anything

Page 75

1 else?
2    A.    Like friends, conversations with my
3 buddies about Vegas trips or whatever, yes, in
4 an attempt to clean up my inbox.
5    Q.    Your buddies going on a Vegas trip
6 are those people at Crowell?
7    A.    Sometimes.
8    Q.    There is no business aspect of that
9 at all?  These are not buddies you consider
10 part of your business network?
11    A.    I don't normally see a distinction
12 between those two things.  If they have
13 business and they are friends I don't really
14 draw a line.
15    Q.    I just wanted to make sure if we
16 were deleting people that were your business
17 network buddy friends that you were going to
18 Vegas with that that would also be a business
19 thing as well as a personal thing?
20    A.    I would say generally it wouldn't
21 be.
22    Q.    Okay.  Do you remember deleting some

Page 76

1 things relative to a trip to Vegas with some
2 buddy?
3    A.    I don't remember specifically.  I
4 probably did.
5    Q.    Do you remember why you picked that
6 out to delete?
7    A.    Sure.  When you have a group of guys
8 on an e-mail chain it can be very lengthy and
9 just going back and forth with comments with
10 one another I don't see a need to keep 50
11 e-mails of my friends ragging over each other
12 over e-mail.
13    Q.    If we had some of those is there
14 also some stuff that might be maybe reflecting
15 in an unflattering way on some of the people
16 just because it's a bunch of buddies in an
17 e-mail string?
18    A.    Not necessarily.
19    Q.    Okay.  So your reason for deleting
20 it was space or that it was too big?  I am
21 trying to understand why you picked that out of
22 all the stuff you didn't delete?

Page 77

1    A.    I not only picked that but hundreds
2 of other e-mails.  You narrowed it down to that
3 but I don't want my e-mail box to have 5,000
4 e-mails.  I try to stay as organized in my
5 personal accounts and business accounts.  It's
6 just housekeeping.
7    Q.    Did you select any of these to drop
8 into subfiles or folders?
9    A.    No.
10    Q.    So it either stays or you delete it?
11    A.    Yes.
12    Q.    Anything other than the Vegas trip
13 with the buddies that you deleted?
14    A.    Yes.
15    Q.    Anything with attorneys or the
16 contact people at law firms for work?
17    A.    Again, some of my friends are
18 attorneys at law firms so if you characterize
19 their e-mail address some use personal, some
20 use business, then yes, I did delete some of
21 that information as part of the housekeeping of
22 my inbox.

Page 78

1    Q.    What about the contact people in
2  connection with business that you do?
3    A.    I don't keep a contact list in my
4  personal e-mail so any contact information that
5  is in the actual correspondence for any e-mails
6  I do have would probably still be there.
7    Q.    But the e-mails themselves might be
8  gone?
9    A.    If I delete the e-mail the contact
10 information is gone.
11   Q.    Do you remember any e-mails from
12 people that were -- were or are contact people
13 at law firms that you have dealt with in your
14 business capacity that you deleted in 2007?
15   A.    That I deleted.  I cannot recall
16 specifically any that I deleted.
17   Q.    No names of people that you went
18 there and found e-mails from them that you
19 deleted?
20   A.    Considering I don't recall deleting
21 any I couldn't give you the names of people I
22 may or may not have deleted.

Page 79

1    Q.    Do you recall deleting any e-mails
2  because you didn't want an electronic paper
3  trail of a communication with somebody that you
4  had done business with at Ajilon?
5    A.    No.
6    Q.    Exhibit No. 5, did you give that
7  information to anyone at Solomon Page?
8    A.    What information?
9    Q.    The information that is in that
10 list?
11   A.    I am taking time to read it.
12   Q.    That's fine.
13   A.    I do not recall specifically
14 providing the information contained in this
15 e-mail to anyone at Solomon.
16   Q.    You did not -- did you or did you
17 not give that actual list to anyone at Solomon?
18   A.    No.
19   Q.    Have you ever given any confidential
20 documents that you prepared while you were at
21 Ajilon to anyone at Solomon?
22   A.    If you consider my employment

Page 80

1  agreement confidential then yes, I did provide
2  that to Solomon.
3    Q.    When did you give that to Solomon?
4    A.    I may not have actually given it.
5  My recruiter Mark Brunkhorst you mentioned
6  earlier I provided it to him.  Whether he
7  provided it to Solomon or not I'm not aware of.
8  I don't recall specifically if I provided it to
9  Solomon myself.
10   Q.    When did you provide it to
11 Brunkhorst?
12   A.    It might be -- should be in e-mails
13 that you have ahead of you or before you.
14 Sorry.  There is my tax information in there.
15 A W2 is typical stuff you give a headhunter.
16   Q.    Do you recall giving anything else
17 to him?
18   A.    My tax info.  I believe I gave him
19 my employment agreement as well, and I gave him
20 an overview of how I approach my business
21 because he was trying to understand it.
22   Q.    Was that a document that you

Page 81

1  prepared specifically for him?
2    A.    I changed the document but I did not
3  from start to finish prepare it solely for that
4  purpose.
5    Q.    What document did you change?
6    A.    Business plan.
7    Q.    Who was the business plan prepared
8  for?
9    A.    Prepared for myself to share with my
10 then -- I forget his title -- senior vice
11 president Mark Davies of Ajilon Legal.
12   Q.    When did you prepare the business
13 plan for Mark Davies?
14   A.    I don't remember the time frame.  It
15 was something I worked up on my own over the
16 course of my years there so there wasn't a
17 specific request from Mark to me to prepare a
18 business plan.  Just kind of my mental muses
19 that I collected over the course of my years at
20 Ajilon that I consolidated down into a
21 document.
22   Q.    Did Mark ask you to send this

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

## Page 82

1  information to him?

2      A.    He asked me for my impressions and

3  he asked me for my take on business on an

4  ongoing basis so I'm sure in that, although I

5  don't specifically recall, he asked me for

6  something like that.

7      Q.    I'm going to show you out of Exhibit

8  1 it's a collection of documents beginning with

9  JK 181 and ending with JK 194.

10         If you could let me know whether

11  that e-mail to Mr. Brunkhorst and the

12  attachments are the documents you were just

13  referring to?

14     A.    Do you have the Page 1?  This says

15  Page 2 of 3 on here.  I just want to see that.

16  It should be JK 180.

17     Q.    I have just handed the witness

18  JK 180.

19     A.    Would you repeat the question.

20     Q.    Is that e-mail exchange with Mr.

21  Brunkhorst then the attachment the exchange

22  that you were just describing about what you

## Page 83

1  provided to Mr. Brunkhorst?

2      A.    Yes.

3      Q.    There is a document in there that

4  looks like a business plan.  Maybe it's -- you

5  characterize it however you want.  I believe it

6  begins on page JK 183.  It says "Drafted by

7  Joshua P. Kubicki, Esquire" and it has as a

8  background across the page "Confidential."

9         Did it say confidential on it when

10  you sent it to Mr. Brunkhorst?

11     A.    I don't specifically recall.  I

12  don't know.

13     Q.    Is this a printout from your e-mail?

14     A.    Not to be cute again, it looks like

15  it had been photocopied.  This is not the

16  original I printed out.  It looks like a

17  photocopy of the original.

18     Q.    Do you know if the -- do you know

19  where that background that says confidential

20  came from?  Is that something that was embedded

21  in the document that you had from your

22  computer?

## Page 84

1      A.    It may have been a watermarking.

2      Q.    That's what I call it is a

3  watermark?

4      A.    Yes.  Yes.

5      Q.    Was that a watermark that was in the

6  original document that you sent to Mark Davies?

7      A.    I have no recollection of that.

8      Q.    In your mind was this document

9  confidential?

10     A.    Not necessarily.

11     Q.    Did someone else make it

12  confidential and you just wound up with a

13  watermark on it?

14     A.    No.

15     Q.    As I understand your testimony, the

16  document that you sent to Mr. Brunkhorst was a

17  modification of a document that you prepared

18  for your boss Mark Davies at Ajilon while you

19  were working for Ajilon; is that correct?

20     A.    No.

21     Q.    Okay.  It was not a document you

22  prepared while working at Ajilon?

## Page 85

1      A.    That is correct.

2      Q.    You prepared it when you were

3  working some place else?

4      A.    No.  I prepared it while at Ajilon.

5      Q.    You were --

6      A.    But I wasn't requested by Mark

7  Davies to prepare it.

8      Q.    You were a full-time management

9  employee for Ajilon when you prepared that

10  document; is that correct?

11     A.    Partially.  I may -- I believe I

12  began creating some of the thoughts that are

13  contained within this document while I was a

14  branch manager and then managing director.  I

15  just want to be clear about that.  It was a

16  long process in developing this.

17     Q.    Why did you send it to Mr.

18  Brunkhorst?

19     A.    He was struggling to understand the

20  concepts.  He had a sort of pedestrian

21  understanding of the staffing business and what

22  I offer in my service and how I approach

Esquire Deposition Services          MD - 1-800-539-6398
D.C. - 1-800-441-3376                VA - 1-800-752-8979

Joshua Kubicki

Page 86

1 clients is fundamentally different than a
2 typical staffing agency and I wanted Mr.
3 Brunkhorst as my recruiter who is representing
4 me out there to possible employers to
5 understand and be able to fully comprehend and
6 communicate sort of how I operate.
7    Q.    So you sent him a document that said
8 confidential on it during the period of time
9 that you were employed by Ajilon?
10    A.    It appears to be.  Again, my taxes
11 were attached to this as well and I was
12 obviously very sensitive about that and
13 earnings and all that.  As I mention, "please
14 treat as confidential."  I was trying to apply
15 that to everything here.  I was nervous about
16 sending out my W-2s and all that type of stuff.
17    Q.    Is that document that you prepared
18 that actually says "confidential" on it, is it
19 confidential?
20    A.    I don't believe so.
21    Q.    Okay.  That's all I have on that.
22 Thank you.

Page 87

1        I'm going to show you documents from
2 your compilation Exhibit 1, JK 225 through JK
3 234.
4        Can you tell me what this document,
5 this set of documents is?  It's called "March
6 Madness RSVP 2004."
7    A.    This is a list prepared by Lang
8 Carter who is a current employee of Ajilon
9 Legal in the D.C. branch in regard to all
10 invitees, to some extent RSVPs to an annual
11 event that Staffwise used to through each year
12 for the NCAA March Madness week that basically
13 it would be at the ESPN.  It is a big client
14 entertainment function.  It is that list.
15    Q.    So when you say client entertainment
16 who are -- are those all clients?
17    A.    I have no idea as I did not prepare
18 the list.
19    Q.    Do they look like clients?
20    A.    They look like clients and possible
21 clients as the majority of them are law firms
22 looking at it with some that I know Ajilon does

Page 88

1 business with.
2    Q.    Have you ever done any events at the
3 ESPN Zone for Ajilon?
4    A.    I don't understand the question.
5    Q.    Have you ever sponsored any events
6 at ESPN Zone for Ajilon?
7    A.    Prior to -- no.  This was not my
8 event.
9    Q.    I am not talking about this.  You
10 know what ESPN Zone is?
11    A.    Yes.
12    Q.    Have you ever done anything when you
13 were at Ajilon at ESPN Zone?
14    A.    Yes.
15    Q.    What did you do?
16    A.    I think I rented out a room for --
17 it was an NFL football game that might have
18 been the play offs.  I rented out a room for a
19 cocktail, light hors d' oeuvres sort of
20 reception for clients.
21    Q.    And who did you invite to that?
22    A.    I would have invited clients like

Page 89

1 Crowell & Moring, Mayer Brown, Sidley.  We
2 invited some other clients at the time,
3 prospects of other salespeople that were in the
4 office as well.  I don't necessarily remember
5 those.
6    Q.    How many people attended?
7    A.    Unfortunately it wasn't a popular
8 event so less than 15.
9    Q.    But that was something where you
10 spent Ajilon money to have clients come over
11 and you would entertain them at something like
12 that?
13    A.    Yes.  It was a branch event.
14    Q.    This was a list that you had; is
15 that correct?
16    A.    That is a list that Lang Carter
17 forwarded to me to my personal e-mail account.
18    Q.    You still have this list, correct?
19    A.    Yes, I did as I produced it.
20    Q.    That's why we have it.  Thank you.
21        MR. SCHLANGER:  Can I take one
22 minute?

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Joshua Kubicki

Page 90

1          (A short recess was taken.)
2          MR. HAHN: This is Kubicki 7. Let's
3 make this Kubicki 8.
4          (Deposition Exhibit Nos. 7 and 8
5 were marked for identification.)
6          BY MR. HAHN:
7     Q.    Mr. Kubicki, I am showing you
8 Exhibit 7. This is an e-mail string from March
9 of 2005. It starts with one from Chris Wood
10 and is that an e-mail string that you recall
11 being CC'd on?
12    A.    I don't specifically recall this. I
13 see that I am CC'd so yes, but this e-mail
14 doesn't stand out in my memory.
15    Q.    Who is Chris Wood or who was Chris
16 Wood?
17    A.    He is counsel at the law firm of
18 Dickstein Shapiro.
19    Q.    And do you remember -- do you still
20 have a relationship with Mr. Wood?
21    A.    Yes.
22    Q.    When was the last time you spoke

Page 91

1 with him or communicated with him?
2     A.    Last weekend.
3     Q.    And what were you doing last
4 weekend?
5     A.    Making arrangements for this
6 weekend. There is a concert that we are
7 attending with other friends this weekend.
8     Q.    Is that a personal friendship or is
9 it a business relationship?
10    A.    Both.
11    Q.    How long have you known Chris Wood?
12    A.    Probable five, six years.
13    Q.    And how did you meet him?
14    A.    Again, my relationship with Crowell.
15 He was prior to joining Dickstein an associate
16 at Crowell so with both working there and going
17 to law school with various people there he was
18 part of the social circle that I just got to
19 know.
20    Q.    And did you try to work jointly with
21 Andy Jewell when you were at Ajilon to develop
22 work with Dickstein?

Page 92

1     A.    Yes.
2     Q.    And Joel Klineman did or does he
3 work at Dickstein?
4     A.    I believe so. He was not my
5 contact.
6     Q.    Do you know who Joel Klineman is?
7     A.    I believe he is an attorney at
8 Dickstein.
9     Q.    So someone else had that contact?
10    A.    Yes.
11    Q.    Do you know who had that contact?
12    A.    I believe it was Arthur Polott,
13 P-O-L-O-T-T.
14    Q.    And was Arthur in a sales position
15 at Ajilon?
16    A.    Yes.
17    Q.    Did you have any relationship with
18 Dickstein other than through Mr. Wood?
19    A.    Chris Wood was my foray into
20 Dickstein.
21    Q.    But your understanding is prior to
22 the communications with Mr. Wood, Mr. Polott

Page 93

1 already had a relationship with Joel Klineman
2 at Dickstein?
3     A.    Yes.
4     Q.    Thank you. I am showing you now
5 Exhibit 8 which is an e-mail message from
6 Monica Parham to Josh Kubicki and others from
7 November 22, 2004.
8          Do you remember this e-mail
9 exchange?
10         MR. SCHLANGER: Bates number,
11 please.
12         MR. HAHN: This is one of ours. I'm
13 sorry. Here it is. It was hidden behind your
14 magazine.
15         MR. SCHLANGER: Your magazine.
16         BY MR. HAHN:
17    Q.    Do you recall this e-mail exchange?
18    A.    I'm reading. I'm sorry. Could you
19 repeat the question.
20    Q.    Do you recall the e-mail exchange?
21    A.    I don't specifically recall this. I
22 see now I was on it but this did not stand out

24 (Pages 90 to 93)

Page 94

1 in my memory.

2     Q.     Who is or was Monica Parham?

3     A.     She was and is I believe a partner.

4 If not, counsel at Crowell & Moring.

5     Q.     And do you recall why you were

6 having an e-mail exchange with her in November

7 of 2004?

8     A.     I believe she had a small need, a

9 small project although she engaged Ajilon Legal

10 in to provide temp attorneys.

11     Q.     Who is Andy Lu?

12     A.     Again, he is an associate or was

13 counsel, I forget their exact titles, an

14 attorney at Crowell.

15     Q.     And Tori Melroy?

16     A.     Tori Melroy whose name is now Tori

17 Phillips, she was married, at that time was

18 recruiting coordinator or director for the

19 firm, permanent recruiting director.

20     Q.     And in November of 2004 from looking

21 at this it appears that you were trying to get

22 additional business for Ajilon with Crowell; is

Page 95

1 that correct?

2     A.     The way it is written it appears we

3 already have business with them and we are

4 laying out sort of the process for how to do

5 time sheet approval, all that sort of stuff.

6     Q.     It appears as though this -- you

7 were getting individual projects through

8 individual lawyers at Crowell at the time. So

9 you had to explain how the relationship worked

10 to Crowell even though you had a relationship

11 with Crowell. Is that fair to say?

12     A.     Some attorneys were not experienced

13 in A, the use of temporary attorneys, and, B,

14 the system that Ajilon used for the

15 administrative aspects of it. So on-line time

16 sheets, you know, providing them user name,

17 password and running them through that process,

18 not every attorney at Crowell was familiar with

19 that process.

20     Q.     I guess what I am saying is you had

21 to explain that to the individual lawyers who

22 wanted to use Ajilon services. It wasn't

Page 96

1 something where the lawyers went to their

2 procurement department and they said you can

3 use Ajilon, Hudson, any of these different

4 vendors but we are the ones that tell Ajilon

5 how it is that we want this billed or how we

6 want this done?

7     A.     At this time I don't know quite how

8 that whole process was managed internally

9 within Crowell.

10     Q.     Did you have any large projects

11 where you were supplying dozens of contract

12 attorneys with Crowell at the time?

13     A.     I cannot recall.

14     Q.     Probably not though. This would

15 have been pretty early on?

16     A.     November of '04.

17     Q.     You started in April of '04?

18     A.     Right. I honestly just don't know.

19 I don't remember.

20     Q.     Do you remember your first really

21 big project with Crowell?

22     A.     Well, you have to define really big.

Page 97

1     Q.     Do you remember being really excited

2 about some project that you got with Crowell

3 where the dollar signs were just --

4     A.     I think you are referring to what is

5 referred to as the big project at Crowell.

6 Yes, I remember that one.

7     Q.     When did that start?

8     A.     That started in spring of '05. I

9 don't remember the specific month.

10     Q.     And who did you negotiate that deal

11 with at Crowell?

12     A.     There was a number of people,

13 specifically an associate by the name of

14 Michael Van Arsdall, V-A-N capital

15 A-R-S-D-A-L-L and a partner Jeane Thomas,

16 J-E-A-N-E Thomas were the principal players in

17 that, but I had ongoing conversations and

18 dialogue with a number of people at the firm in

19 setting that project up.

20     Q.     Okay. And at that point you had

21 been with Ajilon for about a year?

22     A.     Probably a little less than. I

Esquire Deposition Services

D.C. - 1-800-441-3376

MD - 1-800-539-6398

VA - 1-800-752-8979

Joshua Kubicki

Page 98

1 would say when I first started working, gearing
2 up.
3     Q.     And do you recall if there were
4 other firms that were looking to get that work?
5     A.     Yes.
6     Q.     Who else was looking to get that
7 work?
8     A.     I don't know specifically.  I do
9 know that Crowell was having a number of
10 staffing agencies as well as E Discovery
11 vendors sort of coming in and presenting
12 pitches, however you want to call it to them
13 for a hypothetical project at that point.
14     Q.     Okay.  And you put together a
15 counterproposal?
16     A.     I don't recall putting together a
17 formal proposal.  It was more of a conversation
18 or series of conversations.
19     Q.     Were any other Ajilon employees
20 involved in getting that work?
21     A.     There was one other person who
22 helped me in different aspects of that and that

Page 99

1 was Andrew Jewell.
2     Q.     What was his job at the time?
3     A.     Regional vice president for the east
4 coast for Ajilon Legal.
5     Q.     He was your boss?
6     A.     Yes.
7     Q.     What assistance did he provide?
8     A.     Very basic sort of a sounding board,
9 if you will, and someone to go into the
10 boardroom over at Crowell which was surrounded
11 with anyone from 10 to 14 Crowell people and
12 myself and Andy to sort of have the first
13 conversation about this.  So it was more or
14 less at that time a kind of having someone else
15 there on your team.
16     Q.     Did Andy have a background in the
17 industry?
18     A.     I believe so.
19     Q.     Was it more extensive than yours?
20     A.     I can't answer that question the way
21 that's phrased because I don't know what you
22 mean by extensive.

Page 100

1     Q.     He was your boss, right?
2     A.     Yes.
3     Q.     So when you went in and did this
4 presentation to the room full of Crowell people
5 it wasn't just that D.C. guy was there; you had
6 the east coast guy there, correct?
7     A.     Yes.
8     Q.     Was it important to show that level
9 of commitment from your company that somebody
10 above you took the time to come to that
11 meeting?
12     A.     I don't know what was important to
13 Crowell or not at that point.  I was not using
14 Andy for his title.  I was using it because it
15 was either Andy walks in there with me, I walk
16 in alone or I walk in with Arthur Polott, the
17 other sales rep.  Arthur and I didn't see eye
18 to eye on many things in many aspects of the
19 business so I didn't feel comfortable bringing
20 him.  I didn't want to walk in alone.
21     Q.     Did Andy contribute anything in that
22 meeting?

Page 101

1     A.     All I remember is I did the majority
2 of the talking.  He may have said and
3 contributed.  I would say though it was less
4 than ten percent.
5     Q.     Is Andy Jewell a pretty bright guy?
6     A.     I mean I would consider -- he is a
7 friend so I certainly would say yes.
8     Q.     Do you think the presentation was
9 enhanced by the fact that the regional vice
10 president was there?
11     A.     Again, I don't know what Crowell
12 considers important or not.  I honestly don't
13 know.  I wasn't privy to how they made the
14 decision.
15     Q.     Did Andy Jewell want to support you
16 in trying to get that business?
17     A.     Yes.
18     Q.     Did he tell you that was part of the
19 reason that he was willing to take the time to
20 be there?
21     A.     I don't remember specifically if he
22 articulated it that way but I'm sure that was

26 (Pages 98 to 101)

Page 102

1 one of his motives.

2    Q.    He wouldn't have gone on a

3 presentation to a one lawyer law firm to hire

4 one contract attorney for a week, right?

5    A.    He has.  He did in his capacity.

6    Q.    On something of that scale?

7    A.    Yes.

8    Q.    So in other words, you got a lot of

9 support from upper management in your sales

10 activities?

11    A.    No.

12    MR. HAHN:  Okay.  Let's make this

13 Exhibit 9.

14    (Deposition Exhibit No. 9 was marked

15 for identification.)

16    BY MR. HAHN:

17    Q.    I am showing you a document that has

18 been marked as Exhibit 9.  It's called

19 "Staffing Partnership Development."

20    Do you know what this document is?

21    A.    It looks like it's a sales -- I

22 don't want to say presentation but a sales

Page 103

1 oriented document.

2    Q.    Did you prepare it?

3    A.    I believe I did.

4    Q.    I notice the bullets -- for example,

5 there are black dots, open dots and then check

6 marks.  Is that a way that you would set up a

7 document yourself?

8    A.    Not now.

9    Q.    But it seemed distinctive.  I

10 thought that might be something that would

11 trigger your memory?

12    A.    It was perhaps an ill attempt at

13 creativity.

14    Q.    I kind of like it.  It is also

15 something that was individual.  I thought maybe

16 you would know if you did that.

17    A.    I don't specifically remember.

18    Q.    Do you have any recollection of

19 giving this document to anyone ever?

20    A.    It's difficult to look at this

21 document like it is.  I don't know if there is

22 anything supporting it or if it was attached to

Page 104

1 an e-mail.  I don't know if this was a draft,

2 if this was a final document prepared and

3 provided to anybody.  Looking at just what is

4 in front of me I can't answer that question.

5    Q.    The third page of this is a thing

6 called "Partnership Development and

7 Post-Project Debriefing" dated July 21, 2004.

8    Do you know what that was?  I don't

9 think that's the document.  I think this is a

10 cover page for it.

11    A.    Yeah.  Again, in the course of

12 business you prepare many sorts of documents to

13 provide your team or clients and I just don't

14 recall specifically this document or what the

15 object or purpose of this was just looking at

16 that title page.

17    Q.    Would that have been something you

18 prepared for Crowell & Moring though in July of

19 '04?

20    A.    I could have.

21    Q.    Okay.  Do you remember a project

22 that would have ended that you would have done

Page 105

1 debriefing on back then?

2    A.    That may have been -- that may have

3 been a project at Crowell with a number of

4 agencies sort of there in supplying contract

5 attorneys.  I don't recall the project

6 specifically or even the timing of it.  But

7 seeing this document and sort of that date it

8 is kind of jogging my memory about something

9 relating to some sort of project there.

10    MR. HAHN:  Mark this as Exhibit 10.

11    (Deposition Exhibit No. 10 was

12 marked for identification.)

13    BY MR. HAHN:

14    Q.    Do you remember this document, a

15 July 27, '04 document, a letter to Buckley

16 Kolar?  Did you have anything to do with this?

17    A.    Buckley.  I have no idea.  Buckley

18 Kolar was not nor ever a client or a target of

19 mine.  I don't know.  This appears to be an

20 agreement between Crowell & Moring and Ajilon.

21 Why it's addressed to Buckley Kolar I have no

22 idea.

27 (Pages 102 to 105)

Page 106

1    Q.    Do you know who Buckley Kolar is?
2    A.    I believe it's a law firm.
3    Q.    Do you know what this -- this
4  appears to be a draft Crowell document.  Could
5  this have been something that was being created
6  to go to Crowell and it was just a draft and it
7  just hadn't had the --
8    A.    I mean it appears to be that.  I
9  can't say for certain.  The language and such
10  indicates there was an agreement or draft
11  agreement, possible agreement between Crowell
12  and Ajilon.
13    Q.    This isn't signed, right?
14    A.    It doesn't appear to be.
15    Q.    So you have never seen this before?
16    A.    Not this specific document.
17    Q.    Have you seen anything like it that
18  went to Crowell?
19    A.    Yes.
20    Q.    What did you see that went to
21  Crowell?
22    A.    An agreement for the AT&T Bellsouth

Page 107

1  acquisition.
2    Q.    It looked like this.  It just went
3  to Crowell instead of Buckley Kolar?
4    A.    I mean, this looks like an agreement
5  and there was an agreement for AT&T Bellsouth.
6  I just don't know because the Buckley Kolar is
7  sort of throwing me for a loop exactly what
8  this document is.
9        MR. HAHN:  Okay.  Let's mark this as
10  Exhibit 11.
11        (Deposition Exhibit No. 11 was
12  marked for identification.)
13        BY MR. HAHN:
14    Q.    This is a July 27, 04 letter to
15  Rebecca Anderson from you.
16        Do you recall sending this letter?
17    A.    Yes.
18    Q.    Did you know Rebecca Anderson before
19  July of '04?
20    A.    No.
21    Q.    Thank you.
22        MR. HAHN:  Let's mark this as

Page 108

1  Exhibit 12.
2        (Deposition Exhibit No. 12 was
3  marked for identification.)
4        BY MR. HAHN:
5    Q.    Did you prepare Exhibit 12 in your
6  capacity as managing director of national legal
7  projects for Ajilon Legal to present to Mayer
8  Brown?
9    A.    Yes.
10    Q.    Did you actually give that to anyone
11  at Mayer Brown?
12    A.    I may have.  I don't specifically
13  recall.
14    Q.    If you did give it to someone who
15  would you have given it to?
16    A.    Again, I remember this is sort of
17  not something that Mayer typically wanted.
18  They didn't like being solicited in this manner
19  so I am not sure who I would have sent it to.
20  I may have prepared it to be sent but I don't
21  specifically recall sending it to anyone at
22  Mayer Brown.

Page 109

1        MR. HAHN:  Let's mark this as
2  Exhibit 13.
3        (Deposition Exhibit No. 13 was
4  marked for identification.)
5        BY MR. HAHN:
6    Q.    This is a June 19, 2007 draft
7  agreement from Ajilon Staffwise Legal to
8  Crowell & Moring regarding the direct hire of
9  candidates for a $1,000 per candidate fee.
10        Did you have anything to do with the
11  negotiation of this document?
12    A.    Yes.
13    Q.    At the time that -- well, do you
14  know whether this document was executed?
15    A.    This appears to be a draft.
16    Q.    Right.  Do you know whether there
17  was an executed version of this?
18    A.    There was a contract and agreement
19  between Ajilon and Crowell that was executed.
20  I don't know what the differences are between
21  the two.
22        MR. HAHN:  Let's mark this as

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Joshua Kubicki

Page 110

1 Exhibit 14.

2         (Deposition Exhibit No. 14 was

3 marked for identification.)

4     BY MR. HAHN:

5     Q.    This is an invoice from Ajilon Legal

6 to Crowell & Moring, Linda Novosel,

7 N-O-V-O-S-E-L, for 42 direct hires at $1,000

8 per hire for a total of $42,000.  The invoice

9 is dated 6-17-07.

10        Is this an invoice in connection

11 with the transaction that was reflected in

12 Exhibit 1, the draft contract?

13    A.    It appears to be.  I have never seen

14 this specific invoice before but it appears

15 like it is, yes.

16    Q.    Is that all part of the transaction?

17    A.    It appears to be.

18    Q.    Was there any other direct hire

19 agreement with Crowell & Moring and Ajilon in

20 June other than this one for 42 direct hires?

21    A.    No, I don't believe so.

22    Q.    At the time that this transaction

Page 111

1 occurred between Crowell and Ajilon did you

2 know what the direct hires were going to be

3 doing?

4     A.    Yes.

5     Q.    Did you also know that you were

6 going to be going to work for Solomon Page?

7     A.    No.  You have to be specific about

8 when.

9     Q.    June 17th.

10    A.    I'm sorry.  I need a calendar to

11 look at that.  What day of the week that falls

12 on.  Does anyone have a calendar?

13    Q.    What's the first day that you recall

14 you were going to go to work for Solomon Page?

15    A.    I didn't sign an agreement with

16 Solomon Page until Monday the twenty --

17 whatever that Monday in June was.  Following

18 the week of the 17th.  Whatever that Monday is.

19    Q.    Had you had any conversations with

20 anyone at Solomon Page -- when did you get an

21 offer from Solomon Page that you orally

22 accepted?

Page 112

1     A.    Sometime during the week of the 17th

2 I believe.  I don't remember specifically.

3     Q.    It's your testimony that whether you

4 were actually going to go to Solomon Page was

5 still in the balance on June 17th?

6     A.    Yes.

7     Q.    You might not have gone?

8     A.    Yes.

9     Q.    Okay.  On June 17th or thereabouts

10 had you talked with Solomon Page about having

11 Kimberly Danowski and Jon Pomykala come with

12 you to Solomon Page?

13    A.    I made it known I would like room

14 for them as part of the team at Solomon Page,

15 yes.

16    Q.    And did you make any representation

17 about why they should come and what they should

18 be paid?

19    A.    Yes.

20    Q.    Did you tell Solomon Page it was

21 important to you in order to be able to develop

22 business that you have them as part of your

Page 113

1 team?

2     A.    I certainly represented to Solomon

3 that I would like them to be part of my team

4 but whether they came or not my ability to do

5 business would be the same.

6     Q.    Did you say to anyone at Solomon

7 Page that their help to you would be

8 invaluable?

9     A.    I don't specifically recall using

10 that language.

11    Q.    I mean, is it your belief that

12 having that whole team come over would be

13 invaluable?

14    A.    It would be helpful.  I wouldn't say

15 invaluable.

16    Q.    It would be inaccurate to say it

17 would be invaluable?

18    A.    Yes.

19        MR. SCHLANGER:  It's 5:30.  We have

20 been at this since no later than 2:15.  I will

21 give you another ten minutes.

22        MR. HAHN:  Okay.  Counsel, I think

29 (Pages 110 to 113)

| Page 114 | Page 116 |
|---|---|
| 1 you have been cooperative.  We did have an | 1    CERTIFICATE OF NOTARY PUBLIC |
| 2 agreement about sticking to times and we are | 2    I, Bonnie L. Russo, the officer before |
| 3 over the time that we were going to end so I am | 3 whom the foregoing deposition was taken, do |
| 4 going to stop the deposition now. | 4 hereby certify that the witness whose testimony |
| 5    Thank you, Mr. Kubicki, for your | 5 appears in the foregoing deposition was duly |
| 6 cooperation. | 6 sworn by me; that the testimony of said witness |
| 7    MR. SCHLANGER:  Thank you. | 7 was taken by me in shorthand and thereafter |
| 8    MR. HAHN:  Read and sign? | 8 reduced to computerized transcription under my |
| 9    MR. SCHLANGER:  Yes. | 9 direction; that said deposition is a true |
| 10    (Whereupon, the proceeding was | 10 record of the testimony given by said witness; |
| 11 concluded at 5:29 p.m.) | 11 that I am neither counsel for, related to, nor |
| 12 | 12 employed by any of the parties to the action in |
| 13 | 13 which this deposition was taken; and further, |
| 14 | 14 that I am not a relative or employee of any |
| 15 | 15 attorney or counsel employed by the parties |
| 16 | 16 hereto, nor financially or otherwise interested |
| 17 | 17 in the outcome of the action. |
| 18 | 18    _____ |
| 19 | 19    Notary Public in and for |
| 20 | 20    the District of Columbia |
| 21 | 21 My Commission expires:  May 14, 2010 |
| 22 | 22 |

| Page 115 | Page 117 |
|---|---|
| 1    ACKNOWLEDGMENT OF DEPONENT | 1 Mr. Michael A. Schlanger |
| 2 I, JOSHUA P. KUBICKI, do hereby acknowledge I | 1201 Pennsylvania Avenue, N.W. |
| 3 have read and examined the foregoing pages of | 2 Washington, D.C. 20004 |
| 4 testimony, and the same is a true, correct and | 3 |
| 5 complete transcription of the testimony given | 4 |
| 6 by me, and any changes or corrections, if any, | 5 IN RE:  Ajilon vs. Kubicki |
| 7 appear in the attached errata sheet signed by | 6 |
| 8 me. | 7 Dear Mr Schlanger: |
| 9 _____  _____ | 8 Enclosed please find your copy of the |
| 10 Date    JOSHUA P. KUBICKI | deposition of JOSHUA P. KUBICKI along with the |
| 11 | 9 original signature page.  As agreed, you will |
| 12 | be responsible for contacting the witness |
| 13 | 10 regarding reading and signing the transcript. |
| 14 | 11 Within 30 days of receipt, please forward |
| 15 | errata sheet and original signature page signed |
| 16 | 12 to opposing counsel. |
| 17 | 13 If you would like to change this procedure or |
| 18 | if you have any questions, please do not |
| 19 | 14 hesitate to call. |
| 20 | 15 Thank you. |
| 21 | 16 Yours, |
| 22 | 17 |
| | 18 |
| | 19 Bonnie L. Russo |
| |    Reporter/Notary |
| | 20 |
| | 21 |
| | 22 |

30 (Pages 114 to 117)

**Joshua Kubicki**

Page 118

```
 1              DEPOSITION ERRATA SHEET
        CASE CAPTION:  Ajilon vs. Kubicki
 2   DEPONENT:  Joshua P. Kubicki
        DEPOSITION DATE:  August 2, 2007
 3          I have read the entire transcript of my
        Deposition taken in the captioned matter or the
 4   same has been read to me.  I request that the
        changes noted on the following errata sheet be
 5   entered upon the record for the reasons
        indicated.  I have signed my name to the Errata
 6   Sheet and the appropriate Certificate and
        authorize you to attach both to the original
 7   transcript.
        PAGE/LINE        CHANGE           REASON
 8   _____
        _____
 9   _____
        _____
10   _____
        _____
11   _____
        _____
12   _____
        _____
13   _____
        _____
14   _____
        _____
15   _____
        _____
16   _____
        _____
17   _____
        _____
18   _____
        SIGNATURE_____DATE_____
19          JOSHUA P. KUBICKI
20
21
22
```

31 (Page 118)

| A | | | | |
|---|---|---|---|---|

**A**

**ability** 35:19 36:4
113:4
**able** 7:17 35:11
41:17 46:2
49:10 86:5
112:21
**absolutely** 15:4
**acceptable** 47:5
**accepted** 111:22
**access** 8:3 9:9,20
10:2 11:18
14:19 18:11
21:19 22:1
**accessed** 21:21
**account** 72:2
89:17
**accounts** 10:10
11:6 35:3,4,10
77:5,5
**accurate** 19:6,7
22:6
**accurately** 57:8
**acknowledge**
115:2
**ACKNOWLE...**
115:1
**acquisition** 107:1
**action** 1:5 68:20
116:12,17
**active** 17:11,13
34:20 35:1,2
49:11
**activities** 102:10
**actual** 35:2,15,19
42:10 67:10
78:5 79:17
**add** 16:20
**additional** 53:18
53:21 54:5,10
54:11,14 55:13
94:22
**address** 16:4
77:19
**addressed** 105:21
**adequately** 18:10

23:16
**administrative**
95:15
**advantage** 47:5
48:4
**affect** 36:4
**agencies** 24:22
25:4 98:10
105:4
**agency** 58:3 86:2
**agent** 51:18
**ago** 54:6
**agreed** 6:8 61:7
117:9
**agreement** 4:20
5:22 33:8,10
60:17 61:11,13
61:18 65:19
66:4 80:1,19
105:20 106:10
106:11,11,22
107:4,5 109:7
109:18 110:19
111:15 114:2
**ahead** 80:13
**Ajilon** 1:4 5:13,16
19:9,10,14,15
19:20,22 21:3
29:3 30:13 31:1
33:5,9,18,21
34:8,21 35:5,5,8
35:10,14,18
36:2,9,18,20,21
37:17 38:3 39:3
41:6 43:16,19
44:14 46:16
48:12,22 49:2
54:16 55:7,10
55:14,18,22
56:7 62:6,9,13
62:13,14,19
63:7,8 64:6
70:11,13,19
71:1,2,16 72:5
79:4,21 81:11
81:20 84:18,19

84:22 85:4,9
86:9 87:8,22
88:3,6,13 89:10
91:21 92:15
94:9,22 95:14
95:22 96:3,4
97:21 98:19
99:4 105:20
106:12 108:7
109:7,19 110:5
110:19 111:1
117:5 118:1
**Ajilon's** 6:4 36:22
37:4
**al** 1:6
**ALJ** 29:21 30:10
**amass** 10:22
**amount** 21:19
25:2 60:21
**Anderson** 107:15
107:18
**Andrew** 30:11
99:1
**Andy** 91:21 94:11
99:12,16 100:14
100:15,21 101:5
101:15
**annual** 87:10
**answer** 7:22
18:10 19:6
23:17 26:7,21
27:13,17,20
28:2 36:1 42:19
67:14 99:20
104:4
**answers** 19:7
23:21
**anybody** 41:22
45:4,11 104:3
**Anyway** 56:22
**appear** 6:21
106:14 115:7
**APPEARANCES**
3:1
**appears** 30:2,6
31:3 67:6 68:7

86:10 94:21
95:2,6 105:19
106:4,8 109:15
110:13,14,17
116:5
**apply** 86:14
**approach** 80:20
85:22
**appropriate**
39:18 118:6
**approval** 95:5
**approved** 53:22
**approximately**
33:20
**April** 29:14 30:22
31:17 33:5 34:6
96:17
**area** 40:22
**arena** 24:13
**arrangement**
50:9,10,14
51:13
**arrangements**
91:5
**Arsdall** 97:14
**Arthur** 92:12,14
100:16,17
**articulate** 37:9
**articulated**
101:22
**ascertain** 19:8
**asked** 22:19,21
23:20 53:2 82:2
82:3,5
**asking** 27:14 28:1
43:9 68:19
**aspect** 18:4 75:8
**aspects** 12:4
95:15 98:22
100:18
**assemble** 7:17
**assembled** 7:10
15:7
**asset** 40:17
**assets** 41:13
**assigned** 17:15

22:20
**assignment** 44:18
**assignments**
42:11
**assistance** 99:7
**associate** 5:19
32:16 37:11
91:15 94:12
97:13
**associated** 37:20
61:1
**assuming** 16:18
**attach** 118:6
**attached** 29:20
86:11 103:22
115:7
**attachment** 68:18
82:21
**attachments**
82:12
**attempt** 75:4
103:12
**attended** 89:6
**attending** 91:7
**attorney** 32:1
43:6,8 48:18
92:7 94:14
95:18 102:4
116:15
**attorneys** 10:3
12:7 17:15
22:19 33:1 35:3
38:17,20 39:5
39:13 40:12,16
41:1 42:7 43:4
45:5,22 46:18
47:13,16 51:4
62:15,18,18
63:5,6,8 64:5,15
65:2,6,12 66:6,8
77:15,18 94:10
95:12,13 96:12
105:5
**AT&T** 106:22
107:5
**August** 1:13 2:5

59:2 118:2
**Austin** 41:17
45:14
**authorities** 13:4
**authorize** 118:6
**available** 24:7
32:11 46:10
47:19 52:22
53:3 64:20,22
**Avenue** 2:12 3:4
3:10 117:1
**aware** 7:14 9:9
56:9 62:4 63:4
80:7
**A-R-S-D-A-L-L**
97:15
**a.m** 68:10

**B**

**B** 95:13
**back** 8:8 14:15
26:9 27:6 29:18
46:7 72:21 73:5
73:12,17 74:15
76:9 105:1
**background** 12:7
83:8,19 99:16
**balance** 112:5
**Bank** 56:20
**Banks** 56:20
**Barry** 56:19
**base** 33:13 41:8
**based** 35:19 40:16
60:13
**baseline** 44:16
**basic** 60:17 99:8
**basically** 47:19
57:9 66:4 87:12
**basis** 82:4
**Bates** 93:10
**BCS** 17:6
**began** 85:12
**beginning** 82:8
**begins** 83:6
**behalf** 36:17
**belief** 113:11

**believe** 7:15 11:19
14:16 17:5,21
18:1,5 28:18
29:1,20 33:6,19
34:5 43:21
54:21 55:5 57:8
57:13 58:10
64:12 69:4
80:18 83:5
85:11 86:20
92:4,7,12 94:3,8
99:18 103:3
106:2 110:21
112:2
**Bellsouth** 106:22
107:5
**Ben** 5:11 45:2
**BENJAMIN** 3:3
**best** 49:12 69:18
**better** 39:17,21
40:6
**big** 45:7 58:19
76:20 87:13
96:21,22 97:5
**bill** 12:2 16:5 24:8
24:20 25:6 67:3
67:5,11,14 68:6
68:10 69:3,19
**billed** 9:14 96:5
**billing** 16:4 17:13
22:22 25:9 35:5
48:10,14
**black** 103:5
**board** 99:8
**boardroom** 99:10
**Bonnie** 1:21 2:21
116:2 117:19
**book** 24:5 35:2
**boss** 84:18 99:5
100:1
**bottom** 31:2
**box** 77:3
**boxes** 71:10
**brain** 22:7
**branch** 85:14
87:9 89:13

**break** 29:6 49:16
**breath** 47:20
**bright** 101:5
**bring** 34:20
**bringing** 100:19
**broad** 7:18
**broker** 52:6
**brought** 67:15
**Brown** 4:19 10:11
41:17 89:1
108:8,11,22
**Brunkhorst**
73:19 80:5,11
82:11,21 83:11
83:10 84:16
85:18 86:3
**Buckley** 105:15
105:17,17,21
106:1 107:3,6
**buddies** 75:3,5,9
76:16 77:13
**buddy** 75:17 76:2
**bullets** 103:4
**bunch** 71:10
76:16
**BURLING** 3:9
**business** 10:16
12:4,5 21:18
34:21 35:1,2,7
35:12,20,22
36:14,21 37:7
40:3 46:19 47:6
58:4 62:13 70:5
74:20 75:8,10
75:13,16,18
77:5,20 78:2,14
79:4 80:20 81:6
81:7,12,18 82:3
83:4 85:21 88:1
91:9 94:22 95:3
100:19 101:16
104:12 112:22
113:5

**C**

**C** 4:1

**Cab** 37:6
**calculated** 61:7
**calculations** 15:2
**calendar** 111:10
111:12
**call** 14:7 45:2
46:13 55:16,20
55:22 56:8,13
56:21 84:2
98:12 117:14
**called** 14:11 17:6
22:15,18,21
23:10,19 56:11
56:22 63:14
87:5 102:18
104:6
**calling** 26:13 49:5
56:1
**calls** 8:13 25:13
25:18,22 48:22
**camera** 14:10
**candidate** 40:10
109:9
**candidates** 39:18
39:18,22 40:6
40:11,22 41:19
42:4 44:16
45:20 46:1
47:21 109:9
**capacity** 8:4 45:9
55:17,19 78:14
102:5 108:6
**capital** 97:14
**CAPTION** 118:1
**captioned** 118:3
**care** 42:7 45:10
50:13
**carry** 46:20 47:8
47:8
**Carter** 87:8 89:16
**case** 6:1 118:1
**cases** 13:3
**categories** 7:18
**CC** 70:3
**CC'd** 90:11,13
**cents** 25:8

**certain** 12:2
36:19 41:2
42:11 44:15
45:18 71:5
74:11 106:9
**certainly** 23:22
24:11 25:10
70:21 101:7
113:2
**Certificate** 116:1
118:6
**certify** 116:4
**cetera** 68:14
**CFO** 52:7,16
**CFO's** 50:13
**chain** 76:8
**change** 48:14
81:5 117:13
118:7
**changed** 81:2
**changes** 115:6
118:4
**characterization**
18:2
**characterize**
77:18 83:5
**charge** 25:2
**charging** 24:18
**check** 71:10 103:5
**checked** 44:8
**checks** 47:3
**Chris** 90:9,15,15
91:11 92:19
**circle** 91:18
**city** 53:3
**Civil** 1:5
**clarification** 15:8
43:6
**clean** 71:6 75:4
**clear** 85:15
**click** 71:11 74:10
**client** 15:12 16:15
17:12,17 37:12
38:4 39:11,20
40:2,4,8,9,18
46:5 47:7,17

48:10,18 49:11
49:11,13 59:18
59:19,20,22
87:13,15 105:18
clients 10:3,15
12:2,3 16:4
22:16 23:14
24:21 25:4
35:15 36:16,20
37:15 42:12
46:16,17 48:5
48:12 63:17
64:21 86:1
87:16,19,20,21
88:20,22 89:2
89:10 104:13
client's 37:6
close 8:12 25:10
closed 64:1
coaching 27:1
coast 30:13 99:4
100:6
cocktail 88:19
colleagues 32:9
collected 81:19
collection 82:8
Columbia 1:2
5:16 116:20
combination
58:21 59:6 61:5
combined 61:9
come 89:10
100:10 112:11
112:17 113:12
comes 48:11
comfortable
100:19
coming 98:11
comments 14:2
76:9
Commission
116:21
commitment 42:6
100:9
commitments
68:14

committed 35:16
communicate
86:6
communicated
54:21 91:1
communication
55:3 79:3
communications
55:12 73:18
74:16 92:22
companies 39:15
39:16
company 21:16
31:20 38:14
39:19,22 40:2
41:6,10,11
100:9
competitive 25:5
58:2
competitively
25:14
competitor 38:9
38:12,12
competitors
24:15,16,17
25:9 28:20 29:3
38:14,22 41:7
compilation 4:8
6:15 12:16
13:17 18:21
87:2
compiled 20:13
complete 115:5
completely 39:4
composite 17:21
19:16
comprehend 86:5
computed 61:2
computer 10:5
11:19 16:20
17:22 83:22
computerized
116:8
concepts 85:20
concerned 25:19
41:12

concerning 13:6
concert 91:6
concluded 66:16
114:11
confidential
11:20 15:5
79:19 80:1 83:8
83:9,19 84:9,12
86:8,14,18,19
configured 58:19
conflict 47:3
conflicts 45:17
confused 47:9
53:17 55:21
Connecticut 50:2
50:4 51:3,8,9
connection 78:2
110:10
consider 12:10
15:5 20:7 21:12
23:6 75:9 79:22
101:6
Considering 18:8
78:20
considers 101:12
consolidated
81:20
contact 16:7
32:12,19 53:16
54:1,13,19
77:16 78:1,3,4,9
78:12 92:5,9,11
contacted 32:10
54:5
contacting 117:9
contain 15:13
contained 19:12
79:14 85:13
contract 10:2,9
12:7 17:15
22:19 31:22
38:17,20 39:13
40:12,15 41:1
42:6 43:3,6,7
48:17 96:11
102:4 105:4

109:18 110:12
contracted 66:7
contracts 10:13
contractual 15:12
22:17
contribute 100:21
contributed
15:13,18 101:3
control 12:21
13:2,8
conversation 57:5
57:8 98:17
99:13
conversations
33:2 75:2 97:17
98:18 111:19
cooperation
114:6
cooperative 114:1
coordinator
94:18
copies 67:4
copy 31:2 61:10
65:19 70:1
117:8
correct 7:20 10:7
10:17 16:21
25:22 30:21
31:8 33:9,11,14
36:10,11 49:9
50:1 55:9 57:1,2
57:4 59:22 60:1
60:3,4 63:9,10
64:18 70:5,6
84:19 85:1,10
89:15,18 95:1
100:6 115:4
corrections 115:6
correspondence
78:5
counsel 4:22 5:6
5:20,20 6:19
7:11,17 8:1,19
13:10,12,16,21
14:7 26:5 39:3,3
65:18 66:17

90:17 94:4,13
113:22 116:11
116:15 117:12
counterproposal
98:15
course 14:13 16:5
81:16,19 104:11
court 1:2 5:16 8:8
14:6,9 66:2,14
covenant 36:3
cover 104:10
covered 45:10
COVINGTON
3:9
co-defendants
12:22
Craig's 45:22
created 69:5,13
69:14 106:5
creating 85:12
creativity 103:13
Crowell 10:11
11:1 32:2,3,6,8
32:22 33:3
41:16 47:11
48:2 59:9,13,21
60:2,5,10 61:5
62:4,10,11,14
62:17,18 63:5
63:16,20 64:6
64:13 65:12,20
66:6 72:9 75:6
89:1 91:14,16
94:4,14,22 95:8
95:10,11,18
96:9,12,21 97:2
97:5,11 98:9
99:10,11 100:4
100:13 101:11
104:18 105:3,20
106:4,6,11,18
106:21 107:3
109:8,19 110:6
110:19 111:1
Crowell's 63:1
64:16

current 62:12,13
  62:16 87:8
currently 5:15
  10:3 12:9 22:12
custodian 8:5
custody 12:21
  13:2,8
customers 68:14
cute 44:21 72:20
  83:14

**D**

d 88:19
Danowski 22:12
  23:11 25:21
  26:13 112:11
data 17:20 20:1
  22:1
database 14:22
  15:3,10,21 16:3
  16:11,18,19
  17:2,5,11 18:5,7
  18:9,14,17,20
  19:3,4,10,16,19
  19:20 20:5,13
  20:13,15,16,17
  21:1,3,5,9,15
  23:3,4 43:18
databases 17:22
date 30:3 33:6
  67:3 71:3 72:15
  105:7 115:10
  118:2,18
dated 4:17,18,20
  4:21 29:14
  104:7 110:9
dates 11:8
Davies 81:11,13
  84:6,18 85:7
Davis 52:8
day 11:9 34:21
  35:6 111:11,13
days 117:11
deal 53:13 97:10
dealing 40:21
dealt 78:13

Dear 117:7
debriefing 104:7
  105:1
decided 13:4
decision 101:14
deem 24:10
deems 21:17
Defendant 3:7
Defendants 1:6
define 96:22
defined 13:3
  21:22
degree 19:3 47:3
delete 71:8,11
  72:19 73:2,19
  74:10,18 76:6
  76:22 77:10,20
  78:9
deleted 70:13,18
  71:3,6,18 72:1,4
  72:8,14 73:12
  73:22 74:11
  77:13 78:14,15
  78:16,19,22
deleting 75:16,22
  76:19 78:20
  79:1
deliberately 74:3
  74:5
deliver 35:11,19
  35:22
Demario 67:4,5
  67:12 68:6,10
department 96:2
depending 14:12
  39:9 46:5
depends 16:9
  38:11 40:1 44:5
  46:7 72:18,18
  72:20
DEPONENT
  115:1 118:2
deposition 1:11
  2:9 4:9 6:11,19
  6:20 7:2,2,3
  29:8 66:16,19

67:21 90:4
  102:14 105:11
  107:11 108:2
  109:3 110:2
  114:4 116:3,5,9
  116:13 117:8
  118:1,2,3
depositions 6:1,2
describe 9:8
described 14:3
describing 13:18
  14:19 15:11
  82:22
details 50:12
determination
  12:20 13:1
develop 37:1,4
  91:21 112:21
developed 17:8
  36:17
developing 85:16
Development
  4:16 102:19
  104:6
dialogue 97:18
Dickstein 90:18
  91:15,22 92:3,8
  92:18,20 93:2
dictated 24:21
difference 20:12
  20:18 38:7
  40:10
differences
  109:20
different 6:15
  21:19 27:7 39:8
  39:9 40:12
  41:10 47:17
  68:21 86:1 96:3
  98:22
differentiates
  41:14
difficult 67:13
  103:20
dinners 37:7
direct 28:1,10

32:1 62:19 63:5
  63:7 64:6,15
  65:12 66:7
  109:8 110:7,18
  110:20 111:2
directed 13:9
directing 27:12
  27:17,19
direction 116:9
directly 10:6
  32:11
director 55:22
  85:14 94:18,19
  108:6
disclose 8:18 9:5
  9:11 12:12
  18:17
disclosed 9:18
discourage 24:1
discovery 13:4
  14:5 98:10
discuss 15:20
  16:1 62:8,9
discussed 19:1
  62:12 67:15
discussing 24:12
discussion 26:19
  67:17
discussions 8:1
displayed 21:21
distinction 75:11
distinctive 103:9
distinguish 21:13
  41:2
District 1:2,2
  5:15,16 116:20
document 4:17
  7:7 30:16 38:18
  45:16 47:12
  51:4 59:17 60:9
  60:9 66:12,13
  67:8 68:2,18,22
  69:5 70:7 80:22
  81:2,5,21 83:3
  83:21 84:6,8,16
  84:17,21 85:10

85:13 86:7,17
  87:4 102:17,20
  103:1,7,19,21
  104:2,9,14
  105:7,14,15
  106:4,16 107:8
  109:11,14
documents 4:8
  6:16,16,18 7:8,9
  7:15 8:3,17,18
  8:22 9:3,6,8
  10:10,20 11:5,6
  11:12,18,21
  12:20 13:1,7,16
  13:20 14:10
  18:21 19:2,5
  49:17 70:11,13
  70:19 72:5,8,11
  72:14,17 73:1
  73:18 79:20
  82:8,12 87:1,5
  104:12
doing 12:4 27:3
  31:6,16,18
  35:16 39:6 40:4
  47:12 62:13
  63:7 68:15 91:3
  111:3
dollar 97:3
dollars 25:3,7
door 43:8
dots 103:5,5
downtown 57:18
dozens 41:1 96:11
draft 4:20 104:1
  106:4,6,10
  109:6,15 110:12
Drafted 83:6
draw 75:14
drop 77:7
duly 5:3 116:5
D.C 1:12 2:13 3:5
  3:10 32:2 36:14
  38:21 40:22
  45:22 49:21
  50:11 54:15

55:8 57:10,18
58:2 87:9 100:5
117:2

**E**

E 4:1 98:10
**earlier** 80:6
**early** 96:15
**earnings** 86:13
**east** 30:13 99:3
100:6
**educated** 30:11
**effort** 68:12
**eight** 59:12
**either** 17:14 27:4
44:6 46:15 52:5
73:18 74:1
77:10 100:15
**electronic** 19:16
20:5 22:4 79:2
**embedded** 83:20
**embodied** 60:8
**employed** 31:11
49:10 55:10,13
86:9 116:12,15
**employee** 8:4
85:9 87:8
116:14
**employees** 43:19
63:1 98:19
**employers** 86:4
**employment**
33:10 62:1
79:22 80:19
**Enclosed** 117:8
**ended** 47:14,15
104:22
**engaged** 31:10
66:8 94:9
**enhanced** 101:9
**entered** 118:5
**entertain** 89:11
**entertainment**
37:8,10 87:14
87:15
**entire** 118:3

**entirely** 13:13
**entity** 74:17
**Eric** 52:7,16,17
52:19 53:20
54:2
**errata** 115:7
117:11 118:1,4
118:5
**ESPN** 87:13 88:3
88:6,10,13
**Esq** 3:3,3,8,9
**Esquire** 83:7
**estate** 52:6
**et** 1:6 68:14
**evaluate** 43:3,9
**evaluation** 29:21
**event** 87:11 88:8
89:8,13
**events** 88:2,5
**exact** 65:16 94:13
**exactly** 14:3
107:7
**EXAMINATION**
4:2 5:6
**examined** 115:3
**example** 10:11
12:1 37:3 45:1
103:4
**exchange** 27:6
82:20,21 93:9
93:17,20 94:6
**excited** 97:1
**exclusively** 25:5
**executed** 109:14
109:17,19
**executive** 8:13 9:2
50:14
**executives** 21:20
**exhibit** 6:11,14
7:1,3,9,12,16
9:12 29:8,13,15
30:19,22 31:4
33:14 49:17
66:18,19 67:1,1
67:20,21 69:1
69:16 79:6 82:7

87:2 90:4,8 93:5
102:13,14,18
105:10,11
107:10,11 108:1
108:2,5 109:2,3
110:1,2,12
**exhibits** 4:7,22
29:11
**exist** 7:15
**existed** 15:15
70:22
**existing** 47:6 48:5
**expect** 44:15
45:18 46:1,3,8
**expectation** 35:21
**expected** 14:4
**expense** 37:11,19
**expenses** 37:11,19
**experience** 18:8
21:16 22:9
40:16,21 41:19
42:10
**experienced**
95:12
**expires** 116:21
**explain** 95:9,21
**extensive** 99:19
99:22
**extent** 10:12 12:3
87:10
**extract** 22:8
**eye** 100:17,18
**e-mail** 4:12,13,14
4:15 67:2,4,16
68:3,5 69:1,2,8
69:10,17 70:2,4
70:5,8,12,13,14
70:19 71:10,12
71:13,19 72:1
72:15,22 73:20
74:1,8,16 76:8
76:12,17 77:3
77:19 78:4,9
79:15 82:11,20
83:13 89:17
90:8,10,13 93:5

93:8,17,20 94:6
104:1
**e-mails** 72:3
73:13 74:12
76:11 77:2,4
78:5,7,11,18
79:1 80:12

**F**

**face-to-face** 67:11
**fact** 47:17 101:9
**fair** 18:1 23:8
27:4,5,10 28:4
70:10 95:11
**faith** 69:19
**falls** 111:11
**familiar** 17:1,3
47:1 95:18
**far** 19:11 25:19
41:11 46:6
61:19
**February** 31:11
**federal** 13:4
**fee** 60:18 61:7
109:9
**feel** 100:19
**fees** 60:20,21
**feet** 57:17 58:14
58:16
**field** 16:10 43:17
**fields** 20:9
**filed** 73:7
**files** 10:19,20,22
11:19
**filing** 73:16
**fill** 16:10
**film** 31:21
**filming** 31:19
**final** 104:2
**financially**
116:16
**find** 22:16 52:19
117:8
**fine** 26:18 49:18
79:12
**finish** 81:3

**firm** 5:13 24:22
25:1,1 32:1
41:11 45:2,7
47:2 64:14
90:17 94:19
97:18 102:3
106:2
**firms** 77:16,18
78:13 87:21
98:4
**first** 5:3 29:22
50:15 54:1,4
58:8 61:21,22
64:19 65:3
96:20 98:1
99:12 111:13
**firsthand** 64:13
**five** 24:22 45:5,14
91:12
**five-minute** 49:16
**folder** 11:1,3
71:16
**folders** 77:8
**folks** 23:19
**follow** 46:19
**following** 45:3
111:17 118:4
**follows** 5:5
**followup** 67:16
**foot** 60:13
**football** 88:17
**foray** 92:19
**foregoing** 115:3
116:3,5
**forget** 23:4 81:10
94:13
**form** 15:1 27:5,9
30:8
**formal** 42:22
98:17
**formulating**
26:22
**forth** 27:7 76:9
**forward** 68:15
117:11
**forwarded** 89:17

found 78:18
four 45:5 59:11
frame 29:18
  37:16 81:14
friend 101:7
friends 32:9 75:2
  75:13,17 76:11
  77:17 91:7
friendship 91:8
front 104:4
full 100:4
fully 86:5
full-time 85:8
function 39:10
  87:14
fundamentally
  86:1
furniture 58:17
further 116:13
fuse 8:8

**G**

G 70:2
gain 23:12
gained 22:4
game 23:8 88:17
gatekeeper 28:10
gathering 22:1
gearing 98:1
general 43:17
generally 38:21
  38:22 42:5 44:2
  75:20
generating 36:13
gentleman 32:13
  56:19
getting 8:8 14:15
  17:3 19:13 42:6
  47:4 54:5,14
  55:8,12 56:5,6
  95:7 98:20
give 12:1,15
  13:20 23:20
  26:22 28:20
  29:2 37:3 45:1
  78:21 79:6,17

80:3,15 108:10
  108:14 113:21
given 14:4 18:11
  21:19 59:11
  79:19 80:4
  108:15 115:5
  116:10
gives 26:21
giving 25:21
  74:22 80:16
  103:19
go 15:3 17:20
  36:4 38:19 39:2
  45:19 58:8 69:3
  73:17 99:9
  106:6 111:14
  112:4
goes 42:14 58:4
going 6:6,14 22:5
  27:11 37:11
  39:6,10 43:7
  47:15 48:1
  54:18 57:7 65:3
  66:2 69:12
  72:21 73:5,5
  75:5,17 76:9
  82:7 87:1 91:16
  111:2,6,6,14
  112:4 114:3,4
good 41:21 42:13
  44:18
gotten 23:6 25:12
  25:17 26:13
  66:5
group 54:15 76:7
guess 15:20 19:13
  29:19 30:11
  43:5,22 47:9
  95:20
guessing 57:6
guy 100:5,6 101:5
guys 76:7

**H**

Hahn 3:3 4:3 5:7
  5:11 6:13 7:1,5

13:12,14 14:14
  26:3,6,12,20
  27:11,16,19
  28:3,9,14 29:10
  49:15,20 65:18
  66:17,21 67:19
  68:1 90:2,6
  93:12,16 102:12
  102:16 105:10
  105:13 107:9,13
  107:22 108:4
  109:1,5,22
  110:4 113:22
  114:8
handed 82:17
handle 45:12
hands 8:20
handwritten 30:9
happened 14:4
  55:11 73:4
happy 15:19
  41:20
hard 60:22
Harrison 2:11 3:4
  5:12
head 22:3 45:5
  48:9 53:12
headhunter 80:15
headquarters
  50:11
heads 21:8
heard 48:19 49:4
hearing 6:3
held 2:9
help 40:11 42:9
  113:7
helped 52:7 98:22
helpful 44:13
  113:14
helps 41:9
hereto 116:16
hesitate 117:14
HG 52:1
hidden 93:13
hire 32:1 35:11
  39:3 62:19 63:5

63:8 64:6,15
  102:3 109:8
  110:8,18
hired 30:14 32:7
  32:11 35:15
  41:20
hires 65:12 66:7
  110:7,20 111:2
hiring 63:7,12
historically 16:14
hold 47:20
honestly 33:4
  34:9 54:3 71:5
  96:18 101:12
hors 88:19
hours 9:14
housekeeping
  77:6,21
Hudson 23:19
  39:2 96:3
hundred 34:11,13
hundreds 41:1
  72:2 77:1
hypothetical
  22:15 23:5,10
  48:9 98:13

**I**

idea 30:9 46:3,11
  50:17,19 87:17
  105:17,22
Ideally 57:19
identification
  6:12 7:4 29:9
  66:20 67:22
  90:5 102:15
  105:12 107:12
  108:3 109:4
  110:3
identify 29:16,22
  30:19 49:16
ill 103:12
immediately 24:7
important 21:18
  41:5 44:11
  100:8,12 101:12

112:21
impressions 82:2
inaccurate
  113:16
inbox 71:6 75:4
  77:22
include 17:11,14
increase 36:12
independent
  14:16
indicated 118:5
indicates 106:10
indifferent 39:4
individual 17:20
  18:4 19:22 20:8
  38:15 95:7,8,21
  103:15
industry 38:9
  40:20 49:3,5
  99:17
info 80:18
information 9:17
  9:21 10:6 12:7
  12:15 14:18,20
  15:1,4,7,9,13,17
  15:20,22 16:2
  19:1,11,17 20:1
  20:8,9,12,15
  21:8,17,21 22:8
  23:12,13,15
  24:4,9,10,11,15
  25:17,21 26:11
  26:12,16,18,18
  27:8,9 28:20
  29:2 71:22
  77:21 78:4,10
  79:7,8,9,14
  80:14 82:1
Infrequently 38:6
initiate 53:16
  56:8
initiation 57:1,3
injunction 6:4
  66:15
inked 61:18
instances 74:14

**intend** 66:11
**intended** 69:16
**intention** 69:13
   69:22
**interested** 116:16
**internally** 96:8
**Internet** 24:6
**interview** 42:8
**invaluable** 113:8
   113:13,15,17
**invite** 88:21
**invited** 88:22 89:2
**invitees** 87:10
**invoice** 4:21
   48:14 110:5,8
   110:10,14
**invoices** 9:14
   48:15
**involve** 38:3
**involved** 38:1
   98:20
**issues** 8:2
**items** 17:20 19:22
   67:15 68:20

**J**

**Jeane** 97:15
**Jewell** 30:12
   91:21 99:1
   101:5,15
**JK** 6:17,17 82:9,9
   82:16,18 83:6
   87:2,2
**job** 1:22 32:4 42:3
   43:10,11 50:13
   99:2
**Joel** 92:2,6 93:1
**jogging** 105:8
**joined** 33:5,17
   37:17 52:11
   55:1
**joining** 15:16
   33:3 36:20
   91:15
**jointly** 91:20
**Joleen** 3:3 5:18

**Jon** 22:11,18
   23:11 25:20
   44:15 45:13,18
   112:11
**Jon's** 28:19
**Josh** 45:9 93:6
**Joshua** 1:6,11 2:9
   4:2 5:2,10 14:17
   29:12 83:7
   115:2,10 117:8
   118:2,19
**July** 58:10 62:2
   65:1,4,7 104:7
   104:18 105:15
   107:14,19
**June** 11:10 31:5
   31:11,16,21
   55:2,5 63:6 67:3
   67:5 68:6,9,17
   68:19 69:1,2,4,8
   69:9,17 71:4
   109:6 110:20
   111:9,17 112:5
   112:9
**junk** 74:7
**J-E-A-N-E** 97:16

**K**

**keep** 15:1 48:2
   49:10,10,12
   63:2 70:1 76:10
   78:3
**Kelly** 53:10,22
   54:1,5
**kept** 69:19
**keyboard** 22:7
**Kim** 22:21
**Kimberly** 22:11
   23:11 25:21
   112:11
**Kim's** 28:19
**kind** 31:9 36:3
   37:14 45:16
   47:16 48:8 61:8
   81:18 99:14
   103:14 105:8

**kinds** 26:17 27:7
   45:17
**Klineman** 92:2,6
   93:1
**knew** 20:17 32:22
   47:14 52:22
**know** 15:6 17:10
   20:14 21:8,10
   23:12,13,14
   24:17 25:8,9
   32:10 33:20
   39:17 40:2,3,11
   40:15,22 41:18
   41:21 42:2,4,19
   44:11,15,20,20
   44:22 45:6,8,21
   46:10,11 47:3
   49:2 50:12 51:9
   51:15,15 52:9
   53:11 56:5,15
   56:18 62:22
   63:11,16 65:9
   65:16 71:9
   82:10 83:12,18
   83:18 87:22
   88:10 91:19
   92:6,11 95:16
   96:7,18 98:8,9
   99:21 100:12
   101:11,13
   102:20 103:16
   103:21 104:1,8
   105:19 106:1,3
   107:6,18 109:14
   109:16,20 111:2
   111:5
**knowing** 24:15
**knowledge** 22:3,4
   22:9 41:7 64:13
   72:4,7,10,13
**known** 38:21
   91:11 112:13
**Kolar** 105:16,18
   105:21 106:1
   107:3,6
**Kubicki** 1:6,11

2:9 4:2,10,11
   5:2,10,11,17
   14:18 26:14
   28:15 29:12,17
   29:21 49:21
   66:22 83:7 90:2
   90:3,7 93:6
   114:5 115:2,10
   117:5,8 118:1,2
   118:19

**L**

**L** 1:21 2:21 116:2
   117:19
**landlord** 51:10,17
**Lang** 87:7 89:16
**language** 106:9
   113:10
**large** 36:13 96:10
**Larry** 56:21,22
   57:11
**law** 32:1 41:11
   45:2,7 64:13
   77:16,18 78:13
   87:21 90:17
   91:17 102:3
   106:2
**lawsuit** 71:20,22
   72:6 73:6,9,10
   73:17 74:2
**lawyer** 13:11
   102:3
**lawyers** 12:19
   13:11 95:8,21
   96:1
**laying** 95:4
**learned** 22:9
**lease** 50:8,10,15
   51:12 60:14
**leased** 49:22
**left** 31:6 71:2
**legal** 13:3 30:13
   31:6,10 36:14
   38:9 54:15
   81:11 87:9 94:9
   99:4 108:6,7

109:7 110:5
**lengthy** 76:8
**letter** 4:11,18
   29:14 31:1
   105:15 107:14
   107:16
**Let's** 29:22 47:11
   56:21 66:18
   67:19 73:8 90:2
   102:12 107:9,22
   109:1,22
**level** 21:19 40:4
   47:5 61:6 100:8
**Lewis** 2:11 3:4
   5:13
**liberty** 8:18 9:4
   9:11 12:12
**light** 88:19
**limited** 5:22 6:2
   18:8
**limiting** 6:7
**Linda** 110:6
**line** 54:9 75:14
**list** 45:21,22
   68:13,17 69:9,9
   69:14,15,15
   70:1 78:3 79:10
   79:17 87:7,14
   87:18 89:14,16
   89:18
**listed** 7:12
**litigation** 5:14 8:9
   8:10
**little** 97:22
**live** 26:21
**LLC** 1:4 5:14
**Lloyd** 54:21 55:3
   55:7
**LLP** 2:11 3:4,9
**location** 51:2
**long** 10:21 26:19
   85:16 91:11
**look** 7:6 47:22
   48:2 68:8,15
   69:12 73:17
   87:19,20 103:20

111:11
**looked** 107:2
**looking** 28:5 31:4
34:10 61:3
72:22 73:13
74:16 87:22
94:20 98:4,6
104:3,15
**looks** 31:5 74:7
83:4,14,16
102:21 107:4
**loop** 107:7
**lot** 8:12 36:8 57:7
102:8
**Lu** 94:11
**lunches** 37:7

**M**

**Madness** 87:6,12
**magazine** 93:14
93:15
**mail** 70:3
**main** 50:10
**majority** 87:21
101:1
**making** 25:13,17
31:21 91:5
**managed** 96:8
**management**
51:18 85:8
102:9
**manager** 55:18
85:14
**managers** 21:20
38:13
**managing** 55:21
85:14 108:6
**manner** 108:18
**March** 87:5,12
90:8
**margin** 66:4
**margins** 16:6
24:9
**mark** 3:9 66:18
67:19 80:5
81:11,13,17,22

84:6,18 85:6
105:10 107:9,22
109:1,22
**marked** 6:11 7:3
29:9,11,14
66:19 67:1,21
90:5 102:14,18
105:12 107:12
108:3 109:4
110:3
**market** 24:17,19
25:6 57:10 58:3
**marketed** 48:4
**marks** 103:6
**married** 94:17
**matter** 48:11
118:3
**Mayer** 4:19 10:11
11:3 41:16 89:1
108:7,11,17,22
**mean** 10:21 20:4
20:6,15 24:5
28:17 35:1
42:22 44:20,21
45:7 47:10
99:22 101:6
106:8 107:4
113:11
**meaning** 59:2
**mechanism** 43:13
43:15
**meet** 42:8 45:8
91:13
**meeting** 37:12
67:11 100:11,22
**meetings** 38:5
**Melroy** 94:15,16
**memory** 46:9
90:14 94:1
103:11 105:8
**mental** 81:18
**mention** 86:13
**mentioned** 32:22
80:5
**message** 68:9
93:5

messages 71:11
71:13
**met** 45:6
**Metro** 45:22
51:21 53:1,8
**Michael** 3:8 97:14
117:1
**mid** 55:5 63:6
**Miguel** 32:13
**mind** 8:17 20:11
20:19 38:7 84:8
**mine** 105:19
**minute** 89:22
**minutes** 113:21
**mix** 42:15
**modification**
84:17
**modify** 16:20
**mom** 71:14
**Monday** 6:5
45:15 111:16,17
111:18
**money** 33:21 36:8
36:22 37:3,4
89:10
**Monica** 93:6 94:2
**monies** 9:14
**month** 35:12 97:9
**months** 35:20,22
48:1 70:17,21
**Morin** 10:11
**Moring** 32:2 33:1
41:16 47:11
59:9,14,21 60:2
60:5,11 62:11
62:14 65:20
66:6 89:1 94:4
104:18 105:20
109:8 110:6,19
**Moring's** 62:4
64:13
**Mosier** 3:9 5:21
**motion** 6:4
**motives** 102:1
**multiple** 63:15
65:8

**muses** 81:18

**N**

**N** 4:1,1
**nail** 25:10
**name** 5:8,11 16:4
16:7 17:4 32:13
49:8 51:17
53:10,11 56:19
94:16 95:16
97:13 118:5
**names** 12:3,6
63:16 74:22
78:17,21
**narrow** 25:7
**narrowed** 77:2
**national** 108:6
**nature** 40:3
**NCAA** 87:12
**necessarily** 63:2
76:18 84:10
89:4
**need** 15:8 29:5
38:17 45:3
47:15 53:21
54:22 57:18
58:1 62:5 64:16
76:10 94:8
111:10
**needed** 54:9,12
57:12,15
**needs** 40:8 45:14
58:3
**negotiate** 35:18
50:22 51:12
52:7 61:13
97:10
**negotiation** 61:15
109:11
**negotiations**
51:16 52:2,9
**neither** 116:11
**nervous** 86:15
**network** 75:10,17
**never** 73:4,10,12
106:15 110:13

**new** 26:4 41:21
42:6 47:6 52:17
65:9
**NFL** 88:17
**nice** 49:14
**noncompete**
31:14
**normally** 75:11
**Nos** 29:8 90:4
**Notary** 2:22
116:1,19
**noted** 44:4 118:4
**notes** 30:9
**notice** 2:21 4:9
6:19 7:2,11
71:19 72:6 73:9
103:4
**November** 93:7
94:6,20 96:16
**Novosel** 110:6
**Numark** 52:6,13
54:14 55:12
56:2,5,9,17
**number** 31:18,21
45:18 48:15
60:22 93:10
97:12,18 98:9
105:3
**numbered** 6:16
**numbers** 9:14
15:2 34:2 65:16
**N-O-V-O-S-E-L**
110:7
**N.W** 2:12 3:4,10
117:1

**O**

**O** 4:1
**object** 26:20 27:9
104:15
**objecting** 27:5
**objection** 26:1
28:11
**obtained** 32:4
**obviously** 8:5
86:12

occur 51:16
occurred 55:2
  111:1
oeuvres 88:19
offer 4:11 29:13
  31:1 85:22
  111:21
offhand 62:22
office 5:19 10:1
  10:19 11:7
  49:22,22 50:11
  50:11 89:4
officer 116:2
offices 50:7,8
  51:21 53:1,1,8
offs 88:18
Okay 8:7 9:16
  10:1 11:14,17
  12:6 15:6,17
  16:2 20:11,22
  21:13 30:22
  31:16 32:5 34:6
  34:20 39:12
  44:1 50:18 53:7
  54:7 55:6 56:4
  56:21 58:11,22
  59:7,13 62:15
  65:2 67:18 69:6
  73:16 74:14
  75:22 76:19
  84:21 86:21
  97:20 98:14
  102:12 104:21
  107:9 112:9
  113:22
Okun 3:3 5:18
once 27:21
ones 13:17,21
  14:11 41:2,3
  65:7 71:14
  73:13 96:4
one-minute 29:6
one-page 29:13
ongoing 35:7 82:4
  97:17
on-line 95:15

open 16:19 64:3,7
  64:10 103:5
openly 24:12
operate 86:6
operation 23:7
opposed 22:2
  45:20
opposing 117:12
orally 111:21
order 40:5 112:21
organized 77:4
oriented 103:1
original 83:16,17
  84:6 117:9,11
  118:6
other's 25:9
ought 13:9
outcome 116:17
outstanding
  67:15
overcrowded
  71:7
overhead 16:6
overview 80:20

**P**

**P** 1:11 2:9 4:2 5:2
  83:7 115:2,10
  117:8 118:2,19
page 4:2 8:4,9,14
  9:1,5,10,21 10:2
  11:20 12:5,8,9
  13:13 14:20,21
  15:16 22:13
  23:7 28:21 39:2
  41:6 42:18 43:3
  46:16 49:21
  52:3 53:20 54:8
  54:9,19 55:1,9
  56:3,6,10 59:8
  59:10 60:6,10
  61:4,16 62:1,11
  62:16 64:7,20
  65:11,19 66:3,8
  67:2 68:8 72:12
  73:19 74:7,9

79:7 82:14,15
  83:6,8 104:5,10
  104:16 111:6,14
  111:16,20,21
  112:4,10,12,14
  112:20 113:7
  117:9,11
pages 6:17 7:7
  29:22 30:7,19
  30:20 115:3
Page's 17:5 21:5
  41:16 50:7,10
  54:15 60:3
  63:20
**PAGE/LINE**
  118:7
paid 22:22 33:17
  66:4 112:18
paper 10:20 11:6
  11:19 79:2
paperwork 42:7
paragraph 68:11
Parham 93:6 94:2
part 75:10 77:21
  91:18 101:18
  110:16 112:14
  112:22 113:3
**Partial** 9:22
**Partially** 85:11
particular 17:16
  74:17
parties 116:12,15
partner 5:12 94:3
  97:15
**Partnership** 4:16
  102:19 104:6
party 8:10
password 95:17
Paul 29:12
pay 16:5 24:18,20
  35:19 36:12
paying 60:6
pedestrian 85:20
pending 5:15
Penn 50:1 57:21
  62:16 64:20

**Pennsylvania**
  2:12 3:4,10
  50:19 117:1
people 20:14,17
  21:7 38:4,19
  40:1,18,20
  41:18 42:10
  43:2 44:6,7,16
  44:18 45:8,14
  45:19 46:10,22
  47:4,12 56:4
  58:8,11,12 59:1
  59:3,6,12 74:8
  75:6,16 76:15
  77:16 78:1,12
  78:12,17,21
  89:6 91:17
  97:12,18 99:11
  100:4
percent 22:5
  24:19 38:2
  43:18,20 74:13
  101:4
perfectly 28:3,19
perform 39:10
performance
  43:10,12 44:3
performers 42:13
period 31:14 33:3
  86:8
permanent 94:19
permit 68:16
person 16:7 30:14
  38:11 41:21
  43:10 49:12
  53:13 67:14
  74:17 98:21
personal 11:7
  14:17 37:22
  70:2,4,8,12,12
  70:14,19 71:12
  71:19 72:2,15
  72:22 73:20
  74:1,15 75:19
  77:5,19 78:4
  89:17 91:8

personality 40:7
personally 16:16
  44:20 45:6
**Phillips** 94:17
phone 22:18 23:1
  24:5 25:13,18
  55:16,20,22
  56:8
photocopied
  83:15
photocopy 83:17
phrased 99:21
physical 11:5
  60:18 61:1
pick 39:12,14
  40:5
picked 76:5,21
  77:1
picking 39:17,22
**Picture** 16:18
pipeline 35:10
pitches 98:12
place 35:4 40:18
  43:7 47:20,22
  85:3
placed 10:3 12:8
  12:9 32:3 42:11
  43:4
plaintiff 1:5 3:2
  5:6 6:3
plan 81:6,7,13,18
  83:4
play 88:18
players 97:16
please 5:9 86:13
  93:11 117:8,11
  117:13
PO 48:14
point 9:12 11:15
  14:10 20:1
  97:20 98:13
  100:13
Polott 92:12,22
  100:16
Pomykala 22:11
  22:18 23:11

Joshua Kubicki

25:20 26:13
44:15 45:14
112:11
**pool** 38:20,22
39:1 40:22
41:19
**popular** 89:7
**populated** 20:9
**position** 31:6
32:15 46:20
50:15 92:14
**possession** 7:19
8:22 12:21 13:2
13:8
**Posse's** 45:21
**possible** 68:13
86:4 87:20
106:11
**post** 46:14
**posting** 32:6 44:9
45:11,21
**Post-Project**
104:7
**preliminary** 6:4
66:15
**preparation**
70:15
**prepare** 81:3,12
81:17 85:7
87:17 103:2
104:12 108:5
**prepared** 30:5,20
67:5 68:13 69:2
69:9 79:20 81:1
81:7,9 84:17,22
85:2,4,9 86:17
87:7 104:2,18
108:20
**preparing** 6:3
67:7
**present** 5:19 11:9
11:11 108:7
**presentation**
100:4 101:8
102:3,22
**presentations**

37:15,20 38:4
**presented** 15:3
**presenting** 98:11
**president** 30:12
81:11 99:3
101:10
**pretty** 25:10
38:16,18 96:15
101:5
**principal** 97:16
**printed** 83:16
**printout** 83:13
**prior** 15:15 36:20
65:10 73:16
88:7 91:15
92:21
**privilege** 8:2
**privy** 101:13
**Probable** 91:12
**probably** 9:13
54:6 57:16
61:22 69:11
76:4 78:6 96:14
97:22
**problem** 23:18,22
24:14 28:6
**problems** 8:11
**procedure** 117:13
**proceeding**
114:10
**process** 85:16
95:4,17,19 96:8
**procurement**
96:2
**produce** 8:7,15
**produced** 89:19
**producers** 42:14
**Professional** 1:4
5:14
**proffer** 66:2
**profit** 16:6
**project** 17:16
38:13 46:18
47:13,15,16,22
48:13 54:22
57:10 58:3 61:3

61:4,7 63:11,14
94:9 96:21 97:2
97:5,19 98:13
104:21 105:3,5
105:9
**projects** 16:14
17:12 22:20
23:15 31:21
49:13 63:15,17
63:20,22 64:8
64:10 68:13
95:7 96:10
108:7
**properly** 66:13
**property** 9:1
**proposal** 4:19
98:17
**proposed** 61:21
**proprietary**
11:20 12:10
14:20 15:5,18
15:22 17:7,21
18:1,5,7,14
19:18 20:2,3,19
20:22 21:11,22
23:3,7 25:15
**prospective** 46:17
**prospects** 89:3
**protected** 24:10
**provide** 12:18
13:16 15:21
38:17 65:11
80:1,10 94:10
99:7 104:13
**provided** 6:18 7:8
8:21 13:19
14:22 38:8 80:6
80:7,8 83:1
104:3
**providing** 60:17
61:5 79:14
95:16
**Public** 2:22 116:1
116:19
**punch** 22:7
**purpose** 81:4

104:15
**purposes** 6:2
**Pursuant** 2:21
**put** 8:19 20:3,4
23:1,2 37:14
44:18 98:14
**putting** 37:20
45:11,20 98:16
**P-O-L-O-T-T**
92:13
**P-R-O-C-E-E-...**
5:1
**p.m** 2:6 114:11

**Q**
**qualifier** 73:6
**qualify** 74:4,19
**question** 7:22
18:10 23:4 26:4
26:7,8 27:1,4,6
27:10,22 28:4,7
28:8,10 36:1
47:9 66:10
67:13 82:19
88:4 93:19
99:20 104:4
**questions** 6:7
13:6,9 14:15
23:20 117:13
**quickly** 55:1
**quite** 28:16 36:1
54:22 96:7
**quote** 12:21

**R**
**ragging** 76:11
**range** 25:6 34:4
34:17,18 57:16
65:17
**rate** 22:22 24:20
24:21 25:6
**rates** 12:2 16:5,5
24:8,18
**reach** 44:17
**read** 26:8,10
79:11 114:8
115:3 118:3,4

**reading** 93:18
117:10
**real** 8:11 52:6
63:2
**really** 25:12 37:9
41:21 42:13
50:12 75:13
96:20,22 97:1
**reason** 6:6 49:8
76:19 101:19
118:7
**reasons** 21:18
118:5
**Rebecca** 107:15
107:18
**recall** 30:4,15
32:12,21 33:4
34:9 35:13 54:3
57:7 69:18
70:17,20 72:21
74:14 78:15,20
79:1,13 80:8,16
82:5 83:11
90:10,12 93:17
93:20,21 94:5
96:13 98:3,16
104:14 105:5
107:16 108:13
108:21 111:13
113:9
**receipt** 117:11
**receive** 18:12
72:1,2
**received** 33:21
71:19 72:6
**receiving** 60:10
70:16 73:9
**reception** 88:20
**recess** 29:7 49:19
90:1
**recollection** 18:18
69:6 84:7
103:18
**record** 5:9 22:5
26:10 29:20
66:1 116:10

118:5
recruit 42:3
recruiter 80:5
  86:3
recruiters 38:13
recruiter's 42:3
recruiting 31:7
  41:18 94:18,19
reduced 116:8
referred 48:19
  97:5
referring 11:8
  52:4 69:7,11
  82:13 97:4
reflected 9:1 19:2
  31:19 33:13
  68:17,22 110:11
reflecting 65:20
  76:14
reflection 66:13
reformulate
  27:12
regard 19:17
  71:21 87:9
regarding 30:7
  71:22 109:8
  117:10
regional 30:12
  99:3 101:9
Regis 52:1
related 11:6 72:5
  72:9,11 73:13
  73:18 74:1
  116:11
relating 10:10
  73:1 74:12
  105:9
relation 74:19,21
  74:22
relationship
  15:12 22:17
  50:20 51:10
  56:9 60:8 65:20
  90:20 91:9,14
  92:17 93:1 95:9
  95:10

relationships
  36:17,19 37:1,5
relative 76:1
  116:14
relatively 7:10
relevance 14:16
rely 46:8
relying 22:8
remember 33:16
  34:7 54:4 67:7
  75:22 76:3,5
  78:11 81:14
  89:4 90:19 93:8
  96:19,20 97:1,6
  97:9 101:1,21
  103:17 104:21
  105:14 108:16
  112:2
remuneration
  33:21
rendering 61:4
rented 88:16,18
rep 100:17
repeat 73:11
  82:19 93:19
Rephrase 26:19
replace 44:7
Reported 1:21
Reporter/Notary
  117:19
representation
  112:16
representative
  56:16,17
represented
  46:15 113:2
representing 86:3
represents 5:13
  61:8
request 81:17
  118:4
requested 26:10
  66:14 85:6
requests 7:12
requirements
  47:2

Resignation 68:4
resigned 67:14
respect 5:22
  13:18 30:18
  39:5,13
respond 44:8
responded 32:7
response 6:19
  7:11 9:13 66:9
responsibilities
  42:5
responsible 117:9
responsive 7:16
restriction 25:20
  28:17 31:10
restrictions 8:6
restrictive 36:3
result 36:13
resume 4:10
  29:12,17,17,20
  30:5,8,20 31:4
  31:19
resumes 30:1
retained 4:22
review 38:18
  45:16 47:12
  59:17 68:15
reviews 51:4
reworking 48:8
rid 72:16
rides 37:6
right 28:19 29:2
  49:7 50:6 56:1
  58:5 69:7 96:18
  100:1 102:4
  106:13 109:16
rights 8:6
Rodriguez 32:14
role 9:2
roll 48:13
rolling 48:17,17
  49:1,6,13
room 58:19 88:16
  88:18 100:4
  112:13
rooms 58:20

rough 43:21
roughly 58:15
  59:15
round 34:2
RSVP 87:6
RSVPs 87:10
rules 13:5 66:14
running 46:21
  95:17
Russo 1:21 2:21
  116:2 117:19

**S**

S 4:1
salary 33:13
sales 92:14
  100:17 102:9,21
  102:22
salespeople 38:13
  89:3
saying 18:16
  25:11 41:20
  45:11 95:20
says 60:10 68:3
  68:11 82:14
  83:6,19 86:18
scale 102:6
scenario 48:9
schedule 60:20
schedules 68:16
Schlanger 3:8
  5:21 12:19 14:3
  14:13 26:1,8,11
  26:15 27:3,14
  27:18,21 28:7
  28:13 29:5
  49:18 66:9
  89:21 93:10,15
  113:19 114:7,9
  117:1,7
Schlanger's 14:1
Schnader 2:11
  3:4 5:12
school 91:17
scope 6:7
second 30:7 62:3

68:8
secret 24:20 25:3
see 15:2 68:18
  75:11 76:10
  82:15 90:13
  93:22 100:17
  106:20
seeing 8:10 30:15
  105:7
seen 30:17 42:11
  106:15,17
  110:13
Segal 2:11 3:4
  5:12
select 72:16 74:7
  74:9 77:7
selected 74:17
selects 74:9
sell 41:15
send 69:16,16,20
  69:21 81:22
  85:17
sending 86:16
  107:16 108:21
senior 81:10
sensitive 25:14
  86:12
sent 69:15 70:11
  83:10 84:6,16
  86:7 108:19,20
separated 18:6
series 98:18
service 38:8 85:22
services 41:16
  61:4,6,6,9 95:22
set 21:15 24:19
  40:7,7 87:5
  103:6
sets 21:16 41:3
  66:14
setting 97:19
Shapiro 90:18
share 81:9
sheet 95:5 115:7
  117:11 118:1,4
  118:6

sheets 95:16
short 7:10 8:7
  18:9 29:7 49:19
  68:11 90:1
shorthand 116:7
Shortly 52:11
short-term 49:22
  50:8
show 6:14 82:7
  87:1 100:8
showing 66:22
  90:7 93:4
  102:17
side 40:9,10 51:17
Sidley 41:17
  45:14 89:1
sign 111:15 114:8
signature 31:2
  117:9,11 118:18
signed 18:16 33:8
  46:22 61:19
  106:13 115:7
  117:11 118:5
signing 117:10
signs 97:3
silly 22:6
similar 19:10,11
  19:15 25:17
  29:2 47:16 66:5
Similarly 45:13
sites 37:6
sitting 59:2,3
situation 46:8
  48:6 49:14
six 35:12,20,22
  91:12
skill 40:6 41:3
small 94:8,9
smooth 68:12
snapshot 71:3
social 24:12 91:18
socially 32:22
software 17:7,9
sole 42:3
solely 46:9 81:3
solicit 23:15

solicited 108:18
Solomon 8:4,9,14
  9:1,5,10,21 10:2
  11:20 12:5,8,9
  14:19,21 15:16
  17:5 18:10,13
  21:4 22:12 23:7
  28:21 39:2 41:6
  41:15 42:17
  43:3 46:16
  49:21 50:7,10
  52:3,11 53:20
  54:8,9,15,19,22
  55:1,7,9 56:3,6
  56:10 59:8,10
  60:3,6,10 61:4
  61:16 62:1,3,11
  62:16 63:20
  64:7,20 65:11
  65:19 66:3,8
  72:12 73:19
  79:7,15,17,21
  80:2,3,7,9 111:6
  111:14,16,20,21
  112:4,10,12,14
  112:20 113:2,6
somebody 23:19
  42:18 43:11
  44:12 79:3
  100:9
somebody's 44:3
someone's 22:3,7
  22:9 56:22
soon 68:16
sophistication
  40:4
sorry 15:8 80:14
  93:13,18 111:10
sort 40:5 58:4
  85:20 86:6
  88:19 95:4,5
  98:11 99:8,12
  105:4,7,9 107:7
  108:16
sorts 26:15 27:7
  104:12

sounding 99:8
sounds 25:11
Source 31:10
sources 65:9
space 47:19 50:8
  50:18 51:3
  52:22 53:2,14
  53:18,21 54:5
  54:10,11,14,22
  55:8,13 56:3,5
  57:9,10,11,12
  57:14,20 58:1,3
  58:5,9 60:3,6,11
  60:19,21 61:1
  62:5,17 63:20
  64:7,17,20
  65:13,22 76:20
spaces 50:1
spam 74:8
speak 10:22
speaking 21:2,4
  24:8 37:16
  74:12
Special 39:3
specific 9:13
  10:10,15 21:16
  22:2 23:14,14
  25:7 26:17 33:3
  38:21 40:7,18
  44:17 47:1 48:6
  49:17 60:22
  61:7 71:22
  72:16 81:17
  97:9 106:16
  110:14 111:7
specifically 7:6
  21:2 45:19 62:7
  72:22 74:16
  76:3 78:16
  79:13 80:8 81:1
  82:5 83:11
  90:12 93:21
  97:13 98:8
  101:21 103:17
  104:14 105:6
  108:12,21 112:2

113:9
specifics 15:11
speed 67:16
spend 8:12 36:22
  42:2
spent 37:4 89:10
spoke 90:22
sponsored 88:5
spring 97:8
square 57:17
  58:13,15 60:13
staff 33:1
staffed 46:18
staffing 1:4 4:16
  5:14 38:9 58:3
  85:21 86:2
  98:10 102:19
Staffwise 87:11
  109:7
stand 90:14 93:22
start 35:5 65:3
  73:8 81:3 97:7
started 31:20
  34:22 35:6
  52:10 54:8
  96:17 97:8 98:1
starting 45:15
starts 90:9
state 5:8 14:4
  29:19
States 1:2 5:15
stating 27:21
stay 77:4
stays 77:10
sticking 114:2
stop 114:4
string 4:13,14
  68:3,5 76:17
  90:8,10
struggling 85:19
stuff 24:9 69:20
  74:8 76:14,22
  80:15 86:16
  95:5
subfiles 77:8
subfolders 71:13

sublease 50:16
subsequent 73:6
  73:8
suggestion 56:13
suite 3:5 50:14
suited 40:6
supplying 47:13
  96:11 105:4
support 101:15
  102:9
supporting
  103:22
sure 28:16 32:21
  34:12 36:1
  37:18 49:3,18
  62:2 71:9,21
  75:15 76:7 82:4
  101:22 108:19
surrounded
  99:10
sworn 5:3 116:6
system 43:1 95:14

**T**

T 4:1,1
take 14:1 42:1
  45:10 49:15
  50:13 66:15
  82:3 89:21
  101:19
taken 29:7 42:7
  49:19 90:1
  116:3,7,13
  118:3
takes 42:5
talk 53:22 56:6,16
talked 26:16
  112:10
talking 8:16
  16:17 19:14
  55:7 88:9 101:2
target 105:18
tax 80:14,18
taxes 86:10
team 48:2 61:15
  99:15 104:13

112:14 113:1,3
113:12
**tell** 5:3 7:8 14:6
35:10,14 47:21
48:1 54:2,7
57:11,14 87:4
96:4 101:18
112:20
**temp** 48:17 49:10
94:10
**temporary** 95:13
**temps** 17:15
48:10
**ten** 101:4 113:21
**tenure** 18:9
**term** 48:16,21
49:3
**terms** 13:3
**testified** 5:5 26:2
26:4
**testify** 71:8 74:11
**testifying** 13:10
**testimony** 17:19
84:15 112:3
115:4,5 116:4,6
116:10
**Thank** 6:22 7:14
13:12 19:7 29:1
66:17 67:18
86:22 89:20
93:4 107:21
114:5,7 117:15
**thereabouts**
112:9
**thing** 41:5 44:11
47:19 75:19,19
104:5
**things** 16:20,20
31:18 48:20
51:4 60:18
75:12 76:1
100:18
**think** 13:13 14:2
21:21 23:11
25:8,13 28:3,11
43:18 58:15

63:6 88:16 97:4
101:8 104:9,9
113:22
**third** 68:11 104:5
**Thomas** 97:15,16
**thought** 57:12
103:10,15
**thoughts** 85:12
**thousand** 34:11
34:14 58:13
**three** 45:3,15
48:1
**three-page** 68:2
**throwing** 107:7
**time** 5:22 8:12,20
11:11 29:18
30:2,13 31:22
32:20 33:2
35:14 37:16,19
37:22 38:2 42:2
42:6 48:11
59:11 63:3,4
70:18,22 71:2,7
71:7 79:11
81:14 86:8 89:2
90:22 94:17
95:5,8,15 96:7
96:12 99:2,14
100:10 101:19
109:13 110:22
114:3
**times** 28:4 114:2
**timing** 105:6
**title** 81:10 100:14
104:16
**titles** 94:13
**today** 5:18,19,22
6:8,20 9:18
18:22 58:22
17:12 109:21
23:1 53:20
69:20
**top** 42:13 53:12
67:2 68:4
**Tori** 94:15,16,16
**total** 110:8

**track** 42:22 63:2
**tracked** 42:17,20
**tracking** 42:21
43:13,16
**trail** 79:3
**training** 18:12
**transaction**
110:11,16,22
**transcript** 117:10
118:3,7
**transcription**
115:5 116:8
**transition** 67:11
68:12
**transitioned** 35:8
**Transitioning**
49:5
**treat** 86:14
**trigger** 103:11
**trip** 75:5 76:1
77:12
**trips** 75:3
**true** 115:4 116:9
**truth** 5:3,4,4
**try** 46:1 47:6 77:4
91:20
**trying** 19:8 23:9
40:17 41:15
44:21 72:20
76:21 80:21
86:14 94:21
101:16
**turn** 35:4
**turned** 14:6
**twenty** 111:16
**two** 7:7 11:6
21:14 29:11,22
30:7 49:22 54:6
67:2 70:21
75:12 109:21
**type** 19:16 57:9
86:16
**typical** 37:7 80:15
86:2
**typically** 108:17

| U |
| --- |

**ultimate** 59:19
**unacceptable**
44:4
**underlies** 65:21
**understand** 9:10
17:19 23:10
28:8 54:13
76:21 80:21
84:15 85:19
86:5 88:4
**understandably**
7:10
**understanding**
6:9 9:4,17,19
14:5,17 18:19
19:21 40:5 59:1
85:21 92:21
**understood** 28:4
**unfair** 27:22
**unflattering**
76:15
**Unfortunately**
89:7
**United** 1:2 5:15
**upcoming** 68:14
**upper** 102:9
**upset** 24:1
**usage** 61:1
**use** 17:9 39:5 44:7
48:21 60:11,18
60:21 64:21,22
66:11 77:19,20
95:13,22 96:3
**user** 95:16

| V |
| --- |

**valuable** 40:17
46:6
**value** 61:8
**Van** 97:14
**various** 91:17
**Vegas** 75:3,5,18
76:1 77:12
**vendor** 17:8
**vendors** 96:4

98:11
**version** 109:17
**versus** 5:17
**vice** 30:12 81:10
99:3 101:9
**view** 14:10 16:1
38:14
**volume** 36:14
**vs** 1:5 117:5 118:1
**V-A-N** 97:14

| W |
| --- |

**W** 3:3,9
**waiting** 31:13
**walk** 100:15,16
100:20
**walks** 43:8
100:15
**want** 8:12 13:19
24:12 26:17,20
26:22 27:1
41:17 44:9 49:9
49:16 53:21
71:8 72:19
74:10 77:3 79:2
82:15 83:5
85:15 96:5,6
98:12 100:20
101:15 102:22
**wanted** 44:18
73:2 75:15 86:2
95:22 108:17
**Washington** 1:12
2:13 3:5,10
117:2
**wasn't** 64:22
81:16 85:6 89:7
95:22 100:5
101:13
**watermark** 84:3
84:5,13
**watermarking**
84:1
**way** 21:15,17,20
76:15 95:2
99:20 101:22

Joshua Kubicki

103:6
ways 22:2
Wednesday 68:9
week 47:14,21
    61:22 62:2,3
    87:12 102:4
    111:11,18 112:1
weekend 91:2,4,6
    91:7
weeks 35:12 45:4
    45:15 54:6
welcome 46:7
went 58:11 73:12
    74:15 78:17
    96:1 100:3
    106:18,20 107:2
we're 43:6
whatnot 22:10
whatsoever 66:10
willing 16:1
    101:19
wish 19:7
withdraw 27:15
withdrawing
    27:16
witness 12:22
    27:2 28:5 82:17
    116:4,6,10
    117:9
woman 53:10
Wood 90:9,15,16
    90:20 91:11
    92:18,19,22
words 102:8
work 22:12 24:20
    24:22 25:3,4
    35:16 36:4 39:6
    39:19 42:10
    43:2 44:12
    46:12 47:4 59:5
    59:8,9,10,13
    62:10 65:3,21
    73:1,14 77:16
    91:20,22 92:3
    98:4,7,20 111:6
    111:14

workable 57:10
worked 43:9 46:4
    46:17 81:15
    95:9
working 25:1
    29:3 35:3 43:7
    44:14 48:10
    54:8,16 55:6
    59:16 62:9,16
    62:17 63:19
    64:7 65:10,13
    71:1 84:19,22
    85:3 91:16 98:1
works 46:11
worlds 49:12
worried 45:17
wouldn't 23:18
    47:17 75:20
    102:2 113:14
wound 84:12
write 21:10
written 10:12
    60:9 95:2
wrote 20:18 21:11
W-2s 86:16
W2 34:3,10 80:15

X

X 25:2

Y

Yeah 19:13
    104:11
year 33:6 87:11
    97:21
years 40:21 41:19
    42:9 81:16,19
    91:12
yesterday 61:19
    61:20
York 52:17

Z

Zone 88:3,6,10,13

$

$1,000 109:9

110:7
$42,000 110:8
$650,000 34:5
$800,000 34:19

0

02 31:11
03 31:11,17,21
04 31:17 96:16,17
    104:19 105:15
    107:14,19
05 97:8

1

1 4:8 6:11,14,17
    7:9 30:20 49:17
    82:8,14 87:2
    110:12
1:07-CV-01281...
    1:5
10 4:17 57:17
    99:11 105:10,11
100 22:5 74:13
102 4:16
105 4:17
107 4:18
108 4:19
109 4:20
11 4:18 107:10,11
110 4:21
1120 50:4 51:3
12 4:19 108:1,2,5
1201 3:10 50:1,18
    51:22 52:6
    57:20 62:16
    64:20 65:13,22
    117:1
1250 50:1 51:6,7
    51:8,9,19 52:12
    52:19
13 4:20 109:2,3
13th 65:7
13,000 58:15
14 4:21 99:11
    110:1,2 116:21
15 89:8
15,000 57:17

16th 58:10 65:1,4
17th 111:9,18
    112:1,5,9
180 82:16,18
181 82:9
182490 1:22
183 83:6
19 109:6
194 82:9

2

2 1:13 2:5 4:9 7:1
    7:3 9:12 30:20
    59:2 82:15
    118:2
2:15 113:20
2:54 2:6
20 63:3 68:9 74:9
20th 68:19 69:8
20004 3:10 117:2
20006 3:5
2001 2:12 3:4
2003 31:5
2003/2004 29:18
2004 29:14 33:5
    34:6,8 36:10
    87:6 93:7 94:7
    94:20 104:7
2005 34:16 36:9
    90:9
2006 33:22 34:1
    36:9
2007 1:13 2:5
    74:15 78:14
    109:6 118:2
2010 116:21
202-419-4242 3:6
202-662-5435
    3:11
21 104:7
21st 68:6
22 29:14 30:22
    67:3,5 68:18
    69:1,2,4,9,17
    71:4 93:7
225 87:2

23rd 11:10
234 87:3
25 43:18,20 74:10
27 105:15 107:14
29 4:10,11

3

3 4:10 29:8,13
    30:19,19 31:4
    82:15
30 65:17 117:11
300 3:5
35 63:3
369 6:17

4

4 4:11 29:8,15
    30:19,22 33:14
4th 62:2
40 46:18 47:11
42 63:6 110:7,20

5

5 4:3,12 66:18,19
    67:1 69:1,16
    79:6
5,000 77:3
5:00 6:8
5:29 114:11
5:30 113:19
50 47:15 76:10

6

6 4:8,13 67:20,21
6th 6:5
6-17-07 4:21
    110:9
6-19-07 4:20
60 65:17
600 34:4
66 4:12
67 4:13

7

7 4:9,14 34:18
    90:2,4,8
7-27-04 4:17,18

**75** 59:15

**8**

**8** 4:15 90:3,4 93:5
**80** 59:4,15

**9**

**9** 4:16 102:13,14
   102:18
**9:15** 68:9
**90** 4:14,15 24:19
   38:2 59:4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


AJILON PROFESSIONAL                )

STAFFING, LLC                      )

   Plaintiff                       ) Civil Action No.

       vs.                         ) 1:07-CV-01281-RJL

JOSHUA KUBICKI, et al              )

   Defendants                      )




Deposition of Jonathan R. Pomykala

Washington, D.C.

August 2, 2007




Reported by:  Bonnie L. Russo

JOB NO. 182490

## Page 2

```
 1
 2
 3
 4
 5              August 2, 2007
 6              11:18 a.m.
 7
 8
 9  Deposition of Jonathan R. Pomykala held at:
10
11       Schnader, Harrison, Segal & Lewis, LLP
12       2001 Pennsylvania Avenue, N.W.
13       Washington, D.C.
14
15
16
17
18
19
20
21  Pursuant to notice, before Bonnie L. Russo,
22  Notary Public
```

## Page 3

```
 1  APPEARANCES:
 2  For the Plaintiff
 3       BENJAMIN W. HAHN, Esq.
         JOLEEN OKUN, Esq.
 4       SCHNADER, HARRISON, SEGAL & LEWIS, LLP
         2001 Pennsylvania Avenue, N.W.
 5       Suite 300
         Washington, D.C. 20006
 6       202-419-4242
 7
    For the Defendant
 8
         MICHAEL A. SCHLANGER, Esq.
 9       MARK W. MOSIER, Esq.
         COVINGTON & BURLING, LLP
10       1201 Pennsylvania Avenue, N.W.
         Washington, D.C. 20004
11       202-662-5435
12
13
14
15
16
17  Also Present:  John J. Mullenholz
18
19
20
21
22
```

## Page 4

```
 1           C O N T E N T S
 2  EXAMINATION OF JONATHAN R. POMYKALA      PAGE
 3  BY MR. HAHN                                5
 4
 5
 6
 7  EXHIBITS
 8  2    Compilation of Documents           15
 9  2    Deposition Notice                  15
10  3    Posting                            62
11  4    Posting                            62
12
13
14
15
16
17
18
19
20
21
22
```

## Page 5

```
 1           P-R-O-C-E-E-D-I-N-G-S
 2  JONATHAN R. POMYKALA,
 3  being first duly sworn, to tell the truth, the
 4      whole truth and nothing but the truth,
 5          testified as follows:
 6      EXAMINATION BY COUNSEL FOR PLAINTIFF
 7          BY MR. HAHN:
 8      Q.    Would you state your name for the
 9  record, please.
10      A.    Jonathan Robert Pomykala.
11      Q.    Mr. Pomykala, my name is Ben Hahn.
12  I'm a partner with Schnader, Harrison, Segal &
13  Lewis.  This firm represents the plaintiff,
14  Ajilon Professional Staffing, LLC in the
15  litigation that is pending in the United States
16  District Court for the District of Columbia.
17  Case number 1:07-CV-01281.
18      We met on the 25th in the federal
19  court in Judge Leon's courtroom; is that
20  correct?
21      A.    That's correct.
22      Q.    Have we ever met before to your
```

2 (Pages 2 to 5)

Page 6

1 knowledge?

2   A.   No.

3   Q.   We have agreed to a limited number

4 of depositions in preparation for a preliminary

5 injunction hearing on this coming Monday,

6 August 6, and part of the agreement was to keep

7 the depositions limited in time and scope.  So

8 I am going to dispense with some of the

9 preliminaries.

10       You are represented by Mr. Schlanger

11 and Mr. Mosier; is that correct?

12   A.   Yes.

13   Q.   Okay.  I am trusting that they have

14 prepared their client for a deposition the way

15 I know they did and so I am going to cut about

16 ten minutes of preliminary stuff out to try to

17 move this along.

18       What is your current job?

19   A.   I'm a project consultant.

20   Q.   And where do you work?

21   A.   Solomon Page Group.

22   Q.   Where is your office?

Page 7

1   A.   We have an office at 700 12th

2 Street.

3   Q.   Do you have any other offices?

4   A.   We have some temporary space so,

5 yes.

6   Q.   Where is the other space?

7   A.   We have temporary space at 1250

8 Connecticut Avenue and at 1201 Pennsylvania

9 Avenue.

10   Q.   When you say temporary space in what

11 respect is it temporary?

12   A.   We haven't signed a long term lease.

13   Q.   How long is the lease?

14   A.   I don't know how long it is.

15   Q.   Have you seen the lease?

16   A.   No.

17   Q.   Who negotiated the lease?

18   A.   I would imagine Joshua Kubicki or

19 someone else from Solomon Page.

20   Q.   Do you know how long you plan to be

21 in the 1250 Connecticut Avenue space?

22   A.   I do not at this point, no.

Page 8

1   Q.   Do you have any attorneys that you

2 have recruited that are working in the 1250

3 Connecticut Avenue space?

4   A.   Yes.

5   Q.   How long have you told them they

6 should expect to be working for Solomon Page?

7   A.   They are not working for Solomon

8 Page.

9   Q.   Who are they working for?

10   A.   Crowell & Moring.

11   Q.   Do you have anyone that goes to that

12 space to oversee their work?

13   A.   No attorneys.

14   Q.   Any Solomon Page employees?

15   A.   Yes.

16   Q.   Who goes there to oversee their

17 work?

18   A.   There is three front desk people

19 that sign the attorneys in and out.

20   Q.   Who are they?

21   A.   Dani Davies, Asten Hall and

22 Francesco Howard.

Page 9

1   Q.   They work for Solomon Page?

2   A.   Yes.

3   Q.   Are they regular full-time

4 employees?

5   A.   No.

6   Q.   Are they temps?

7   A.   Yes.

8   Q.   Who recruited them?

9   A.   Myself and Jan Templeman.

10   Q.   Do you know how long they have

11 worked for Solomon Page?

12   A.   Yes.

13   Q.   How long?

14   A.   Three weeks.

15   Q.   Okay.  Have you indicated to Davies,

16 Hall or Howard how long they should expect to

17 be in the positions they are in?

18   A.   Yes.

19   Q.   How long is that?

20   A.   I would estimate around another

21 month to month and a half.

22   Q.   And what is that estimate based on?

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

**Jon Pomykala**

Page 10

1    A.    How long we think the project is
2 going to go.
3    Q.    Which project is that?
4    A.    The AT&T and Dobson Communications
5 merger.
6    Q.    Was that a merger that you were
7 familiar with before you came to be employed by
8 Solomon Page?
9    A.    No.
10    Q.    When was the first time you heard
11 about that merger?
12    A.    It was after July 4th.
13    Q.    Is your knowledge about that merger
14 in any way confidential?
15    A.    I don't know to be honest.
16    Q.    Okay.  I mean, do you know whether
17 we should even be talking about it?
18    A.    I don't know.
19    Q.    Okay.  How many people are working
20 at 1250 Connecticut Avenue?
21    A.    Which people?
22    Q.    Total?

Page 11

1    A.    Like throughout the whole building?
2    Q.    Well, how about your temporary
3 space, Solomon Page temporary space at 1250
4 Connecticut Avenue?
5    A.    Working for who?
6    Q.    Well, let me ask you this:  Is it
7 your understanding that Solomon Page has a
8 short-term lease with the owner or manager of
9 the 1250 Connecticut Avenue for a certain
10 amount of space?
11    A.    Yes.
12    Q.    Is it a Solomon Page short-term
13 lease?
14    A.    Yes.
15    Q.    It's not a Crowell short-term lease?
16    A.    Correct.
17    Q.    And you haven't seen that lease?
18    A.    No.
19    Q.    How big a space is it?
20    A.    I don't know.
21    Q.    Have you been over to it?
22    A.    Yes.

Page 12

1    Q.    How many desks are there?
2    A.    I don't know the exact number.
3    Q.    More than ten?
4    A.    Yes.
5    Q.    More than 20?
6    A.    Yes.
7    Q.    More than 30?
8    A.    Yes.
9    Q.    More than 40?
10    A.    Somewhere around there.
11    Q.    Okay.  How many of those desks are
12 filled today, if you know, approximately?  Most
13 of them?
14    A.    I don't know.  I don't know who has
15 come in and out for today.
16    Q.    When is the last time you were
17 there?
18    A.    This morning.
19    Q.    Was there anyone there?
20    A.    Yes.
21    Q.    About how many people did your see?
22    A.    I didn't go to all the rooms so I

Page 13

1 saw about 10 to 15 people.
2    Q.    Okay.  How many different rooms are
3 there?
4    A.    I don't know the exact number.
5    Q.    There is more than one, right?
6    A.    Yes.
7    Q.    Are they private offices or are they
8 rooms with multiple desks?
9    A.    A combination of both.
10    Q.    Okay.  How many big rooms with
11 multiple desks are there?
12    A.    I don't know the exact number.
13    Q.    More than five?
14    A.    Yes.
15    Q.    More than ten?
16    A.    Yes.
17    Q.    Is this a whole floor of the
18 building?
19    A.    No.
20    Q.    It's less than a whole floor?
21    A.    Correct.
22    Q.    Okay.  It's not more than one floor?

4 (Pages 10 to 13)

Jon Pomykala

| Page 14 |
| --- |

1    A.    Correct.

2    Q.    About how much of the floor do you

3 estimate you take up?

4    A.    Half.

5    Q.    Half.  Okay.

6          How soon after you started at --

7 when did you start at Solomon Page?

8    A.    My hire date was the -- was after

9 July 4th.  I think the Monday following July

10 4th.

11    Q.    Did you sign an employment agreement

12 with Solomon Page?

13    A.    Yes.

14    Q.    Did you bring that with you today?

15    A.    No.

16    Q.    Do you have a copy of it?

17    A.    I don't have it with me personally.

18          MR. MOSIER:  The document, yeah.

19          MR. HAHN:  Let's go off the record a

20 second.

21          (Discussion off the record.)

22          BY MR. HAHN:

| Page 15 |
| --- |

1    Q.    During a brief off-the-record

2 discussion Mr. Mosier gave me a copy of the

3 documents being produced today by Mr. Pomykala.

4 I will ask him some questions about these

5 documents but I would like to first mark this

6 as Pomykala Exhibit 1.

7          (Deposition Exhibit No. 1 was marked

8 for identification.)

9          BY MR. HAHN:

10    Q.    Mr. Pomykala, I am showing you a

11 compilation of documents that have been marked

12 as Pomykala Exhibit 1 and I believe they have

13 been consecutively numbered JP 1 through 119

14 and if you could just look at them and tell me

15 whether or not those are documents that you

16 supplied to your counsel in response to the

17 deposition notice in this case.

18    A.    Yes, they are.

19    Q.    Thank you.

20          MR. HAHN:  If we could mark this

21 deposition notice as Plaintiff's Exhibit 2.

22          (Deposition Exhibit No. 2 was marked

| Page 16 |
| --- |

1 for identification.)

2          BY MR. HAHN:

3    Q.    Mr. Pomykala, I am showing you the

4 deposition notice that was served in connection

5 with your deposition and I would just like to

6 refer you to Exhibit A of the list of

7 documents.  I don't want to spend a lot of time

8 getting into privilege issues and issues of

9 whether Solomon Page had the document and you

10 were not at liberty to disclose it.  Counsel

11 have already discussed some of those issues

12 separately, but I do want your representation

13 that the documents that you have provided to us

14 today are the ones that you put together that

15 are in your possession, custody and control

16 based on your review of that list of documents

17 on Exhibit A; is that correct?

18          MR. SCHLANGER:  There were a bunch

19 of preparatory statements.  Just isolate the

20 question.

21          BY MR. HAHN:

22    Q.    My question is the documents that

| Page 17 |
| --- |

1 you produced today was that a compilation of

2 documents that you assembled having reviewed

3 Exhibit A and determined which documents you

4 believed you had that were responsive to that

5 list?

6    A.    Yes.

7    Q.    Thank you.  So as you sit here today

8 you are not aware of any responsive documents

9 that you have in your possession, custody and

10 control that you didn't turn over?

11    A.    To my knowledge, no.

12    Q.    Okay.  Thank you, sir.

13          What duties do you have at Solomon

14 Page in your current position?

15    A.    There is a wide range of duties I

16 have.

17    Q.    Are they different from the ones you

18 had at Ajilon?

19    A.    Similar.

20    Q.    Is there any material difference

21 that you are aware of?

22    A.    What do you mean by "material"?

Esquire Deposition Services

D.C. - 1-800-441-3376

MD - 1-800-539-6398

VA - 1-800-752-8979

Page 18

1    Q.    Well, something that you do now that
2  is significantly different from what you did at
3  Ajilon?
4    A.    Not necessarily, no.
5    Q.    Are you primarily a recruiter?
6    A.    It's one of my duties.
7    Q.    Is that your principal duty?
8    A.    It's just one of them.  I have
9  different duties.
10   Q.    Do you have -- what would you say
11 your three principal duties are or the three
12 most important?
13   A.    Recruiting, project management,
14 administrative help.
15   Q.    Are you currently doing recruiting
16 at Solomon Page?
17   A.    Yes.
18   Q.    Do you have any outstanding postings
19 for the positions that you are trying to fill?
20   A.    No.
21   Q.    Have you posted any listings for the
22 positions that you were trying to fill since

Page 19

1  you joined Solomon Page?
2    A.    Yes.
3    Q.    What positions were you trying to
4  fill?
5    A.    Document review attorneys.
6    Q.    Anything else?
7    A.    No.
8    Q.    Do you post a listing for a position
9  -- first of all, let me ask you when you post a
10 listing where do you do it?  Do you do it in
11 the newspaper?
12   A.    No.
13   Q.    Where do you do it?
14   A.    On the Internet.
15   Q.    And where do you do it on the
16 Internet?
17   A.    Craig's List.
18   Q.    Anywhere else?
19   A.    Yes.
20   Q.    Where else?
21   A.    Posse's List.
22   Q.    Any place else?

Page 20

1    A.    Yes.
2    Q.    Where else?
3    A.    D.C. Metro Contract Attorneys.
4    Q.    Okay.  Any place else?
5    A.    No.
6    Q.    What postings have you put out while
7  you have been at Solomon Page for contract
8  attorneys?
9    A.    What do you mean by "what postings"?
10   Q.    Well, you are not posting anything
11 right now, correct?
12   A.    Correct.
13   Q.    Is that because you don't have
14 anything available for people?
15   A.    Correct.
16   Q.    And you say that you started at
17 Solomon Page you believe shortly after the 4th
18 of July, the Monday after the week of the 4th
19 of July?
20   A.    Correct.
21   Q.    How soon after you started did you
22 post anything?

Page 21

1    A.    Not too long after that.
2    Q.    Like maybe the same day?
3    A.    Possibly.
4    Q.    When you showed up at Solomon Page
5  that first day was there already something for
6  you to fill?
7    A.    Yes.
8    Q.    What was that?
9    A.    A project.
10   Q.    What project was that?
11   A.    The document review attorney
12 project.
13   Q.    Do you know the client that it was
14 for?
15   A.    Yes.
16   Q.    Which client was it?
17   A.    Crowell.
18   Q.    What project was that?  The name of
19 the project, what do you call it?
20   A.    The AT&T merger project.
21   Q.    Okay.  Were you aware before you got
22 to Solomon Page that that project was active

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

**Jon Pomykala**

| Page 22 |
| --- |

1 and you were going to need to recruit attorneys
2 for it?
3    A.    No.
4    Q.    So you found that out when you
5 showed up?
6    A.    Correct.
7    Q.    Had you ever heard of that project
8 before you showed up at Solomon Page?
9    A.    No.
10    Q.    Do you know who the salesperson was
11 that was responsible for that project?
12    A.    Yes.
13    Q.    Who was that?
14    A.    Joshua Kubicki.
15    Q.    So did you talk to him about it the
16 first day that you got to Solomon Page?
17    A.    Yes.
18    Q.    What did he tell you he wanted you
19 to do?
20    A.    Recruit.
21    Q.    Okay.  How many people were you
22 supposed to recruit and for what time frame?

| Page 23 |
| --- |

1    A.    The number it was -- there was no
2 specific number.  And for a time frame within a
3 week to start.
4    Q.    And how long was the position going
5 to be available to the contract attorney?
6    A.    It wasn't specifically defined.
7    Q.    Did Mr. Kubicki tell you when he
8 first found out about this project?
9    A.    He did not.
10    Q.    Do you have any idea when he first
11 found out about the project?
12    A.    I do not.
13    Q.    Do you know who the contact is at
14 Crowell regarding that project?
15    A.    There is no specific one contact for
16 it so...
17    Q.    Who are the contacts that you are
18 aware of?
19    A.    For?
20    Q.    The AT&T merger project.
21    A.    Linda Novosel, Anna Marie Melhado.
22 Linda is probably the main one.

| Page 24 |
| --- |

1    Q.    Any others?  Even minor players?
2    A.    Val Hinko, Tori Phillips.  I believe
3 that's all that I thought about.
4    Q.    Did you know any of those people
5 before you went to work for Solomon Page?
6    A.    Yes.
7    Q.    Did you meet them in connection or
8 did you get to know them in connection with
9 your work for Ajilon?
10    A.    Yes.
11    Q.    Did you know them apart from your
12 work at Ajilon?
13    A.    Sometimes.
14    Q.    And in what context did you know
15 them apart from your work at Ajilon?
16    A.    I would see them at different
17 events.
18    Q.    But your first contact with them was
19 through your work at Ajilon and their work at
20 Crowell?
21    A.    Correct.
22    Q.    How many attorneys, contract

| Page 25 |
| --- |

1 attorneys have you recruited since you joined
2 Solomon Page?
3    A.    I don't know the exact number.
4    Q.    More than ten?
5    A.    Yes.
6    Q.    More than 20?
7    A.    Yes.
8    Q.    More than 50?
9    A.    No.
10    Q.    Are any of them still working?
11    A.    Yes.
12    Q.    Are all of them still working?
13    A.    No.
14    Q.    How many have stopped working?
15    A.    I don't know the exact number.
16    Q.    More than ten?
17    A.    Around there.
18    Q.    Okay.  Have you had any projects
19 that started and stopped while you were at
20 Solomon Page?
21    A.    Yes.
22    Q.    What projects?

7 (Pages 22 to 25)

Page 26

1   A.      A document review attorney project.
2   Q.      What firm was that for?
3   A.      Mayer Brown.
4   Q.      What project was that?
5   A.      John Doe is the name of the project.
6   Q.      John Doe.  How many attorneys were
7   involved in that?
8   A.      Three.
9   Q.      Where did they work?
10  A.      For Mayer Brown.
11  Q.      Did they work at Mayer Brown's
12  offices?
13  A.      Yes.
14  Q.      Do you have any projects that you
15  are aware of for Solomon Page that are in the
16  pipeline, that are on the horizon?
17  A.      Not to my knowledge, no.
18  Q.      Who do you report to?
19  A.      For my current position?
20  Q.      Yes.
21  A.      Who is my boss at Solomon Page?
22  Q.      Yes.

Page 27

1   A.      Joshua Kubicki.
2   Q.      And do you see him every day?
3   A.      No.
4   Q.      Do you see him at least once a week?
5   A.      Yes.
6   Q.      Do you have meetings with him where
7   you discuss what things are on the horizon,
8   what is coming up?
9   A.      If he thinks it's appropriate, yes.
10  Q.      There are not regularly scheduled
11  meetings?
12  A.      No.
13  Q.      As you sit here today, you are not
14  aware of any new work that is in the pipeline
15  that you need to do recruiting for?  Is that
16  your testimony?
17  A.      Correct.
18  Q.      Do you do any work with Mr. Kubicki
19  trying to develop new projects with law firms
20  or clients?
21  A.      No.
22  Q.      That is not your role, correct?

Page 28

1   A.      Correct.
2   Q.      When did you first hear the name
3   Solomon Page or Solomon Page Group?
4   A.      I don't know the exact date.
5   Q.      Have you known about that company
6   for years?
7   A.      No.
8   Q.      Was it sometime during 2007 that you
9   first came to know about that company?
10  A.      Yes.
11  Q.      Who did you first hear about Solomon
12  Page from?
13  A.      Joshua Kubicki.
14  Q.      What did he tell you about it?
15  A.      It was a legal staffing company.
16  Q.      He told you it was a legal staffing
17  company?
18  A.      Correct.
19  Q.      Do you know whether they did work in
20  the D.C. area?
21  A.      Yes.
22  Q.      He told you that they did do work in

Page 29

1   the D.C. area?
2   A.      Correct.
3   Q.      Did he tell you anything about the
4   projects or clients that they had in D.C.?
5   A.      No.
6   Q.      Do you have any kind of time frame,
7   winter, spring, early summer, we are in 2007,
8   where that conversation would have taken place?
9   A.      It would have been late spring,
10  early summer.
11  Q.      So May?
12  A.      Around there.
13  Q.      Could it have been April?
14  A.      Possibly, but I don't believe so.
15  Q.      What did he tell you about Solomon
16  Page other than that they were a legal staffing
17  company?
18  A.      They had offices in New York as
19  well.
20  Q.      Was he talking about going to work
21  for them?
22  A.      He said that they had contacted him

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

**Jon Pomykala**

Page 30

1  about him possibly working there.

2      Q.      And did he talk to you about you

3  coming with him?

4      A.      At the first conversation, no.

5      Q.      Was it your understanding when you

6  had that conversation with Josh Kubicki that he

7  was thinking about maybe going some place else?

8      A.      Yes.

9      Q.      And what did you understand about

10  his thinking about going some place else?

11      A.      What did I understand about it?

12      Q.      Yes.  I mean, this is -- presumably

13  this is something Mr. Kubicki is telling you

14  about?

15      A.      Yes.

16      Q.      This is in his head.  What did he

17  tell you about his thinking?

18      A.      That he was thinking about looking

19  to go to another company.

20      Q.      Did he tell you about any other

21  companies he was looking to go to?

22      A.      Yes.

Page 31

1      Q.      What other companies?

2      A.      Hudson Legal.

3      Q.      Any others?

4      A.      To my knowledge, no.

5      Q.      Were you looking to go to another

6  company?

7      A.      Maybe.

8      Q.      How long had you been at Ajilon?

9  When did you start at Ajilon?

10      A.      As a permanent employee?

11      Q.      When was your first relationship

12  with Ajilon?

13      A.      In February of 2005.

14      Q.      What were you doing?

15      A.      I was a temporary help recruiter.

16      Q.      For the legal department?

17      A.      Correct.

18      Q.      Okay.  And who did you report to?

19      A.      Andrew Jewell.

20      Q.      Did Andrew Jewell hire you?

21      A.      Yes.

22      Q.      And did you have previous experience

Page 32

1  as a recruiter?

2      A.      No.

3      Q.      So then when Andrew Jewell left, you

4  reported to Josh Kubicki?

5      A.      No.

6      Q.      Who did you report to?

7      A.      Jeff Winestock.

8      Q.      And did you ever report to Josh

9  Kubicki at Ajilon?

10      A.      Yes.

11      Q.      When did you first report to him?

12      A.      I'm not sure of the exact time

13  frame.

14      Q.      Year?

15      A.      It would be -- I think it was --

16  wintertime of '06, I believe.  I'm not sure on

17  the exact time frame.

18      Q.      That would be '05 to '06, that

19  winter, correct?

20      A.      It was in the early months of '06.

21      Q.      Okay.

22      A.      I believe.

Page 33

1      Q.      Moving back to your conversations

2  with Josh Kubicki where he was looking to go to

3  work for another company, was it your

4  understanding he was not happy at Ajilon?

5      A.      I know he had been frustrated with

6  some things.

7      Q.      Were you frustrated with anything?

8      A.      Some things.

9      Q.      Were you basically satisfied with

10  your employment?

11      A.      There was good points and bad

12  points.

13      Q.      Did you have your resume out to find

14  another job?

15      A.      It had been on Monster for a while.

16  I don't think I ever took it off of there.

17      Q.      What is that?

18      A.      I don't think I ever took it off of

19  there.

20      Q.      When did you put it out there?

21      A.      In 2005.

22      Q.      It was out there continuously?

9 (Pages 30 to 33)

**Jon Pomykala**

Page 34

1    A.    Correct.

2    Q.    Had you had any offers?

3    A.    No firm offers but some e-mails

4 every once in a while on different positions.

5    Q.    Who had sent you e-mails?

6    A.    I don't know the names of them.

7 It's insurance companies.  I just don't

8 remember the exact names of the companies.

9    Q.    Any other staffing companies?

10    A.    Not through Monster.

11    Q.    Were you looking to get out of the

12 staffing business with your posting on Monster?

13    A.    Not necessarily.

14    Q.    Were you looking to stay in the

15 staffing business?

16    A.    Again, not necessarily.

17    Q.    Did Josh Kubicki recruit you to go

18 to Solomon Page?

19    A.    No, not necessarily.

20    Q.    Was it your idea to go to Solomon

21 Page?

22    A.    I would say it was a combined idea.

Page 35

1    Q.    You both talked about it and

2 concluded that it was a good idea?  You both

3 wanted to do it?

4    A.    If it seemed like a good fit.

5    Q.    Okay.  What were you looking for in

6 that fit?  Obviously you went so you must have

7 decided there was a fit.  What were you looking

8 for?

9    A.    Just a better opportunity.

10    Q.    And what was better about the

11 opportunity at Solomon Page?

12    A.    To work with people that I had been

13 working with for a while and I was comfortable

14 with.

15    Q.    So keeping your team together; you,

16 Kimberly Danowski and Josh Kubicki?

17    A.    Correct.

18    Q.    There wasn't anyone else that you

19 had been working with, correct?

20    A.    There were some other folks.

21    Q.    Who else had you been working with?

22    A.    While at Ajilon?

Page 36

1    Q.    Who else was going to be at Solomon

2 Page that you would still be working with?

3    A.    No one else.

4    Q.    Okay.  So it was just the three of

5 you?

6    A.    Correct.

7    Q.    What about that appealed to you?

8    A.    We had a good working relationship.

9    Q.    And can you describe the elements of

10 the working relationship that you valued that

11 were positive?

12    A.    Trust, team work.  Those are two big

13 ones.

14    Q.    Did you know the other two people's

15 strengths?

16    A.    Yes.

17    Q.    Did you know what they were good at?

18    A.    Yes.

19    Q.    Did they know what you were good at?

20    A.    You would have to ask them but I

21 believe so.

22    Q.    Did the three of you ever talk while

Page 37

1 you were still at Ajilon about going together

2 over to Solomon Page as a team?

3    A.    No.

4    Q.    Did you talk about that with Josh?

5    A.    In my last week we had talked about

6 it at Ajilon.

7    Q.    Your last week would have been --

8 you resigned effective the 29th, correct?

9    A.    Correct.

10    Q.    So it would have been that week?

11    A.    Yes.

12    Q.    You didn't talk with him about that

13 before?

14    A.    I think we talked about it maybe a

15 week before that as well.

16    Q.    When did you commit to Josh that you

17 would go over to Solomon Page?

18    A.    When I signed my offer letter.

19    Q.    You didn't commit before that?

20    A.    I didn't sign anything.

21    Q.    Well, did you ever tell Josh that he

22 could represent to the people at Solomon Page

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 38

1 that you would come over if Josh went to
2 Solomon Page?
3     A.    Parts of that statement are true.
4 Parts aren't.
5     Q.    Okay.  What part of it is true?
6     A.    Can you repeat it, please.
7     Q.    Well, did you ever tell Josh that he
8 could represent --
9     A.    That part is true, yes.
10     Q.    That he could tell the people at
11 Solomon Page that you were going to come over
12 if he came over?
13     A.    That last part I don't believe is
14 necessarily true.
15     Q.    Okay.  Well, did you have an
16 independent offer to go to work for Solomon
17 Page apart from Josh Kubicki going over there?
18     A.    I don't know if it was independent
19 or if it was -- if they viewed it as a package.
20     Q.    Did you ever go to New York to meet
21 with the principals of Solomon Page?
22     A.    Yes.

Page 39

1     Q.    When did you do that?
2     A.    A week after I started, week, week
3 and a half after I started.
4     Q.    Did you ever talk to the principals
5 in New York about going to work for Solomon
6 Page prior to starting?
7     A.    No.
8     Q.    Did you negotiate going to Solomon
9 Page exclusively with Josh Kubicki?  This is
10 prior to going there.  Weren't your discussions
11 about going to Solomon Page strictly with Josh
12 Kubicki?
13     A.    Correct.
14     Q.    You didn't talk to anyone else at
15 Solomon Page prior to actually showing up for
16 work?
17     A.    Correct.
18     Q.    Did you understand that Josh was
19 representing to you what Solomon Page was
20 prepared to do?
21     A.    Yes.
22     Q.    And you trusted what Josh was

Page 40

1 telling you about what Solomon Page would do
2 for you was accurate, correct?
3     A.    Yes.
4     Q.    And some of those discussions took
5 place before Josh terminated at Ajilon; is that
6 correct?
7     A.    Correct.
8     Q.    But at the time you had those
9 discussions with him you understood he was not
10 representing Ajilon; he was representing
11 Solomon Page?
12     A.    Since nothing was set in stone I
13 think he was still representing Ajilon.
14     Q.    He was talking to you about you
15 going to work with Solomon Page but he was
16 representing Ajilon.  That was your
17 understanding?
18     A.    I guess, yeah.
19     Q.    Okay.  Did there seem like a
20 conflict there that he was your boss at Ajilon
21 but he is talking to you about going to work
22 for a competitor?

Page 41

1     A.    Since it wasn't set in stone I
2 didn't think it was a conflict.
3     Q.    You still don't think it's a
4 conflict?
5     A.    It very easily could have -- we
6 still could have been at Ajilon if things had
7 worked out there.
8     Q.    But you don't see a problem with
9 talking to your boss about going to work for a
10 competitor while you both still work for one
11 company?
12     A.    Not necessarily because it wasn't
13 set in stone.  If he had been -- already signed
14 an offer letter and had been employed at both
15 positions or something then I would think there
16 would be a big conflict but it was just talk.
17 Nothing definite about it.
18     Q.    Do you know whether Josh had a
19 provision in his contract at Ajilon that he
20 wouldn't try to solicit Ajilon employees to go
21 to work with a competitor?
22     A.    I don't know.

11 (Pages 38 to 41)

**Jon Pomykala**

Page 42

1    Q.    If he had had such a provision would
2  you have spoken with him or would you have
3  said, Josh, I don't think we should be talking
4  like this?
5    A.    Possibly.
6    Q.    You are not sure though?
7    A.    Correct.
8    Q.    Okay.  If you had had a provision in
9  your contract that said you couldn't do that
10  would you honor that?
11    A.    That I wouldn't do what?
12    Q.    That you wouldn't try to solicit
13  people to go to work for a competitor.  Would
14  you honor that provision?
15    A.    Yeah.
16    Q.    Does it seem reasonable to you?
17    A.    It seems reasonable but I don't view
18  it as him soliciting me.
19    Q.    What was he doing?
20    A.    I just view it as two colleagues
21  just talking about a possible idea.
22    Q.    But he was the one that was talking

Page 43

1  to Solomon Page, right?
2    A.    Correct.
3    Q.    You didn't have any discussions
4  going with Solomon Page?  You didn't know what
5  opportunities there were for you?  You had no
6  independent contact with Solomon Page?
7    A.    Correct.
8    Q.    Did you talk to Kim Danowski about
9  going over to work for Solomon Page before you
10  left Ajilon?
11    A.    Yes.
12    Q.    When did you first talk to her?
13    A.    Probably that last week I left.
14    Q.    Did you talk to her about the two of
15  you going over there?
16    A.    Yes, as a possibility.
17    Q.    You both quit on the same day,
18  right?
19    A.    Correct.
20    Q.    When did you first know you were
21  both going to quit the same day or was it, oh,
22  isn't that a coincidence we quit on the same

Page 44

1  day?
2    A.    I made my decision independent of
3  Kim's.  I guess I found out that she was
4  definitely going to do it that day.
5    Q.    Did Josh Kubicki tell you when he
6  wanted you to start at Solomon Page?
7    A.    He left it up to me.
8    Q.    Do you know whether he left it up to
9  Kim?
10    A.    I don't know.
11    Q.    So as far as you know it's a
12  complete coincidence that you and Kim resigned
13  on the same day?
14    A.    That it actually happened on the
15  same day, yes.  I knew Kim had a bunch of
16  different offers looking for different things.
17    Q.    Did you tell anyone at Ajilon in
18  late June that you were going to go to work for
19  Solomon Page?
20    A.    Prior to my resignation?
21    Q.    Yes.
22    A.    No.

Page 45

1    Q.    Did you tell anyone at Ajilon on the
2  day of your resignation that you were going to
3  work for Solomon Page?
4    A.    Yes.
5    Q.    Who did you tell?
6    A.    John Mullenholz.
7    Q.    Why did you tell him that?
8    A.    I felt I owed it to him to tell him
9  what I was doing.
10    Q.    What about going to work for Solomon
11  Page caused you to feel you owed it to him to
12  tell him that?
13    A.    I just thought it was the fair and
14  right thing to do to let him know what my plan
15  was.
16    Q.    Was that because you have contract
17  provisions that by their terms would restrict
18  your ability to go to work for a competitor?
19    A.    That really didn't play into my
20  decision to tell him.  I just thought it was
21  the fair and right thing to do to let him know
22  what I was doing.

12 (Pages 42 to 45)

**Jon Pomykala**

Page 46

1   Q.    Did you volunteer it?

2   A.    No.  He asked and then I told him.

3   Q.    Did you tell him what you were going

4 to be doing at Solomon Page?

5   A.    I did not.

6   Q.    Did you know what you were going to

7 be doing at Solomon Page?

8   A.    I thought it would be a similar

9 role.

10   Q.    Had you already -- at the time that

11 you resigned from Ajilon did you already know

12 what your terms and conditions of employment at

13 Solomon Page would be?

14   A.    No.

15   Q.    You had not gotten an offer letter?

16   A.    No.

17   Q.    Did you know what you were going to

18 be paid?

19   A.    There had been talk of a different

20 salary but until I got the offer letter I

21 didn't know exactly what it was going to be.

22   Q.    Did you know approximately what it

Page 47

1 would be?

2   A.    Around, yeah.

3   Q.    Did it turn out to be pretty close

4 to what you thought it was going to be?

5   A.    It was lower.

6   Q.    Who had you talked about salary with

7 prior to resigning at Ajilon?

8   A.    Joshua Kubicki.

9   Q.    And no one else?

10   A.    Correct.

11   Q.    Just going back a second to your

12 current work at Solomon Page, are there any

13 projects starting today that you have temps

14 assigned for?

15   A.    No.

16   Q.    Are there any starting July 30?

17   A.    Not to my -- what is today's date?

18   Q.    August 2nd.

19   A.    That already started on the 30th?

20   Q.    No.  That started on the 30th?

21   A.    July 30th?

22   Q.    Yes.

Page 48

1   A.    Probably.  I don't know the exact

2 date that they would start.

3   Q.    What project are you thinking of

4 when you say "probably"?

5   A.    Probably one for Mayer Brown.

6   Q.    What project is that?

7   A.    Who the ultimate client is?

8   Q.    What do you call it?  Don't you have

9 a name for every project?  Internally what do

10 you call it?

11   A.    Mayer Brown or if there is different

12 ones, I believe that is Dobson Communications

13 project.

14   Q.    And how many temps are assigned on

15 that project?

16   A.    Currently?

17   Q.    Yes.

18   A.    I don't know the exact number.  20

19 plus, I would say.

20   Q.    And did you recruit the temps for

21 that?

22   A.    Some of them.

Page 49

1   Q.    Where are they working?

2   A.    At 1250 Connecticut Avenue.

3   Q.    Do you know any of those individuals

4 based on work that you did at Ajilon?

5   A.    Yes.

6   Q.    How many?

7   A.    I don't know the exact number.

8   Q.    When did you interview them, the

9 ones that you did know?

10   A.    While I was at Solomon Page.

11   Q.    So I mean when?  Presumably sometime

12 after you started, right?

13   A.    Correct.

14   Q.    Did they come into your office?

15   A.    Some would.

16   Q.    And some you would go some place

17 else?

18   A.    Correct.

19   Q.    Where did you go to meet with the

20 ones that you did meet in your office?

21   A.    At one of our other offices.

22   Q.    You went over where?

13 (Pages 46 to 49)

**Jon Pomykala**

Page 50

```
1   A.    To one of our project spaces.
2   Q.    You met them either at 1250 or 1201?
3   A.    Correct.
4   Q.    And what did you do as far as
5   interviewing them?
6   A.    Just talk about -- have them fill
7   out the paperwork, talk about more about what
8   they were looking for.
9   Q.    Okay.  Did you have to do a full
10  interview of those individuals?
11  A.    It didn't take any longer than folks
12  I hadn't known previously.
13  Q.    So if you don't know someone at all
14  and you interview them how long does it take?
15  A.    Depends on how much time I have.
16  Q.    Well, what is the least amount of
17  time you can take to do a proper interview?
18  A.    To do a proper one I would like to
19  spend at least 15 minutes.
20  Q.    Okay.  If you already know somebody
21  can you spend less time?
22  A.    Sometimes.
```

Page 52

```
1   Q.    -- Contract Attorneys, other than
2   those three sources, did you personally contact
3   any individual contract attorneys that you knew
4   to see if they were interested?
5   A.    If they were in our database, yes.
6   Q.    So you did do that kind of direct
7   solicitation for contract attorneys?
8   A.    Correct.
9   Q.    What database were you using?
10  A.    Easy Access is what it's called.
11  Q.    And is that a Solomon Page database?
12  A.    Correct.
13  Q.    And was that database already there
14  when you showed up?
15  A.    Yes.
16  Q.    So if the attorneys were not in that
17  database you didn't use it or you didn't use
18  that database for calling the people?
19  A.    I'm confused by your question.
20  Q.    The way that you found the people to
21  call was by looking in the database?
22  A.    Correct.
```

Page 51

```
1   Q.    Are there people that you don't
2   bother to interview because you know they apply
3   but you don't want to work with them?
4   A.    No.
5   Q.    You will take anybody?
6   A.    I wouldn't phrase it like that but
7   if there are folks looking for work we will try
8   to get them working.
9   Q.    Are there people that you reject?
10  A.    Right off the cuff, no.
11  Q.    Do you reject them after you
12  interview them?
13  A.    Not usually.
14  Q.    Have you ever rejected anybody?
15  A.    I don't believe so, no.
16  Q.    Is it your testimony -- well, let me
17  ask it this way.  When you were trying to fill
18  these positions for contract attorneys at
19  Solomon Page, other than posting with Craig's
20  List and Posse.com, and I forget the name of
21  the third, the D.C. Metro --
22  A.    Contract Attorneys.
```

Page 53

```
1   Q.    Did you just start with the As or
2   did you start in the middle of the alphabet?
3   Is it alphabetical?
4   A.    No.
5   Q.    How is it listed?
6   A.    You can type in their name and hit
7   search and it will -- you can find who you are
8   looking for.
9   Q.    How did you come up with a name to
10  type in?
11  A.    My colleague Jan Templeman, she
12  would tell me folks that were available and we
13  would split the work.
14  Q.    You didn't ever type a name in
15  spontaneously without talking to Jan?
16  A.    When are we talking about?  The time
17  frame?
18  Q.    When you worked at Solomon Page.
19  A.    I have recently, yes.
20  Q.    What was the first time you did
21  that?
22  A.    Probably this week.
```

14 (Pages 50 to 53)

**Jon Pomykala**

Page 54

1  Q.    Okay.

2  A.    Monday, Tuesday.

3  Q.    Whose name did you type in?

4  A.    I typed in this morning Raul Batt.

5  Q.    Why did you type his name in?

6  A.    Because he is currently working for

7  us and I needed to contact him about something.

8  Q.    I am talking about you using this

9  database to type somebody's name to solicit

10 them to get them on a project.

11 A.    Oh.

12 Q.    Have you ever done that?

13 A.    I have.

14 Q.    Whose name did you type in?

15 A.    I can't remember the name.

16 Q.    Did you ever type the name Cynthia

17 Butler into the database to access the

18 database?

19 A.    I have.

20 Q.    And why did you type Cynthia Butler?

21 A.    I needed her contact information.

22 Q.    Why did you need her contact

Page 55

1  information?

2  A.    She was on a project for us and I

3  needed to speak to her about something.  My

4  colleague Jan Templeman had recruited her.

5  Q.    Had you ever recruited her for a

6  project at Ajilon?

7  A.    I know she was working for Ajilon

8  but not -- she wasn't working on a project that

9  I was involved in.

10 Q.    Had you ever heard her name before

11 when you were at Ajilon?

12 A.    Yeah.

13 Q.    You knew Cynthia Butler?

14 A.    I heard her name, yeah.

15 Q.    Did you ever interview her?

16 A.    No, not to my knowledge.  But I am

17 pretty sure I didn't.

18 Q.    You interview a lot of people,

19 right?

20 A.    Yes.

21 Q.    When you were discussing going to

22 work at Solomon Page with Josh Kubicki did you

Page 56

1  talk about whether there might be a problem

2  with Ajilon if you went to work for a

3  competitor in D.C.?

4  A.    Not to my knowledge, no.  I could be

5  mistaken but I don't think we talked about

6  that.

7  Q.    Did you have any concerns about

8  going to work for a competitor of Ajilon in

9  D.C. prior to accepting the position with

10 Solomon Page?

11 A.    Not really.

12 Q.    Were you aware that you had a

13 contract that had terms that could limit what

14 you could do for a competitor?

15 A.    I hadn't read it in a long time, but

16 I'm sure there was some provision in there.  I

17 wasn't concerned because I know a lot of folks

18 that left Ajilon and they had never been

19 litigated against.

20 Q.    So you at least thought about

21 whether other people had been sued?

22 A.    Since it seemed to be the nature

Page 57

1  that they weren't, I wasn't concerned.

2  Q.    No, but you thought if -- are you

3  saying that it just never crossed your mind or

4  are you saying that you were not concerned

5  about your contract because other people hadn't

6  been sued?

7  If I don't have an agreement I don't

8  worry about what is in it?

9  A.    Correct.

10 Q.    If I have an agreement and I know

11 there is something in it that might be a

12 problem but other people have an agreement and

13 they didn't have a problem, do you see the

14 difference?

15 A.    I do.

16 Q.    So you at least thought about

17 whether other people had been sued?

18 A.    Correct.

19 Q.    And you took some comfort from the

20 fact that they hadn't been sued?

21 A.    Yes.

22 Q.    If they had been sued would you have

15 (Pages 54 to 57)

**Jon Pomykala**

Page 58

1 thought about it differently?

2    A.    I would have looked to see exactly
3 what was in my employment agreement since I
4 haven't looked at it in a long time.

5    Q.    But you didn't bother to do that
6 because other people hadn't been sued?

7    A.    Correct.

8    Q.    Who had not been sued that you
9 believed had a similar agreement?

10    A.    Andrew Perlin, Andrew Jewell, Susan
11 Campbell.  Those are three names I can think of
12 off the top of my head.

13    Q.    Do you know what happened to any of
14 them?

15    A.    They went to work for competitors.

16    Q.    Do you know what happened to Ajilon
17 after they went to work for a competitor?

18    A.    I never heard of a lawsuit so to my
19 knowledge I don't think they had a lawsuit
20 brought against them.

21    Q.    Do you know whether something was
22 worked out?

Page 59

1    A.    I don't.

2    Q.    Did you call any of them?

3    A.    I talked to Andrew Jewell afterward,
4 yes.

5    Q.    What did Andrew Jewell say?

6    A.    He said they didn't decide to do
7 anything.

8    Q.    Why did you call Andrew Jewell?

9    A.    He is a friend of mine.

10    Q.    Did you call him because you wanted
11 to know whether Ajilon had done anything?

12    A.    No.

13    Q.    You were just talking to him
14 otherwise?

15    A.    Correct.

16    Q.    When did you call him?

17    A.    Andrew Jewell left in the end of
18 2005, I believe.  I would just see him
19 socially.  I don't know the exact time frame.
20 I believe he knew before he left because I
21 think he had spoke with Neil Libowitz and Neil
22 said, good luck in the future, and kind of left

Page 60

1 it at that.

2    Q.    You understood he worked something
3 out with Neil Libowitz?

4    A.    I don't know exactly what happened
5 because I wasn't present when Andrew and Neil
6 were talking.

7    Q.    But he spoke directly with the head
8 of the company about going to work for a
9 competitor?

10    A.    Correct.

11    Q.    Did you do that?

12    A.    To the head of the company?

13    Q.    Did you talk to the head of the
14 company about going to work for a competitor?

15    A.    I did not.

16    Q.    Did you talk to anybody about going
17 to work for a competitor?

18    A.    When I gave my resignation I did.

19    Q.    And you got sued?

20    A.    Correct.

21    Q.    John Mullenholz didn't say "That's
22 fine"?

Page 61

1    A.    Correct.

2    Q.    He didn't say what Neil Libowitz
3 said to Andrew?

4    A.    But to my knowledge Andrew let him
5 know and then left a day later.

6    Q.    I think your testimony was that Neil
7 Libowitz just said "That's fine, good luck"
8 something like that?

9    A.    Something along those lines, yes.

10    Q.    Did John Mullenholz say "That's
11 fine, good luck"?

12    A.    He did not.

13          MR. SCHLANGER:  Can we take a one
14 minute break?

15          MR. HAHN:  Sure.

16          (A short recess was taken.)

17          MR. HAHN:  Let's mark these
18 documents as Pomykala 3 and Pomykala 4.

19          Pomykala 3 is a posting.  It says
20 "Document Review Attorney" and then Pomykala 4
21 is a multi page document that starts "Via
22 Solomon Page Group."

16 (Pages 58 to 61)

Jon Pomykala

Page 62

1          (Deposition Exhibit Nos. 3 and 4
2 were marked for identification.)
3          BY MR. HAHN:
4     Q.   Mr. Pomykala, I am showing you
5 exhibits 3 and 4 and are these postings that
6 you made for contract attorneys while at
7 Solomon Page?
8     A.   Yes, they are.
9     Q.   Thank you.  In your experience as a
10 recruiter do you believe that the work history
11 of a specific contract attorney with a specific
12 client is valuable?
13    A.   Maybe a little bit.
14    Q.   As far as you are concerned are
15 contract attorneys pretty much fungible?  You
16 can --
17    A.   I wouldn't phrase it like that but
18 there is a lot of folks out there so they can
19 be interchangeable, some of them.
20    Q.   Do you ever try to roll a contract
21 attorney that you have an existing relationship
22 with on to a new project immediately so that a

Page 63

1 competitor doesn't pick that person up?
2     A.   I would do it to keep them working
3 and not so that a competitor would pick them
4 up.
5     Q.   And why would you want to keep them
6 working instead of just taking one of the other
7 people that responds to your listing?
8     A.   Maybe if I had known they have done
9 a good job in the past or if I like them.
10    Q.   Well, what does knowing -- how do
11 you know they did a good job?
12    A.   Usually if I just hear there hasn't
13 been complaints about that person.
14    Q.   How do you hear that?
15    A.   I just -- no news is good news.
16    Q.   Would you hear that through Kimberly
17 Danowski?
18    A.   No.
19    Q.   Would you hear that from the client?
20    A.   Yes.
21    Q.   And do you keep track of the people
22 that are either good or not bad and those are

Page 64

1 the ones that you try to keep working?
2     A.   Yes.
3     Q.   Okay.  Are any of the ones that are
4 currently working at Solomon Page attorneys
5 that you were trying to keep working when you
6 were at Ajilon?
7     A.   Probably.
8     Q.   Okay.  Can you give me some names?
9     A.   Michelle Rett.  She had done a good
10 job.  She got let go from another project, I
11 remember, actually with the same client who had
12 thought she had done a good job.  It was two
13 different cases.  It was like a yearlong case.
14 They had been really happy with her.  The
15 second case they thought her productivity was
16 really low so they let her go.  I just decided
17 to give her a second shot.
18    Q.   Do clients ever ask for specific
19 attorneys?
20    A.   Sometimes.
21    Q.   How frequently?
22    A.   Ten percent of the time.

Page 65

1     Q.   And do you try to accommodate that
2 request?
3     A.   Depends.
4     Q.   Do you know a gentleman named John
5 Beuker?
6     A.   I do.
7     Q.   How do you know him?
8     A.   I knew him while I was working at
9 Ajilon.
10    Q.   Is he working for Solomon Page?
11    A.   Yes.
12    Q.   What is he doing?
13    A.   He is doing some project management
14 and document review.
15    Q.   Where is he doing that?
16    A.   At 1201 Penn.
17    Q.   What project is he doing that on?
18    A.   For the one for Crowell.
19    Q.   How many projects total does the
20 D.C. office of Solomon Page have going today?
21    A.   Does the D.C. office have going, how
22 many projects?

17 (Pages 62 to 65)

## Page 66

1    Q.    Yes.

2    A.    You mean like with how many firms?

3    Q.    Is that a hard question for you to

4 answer? I am being patient. We have already

5 run past the one hour. If Josh Kubicki asked

6 you how many projects do we have going this

7 morning what would you have said?

8    A.    I would say are you referring to the

9 ones we have with different firms or projects

10 broken up into between each firms?

11    Q.    Do you have a list of projects in

12 your office that are active?

13    A.    I usually keep it in my head.

14    Q.    What is the list in your head of

15 projects, however you divide it up?

16    A.    There are -- there is one more.

17 Mayer Brown.

18    Q.    I want a number. A total.

19    A.    I am trying to count to get to that

20 number. Mayer Brown. They have more than one

21 project. They have two going on currently.

22 One that just ended that I mentioned before.

## Page 67

1 And for folks that are working for Solomon Page

2 that's it except for the three front desk

3 people that are working at 1201 Pennsylvania

4 and for John Beuker.

5    Q.    What project is John Beuker working

6 on?

7    A.    The AT&T for Crowell.

8    Q.    The three front desk people?

9    A.    Same one. AT&T for Crowell.

10    Q.    So that is one project at Crowell?

11    A.    Correct.

12    Q.    Are there any other projects at

13 Crowell?

14    A.    No.

15    Q.    Do you have any admin people that

16 are supervising direct hire attorneys at

17 Crowell?

18    A.    Besides the three?

19    Q.    Those are the three front desk

20 people?

21    A.    And that's it.

22    Q.    So that's all you have total right

## Page 68

1 now and there is nothing in the pipeline?

2    A.    To my knowledge, no.

3    Q.    Is there anything going on with any

4 other firms that you are aware of?

5    A.    No.

6        MR. HAHN:  If we could take just a

7 five-minute break.

8        MR. SCHLANGER:  Sure.

9        (A short recess was taken.)

10        BY MR. HAHN:

11    Q.    I have one thing I want to try to

12 get nailed down. I know I have gone over it

13 before but I am not satisfied that I have

14 gotten a straight answer. I believe --

15        MR. SCHLANGER:  Sorry. I object to

16 the characterization. I object to any

17 characterization. Just ask him questions.

18        BY MR. HAHN:

19    Q.    I would like you to tell me each

20 project that Solomon Page Group has anyone

21 working on in any capacity for Mayer Brown.

22    A.    You would like to know the projects

## Page 69

1 that are split up within the firm, the

2 different cases they are working on that

3 Solomon Page has folks working at?

4    Q.    Correct. So we are talking about

5 Mayer Brown?

6    A.    Uh-huh.

7    Q.    And this is each project.

8    A.    Dobson Communications project.

9    Q.    Okay. That's one.

10    A.    United Healthcare. There was the

11 John Doe one I mentioned earlier that has since

12 been completed.

13    Q.    Okay.

14    A.    That's it.

15    Q.    Now, for Crowell?

16    A.    AT&T. That's it.

17    Q.    On the Dobson Communications project

18 as best you can recall how many attorneys are

19 working on that project?

20    A.    I believe I said around 25 earlier.

21    Q.    Then United Healthcare?

22    A.    That's around six or seven.

18 (Pages 66 to 69)

**Jon Pomykala**

Page 70

1    Q.    And John Doe?  What was the number
2 during its activity?
3    A.    Three.
4    Q.    And the AT&T project?
5    A.    Four.
6    Q.    And those people are just
7 administering and supervising direct hires of
8 Crowell, correct?
9    A.    Correct.  But also John Beuker does
10 some review as well.
11    Q.    What is reviewed?
12    A.    Document review.
13    Q.    So he is actually acting as a
14 contract attorney for part of his duties?
15    A.    Correct.
16    Q.    And the Crowell work, is all of that
17 being done at 1201 Penn?
18    A.    Yes.
19    Q.    And the Mayer Brown work, the Dobson
20 Communications, where is that being done?
21    A.    At 1250 Connecticut Avenue.
22    Q.    And United Healthcare?

Page 72

1         MR. HAHN:  Do you want to waive
2 signature?
3         MR. SCHLANGER:  No.  He will read.
4         MR. HAHN:  Thank you very much.
5         (Whereupon, the proceeding was
6 concluded at 12:31 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 71

1    A.    At 1120 20th Street.
2    Q.    And what office is that?
3    A.    It's the Mayer Brown office.
4    Q.    Okay.  And the John Doe work is
5 being done at where?
6    A.    That was at the Lafayette Center as
7 well.  1120 20th Street.
8    Q.    Prior to the time that you joined
9 Solomon Page did Solomon Page have short-term
10 leases for either of the locations; the
11 Connecticut Avenue or Pennsylvania Avenue
12 locations?
13    A.    Not to my knowledge, no.
14    Q.    Do you remember when those actively
15 started?
16    A.    Yes.
17    Q.    And did you go look at them on the
18 first day that they were available?
19    A.    No.
20         MR. HAHN:  Thank you, Mr. Pomykala.
21 I have no further questions.
22         MR. SCHLANGER:  I have none.

Page 73

1         ACKNOWLEDGMENT OF DEPONENT
2 I, JONATHAN R. POMYKALA, do hereby acknowledge
3 I have read and examined the foregoing pages of
4 testimony, and the same is a true, correct and
5 complete transcription of the testimony given
6 by me, and any changes or corrections, if any,
7 appear in the attached errata sheet signed by
8 me.
9 _____    _____
10 Date           JONATHAN R. POMYKALA
11
12
13
14
15
16
17
18
19
20
21
22

19 (Pages 70 to 73)

**Jon Pomykala**

## Page 74

```
 1        CERTIFICATE OF NOTARY PUBLIC
 2        I, Bonnie L. Russo, the officer before
 3 whom the foregoing deposition was taken, do
 4 hereby certify that the witness whose testimony
 5 appears in the foregoing deposition was duly
 6 sworn by me; that the testimony of said witness
 7 was taken by me in shorthand and thereafter
 8 reduced to computerized transcription under my
 9 direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18        _____
19             Notary Public in and for
20             the District of Columbia
21 My Commission expires: May 14, 2010
22
```

## Page 76

```
 1        DEPOSITION ERRATA SHEET
   CASE CAPTION:  Ajilon vs. Kubicki
 2 DEPONENT:  Joshua P. Kubicki
   DEPOSITION DATE:  August 2, 2007
 3        I have read the entire transcript of my
 4 Deposition taken in the captioned matter or the
   same has been read to me.  I request that the
 5 changes noted on the following errata sheet be
   entered upon the record for the reasons
 6 indicated.  I have signed my name to the Errata
   Sheet and the appropriate Certificate and
 7 authorize you to attach both to the original
   transcript.
   PAGE/LINE       CHANGE          REASON
 8 _____
 9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
   SIGNATURE_____DATE_____
19      JONATHAN R. POMYKALA
20
21
22
```

## Page 75

```
 1 Mr. Michael A. Schlanger
   1201 Pennsylvania Avenue, N.W.
 2 Washington, D.C. 20004
 3
 4
 5 IN RE:  Ajilon vs. Kubicki
 6
 7 Dear Mr. Schlanger:
 8 Enclosed please find your copy of the
   deposition of JONATHAN R. POMYKALA along with
 9 the original signature page.  As agreed, you
   will be responsible for contacting the witness
10 regarding reading and signing the transcript.
11 Within 30 days of receipt, please forward
   errata sheet and original signature page signed
12 to opposing counsel.
13 If you would like to change this procedure or
   if you have any questions, please do not
14 hesitate to call.
15 Thank you.
16 Yours,
17
18
19 Bonnie L. Russo
   Reporter/Notary
20
21
22
```

20 (Pages 74 to 76)

**A**

ability 45:18
accepting 56:9
access 52:10
  54:17
accommodate
  65:1
accurate 40:2
acknowledge
  73:2
ACKNOWLE...
  73:1
acting 70:13
action 1:5 74:12
  74:17
active 21:22
  66:12
actively 71:14
activity 70:2
admin 67:15
administering
  70:7
administrative
  18:14
afterward 59:3
agreed 6:3 75:9
agreement 6:6
  14:11 57:7,10
  57:12 58:3,9
Ajilon 1:4 5:14
  17:18 18:3 24:9
  24:12,15,19
  31:8,9,12 32:9
  33:4 35:22 37:1
  37:6 40:5,10,13
  40:16,20 41:6
  41:19,20 43:10
  44:17 45:1
  46:11 47:7 49:4
  55:6,7,11 56:2,8
  56:18 58:16
  59:11 64:6 65:9
  75:5 76:1
al 1:6
alphabet 53:2
alphabetical 53:3

amount 11:10
  50:16
Andrew 31:19,20
  32:3 58:10,10
  59:3,5,8,17 60:5
  61:3,4
Anna 23:21
answer 66:4
  68:14
anybody 51:5,14
  60:16
apart 24:11,15
  38:17
appealed 36:7
appear 73:7
APPEARANCES
  3:1
appears 74:5
apply 51:2
appropriate 27:9
  76:6
approximately
  12:12 46:22
April 29:13
area 28:20 29:1
asked 46:2 66:5
assembled 17:2
assigned 47:14
  48:14
Asten 8:21
attach 76:6
attached 73:7
attorney 21:11
  23:5 26:1 61:20
  62:11,21 70:14
  74:15
attorneys 8:1,13
  8:19 19:5 20:3,8
  22:1 24:22 25:1
  26:6 51:18,22
  52:1,3,7,16 62:6
  62:15 64:4,19
  67:16 69:18
AT&T 10:4 21:20
  23:20 67:7,9
  69:16 70:4

August 1:13 2:5
  6:6 47:18 76:2
authorize 76:6
available 20:14
  23:5 53:12
  71:18
Avenue 2:12 3:4
  3:10 7:8,9,21
  8:3 10:20 11:4,9
  49:2 70:21
  71:11,11 75:1
aware 17:8,21
  21:21 23:18
  26:15 27:14
  56:12 68:4
a.m 2:6

**B**

back 33:1 47:11
bad 33:11 63:22
based 9:22 16:16
  49:4
basically 33:9
Batt 54:4
believe 15:12
  20:17 24:2
  29:14 32:16,22
  36:21 38:13
  48:12 51:15
  59:18,20 62:10
  68:14 69:20
believed 17:4
  58:9
Ben 5:11
BENJAMIN 3:3
best 69:18
better 35:9,10
Beuker 65:5 67:4
  67:5 70:9
big 11:19 13:10
  36:12 41:16
bit 62:13
Bonnie 1:21 2:21
  74:2 75:19
boss 26:21 40:20
  41:9

bother 51:2 58:5
break 61:14 68:7
brief 15:1
bring 14:14
broken 66:10
brought 58:20
Brown 26:3,10
  48:5,11 66:17
  66:20 68:21
  69:5 70:19 71:3
Brown's 26:11
building 11:1
  13:18
bunch 16:18
  44:15
BURLING 3:9
business 34:12,15
Butler 54:17,20
  55:13

**C**

C 4:1
call 21:19 48:8,10
  52:21 59:2,8,10
  59:16 75:14
called 52:10
calling 52:18
Campbell 58:11
capacity 68:21
CAPTION 76:1
captioned 76:3
case 5:17 15:17
  64:13,15 76:1
cases 64:13 69:2
caused 45:11
Center 71:6
certain 11:9
Certificate 74:1
  76:6
certify 74:4
change 75:13
  76:7
changes 73:6 76:4
characterization
  68:16,17
Civil 1:5

client 6:14 21:13
  21:16 48:7
  62:12 63:19
  64:11
clients 27:20 29:4
  64:18
close 47:3
coincidence 43:22
  44:12
colleague 53:11
  55:4
colleagues 42:20
Columbia 1:2
  5:16 74:20
combination 13:9
combined 34:22
come 12:15 38:1
  38:11 49:14
  53:9
comfort 57:19
comfortable
  35:13
coming 6:5 27:8
  30:3
Commission
  74:21
commit 37:16,19
Communications
  10:4 48:12 69:8
  69:17 70:20
companies 30:21
  31:1 34:7,8,9
company 28:5,9
  28:15,17 29:17
  30:19 31:6 33:3
  41:11 60:8,12
  60:14
competitor 40:22
  41:10,21 42:13
  45:18 56:3,8,14
  58:17 60:9,14
  60:17 63:1,3
competitors
  58:15
compilation 4:8
  15:11 17:1

complaints 63:13
complete 44:12
73:5
completed 69:12
computerized
74:8
concerned 56:17
57:1,4 62:14
concerns 56:7
concluded 35:2
72:6
conditions 46:12
confidential
10:14
conflict 40:20
41:2,4,16
confused 52:19
Connecticut 7:8
7:21 8:3 10:20
11:4,9 49:2
70:21 71:11
connection 16:4
24:7,8
consecutively
15:13
consultant 6:19
contact 23:13,15
24:18 43:6 52:2
54:7,21,22
contacted 29:22
contacting 75:9
contacts 23:17
context 24:14
continuously
33:22
contract 20:3,7
23:5 24:22
41:19 42:9
45:16 51:18,22
52:1,3,7 56:13
57:5 62:6,11,15
62:20 70:14
control 16:15
17:10
conversation 29:8
30:4,6

conversations
33:1
copy 14:16 15:2
75:8
correct 5:20,21
6:11 11:16
13:21 14:1
16:17 20:11,12
20:15,20 22:6
24:21 27:17,22
28:1,18 29:2
31:17 32:19
34:1 35:17,19
36:6 37:8,9
39:13,17 40:2,6
40:7 42:7 43:2,7
43:19 47:10
49:13,18 50:3
52:8,12,22 57:9
57:18 58:7
59:15 60:10,20
61:1 67:11 69:4
70:8,9,15 73:4
corrections 73:6
counsel 5:6 15:16
16:10 74:11,15
75:12
count 66:19
court 1:2 5:16,19
courtroom 5:19
COVINGTON
3:9
Craig's 19:17
51:19
crossed 57:3
Crowell 8:10
11:15 21:17
23:14 24:20
65:18 67:7,9,10
67:13,17 69:15
70:8,16
cuff 51:10
current 6:18
17:14 26:19
47:12
currently 18:15

48:16 54:6 64:4
66:21
custody 16:15
17:9
cut 6:15
Cynthia 54:16,20
55:13

**D**

Dani 8:21
Danowski 35:16
43:8 63:17
database 52:5,9
52:11,13,17,18
52:21 54:9,17
54:18
date 14:8 28:4
47:17 48:2
73:10 76:2,18
Davies 8:21 9:15
day 21:2,5 22:16
27:2 43:17,21
44:1,4,15,18
45:2 61:5 71:18
days 75:11
Dear 75:7
decide 59:6
decided 35:7
64:16
decision 44:2
45:20
Defendant 3:7
Defendants 1:6
defined 23:6
definite 41:17
definitely 44:4
department 31:16
Depends 50:15
65:3
DEPONENT
73:1 76:2
deposition 1:11
2:9 4:9 6:14
15:7,17,21,22
16:4,5 62:1 74:3
74:5,9,13 75:8

76:1,2,3
depositions 6:4,7
describe 36:9
desk 8:18 67:2,8
67:19
desks 12:1,11
13:8,11
determined 17:3
develop 27:19
difference 17:20
57:14
different 13:2
17:17 18:2,9
24:16 34:4
44:16,16 46:19
48:11 64:13
66:9 69:2
differently 58:1
direct 52:6 67:16
70:7
direction 74:9
directly 60:7
disclose 16:10
discuss 27:7
discussed 16:11
discussing 55:21
discussion 14:21
15:2
discussions 39:10
40:4,9 43:3
dispense 6:8
District 1:2,2
5:16,16 74:20
divide 66:15
Dobson 10:4
48:12 69:8,17
70:19
document 14:18
16:9 19:5 21:11
26:1 61:20,21
65:14 70:12
documents 4:8
15:3,5,11,15
16:7,13,16,22
17:2,3,8 61:13
doe 26:5,6 69:11

70:1 71:4
doing 18:15 31:14
42:19 45:9,22
46:4,7 65:12,13
65:15,17
duly 5:3 74:5
duties 17:13,15
18:6,9,11 70:14
duty 18:7
D.C 1:12 2:13 3:5
3:10 20:3 28:20
29:1,4 51:21
56:3,9 65:20,21
75:2

**E**

E 4:1
earlier 69:11,20
early 29:7,10
32:20
easily 41:5
Easy 52:10
effective 37:8
either 50:2 63:22
71:10
elements 36:9
employed 10:7
41:14 74:12,15
employee 31:10
74:14
employees 8:14
9:4 41:20
employment
14:11 33:10
46:12 58:3
Enclosed 75:8
ended 66:22
entered 76:5
entire 76:3
errata 73:7 75:11
76:1,4,5
Esq 3:3,3,8,9
estimate 9:20,22
14:3
et 1:6
events 24:17

**exact** 12:2 13:4
  13:12 25:3,15
  28:4 32:12,17
  34:8 48:1,18
  49:7 59:19
**exactly** 46:21
  58:2 60:4
**EXAMINATION**
  4:2 5:6
**examined** 73:3
**exclusively** 39:9
**Exhibit** 15:6,7,12
  15:21,22 16:6
  16:17 17:3 62:1
**exhibits** 4:7 62:5
**existing** 62:21
**expect** 8:6 9:16
**experience** 31:22
  62:9
**expires** 74:21
**e-mails** 34:3,5

———————
**F**
**fact** 57:20
**fair** 45:13,21
**familiar** 10:7
**far** 44:11 50:4
  62:14
**February** 31:13
**federal** 5:18
**feel** 45:11
**felt** 45:8
**fill** 18:19,22 19:4
  21:6 50:6 51:17
**filled** 12:12
**financially** 74:16
**find** 33:13 53:7
  75:8
**fine** 60:22 61:7,11
**firm** 5:13 26:2
  34:3 69:1
**firms** 27:19 66:2
  66:9,10 68:4
**first** 5:3 10:10
  15:5 19:9 21:5
  22:16 23:8,10

**24:18 28:2,9,11**
  30:4 31:11
  32:11 43:12,20
  53:20 71:18
**fit** 35:4,6,7
**five** 13:13
**five-minute** 68:7
**floor** 13:17,20,22
  14:2
**folks** 35:20 50:11
  51:7 53:12
  56:17 62:18
  67:1 69:3
**following** 14:9
  76:4
**follows** 5:5
**foregoing** 73:3
  74:3,5
**forget** 51:20
**forward** 75:11
**found** 22:4 23:8
  23:11 44:3
  52:20
**Four** 70:5
**frame** 22:22 23:2
  29:6 32:13,17
  53:17 59:19
**Francesco** 8:22
**frequently** 64:21
**friend** 59:9
**front** 8:18 67:2,8
  67:19
**frustrated** 33:5,7
**full** 50:9
**full-time** 9:3
**fungible** 62:15
**further** 71:21
  74:13
**future** 59:22

———————
**G**
**gentleman** 65:4
**getting** 16:8
**give** 64:8,17
**given** 73:5 74:10
**go** 10:2 12:22

**14:19 30:19,21**
  31:5 33:2 34:17
  34:20 37:17
  38:16,20 41:20
  42:13 44:18
  45:18 49:16,19
  64:10,16 71:17
**goes** 8:11,16
**going** 6:8,15 10:2
  22:1 23:4 29:20
  30:7,10 36:1
  37:1 38:11,17
  39:5,8,10,11
  40:15,21 41:9
  43:4,9,15,21
  44:4,18 45:2,10
  46:3,6,17,21
  47:4,11 55:21
  56:8 60:8,14,16
  65:20,21 66:6
  66:21 68:3
**good** 33:11 35:2,4
  36:8,17,19
  59:22 61:7,11
  63:9,11,15,22
  64:9,12
**gotten** 46:15
  68:14
**Group** 6:21 28:3
  61:22 68:20
**guess** 40:18 44:3

———————
**H**
**Hahn** 3:3 4:3 5:7
  5:11 14:19,22
  15:9,20 16:2,21
  61:15,17 62:3
  68:6,10,18
  71:20 72:1,4
**half** 9:21 14:4,5
  39:3
**Hall** 8:21 9:16
**happened** 44:14
  58:13,16 60:4
**happy** 33:4 64:14
**hard** 66:3

**Harrison** 2:11 3:4
  5:12
**head** 30:16 58:12
  60:7,12,13
  66:13,14
**Healthcare** 69:10
  69:21 70:22
**hear** 28:2,11
  63:12,14,16,19
**heard** 10:10 22:7
  55:10,14 58:18
**hearing** 6:5
**held** 2:9
**help** 18:14 31:15
**hereto** 74:16
**hesitate** 75:14
**Hinko** 24:2
**hire** 14:8 31:20
  67:16
**hires** 70:7
**history** 62:10
**hit** 53:6
**honest** 10:15
**honor** 42:10,14
**horizon** 26:16
  27:7
**hour** 66:5
**Howard** 8:22
  9:16
**Hudson** 31:2

———————
**I**
**idea** 23:10 34:20
  34:22 35:2
  42:21
**identification**
  15:8 16:1 62:2
**imagine** 7:18
**immediately**
  62:22
**important** 18:12
**independent**
  38:16,18 43:6
  44:2
**indicated** 9:15
  76:5

**individual** 52:3
**individuals** 49:3
  50:10
**information**
  54:21 55:1
**injunction** 6:5
**insurance** 34:7
**interchangeable**
  62:19
**interested** 52:4
  74:16
**Internally** 48:9
**Internet** 19:14,16
**interview** 49:8
  50:10,14,17
  51:2,12 55:15
  55:18
**interviewing** 50:5
**involved** 26:7
  55:9
**isolate** 16:19
**issues** 16:8,8,11

———————
**J**
**J** 3:17
**Jan** 9:9 53:11,15
  55:4
**Jeff** 32:7
**Jewell** 31:19,20
  32:3 58:10 59:3
  59:5,8,17
**job** 1:22 6:18
  33:14 63:9,11
  64:10,12
**John** 3:17 26:5,6
  45:6 60:21
  61:10 65:4 67:4
  67:5 69:11 70:1
  70:9 71:4
**joined** 19:1 25:1
  71:8
**JOLEEN** 3:3
**Jonathan** 1:11
  2:9 4:2 5:2,10
  73:2,10 75:8
  76:19

**Josh** 30:6 32:4,8
  33:2 34:17
  35:16 37:4,16
  37:21 38:1,7,17
  39:9,11,18,22
  40:5 41:18 42:3
  44:5 55:22 66:5
**Joshua** 1:6 7:18
  22:14 27:1
  28:13 47:8 76:2
**JP** 15:13
**Judge** 5:19
**July** 10:12 14:9,9
  20:18,19 47:16
  47:21
**June** 44:18

**K**

**keep** 6:6 63:2,5
  63:21 64:1,5
  66:13
**keeping** 35:15
**Kim** 43:8 44:9,12
  44:15
**Kimberly** 35:16
  63:16
**Kim's** 44:3
**kind** 29:6 52:6
  59:22
**knew** 44:15 52:3
  55:13 59:20
  65:8
**know** 6:15 7:14
  7:20 9:10 10:15
  10:16,18 11:20
  12:2,12,14,14
  13:4,12 21:13
  22:10 23:13
  24:4,8,11,14
  25:3,15 28:4,9
  28:19 33:5 34:6
  36:14,17,19
  38:18 41:18,22
  43:4,20 44:8,10
  44:11 45:14,21
  46:6,11,17,21

46:22 48:1,18
  49:3,7,9 50:13
  50:20 51:2 55:7
  56:17 57:10
  58:13,16,21
  59:11,19 60:4
  61:5 63:11 65:4
  65:7 68:12,22
**knowing** 63:10
**knowledge** 6:1
  10:13 17:11
  26:17 31:4
  55:16 56:4
  58:19 61:4 68:2
  71:13
**known** 28:5 50:12
  63:8
**Kubicki** 1:6 7:18
  22:14 23:7 27:1
  27:18 28:13
  30:6,13 32:4,9
  33:2 34:17
  35:16 38:17
  39:9,12 44:5
  47:8 55:22 66:5
  75:5 76:1,2

**L**

**L** 1:21 2:21 74:2
  75:19
**Lafayette** 71:6
**late** 29:9 44:18
**law** 27:19
**lawsuit** 58:18,19
**lease** 7:12,13,15
  7:17 11:8,13,15
  11:17
**leases** 71:10
**left** 32:3 43:10,13
  44:7,8 56:18
  59:17,20,22
  61:5
**legal** 28:15,16
  29:16 31:2,16
**Leon's** 5:19
**letter** 37:18 41:14

46:15,20
**Let's** 14:19 61:17
**Lewis** 2:11 3:4
  5:13
**liberty** 16:10
**Libowitz** 59:21
  60:3 61:2,7
**limit** 56:13
**limited** 6:3,7
**Linda** 23:21,22
**lines** 61:9
**list** 16:6,16 17:5
  19:17,21 51:20
  66:11,14
**listed** 53:5
**listing** 19:8,10
  63:7
**listings** 18:21
**litigated** 56:19
**litigation** 5:15
**little** 62:13
**LLC** 1:4 5:14
**LLP** 2:11 3:4,9
**locations** 71:10
  71:12
**long** 7:12,13,14
  7:20 8:5 9:10,13
  9:16,19 10:1
  21:1 23:4 31:8
  50:14 56:15
  58:4
**longer** 50:11
**look** 15:14 71:17
**looked** 58:2,4
**looking** 30:18,21
  31:5 33:2 34:11
  34:14 35:5,7
  44:16 50:8 51:7
  52:21 53:8
**lot** 16:7 55:18
  56:17 62:18
**low** 64:16
**lower** 47:5
**luck** 59:22 61:7
  61:11

**M**

**main** 23:22
**management**
  18:13 65:13
**manager** 11:8
**Marie** 23:21
**mark** 3:9 15:5,20
  61:17
**marked** 15:7,11
  15:22 62:2
**material** 17:20,22
**matter** 76:3
**Mayer** 26:3,10,11
  48:5,11 66:17
  66:20 68:21
  69:5 70:19 71:3
**mean** 10:16 17:22
  20:9 30:12
  49:11 66:2
**meet** 24:7 38:20
  49:19,20
**meetings** 27:6,11
**Melhado** 23:21
**mentioned** 66:22
  69:11
**merger** 10:5,6,11
  10:13 21:20
  23:20
**met** 5:18,22 50:2
**Metro** 20:3 51:21
**Michael** 3:8 75:1
**Michelle** 64:9
**middle** 53:2
**mind** 57:3
**mine** 59:9
**minor** 24:1
**minute** 61:14
**minutes** 6:16
  50:19
**mistaken** 56:5
**Monday** 6:5 14:9
  20:18 54:2
**Monster** 33:15
  34:10,12
**month** 9:21,21
**months** 32:20

**Moring** 8:10
**morning** 12:18
  54:4 66:7
**Mosier** 3:9 6:11
  14:18 15:2
**move** 6:17
**Moving** 33:1
**Mullenholz** 3:17
  45:6 60:21
  61:10
**multi** 61:21
**multiple** 13:8,11

**N**

**N** 4:1,1
**nailed** 68:12
**name** 5:8,11
  21:18 26:5 28:2
  48:9 51:20 53:6
  53:9,14 54:3,5,9
  54:14,15,16
  55:10,14 76:5
**named** 65:4
**names** 34:6,8
  58:11 64:8
**nature** 56:22
**necessarily** 18:4
  34:13,16,19
  38:14 41:12
**need** 22:1 27:15
  54:22
**needed** 54:7,21
  55:3
**negotiate** 39:8
**negotiated** 7:17
**Neil** 59:21,21
  60:3,5 61:2,6
**neither** 74:11
**never** 56:18 57:3
  58:18
**new** 27:14,19
  29:18 38:20
  39:5 62:22
**news** 63:15,15
**newspaper** 19:11
**Nos** 62:1

**Jon Pomykala**

**Notary** 2:22 74:1
74:19
**noted** 76:4
**notice** 2:21 4:9
15:17,21 16:4
**Novosel** 23:21
**number** 5:17 6:3
12:2 13:4,12
23:1,2 25:3,15
48:18 49:7
66:18,20 70:1
**numbered** 15:13
**N.W** 2:12 3:4,10
75:1

**O**

**O** 4:1
**object** 68:15,16
**Obviously** 35:6
**offer** 37:18 38:16
41:14 46:15,20
**offers** 34:2,3
44:16
**office** 6:22 7:1
49:14,20 65:20
65:21 66:12
71:2,3
**officer** 74:2
**offices** 7:3 13:7
26:12 29:18
49:21
**off-the-record**
15:1
**oh** 43:21 54:11
**Okay** 6:13 9:15
10:16,19 12:11
13:2,10,22 14:5
17:12 20:4
21:21 22:21
25:18 31:18
32:21 35:5 36:4
38:5,15 40:19
42:8 50:9,20
54:1 64:3,8 69:9
69:13 71:4
**OKUN** 3:3

**once** 27:4 34:4
**ones** 16:14 17:17
36:13 48:12
49:9,20 64:1,3
66:9
**opportunities**
43:5
**opportunity** 35:9
35:11
**opposing** 75:12
**original** 75:9,11
76:6
**outcome** 74:17
**outstanding**
18:18
**oversee** 8:12,16
**owed** 45:8,11
**owner** 11:8

**P**

**P** 76:2
**package** 38:19
**page** 4:2 6:21
7:19 8:6,8,14
9:1,11 10:8 11:3
11:7,12 14:7,12
16:9 17:14
18:16 19:1 20:7
20:17 21:4,22
22:8,16 24:5
25:2,20 26:15
26:21 28:3,3,12
29:16 34:18,21
35:11 36:2 37:2
37:17,22 38:2
38:11,17,21
39:6,9,11,15,19
40:1,11,15 43:1
43:4,6,9 44:6,19
45:3,11 46:4,7
46:13 47:12
49:10 51:19
52:11 53:18
55:22 56:10
61:21,22 62:7
64:4 65:10,20

67:1 68:20 69:3
71:9,9 75:9,11
**pages** 73:3
**PAGE/LINE**
76:7
**paid** 46:18
**paperwork** 50:7
**part** 6:6 38:5,9,13
70:14
**parties** 74:12,15
**partner** 5:12
**Parts** 38:3,4
**patient** 66:4
**pending** 5:15
**Penn** 65:16 70:17
**Pennsylvania**
2:12 3:4,10 7:8
67:3 71:11 75:1
**people** 8:18 10:19
10:21 12:21
13:1 20:14
22:21 24:4
35:12 37:22
38:10 42:13
51:1,9 52:18,20
55:18 56:21
57:5,12,17 58:6
63:7,21 67:3,8
67:15,20 70:6
**people's** 36:14
**percent** 64:22
**Perlin** 58:10
**permanent** 31:10
**person** 63:1,13
**personally** 14:17
52:2
**Phillips** 24:2
**phrase** 51:6 62:17
**pick** 63:1,3
**pipeline** 26:16
27:14 68:1
**place** 19:22 20:4
29:8 30:7,10
40:5 49:16
**plaintiff** 1:5 3:2
5:6,13

**Plaintiff's** 15:21
**plan** 7:20 45:14
**play** 45:19
**players** 24:1
**please** 5:9 38:6
75:8,11,13
**plus** 48:19
**point** 7:22
**points** 33:11,12
**Pomykala** 1:11
2:9 4:2 5:2,10
5:11 15:3,6,10
15:12 16:3
61:18,18,19,20
62:4 71:20 73:2
73:10 75:8
76:19
**position** 17:14
19:8 23:4 26:19
56:9
**positions** 9:17
18:19,22 19:3
34:4 41:15
51:18
**positive** 36:11
**possession** 16:15
17:9
**Posse's** 19:21
**Posse.com** 51:20
**possibility** 43:16
**possible** 42:21
**possibly** 21:3
29:14 30:1 42:5
**post** 19:8,9 20:22
**posted** 18:21
**posting** 4:10,11
20:10 34:12
51:19 61:19
**postings** 18:18
20:6,9 62:5
**preliminaries** 6:9
**preliminary** 6:4
6:16
**preparation** 6:4
**preparatory**
16:19

**prepared** 6:14
39:20
**present** 3:17 60:5
**presumably**
30:12 49:11
**pretty** 47:3 55:17
62:15
**previous** 31:22
**previously** 50:12
**primarily** 18:5
**principal** 18:7,11
**principals** 38:21
39:4
**prior** 39:6,10,15
44:20 47:7 56:9
71:8
**private** 13:7
**privilege** 16:8
**probably** 23:22
43:13 48:1,4,5
53:22 64:7
**problem** 41:8
56:1 57:12,13
**procedure** 75:13
**proceeding** 72:5
**produced** 15:3
17:1
**productivity**
64:15
**Professional** 1:4
5:14
**project** 6:19 10:1
10:3 18:13 21:9
21:10,12,18,19
21:20,22 22:7
22:11 23:8,11
23:14,20 26:1,4
26:5 48:3,6,9,13
48:15 50:1
54:10 55:2,6,8
62:22 64:10
65:13,17 66:21
67:5,10 68:20
69:7,8,17,19
70:4
**projects** 25:18,22

26:14 27:19
29:4 47:13
65:19,22 66:6,9
66:11,15 67:12
68:22
**proper** 50:17,18
**provided** 16:13
**provision** 41:19
42:1,8,14 56:16
**provisions** 45:17
**Public** 2:22 74:1
74:19
**Pursuant** 2:21
**put** 16:14 20:6
33:20
**P-R-O-C-E-E-...**
5:1
**p.m** 72:6

**Q**

**question** 16:20,22
52:19 66:3
**questions** 15:4
68:17 71:21
75:13
**quit** 43:17,21,22

**R**

**R** 1:11 2:9 4:2 5:2
73:2,10 75:8
76:19
**range** 17:15
**Raul** 54:4
**read** 56:15 72:3
73:3 76:3,4
**reading** 75:10
**really** 45:19 56:11
64:14,16
**REASON** 76:7
**reasonable** 42:16
42:17
**reasons** 76:5
**recall** 69:18
**receipt** 75:11
**recess** 61:16 68:9
**record** 5:9 14:19
14:21 74:10

76:5
**recruit** 22:1,20,22
34:17 48:20
**recruited** 8:2 9:8
25:1 55:4,5
**recruiter** 18:5
31:15 32:1
62:10
**recruiting** 18:13
18:15 27:15
**reduced** 74:8
**refer** 16:6
**referring** 66:8
**regarding** 23:14
75:10
**regular** 9:3
**regularly** 27:10
**reject** 51:9,11
**rejected** 51:14
**related** 74:11
**relationship**
31:11 36:8,10
62:21
**relative** 74:14
**remember** 34:8
54:15 64:11
71:14
**repeat** 38:6
**report** 26:18
31:18 32:6,8,11
**reported** 1:21
32:4
**Reporter/Notary**
75:19
**represent** 37:22
38:8
**representation**
16:12
**represented** 6:10
**representing**
39:19 40:10,10
40:13,16
**represents** 5:13
**request** 65:2 76:4
**resignation** 44:20
45:2 60:18

**resigned** 37:8
44:12 46:11
**resigning** 47:7
**respect** 7:11
**responds** 63:7
**response** 15:16
**responsible** 22:11
75:9
**responsive** 17:4,8
**restrict** 45:17
**resume** 33:13
**Rett** 64:9
**review** 16:16 19:5
21:11 26:1
61:20 65:14
70:10,12
**reviewed** 17:2
70:11
**right** 13:5 20:11
43:1,18 45:14
45:21 49:12
51:10 55:19
67:22
**Robert** 5:10
**role** 27:22 46:9
**roll** 62:20
**rooms** 12:22 13:2
13:8,10
**run** 66:5
**Russo** 1:21 2:21
74:2 75:19

**S**

**S** 4:1
**salary** 46:20 47:6
**salesperson** 22:10
**satisfied** 33:9
68:13
**saw** 13:1
**saying** 57:3,4
**says** 61:19
**scheduled** 27:10
**Schlanger** 3:8
6:10 16:18
61:13 68:8,15
71:22 72:3 75:1

75:7
**Schnader** 2:11
3:4 5:12
**scope** 6:7
**search** 53:7
**second** 14:20
47:11 64:15,17
**see** 12:21 24:16
27:2,4 41:8 52:4
57:13 58:2
59:18
**seen** 7:15 11:17
**Segal** 2:11 3:4
5:12
**sent** 34:5
**separately** 16:12
**served** 16:4
**set** 40:12 41:1,13
**seven** 69:22
**sheet** 73:7 75:11
76:1,4,6
**short** 61:16 68:9
**shorthand** 74:7
**shortly** 20:17
**short-term** 11:8
11:12,15 71:9
**shot** 64:17
**showed** 21:4 22:5
22:8 52:14
**showing** 15:10
16:3 39:15 62:4
**sign** 8:19 14:11
37:20
**signature** 72:2
75:9,11 76:18
**signed** 7:12 37:18
41:13 73:7
75:11 76:5
**significantly** 18:2
**signing** 75:10
**similar** 17:19
46:8 58:9
**sir** 17:12
**sit** 17:7 27:13
**six** 69:22
**socially** 59:19

**solicit** 41:20
42:12 54:9
**solicitation** 52:7
**soliciting** 42:18
**Solomon** 6:21
7:19 8:6,7,14
9:1,11 10:8 11:3
11:7,12 14:7,12
16:9 17:13
18:16 19:1 20:7
20:17 21:4,22
22:8,16 24:5
25:2,20 26:15
26:21 28:3,3,11
29:15 34:18,20
35:11 36:1 37:2
37:17,22 38:2
38:11,16,21
39:5,8,11,15,19
40:1,11,15 43:1
43:4,6,9 44:6,19
45:3,10 46:4,7
46:13 47:12
49:10 51:19
52:11 53:18
55:22 56:10
61:22 62:7 64:4
65:10,20 67:1
68:20 69:3 71:9
71:9
**somebody** 50:20
**somebody's** 54:9
**soon** 14:6 20:21
**Sorry** 68:15
**sources** 52:2
**space** 7:4,6,7,10
7:21 8:3,12 11:3
11:3,10,19
**spaces** 50:1
**speak** 55:3
**specific** 23:2,15
62:11,11 64:18
**specifically** 23:6
**spend** 16:7 50:19
50:21
**split** 53:13 69:1

**Jon Pomykala**

spoke 59:21 60:7
spoken 42:2
spontaneously 53:15
spring 29:7,9
staffing 1:4 5:14 28:15,16 29:16 34:9,12,15
start 14:7 23:3 31:9 44:6 48:2 53:1,2
started 14:6 20:16,21 25:19 39:2,3 47:19,20 49:12 71:15
starting 39:6 47:13,16
starts 61:21
state 5:8
statement 38:3
statements 16:19
States 1:2 5:15
stay 34:14
stone 40:12 41:1 41:13
stopped 25:14,19
straight 68:14
Street 7:2 71:1,7
strengths 36:15
strictly 39:11
stuff 6:16
sued 56:21 57:6 57:17,20,22 58:6,8 60:19
Suite 3:5
summer 29:7,10
supervising 67:16 70:7
supplied 15:16
supposed 22:22
sure 32:12,16 42:6 55:17 56:16 61:15 68:8
Susan 58:10
sworn 5:3 74:6

**T**

T 4:1,1
take 14:3 50:11 50:14,17 51:5 61:13 68:6
taken 29:8 61:16 68:9 74:3,7,13 76:3
talk 22:15 30:2 36:22 37:4,12 39:4,14 41:16 43:8,12,14 46:19 50:6,7 56:1 60:13,16
talked 35:1 37:5 37:14 47:6 56:5 59:3
talking 10:17 29:20 40:14,21 41:9 42:3,21,22 53:15,16 54:8 59:13 60:6 69:4
team 35:15 36:12 37:2
tell 5:3 15:14 22:18 23:7 28:14 29:3,15 30:17,20 37:21 38:7,10 44:5,17 45:1,5,7,8,12,20 46:3 53:12 68:19
telling 30:13 40:1
Templeman 9:9 53:11 55:4
temporary 7:4,7 7:10,11 11:2,3 31:15
temps 9:6 47:13 48:14,20
ten 6:16 12:3 13:15 25:4,16 64:22
term 7:12
terminated 40:5
terms 45:17 46:12

56:13
testified 5:5
testimony 27:16 51:16 61:6 73:4 73:5 74:4,6,10
Thank 15:19 17:7 17:12 62:9 71:20 72:4 75:15
thing 45:14,21 68:11
things 27:7 33:6,8 41:6 44:16
think 10:1 14:9 32:15 33:16,18 37:14 40:13 41:2,3,15 42:3 56:5 58:11,19 59:21 61:6
thinking 30:7,10 30:17,18 48:3
thinks 27:9
third 51:21
thought 24:3 45:13,20 46:8 47:4 56:20 57:2 57:16 58:1 64:12,15
three 8:18 9:14 18:11,11 26:8 36:4,22 52:2 58:11 67:2,8,18 67:19 70:3
time 6:7 10:10 12:16 16:7 22:22 23:2 29:6 32:12,17 40:8 46:10 50:15,17 50:21 53:16,20 56:15 58:4 59:19 64:22 71:8
today 12:12,15 14:14 15:3 16:14 17:1,7 27:13 47:13

65:20
today's 47:17
told 8:5 28:16,22 46:2
top 58:12
Tori 24:2
total 10:22 65:19 66:18 67:22
track 63:21
transcript 75:10 76:3,7
transcription 73:5 74:8
true 38:3,5,9,14 73:4 74:9
Trust 36:12
trusted 39:22
trusting 6:13
truth 5:3,4,4
try 6:16 41:20 42:12 51:7 62:20 64:1 65:1 68:11
trying 18:19,22 19:3 27:19 51:17 64:5 66:19
Tuesday 54:2
turn 17:10 47:3
two 36:12,14 42:20 43:14 64:12 66:21
type 53:6,10,14 54:3,5,9,14,16 54:20
typed 54:4

**U**

Uh-huh 69:6
ultimate 48:7
understand 30:9 30:11 39:18
understanding 11:7 30:5 33:4 40:17
understood 40:9

60:2
United 1:2 5:15 69:10,21 70:22
use 52:17,17
usually 51:13 63:12 66:13

**V**

Val 24:2
valuable 62:12
valued 36:10
view 42:17,20
viewed 38:19
volunteer 46:1
vs 1:5 75:5 76:1

**W**

W 3:3,9
waive 72:1
want 16:7,12 51:3 63:5 66:18 68:11 72:1
wanted 22:18 35:3 44:6 59:10
Washington 1:12 2:13 3:5,10 75:2
wasn't 23:6 35:18 41:1,12 55:8 56:17 57:1 60:5
way 6:14 10:14 51:17 52:20
week 20:18 23:3 27:4 37:5,7,10 37:15 39:2,2,2 43:13 53:22
weeks 9:14
went 24:5 35:6 38:1 49:22 56:2 58:15,17
weren't 39:10 57:1
wide 17:15
Winestock 32:7
winter 29:7 32:19
wintertime 32:16
witness 74:4,6,10 75:9

**Jon Pomykala**

**work** 6:20 8:12
  8:17 9:1 24:5,9
  24:12,15,19,19
  26:9,11 27:14
  27:18 28:19,22
  29:20 33:3
  35:12 36:12
  38:16 39:5,16
  40:15,21 41:9
  41:10,21 42:13
  43:9 44:18 45:3
  45:10,18 47:12
  49:4 51:3,7
  53:13 55:22
  56:2,8 58:15,17
  60:8,14,17
  62:10 70:16,19
  71:4
**worked** 9:11 41:7
  53:18 58:22
  60:2
**working** 8:2,6,7,9
  10:19 11:5
  25:10,12,14
  30:1 35:13,19
  35:21 36:2,8,10
  49:1 51:8 54:6
  55:7,8 63:2,6
  64:1,4,5 65:8,10
  67:1,3,5 68:21
  69:2,3,19
**worry** 57:8
**wouldn't** 41:20
  42:11,12 51:6
  62:17

      **Y**
**yeah** 14:18 40:18
  42:15 47:2
  55:12,14
**Year** 32:14
**yearlong** 64:13
**years** 28:6
**York** 29:18 38:20
  39:5

      **0**

**05** 32:18
**06** 32:16,18,20

      **1**
**1** 4:8 15:6,7,12,13
**1:07-CV-01281**
  5:17
**1:07-CV-01281...**
  1:5
**10** 13:1
**11:18** 2:6
**1120** 71:1,7
**119** 15:13
**12th** 7:1
**12:31** 72:6
**1201** 3:10 7:8
  50:2 65:16 67:3
  70:17 75:1
**1250** 7:7,21 8:2
  10:20 11:3,9
  49:2 50:2 70:21
**14** 74:21
**15** 4:8,9 13:1
  50:19
**182490** 1:22

      **2**
**2** 1:13 2:5 4:9
  15:21,22 76:2
**2nd** 47:18
**20** 12:5 25:6
  48:18
**20th** 71:1,7
**20004** 3:10 75:2
**20006** 3:5
**2001** 2:12 3:4
**2005** 31:13 33:21
  59:18
**2007** 1:13 2:5
  28:8 29:7 76:2
**2010** 74:21
**202-419-4242** 3:6
**202-662-5435**
  3:11
**25** 69:20
**25th** 5:18
**29th** 37:8

      **3**
**3** 4:10 61:18,19
  62:1,5
**30** 12:7 47:16
  75:11
**30th** 47:19,20,21
**300** 3:5

      **4**
**4** 4:11 61:18,20
  62:1,5
**4th** 10:12 14:9,10
  20:17,18
**40** 12:9

      **5**
**5** 4:3
**50** 25:8

      **6**
**6** 6:6
**62** 4:10,11

      **7**
**700** 7:1

# Transcript of:**Kimberly Danowski**

**Date:** August 1, 2007
**Volume:**

**Case:** Ajilon Staffing v. Kubicki et al.

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
|-------------------------+
                          |
AJILON PROFESSIONAL       |
STAFFING, LLC.            |   Civil Action No.
                          |   1:07-CV-01281-RJL
        Plaintiff         |
                          |
                          |
v                         |
                          |
                          |
JOSHUA KUBICKI, et al.    |
                          |
                          |
        Defendants.       |
|-------------------------+
```

Wednesday,

August 1, 2007

Deposition of:

KIMBERLY DANOWSKI

called for examination by counsel for the
plaintiff, pursuant to notice, at the law
offices of Schnader, Harrison, Segal & Lewis,
LLP, 2001 Pennsylvania Avenue, NW, Suite 300,
Washington, DC, at 3:00 p.m., when were
present on behalf of the respective parties:

2

---

Page 2

APPEARANCES:
  On Behalf of the Plaintiff:
    BENJAMIN W. HAHN, Esq.
    JOLEEN OKUN, Esq.
  Of:  Schnader Harrison Segal & Lewis, LLP
    2001 Pennsylvania Avenue, NW
    Washington, DC 20006-1825
    (202) 419-4242
    (202) 419-3454 (fax)

  On Behalf of the Defendants:

    MICHAEL A. SCHLANGER, Esq.
    MARK W. MOSIER, Esq.
  Of:  Covington & Burling, LLP
    1201 Pennsylvania Avenue, NW
    Washington, DC 20004-2401
    (202) 662-5459
    (202) 778-5459 (fax)

ALSO PRESENT:

    JOHN J. MULLENHOLZ, Senior Regional Vice
  President, International Projects &
  Consulting, Ajilon

---

Page 3

### T-A-B-L-E O-F C-O-N-T-E-N-T-S

| Witness | Direct |
| --- | --- |
| Kimberly Danowski | 4 |

### E-X-H-I-B-I-T-S

Plaintiff
Exhibit
Danowski No.   Document                    Marked

| 1 | June 15, 2007 2:40 p.m. email From Danowski | 27 |
| --- | --- | --- |
| 2 | Notice of Deposition | 35 |
| 3 | Employment Agreement | 35 |
| 4 | Composite of Documents By K. Danowski | 48 |

---

Page 4

1          D-E-P-O-S-I-T-I-O-N
2              2:59 p.m.
3      MR. HAHN:  On the record.  Why
4  don't we go ahead and swear in the witness.
5  Whereupon,
6        KIMBERLY DANOWSKI
7  was recalled as a witness, and having been
8  previously duly sworn, was examined and
9  testified as follows:
10     (Off the record comments.)
11     DIRECT EXAMINATION
12    BY MR. HAHN:
13    Q    Could you state your name for the
14  record please?
15    **A    Kimberly Danowski.**
16    Q    And, Ms. Danowski, are you a
17  defendant in Ajilon v. Kubicki, et al.?
18    **A    Yes.**
19    Q    And you're here by agreement
20  through your counsel for a limited deposition
21  today in connection with a motion by the
22  Plaintiff, Ajilon, for a preliminary

---

Page 5

1  injunction.  Is that your understanding?
2    **A    Yes.**
3      MR. HAHN:  Okay.  For the record,
4  we are getting started a little bit late.
5  Counsel agreed to stay here and have the
6  deposition go forward.  We are still going to
7  finish this deposition this afternoon if at
8  all possible and have the follow-on deposition
9  at 3:30 p.m. and I appreciate counsel's
10  cooperation on that.
11      MR. SCHLANGER:  Thank you.
12      BY MR. HAHN:
13    Q    Ms. Danowski, I represent -- My
14  name is Benjamin Hahn with Schnader Harrison
15  Segal & Lewis.  I represent the Plaintiff,
16  Ajilon Professional Staffing, LLC and we met
17  the other day on July 25th in the Federal
18  Court House.  Is that correct?
19    **A    Yes, it is.**
20    Q    We have not met before that.  Is
21  that right?
22    **A    No.**

Page 6

| | |
|---|---|
| 1 | Q    And you're familiar with what this |
| 2 | lawsuit is about. |
| 3 | A    Yes. |
| 4 | Q    You've read the complaint. |
| 5 | A    Yes. |
| 6 | Q    Have you read the other papers |
| 7 | that were filed in connection with this |
| 8 | lawsuit? |
| 9 | A    Yes. |
| 10 | Q    Have you looked at any other |
| 11 | document besides the ones that have been filed |
| 12 | in court? |
| 13 | A    No. |
| 14 | Q    Have you looked at any document in |
| 15 | preparation for this deposition? |
| 16 | A    No. |
| 17 | Q    No.  And today you're represented |
| 18 | by Michael Schlanger and Mark Mosier of |
| 19 | Covington & Burling.  Is that correct? |
| 20 | A    Yes. |
| 21 | Q    Did you bring a copy of any |
| 22 | documents with you today? |

Page 7

| | |
|---|---|
| 1 | A    Yes. |
| 2 | Q    And may I see the documents that |
| 3 | you brought with you? |
| 4 | A    Yes. |
| 5 | MR. HAHN:  Counsel, is this a set |
| 6 | for me? |
| 7 | MR. SCHLANGER:  Yes. |
| 8 | MR. HAHN:  Thank you. |
| 9 | MR. SCHLANGER:  If you want to |
| 10 | take a break to go through them. |
| 11 | MR. HAHN:  I'm actually going to |
| 12 | let my colleague here, Joleen Okun, go through |
| 13 | these.  I have some questions that probably |
| 14 | won't relate to documents.  That might |
| 15 | expedite them. |
| 16 | MR. SCHLANGER:  Okay. |
| 17 | MR. HAHN:  And thank you, counsel, |
| 18 | for your cooperation. |
| 19 | MR. SCHLANGER:  I just meant that |
| 20 | we're not on the 24 second shot clock or any |
| 21 | kind of shot clock on you.  So if you want to |
| 22 | -- |

Page 8

| | |
|---|---|
| 1 | MR. HAHN:  I appreciate it, but we |
| 2 | also have some depositions of my clients going |
| 3 | forward on Friday. |
| 4 | MR. SCHLANGER:  Okay. |
| 5 | MR. HAHN:  And I want to establish |
| 6 | that if I tell you that I'm going to engage in |
| 7 | a limited discovery for a preliminary |
| 8 | injunction, then I don't set the bar a |
| 9 | different place from what I had originally |
| 10 | set. |
| 11 | MR. SCHLANGER:  Okay. |
| 12 | MR. HAHN:  But your cooperation is |
| 13 | very much appreciated. |
| 14 | DIRECT EXAMINATION (Cont'd.) |
| 15 | BY MR. HAHN: |
| 16 | Q    Ms. Danowski, what is your current |
| 17 | employment? |
| 18 | A    I work at Solomon Page Group. |
| 19 | Q    And in a nutshell, what do you do |
| 20 | there? |
| 21 | A    Operations administrator. |
| 22 | Q    Okay, and it's pretty much the |

Page 9

| | |
|---|---|
| 1 | same job that you did when you were at Ajilon. |
| 2 | A    Yes. |
| 3 | Q    And when was your first day at |
| 4 | Solomon Page? |
| 5 | A    July 2nd. |
| 6 | Q    And what was your last day at |
| 7 | Ajilon? |
| 8 | A    June 29th. |
| 9 | Q    Okay.  When did you decide to quit |
| 10 | at Ajilon and go to work at Solomon Page? |
| 11 | A    June -- The last week of June I |
| 12 | was thinking about it. |
| 13 | Q    You hadn't made a decision. |
| 14 | A    No. |
| 15 | Q    Okay.  So was it -- You actually |
| 16 | gave notice -- Well, I won't call it notice. |
| 17 | You actually told Ajilon you were leaving on |
| 18 | July 29th? |
| 19 | A    On June. |
| 20 | Q    I'm sorry.  June 29, 2007? |
| 21 | A    Yes. |
| 22 | Q    Did you tell anyone before that |

4

Page 10

1   that you were leaving?

2      **A**   **No.**

3      Q   Did you tell anyone before that

4   you were thinking of leaving?

5      **A**   **Yes.**

6      Q   Okay. Who did you tell at Ajilon

7   before that that you were thinking of leaving?

8      **A**   **Denise Feeley.**

9      Q   Okay. And is Denise Feeley?

10      **A**   **She is the Building Administrator**

11   **in Cellbrook (phonetic).**

12      Q   Okay, and what did you tell

13   Denise?

14      **A**   **Just that I was looking for other**

15   **jobs and I was looking to leave soon.**

16      Q   Okay. Why did you tell her? Was

17   that just --

18      **A**   **Just I call her for billing and**

19   **it's just conversation.**

20      Q   Okay. She's not your supervisor

21   or anything?

22      **A**   **No.**

Page 11

1      Q   Okay. Do you recall anything else

2   of that conversation?

3      **A**   **No.**

4      Q   When was the first time anyone

5   approached you about going to work for Solomon

6   Page?

7      **A**   **I guess, are you asking just to**

8   **get my feeling? I'm not really sure of your**

9   **question. Yes, I don't really -- Just**

10   **approached me in general or --**

11      Q   Let me start. When was the first

12   time you'd heard of Solomon Page?

13      **A**   **Probably May, around April or May.**

14      Q   Okay.

15      **A**   **If I recall correctly.**

16      Q   You had never even heard of the

17   company before May?

18      **A**   **No.**

19      Q   Okay. How long have you been

20   working in the professional staffing industry

21   in D.C.?

22      **A**   **I started August 15, 2005.**

Page 12

1      Q   Okay. So before that you have no

2   experience in the industry at all?

3      **A**   **Correct.**

4      Q   What were you doing before that?

5      **A**   **I worked for Enterprise Rent-a-Car**

6   **and I was a client service representative.**

7      Q   Okay. What do you recall hearing

8   about Solomon Page back in April or May?

9      **A**   **Josh just mentioned that that was**

10   **one of the places he was interviewing and that**

11   **was it.**

12      Q   Okay. When you say that he was

13   interviewing, you mean that he was looking to

14   get a job there?

15      **A**   **Yes.**

16      Q   What other places did he say he

17   was interviewing?

18      **A**   **Hudson Legal.**

19      Q   Any others?

20      **A**   **There were others. He didn't**

21   **mention those by names. He just said there**

22   **were others.**

Page 13

1      Q   Do you remember the context that

2   he mentioned that? Were you in his office?

3   Were you at lunch?

4      **A**   **The first time was in his office.**

5      Q   Okay, and then the next time?

6      **A**   **I don't recall. Probably either**

7   **his office or -- Yes, most of the**

8   **conversations we had were in his office.**

9      Q   Did you have any other

10   conversations about Solomon Page that weren't

11   in his office?

12      **A**   **We had one conversation if I**

13   **recall correctly.**

14      Q   Okay. Where was that?

15      **A**   **It was at a coffee shop.**

16      Q   Do you remember which coffee shop?

17      **A**   **I don't -- I think it's called The**

18   **Mudhouse.**

19      Q   And do you remember when that was?

20      **A**   **Specifically no.**

21      Q   What month?

22      **A**   **I know it was at the end of June.**

**Page 14**

1    I just don't know --
2        Q    Was he still working for Ajilon?
3        A    I don't -- I don't know.
4        Q    He may have already quit?
5        A    I know when he quit.  I just don't
6    remember the exact day the conversation was.
7        Q    It could have been before or after
8    he quit.
9        A    Mostly likely it was after.
10       Q    When you were talking with him
11   about Solomon Page in his office at Ajilon,
12   was the conversation ever about you going to
13   work for Solomon Page?
14       A    No.  Yes, it was.
15       Q    Okay.  What do you recall about
16   that?
17       A    He just told me that if he --
18   there's a position at Solomon Page, that if he
19   were to take it that he would hiring people
20   and would want me to put in for the position.
21       Q    And what did you say?
22       A    I said I would think about it.

**Page 15**

1    I'm looking at other opportunities.
2        Q    Okay, and do you recall at least
3    one specific conversation like that where you
4    were in his office?
5        A    Yes.
6        Q    Were you both on the clock working
7    for Ajilon at the time?
8        A    Yes.
9        Q    Did you ever discuss your
10   employment contract with Ajilon with Josh
11   Kubicki while you were still working for
12   Ajilon?
13       A    Yes.
14       Q    And what do you recall about that
15   discussion?
16       A    I just -- I emailed it to him.  I
17   had a question about it at the end of June and
18   I emailed him and asked him, you know, prior
19   to that over the phone.  I just asked him to
20   review it and see if it's liable for being an
21   operations coordinator because it's right when
22   I was a recruiter in the Office division.

**Page 16**

1        Q    And where did you email it to him?
2        A    His personal account.
3        Q    Do you know what personal email?
4        A    Off the top of my head, no.
5        Q    Okay.  Was he still working for
6    Ajilon at the time?
7        A    No, he was not.
8        Q    Okay.  Why did you send him the
9    actual document?
10       A    It was when I was looking because
11   he worked for Solomon Page at that time and I
12   was -- He had talked to me about the position
13   and I was interested to see about that
14   position and I was interviewing at another
15   staffing agency also and I wanted to find out
16   whether or not my non-compete would come into
17   play.
18       Q    Okay, and what did he tell you?
19       A    I didn't hear anything back from
20   him.
21       Q    He never gave you any feedback?
22       A    He never -- No.

**Page 17**

1        Q    But did he ultimately offer you a
2    job or had he already offer you a job?
3        A    He did not offer me the job at
4    that time.
5        Q    Okay.  So when did you get a job
6    offer from Solomon Page?
7        A    I got the official -- I got an
8    unofficial offer letter on June 30th is when
9    I saw everything we spoke about on June 27th
10   in writing.
11       Q    Okay.  Who did you speak with at
12   Solomon Page on June 27th?
13       A    Just Josh.
14       Q    And where did you speak with him?
15       A    Over the phone.
16       Q    And where were you when you were
17   talking to him?
18       A    On vacation.
19       Q    Okay.  And physically, where were
20   you?
21       A    I was at concert at Nissan
22   Pavilion.

Page 18

1   Q    Okay.  Did you ever meet with Josh
2   Kubicki, Jon Pomykala together to discuss the
3   three of you working at Solomon Page while you
4   were still working for Ajilon?
5   **A    I don't recall.**
6   Q    You might have?
7   **A    I don't recall.**
8   Q    In any of the meetings that you
9   had with Josh Kubicki in his office was Jon
10  there?
11  **A    Jon was always in and out of his**
12  **office.  If I sat down with Josh very rarely,**
13  **I had an opportunity to, but he was in and**
14  **out.  Whether -- Yes, he was in and out of his**
15  **office all the time.**
16  Q    Jon Pomykala works for Solomon
17  Page also.  Correct?
18  **A    Yes.**
19  Q    And you both quit at Ajilon on the
20  same day.  Correct?
21  **A    Yes.**
22  Q    Did you discuss with Jon going

Page 19

1   over to Solomon Page prior to quitting?
2   **A    Yes.**
3   Q    When was the first time you
4   discussed that with Jon?
5   **A    I don't recall the exact day.  You**
6   **know, we have spoken about it.  I really don't**
7   **recall the days.**
8   Q    May?
9   **A    I'd say later.**
10  Q    But it could have been May.
11  **A    Only because I don't recall.  I**
12  **didn't write every conversation down that we**
13  **had unfortunately.**
14  Q    Well, just generally, how long a
15  time frame was it that you were thinking of
16  leaving Ajilon?
17  **A    I've been thinking for over a year**
18  **to leave Ajilon.  Since August of last year,**
19  **I've been looking.**
20  Q    And you didn't find anything.
21  **A    No.  I've interviewed at multiple**
22  **places.**

Page 20

1   Q    What was it about the Solomon Page
2   job that appealed to you?
3   **A    I liked what I was doing and I**
4   **liked the fact that Josh went over there.**
5   Q    So the fact that Josh went there
6   was a key element of your taking the job?
7   **A    Yes.**
8   Q    Okay.  Were you aware that Josh
9   had a contract provision that said that he
10  could not recruit people from Ajilon to a
11  competing company for a year?
12  **A    No.**
13  Q    You were not aware of that?
14  **A    No.  I don't know what was in his**
15  **contracts.**
16  Q    Okay.  If you had known that,
17  would that have made a difference to you?
18  **A    I don't know.**
19  Q    Just my saying it now, it doesn't
20  make a difference to you.
21  **A    I don't know if it would or not.**
22  Q    Okay.  What clients of Solomon

Page 21

1   Page are you dealing with now in your job?
2   **A    Directly, none.  I handle the**
3   **candidates mostly.**
4   Q    Okay.  Do you do any invoicing at
5   all to the clients?
6   **A    Yes.**
7   Q    What clients do you send invoices
8   to?
9   **A    It's Mayer, Brown, Rowe & Maw and**
10  **Crowell & Moring and that's it for right now.**
11  Q    Does the -- Do you do any work for
12  clients other than Josh Kubicki's clients?
13  **A    Yes.**
14  Q    Okay.  What work do you do for
15  other than Josh Kubicki's clients?
16  **A    We don't have any but I would.  I**
17  **would do the same thing that I'm doing for**
18  **Josh for anyone else who pulled in business.**
19  Q    I'm not asking what you would do.
20  I'm asking what you actually do do.
21  **A    Okay.  Then no.**
22  Q    Does Andrew Perlin have any

7

Page 22

1   clients?
2       A   Yes.
3       Q   Who does his invoicing?
4       A   He doesn't have any candidates out
5   working.  So he wouldn't have any invoices.
6       Q   So other than Crowell & Moring and
7   Mayer Brown, what work does Solomon Page in
8   the D.C. office?
9       A   That is it.
10      Q   Okay.  What work was Solomon
11  Page's D.C. office doing when you showed up on
12  July 2nd?
13      A   We were working on Mayer Brown.
14      Q   Well, that was before you showed
15  up or when you showed up?
16      A   The day that I showed up I was
17  working on Mayer Brown.
18      Q   Okay.  So there was already a
19  Mayer Brown project up and running on July
20  2nd.
21      A   Yes.
22      Q   And was that Andrew Perlin's

Page 23

1   project?
2       A   No.
3       Q   Was that Josh Kubicki's project?
4       A   Yes.
5       Q   Okay.  When did it start?
6       A   On June 29th.
7       Q   And who were you dealing with at
8   Mayer Brown?
9       A   I don't deal with Mayer Brown.  I
10  don't deal with the client directly.
11      Q   Okay.  How many -- Was it a
12  project that involved placement of contract
13  attorneys?
14      A   Yes, it did.
15      Q   And how many attorneys?
16      A   There was two.
17      Q   Okay, and did you know the
18  attorneys?
19      A   I recognize their names.
20      Q   So where did you recognize their
21  names from?
22      A   I've -- From prior Ajilon payroll

Page 24

1   I've done.
2       Q   Okay.  They had also been Ajilon
3   contract attorneys when you worked at Ajilon.
4       A   Yes.
5       Q   You say you recognize their names.
6   Had you met either of them?
7       A   No.
8       Q   Okay.  Do you know how those two
9   attorneys were recruited?
10      A   No.
11      Q   Did Jon Pomykala have anything to
12  do with it?
13      A   I don't know.
14      Q   Do you know whether Jon Pomykala
15  recruited those attorneys at Ajilon?
16      A   I don't know.  We had multiple
17  recruiters.
18      Q   Were these attorneys that had
19  worked at Mayer Brown while you were at
20  Ajilon?
21      A   I don't know.
22      Q   Do you know their names?

Page 25

1       A   Yes, I do.
2       Q   What are their names?
3       A   Roger Patterson and Edwin Hodge.
4       Q   What projects do you have
5   responsibility on now?  For which clients?
6       A   Mayer Brown and Crowell.
7       Q   And how many projects?
8       A   Currently, Mayer Brown has two and
9   Crowell, I only know of recruiting for them
10  for one project.
11      Q   It's an active project.
12      A   Yes.
13      Q   So you have people placed there
14  now.
15      A   Right.
16      Q   How many people?
17      A   Well, they're not working for us.
18  They're direct hires.
19      Q   Well, what's your responsibility
20  for them?
21      A   Nothing.  They're not on our
22  payroll.  Crowell is -- They're on a Crowell

Page 26

1 & Moring's payroll.
2   Q   Would there be 42 of them?
3   A   No.
4   Q   Is -- What involved do you have
5 right now on anything relating to Crowell?
6   A   The four administrative admins
7 that are right now and one contract attorney.
8   Q   Okay.  The four admins, what are
9 they?
10   A   They run around and manage the
11 project space.
12   Q   When you say "they run around and
13 manage the project space," what space is that?
14   A   We have a space that's 1201 Penn
15 where we have Crowell & Moring direct hires
16 working there and our admins go -- Or they go
17 around and just do whatever needs to be done
18 whether it's collecting paperwork from them
19 that Crowell & Moring from them for like I-9s
20 or any other small minute details from letting
21 me know what needs ordered?
22   Q   Okay, and those admins are Solomon

Page 27

1 Page employees?
2   A   Yes.
3   Q   And their time is billed to
4 Crowell?
5   A   Yes.
6   Q   Okay.  Are the contract attorneys
7 that are direct hires by Crowell that are
8 being administered by your folks, are they the
9 same ones that Crowell did a direct hire from
10 through Ajilon and paid $1,000 a head back in
11 mid June?
12   A   I don't know.
13   Q   You were involved in that
14 transaction where Crowell did direct hire of
15 approximately 42 attorneys in mid June for
16 $1,000 per person.
17   A   No, I wasn't.  That was a direct
18 hire also.  I'm not involved in direct hires.
19       MR. HAHN:  If we could mark this
20 as Plaintiff's Exhibit Danowski 1.
21       (Whereupon, the above-
22       referred to document was

Page 28

1       marked as Plaintiff
2       Exhibit Danowski No. 1
3       for identification.)
4   THE WITNESS:  Okay.
5   BY MR. HAHN:
6   Q   Ms. Danowski, is Exhibit 1 an
7 email exchange between and Josh Kubicki?
8   A   Yes.
9   Q   Did that relate to direct hires by
10 Crowell & Moring in mid June?
11   A   Yes.
12   Q   Are these the same people that are
13 now in your space at 1201 Penn?
14   A   I don't have -- I don't know.
15   Q   Is it the same project?
16   A   The same -- I don't know.
17   Q   Do you have any idea what the
18 people who are in 1201 right now are doing?
19   A   I know the people that we direct
20 hired, there could be multiple different
21 projects going on in that space.  I do not
22 know specifically if this was for maybe one PO

Page 29

1 number and ours is for a different PO number.
2 I do not know that.  Because they are direct
3 hires, I don't need to know that information.
4 All this -- I don't know that information and
5 that's something I don't need to know.
6   Q   Well, you'd needed to know it at
7 Ajilon and that's why you were asking Josh
8 about it.  Right?
9   A   I was just asking whether or not
10 on this email to put this on our weekly -- I
11 was responsible for John Mullenholz that put
12 me in charge of getting all the numbers that
13 we did per week ons, adds and offs and I was
14 asking if the direct hires that I was aware
15 that went over there would be considered on
16 our -- I forget the name of it, but on that
17 little report that I put together for John
18 Mullenholz and the rest of the company.
19 That's all I was asking on there.  I don't
20 know who those people were and I don't know
21 anything else about what they -- what project
22 they went on or anything like that.

9

1    Q    So as you sit here today, you
2    don't know whether the Crowell & Moring direct
3    hires that are in the Solomon Page space at
4    1201 Pennsylvania are -- whether any of those
5    people are ones that were direct hires from
6    Ajilon.
7        A    I don't know.
8    Q    Who would know that?
9        A    Josh would.
10    Q    Would Jon know that?
11        A    I believe so.
12    Q    Okay.  Who recruited the people
13    that were hired by Crowell & Moring?
14        A    Jon.
15    Q    Did Josh get involved in that?
16        A    I don't know.
17    Q    He got involved in recruiting
18    sometimes.  Right?
19        A    I couldn't tell you the last time
20    he got involved in recruiting.  He dealt with
21    strictly the client.
22    Q    When was the first time that you

1    understood that Jon Pomykala was going to go
2    to Solomon Page?
3        A    The last week of June.
4    Q    But you talked to him about it
5    before that.  Correct?
6        A    Yes.
7    Q    Did you talk about all three of
8    you, Josh, Jon and you going over there
9    together?
10        A    Yes.
11    Q    Okay.  When did you talk about
12    that?
13        A    I don't specific dates.  I guess -
14    - I don't know.
15    Q    What was the earliest that you
16    talked about that?
17        A    Late May, early June.
18    Q    Have you ever seen any documents
19    that outlined work that the Solomon Page group
20    D.C. office was going to be doing?
21        A    No.
22    Q    Has anybody discussed the

1    existence of such documents to you?
2        A    No.
3    Q    Have you ever given anybody any
4    information to prepare a document like that?
5        A    No.
6    Q    Did Josh ever tell you about his
7    discussions with Solomon Page group in New
8    York?
9        A    Yes.
10    Q    What did he tell you about that?
11        A    That he was going up there for an
12    interview.
13    Q    And when did he tell you that?
14        A    Whenever he went up there for an
15    interview.
16    Q    How long ago was that?
17        A    Back in June?  May?
18    Q    April?
19        A    I don't recall that.  I don't
20    know.
21    Q    It was a long time ago though.  It
22    wasn't just a couple of weeks ago.

1        A    No.
2    Q    Okay.  Did you understand that
3    that was his first interview?  Did it sound to
4    you like he had been up there before?
5        A    No.
6    Q    Okay.  So it sounded like it was
7    his first interview.
8        A    Yes.
9    Q    Did he tell you what he was
10    telling them?
11        A    No.
12    Q    Did he talk to you about whether
13    he could represent to them that you might come
14    with him?
15        A    I don't know.
16    Q    Did he ever talk to you at the
17    time that he was telling you that he was
18    discussing working for Solomon Page with
19    Solomon Page in New York?  Did he ever say
20    that he wanted to tell them that you and Jon
21    and he could come as a package and bring
22    business?

Page 34

1     A     No, I don't -- No.
2     Q     You know he never said that. Is
3   that what you're telling me?
4     A     I don't know. I don't know if he
5   said that.
6     Q     He might have said that.
7     A     I don't know.
8     Q     All right. Did the three of you
9   ever talk together about what you might be
10  able to do if you stayed together as a team?
11    A     No. Well, yes, we did actually
12  but that was for Ajilon. It wasn't for what
13  would we do anywhere else.
14    Q     Did you have a value as a team at
15  Ajilon?
16    A     Yes.
17    Q     And was that -- Do you have value
18  as a team at Solomon Page?
19    A     Yes.
20    Q     Do you have the same value as a
21  team at Solomon Page?
22    A     I believe so, yes.

Page 35

1     Q     Do you think that Josh would have
2   had a hard time replacing you if he had to get
3   somebody new at Solomon Page?
4     A     Yes.
5     Q     Would he have had a hard time
6   replacing Jon if he needed to get a recruiter
7   at Solomon Page?
8     A     Yes.
9         MR. HAHN: I would just like
10  quickly to get these documents as exhibits.
11  One is the deposition notice and the other is
12  Ms. Danowski's employment agreement. And
13  we'll make the deposition notice Exhibit 2.
14            (Whereupon, the above-
15            referred to document was
16            marked as Plaintiff
17            Exhibit Danowski No. 2
18            for identification.)
19        MR. HAHN: And we'll make the
20  employment agreement Exhibit 3.
21            (Whereupon, the above-
22            referred to document was

Page 36

1               marked as Plaintiff
2               Exhibit Danowski No. 3
3               for identification.)
4       MR. HAHN: Off the record.
5           (Whereupon, the foregoing matter
6   went off the record at 3:31 p.m. and went back
7   on the record at 3:32 p.m.)
8       MR. HAHN: On the record.
9         DIRECT EXAMINATION (Cont'd.)
10        BY MR. HAHN:
11    Q     Ms. Danowski, the employment
12  agreement that's Exhibit 3, I would just like
13  you to confirm here today under oath that is,
14  in fact, your employment agreement with
15  Ajilon.
16    A     Yes, it is.
17    Q     Thank you, and the other exhibit,
18  Exhibit No. 2 -- I'm sorry. Did I hand you a
19  deposition notice?
20    A     No.
21    Q     Maybe I didn't hand you that yet.
22  Thank you. This is the notice of your

Page 37

1   deposition and there is a listing -- Did you
2   receive a copy of this notice?
3     A     Yes.
4     Q     And there's a listing of documents
5   attached to that. The documents that you have
6   produced today, are those documents that you
7   assembled and provided to your counsel after
8   reviewing that notice?
9     A     Yes.
10    Q     And is it your testimony today
11  that you made a good faith effort to provide
12  the documents responsive to that notice
13  subject to your counsel's advice as to what
14  you did not have to produce?
15    A     Yes.
16        MR. HAHN: Just for the record, we
17  are at a preliminary injunction stage.
18  Counsel has been very cooperative in trying to
19  get things scheduled. There are obviously some
20  big issues about what documents are within an
21  individual defendant's possession, custody and
22  control and what is a document that is legally

11

1   the property of Solomon Page Group which is
2   not at this point a party to the litigation.
3           I don't want to take a lot of time
4   this afternoon on that issue. I haven't had
5   a chance to review these documents closely.
6   But if there is an issue that I need to take
7   up with counsel, I will do that as soon as I
8   can. I'm not going to keep this witness here.
9           MR. SCHLANGER: Sure. Understood.
10          MR. HAHN: But we have had an
11  exchange about, an email exchange about, what
12  documents are fair game in these circumstances
13  and which ones aren't and I think it's all the
14  arm wrestling that I would expect to go on at
15  this stage of the litigation.
16          What I'd like to do is take about
17  a three minute break so that I can talk with
18  my colleague here, Ms. Okun, about these
19  documents and then come back and finish up.
20          MR. SCHLANGER: Of course.
21          MR. HAHN: Thank you and we'll let
22  you have the room with the thermostat now

1   turned down. Off the record.
2           (Whereupon, the foregoing matter
3   went off the record at 3:35 p.m. and went back
4   on the record at 3:40 p.m.)
5           MR. HAHN: On the record.
6           DIRECT EXAMINATION (Cont'd.)
7           BY MR. HAHN:
8       Q    Regarding the current contracts at
9   Mayer Brown that Solomon Page has, you said
10  there was one where there were two people
11  assigned. Is that correct? And you gave us
12  the names.
13      A    Yes.
14      Q    Okay. What is the name of that
15  project as far as you're concerned?
16      A    It was Bow Water.
17      Q    Bow Water?
18      A    Yes.
19      Q    Is there another Mayer project
20  right now?
21      A    Yes.
22      Q    Okay, and how many people are

1   placed on that?
2       A    Eight.
3       Q    And what's the name of that
4   project?
5       A    United Healthcare.
6       Q    And do you know the names of the
7   individuals placed on that?
8       A    Not off the top of my head.
9       Q    Do you know any of them? Out of
10  eight, you don't know any of their names?
11      A    I know a couple. Brian Gilmore,
12  David Johnstone, Sheila Mayers, Cynthia
13  Butler, Wise Allen, Cathy Sagales, Sass Mwine.
14  I think -- That's all I remember. I might be
15  missing one or two.
16      Q    Were any of the attorneys that you
17  just named or the individuals that you just
18  named ones that also worked as contract
19  attorneys when you were working at Ajilon?
20      A    Yes.
21      Q    All of them?
22      A    No.

1       Q    Most of them? Some of them?
2       A    Some of them.
3       Q    Okay. Did you personally sign
4   them up as far as getting all of their
5   paperwork done at Solomon Page?
6       A    Not all of them.
7       Q    Okay. Who else did that?
8       A    Jan Templeman.
9       Q    Who is Jan Templeman?
10      A    She is the other recruiter for
11  Solomon Page.
12      Q    Jon being one and Jan being --
13      A    And Jan being the other.
14      Q    Okay. And she might have done
15  some of the paperwork signing people up?
16      A    Yes.
17      Q    Did Jon do any of the paperwork?
18      A    That's a good question. Maybe one
19  or two.
20      Q    When were those people signed up?
21      A    Some in the office. Some at the
22  project space.

Page 42

1  Q    And over what time frame?
2  A    **Could you clarify?**
3  Q    Well, when was the first one of
4  them signed up? What day? Like --
5  A    **I don't know. I don't know the**
6  **dates of sign-up. They didn't --**
7  Q    July 2nd? Did you sign up --
8  A    **It would be later than that. No.**
9  Q    What was the soonest that you
10  signed anybody up that you personally did?
11  A    **That I personally did would be**
12  **July 6th.**
13  Q    July 6th. Okay, and who was that?
14  A    **Wise Allen.**
15  Q    Did you sign up Cynthia Butler?
16  A    **No.**
17  Q    Who signed her up?
18  A    **I don't know.**
19  Q    Okay. Now the person you signed
20  up was Wise Allen. Is that correct?
21  A    **Yes.**
22  Q    Is that someone you worked with at

Page 43

1  Ajilon?
2  A    **He worked there, yes.**
3  Q    And did anyone at Solomon Page
4  Group interview him?
5  A    **I don't know. I just give people**
6  **paperwork at the project space. That's all I**
7  **do.**
8  Q    Okay. All right. Other than the
9  two people on the Bow Water project and the
10  eight people on the United Healthcare project
11  and the four -- I'm sorry. I forget the title
12  that you gave, the four people that were
13  running around over a 12 --
14  A    **The admins.**
15  Q    The admins.
16  A    **There are three admins and one**
17  **contract attorney.**
18  Q    Okay. Three and who was the
19  contract attorney?
20  A    **John Beuker.**
21  Q    John Beuker. Was he one of the
22  people who was a contract attorney at Ajilon?

Page 44

1  A    **Yes, he was.**
2  Q    Okay. And he is in with the
3  direct hires?
4  A    **No. Well, yes. He is within the**
5  **direct hires.**
6  Q    And is he doing what they're
7  doing?
8  A    **Yes.**
9  Q    Okay. But he's not a direct hire.
10  A    **No. He's helping us manage, too.**
11  Q    Were any of the three admins
12  people that worked for Ajilon while you were
13  at Ajilon?
14  A    **One was, Danny Davis.**
15  Q    And the other two you've never met
16  before, never heard of before?
17  A    **No.**
18  Q    Is part of your job now to process
19  time cards?
20  A    **Yes.**
21  Q    And part of you job at Ajilon was
22  to process time cards?

Page 45

1  A    **Yes.**
2  Q    And did you recognize the names of
3  these people that we're talking about on the
4  Mayer and Crowell projects because you
5  recognized their names from processing time
6  cards or other administrative duties?
7  A    **Yes.**
8  Q    Have you met most of these people?
9  A    **No.**
10  Q    Is there anything that you're
11  doing now at SPG that in your opinion is
12  different from what you did at Ajilon?
13  A    **Yes.**
14  Q    What do you know that's different?
15  A    **I go and actually deliver**
16  **paperwork to the candidates which I never had**
17  **any contact, usually had any contact with**
18  **candidates before. I explain to them and go**
19  **over all their benefits. I never did that**
20  **before. And I also am responsible for any**
21  **type of supplies, food. Anything that's**
22  **needed for project spaces, I'm responsible in**

Page 46

1   getting that.
2       Q    Did you ever have a discussion
3   with -- Prior to leaving Ajilon, did you ever
4   talk with Jon Pomykala about being worried
5   that Ajilon might sue you if you went to work
6   for a competitor?
7       A    No.
8       Q    That didn't cross your mind?
9       A    No.
10      Q    Okay.  Other than with Jon
11  Pomykala, did you have that conversation with
12  anyone?
13      A    No.
14      Q    Is there any kind of an agreement
15  that you have with anyone to cover your
16  expenses in connection with this lawsuit?
17      A    I don't know.  I never worked
18  anything out.
19      Q    Have you ever talked with Josh
20  Kubicki about who is going to pay for your
21  defense?
22      A    Yes.

Page 47

1       Q    And what is your understanding
2   from Mr. Kubicki?
3       A    That Solomon Page will be paying
4   for it.
5       Q    Okay, and do you believe that?
6       A    Yes.
7       Q    Has anyone at Solomon Page told
8   you that other than Josh Kubicki?
9       A    No.
10      Q    Have you talked with Jon Pomykala
11  about that?
12      A    No.
13      MR. HAHN:  I have no further
14  questions.  Thank you, Ms. Danowski.
15      THE WITNESS:  Yes.
16      MR. MOSIER:  None.
17      MR. HAHN:  Do you want to waive
18  signature?
19      MR. MOSIER:  We'll read it.
20      MR. HAHN:  Okay.  Thank you.  And
21  I think we're off the record.
22      (Whereupon, the foregoing matter

Page 48

1   went off the record at 3:51 p.m. and went back
2   on the record at 3:51 p.m.)
3       MR. HAHN:  On the record.  I
4   wanted to ask Ms. Danowski to identify the
5   composite of documents that she provided.
6   We've marked that as Exhibit No. 4.
7       (Whereupon, the above-
8       referred to document was
9       marked as Plaintiff
10      Exhibit Danowski No. 4
11      for identification.)
12      MR. HAHN:  Counsel, if we want to
13  get that consecutively numbered later or
14  something.
15      MR. MOSIER:  Yes, let's do that.
16      MR. HAHN:  But I just wanted --
17  This way we have on the record that she says,
18  "This is what I produced at the deposition."
19      MR. MOSIER:  That's fine.
20      MR. HAHN:  Is that correct, Ms.
21  Danowski?
22      THE WITNESS:  Yes, it is.  These

Page 49

1   are emails that I brought to the deposition.
2       MR. HAHN:  Thank you very much.
3   Now we're off the record.
4       (Whereupon, the taking of
5   deposition in the above-entitled matter was
6   concluded at 3:52 p.m., signature having NOT
7   been waived.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## A

able 34:10
about 6:2 9:12 11:5
  12:8 13:10 14:11,12
  14:15,22 15:14,17
  16:12,13 17:9 19:6
  20:1 29:8,21 31:4,7
  31:11,16 32:6,10
  33:12 34:9 37:20
  38:11,11,16,18 45:3
  46:4,20 47:11
above 27:21 35:14,21
  48:7
above-entitled 49:5
account 16:2
Action 1:5
active 25:11
actual 16:9
actually 7:11 9:15,17
  21:20 34:11 45:15
adds 29:13
administered 27:8
administrative 26:6
  45:6
administrator 8:21
  10:10
admins 26:6,8,16,22
  43:14,15,16 44:11
advice 37:13
after 14:7,9 37:7
afternoon 5:7 38:4
agency 16:15
ago 32:16,21,22
agreed 5:5
agreement 3:18 4:19
  35:12,20 36:12,14
  46:14
ahead 4:4
Ajilon 1:4 2:22 4:17,22
  5:16 9:1,7,10,17 10:6
  14:2,11 15:7,10,12
  16:6 18:4,19 19:16
  19:18 20:10 23:22
  24:2,3,15,20 27:10
  29:7 30:6 34:12,15
  36:15 40:19 43:1,22
  44:12,13,21 45:12
  46:3,5
al 1:8 4:17
Allen 40:13 42:14,20
already 14:4 17:2
  22:18
always 18:11
Andrew 21:22 22:22
another 16:14 39:19
anybody 31:22 32:3
  42:10
anyone 9:22 10:3 11:4

21:18 43:3 46:12,15
  47:7
anything 10:21 11:1
  16:19 19:20 24:11
  26:5 29:21,22 45:10
  45:21 46:18
anywhere 34:13
appealed 20:2
APPEARANCES 2:1
appreciate 5:9 8:1
appreciated 8:13
approached 11:5,10
approximately 27:15
April 11:13 12:8 32:18
arm 38:14
around 11:13 26:10,12
  26:17 43:13
asked 15:18,19
asking 11:7 21:19,20
  29:7,9,14,19
assembled 37:7
assigned 39:11
attached 37:5
attorney 26:7 43:17,19
  43:22
attorneys 23:13,15,18
  24:3,9,15,18 27:6,15
  40:16,19
August 1:12 11:22
  19:18
Avenue 1:20 2:5,11
aware 20:8,13 29:14

## B

back 12:8 16:19 27:10
  32:17 36:6 38:19
  39:3 48:1
bar 8:8
before 5:20 9:22 10:3,7
  11:17 12:1,4 14:7
  22:14 31:5 33:4
  44:16,16 45:18,20
behalf 1:22 2:2,8
being 15:20 27:8 41:12
  41:12,13 46:4
believe 30:11 34:22
  47:5
benefits 45:19
Benjamin 2:3 5:14
besides 6:11
between 28:7
Beuker 43:20,21
big 37:20
billed 27:3
billing 10:18
bit 5:4
both 15:6 18:19
Bow 39:16,17 43:9

break 7:10 38:17
Brian 40:11
bring 6:21 33:21
brought 7:3 49:1
Brown 21:9 22:7,13,17
  22:19 23:8,9 24:19
  25:6,8 39:9
Building 10:10
Burling 2:10 6:19
business 21:18 33:22
Butler 40:13 42:15

## C

call 9:16 10:18
called 1:17 13:17
candidates 21:3 22:4
  45:16,18
cards 44:19,22 45:6
Cathy 40:13
Cellbrook 10:11
chance 38:5
charge 29:12
circumstances 38:12
Civil 1:5
clarify 42:2
client 12:6 23:10 30:21
clients 8:2 20:22 21:5,7
  21:12,12,15 22:1
  25:5
clock 7:20,21 15:6
closely 38:5
coffee 13:15,16
colleague 7:12 38:18
collecting 26:18
COLUMBIA 1:1
come 16:16 33:13,21
  38:19
comments 4:10
company 11:17 20:11
  29:18
competing 20:11
competitor 46:6
complaint 6:4
composite 3:21 48:5
concerned 39:15
concert 17:21
concluded 49:6
confirm 36:13
connection 4:21 6:7
  46:16
consecutively 48:13
considered 29:15
Consulting 2:22
contact 45:17,17
context 13:1
contract 15:10 20:9
  23:12 24:3 26:7 27:6
  40:18 43:17,19,22

contracts 20:15 39:8
control 37:22
Cont'd 8:14 36:9 39:6
conversation 10:19
  11:2 13:12 14:6,12
  15:3 19:12 46:11
conversations 13:8,10
cooperation 5:10 7:18
  8:12
cooperative 37:18
coordinator 15:21
copy 6:21 37:2
correct 5:18 6:19 12:3
  18:17,20 31:5 39:11
  42:20 48:20
correctly 11:15 13:13
counsel 1:17 4:20 5:5
  7:5,17 37:7,18 38:7
  48:12
counsel's 5:9 37:13
couple 32:22 40:11
course 38:20
court 1:1 5:18 6:12
cover 46:15
Covington 21:10 6:19
cross 46:8
Crowell 21:10 22:6
  25:6,9,22,22 26:5,15
  26:19 27:4,7,9,14
  28:10 30:2,13 45:4
current 8:16 39:8
Currently 25:8
custody 37:21
Cynthia 40:12 42:15
C-O-N-T-E-N-T-S 3:1

## D

Danny 44:14
Danowski 1:15 3:3,10
  3:14,22 4:6,15,16
  5:13 8:16 27:20 28:2
  28:6 35:17 36:2,11
  47:14 48:4,10,21
Danowski's 35:12
dates 31:13 42:6
David 40:12
Davis 44:14
day 5:17 9:3,6 14:6
  18:20 19:5 22:16
  42:4
days 19:7
DC 1:21 2:5,12
deal 23:9,10
dealing 21:1 23:7
dealt 30:20
decide 9:9
decision 9:13
defendant 4:17

Defendants 1:9 2:8
defendant's 37:21
defense 46:21
deliver 45:15
Denise 10:8,9,13
deposition 1:14 3:16
  4:20 5:6,7,8 6:15
  35:11,13 36:19 37:1
  48:18 49:1,5
depositions 8:2
details 26:20
difference 20:17,20
different 8:9 28:20
  29:1 45:12,14
direct 3:2 4:11 8:14
  25:18 26:15 27:7,9
  27:14,17,18 28:9,19
  29:2,14 30:2,5 36:9
  39:6 44:3,5,9
directly 21:2 23:10
discovery 8:7
discuss 15:9 18:2,22
discussed 19:4 31:22
discussing 33:18
discussion 15:15 46:2
discussions 32:7
DISTRICT 1:1,1
division 15:22
document 3:10 6:11,14
  16:9 27:22 32:4
  35:15,22 37:22 48:8
documents 3:21 6:22
  7:2,14 31:18 32:1
  35:10 37:4,5,6,12,20
  38:5,12,19 48:5
doing 12:4 20:3 21:17
  22:11 28:18 31:20
  44:6,7 45:11
done 24:1 26:17 41:5
  41:14
down 18:12 19:12 39:1
duly 4:8
duties 45:6
D-E-P-O-S-I-T-I-O-N
  4:1
D.C 11:21 22:8,11
  31:20

## E

earliest 31:15
early 31:17
Edwin 25:3
effort 37:11
eight 40:2,10 43:10
either 13:6 24:6
element 20:6
email 3:13 16:1,3 28:7
  29:10 38:11

emailed 15:16,18
emails 49:1
employees 27:1
employment 3:18 8:17
  15:10 35:12,20 36:11
  36:14
end 13:22 15:17
engage 8:6
Enterprise 12:5
Esq 2:3,4,9,10
establish 8:5
et 1:8 4:17
even 11:16
ever 14:12 15:9 18:1
  31:18 32:3,6 33:16
  33:19 34:9 46:2,3,19
every 19:12
everything 17:9
exact 14:6 19:5
examination 1:17 4:11
  8:14 36:9 39:6
examined 4:8
exchange 28:7 38:11
  38:11 .
exhibit 3:9 27:20 28:2
  28:6 35:13,17,20
  36:2,12,17,18 48:6
  48:10
exhibits 35:10
existence 32:1
expect 38:14
expedite 7:15
expenses 46:16
experience 12:2
explain 45:18
E-X-H-I-B-I-T-S 3:6

F
fact 20:4,5 36:14
fair 38:12
faith 37:11
familiar 6:1
far 39:15 41:4
fax 2:6,13
Federal 5:17
feedback 16:21
Feeley 10:8,9
feeling 11:8
filed 6:7,11
find 16:15 19:20
fine 48:19
finish 5:7 38:19
first 9:3 11:4,11 13:4
  19:3 30:22 33:3,7
  42:3
folks 27:8
follows 4:9
follow-on 5:8

food 45:21
foregoing 36:5 39:2
  47:22
forget 29:16 43:11
forward 5:6 8:3
four 26:6,8 43:11,12
frame 19:15 42:1
Friday 8:3
from 3:14 8:9 16:19
  17:6 20:10 23:21,22
  26:18,19,20 27:9
  30:5 45:5,12 47:2
further 47:13

G
game 38:12
gave 9:16 16:21 39:11
  43:12
general 11:10
generally 19:14
getting 5:4 29:12 41:4
  46:1
Gilmore 40:11
give 43:5
given 32:3
go 4:4 5:6 7:10,12 9:10
  26:16,16 31:1 38:14
  45:15,18
going 5:6 7:11 8:2,6
  11:5 14:12 18:22
  28:21 31:1,8,20
  32:11 38:8 46:20
good 37:11 41:18
group 8:18 31:19 32:7
  38:1 43:4
guess 11:7 31:13

H
Hahn 2:3 4:3,12 5:3,12
  5:14 7:5,8,11,17 8:1
  8:5,12,15 27:19 28:5
  35:9,19 36:4,8,10
  37:16 38:10,21 39:5
  39:7 47:13,17,20
  48:3,12,16,20 49:2
hand 36:18,21
handle 21:2
hard 35:2,5
Harrison 1:19 2:4 5:14
having 4:7 49:6
head 16:4 27:10 40:8
Healthcare 40:5 43:10
hear 16:19
heard 11:12,16 44:16
hearing 12:7
helping 44:10
her 10:16,18 42:17
him 14:10 15:16,18,18

15:19 16:1,8,20
17:14,17 31:4 33:14
43:4
hire 27:9,14,18 44:9
hired 28:20 30:13
hires 25:18 26:15 27:7
  27:18 28:9 29:3,14
  30:3,5 44:3,5
hiring 14:19
Hodge 25:3
House 5:18
Hudson 12:18

I
idea 28:17
identification 28:3
  35:18 36:3 48:11
identify 48:4
individual 37:21
individuals 40:7,17
industry 11:20 12:2
information 29:3,4
  32:4
injunction 5:1 8:8
  37:17
interested 16:13
International 2:21
interview 32:12,15
  33:3,7 43:4
interviewed 19:21
interviewing 12:10,13
  12:17 16:14
invoices 21:7 22:5
invoicing 21:4 22:3
involved 23:12 26:4
  27:13,18 30:15,17,20
issue 38:4,6
issues 37:20
I-9s 26:19

J
J 2:20
Jan 41:8,9,12,13
job 9:1 12:14 17:2,2,3
  17:5 20:2,6 21:1
  44:18,21
jobs 10:15
John 2:20 29:11,17
  43:20,21
Johnstone 40:12
Joleen 2:4 7:12
Jon 18:2,9,11,16,22
  19:4 24:11,14 30:10
  30:14 31:1,8 33:20
  35:6 41:12,17 46:4
  46:10 47:10
Josh 12:9 15:10 17:13
  18:1,9,12 20:4,5,8

21:12,15,18 23:3
28:7 29:7 30:9,15
31:8 32:6 35:1 46:19
47:8
JOSHUA 1:8
July 5:17 9:5,18 22:12
  22:19 42:7,12,13
June 3:13 9:8,11,11,19
  9:20 13:22 15:17
  17:8,9,12 23:6 27:11
  27:15 28:10 31:3,17
  32:17
just 7:19 10:14,17,18
  10:19 11:7,9 12:9,21
  14:1,5,17 15:16,19
  17:13 19:14 20:19
  26:17 29:9 32:22
  35:9 36:12 37:16
  40:17,17 43:5 48:16

K
K 3:22
keep 38:8
key 20:6
Kimberly 1:15 3:3 4:6
  4:15
kind 7:21 46:14
know 13:22 14:1,3,5
  15:18 16:3 19:6
  20:14,18,21 23:17
  24:8,13,14,16,21,22
  25:9 26:21 27:12
  28:14,16,19,22 29:2
  29:3,4,5,6,20,20 30:2
  30:7,8,10,16 31:14
  32:20 33:15 34:2,4,4
  34:7 40:6,9,10,11
  42:5,5,18 43:5 45:14
  46:17
known 20:16
Kubicki 1:8 4:17 15:11
  18:2,9 28:7 46:20
  47:2,8
Kubicki's 21:12,15
  23:3

L
last 9:6,11 19:18 30:19
  31:3
late 5:4 31:17
later 19:9 42:8 48:13
law 1:18
lawsuit 6:2,8 46:16
least 15:2
leave 10:15 19:18
leaving 9:17 10:1,4,7
  19:16 46:3
Legal 12:18

legally 37:22
let 7:12 11:11 38:21
letter 17:8
letting 26:20
let's 48:15
Lewis 1:19 2:4 5:15
liable 15:20
like 15:3 26:19 29:22
  32:4 33:4,6 35:9
  36:12 38:16 42:4
liked 20:3,4
likely 14:9
limited 4:20 8:7
listing 37:1,4
litigation 38:2,15
little 5:4 29:17
LLC 1:5 5:16
LLP 1:20 2:4,10
long 11:19 19:14 32:16
  32:21
looked 6:10,14
looking 10:14,15 12:13
  15:1 16:10 19:19
lot 38:3
lunch 13:3

M
made 9:13 20:17 37:11
make 20:20 35:13,19
manage 26:10,13 44:10
many 23:11,15 25:7,16
  39:22
mark 2:10 6:18 27:19
marked 3:10 28:1
  35:16 36:1 48:6,9
matter 36:5 39:2 47:22
  49:5
Maw 21:9
may 7:2 11:13,13,17
  12:8 14:4 19:8,10
  31:17 32:17
maybe 28:22 36:21
  41:18
Mayer 21:9 22:7,13,17
  22:19 23:8,9 24:19
  25:6,8 39:9,19 45:4
Mayers 40:12
mean 12:13
meant 7:19
meet 18:1
meetings 18:8
mention 12:21
mentioned 12:9 13:2
met 5:16,20 24:6 44:15
  45:8
Michael 2:9 6:18
mid 27:11,15 28:10
might 7:14 18:6 33:13

34:6,9 40:14 41:14
46:5
**mind** 46:8
**minute** 26:20 38:17
**missing** 40:15
**month** 13:21
**Moring** 21:10 22:6
26:15,19 28:10 30:2
30:13
**Moring's** 26:1
**Mosier** 2:10 6:18 47:16
47:19 48:15,19
**most** 13:7 41:1 45:8
**mostly** 14:9 21:3
**motion** 4:21
**much** 8:13,22 49:2
**Mudhouse** 13:18
**Mullenholz** 2:20 29:11
29:18
**multiple** 19:21 24:16
28:20
**Mwine** 40:13

_____

**N**

**name** 4:13 5:14 29:16
39:14 40:3
**named** 40:17,18
**names** 12:21 23:19,21
24:5,22 25:2 39:12
40:6,10 45:2,5
**need** 29:3,5 38:6
**needed** 29:6 35:6 45:22
**needs** 26:17,21
**never** 11:16 16:21,22
34:2 44:15,16 45:16
45:19 46:17
**new** 32:7 33:19 35:3
**next** 13:5
**Nissan** 17:21
**none** 21:2 47:16
**non-compete** 16:16
**Nothing** 25:21
**notice** 1:18 3:16 9:16
9:16 35:11,13 36:19
36:22 37:2,8,12
**number** 29:1,1
**numbered** 48:13
**numbers** 29:12
**nutshell** 8:19
**NW** 1:20 2:5,11

_____

**O**

**oath** 36:13
**obviously** 37:19
**off** 4:10 16:4 36:4,6
39:1,3 40:8 47:21
48:1 49:3
**offer** 17:1,2,3,6,8

**office** 13:2,4,7,8,11
14:11 15:4,22 18:9
18:12,15 22:8,11
31:20 41:21
**offices** 1:19
**official** 17:7
**offs** 29:13
**Okay** 5:3 7:16 8:4,11
8:22 9:9,15 10:6,9,12
10:16,20 11:1,14,19
12:1,7,12 13:5,14
14:15 15:2 16:5,8,18
17:5,11,19 18:1 20:8
20:16,22 21:4,14,21
22:10,18 23:5,11,17
24:2,8 26:8,22 27:6
28:4 30:12 31:11
33:2,6 39:14,22 41:3
41:7,14 42:13,19
43:8,18 44:2,9 46:10
47:5,20
**Okun** 2:4 7:12 38:18
**one** 12:10 13:12 15:3
25:10 26:7 28:22
35:11 39:10 40:15
41:12,18 42:3 43:16
43:21 44:14
**ones** 6:11 27:9 30:5
38:13 40:18
**only** 19:11 25:9
**ons** 29:13
**operations** 8:21 15:21
**opinion** 45:11
**opportunities** 15:17
**opportunity** 18:13
**ordered** 26:21
**originally** 8:9
**other** 5:17 6:6,10 10:14
12:16 13:9 15:1
21:12,15 22:6 26:20
35:11 36:17 41:10,13
43:8 44:15 45:6
46:10 47:8
**others** 12:19,20,22
**out** 16:15 18:11,14,14
22:4 40:9 46:18
**outlined** 31:19
**over** 15:19 17:15 19:1
19:17 20:4 29:15
31:8 42:1 43:13
45:19
**O-F** 3:1

_____

**P**

**package** 33:21
**Page** 8:18 9:4,10 11:6
11:12 12:8 13:10
14:11,13,18 16:11

17:6,12 18:3,17 19:1
20:1 21:1 22:7 27:1
30:3 31:2,19 32:7
33:18,19 34:18,21
35:3,7 38:1 39:9 41:5
41:11 43:3 47:3,7
**Page's** 22:11
**paid** 27:10
**papers** 6:6
**paperwork** 26:18 41:5
41:15,17 43:6 45:16
**part** 44:18,21
**parties** 1:22
**party** 38:2
**Patterson** 25:3
**Pavilion** 17:22
**pay** 46:20
**paying** 47:3
**payroll** 23:22 25:22
26:1
**Penn** 26:14 28:13
**Pennsylvania** 1:20 2:5
2:11 30:4
**people** 14:19 20:10
25:13,16 28:12,18,19
29:20 30:5,12 39:10
39:22 41:15,20 43:5
43:9,10,12,22 44:12
45:3,8
**per** 27:16 29:13
**Perlin** 21:22
**Perlin's** 2:12
**person** 27:16 42:19
**personal** 16:2,3
**personally** 41:3 42:10
42:11
**phone** 15:19 17:15
**phonetic** 10:11
**physically** 17:19
**place** 8:9
**placed** 25:13 40:1,7
**placement** 23:12
**places** 12:10,16 19:22
**plaintiff** 1:6,18 2:2 3:8
4:22 5:15 28:1 35:16
36:1 48:9
**Plaintiff's** 27:20
**play** 16:17
**please** 4:14
**PO** 28:22 29:1
**point** 38:2
**Pomykala** 18:2,16
24:11,14 31:1 46:4
46:11 47:10
**position** 14:18,20 16:12
16:14
**possession** 37:21
**possible** 5:8

**preliminary** 4:22 8:7
37:17
**preparation** 6:15
**prepare** 32:4
**present** 1:22 2:17
**President** 2:21
**pretty** 8:22
**previously** 4:8
**prior** 15:18 19:1 23:22
46:3
**probably** 7:13 11:13
13:6
**process** 44:18,22
**processing** 45:5
**produce** 37:14
**produced** 37:6 48:18
**professional** 1:4 5:16
11:20
**project** 22:19 23:1,3,12
25:10,11 26:11,13
28:15 29:21 39:15,19
40:4 41:22 43:6,9,10
45:22
**projects** 2:21 25:4,7
28:21 45:4
**property** 38:1
**provide** 37:11
**provided** 37:7 48:5
**provision** 20:9
**pulled** 21:18
**pursuant** 1:18
**put** 14:20 29:10,11,17
**p.m** 1:21 3:13 4:2 5:9
36:6,7 39:3,4 48:1,2
49:6

_____

**Q**

**question** 11:9 15:17
41:18
**questions** 7:13 47:14
**quickly** 35:10
**quit** 9:9 14:4,5,8 18:19
**quitting** 19:1

_____

**R**

**rarely** 18:12
**read** 6:4,6 47:19
**really** 11:8,9 19:6
**recall** 11:1,15 12:7 13:6
13:13 14:15 15:2,14
18:5,7 19:5,7,11
32:19
**recalled** 4:7
**receive** 37:2
**recognize** 23:19,20
24:5 45:2
**recognized** 45:5
**record** 4:3,10,14 5:3

36:4,6,7,8 37:16 39:1
39:3,4,5 47:21 48:1,2
48:3,17 49:3
**recruit** 20:10
**recruited** 24:9,15
30:12
**recruiter** 15:22 35:6
41:10
**recruiters** 24:17
**recruiting** 25:9 30:17
30:20
**referred** 27:22 35:15
35:22 48:8
**Regarding** 39:8
**Regional** 2:20
**relate** 7:14 28:9
**relating** 26:5
**remember** 13:1,16,19
14:6 40:14
**Rent-a-Car** 12:5
**replacing** 35:2,6
**report** 29:17
**represent** 5:13,15
33:13
**representative** 12:6
**represented** 6:17
**respective** 1:22
**responsibility** 25:5,19
**responsible** 29:11
45:20,22
**responsive** 37:12
**rest** 29:18
**review** 15:20 38:5
**reviewing** 37:8
**right** 5:21 15:21 21:10
25:15 26:5,7 28:18
29:8 30:18 34:8
39:20 43:8
**Roger** 25:3
**room** 38:22
**Rowe** 21:9
**run** 26:10,12
**running** 22:19 43:13

_____

**S**

**Sagales** 40:13
**same** 9:1 18:20 21:17
27:9 28:12,15,16
34:20
**Sass** 40:13
**sat** 18:12
**saw** 17:9
**saying** 20:19
**says** 48:17
**scheduled** 37:19
**Schlanger** 2:9 5:11
6:18 7:7,9,16,19 8:4
8:11 38:9,20

Schnader 1:19 2:4 5:14
second 7:20
see 7:2 15:20 16:13
seen 31:18
Segal 1:19 2:4 5:15
send 16:8 21:7
Senior 2:20
service 12:6
set 7:5 8:8,10
Sheila 40:12
shop 13:15,16
shot 7:20,21
showed 22:11,14,15,16
sign 41:3 42:7,15
signature 47:18 49:6
signed 41:20 42:4,10
    42:17,19
signing 41:15
sign-up 42:6
Since 19:18
sit 30:1
small 26:20
Solomon 8:18 9:4,10
    11:5,12 12:8 13:10
    14:11,13,18 16:11
    17:6,12 18:3,16 19:1
    20:1,22 22:7,10
    26:22 30:3 31:2,19
    32:7 33:18,19 34:18
    34:21 35:3,7 38:1
    39:9 41:5,11 43:3
    47:3,7
some 7:13 8:2 37:19
    41:1,2,15,21,21
somebody 35:3
someone 42:22
something 29:5 48:14
sometimes 30:18
soon 10:15 38:7
soonest 42:9
sorry 9:20 36:18 43:11
sound 33:3
sounded 33:6
space 26:11,13,13,14
    28:13,21 30:3 41:22
    43:6
spaces 45:22
speak 17:11,14
specific 15:3 31:13
specifically 13:20
    28:22
SPG 45:11
spoke 17:9
spoken 19:6
staffing 1:5 5:16 11:20
    16:15
stage 37:17 38:15
start 11:11 23:5

started 5:4 11:22
state 4:13
STATES 1:1
stay 5:5
stayed 34:10
still 5:6 14:2 15:11 16:5
    18:4
strictly 30:21
subject 37:13
sue 46:5
Suite 1:20
supervisor 10:20
supplies 45:21
sure 11:8 38:9
swear 4:4
sworn 4:8

T
take 7:10 14:19 38:3,6
    38:16
taking 20:6 49:4
talk 31:7,11 33:12,16
    34:9 38:17 46:4
talked 16:12 31:4,16
    46:19 47:10
talking 14:10 17:17
    45:3
team 34:10,14,18,21
tell 8:6 9:22 10:3,6,12
    10:16 16:18 30:19
    32:6,10,13 33:9,20
telling 33:10,17 34:3
Templeman 41:8,9
testified 4:9
testimony 37:10
thank 5:11 7:8,17
    36:17,22 38:21 47:14
    47:20 49:2
their 23:19,20 24:5,22
    25:2 27:3 40:10 41:4
    45:5,19
thermostat 38:22
thing 21:17
things 37:19
think 13:17 14:22 35:1
    38:13 40:14 47:21
thinking 9:12 10:4,7
    19:15,17
though 32:21
three 18:3 31:7 34:8
    38:17 43:16,18 44:11
through 4:20 7:10,12
    27:10
time 11:4,12 13:4,5
    15:7 16:6,11 17:4
    18:15 19:3,15 27:3
    30:19,22 32:21 33:17
    35:2,5 38:3 42:1

44:19,22 45:5
title 43:11
today 4:21 6:17,22
    30:1 36:13 37:6,10
together 18:2 29:17
    31:9 34:9,10
told 9:17 14:17 47:7
top 16:4 40:8
transaction 27:14
trying 37:18
turned 39:1
two 23:16 24:8 25:8
    39:10 40:15 41:19
    43:9 44:15
type 45:21
T-A-B-L-E 3:1

U
ultimately 17:1
under 36:13
understand 33:2
understanding 5:1
    47:1
understood 31:1 38:9
unfortunately 19:13
United 1:1 40:5 43:10
unofficial 17:8
usually 45:17

V
v 1:7 4:17
vacation 17:18
value 34:14,17,20
very 8:13 18:12 37:18
    49:2
Vice 2:20

W
W 2:3,10
waive 47:17
waived 49:7
want 7:9,21 8:5 14:20
    38:3 47:17 48:12
wanted 16:15 33:20
    48:4,16
Washington 1:21 2:5
    2:12
wasn't 27:17 32:22
    34:12
Water 39:16,17 43:9
way 48:17
Wednesday 1:12
week 9:11 29:13 31:3
weekly 29:10
weeks 32:22
Well 9:16 19:14 22:14
    25:17,19 29:6 34:11
    42:3 44:4

went 20:4,5 29:15,22
    32:14 36:6,6 39:3,3
    46:5 48:1,1
were 1:21 6:7 9:1,17
    10:1,4,7 12:4,20,22
    13:2,3,8 14:10,19
    15:4,6,11 17:16,16
    17:19 18:4 19:15
    20:8,13 22:13 23:7
    24:9,18,19 27:13
    29:7,20 30:5,13
    39:10 40:16,19 41:20
    43:12 44:11,12
weren't 13:10
we'll 35:13,19 38:21
    47:19
we're 7:20 45:3 47:21
    49:3
We've 48:6
while 15:11 18:3 24:19
    44:12
Wise 40:13 42:14,20
witness 3:2 4:4,7 28:4
    38:8 47:15 48:22
work 8:18 9:10 11:5
    14:13 21:11,14 22:7
    22:10 31:19 46:5
worked 12:5 16:11
    24:3,19 40:18 42:22
    43:2 44:12 46:17
working 11:20 14:2
    15:6,11 16:5 18:3,4
    22:5,13,17 25:17
    26:16 33:18 40:19
works 18:16
worried 46:4
wouldn't 22:5
wrestling 38:14
write 19:12
writing 17:10

Y
year 19:17,18 20:11
York 32:8 33:19

$
$1,000 27:10,16

1
1 1:12 3:13 27:20 28:2
    28:6
1:07-CV-01281-RJL
    1:5
12 43:13
1201 2:11 26:14 28:13
    28:18 30:4
15 3:13 11:22

2
2 3:16 35:13,17 36:18
2nd 9:5 22:12,20 42:7
2:40 3:13
2:59 4:2
20004-2401 2:12
20006-1825 2:5
2001 1:20 2:5
2005 11:22
2007 1:12 3:13 9:20
202 2:6,6,12,13
24 7:20
25th 5:17
27 3:13
27th 17:9,12
29 9:20
29th 9:8,18 23:6

3
3 3:18 35:20 36:2,12
3:00 1:21
3:30 5:9
3:31 36:6
3:32 36:7
3:35 39:3
3:40 39:4
3:51 48:1,2
3:52 49:6
30th 17:8
300 1:20
35 3:16,18

4
4 3:3,21 48:6,10
419-3454 2:6
419-4242 2:6
42 26:2 27:15
48 3:21

6
6th 42:12,13
662-5459 2:12

7
778-5459 2:13

# Transcript of:**Andrew Perlin**

**Date:** August 1, 2007
**Volume:**

**Case:** Ajilon Staffing v. Kubicki et al.

Neal R. Gross & Co., Inc.
Phone: 202-234-4433
Fax: 202-387-7330
Email: info@nealrgross.com
Internet: www.nealrgross.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
|------------------------+
                         |
AJILON PROFESSIONAL      |
STAFFING, LLC.           |  Civil Action No.
                         |  1:07-CV-01281-RJL
        Plaintiff        |
                         |
                         |
v                        |
                         |
                         |
JOSHUA KUBICKI, et al.   |
                         |
                         |
        Defendants.      |
|------------------------+
```

Wednesday,

August 1, 2007

Deposition of:

ANDREW PERLIN

called for examination by counsel for the plaintiff, pursuant to notice, at the law offices of Schnader, Harrison, Segal & Lewis, LLP, 2001 Pennsylvania Avenue, NW, Suite 300, Washington, DC, at 4:00 p.m., when were present on behalf of the respective parties:

2

Page 2

APPEARANCES:

    On Behalf of the Plaintiff:
    BENJAMIN W. HAHN, Esq.
    JOLEEN OKUN, Esq.
Of:  Schnader Harrison Segal & Lewis, LLP
    2001 Pennsylvania Avenue, NW
    Washington, DC 20006-1825
    (202) 419-4242
    (202) 419-3454 (fax)

    On Behalf of the Defendants:
    MICHAEL A. SCHLANGER, Esq.
    MARK W. MOSIER, Esq.
Of:  Covington & Burling, LLP
    1201 Pennsylvania Avenue, NW
    Washington, DC 20004-2401
    (202) 662-5459
    (202) 778-5459 (fax)

ALSO PRESENT:

    JOHN J. MULLENHOLZ, Senior Regional Vice

    President, International Projects &
    Consulting, Ajilon

---

Page 3

T-A-B-L-E O-F C-O-N-T-E-N-T-S

Witness          Direct

Andrew Perlin    8

E-X-H-I-B-I-T-S

Plaintiff
Exhibit
Perlin No.  Document         Marked

1    Subpoena       5

2    Consolidation of documents    8
    by A. Perlin

---

Page 4

1    D-E-P-O-S-I-T-I-O-N
2                4:15 p.m.
3        MR. HAHN:  We're on the record.
4    Okay.  Are we ready to go?  If you could swear
5    the witness.
6    Whereupon,
7            ANDREW PERLIN
8    was recalled as a witness, and having been
9    previously duly sworn, was examined and
10   testified as follows:
11       MR. HAHN:  Would you state your
12   name for the record please?
13       THE WITNESS:  Andrew J. Perlin.
14       MR. HAHN:  Mr. Perlin, my name is
15   Benjamin W. Hahn.  I'm a partner in Schnader
16   Harrison Segal & Lewis.  We are counsel for
17   the Plaintiff in the lawsuit that's coming in
18   the United States District Court for the
19   District of Columbia, Ajilon Professional
20   Staffing, LLC v. Joshua Kubicki, et al. and in
21   the room today with me is my colleague at
22   Schnader Harrison Joleen Okun and next to her

---

Page 5

1    is a representative of the Plaintiff, Ajilon
2    Professional Staffing, John Mullenholz and
3    opposite me is counsel for the Defendants,
4    Michael Schlanger and Mark Mosier of Covington
5    & Burling.
6        And you are here today pursuant to
7    a subpoena that I had issued by the court for
8    your deposition.  Your actual appearance was
9    worked out with counsel by agreement, but my
10   understanding is that you are here because you
11   have been subpoenaed to be here.  Is that
12   correct?
13       THE WITNESS:  Yes.
14       MR. HAHN:  And I'd like to mark as
15   Exhibit 1 to your deposition, we'll mark this
16   Perlin 1.  This is a copy of the subpoena that
17   was served.
18           (Whereupon, the document
19           referred to was marked
20           as Perlin Exhibit No. 1
21           for identification.)
22       MR. HAHN:  I did it electronically

---

3

Page 6

1   to Mr. Mosier.  Just so you know, this is
2   something that's fairly common where people
3   are trying to do things on an expedited basis
4   and there is not an affirmative issue about
5   the witness appearing.  It's just that the
6   witness wants to have a subpoena so that the
7   testimony is under the compulsion of the court
8   order rather than volunteered.
9           THE WITNESS:  All right.
10          MR. HAHN:  Have you seen a copy of
11  that subpoena before?
12          THE WITNESS:  I don't know if this
13  is -- I saw this, this page, and I don't think
14  I saw the first page.
15          MR. HAHN:  All right.  The part
16  that's a notice of deposition that has a
17  listing of documents.
18          THE WITNESS:  Yes.
19          MR. HAHN:  You said you've seen
20  that.
21          THE WITNESS:  I did see that page.
22          MR. HAHN:  Just for the record,

Page 7

1   there isn't any great need for you to actually
2   see the physical subpoena.  Again, it was with
3   the consent of counsel for the Defendants that
4   I sent that with the understanding that you
5   were talking with them.
6           I chose not to talk directly with
7   you.  I wanted your deposition testimony and
8   they arranged.  But I did want to make sure
9   that you had seen the deposition notice and
10  the document listing there.  You did have a
11  chance in advance of the subpoena to go
12  through that list?
13          THE WITNESS:  Exhibit A, yes.
14          MR. HAHN:  Okay.  That's the last
15  page of the Deposition Exhibit 1 and it's
16  called Exhibit A.  That's a list of documents.
17          THE WITNESS:  Yes.
18          MR. HAHN:  And did you go through
19  that list and attempt to gather some
20  documents?
21          THE WITNESS:  Yes sir.
22          MR. HAHN:  And let's mark this as

Page 8

1   Perlin Exhibit 2.
2               (Whereupon, the document
3               referred to was marked
4               as Perlin Exhibit No. 2
5               for identification.)
6           MR. HAHN:  And Perlin 2 is a
7   compilation of documents with a cover sheet
8   that says Andrew Perlin and then the following
9   pages are number AP-00001 through 00048 and if
10  you could just look at this and tell me
11  whether these are the documents that you're
12  producing today in response to that subpoena.
13          THE WITNESS:  Yes.
14          MR. HAHN:  Very good.  Thank you.
15  And I understand that you did not have a lot
16  of time to respond to the subpoena.  I
17  appreciate your cooperation in putting
18  together what you brought today.
19          THE WITNESS:  Okay.
20          DIRECT EXAMINATION
21          BY MR. HAHN:
22  Q    Mr. Perlin, where do you work?

Page 9

1   **A    I work for Solomon Page Group.**
2   Q    And what is your position there?
3   **A    Director of Business Development.**
4   Q    And what are your general duties
5   as Director of Business Development?
6   **A    Developing new business for the**
7   **firm, not to be so vague, but it's just sales,**
8   **marketing and business development.**
9   Q    And is that in any particular
10  discipline or industry?
11  **A    In the legal community here in**
12  **D.C.**
13  Q    Does Solomon Page place or -- Is
14  Solomon Page active in industries other than
15  legal?
16  **A    Yes.**
17  Q    Okay.  What other industries?
18  **A    Let see.  They deal with like Wall**
19  **Street financial folks up in New York, I think**
20  **healthcare up in New York, IT, accountants.**
21  **I'm sure there are more, but I don't know off**
22  **the top of my head all of them.**

**Page 10**

1   Q    What is your territory or
2   jurisdiction?
3       **A    I typically work in Washington,**
4   **D.C. I do have some -- I've done some trips**
5   **to New York, to Houston and to Atlanta again**
6   **under the business development.**
7       Q    And I believe in your documents
8   that you produced beginning at page 32, there
9   is a 2007 marketing plan for Andrew J. Perlin.
10  Is -- Would this give us some idea of what it
11  is that you are doing 2007?
12      **A    Yes sir.**
13      Q    Good.  And you prepared this
14  document.  Is that correct?
15      **A    Correct.**
16      Q    And is accurate as far as you're
17  concerned?  You would stick by what you put in
18  this.
19      **A    Yes.**
20      Q    Okay.  Good.  Then that means I'm
21  not going to spend a lot of time asking you
22  about what you're doing.  How many employees

**Page 11**

1   are there?  Well, how many full-time employees
2   does Solomon Page have in the legal group
3   today?
4       **A    As of today?**
5       Q    Yes.
6       **A    Nine.**
7       Q    Nine and can you tell me who they
8   are?
9       **A    Sure.  Myself, Jan Templeman, and**
10  **then of course Josh Kubicki, Kym --**
11      Q    Danowski.
12      **A    Thank you.  Jon Pomykala, Jimmy**
13  **Whitaker or James Whitaker, Chelsea Silverman**
14  **and Richard Zakin.  Oh, I'm sorry.  There's**
15  **one more, Bryan.  I can't remember Bryan's**
16  **last name.**
17      Q    Okay.  Where does Chelsea
18  Silverman work?
19      **A    Chelsea is out of New York.**
20      Q    Okay, and Richard Zakin?
21      **A    New York.**
22      Q    And Bryan?

**Page 12**

1       **A    Bryan is here in D.C.**
2       Q    Okay.
3       **A    I cannot remember his last name.**
4       Q    Blanking on his last name.
5       **A    I'm blanking on his last name.**
6       Q    Okay.  And James Whitaker?
7       **A    New York.**
8       Q    And Jan Templeman?
9       **A    Here in D.C.**
10      Q    Okay.  Prior to going to work for
11  Solomon Page, where did you work?
12      **A    I was StaffWise Ajilon.**
13      Q    And what was your job at StaffWise
14  Ajilon?
15      **A    Director of Business Development.**
16      Q    And I believe there is some
17  correspondence.  There are some documents in
18  the documents that you produced that show that
19  at some point you left and went to Solomon
20  Page and you got a letter from Ajilon about
21  that.
22      **A    Yes.**

**Page 13**

1       Q    Did you respond to that letter?
2       **A    No.  I don't recall there was a**
3   **reason to respond to it, but I didn't respond**
4   **to it.  No.**
5       Q    Okay.  Did you have any further
6   contact from Ajilon?
7       **A    No.**
8       Q    At the time that you left Ajilon,
9   did you tell anyone at Ajilon where you were
10  going to work?
11      **A    I told -- No, I don't believe I**
12  **told anybody.**
13      Q    Okay.  After you left Ajilon, did
14  you make any attempt to contact the clients
15  that you had dealt with while you were at
16  Ajilon?
17      **A    My personal clients?**
18      Q    Well, any client of Ajilon.
19      **A    Yes.**
20      Q    While you were there, did you make
21  --
22      **A    Yes.**

5

Page 14

1    Q    Okay.  Who did you attempt to
2  contact?
3    A    Williams & Connolly.  Zuckerman
4  Spaeder.  Clifford Chance.  If I might ask a
5  question.  Is it more initially or throughout
6  the whole time I've been there?
7    Q    What was the duration of the
8  restrictive covenant in your agreement with
9  Alijon StaffWise when you left?
10    A    It was six months.
11    Q    Okay.  During that sixth month
12  period is what I'm talking about.  Thank you.
13  You may ask that kind of a question.  Yes, I'm
14  focusing on the six months from when you left
15  Ajilon StaffWise going forward.
16    A    There are a lot of clients or a
17  lot of prospects in D.C. that I have
18  contacted.  I don't know them all off the top
19  of my head.  I will say that I made a very
20  good effort not to contact the clients that
21  StaffWise Ajilon -- that to my knowledge of
22  where StaffWise had the bulk of their

Page 15

1  business.  For example, one of my clients
2  while I was at StaffWise was McKee Nelson and
3  I haven't contacted McKee Nelson.
4    Q    Ever?
5    A    Not in that six months.
6    Q    Okay.  Not in that six months.
7  Okay.  Did you do that for a reason?
8    A    Yes.  I mean, I just didn't think
9  it was right.  I was bound, I guess, by the
10  six months and I knew where their business was
11  and I just wanted to make sure that my
12  business was someplace else.
13    Q    This is a completely new question.
14  All right?
15    A    Okay.
16    Q    During that six month period, did
17  you, in fact, do any business on behalf of
18  Solomon Page with former clients of Ajilon?
19    A    I would have to say yes.
20    Q    Okay.  Who do you recall doing
21  business with?
22    A    Williams & Connolly.

Page 16

1    Q    And how much business did you do
2  with Williams & Connolly?
3    A    Not much.  A few temps.  Maybe two
4  temps in this first six months.  And then --
5  See.  I don't know where Ajilon -- Because I
6  wasn't really with Ajilon very long, I don't
7  know where their clients were.  My knowledge
8  is more with StaffWise.
9    Q    Okay.  But Williams & Connolly was
10  a StaffWise client.  Correct?
11    A    Yes.
12    Q    Okay.  And you were hired by Lange
13  Carter at StaffWise.  Correct?
14    A    Yes.
15    Q    And when you left StaffWise or
16  when you left Ajilon, what did you do as far
17  as any kind of transition of work?  Did you
18  just leave one day and just say, "I'm
19  leaving"?
20    A    I told Lange that I was leaving
21  and she and I had a conversation about the
22  whole situation and then she had asked me to

Page 17

1  come back the next day to tell John that I was
2  leaving and that was it.
3    Q    Did you have any active projects
4  that you were working on at the time?
5    A    Not really.
6    Q    Did you have anything in the
7  pipeline that you then tried to take over to
8  Solomon Page?
9    A    The only thing that was in the
10  works, it was this Dickstein deal.  It was
11  already -- I think Ajilon had already had some
12  of it and I had a phone call from one of the
13  folks over there at Dickstein before I left.
14  But I didn't do anything with it once I left.
15    Q    Okay.  When did you first find out
16  that Josh Kubicki and Jon Pomykala and Kym
17  Danowski were going to be employed at Solomon
18  Page?
19    A    I found out that Josh Kubicki was
20  coming over to Solomon Page.  It was a Monday
21  evening via email and it was, I don't know the
22  date off the top of my head, but it was the

Page 18

1 week before the Fourth of July. So it was in
2 June. I don't know that date. It was that
3 Monday. The next day Josh came to my office
4 here in town and he had a meeting with myself
5 and Jan Templeman and that's when he told us
6 that Kym and Jon were coming with him.
7     Q   Okay. So again, the Monday email,
8 if we look at a calendar, that's the Monday
9 before the week that the Fourth of July was
10 in.
11     A   Yes, the Fourth of July was on a
12 Wednesday. It was that week before Monday.
13 I don't remember the date. I think it's the
14 20 something.
15     Q   Okay, and the next day you
16 actually met with Josh.
17     A   Yes, that Tuesday.
18     Q   And he said to you that Kym and
19 Jon are both coming as well.
20     A   Yes.
21     Q   It wasn't he hoped they will or
22 he's made an offer to them. It's they are

Page 19

1 coming or --
2     A   As I understood it, they were
3 coming. But I don't know.
4     Q   Okay. That was your understanding
5 from what he said.
6     A   Right.
7     Q   Anything else that you recall of
8 that discussion?
9     A   Just basically that he was
10 bringing in this gentleman, Bryan, over who
11 again I can't remember his last name and that
12 he was now in charge of the whole legal
13 division and he was going to be working here
14 out of D.C. and there was so much going on at
15 the time as far as this big whirlwind of -- I
16 mean, everything just kind of hit all at once
17 that myself and my colleague, Jan, we didn't
18 really know what to do. So it wasn't exactly
19 a long meeting. We were just kind of sitting
20 back just kind of taking it all in. But that
21 was pretty much the gist of the meeting I
22 guess.

Page 20

1     Q   Did you get any indication from
2 New York from Headquarters about any of this?
3     A   No. The email was the first
4 notification that I got and that came from the
5 owner of the company, Lloyd Solomon.
6     Q   Who do you report to now?
7     A   Josh.
8     Q   And what is Josh's geographic
9 territory? Nationwide?
10     A   To be perfectly frank, we haven't
11 really had that conversation. I don't know
12 exactly what he's going to be doing. I'm
13 assuming it's D.C. and wherever else his
14 client base is at this point. But we haven't
15 really sat down and had a chance to map that
16 kind of thing out.
17     Q   When did you produce your 2007
18 marketing plan?
19     A   Just a guess, it's sometime -- I'm
20 going to put it around March.
21     Q   Okay.
22     A   That's a guess.

Page 21

1     Q   Do you know whether Josh has put
2 together a marketing plan?
3     A   If he has, I haven't seen it.
4     Q   Okay. Do you know whether he's
5 seen yours?
6     A   I don't know that. I don't know.
7 I haven't shown it to him.
8     Q   What clients are being served by
9 Solomon Page Group out of D.C. right now in
10 the legal function?
11     A   Do you mean -- I'm sorry. Just to
12 clarify, where we have people billing or just
13 who we've billed? I'm not quite sure what
14 you're asking.
15     Q   Well, let's start with active
16 placements right now.
17     A   Okay. Williams & Connolly,
18 Crowell & Moring and Mayer Brown. That's
19 active.
20     Q   How many are at Williams &
21 Connolly?
22     A   Just one.

Page 22

1      Q      And internally in terms of for
2  commission sales or something like that, is
3  the Williams & Connolly your account?
4      A      Yes.
5      Q      And the other two, whose accounts
6  are those?
7      A      I'm going to assume their Josh's.
8      Q      Okay.
9      A      I didn't bring them and I haven't
10  had any contact with them since he's been
11  here. So I'm going to assume they're his.
12      Q      When did -- So prior to Josh
13  showing up, those were not accounts that the
14  Solomon Page legal was doing anything with?
15      A      Correct. I mean, we were
16  prospecting them, but there was no business
17  generated out of those two firms.
18      Q      And are you familiar with some
19  space that's being, I guess, leased by Solomon
20  Page at 1201 Pennsylvania?
21      A      Yes.
22      Q      Is that under lease with Solomon

Page 23

1  Page?
2      A      I don't know. I'm not privy to
3  that information. I don't know. I don't know
4  how Josh or how the deal went down.
5      Q      Do you know when that space was
6  set up?
7      A      Let's see. Was that the week of
8  the Fourth of July? I would probably put it
9  the week after the Fourth. I was on vacation
10  the week of the Fourth. I don't know exactly
11  what happened that week, but when I got back,
12  they pretty much had everything up and
13  running.
14      Q      It was already -- You were in it
15  when you got back.
16      A      I'm not in it.
17      Q      No, no. But Solomon Page was --
18      A      Yes, yes. Correct.
19      Q      Thank you. Solomon Page was in it
20  when you got back.
21      A      Yes.
22      Q      And what day did you get back?

Page 24

1      A      That Tuesday after the Fourth.
2  The Fourth was on a Wednesday. So it was the
3  next Tuesday. I don't know the date.
4      Q      Have you ever been involved in
5  negotiating space with a landlord like that?
6      A      No.
7      Q      Do you know what the lead time is?
8      A      I'm sorry.
9      Q      Do you know what kind of lead time
10  there is to get space?
11      A      No, I have no idea.
12      Q      And you don't know what the terms
13  of the lease or whatever it is are.
14      A      No.
15      Q      Okay. Before Josh Kubicki showed
16  up, I'm going to say, the end of June, the
17  third week of June, the fourth, who did you
18  report to?
19      A      Richard Zakin.
20      Q      And what was Richard Zakin's
21  position?
22      A      He was the Managing Director of

Page 25

1  the Legal Temp Division for Solomon Page
2  Group.
3      Q      And does he still work for Solomon
4  Page?
5      A      Yes.
6      Q      And what does he do now?
7      A      I don't know. I guess he's just
8  sales and marketing.
9      Q      So did Josh take his spot?
10      A      Yes.
11      Q      Have you talked with Mr. Zakin
12  about what happened with Josh coming over?
13      A      Very briefly. He called me --
14  Let's see. That email came out Tuesday, I'm
15  sorry, Monday. He called me, I guess, Tuesday
16  morning just to see how everyone was doing and
17  -- But that was it. I mean, nothing more than
18  that.
19      Q      You haven't met with him recently.
20      A      Richard?
21      Q      Yes.
22      A      No.

8

Page 26

1    Q    Okay. How often do you see Josh
2  Kubicki?
3    A    Not very often. Prior to this
4  week, I probably only ran into him a couple of
5  times and this week I've seen him twice.
6    Q    Are you physically officed in the
7  same space?
8    A    He has an office in the space
9  where I am. We're like around the corner from
10  one another. So I don't really see him a lot
11  and then he does spend a lot of his time at
12  the 1201 space and I have no reason to be
13  there. So I just -- I'm not usually there.
14    Q    Have you been over there?
15    A    I've been there once or twice.
16    Q    I mean, does he have a place at
17  the 1201 space that's an enclosed office?
18    A    I mean, it's an office. I don't
19  know that it's enclosed necessarily. But
20  yeah.
21    Q    I mean, it has a door on it.
22    A    Yes, I guess.

Page 27

1    Q    Okay. Does he have a telephone
2  that rings there?
3    A    That I don't know.
4    Q    Okay.
5    A    The only number I have for Josh
6  would be his cell phone or his extension in
7  the suite that I'm in.
8    Q    Okay.
9      (Off the record comments.)
10      BY MR. HAHN:
11    Q    Prior to Kym Danowski coming over
12  to Solomon Page, who was doing the functions
13  that Kym does now?
14    A    Jimmy Whitaker or James Whitaker.
15    Q    Okay. So you were doing that out
16  of New York.
17    A    Yes.
18    Q    Does he still do that for the New
19  York office or does Kym do it for everybody?
20    A    It's so new. I'm not really sure
21  how the whole thing is unfolding at this
22  point. Jimmy is -- Whatever Jimmy is doing,

Page 28

1  it's New York and I don't know if Kym is doing
2  just D.C. or doing both. I don't know.
3    Q    What's happening with Williams &
4  Connolly?
5    A    Not much.
6    Q    But is Whitaker still doing that
7  or is Danowski doing that?
8    A    I'm sorry. No, I get the email,
9  the time sheet. It's emailed to me and I send
10  it to Jimmy and Jimmy takes care of it from
11  there. But again, it's been so new that I
12  don't know exactly how the new procedures are
13  going to unfold and who I'm supposed to hand
14  that to or what.
15    Q    But when Kubicki came over, he
16  didn't just slot the work that he was setting
17  up into the existing framework. He set up his
18  own new framework.
19    A    I mean, Kym handles everything
20  that Josh brought in and right now, the little
21  that I have I still send it to Jimmy in New
22  York. As far as who is doing, like what role

Page 29

1  Jimmy now plays in comparison to Kym, I don't
2  know. I don't know what Josh has in mind or
3  what he has set out.
4    Q    Okay. Would it -- Is there any way
5  that you're aware of that the work that Josh
6  has brought over is not being run as a
7  separate branch? Is there any aspect of the
8  work that you're aware of that has been
9  integrated into the Solomon Page process that
10  existed prior to his coming?
11    A    I would think it's integrated, but
12  I don't know the framework of it. I mean, I
13  know Kym comes in and she handles like all the
14  time sheets and all that stuff and I guess at
15  some point it has to go to New York because
16  that's where the corporate office is and
17  that's how things get processed. Is Jimmy
18  involved in any of that? I don't know.
19    Q    Okay. Does Jon Pomykala do any
20  recruiting for you?
21    A    No. Not yet.
22    Q    So he's only recruiting for Josh.

9

Page 30

1    A    Yes.
2    Q    And does Jan do anything for Josh?
3    A    Yes.
4    Q    What does Jan do for Josh?
5    A    **Jan pretty much supplements**
6    **whatever Jon's recruiting efforts or**
7    **supplements his recruiting efforts.**
8    Q    Okay, and what's the commission
9    split on that?  Is it the same with Jon and
10   Jan on anything Josh is doing?
11   A    **Yes, I believe so.**
12   Q    Okay.  But you don't.
13   A    **I don't know for a fact.**
14   Q    Do you know if what they're doing
15   with Josh is the same as what Jan does with
16   you?
17   A    **I would think.  I would think it's**
18   **the same.**
19   Q    You sound like you don't have an
20   affirmative knowledge of --
21   A    **Well, again, I don't know exactly**
22   **what they're doing just because even though**

Page 31

1    **we're in the same suite, they are around the**
2    **corner from me.  I just don't interact with**
3    **Kym or Jon or Josh all that much throughout**
4    **the day.  The only person that I see day in**
5    **and day out would be Jan because she and I**
6    **share an office.  So if any of my work comes**
7    **in, that goes directly to Jan and she works on**
8    **it and we have a relationship that way.  When**
9    **Josh brought these two accounts in, Jan just**
10   **picked up the slack wherever Jon couldn't.**
11   Q    Have you talked with Josh at all
12   about what his plans are?
13   A    **I mean, a little.  We haven't had**
14   **a real formal meeting yet.  In fact, we had**
15   **our first branch meeting yesterday, but we**
16   **didn't really get into specifics as far as**
17   **like what he expects out of me or what his**
18   **long-term plans are.  I think that's going to**
19   **be coming down the pike, I would think, but**
20   **nothing yet.**
21   Q    Have you signed any kind of a
22   restrictive covenant with Solomon Page?

Page 32

1    A    No.
2    Q    No.  I'm looking at -- Well,
3    that's the unsigned version.  I think there's
4    a signed version of an employment agreement
5    here.
6    A    Yes.
7    Q    Is that correct?
8    A    Yes.
9        MR. HAHN:  I want to make sure I
10   look at that.  Actually, I'm going to let you
11   find the signed version of your employment
12   agreement.  There seem to be several non-
13   signed ones and I'm looking at a provision
14   that appears to be either on the last page or
15   toward the end regarding indemnification.  So
16   if you could just point us to the page in
17   there when you find it.
18       MR. McINTOSH:  Page seven.
19       THE WITNESS:  Yes, it's early.
20   Page four.  Oh yes, seven.
21       BY MR. HAHN:
22   Q    Okay.  So page seven is your

Page 33

1    actual signature -- Okay.
2    A    Yes sir.
3    Q    So that's your existing employment
4    agreement with Solomon Page.
5    A    Yes sir.
6    Q    Do you know whether this
7    indemnification provision is a standard
8    provision in the agreements between Solomon
9    Page and its employees?
10   A    **Standard for all employees?**
11   Q    Yes.
12   A    **I don't know that.  I do know --**
13   **Of course, mine and I believe Richard Zakin**
14   **got an indemnification clause in his contract.**
15   **I have no idea what the wording of it is**
16   **though.**
17   Q    Do you know where Richard Zakin
18   came from?  Did he come from another --
19   A    **He did.  I'm assuming a staffing**
20   **company.  I want to say it's called Strategic,**
21   **but I don't -- I think that's what it was**
22   **called.**

Page 34

1    Q    Okay, and when you were hired by
2  Solomon Page you gave Solomon Page a copy of
3  your existing employment agreement that had a
4  restrictive covenant. Correct?
5    A    Yes.
6    Q    Did anyone at Solomon Page at the
7  time you were hired tell you that they did not
8  want you trying to hire StaffWise or Ajilon
9  employees, meaning staff employees that, say,
10  Gail Grabow or someone like that that you knew
11  from StaffWise to come over to Solomon Page?
12    **A    Yes, Lloyd Solomon told me that**
13  **directly, almost verbatim. He said there's no**
14  **reason to do that. He said if we're going to**
15  **hire some people, we're going to hire some**
16  **other people.**
17    Q    Okay.
18    **A    He made it very clear that he**
19  **didn't want me to talk to anybody about that.**
20    Q    Did he tell you why he didn't want
21  you to do that?
22    **A    He just said we're not in business**

Page 35

1  **to put other companies out of business. We**
2  **just want to grow our business and we can find**
3  **good people without going back to StaffWise.**
4    Q    Okay. Did you negotiate your
5  agreement directly with Lloyd Solomon?
6    **A    My indemnification agreement?**
7    Q    No, the employment relationship.
8  Did you meet with him?
9    **A    Oh yes.**
10    Q    Did you meet with anyone else as
11  part of the negotiation?
12    **A    Yes, I met with Richard Zakin and**
13  **then Bernard Schneider who was the recruiter.**
14    Q    And for whom, did Bernard
15  Schneider work?
16    **A    Solomon Page Group.**
17    Q    Okay. At the time that you joined
18  Solomon Page in D.C., did Solomon Page have
19  any active accounts in D.C.?
20    **A    Active, no. They had a presence,**
21  **a small presence, but I don't believe anybody**
22  **was billing at the time.**

Page 36

1    Q    Who was working in D.C. on the
2  side of client sales, if you will?
3    **A    Richard Zakin and Chelsea**
4  **Silverman were working out of New York, but**
5  **they were coming to D.C., I guess, to do**
6  **whatever client relationship they needed to**
7  **do.**
8    Q    Was there anyone who was
9  physically officed in D.C. when you came over?
10    **A    No.**
11    Q    Who was doing the recruiting for
12  D.C. when you came over?
13    **A    Initially, it was Chelsea**
14  **Silverman.**
15    Q    Okay.
16    **A    I helped out when I could and then**
17  **we hired Jan.**
18    MR. HAHN: Okay. I'd like to take
19  just a five minute break at this point. Off
20  the record.
21    (Whereupon, at 4:48 p.m., the
22  above-entitled matter recessed and reconvened

Page 37

1  at 5:01 p.m. the same day.)
2    MR. HAHN: Back on the record.
3  All right. Mr. Perlin, those were all the
4  questions I have. Thank you very much for
5  your cooperation today.
6    MR. McINTOSH: I have no questions
7  for you.
8    MR. HAHN: You can review your
9  deposition testimony for accuracy and then
10  sign it or you can waive reviewing and
11  signature. If you do choose to review it, you
12  don't get to change your answers. All you're
13  looking at is whether the court reporter has
14  accurately taken down what you understood the
15  questions and answers to be. But it is your
16  right to look at the testimony before you
17  officially sign off on it. If you want to
18  review it before signing it and finalizing it,
19  we'll make it available to you. So would you
20  rather waive or do you want to review?
21    THE WITNESS: I'll review.
22    MR. HAHN: Okay. Counsel, just

11

Page 38

1  while we're on the record, given our time
2  frame, can I have your agreement --
3        MR. McINTOSH:  Yes.
4        MR. HAHN:  -- that unless there is
5  some glaring discrepancy, we will use the
6  unofficial transcript for purposes of the
7  hearing on Monday?
8        MR. McINTOSH:  I already answered
9  that in the middle of the question.
10        MR. HAHN:  Okay.
11        MR. McINTOSH:  Of course.
12        MR. HAHN:  You weren't under oath
13  though.
14        MR. McINTOSH:  No, I understand.
15        MR. HAHN:  Okay.  Thank you,
16  gentlemen and we'll see you again tomorrow.
17  Off the record.
18      (Whereupon, the taking of deposition in
19      the above-entitled matter was concluded
20      at 5:02 p.m., signature having NOT been
21      waived.)
22

**A**

**about** 6:4 10:22 12:20
  14:12 16:21 20:2
  25:12 31:12 34:19
**above-entitled** 36:22
  38:19
**account** 22:3
**accountants** 9:20
**accounts** 22:5,13 31:9
  35:19
**accuracy** 37:9
**accurate** 10:16
**accurately** 37:14
**Action** 1:5
**active** 9:14 17:3 21:15
  21:19 35:19,20
**actual** 5:8 33:1
**actually** 7:1 18:16
  32:10
**advance** 7:11
**affirmative** 6:4 30:20
**after** 13:13 23:9 24:1
**again** 7:2 10:5 18:7
  19:11 28:11 30:21
  38:16
**agreement** 5:9 14:8
  32:4,12 33:4 34:3
  35:5,6 38:2
**agreements** 33:8
**Ajilon** 1:4 2:22 4:19
  5:1 12:12,14,20 13:6
  13:8,9,13,16,18
  14:15,21 15:18 16:5
  16:6,16 17:11 34:8
**al** 1:8 4:20
**Alijon** 14:9
**almost** 34:13
**already** 17:11,11 23:14
  38:8
**Andrew** 1:15 3:8 4:7
  4:13 8:8 10:9
**another** 26:10 33:14
**answered** 38:8
**answers** 37:12,15
**anybody** 13:12 34:19
  35:21
**anyone** 13:9 34:6 35:10
  36:8
**anything** 17:6,14 19:7
  22:14 30:2,10
**appearance** 5:8
**APPEARANCES** 2:1
**appearing** 6:5
**appears** 32:14
**appreciate** 8:17
**AP-00001** 8:9
**around** 20:20 26:9 31:1
**arranged** 7:8

**asked** 16:22
**asking** 10:21 21:14
**aspect** 29:7
**assume** 22:7,11
**assuming** 20:13 33:19
**Atlanta** 10:5
**attempt** 7:19 13:14
  14:1
**August** 1:12
**available** 37:19
**Avenue** 1:20 2:5,10
**aware** 29:5,8

**B**

**back** 17:1 19:20 23:11
  23:15,20,22 35:3
  37:2
**base** 20:14
**basically** 19:9
**basis** 6:3
**before** 6:11 17:13 18:1
  18:9,12 24:15 37:16
  37:18
**beginning** 10:8
**behalf** 1:22 2:2,8 15:17
**being** 21:8 22:19 29:6
**believe** 10:7 12:16
  13:11 30:11 33:13
  35:21
**Benjamin** 2:3 4:15
**Bernard** 35:13,14
**between** 33:8
**big** 19:15
**billed** 21:13
**billing** 21:12 35:22
**blanking** 12:4,5
**both** 18:19 28:2
**bound** 15:9
**branch** 29:7 31:15
**break** 36:19
**briefly** 25:13
**bring** 22:9
**bringing** 19:10
**brought** 8:18 28:20
  29:6 31:9
**Brown** 21:18
**Bryan** 11:15,22 12:1
  19:10
**Bryan's** 11:15
**bulk** 14:22
**Burling** 2:10 5:5
**business** 9:3,5,6,8 10:6
  12:15 15:1,10,12,17
  15:21 16:1 22:16
  34:22 35:1,2

**C**

**calendar** 18:8

**call** 17:12
**called** 1:17 7:16 25:13
  25:15 33:20,22
**came** 18:3 20:4 25:14
  28:15 33:18 36:9,12
**care** 28:10
**Carter** 16:13
**cell** 27:6
**chance** 7:11 14:4 20:15
**change** 37:12
**charge** 19:12
**Chelsea** 11:13,17,19
  36:3,13
**choose** 37:11
**chose** 7:6
**Civil** 1:5
**clarify** 21:12
**clause** 33:14
**clear** 34:18
**client** 13:18 16:10
  20:14 36:2,6
**clients** 13:14,17 14:16
  14:20 15:1,18 16:7
  21:8
**Clifford** 14:4
**colleague** 4:21 19:17
**Columbia** 1:1 4:19
**come** 17:1 33:18 34:11
**comes** 29:13 31:6
**coming** 4:17 17:20 18:6
  18:19 19:1,3 25:12
  27:11 29:10 31:19
  36:5
**comments** 27:9
**commission** 22:2 30:8
**common** 6:2
**community** 9:11
**companies** 35:1
**company** 20:5 33:20
**comparison** 21:7
**compilation** 8:7
**completely** 15:13
**compulsion** 6:7
**concerned** 10:17
**concluded** 38:19
**Connolly** 14:3 15:22
  16:2,9 21:17,21 22:3
  28:4
**consent** 7:3
**Consolidation** 3:21
**Consulting** 2:22
**contact** 13:6,14 14:2,20
  22:10
**contacted** 14:18 15:3
**contract** 33:14
**conversation** 16:21
  20:11
**cooperation** 8:17 37:5

**copy** 5:16 6:10 34:2
**corner** 26:9 31:2
**corporate** 29:16
**correct** 5:12 10:14,15
  16:10,13 22:15 23:18
  32:7 34:4
**correspondence** 12:17
**counsel** 1:17 4:16 5:3,9
  7:3 37:22
**couple** 26:4
**course** 11:10 33:13
  38:11
**court** 1:4 18:5 5:7 6:7
  37:13
**covenance** 14:8
**covenant** 31:22 34:4
**cover** 8:7
**Covington** 2:10 5:4
**Crowell** 21:18
**C-O-N-T-E-N-T-S** 3:4

**D**

**Danowski** 11:11 17:17
  27:11 28:7
**date** 17:22 18:2,13 24:3
  23:22 31:4,4,5 37:1
**day** 16:18 17:1 18:3,15
  23:22 31:4,4,5 37:1
**DC** 1:21 2:5,11
**deal** 9:18 17:10 23:4
**dealt** 13:15
**Defendants** 1:9 2:8 5:3
  7:3
**deposition** 1:14 5:8,15
  6:16 7:7,9,15 37:9
  38:18
**Developing** 9:6
**development** 9:3,5,8
  10:6 12:15
**Dickstein** 17:10,13
**Direct** 3:6 8:20
**directly** 7:6 31:7 34:13
  35:5
**Director** 9:3,5 12:15
  24:22
**discipline** 9:10
**discrepancy** 38:5
**discussion** 19:8
**District** 1:1,1 4:18,19
**division** 19:13 25:1
**document** 3:16 5:18
  7:10 8:2 10:14
**documents** 3:21 6:17
  7:16,20 8:7,11 10:7
  12:17,18
**doing** 10:11,22 15:20
  20:12 22:14 25:16
  27:12,15,22 28:1,2,6
  28:7,22 30:10,14,22

**copy** (above)
**asked** (above)

**E**

**early** 32:19
**effort** 14:20
**efforts** 30:6,7
**either** 32:14
**electronically** 5:22
**email** 17:21 18:7 20:3
  25:14 28:8
**emailed** 28:9
**employed** 17:17
**employees** 10:22 11:1
  33:9,10 34:9,9
**employment** 32:4,11
  33:3 34:3 35:7
**enclosed** 26:17,19
**end** 24:16 32:15
**Esq** 2:3,4,9,9
**et** 1:8 4:20
**even** 30:22
**evening** 17:21
**ever** 15:4 24:4
**everybody** 27:19
**everyone** 25:16
**everything** 19:16 23:12
  28:19
**exactly** 19:18 20:12
  23:10 28:12 30:21
**examination** 1:17 8:20
**examined** 4:9
**example** 15:1
**Exhibit** 3:15 5:15,20
  7:13,15,16 8:1,4
**existed** 29:10
**existing** 28:17 33:3
  34:3
**expects** 31:17
**expedited** 6:3
**extension** 27:6
**E-X-H-I-B-I-T-S** 3:12

**F**

**fact** 15:17 30:13 31:14

**36**:11
**done** 10:4
**door** 26:21
**down** 20:15 23:4 31:19
  37:14
**duly** 4:9
**duration** 14:7
**During** 14:11 15:16
**duties** 9:4
**D-E-P-O-S-I-T-I-O-N**
  4:1
**D.C** 9:12 10:4 12:1,9
  14:17 19:14 20:13
  21:9 28:2 35:18,19
  36:1,5,9,12

fairly 6:2
familiar 22:18
far 10:16 16:16 19:15
28:22 31:16
fax 2:6,13
few 16:3
finalizing 37:18
financial 9:19
find 17:15 32:11,17
35:2
firm 9:7
firms 22:17
first 6:14 16:4 17:15
20:3 31:15
five 36:19
focusing 14:14
folks 9:19 17:13
following 8:8
follows 4:10
formal 31:14
former 15:18
forward 14:15
found 17:19
four 32:20
fourth 18:1,9,11 23:8,9
23:10 24:1,2,17
frame 38:2
framework 28:17,18
29:12
frank 20:10
from 12:20 13:6 14:14
17:12 19:5 20:1,2,4
26:9 28:10 31:2
33:18,18 34:11
full-time 1:1
function 21:10
functions 27:12
further 13:5

G

Gail 34:10
gather 7:19
gave 34:2
general 9:4
generated 22:17
gentleman 19:10
gentlemen 38:16
geographic 20:8
gist 19:21
give 10:10
given 38:1
glaring 38:5
go 4:4 7:11,18 29:15
goes 31:7
going 10:21 12:10
13:10 14:15 17:17
19:13,14 20:12,20
22:7,11 24:16 28:13

31:18 32:10 34:14,15
35:3
good 8:14 10:13,20
14:20 35:3
Grabow 34:10
great 7:1
group 9:1 11:2 21:9
25:2 35:16
grow 35:2
guess 15:9 19:22 20:19
20:22 22:19 25:7,15
26:22 29:14 36:5

H

Hahn 2:3 4:3,11,14,15
5:14,22 6:10,15,19
6:22 7:14,18,22 8:6
8:14,21 27:10 32:9
32:21 36:18 37:2,8
37:22 38:4,10,12,15
hand 28:13
handles 28:19 29:13
happened 23:11 25:12
happening 28:3
Harrison 1:19 2:4 4:16
4:22
having 4:8 38:20
head 9:22 14:19 17:22
Headquarters 20:2
healthcare 9:20
hearing 38:7
helped 36:16
her 4:22
him 18:6 21:7 25:19
26:4,5,10 35:8
hire 34:8,15,15
hired 16:12 34:1,7
36:17
hit 19:16
hoped 18:21
Houston 10:5

I

idea 10:10 24:11 33:15
identification 5:21 8:5
indemnification 32:15
33:7,14 35:6
indication 20:1
industries 9:14,17
industry 9:10
information 23:3
initially 14:5 36:13
integrated 29:9,11
interact 31:2
internally 22:1
International 2:21
involved 24:4 29:18
issue 6:4

issued 5:7

J

J 2:19 4:13 10:9
James 11:13 12:6 27:14
Jan 11:9 12:8 18:5
19:17 30:2,4,5,10,15
31:5,7,9 36:17
Jimmy 11:12 27:14,22
27:22 28:10,10,21
29:1,17
job 12:13
John 2:19 5:2 17:1
joined 35:17
Joleen 2:4 4:22
Jon 11:12 17:16 18:6
18:19 29:19 30:9
31:3,10
Jon's 30:6
Josh 11:10 17:16,19
18:3,16 20:7 21:1
22:12 23:4 24:15
25:9,12 26:1 27:5
28:20 29:2,5,22 30:2
30:4,10,15 31:3,9,11
Joshua 1:8 4:20
Josh's 20:8 22:7
July 18:1,9,11 23:8
June 18:2 24:16,17
jurisdiction 10:2
just 6:1,5,22 8:10 9:7
15:8,11 16:18,18
19:9,16,19,20 20:19
21:11,12,22 25:7,16
26:13 28:2,16 30:22
31:2,9 32:16 34:22
35:2 36:19 37:22

K

kind 14:13 16:17 19:16
19:19,20 20:16 24:9
31:21
knew 15:10 34:10
know 6:1,12 9:21 14:18
16:5,7 17:21 18:2
19:3,18 20:11 21:1,4
21:6,6 23:2,3,3,5,10
24:3,7,9,12 25:7
26:19 27:3 28:1,2,12
29:2,2,12,13,18
30:13,14,21 33:6,12
33:12,17
knowledge 14:21 16:7
30:20
Kubicki 1:8 4:20 11:10
17:16,19 24:15 26:2
28:15
Kym 11:10 17:16 18:6

18:18 27:11,13,19
28:1,19 29:1,13 31:3

L

landlord 24:5
Lange 16:12,20
last 7:14 11:16 12:3,4,5
19:11 32:14
law 1:18
lawsuit 4:17
lead 24:7,9
lease 22:22 24:13
leased 22:19
leave 16:18
leaving 16:19,20 17:2
left 12:19 13:8,13 14:9
14:14 16:15,16 17:13
17:14
legal 9:11,15 11:2
19:12 21:10 22:14
25:1
let 9:18 32:10
letter 12:20 13:1
let's 7:22 21:15 23:7
25:14
Lewis 1:19 2:4 4:16
like 5:14 9:18 22:2 24:5
26:9 28:22 29:13
30:19 31:17 34:10
36:18
list 7:12,16,19
listing 6:17 7:10
little 28:20 31:13
LLC 1:5 4:20
Lloyd 20:5 34:12 35:5
LLP 1:20 2:4,10
long 16:6 19:19
long-term 31:18
look 8:10 18:8 32:10
37:16
looking 32:2,13 37:13
lot 8:15 10:21 14:16,17
26:10,11

M

made 14:19 18:22
34:18
make 7:8 13:14,20
15:11 32:9 37:19
Managing 24:22
many 10:22 11:1 21:20
map 20:15
March 20:20
mark 2:9 5:4,14,15
7:22
marked 3:16 5:19 8:3
marketing 9:8 10:9
20:18 21:2 25:8

matter 36:22 38:19
may 14:13
Maybe 16:3
Mayer 21:18
McINTOSH 32:18
37:6 38:3,8,11,14
McKee 15:2,3
mean 15:8 19:16 21:11
22:15 25:17 26:16,18
26:21 28:19 29:12
31:13
meaning 34:9
means 10:20
meet 35:8,10
meeting 18:4 19:19,21
31:14,15
met 18:16 25:19 35:12
Michael 2:9 5:4
middle 38:9
might 14:4
mind 29:2
mine 33:13
minute 36:19
Monday 17:20 18:3,7,8
18:12 25:15 38:7
month 14:11 15:16
months 14:10,14 15:5,6
15:10 16:4
more 9:21 11:15 14:5
16:8 25:17
Moring 21:18
morning 25:16
Mosier 2:9 5:4 6:1
much 16:1,3 19:14,21
23:12 28:5 30:5 31:3
37:4
Mullenholz 2:19 5:2
myself 11:9 18:4 19:17

N

name 4:12,14 11:16
12:3,4,5 19:11
Nationwide 20:9
necessarily 26:19
need 7:1
needed 36:6
negotiate 35:4
negotiating 24:5
negotiation 35:11
Nelson 15:2,3
new 9:6,19,20 10:5
11:19,21 12:7 15:13
20:2 27:16,18,20
28:1,11,12,18,21
29:15 36:4
next 4:22 17:1 18:3,15
24:3
Nine 11:6,7

non 32:12
nothing 25:17 31:20
notice 1:18 6:16 7:9
notification 20:4
number 8:9 27:5
NW 1:20 2:5,10

**O**

oath 38:12
off 9:21 14:18 17:22
  27:9 36:19 37:17
  38:17
offer 18:22
office 18:3 26:8,17,18
  27:19 29:16 31:6
officed 26:6 36:9
offices 1:19
officially 37:17
often 26:1,3
Oh 11:14 32:20 35:9
Okay 4:4 7:14 8:19
  9:17 10:20 11:17,20
  12:2,6,10 13:5,13
  14:1,11 15:6,7,15,20
  16:9,12 17:15 18:7
  18:15 19:4 20:21
  21:4,17 22:8 24:15
  26:1 27:1,4,8,15 29:4
  29:19 30:8,12 32:22
  33:1 34:1,17 35:4,17
  36:15,18 37:22 38:10
  38:15
Okun 2:4 4:22
once 17:14 19:16 26:15
one 11:15 15:1 16:18
  17:12 21:22 26:10
ones 32:13
only 17:9 26:4 27:5
  29:22 31:4
opposite 5:3
order 6:8
other 9:14,17 22:5
  34:16 35:1
out 5:9 11:19 17:15,19
  19:14 20:16 21:9
  22:17 25:14 27:15
  29:3 31:5,17 35:1
  36:4,16
over 17:7,13,20 19:10
  25:12 26:14 27:11
  28:15 29:6 34:11
  36:9,12
own 28:18
owner 20:5
O-F 3:4

**P**

page 6:13,14,21 7:15

9:1,13,14 10:8 11:2
  12:11,20 15:18 17:8
  17:18,20 21:9 22:14
  22:20 23:1,17,19
  25:1,4 27:12 29:9
  31:22 32:14,16,18,20
  32:22 33:4,9 34:2,2,6
  34:11 35:16,18,18
pages 8:9
part 6:15 35:11
particular 9:9
parties 1:22
partner 4:15
Pennsylvania 1:20 2:5
  2:10 22:20
people 6:2 21:12 34:15
  34:16 35:3
perfectly 20:10
period 14:12 15:16
Perlin 1:15 3:8,16,22
  4:7,13,14 5:16,20 8:1
  8:4,6,8,22 10:9 37:3
person 31:4
personal 13:17
phone 17:12 27:6
physical 7:2
physically 26:6 36:9
picked 31:10
pike 31:19
pipeline 17:7
place 9:13 26:16
placements 21:16
plaintiff 1:6,18 2:2
  3:14 4:17 5:1
plan 10:9 20:18 21:2
plans 31:12,18
plays 29:1
please 4:12
point 12:19 20:14
  27:22 29:15 32:16
  36:19
Pomykala 11:12 17:16
  29:19
position 9:2 24:21
prepared 10:13
presence 35:20,21
present 1:22 2:17
President 2:21
pretty 19:21 23:12 30:5
previously 4:9
prior 12:10 22:12 26:3
  27:11 29:10
privy 3:2
probably 23:8 26:4
procedures 28:12
process 29:9
processed 29:17
produce 20:17

produced 10:8 12:18
producing 8:12
Professional 1:4 4:19
  5:2
projects 2:21 17:3
prospecting 22:16
prospects 14:17
provision 32:13 33:7,8
purposes 38:6
pursuant 1:18 5:6
put 10:17 20:20 21:1
  23:8 35:1
putting 8:17
p.m 1:21 4:2 36:21 37:1
  38:20

**Q**

question 14:5,13 15:13
  38:9
questions 37:4,6,15
quite 21:13

**R**

ran 26:4
rather 6:8 37:20
ready 4:4
real 31:14
really 16:6 17:5 19:18
  20:11,15 26:10 27:20
  31:16
reason 13:3 15:7 26:12
  34:14
recall 13:2 15:20 19:7
recalled 4:8
recently 25:19
recessed 36:22
reconvened 36:22
record 4:3,12 6:22 27:9
  36:20 37:2 38:1,17
recruiter 35:13
recruiting 29:20,22
  30:6,7 36:11
referred 5:19 8:3
regarding 32:15
Regional 2:19
relationship 31:8 35:7
  36:6
remember 11:15 12:3
  18:13 19:11
report 20:6 24:18
reporter 37:13
representative 5:1
respective 1:22
respond 8:16 13:1,3,3
response 8:12
restrictive 14:8 31:22
  34:4
review 37:8,11,18,20

37:21
reviewing 37:10
Richard 11:14,20
  24:19,20 25:20 33:13
  33:17 35:12 36:3
right 6:9,15 15:9,14
  19:6 21:9,16 28:20
  37:3,16
rings 27:2
role 28:22
room 4:21
run 29:6
running 23:13

**S**

sales 9:7 22:2 25:8 36:2
same 26:7 30:9,15,18
  31:1 37:1
sat 20:15
saw 6:13,14
says 8:8
Schlanger 2:9 5:4
Schnader 1:19 2:4 4:15
  4:22
Schneider 35:13,15
see 6:21 7:2 9:18 16:5
  23:7 25:14,16 26:1
  26:10 31:4 38:16
seem 32:12
seen 6:10,19 7:9 21:3,5
  26:5
Segal 1:19 2:4 4:16
send 28:9,21
Senior 2:19
sent 7:4
separate 29:7
served 5:17 21:8
set 23:6 28:17 29:3
setting 28:16
seven 32:18,20,22
several 32:12
share 31:6
sheet 8:7 28:9
sheets 29:14
show 12:18
showed 24:15
showing 22:13
shown 21:7
side 36:2
sign 37:10,17
signature 33:1 37:11
  38:20
signed 31:21 32:4,11
  32:13
signing 37:18
Silverman 11:13,18
  36:4,14
since 22:10

sir 7:21 10:12 33:2,5
sitting 19:19
situation 16:22
six 34:10,14 15:5,6,10
  15:16 16:4
sixth 14:11
slack 31:10
slot 28:16
small 35:21
Solomon 9:1,13,14
  11:2 12:11,19 15:18
  17:8,17,20 20:5 21:9
  22:14,19,22 23:17,19
  25:1,3 27:12 29:9
  31:22 33:4,8 34:2,2,6
  34:11,12 35:5,16,18
  35:18
some 7:19 10:4,4,10
  12:16,17,19 17:11
  22:18 29:15 34:15,15
  38:5
someone 34:10
someplace 15:12
something 6:2 18:14
  22:2
sometime 20:19
sorry 11:14 21:11 24:8
  25:15 28:8
sound 30:19
space 22:19 23:5 24:5
  24:10 26:7,8,12,17
Spaeder 14:4
specifics 31:16
spend 10:21 26:11
split 30:9
spot 25:9
staff 34:9
staffing 1:5 4:20 5:2
  33:19
StaffWise 12:12,13
  14:9,15,21,22 15:2
  16:8,10,13,15 34:8
  34:11 35:3
standard 33:7,10
start 21:15
state 4:11
States 1:1 4:18
stick 10:17
still 25:3 27:18 28:6,21
Strategic 33:20
Street 9:19
stuff 29:14
subpoena 3:19 5:7,16
  6:6,11 7:2,11 8:12,16
subpoenaed 5:11
suite 1:20 27:7 31:1
supplements 30:5,7
supposed 28:13

sure 7:8 9:21 11:9
15:11 21:13 27:20
32:9
swear 4:4
sworn 4:9

_____

**T**

take 17:7 25:9 36:18
taken 37:14
takes 28:10
taking 19:20 38:18
talk 7:6 34:19
talked 25:11 31:11
talking 7:5 14:12
telephone 27:1
tell 8:10 11:7 13:9 17:1
34:7,20
Temp 25:1
Templeman 11:9 12:8
18:5
temps 16:3,4
terms 22:1 24:12
territory 10:1 20:9
testified 4:10
testimony 6:7 7:7 37:9
37:16
Thank 8:14 11:12
14:12 23:19 37:4
38:15
their 14:22 15:10 16:7
22:7
thing 17:9 20:16 27:21
things 6:3 29:17
think 6:13 9:19 15:8
17:11 18:13 29:11
30:17,17 31:18,19
32:3 33:21
third 24:17
though 30:22 33:16
38:13
through 7:12,18 8:9
throughout 14:5 31:3
time 8:16 10:21 13:8
14:6 17:4 19:15 24:7
24:9 26:11 28:9
29:14 34:7 35:17,22
38:1
times 26:5
today 4:21 5:6 8:12,18
11:3,4 37:5
together 8:18 21:2
told 13:11,12 16:20
18:5 34:12
tomorrow 38:16
top 9:22 14:18 17:22
toward 32:15
town 18:4
transcript 38:6

transition 16:17
tried 17:7
trips 10:4
trying 6:3 34:8
Tuesday 18:17 24:1,3
25:14,15
twice 26:5,15
two 16:3 22:5,17 31:9
typically 10:3
T-A-B-L-E 3:4

_____

**U**

under 6:7 10:6 22:22
38:12
understand 8:15 38:14
understanding 5:10
7:4 19:4
understood 19:2 37:14
unfold 28:13
unfolding 27:21
United 1:1 4:18
unless 38:4
unofficial 38:6
unsigned 32:3
use 38:5
usually 26:13

_____

**V**

v 1:7 4:20
vacation 23:9
vague 9:7
verbatim 34:13
version 32:3,4,11
very 8:14 14:19 16:6
25:13 26:3 34:18
37:4
via 17:21
Vice 2:19
volunteered 6:8

_____

**W**

W 2:3,9 4:15
waive 37:10,20
waived 38:21
Wall 9:18
want 7:8 32:9 33:20
34:8,19,20 35:2
37:17,20
wanted 7:7 15:11
wants 6:6
Washington 1:21 2:5
2:11 10:3
wasn't 16:6 18:21
19:18
way 29:4 31:8
Wednesday 1:11 18:12
24:2
week 18:1,9,12 23:7,9

23:10,11 24:17 26:4
26:5
well 11:1 13:18 18:19
21:15 30:21 32:2
went 12:19 23:4
were 1:21 7:5 13:9,15
13:20 16:7,12 17:4
17:17 18:6 19:2,19
22:13,15 23:14 27:15
34:1,7 36:4,5 37:3
weren't 38:12
we'll 5:15 37:19 38:16
we're 4:3 26:9 31:1
34:14,15,22 38:1
we've 21:13
while 13:15,20 15:2
38:1
whirlwind 19:15
Whitaker 11:13,13
12:6 27:14,14 28:6
whole 14:6 16:22 19:12
27:21
Williams 14:3 15:22
16:2,9 21:17,20 22:3
28:3
witness 3:6 4:5,8,13
5:13 6:5,6,9,12,18,21
7:13,17,21 8:13,19
32:19 37:21
wording 33:15
work 8:22 9:1 10:3
11:18 12:10,11 13:10
16:17 25:3 28:16
29:5,8 31:6 35:15
worked 5:9
working 17:4 19:13
36:1,4
works 17:10 31:7

_____

**Y**

yeah 26:20
yesterday 31:15
York 9:19,20 10:5
11:19,21 12:7 20:2
27:16,19 28:1,22
29:15 36:4

_____

**Z**

Zakin 11:14,20 24:19
25:11 33:13,17 35:12
36:3
Zakin's 24:20
Zuckerman 14:3

_____

**0**

00048 8:9

_____

**1**

1 1:12 3:19 5:15,16,20
7:15
1:07-CV-01281-RJL
1:5
1201 2:10 22:20 26:12
26:17

_____

**2**

2 3:21 8:1,4,6
20 18:14
20004-2401 2:11
20006-1825 2:5
2001 1:20 2:5
2007 1:12 10:9,11
20:17
202 2:6,6,12,13

_____

**3**

300 1:20
32 10:8

_____

**4**

4:00 1:21
4:15 4:2
4:48 36:21
419-3454 2:6
419-4242 2:6

_____

**5**

5 3:19
5:01 37:1
5:02 38:20

_____

**6**

662-5459 2:12

_____

**7**

778-5459 2:13

_____

**8**

8 3:8,21