## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL                  *
STAFFING, LLC
                                     *
Plaintiff,
                                     *
v.                                         Civil Action No.  07-cv-01281
                                     *

JOSHUA KUBICKI, et. al.              *

Defendants.                          *

*     *     *     *     *     *     *

## SUPPLEMENTAL MEMORANDUM IN SUPPORT
## OF PRELIMINARY INJUNCTION

Pursuant to the Court's July 25, 2007 order, Plaintiff Ajilon Professional Staffing, LLC ("Ajilon") respectfully submits this supplemental memorandum in preparation for the preliminary injunction hearing to be held on August 6, 2007.

### Procedural History

The parties have engaged in limited discovery, in accordance with the Court's order.  Plaintiff noticed and conducted depositions *duces tecum* of Defendants Joshua Kubicki ("Kubicki"), Kimberly Danowski ("Danowski") and Jon Pomykala ("Pomykala"), in addition to Andrew Perlin, an employee of Solomon-Page Group ("SPG"), on August 1-2, 2007.  Defendants noticed depositions of Ajilon employees William DeMario, John Mullenholz, and Lange Carter, to be held on August 3, 2007, and chose to cancel those noticed depositions on August 2, 2007.

**Factual Basis for Preliminary Injunction**

Joshua Kubicki ("Kubicki") became employed by Ajilon Legal Staffing, LLC ("Ajilon") on April 22, 2004 without appreciable prior experience in the staffing industry. *See* Exhibit 1.  In recognition of this fact, Ajilon offered him a relatively modest salary package that was commensurate with his lack of experience.  Exh. 2.  Kubicki did not bring established clients to Ajilon, but rather, developed an impressive volume of business using Ajilon's name and resources to develop ongoing relationships with large law firms in the Washington, D.C. area.  Exh. 3.  Kubicki's salary, which was based on the amount of business and revenue he brought to Ajilon, grew exponentially after he established himself as an Ajilon employee.  While Kubicki's compensation was approximately $100,000 in 2004, his salary grew to approximately $600,000-800,000 in 2005 and 2006.  *Id.*  This is because Ajilon gave Kubicki a wealth of resources and the opportunity to understand the staffing industry, establish client contacts, and develop ongoing business relationships for Ajilon.

After using Ajilon's name and resources to establish himself as a successful staffing industry professional with a well-integrated, "difficult to replace" team of employees, namely Kimberly Danowski ("Danowski") and Jon Pomykala ("Pomykala"), Kubicki – in direct violation of his employment agreement – began negotiating with Solomon-Page Group ("SPG") in the spring of 2007 to bring this entire branch of Ajilon's Washington, DC-based legal staffing business to SPG.  *See* Exhs. 4-6.  SPG did not have a foothold in the DC market, and had never done business with firms such as Crowell and Moring and Mayer Brown before Kubicki, Danowski and Pomykala became SPG employees.  Exh. 7.  Hiring Kubicki, Danowski and Pomykala allowed SPG to gain

a market share that it had previously lacked; a market share that Ajilon had worked hard to develop and safeguard.

In order to secure his position with SPG, Kubicki set out a detailed market analysis of what SPG needed to provide, and in return, the volume of business he would be able to divert from Ajilon to SPG. Exh. 8. Kubicki's analysis included an outline that identified Danowski and Pomykala as both "invaluable" and unmatched" members of his team whom he would need to bring with him to SPG. Exh. 9. Negotiating entirely on their behalves, Kubicki secured positions for Danowski and Pomykala with SPG as part of his own employment package. Exh. 10. Lloyd Solomon, the Chief Executive Officer of SPG, accepted and confirmed this arrangement as early as June 1, 2007: nearly one month before Pomykala and Danowski resigned from their positions with Ajilon. Exh. 11. Pomykala and Danowski had no contact with anyone from SPG, did not solicit work for themselves with SPG, and allowed Kubicki to negotiate salary packages for them. Exhs. 12-13. This all occurred while Kubicki, Danowski and Pomykala were employed by Ajilon, and in direct violation of their employment agreements.

Although in their depositions Danowski and Pomykala denied having any prior arrangement to leave Ajilon with Kubicki and join him at SPG (Exhs. 14-15), Kubicki made it clear to SPG employee Andrew Perlin on or about June 25, 2007 – four days before they resigned – that both Danowski and Pomykala would soon be working for Kubicki at SPG. Exh. 16. Danowski and Pomykala both resigned from their positions with Ajilon on June 29, 2007 and promptly began working for SPG.

In addition to securing employment for Danowski and Pomykala, in his negotiations with SPG, Kubicki also requested that SPG acquire leased space to house

contract attorneys, and even went so far as to help <u>seek out and negotiate for that space on SPG's behalf while he was still employed by Ajilon</u>. *See* Exhs. 17-18. Subsequently, in July of 2007, Kubicki began using this SPG-leased space to charge Crowell and Moring to have SPG house, oversee and administer the daily work of 80-90 direct hire contract attorneys, at least 35 of whom he placed with Crowell and Moring for a heavily discounted rate in his last days at Ajilon. Exh. 19. In other words, Kubicki is now using newly hired SPG employees to staff and manage the direct hires he placed through Ajilon. To accomplish this, Kubicki has strategically hired two former Ajilon employees, John Beuker and Brian Ingram, in addition to soliciting and employing persons that he and his team previously hired for Ajilon. *See* Exhs. 20-21.

In order to secure his new position with SPG, Kubicki <u>disclosed a confidential business plan</u> to Lloyd Solomon that he prepared at the direction of his former supervisor, Mark Davies, while Kubicki worked at Ajilon. Exh. 22. This document was shared with senior Ajilon management in furtherance of Ajilon's legal staffing enterprise. *Id.* This business plan is extremely detailed and is clearly marked "Confidential" because it contains trade secrets regarding Ajilon's legal staffing business. Exh. 23. Kubicki chose to e-mail it directly to SPG to further his efforts to gain employment for himself and his co-defendants at SPG. *See id.* Kubicki represented that he would implement, and is currently implementing, this confidential Ajilon business plan for SPG in the Washington, D.C. legal staffing market.

To implement this plan, of course, Kubicki needed to deliver business to SPG. In fact, he was able to promise and deliver pipeline work <u>that he learned about while employed by Ajilon</u> for SPG, and if not enjoined, he will only continue to do so. Exh.

24.  To date, he has garnered multiple projects for SPG with two of Ajilon's largest clients, Mayer Brown and Crowell and Moring.  Exh. 25.  Kubicki established his professional relationships with both firms by relying on Ajilon's name and reputation and utilizing Ajilon resources.  Kubicki spent a great deal of Ajilon's time, money and other resources planning large events – such as cocktail parties and other events at local restaurants and bars – to attract and retain business for Ajilon.  *See* Exh. 26.  Then, Kubicki intentionally scaled back Ajilon's business with key clients in 2007, as he was preparing to take this business to SPG.  *See* Exh. 27.

    The business Kubicki has taken from Ajilon and brought to SPG is not the result of preexisting relationships he had with well-placed people at these law firms.  Although Kubicki admittedly did not know Rebecca Anderson, a Mayer Brown employee responsible for staffing projects with contract attorneys, before he began working for Ajilon and only met her through his work for Ajilon, he has been using his Ajilon-established relationship with Anderson to garner two Mayer Brown attorney staffing projects for SPG.  Exhs. 28-31.  Likewise, Kubicki developed a business relationship with contacts at firms such as Crowell and Moring and Dickstein Shapiro by using Ajilon resources to make presentations and to entertain key employees.  Exhs. 32-34.  He is now exploiting these relationships to promise, seek and receive business from Crowell for SPG.

    Kubicki currently has the capacity to garner much more of Ajilon's business.  To date, by saving business-related e-mails in his personal e-mail account, Kubicki has retained a multitude of Ajilon's confidential business information – including detailed listings of client names and contact information – that others at Ajilon prepared.  For

example, he has a lengthy list of Ajilon's most important business contacts and clients that was prepared by Ajilon employee Lange Carter. Exh. 35. Ajilon compiled this list, which includes a wealth of confidential contact information, to invite key clients to an annual Ajilon-sponsored business development event. *Id.* Kubicki is now at liberty to use it for the benefit of SPG, at Ajilon's expense. In addition, he has retained the contact information and resumes of numerous Ajilon contract attorneys (Exh. 36); a confidential, highly detailed client agreement drafted for Ajilon by Senior Regional Vice President John Mullenholz (Exh. 37); and Kubicki's own "list" of Ajilon projects that were active when he resigned (Exh. 38).

Like Kubicki, Pomykala has also retained confidential trade secret information from Ajilon, which he can use for the benefit of SPG. Through his personal e-mail account, in the spring of 2007, he saved multiple pages that list all of the pertinent contact information for contract attorneys and paralegals whom Ajilon employed. Exh. 39. These lists include telephone numbers and e-mail addresses for hundreds of Ajilon contract attorneys, notations of the states in which the attorneys are barred, certain employees' language proficiencies, and even some contract attorneys' social security numbers.

## Legal Basis for Preliminary Injunction

Defendants signed limited, reasonable employment agreements, which are fully enforceable under both District of Columbia and New Jersey law. Their actions, in direct violation of these agreements, did not simply involve taking a rolodex file of publicly available names and addresses, as in *Ruesch v. Ruesch International Monetary Services, Inc.*, 479 A.2d 295 (D.C. 1984).

Defendants exploited the relationships they cultivated with Ajilon clients, at Ajilon's expense, and converted the goodwill established by Kubicki for Ajilon to the benefit of SPG. This is not something that they could have done with simple, publicly-available contact information such as a telephone number or an e-mail address. This is not something a company based in New Jersey would be powerless to prevent, as Defendants appear to argue in their opposition. New Jersey courts have protected companies in circumstances similar to Ajilon's by enforcing reasonable restrictive covenants. *See, e.g., Platinum Management, Inc. v. Dahms*, 285 N.J.Super. 274, 295, 666 A.2d 1028 (Law Div. 1995); *A.T. Hudson & Co v. Donovan*, 216 N.J. Super. 426, 434, 524 A.2d 412 (1987).

In order to protect an employer's customer relationships with an enforceable restrictive covenant, New Jersey courts do not require that "misappropriated information…rise to the level of the usual trade secret"; in fact, the information may otherwise be publicly available. *Platinum Management, Inc.*, 285 N.J.Super. at 295. The "validity and enforceability of the covenant is fact-sensitive and must be determined in light of the facts" of the case. *Id.* at 294. So long as the plaintiff has a defensible interest in the information it seeks to protect, the plaintiff's restrictive covenant is enforceable under New Jersey law. Ajilon meets this standard, as clearly confidential, private information has been pilfered and retained by Defendants Kubicki and Pomykala.

In accordance with New Jersey law, the customer information at issue "was developed on [plaintiff's] payroll." *Id.* Defendants' assertion that Kubicki had a readymade client base because of a few well-placed friends at certain law firms completely misses the mark. This is not a case of a seasoned individual who had a roster

of numerous clients and several decades of experience. *Cf. Coskey's Television & Radio Sales & Service, Inc. v. Foti*, 542 A.2d 879 (N.J. Super. Ct. App. Div. 1992) (the defendant in this case had over twenty-five years of experience in the industry and had developed a large network of contacts that the plaintiff was "merely rent[ing] during the period of employment."). Rather, Kubicki was a novice contract attorney with no experience on the sales or management side of a staffing organization when he was hired by Ajilon.

Kubicki, on behalf of Ajilon and at Ajilon's expense, cultivated client relationships that allowed Ajilon to be attuned to specific firms' needs and preferences, and placed Ajilon in a position to staff multiple projects at certain firms over the course of years. Ajilon provided the support for and assisted in the development of these client relationships; therefore these relationships may be protected by a restrictive covenant. *See* 253 N.J. Super. at 638-39.

The fact that Ajilon spent a "substantial [amount of] energy and money, either through [defendants] or otherwise, in soliciting the actual customers involved herein [is] a matter 'worthy of protection.'" *Id.* at 296 (quoting *A.T. Hudson & Co v. Donovan*, 216 N.J. Super 426, 434, 524 A.2d 412 (1987).) This right is threefold because Ajilon not only did so with regard to its customers, but also its employees, and contract attorneys – all of whom Defendants saw diverted to Solomon-Page Group, in direct violation of their employment agreements. The facts of this case closely parallel the facts of *A.T. Hudson*, in which the New Jersey court enforced a comparable restrictive covenant, recognizing that relationships between consulting firms and their clients were ongoing and depended on relationships of trust. *See id.*

Unlike in *HIRECounsel D.C.  v. Thuemmler*, No. 05-2111 (D.D.C. filed Oct. 28, 2005), which Defendants cited at length in their initial Response, this case does not involve a recruiter alleged to have contacted a single contract attorney.  Rather, the facts of this case closely parallel those of *Merrill Lynch v. Wertz et al.* and *Morgan Stanley DW Inc. v. Rothe*, in which employees signed reasonable, limited non-solicitation agreements with their employers; resigned from their positions; and then embarked upon wholesale solicitations of their former employer's entire client bases, in direct violation of their employment agreements.  298 F.Supp.2d 27 (D.D.C. 2002); 150 F.Supp.2d 67 (D.D.C. 2001).

In *Merrill Lynch*, Judge Leon held that on these facts, that the plaintiff "demonstrated a substantial likelihood of success on the merits."  *Id.* at 31.  As in *Merrill Lynch*, the information that Plaintiff is seeking to protect involves client information – not merely a list containing that information – which is fully protected under the District of Columbia Trade Secrets Act.   Plaintiff is not alleging that Defendants simply "brought tools to [their] employer and upon separation [left] with them."  *Coskey's*, 602 A.2d at 795.  Rather, Defendants – without any prior experience in the legal staffing industry – became employees of Ajilon, and were provided with the resources to build client relationships on behalf of Ajilon in exchange for signing a limited, reasonable employment agreement.

Therefore, the terms of the agreements should now be enforced and injunctive relief should be properly granted.

Respectfully submitted,


Schnader Harrison Segal & Lewis LLP


By:     __/s/  Benjamin W. Hahn_____
        Benjamin W. Hahn (Bar No. 446270)
        2001 Pennsylvania Ave. N.W., Suite 300
        Washington, DC 20006-1825
        Telephone: (202) 419-4242
        Email: bhahn@schnader.com


        Counsel for Plaintiff Ajilon Professional Staffing, LLC

## EXHIBIT LIST

Exhibit 1  – Resume of Joshua Kubicki
Exhibit 2  – Ajilon Offer of Employment to Joshua Kubicki
Exhibit 3  – Excerpt from Deposition of Joshua Kubicki
Exhibit 4  – Excerpt from Deposition of Kimberly Danowski
Exhibit 5  – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 6  – Ajilon 2007 Staffing Chart
Exhibit 7  – Excerpt from Deposition of Andrew Perlin
Exhibit 8  – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 9  – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 10 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 11 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 12 – Excerpt from Deposition of Jon Pomykala
Exhibit 13 – Excerpt from Deposition of Kimberly Danowski
Exhibit 14 – Excerpt from Deposition of Jon Pomykala
Exhibit 15 – Excerpt from Deposition of Kimberly Danowski
Exhibit 16 – Excerpt from Deposition of Andrew Perlin
Exhibit 17 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 18 – Excerpt from Deposition of Joshua Kubicki and Documents Joshua Kubicki
         Provided at Deposition *Duces Tecum*
Exhibit 19 – Ajilon Agreement and Invoice with Crowell and Moring
Exhibit 20 – Ajilon Payroll Information and Documents Joshua Kubicki Provided at
         Deposition *Duces Tecum*
Exhibit 21 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 22 – Supplemental Declaration of John J. Mullenholz
Exhibit 23 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 24 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 25 – Excerpt from Deposition of Jon Pomykala
Exhibit 26 – Excerpt from Deposition of Joshua Kubicki
Exhibit 27 – Chart and Graph of Joshua Kubicki's 2007 Client Billings
Exhibit 28 – Excerpt from Deposition of Joshua Kubicki
Exhibit 29 – Letter from Joshua Kubicki to Rebecca Anderson of Mayer Brown Rowe &
         Mawe
Exhibit 30 – Presentation Prepared by Joshua Kubicki for Mayer Brown Rowe & Mawe
Exhibit 31 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 32 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 33 – E-mail Messages Between Former Ajilon Employee Andrew Jewel and
         Client Contacts
Exhibit 34 – E-mails Between Joshua Kubicki and Crowell and Moring Employees
Exhibit 35 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 36 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 37 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum*
Exhibit 38 – Documents Joshua Kubicki Provided at Deposition *Duces Tecum* and E-mail
         with Ajilon Confidential List
Exhibit 39 – Documents Jon Pomykala Provided at Deposition *Duces Tecum*

# Joshua Paul Kubicki

1714 North Quincy Street
Arlington, Virginia 22207

703-855-4380
jpkub22302@yahoo.com

### GOAL STATEMENT

Aggressive, goal-oriented professional, looking to begin a successful career as an ethical sales and marketing representative with a leading growth-orientated company, to deliver world class service and products to individuals and businesses, while reaching and exceeding corporate sales goals.

---

## PROFESSIONAL EXPERIENCE

**LEGALSOURCE**                                                 **FEB. 2002 – JUNE 2003**
Washington, DC – Recruitment Director/Contract Attorney for Washington DC office – Firm specializes in permanent and temporary placement of attorneys and other legal professionals for deployment in large scale litigation matters.

- Conducted customer service/public relations calls to established customers in effort to maintain excellent business relationships and promote retention. Prospected new customers utilizing cold calling and network development. Maintained and furthered my involvement in local professional, business, and civic organizations to enhance company image and broaden industry network.

- Cold-called hundreds of potential customers in new market territory to establish and assess business needs and opportunities for service. Applied assertive and respectful sales techniques to achieve key goals of decision-maker identification and current service utilization.

- Initiated development of my individual sales training by attending sales conferences/seminars and seeking industry mentor. Attended trade seminars and gatherings to broaden network, deepen client base and remain current on all issues and trends relevant to my growth and my customers' interests.

- Successfully recruited well-qualified attorneys and legal professionals by contacting and establishing a rapport and professional relationship in condensed period of time. Identified professional career opportunities and represented individuals to my customers, paying close attention to the specific needs and criteria of each customer's search efforts.

**WITNESS THIS PRODUCTIONS, INC.**                              **SEPT. 2002 – PRESENT**
Arlington, VA – President and CEO for non-profit corporation focusing on the use documentary media to explore the local DC culture for events and movements that helped shape the community.

- Developed and incorporated new not-for-profit corporation focused on delivering multi-media products to local communities in effort to educate populations about cultural and societal events and trends. Constructed business plan and pitch proposal for use in approaching potential production partners.

- Grew grassroots organization through energetic and convincing presentations, outlining project goals and communicating strategic business development plan. Built and maintained diverse membership.

- Produced, directed and wrote a documentary film exploring the Washington DC music culture of the early eighties and nineties, concentrating specifically on a world renown musical venue

**VERIZON SERVICES CORPORATION**                                **MAY 2000 – JAN. 2002**
Arlington, VA – Office of General Counsel, Antitrust & Special Projects Practice Group of major telecommunications corporation – focused on telecommunications regulatory law, antitrust litigation, mergers and acquisitions and strategic alliances.

**KELLOGG, HUBER, HANSEN, TODD & EVANS P.L.L.C.**               **NOV. 1999 – MAY 2000**
Washington, DC – private law practice focused on complex civil litigation and regulatory advocacy for the communications industry – telecommunication specialists

---

Page 2



PLAINTIFF'S
EXHIBIT
Kubicki 3
8-2-07

- Managed complex legal and strategic matters on behalf of Verizon Communications Inc. in its competitive market positioning efforts. Directed outside counsel, prepared filings, reviewed proposed pleadings, conducted witness deposition preparation and prepared discovery responses.

- Delivered a capital recovery of nearly $500K in lost revenue and profit by successfully representing corporate positions and injuries through my structured retrieval, analysis and presentation of all pertinent data. Formed close working partnerships with key executives from varying and dispersed corporate departments.

- Initiated, planned and instituted new technological and operational procedures which greatly streamlined and increased productivity of legal due diligence operations. Resulted in dynamic cost and time savings which allowed for further expansion of other useful resources and overall budget fluidity.

- Devised and coordinated complex data and information collection plans and directed teams of professionals in plan execution. Liased with varying levels of personnel, from high level front office executives to support staff and gatekeepers. Thrived in a diverse environment of personalities, effectively bridged gaps and build trust with new acquaintances in a deliberate and focused manner.

- Served as source and conduit of information; channeling vast amounts of wide ranging sensitive legal and business data through my daily activities often requiring adjustments in presentation and tone to allow for proper and effective reception.

EDUCATION

**The Catholic University of America, Columbus School of Law,** Washington, DC
**JD,** May 1999, GPA B

> **Activities**: National Moot Court Trials Team; Law Clerk, Montgomery County, Maryland, Office of Public Defender; Student Attorney, Columbus Community Legal Services

> **Work**: law clerk for small firm handling family, civil, criminal, administrative and wills/estates matters throughout second and third years; researcher/cite-checker for Williams & Connolly during first year

**Niagara University,** Niagara Falls, New York
**BA,** *cum laude* **and Departmental Honors,** Political Science, Minor in Sociology, 1995, GPA 3.4

> **Awards & Activities: Dean's List;** Member, Pi Sigma Alpha – National Political Science Honor Society; Parliamentarian, University Student Government; Member, Housing Advisory Council; General Manager, WRNU, college radio station

> **Work:** Teaching/Research Assistant for Pre-law professor – 3 years

**Oxford University, St. Catherine's College,** Oxford, England – Autumn/Winter 1993

> **Area of Study**: The European Court of Justice's role/influence on the development of the EU

> **Activities**: Member, Oxford Student Union; Member, St. Catherine's College rugby team

PROFESSIONAL CREDENTIALS/ACTIVITIES

- Member, The District of Columbia Bar
- Member, U.S. District Court for the District of Columbia

HOBBIES/INTERESTS
People, Golf, Running, Biking, Film, Music, Reading, Writing, Travel, Sailing, Cooking, Learning



April 22, 2004

Joshua Paul Kubicki
1714 North Quincy Street
Arlington, VA  22207

Dear Joshua:

It is with great pleasure that I confirm our offer of employment with Ajilon Legal as Branch Manager in our Washington DC office.  You will be paid $5750 monthly as described in your compensation schedule (enclosed).  You will be eligible to participate in Ajilon's benefit offerings after satisfying the benefit eligibility requirements.

Ajilon offers a competitive benefits package including medical, dental, and vision. New employees are eligible for these benefits on the first day of the month following 30 days of employment.

We look forward to you starting on May 10, 2004, at 9:00 a.m.  Please bring with you on your start date the necessary document(s) to complete the required I-9 form and your signed Employment Agreement and Compensation Schedule that I have enclosed for your review.

Joshua, we are pleased that you have decided to join our team.  **Please sign and return a copy of this offer letter indicating your acceptance of this offer**.

Welcome aboard!!!

Sincerely,

*Janet Doyle*

Janet Doyle
HR Generalist

Encl.

Accepted by: _____
Joshua Paul Kubicki

PLAINTIFF'S EXHIBIT
Kubicki 4
8-2-07

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL          )     ORIGINAL
STAFFING, LLC                )
    Plaintiff            )   Civil Action No.
       vs.            )   1:07-CV-01281-RJL
JOSHUA KUBICKI, et al        )
    Defendants           )

Deposition of Joshua P. Kubicki

Washington, D.C.

August 2, 2007

Reported by:  Bonnie L. Russo

JOB NO. 182490

**Joshua Kubicki**

Page 33

1 & Moring attorneys and staff so I may have had

2 conversations with them during that time

3 period.  Specific to joining Crowell, I

4 honestly can't recall.

5      Q.     In April of 2004 you joined Ajilon?

6      A.     I believe that is the date and year,

7 yes.

8      Q.     And you signed an agreement with

9 Ajilon; is that correct?

10     A.     An employment agreement?

11     Q.     Correct.

12     A.     Yes.

13     Q.     And your base salary is reflected in

14 Exhibit 4; is that correct?

15     A.     Yes.

16     Q.     And do you remember whether that is

17 what you were being paid when you joined

18 Ajilon?

19     A.     I believe it was.

20     Q.     Do you know approximately how much

21 money you received as remuneration from Ajilon

22 during 2006?

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

# Joshua Kubicki

Page 34

1    A.    During 2006?

2    Q.    Just in round numbers what was on

3 your W2?

4    A.    Somewhere in the range of 600 to

5 $650,000, I believe.

6    Q.    Okay.  So between April of 2004 --

7 well, do you remember about how much you made

8 in 2004 from Ajilon?

9    A.    I honestly can't recall without

10 looking at my W2.

11    Q.    Was it over a hundred thousand?

12    A.    I am not sure.

13    Q.    Could it have been under a hundred

14 thousand?

15    A.    It could have.

16    Q.    And in 2005 again just within a

17 range?

18    A.    Somewhere in the range of 7 to

19 $800,000.

20    Q.    Okay.  Did you bring any active

21 business with you to Ajilon the day you

22 started?

# Joshua Kubicki

Page 35

1    A.    By active business what do you mean?

2    Q.    An active book of business.  Actual

3 accounts where there were attorneys working who

4 were in place and you could turn those accounts

5 over to Ajilon and Ajilon would start billing

6 them?  The day you started?

7    A.    I had no ongoing business that I

8 transitioned to Ajilon, no.

9    Q.    Did you have anything in the

10 pipeline, accounts you could tell Ajilon, you

11 hire me, I will be able to deliver this

12 business within a month or six weeks?

13    A.    Not that I recall.

14    Q.    Did you tell Ajilon at the time that

15 you were hired that you had actual clients that

16 had committed to doing work with you?

17    A.    No.

18    Q.    Did you negotiate with Ajilon for

19 pay based on your ability to deliver actual

20 business within six months?

21    A.    The expectation was that I would

22 deliver business within six months so I am not

1          CERTIFICATE OF NOTARY PUBLIC

2          I, Bonnie L. Russo, the officer before

3  whom the foregoing deposition was taken, do

4  hereby certify that the witness whose testimony

5  appears in the foregoing deposition was duly

6  sworn by me; that the testimony of said witness

7  was taken by me in shorthand and thereafter

8  reduced to computerized transcription under my

9  direction; that said deposition is a true

10  record of the testimony given by said witness;

11  that I am neither counsel for, related to, nor

12  employed by any of the parties to the action in

13  which this deposition was taken; and further,

14  that I am not a relative or employee of any

15  attorney or counsel employed by the parties

16  hereto, nor financially or otherwise interested

17  in the outcome of the action.

18                              *Bonnie L. Russo*

19                    Notary Public in and for

20                    the District of Columbia

21  My Commission expires:  May 14, 2010

22

**Esquire Deposition Services**
**D.C. - 1-800-441-3376**

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL
STAFFING, LLC.

      Plaintiff

v

JOSHUA KUBICKI, et al.

      Defendants.

Civil Action No.
1:07-CV-01281-RJL

Wednesday,
August 1, 2007

Deposition of:

      KIMBERLY DANOWSKI

called for examination by counsel for the
plaintiff, pursuant to notice, at the law
offices of Schnader, Harrison, Segal & Lewis,
LLP, 2001 Pennsylvania Avenue, NW, Suite 300,
Washington, DC, at 3:00 p.m., when were
present on behalf of the respective parties:

34

1          A      No, I don't -- No.

2          Q      You know he never said that.   Is

3    that what you're telling me?

4          A      I don't know.   I don't know if he

5    said that.

6          Q      He might have said that.

7          A      I don't know.

8          Q      All right.   Did the three of you

9    ever talk together about what you might be

10   able to do if you stayed together as a team?

11         A      No.   Well, yes, we did actually

12   but that was for Ajilon.   It wasn't for what

13   would we do anywhere else.

14         Q      Did you have a value as a team at

15   Ajilon?

16         A      Yes.

17         Q      And was that -- Do you have value

18   as a team at Solomon Page?

19         A      Yes.

20         Q      Do you have the same value as a

21   team at Solomon Page?

22         A      I believe so, yes.

1          Q      Do you think that Josh would have

2    had a hard time replacing you if he had to get

3    somebody new at Solomon Page?

4          A      Yes.

5          Q      Would he have had a hard time

6    replacing Jon if he needed to get a recruiter

7    at Solomon Page?

8          A      Yes.

9                 MR.  HAHN:    I would just like

10   quickly to get these documents as exhibits.

11   One is the deposition notice and the other is

12   Ms.  Danowski's  employment  agreement.    And

13   we'll make the deposition notice Exhibit 2.

14                           (Whereupon,  the  above-

15                           referred to document was

16                           marked    as    Plaintiff

17                           Exhibit Danowski No.  2

18                           for identification.)

19                MR.  HAHN:    And we'll make the

20   employment agreement Exhibit 3.

21                           (Whereupon,  the  above-

22                           referred to document was

54

## CERTIFICATE

This is to certify that the foregoing proceedings

in the matter of:    The Deposition of
Kimberly Danowski

held on:    August 1, 2007

at the location of:    Schnader, Harrison, Segal & Lewis
Washington, D.C.

were duly recorded and accurately transcribed under my

direction; further, that said proceedings are a true

and accurate record of the testimony given by said

witness; and that I am neither counsel for, related

to, nor employed by any of the parties to this action

in which this deposition was taken; and further that

I am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I am

not financially or otherwise interested in the outcome

of the action.

Notary Public/Reporter in and for

the District of Columbia

My commission expires

March 31, 2011



Joshua Kubicki <jpkubicki@gmail.com>

# Meeting confirmed with Lloyd Solomon Wed (tomorrow) 1PM NYC

2 messages

---

**mark brunkhorst <mark@brunkmeyer.com>**
To: jpkubicki@gmail.com

**Tue, Apr 3, 2007 at 8:45 PM**

Good evening Joshua,

I confirmed you're in person meeting with Lloyd for 1:00PM in their NYC office. Lloyds direct dial # is 212-764-9113, cell 516-250-1016. I will call you in the morning during your train ride to NYC. Thanks for responding with such short notice, Lloyd is a genuine direct, tell it like it is type of guy, he is looking forward to meeting with you.

Best regards,

Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell   1-914-213-0738

www.brunkmeyer.com

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**
Reply-To: jpkubicki@gmail.com
To: mark brunkhorst <mark@brunkmeyer.com>

**Wed, Apr 4, 2007 at 4:49 PM**

Mark,

Tried to call you to share with you how the meeting went. Grabbing a bite to eat right now and then on the 7pm train back to DC. Call me later if you want or we can catch up tomorrow.

Thanks again for your help and support on this.

Best,
Joshua
Sent via BlackBerry from Cingular Wireless

**DEF JK00239**

Loading "Gmail - Meeting confirmed with Lloyd Solomon Wed (tomorrow) 1PM NYC"

07/30/2007 02:47 AM

-----Original Message-----
From: "mark brunkhorst" <mark@brunkmeyer.com>
Date: Tue, 3 Apr 2007 20:45:08
To:<jpkubicki@gmail.com>
Subject: Meeting confirmed with Lloyd Solomon  Wed (tomorrow) 1PM NYC

Good evening Joshua,


I confirmed you're in person meeting with Lloyd for 1:00PM in their NYC office. Lloyds direct dial # is 212-764-9113, cell 516-250-1016. I will call you in the morning during your train ride to NYC. Thanks for responding with such short notice, Lloyd is a genuine direct, tell it like it is type of guy, he is looking forward to meeting with you.


Best regards,


AUTOTEXTLIST \s "E-mail Signature" Mark P. Brunkhorst
[Quoted text hidden]

DEF JK00240

 BETA

Joshua Kubicki <jpkubicki@gmail.com>

# Tuesday
7 messages

---

**JP Kubicki <jpkubicki@gmail.com>**                                      **Mon, Apr 23, 2007 at 7:18 PM**
To: LSolomon@spges.com
Cc: mark brunkhorst <mark@brunkmeyer.com>

Lloyd,

I need to postpone our meeting this week due to my work responsibilities. Some things have developed on the business front that I need to address and being that I am leaving for the West Coast on Wednesday I need to do this all tomorrow.

Please accept my apologies for the late notice and extend them to Scott and Al. It is not my style to change plans so late in the game but as I was trying to accommodate everything I was not positive until late this afternoon that our meeting would need to be delayed.

I will coordinate with Mark and you as to the next possible date. Until then be well.

Sincerely,
Joshua

---

**Lloyd Solomon <LSolomon@spges.com>**                                    **Mon, Apr 23, 2007 at 7:22 PM**
To: jpkubicki@gmail.com

No problem. I look forward to our next meeting.

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                    **Wed, Apr 25, 2007 at 9:49 AM**
To: JP Kubicki <jpkubicki@gmail.com>

When would you like to reschedule?

[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                                      **Thu, Apr 26, 2007 at 10:54 AM**
To: Lloyd Solomon <LSolomon@spges.com>

Lloyd,

The simply answer is ASAP as I am keenly interested in further our talks. That said my schedule is a bit out of sorts right now due to a number of things. THe week of May 7th looks good but I do not get back to DC until that night and I may need to go to TX later that week. If so the following week would be good. My apologies for this.

Thanks,
Joshua

**DEF JK00346**

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**         **Thu, Apr 26, 2007 at 11:01 AM**
To: JP Kubicki <jpkubicki@gmail.com>

Would you prefer May 8th in the afternoon and dinner and stay over in NYC or the following week?

     -----Original Message-----
     **From:** JP Kubicki [mailto:jpkubicki@gmail.com]
     [Quoted text hidden]

[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**         **Mon, May 7, 2007 at 1:36 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Lloyd,

Good afternoon sir. I am back from the west coast. My apologies for being out of pocket as I was addressing some issues that diverted my attention temporarily. I have been able to free up my time for tomorrow if you still have availability. Kindly let me know.

Again, my apologies and thank you for your patience.

Sincerely,
Joshua

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**         **Mon, May 7, 2007 at 1:52 PM**
To: JP Kubicki <jpkubicki@gmail.com>

You will see Scott at 4:30 and Al Spahn at 5:30 and then I will meet you for dinner.

     -----Original Message-----
     **From:** JP Kubicki [mailto:jpkubicki@gmail.com]
     [Quoted text hidden]

[Quoted text hidden]

---

**DEF JK00347**

Loading "Gmail – Sample Res. letter"

                                               Joshua Kubicki <jpkubicki@gmail.com>

# Sample Res. letter

2 messages

---

**mark brunkhorst <mark@brunkmeyer.com>**                         **Thu, May 10, 2007 at 4:12 PM**
To: jpkubicki@gmail.com

Joshua,

Spoke with Lloyd, he is fine with having an offer to you likely to arrive Tuesday, we also discussed the staff additions and he is 100% fine with that.

Thanks,

Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell   1-914-213-0738

www.brunkmeyer.com

---

 **Resignation Process BMG .doc**
23K

---

**JP Kubicki <jpkubicki@gmail.com>**                             **Mon, May 14, 2007 at 10:14 AM**
To: mark brunkhorst <mark@brunkmeyer.com>

Mark,

Thanks for this.  Here are some of the expenses I have incurred thus far.  I will forward you the other ones shortly.

Please note that on 4/19 trip I upgraded to 1st Class ($87 fee) - I do not feel that is SP's responsibility.  Also on this past trip which you will see on the email following this.

Further, this last trip I seriously could not find a hotel room within the city.  The only room I coudl find was at the Hyatt for $700/night.  If they want to pick this up that is fine if they do not want to pay full I understand as well.

**DEF JK00323**

Please let me know if you need anything further.

| Posted Date | Type | Description | Travel Date | Points | |
|---|---|---|---|---|---|
| 05/03/2007 | Amtrak Travel | **Travel:** WASHINGTON D.C. - NEW YORK-PENN. STATION<br>**Ticket Number:** 1081181001461<br>**Transaction Amt:** 226.00 | 04/18/2007 | 750 | view details |
| 04/28/2007 | Amtrak Travel | **Travel:** NEW YORK-PENN. STATION - WASHINGTON D.C.<br>**Ticket Number:** 1094803283540<br>**Transaction Amt:** 286.00 | 04/19/2007 | 750 | view details |
| 04/13/2007 | Amtrak Travel | **Travel:** WASHINGTON D.C. - NEW YORK-PENN. STATION<br>**Ticket Number:** 0941181089348<br>**Transaction Amt:** 157.00 | 04/04/2007 | 500 | view details |
| 04/11/2007 | Amtrak Travel | **Travel:** NEW YORK-PENN. STATION - WASHINGTON D.C.<br>**Ticket Number:** 0949268459250<br>**Transaction Amt:** 173.00 | 04/04/2007 | 500 | view details |

[Quoted text hidden]

DEF JK00324

### *The Resignation Process & Sample Letter*

The anticipation we feel prior to resigning a position is often laced with uncertainty and anxiousness. We are uncertain as to exactly how our employer/boss or supervisor will respond to our resignation and anxious about going through the process and how to best handle the details. It is important to prepare exactly what you will be saying and to whom you will tender your resignation.

Key Components to the Resignation Process include:

- ❑ Prior to resigning you will want to have a signed resignation letter prepared to hand or your boss or supervisor.
- ❑ Ideally you will want to resign in person verses over the phone or via e-mail.
- ❑ Stepping into your bosses' office and asking to have a word with them typically works better than setting an appointment.
- ❑ *Timing*: Sooner than later! Once you have decided to depart your current employer and have accepted an offer of employment with a new company its best to do so as quickly as possible. When we try and determine the best time to resign there never is one. Its best to give your current employer as much time as possible to digest the news and move towards transition while conversely enabling you to start working outwardly with coworkers in transitioning responsibilities. We are emotionally moving on to our new opportunity while trying to coordinate our thoughts as to who can take over our duties and assume responsibilities for key commitments and projects. First prepare two lists 1) That provides project status and important dates for upcoming commitments or customer's and their related expectations. When possible list individuals who might be applicable towards helping with a particular project or support of a customer. 2) A list of projects or clients that will require you and your boss to work together in transitioning.
- ❑ *What to say* (Boss) I'm sure this might come as a surprise to you, but effectively today I am resigning from (Your Company) and tendering my notice of X weeks. This is a decision that has not been made lightly and one I have given great thought to. It's truly more about what I'm going to be doing and the related up-side opportunity than it is about why I'm leaving. I will be joining _____company on _____date as a _____(title) this is an opportunity I'm very excited about and one you need to know I've made up my mind to take on. I am grateful for the career opportunity you and _____,_____, have provided and will look back as to what we have accomplished together with pride and affection. I ask for and would appreciate your support in my transition. I have prepared lists of projects/responsibilities and would like to have the news shared with our staff as soon as possible enabling us as much time as possible towards making this as smooth a transition as possible. (If you are joining a company and role that may be viewed as being in competition with your old employer) (boss) _____ Please know I can be relied to do the right thing in regard to my none-compete and or none disclosure agreement. I will reach out to customers, solicit

DEF JK00325

former co-workers, or disclose any proprietary information. Then proceed to discuss whom else you would like to tell of your departure and whom they would like to tell. End that dialogue by saying its important to know I will give you my best effort during this transition conversely my decision to leave is final and its important we take best advantage of the time we have. If as we transition responsibilities during the next X weeks please know I understand if you feel at any time it would be appropriate for me to depart prior to the end of my notice period I'm OK with that.

Dear (supervisors name)

 This letter is to confirm my resignation today (date) as (title of your position) with (Company) and will be departing my position no later than on (end of notice period).

I really appreciate our experiences in working together at (name of company) and the opportunity to contribute towards (growth of clients/ Account base/ deploying programs etc).

In an effort to make this transition as smooth as possible I've prepared a list of (projects, customers, upcoming commitments etc) for us to review together and look forward to doing so as soon as schedules permit.
Thank you, for the support, leadership and professionalism you have put forth towards my personal and professional development. (option)Please express my appreciation to _____and _____ for all they have done in supporting me in my role.

I truly hope we can stay in touch from time to time in years to come.

Sincerely,

DEF JK00326

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL
STAFFING, LLC.

     Plaintiff

v

JOSHUA KUBICKI, et al.

     Defendants.

Civil Action No.
1:07-CV-01281-RJL

Wednesday,
August 1, 2007

Deposition of:

ANDREW PERLIN

called for examination by counsel for the
plaintiff, pursuant to notice, at the law
offices of Schnader, Harrison, Segal & Lewis,
LLP, 2001 Pennsylvania Avenue, NW, Suite 300,
Washington, DC, at 4:00 p.m., when were
present on behalf of the respective parties:

22

1       Q    And internally in terms of for

2  commission sales or something like that, is

3  the Williams & Connolly your account?

4       A    Yes.

5       Q    And the other two, whose accounts

6  are those?

7       A    I'm going to assume their Josh's.

8       Q    Okay.

9       A    I didn't bring them and I haven't

10  had any contact with them since he's been

11  here.  So I'm going to assume they're his.

12       Q    When did -- So prior to Josh

13  showing up, those were not accounts that the

14  Solomon Page legal was doing anything with?

15       A    Correct.  I mean, we were

16  prospecting them, but there was no business

17  generated out of those two firms.

18       Q    And are you familiar with some

19  space that's being, I guess, leased by Solomon

20  Page at 1201 Pennsylvania?

21       A    Yes.

22       Q    Is that under lease with Solomon

## CERTIFICATE

This is to certify that the foregoing proceedings

in the matter of:     The Deposition of
                      Andrew Perlin

held on:              August 1, 2007

at the location of:   Schnader, Harrison, Segal & Lewis
                      Washington, D.C.

were duly recorded and accurately transcribed under my

direction; further, that said proceedings are a true

and accurate record of the testimony given by said

witness; and that I am neither counsel for, related

to, nor employed by any of the parties to this action

in which this deposition was taken; and further that

I am not a relative nor an employee of any of the

parties nor counsel employed by the parties, and I am

not financially or otherwise interested in the outcome

of the action.


Notary Public/Reporter in and for

the District of Columbia

My commission expires

March 31, 2011

This is a sampling of what we discussed. Its compelling and should have your attention. Lets connect later this afternoon.


Best regards,



Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell   1-914-213-0738

www.brunkmeyer.com

---

**JP Kubicki <jpkubicki@gmail.com>**                          **Wed, May 23, 2007 at 10:00 PM**
To: mark brunkhorst <mark@brunkmeyer.com>

Mark,

Here is the draft.  Your remarks and suggestions are welcomed.

Lloyd,

Per our conversation earlier, I am providing you with the following list of action items and spend that I am keenly interested in gaining your commitment to prior to my joining SP.  This is meant to be a primer on the needs and demands of my business and business model.  Though not exhaustive it is meant to be as inclusive as can be at this moment.

Please let me know your level of commitment to each and of course any concerns you may have with each.

PRIORITIES:

1.        Project Space in DC.  We will need at least 10,000 sq. ft of project space.  This space cannot be subterranean but does not have to be Class A.  It needs to be in the downtown DC area, relatively close to a Metro.

        COST: $15 to $25k/month plus facilities, furniture, technology, etc.

2.        Office Space in DC.  We will need an actual permanent address with useful and proprietary office facilities.  Again, this does not have to be Class A space but should reflect our level of investment/commitment into the DC Metro market.

        COST: variable

**DEF JK00219**

3.      Litigation Support Consultants/Professionals: Initially we will need to secure a high level litigation support consultant capable of both being deployed into client environments to consult as well as being a part of the business development efforts of the legal team.

COST: $150k to $200k/year – commission alternative

4.      Technology: We will need to develop and deploy a web-based technology solution to facilitate and deliver a time keeping, expense tracking, billing, approval, review mechanism for both candidates and clients.

Remote access to client/candidate database.

COST: $40k to $80k (cost can vary greatly)

5.      Logistics Support: We will need dedicated resources within HQ to facilitate any and all necessary logistics relating to serving clients. From travel arrangements for travel teams to securing and negotiating real estate for projects to arranging technology support and delivery. This person or persons MUST be dedicated when needed and educated on the Legal mission and personality of the group. This cannot be a 9 to 5 mentality.

COST: unknown

6.      Marketing: We will need an immediate and potent marketing/branding effort. This should be the initial stages of an overall campaign. This is for web re-design and deployment, print materials, announcements, post cards, etc. Ability to host events in DC and NY to meet and introduce ourselves to clients.

COST: $100k to $200k/ for the first 6 months

7.      Securing Jon Pomykala: As the lead Project Manager Jon will be invaluable to our initial and ongoing efforts to serve and maintain excellence in delivery of all our project and recruiter.

COST: $65k - $75k Base + override legal GM and/or commissions on sales

8.      Securing Kym Danowski: As the Legal Operations lead for my current group Kym would be invaluable to SP for bringing the best practices of a back office as well as the client service of the front office. Her attention to detail and high level of client support is unmatched and would truly be an asset to our team and effort.

COST: $55k Base + override legal GM

9.      Entertainment/Travel: It will be necessary for me to travel throughout the US to meet with and entertain clients. Not that all clients have to have an expensive dinner with a celebrity but I will need to the support and commitment to this effort.

COST: $10k to $25k month (based on historical activity/spend)

10.     Training/Education/Seminars/Subscriptions:

COST: $5k to $7k/month

11.     DC/NY commute: As we discussed initially I would commute more heavily and then transition down to a 2/per month schedule. I would plane to take the train most times and stay NOT in the Waldorf but NOT in the Best Western. Typically a Westin, Hyatt, Marriot or Hilton.

COST: Seasonal dependant and booking advance

**DEF JK00220**

12.      Back Office Upgrade/Automation/Technology Infusion:  Cannot compete nationally or globally or even locally with some clients using the current methods and procedures SP employs.  The front end delivery system MUST integrate with the back office functions.  Get away from manual operations!

           COST: unknown

13.      Parking/Transportation:  For all Legal employees. Monthly Parking or Metro Check

           COST: $250-350/month for parking per employee

14.      Cell phone and Blackberry provided to ALL Business Development employees.  Blackberry to Support personnel.

15.      Laptops to all Legal employees.

My Compensation: Mark mentioned to me that there could be a "seat at the table" for me in the future based on growth and profitability of the Legal group.  I would like to know more details about this and what it could mean for my compensation.

[Quoted text hidden]

---

**mark brunkhorst <mark@brunkmeyer.com>**                            **Thu, May 24, 2007 at 8:02 AM**
To: JP Kubicki <jpkubicki@gmail.com>

Thank you, Joshua,


Lets connect and discuss before you send this off to Lloyd as I have a few questions. I have a 8-9:15 Conf call but am OK after that please let me know what works for you.


Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell  1-914-213-0738

www.brunkmeyer.com


[Quoted text hidden]

---

**DEF JK00221**



Joshua Kubicki <jpkubicki@gmail.com>

# RE Lloyd's Investment Plan
1 message

---

**mark brunkhorst <mark@brunkmeyer.com>**                                   **Wed, May 30, 2007 at 3:08 PM**
To: JP Kubicki <jpkubicki@gmail.com>

*Good afternoon Joshua,*

Eric Lloyd and I had a detailed conference call late this morning and reviewed your document in detail. Overall I'm very pleased with their willingness and commitment. Lloyd & Eric specifically commented on your closing paragraph concluding your sentiments regarding compensation sends a clear message that they get loud and clear while further demonstrating you are of the caliber and fiber of the right individual to drive the Legal Project and Litigation Support Division.

Lloyd understands and demonstrated commitment to the importance of office space, technology and key staff members. As I would expect the areas we need to better describe and break out are the Marketing, PR, and T&E. When we were going through those three topics there seems to be obvious overlap which Lloyd would like to break out with specific agreed on anticipated cost and investment sub-categories.

We also discussed a model with a reasonable incremental approach. In preparation for our conversation listed below are comments on each item to include what they have absolutely committed to with related timelines and those topics we need to better clarify.

**1 & 2) Office space and Project-Litigation Support space.** Lloyd is absolutely committed to going with 10,000' out of the box. What he asked for is to initially combine the office with the Project space enabling you and your team to be closer to the project staff members, which in his mind offers more continuity. We discussed trying to find a location that would have additional space in the building, which could then be expanded, based on the growing project business.

**3) Litigation Consultant** After describing to Eric the importance and role of the litigation Support Consultant they absolutely committed to a day one hire of your target candidate in the salary range you outlined. Eric asked if the person was a direct cost component or revenue generator and I told him the person would more than pay for themselves but there would be likely a 3-5 month lag, they both were fine with that. I was pleased with the extent to which Eric gets it, he is obviously well exposed to project like models and made reference to their IT solutions offerings and how they have some overlapping commonality.

**4) Web based billing and reporting technology:** They both seemed to have discussed this in detail with Al and committed to having it in place and functioning in 6-8 weeks. This required zero negotiation they discussed it as a done deal and were 100% understanding of the importance of getting it in place ASAP.

---

Confidential                DEF JK00262

Loading "Gmail – RE Lloyd's Investment Plan"

5) **Logistics Support:** Both Lloyd and Eric were questioning exactly what this effort requires as they see some overlap with # 8 in hiring Kym. Eric said they would secure a travel agency to assist in providing around the clock travel coordination support. They obviously would support the space and related contractual issues. This is an area I believe you need to discuss in more detail giving them a better understanding as to what Kym could handle outright vs. front-end, vs. need additional resources to handle.

6) **Marketing:** As Lloyd went through the examples he was having difficulty-allocating 200k to get the items more than covered. He said he was comfortable with 100K and wants you to look at items 6,9,& 10 and break out the specifics in doing so creating two categories 1-marketing and 2-T&E. (lets discuss)

7-8) **Jon and Kym:** Absolutely move forward, this was a next-done deal like conversation. No concerns or issues other than gaining a better understanding as to what additional support services will be needed for Logistical support.

9) **T&E:** Lloyd offered 100K sharing his IT leader spends 75K and that was inclusive of attending numerous tradeshows etc. I sensed Eric may have a little more flexibility on this one but we need to provide a more detailed list of your current cost structure. Lloyd had a hard time with 25k a month as being reasonable year one if he is also allocating 100k for marketing.

10) **Travel to NYC:** They said lets combine that into the T&E projections and allocation.

11) **Back Office:** They are moving forward with the conversion based on your and other divisions needs. Initially Lloyd wanted to wait until they moved the NYC offices but has now committed to move forward. Lloyd shared they are looking at Great Plains which is web based and 100% integrated with Microsoft Office.

12) **Metro and or Parking:** No Go. Lloyd explained he does not offer this to the NYC team and cannot set the precedent. Lloyd said he would incorporate a way for you to be covered but not all the S-P staff.

13) **Blackberry & or cell phone for all staff:** Yes S-P will provide.

14) **Laptops:** Yes absolutely Eric mentioned providing docking stations as well, I'm not sure what that is.

**Compensation:** As I referenced earlier Lloyd and Eric are most appreciative of your skin in the game incentive focused compensation model. Lloyd said he is open to discussing enhancements beyond the EIB and 15% GM. I suggest we leave that component to your in person meeting next week getting the budget commitments cemented first is an obvious must. Lloyd reiterated how all the agreed on line items will be put in writing. We discussed how many of the global and national players are experiencing a down turn in Q-1 and shrinking their 2007 projections. Lloyd reminded me of the fact that S-P doesn't renege on a promising business venture when other markets may be experiencing market declines.

Confidential    DEF JK00263

Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell 1-914-213-0738

www.brunkmeyer.com

-----Original Message-----
**From:** JP Kubicki [mailto:jpkubicki@gmail.com]
**Sent:** Thursday, May 24, 2007 5:52 PM
**To:** mark brunkhorst
**Subject:** [SPAM] Re: Lloyd's Business Plan and Investment Plan

latest draft

----------------------

Lloyd,

Per our conversation earlier, I am providing you with the following list of action items and spend that I am keenly interested in gaining your commitment to prior to my joining SP. This is meant to be a primer on the needs and demands of my business and business model. Though not exhaustive it is meant to be as inclusive as can be at this moment.

Please let me know your level of commitment to each and of course any concerns you may have with each.

PRIORITIES:

     1.    Project Space in DC. We will need at least 10,000 sq. ft of project space. This space cannot be subterranean but does not have to be Class A. It needs to be in the downtown DC area, relatively close to a Metro.

          COST: $15 to $25k/month plus facilities (defined to include HVAC etc.), furniture, technology, etc. My Current space is roughly 25,000'. Project related revenue for 2006 was 25ML of which I generated 17ML.

     2.    Office Space in DC. We will need an actual permanent address with useful and proprietary office facilities. Again, this does not have to be Class A space but should reflect our level of investment/commitment into the DC Metro market. Initially we would need 3-5,000' - currently I have 14 staff in the DC branch in roughly 6-7k sq. ft.

          COST: variable

**DEF JK00264**

3.      Litigation Support Consultants/Professionals: Initially we will need to secure a high level litigation support consultant capable of both being deployed into client environments to consult as well as being a part of the business development efforts of the legal team.

The role of the LSC will provide that they will be servicing 25-30% of the Lit Support Business and investing 30% of their time in second and third round sales engagements as they will be providing value add subject matter expertise during the front end evolving through discovery, project definition and fulfillment. Other revenue may be generated through temp assignments and project management.

COST: $150k to $200k/year – commission alterna tive.

4.      Technology: We will need to develop and deploy a web-based technology solution to facilitate and deliver a time keeping, expense tracking, billing, approval, review mechanism for both candidates and clients. Remote password access for clients and temporary staff is vital. The types of transactions that will take place are billing approval, time and attendance approval etc. This is an intricate part of reducing DSO. Further, some of my clients have this type of technology already deployed on their end which we will need to incorporate with. Wherever there is technology that speeds invoicing and payment delivery DSO has been reduced to below 30 days in the majority of cases.

COST: $40k to $80k (cost can vary greatly)

5.      Logistics Support: We will need dedicated resources within HQ to facilitate any and all necessary logistics relating to serving clients. From travel arrangements for travel teams to securing and negotiating real estate for projects to arranging technology support and delivery. This person or persons MUST be dedicated when needed and educated on the Legal mission and personality of the group. This cannot be a 9 to 5 mentality. Possibly a third party travel service could provide assistance for travel related support but only under clear and strict expectation communication as when it does occur it can be high demand. Kym is well-qualified to spearhead this effort and task when it arrives though she is not a travel agent herself so access to SABRE and likewise is limited.

COST: unknown

6.      Marketing: We will need an immediate and potent marketing/branding effort. This should be the initial stages of an overall campaign. This is for web re-design and deployment, print materials, announcements, post cards, etc. Ability to host events in DC and NY to meet and introduce ourselves to clients . - Trade Journals mailing campaigns, Tradeshow booth, Give-a-ways, having a MKT PR firm assist in getting published in targeted trade journals, and the positive synergies affiliated with being able to drive the strategy & investment that I currently do not enjoy.

COST: $100k to $200k/ for the first 6 months

7.      Securing Jon Pomykala: As the lead Project Manager Jon will be invaluable to our initial and ongoing efforts to serve and maintain excellence in delivery of all our project and recruiter.

**DEF JK00265**

Loading "Gmail – RE Lloyd's Investment Plan"    07/30/2007 02:41 AM

COST:  $65k - $75k Base + override legal GM and/or commissions on sales

8.    Securing Kym Danowski: As the Legal Operations lead for my current group Kym would be invaluable to SP for bringing the best practices of a back office as well as the client service of the front office.  Her attention to detail and high level of client support is unmatched and would truly be an asset to our team and effort.

COST: $55k Base + override legal GM

9.    Entertainment/Travel: It will be necessary for me to travel throughout the US to meet with and entertain clients. Not that all clients have to have an expensive dinner with a celebrity but I will need to the support and commitment to this effort.

COST: $10k to $25k month (based on historical activity/spend).  Examples: in 2006 I secured suites at two major conventions specifically targeting specific clients that they ranged in the 12-15k per event range.  We secured business out of this totaling roughly 20k in perm fees and a $500,000 profit project.

10.    Training/Education/Seminars/Subscriptions: Running ads and articles in trade journals, attending E-Discovery, Litigation, Antitrust seminars.

COST: $5k to $7k/month

10.    DC/NY commute: As we discussed initially I would commute more heavily and then transition down to a 2/per month schedule.  I would plane to take the train most times and stay NOT in the Waldorf but NOT in the Best Western.  Typically a Westin, Hyatt, Marriot or Hilton. Does Solomon Page have an arrangement with some local hotels?

COST:  Seasonal dependant and booking advance

11.    Back Office Upgrade/Automation/Technology Infusion: Cannot compete nationally or globally or even locally with some clients using the current methods and procedures SP employs.  The front end delivery system MUST integrate with the back office functions.  Get away from manual operations ! In the recent past I have had input on this and would want it with SP.  Also, it is important to incorporate other div heads in the process in soliciting their needs while communicating the platform requirements to Al. Certain important components if not in place will generate excessive cost, inefficiency and service burdens on team members who would be far better suited to be selling and or filling orders.

COST: unknown

12.    Parking/Transportation:  For all Solomon Page Legal employees.  Monthly Parking or Metro Check

COST: $250-350/month for parking per employee

13.    Cell phone and Blackberry provided to ALL Solomon Page Business

DEF JK00266

Development employees.  Blackberry to Support personnel.

14.        Laptops to all Solomon Page Legal employees.

My Compensation:  Mark mentioned to me that there could be a "seat at the table" for me in the future based on growth and profitability of the Legal group.  I would like to know more details about this and what it could mean for my compensation.

Further, I want to explain that though generous, the guarantee you have offered (and even discussed with Mark about increasing) is not a major component of my consideration. For the first year, yes, a guarantee is nice while I transition clients and build the business.  However, I would like you to understand that if I am not hitting my income expectations by 12 months then something is seriously wrong. I would much prefer discussing incorporating a bonus GP % escalator to 20%, this might be after 12 months or upon achieving certain revenue targets year one then brought closer to my current plan in year two.

My goal would be to deliver unto SP my book of clients along with new ones.  In order for me to do this I will need not only my own talent and skills but the above mentioned facets and a commitment from you and SP that we are set to do this.  Guarantees are not my bag – developing true business and making real money is.  That is what I can do and want to do for any organization I work with.  My current employer has suffered in delivering me all the tools I need to truly realize all the benefits and profits that are in this emerging industry.   SP has the potential to do just that.

**DEF JK00267**



Joshua Kubicki <jpkubicki@gmail.com>

# Follow Up
9 messages

**Lloyd Solomon <LSolomon@spges.com>**                              Fri, Jun 1, 2007 at 2:07 PM
To: jpkubicki@gmail.com
Cc: mark@brunkmeyer.com, Eric Davis <Eric@solomonpage.com>

Joshua, it was good speaking with you yesterday! The following is numbered to correspond to the "priorities" document you sent to me.


Items 1 and 2

As discussed, we are pleased to take a take a combined space (to accommodate our headquarter and project based needs) in Washington, DC in order to properly support the Litigation Support business.


Item 3

As discussed, we will employ a Litigation Support Consultant/Professional in order to create the value proposition for this service offering.  It is our understanding that this person would cost between $150,000 - $200,000 and would be billable 50% of the time at $150/hour and supplementally as a Project Manager at lower rates.


Items 4 and 11

We anticipate being able to roll out an appropriate web-based technology solution within a six to eight week timeframe.  The company is committed to a Back Office upgrade and automation program and is currently in the process of undertaking a companywide initiative with an anticipated 12 month timeframe.


Items 5 and 8

We look forward to bringing Kym Danowski on board as Legal Operations Lead, handling many of the administrative and operational issues covered in our conversation yesterday.

**DEF JK00068**

In addition it is important to note that we are highly confident in our internal corporate infrastructure from a legal, human resource, insurance, administrative and financial

Loading "Gmail – Follow Up"

07/30/2007 02:39 AM

perspective, which would be invaluable to the growth of the business.

In order to facilitate travel arrangements in a real-time manner, we foresee developing a relationship with an appropriate third-party travel service provider with whom Kym would be the primary liaison.

## Item 6

We are in the process of a website re-design which is being done internally. We would be happy to incorporate the Litigation Support business into our Legal framework according to your needs and specifications.

Also, we would consider a public relations marketing relationship in order to assist us in establishing our brand identity in a cost effective manner.

## Item 7

We look forward to securing Jon Pomykala as Lead Project Manager/Recruiter for this undertaking at a compensation level and structure consistent with our model.

## Item 9

A travel and entertainment budget of $15,000/month will be provided for your first year of expenses for the group (to include DC/NY) and participation in key industry/convention events.

## Item 10

A budget of $75,000 for the first year will be provided for Training / Education /Seminars/Subscriptions (to include advertising, job board postings, print ads, trade journals, subscriptions, seminars, etc.

## Item 12

As discussed, you will be provided with a parking allowance. All SPG employees have the option of participating in our Transit Check program, currently limited to $105 a month, deducted pre-tax from payroll checks.

**DEF JK00069**

**Confidential**

Loading "Gmail – Follow Up"

Item 13

Cell phones and blackberries will be provided in accordance with company policy and usage plans.


Item 14

Either desk top computers or lap tops with docking stations will be provided for all SP Litigation Support people.


Compensation

-

*Fast Start Bonus*


The growth of the Litigation Support business would be enhanced greatly if you were to generate significant Fully Loaded Gross Margin Dollars (FLGMD)* dollars early in its development. Therefore, we would like to provide added incentive compensation upon reaching the following goals.


If you reach $3,000,000 in FLGMD* within the first eighteen months of employment, you will receive a $50,000 bonus. If you reach $5,000,000 in FLGMD* within the first twenty-four months of employment, you will receive a $100,000 bonus. Each of these bonuses may be earned only once and are limited to business generated by you.


*  FLGMD is defined as revenue less direct labor plus burden at 15% and other costs directly related to placements (including but not limited to referral fees, relocation fees, non-reimbursable travel expenses, etc.)

* * *

In summary, we are highly confident in our collective abilities to building a very successful, quality driven, brand in this emerging and exciting niche.  It is my sincere belief that our respective styles and desires would make a phenomenal team.  I look forward to our next conversation which will hopefully result in a successful conclusion to our discussions.


Lloyd

**Confidential**

**DEF JK00070**

Loading "Gmail - Follow Up"

07/30/2007 02:39 AM

---

**JP Kubicki <jpkubicki@gmail.com>**
To: Lloyd Solomon <LSolomon@spges.com>
Cc: mark brunkhorst <mark@brunkmeyer.com>

**Mon, Jun 4, 2007 at 8:19 PM**

Lloyd - sorry for the delay in getting back to you.  My world continues to be a bit crazy right now.  I am still on the West Coast wrapping up my days meetings.  I am travelling all day tomorrow to attend to my family and will be spending a few days there (most likely not returning to DC until Saturday).

I want to say to you that my interest in joining SP has only heightened in the last weeks and I feel more solid about the opportunity.  It is my Hope to get you what I need to shortly and then to come up to NY early next week to flesh everything out and finalize both of our thoughts so that a final decision can be made.

Thanks for your patience with me on this and during this time.

Sincerely,
Joshua


[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**
To: jpkubicki@gmail.com

**Mon, Jun 4, 2007 at 8:36 PM**

One step at a time. It is a long term situation so i appreciate your caution and process.
[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**
To: Lloyd Solomon <LSolomon@spges.com>
Cc: Mark Brunkhorst <mark@brunkmeyer.com>

**Tue, Jun 12, 2007 at 1:31 PM**

Lloyd,

I wanted to confirm our meeting for tomorrow at 10am in NY.  I look forward to seeing and talking with you again.  My interest and excitment in this opportunity continue to increase with each passing conversation we have and I expect tomorrow to be no different.

Best,
Joshua

Sent via BlackBerry from Cingular Wireless

**DEF JK00071**

[Quoted text hidden]

Loading "Gmail – Follow Up"

07/30/2007 02:39 AM

---

**Lloyd Solomon <LSolomon@spges.com>**
To: jpkubicki@gmail.com

Tue, Jun 12, 2007 at 1:34 PM

See you then...we feel the  same way.

[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**
To: Mark Brunkhorst <mark@brunkmeyer.com>

Tue, Jun 12, 2007 at 1:37 PM

Fyi
Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Lloyd Solomon" <LSolomon@spges.com>

Date: Tue, 12 Jun 2007 13:34:01
To:<jpkubicki@gmail.com>

[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**
To: Lloyd Solomon <LSolomon@spges.com>
Cc: Mark Brunkhorst <mark@brunkmeyer.com>

Wed, Jun 13, 2007 at 4:36 AM

Lloyd,

Good morning. My appologies but it appears I have come down with a bug or have food poisoning.  I have been up
all night and was still preparing to head up to NY this morning. However it seems lke the best thing to do is
recover.

The rest of my week is open and I am eager to meet so please let me know what may work. Sorry about this but I
don't think a 3 hour train ride this morning would be a great idea for me. Plus I would most likely look like
something the cat dragged in.

Thanks,
Joshua

Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Lloyd Solomon" <LSolomon@spges.com>

Date: Tue, 12 Jun 2007 13:34:01

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**
To: jpkubicki@gmail.com

Wed, Jun 13, 2007 at 6:03 AM

Feel better. Friday same time?

DEF JK00072

-----Original Message-----
From: jpkubicki@gmail.com <jpkubicki@gmail.com>
To: Lloyd Solomon
[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**
To: Lloyd Solomon <LSolomon@spges.com>                    **Thu, Jun 14, 2007 at 11:42 AM**

Sounds good.  See you tomorrow.
Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Lloyd Solomon" <LSolomon@spges.com>

[Quoted text hidden]

**DEF JK00073**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

AJILON PROFESSIONAL          )          ORIGINAL

STAFFING, LLC                )

    Plaintiff               )   Civil Action No.

       vs.                  )   1:07-CV-01281-RJL

JOSHUA KUBICKI, et al        )

    Defendants              )

Deposition of Jonathan R. Pomykala

Washington, D.C.

August 2, 2007

Reported by:  Bonnie L. Russo

JOB NO. 182490

# Jon Pomykala

Page 39

1    Q.    When did you do that?

2    A.    A week after I started, week, week

3 and a half after I started.

4    Q.    Did you ever talk to the principals

5 in New York about going to work for Solomon

6 Page prior to starting?

7    A.    No.

8    Q.    Did you negotiate going to Solomon

9 Page exclusively with Josh Kubicki?  This is

10 prior to going there.  Weren't your discussions

11 about going to Solomon Page strictly with Josh

12 Kubicki?

13    A.    Correct.

14    Q.    You didn't talk to anyone else at

15 Solomon Page prior to actually showing up for

16 work?

17    A.    Correct.

18    Q.    Did you understand that Josh was

19 representing to you what Solomon Page was

20 prepared to do?

21    A.    Yes.

22    Q.    And you trusted what Josh was

# Jon Pomykala

Page 40

1  telling you about what Solomon Page would do

2  for you was accurate, correct?

3      A.    Yes.

4      Q.    And some of those discussions took

5  place before Josh terminated at Ajilon; is that

6  correct?

7      A.    Correct.

8      Q.    But at the time you had those

9  discussions with him you understood he was not

10  representing Ajilon; he was representing

11  Solomon Page?

12      A.    Since nothing was set in stone I

13  think he was still representing Ajilon.

14      Q.    He was talking to you about you

15  going to work with Solomon Page but he was

16  representing Ajilon.  That was your

17  understanding?

18      A.    I guess, yeah.

19      Q.    Okay.  Did there seem like a

20  conflict there that he was your boss at Ajilon

21  but he is talking to you about going to work

22  for a competitor?

1    CERTIFICATE OF NOTARY PUBLIC

2        I, Bonnie L. Russo, the officer before

3  whom the foregoing deposition was taken, do

4  hereby certify that the witness whose testimony

5  appears in the foregoing deposition was duly

6  sworn by me; that the testimony of said witness

7  was taken by me in shorthand and thereafter

8  reduced to computerized transcription under my

9  direction; that said deposition is a true

10  record of the testimony given by said witness;

11  that I am neither counsel for, related to, nor

12  employed by any of the parties to the action in

13  which this deposition was taken; and further,

14  that I am not a relative or employee of any

15  attorney or counsel employed by the parties

16  hereto, nor financially or otherwise interested

17  in the outcome of the action.

18                        *Bonnie L. Russo*

19              Notary Public in and for

20                the District of Columbia

21  My Commission expires:  May 14, 2010

22

**Esquire Deposition Services**          **MD - 1-800-539-6398**
**D.C. - 1-800-441-3376**                 **VA - 1-800-752-8979**

17

1       Q       But did he ultimately offer you a

2   job or had he already offer you a job?

3       A       He did not offer me the job at

4   that time.

5       Q       Okay.  So when did you get a job

6   offer from Solomon Page?

7       A       I got the official -- I got an

8   unofficial offer letter on June 30th is when

9   I saw everything we spoke about on June 27th

10  in writing.

11      Q       Okay.  Who did you speak with at

12  Solomon Page on June 27th?

13      A       Just Josh.

14      Q       And where did you speak with him?

15      A       Over the phone.

16      Q       And where were you when you were

17  talking to him?

18      A       On vacation.

19      Q       Okay.  And physically, where were

20  you?

21      A       I was at concert at Nissan

22  Pavilion.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C.  20005-3701          www.nealrgross.com

### Jon Pomykala

Page 36

1    Q.    Who else was going to be at Solomon

2 Page that you would still be working with?

3    A.    No one else.

4    Q.    Okay.  So it was just the three of

5 you?

6    A.    Correct.

7    Q.    What about that appealed to you?

8    A.    We had a good working relationship.

9    Q.    And can you describe the elements of

10 the working relationship that you valued that

11 were positive?

12    A.    Trust, team work.  Those are two big

13 ones.

14    Q.    Did you know the other two people's

15 strengths?

16    A.    Yes.

17    Q.    Did you know what they were good at?

18    A.    Yes.

19    Q.    Did they know what you were good at?

20    A.    You would have to ask them but I

21 believe so.

22    Q.    Did the three of you ever talk while

**Jon Pomykala**

Page 37

1 you were still at Ajilon about going together

2 over to Solomon Page as a team?

3      A.      No.

4      Q.      Did you talk about that with Josh?

5      A.      In my last week we had talked about

6 it at Ajilon.

7      Q.      Your last week would have been --

8 you resigned effective the 29th, correct?

9      A.      Correct.

10      Q.      So it would have been that week?

11      A.      Yes.

12      Q.      You didn't talk with him about that

13 before?

14      A.      I think we talked about it maybe a

15 week before that as well.

16      Q.      When did you commit to Josh that you

17 would go over to Solomon Page?

18      A.      When I signed my offer letter.

19      Q.      You didn't commit before that?

20      A.      I didn't sign anything.

21      Q.      Well, did you ever tell Josh that he

22 could represent to the people at Solomon Page

1    same job that you did when you were at Ajilon.

2         A    Yes.

3         Q    And when was your first day at

4    Solomon Page?

5         A    July 2nd.

6         Q    And what was your last day at

7    Ajilon?

8         A    June 29th.

9         Q    Okay.  When did you decide to quit

10   at Ajilon and go to work at Solomon Page?

11        A    June -- The last week of June I

12   was thinking about it.

13        Q    You hadn't made a decision.

14        A    No.

15        Q    Okay.  So was it -- You actually

16   gave notice -- Well, I won't call it notice.

17   You actually told Ajilon you were leaving on

18   July 29th?

19        A    On June.

20        Q    I'm sorry.  June 29, 2007?

21        A    Yes.

22        Q    Did you tell anyone before that

1    that you were leaving?

2           A    No.

3           Q    Did you tell anyone before that

4    you were thinking of leaving?

5           A    Yes.

6           Q    Okay.  Who did you tell at Ajilon

7    before that that you were thinking of leaving?

8           A    Denise Feeley.

9           Q    Okay.  And is Denise Feeley?

10          A    She is the Building Administrator

11   in Cellbrook (phonetic).

12          Q    Okay, and what did you tell

13   Denise?

14          A    Just that I was looking for other

15   jobs and I was looking to leave soon.

16          Q    Okay.  Why did you tell her?  Was

17   that just --

18          A    Just I call her for billing and

19   it's just conversation.

20          Q    Okay.  She's not your supervisor

21   or anything?

22          A    No.

1    come back the next day to tell John that I was

2    leaving and that was it.

3        Q    Did you have any active projects

4    that you were working on at the time?

5        A    Not really.

6        Q    Did you have anything in the

7    pipeline that you then tried to take over to

8    Solomon Page?

9        A    The only thing that was in the

10   works, it was this Dickstein deal.  It was

11   already -- I think Ajilon had already had some

12   of it and I had a phone call from one of the

13   folks over there at Dickstein before I left.

14   But I didn't do anything with it once I left.

15       Q    Okay.  When did you first find out

16   that Josh Kubicki and Jon Pomykala and Kym

17   Danowski were going to be employed at Solomon

18   Page?

19       A    I found out that Josh Kubicki was

20   coming over to Solomon Page.  It was a Monday

21   evening via email and it was, I don't know the

22   date off the top of my head, but it was the

18

1  week before the Fourth of July. So it was in

2  June. I don't know that date. It was that

3  Monday. The next day Josh came to my office

4  here in town and he had a meeting with myself

5  and Jan Templeman and that's when he told us

6  that Kym and Jon were coming with him.

7      Q    Okay. So again, the Monday email,

8  if we look at a calendar, that's the Monday

9  before the week that the Fourth of July was

10 in.

11     A    Yes, the Fourth of July was on a

12 Wednesday. It was that week before Monday.

13 I don't remember the date. I think it's the

14 20 something.

15     Q    Okay, and the next day you

16 actually met with Josh.

17     A    Yes, that Tuesday.

18     Q    And he said to you that Kym and

19 Jon are both coming as well.

20     A    Yes.

21     Q    It wasn't he hoped they will or

22 he's made an offer to them. It's they are

1  coming or --

2      A    As I understood it, they were

3  coming. But I don't know.

4      Q    Okay. That was your understanding

5  from what he said.

6      A    Right.

7      Q    Anything else that you recall of

8  that discussion?

9      A    Just basically that he was

10  bringing in this gentleman, Bryan, over who

11  again I can't remember his last name and that

12  he was now in charge of the whole legal

13  division and he was going to be working here

14  out of D.C. and there was so much going on at

15  the time as far as this big whirlwind of -- I

16  mean, everything just kind of hit all at once

17  that myself and my colleague, Jan, we didn't

18  really know what to do. So it wasn't exactly

19  a long meeting. We were just kind of sitting

20  back just kind of taking it all in. But that

21  was pretty much the gist of the meeting I

22  guess.

Cell  1-914-213-0738

www.brunkmeyer.com

[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                    **Fri, May 25, 2007 at 6:51 AM**
To: Lloyd Solomon <LSolomon@spges.com>

Lloyd,

Per our conversation earlier this week, I am providing you with the following list of action items and spend that I am keenly interested in gaining your commitment to prior to my joining SP.  This is meant to be a primer on the needs and demands of my business and business model.  Though not exhaustive it is meant to be as inclusive as can be at this moment.

Please let me know your level of commitment to each and of course any concerns you may have with each.

PRIORITIES:

1.   Project Space in DC.  We will need at least 10,000 sq. ft of project space.  This space cannot be subterranean but does not have to be Class A.  It needs to be in the downtown DC area, relatively close to a Metro.

   COST: $15 to $25k/month plus facilities (defined to include HVAC etc.), furniture, technology, etc. My Current space is roughly 25,000'. Project related revenue for 2006 was 25ML of which I generated 17ML.

2.   Office Space in DC.  We will need an actual permanent address with useful and proprietary office facilities.  Again, this does not have to be Class A space but should reflect our level of investment/commitment into the DC Metro market. Initially we would need 3-5,000' - currently I have 14 staff in the DC branch in roughly 6-7k sq. ft.

   COST: variable

3.   Litigation Support Consultants/Professionals: Initially we will need to secure a high level litigation support consultant capable of both being deployed into client environments to consult as well as being a part of the business development efforts of the legal team.

   The role of the LSC will provide that they will be servicing 25-30% of the Lit Support Business and investing 30% of their time in second and third round sales engagements as they will be providing value add subject matter expertise during the front end evolving through discovery, project definition and fulfillment.   Other revenue may be generated through temp assignments and project management.

   COST: $150k to $200k/year – commission alterna tive.

4.   Technology: We will need to develop and deploy a web-based technology solution to facilitate and deliver a time keeping, expense tracking, billing, approval, review mechanism for both candidates and clients. Remote password access for clients and temporary staff is vital.  The

DEF JK00250

types of transactions that will take place are billing approval, time and attendance approval etc. This is an intricate part of reducing DSO. Further, some of my clients have this type of technology already deployed on their end which we will need to incorporate with. Wherever there is technology that speeds invoicing and payment delivery DSO has been reduced to below 30 days in the majority of cases.

COST: $40k to $80k (cost can vary greatly)

5.  Logistics Support: We will need dedicated resources within HQ to facilitate any and all necessary logistics relating to serving clients. From travel arrangements for travel teams to securing and negotiating real estate for projects to arranging technology support and delivery. This person or persons MUST be dedicated when needed and educated on the Legal mission and personality of the group. This cannot be a 9 to 5 mentality. Possibly a third party travel service could provide assistance for travel related support but only under clear and strict expectation communication as when it does occur it can be high demand. Kym is well-qualified to spearhead this effort and task when it arrives though she is not a travel agent herself so access to SABRE and likewise is limited.

COST: unknown

6.  Marketing: We will need an immediate and potent marketing/branding effort. This should be the initial stages of an overall campaign. This is for web re-design and deployment, print materials, announcements, post cards, etc. Ability to host events in DC and NY to meet and introduce ourselves to clients . - Trade Journals mailing campaigns, Tradeshow booth, Give-a-ways, having a MKT PR firm assist in getting published in targeted trade journals, and the positive synergies affiliated with being able to drive the strategy & investment that I currently do not enjoy.

COST: $100k to $200k/ for the first 6 months

7.  Securing Jon Pomykala: As the lead Project Manager Jon will be invaluable to our initial and ongoing efforts to serve and maintain excellence in delivery of all our project and recruiter.

COST: $65k - $75k Base + override legal GM and/or commissions on sales

8.  Securing Kym Danowski: As the Legal Operations lead for my current group Kym would be invaluable to SP for bringing the best practices of a back office as well as the client service of the front office. Her attention to detail and high level of client support is unmatched and would truly be an asset to our team and effort.

COST: $55k Base + override legal GM

9.  Entertainment/Travel: It will be necessary for me to travel throughout the US to meet with and entertain clients. Not that all clients have to have an expensive dinner with a celebrity but I will need to the support and commitment to this effort.

COST: $10k to $25k month (based on historical activity/spend). Examples: in 2006 I secured suites at two major conventions specifically targeting specific clients that they ranged in the 12-15k per event range. We secured business out of this totaling roughly 20k in perm fees and a $500,000 profit project.

**DEF JK00251**

Loading "Gmail - phone call..."

10.    Training/Education/Seminars/Subscriptions: Running ads and articles in trade journals, attending E-Discovery, Litigation, Antitrust seminars.

COST: $5k to $7k/month

10.    DC/NY commute: As we discussed initially I would commute more heavily and then transition down to a 2/per month schedule. I would plane to take the train most times and stay NOT in the Waldorf but NOT in the Best Western. Typically a Westin, Hyatt, Marriot or Hilton. Does Solomon Page have an arrangement with some local hotels?

COST: Seasonal dependant and booking advance

11.    Back Office Upgrade/Automation/Technology Infusion: Cannot compete nationally or globally or even locally with some clients using the current methods and procedures SP employs. The front end delivery system MUST integrate with the back office functions. Get away from manual operations ! In the recent past I have had input on this and would want it with SP. Also, it is important to incorporate other div heads in the process in soliciting their needs while communicating the platform requirements to Al. Certain important components if not in place will generate excessive cost, inefficiency and service burdens on team members who would be far better suited to be selling and or filling orders.

COST: unknown

12.    Parking/Transportation:  For all Solomon Page Legal employees.  Monthly Parking or Metro Check

COST: $250-350/month for parking per employee

13.    Cell phone and Blackberry provided to ALL Solomon Page Business Development employees.  Blackberry to Support personnel.

14.    Laptops to all Solomon Page Legal employees.

My Compensation: Mark mentioned to me that there could be a "seat at the table" for me in the future based on growth and profitability of the Legal group.  I would like to know more details about this and what it could mean for my compensation.

Further, I want to explain that though generous, the guarantee you have offered (and even discussed with Mark about increasing) is not a major component of my consideration.  For the first year, yes, a guarantee is nice while I transition clients and build the business.  However, I would like you to understand that if I am not hitting my income expectations by 12 months then something is seriously wrong. I would much prefer discussing incorporating a bonus GP % escalator to 20%, this might be after 12 months or upon achieving certain revenue targets year one then brought closer to my current plan in year two.

My goal would be to deliver unto SP my book of clients along with new ones.  In order for me to do this I will need not only my own talent and skills but the above mentioned facets and a commitment from you and SP that we are set to do this.  Guarantees are not my bag – developing true business and making real money is.  That is what I can do and want to do for any organization I work with.  My current employer has suffered in delivering me all the tools I need to truly realize all the benefits and profits that are in this emerging industry.  SP has the potential to do just that.

Best,
Joshua

**DEF JK00252**

Loading "Gmail – phone call..."

07/30/2007 02:41 AM

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                   **Fri, May 25, 2007 at 7:39 AM**
To: jpkubicki@gmail.com

Thanks for forwarding the list. We will take a careful look on Tuesday and i will get back to you shortly thereafter. Does that timeframe work for you?

-----Original Message-----
From: JP Kubicki <jpkubicki@gmail.com>
To: Lloyd Solomon
[Quoted text hidden]

[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                                     **Fri, May 25, 2007 at 8:05 AM**
To: Lloyd Solomon <LSolomon@spges.com>

Sure thing.  Have a great holiday weekend.

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                   **Fri, May 25, 2007 at 8:42 AM**
To: jpkubicki@gmail.com

Same.

-----Original Message-----
From: JP Kubicki <jpkubicki@gmail.com>
To: Lloyd Solomon
[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                            **Wed, May 30, 2007 at 9:42 AM**
Reply-To: jpkubicki@gmail.com
To: Lloyd Solomon <LSolomon@spges.com>

Good morning - 1015 is starting to get jammed. I hear 3 is also good for you.  That works for me.
Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Lloyd Solomon" <LSolomon@spges.com>
Date: Fri, 25 May 2007 07:39:19
To:<jpkubicki@gmail.com>
Subject: Re: phone call...

**DEF JK00253**

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                   **Wed, May 30, 2007 at 9:56 AM**

To: jpkubicki@gmail.com

3:00 is ok...you can reach me in the office.  If 3 doesn't work we can
speak by phone tomorrow morning at 8:30 on my cell.

-----Original Message-----
From: jpkubicki@gmail.com [mailto:jpkubicki@gmail.com]
Sent: Wednesday, May 30, 2007 9:42 AM
To: Lloyd Solomon
Subject: Re: phone call...

[Quoted text hidden]

Wednesday?  I can do noon or 1:30 ...

**DEF JK00254**

# Joshua Kubicki

Page 55

1  quickly after I joined Solomon Page.

2    Q.    **And that occurred May, June?**

3    A.    That communication with Lloyd?

4    Q.    **Yes.**

5    A.    I believe it's mid June.

6    Q.    **Okay.  So you were still working at**

7  **Ajilon when you were talking with Lloyd Solomon**

8  **about getting space in D.C. for when you came**

9  **over to Solomon Page; is that correct?**

10    A.    I was still employed by Ajilon, yes.

11    Q.    **And what happened?  Did you have any**

12  **communications with Numark about getting the**

13  **additional space while you were still employed**

14  **at Ajilon?**

15    A.    I may have.  There may have been a

16  phone call.

17    Q.    **And was that in your capacity as a**

18  **manager for Ajilon?**

19    A.    Was what in my capacity?

20    Q.    **That phone call?**

21    A.    I am confused.  I was still managing

22  director of Ajilon when I had that phone call.

# Joshua Kubicki

Page 56

1      Q.      Right.   So what were you calling

2 Numark about?

3      A.      Space for Solomon Page.

4      Q.      Okay.   Did you let the people at

5 Numark know that you were getting the space for

6 Solomon Page or talk about getting it for

7 Ajilon?

8      A.      I did not initiate that phone call.

9 Numark was already aware of the relationship

10 with Solomon Page.

11     Q.      So they called you?

12     A.      Yes.

13     Q.      At whose suggestion did they call

14 you?

15     A.      I can't -- I don't know.

16     Q.      Did you talk with the representative

17 of Numark -- who was that representative, do

18 you know?

19     A.      A gentleman by the name of Barry

20 Bank or Banks.

21     Q.      Okay.   Let's call him Larry.

22 Anyway, Larry called you at someone's

## Joshua Kubicki

Page 57

initiation, correct?

1

2    A.    Correct.

3    Q.    But it was not at your initiation?

4    A.    Correct.

5    Q.    And what conversation did you have?

6    A.    This is guessing because there is a

7 lot going on and I don't -- I can't recall

8 accurately but I believe the conversation was

9 basically about what type of space would be

10 workable for the D.C. market for project space.

11    Q.    How much space -- did you tell Larry

12 how much space you thought you needed?

13    A.    I believe so.

14    Q.    How much space did you tell him you

15 needed?

16    A.    Probably somewhere on the range of

17 10 to 15,000 square feet.

18    Q.    Did you need it in downtown D.C.?

19    A.    Ideally, yes.

20    Q.    Did he get you the space at 1201

21 Penn?

22    A.    Yes.

Loading "Gmail - Fw: Joshua P. Kibicki 6-14-07"

07/30/2007 02:39 AM



Joshua Kubicki <jpkubicki@gmail.com>

# Fw: Joshua P. Kibicki 6-14-07

8 messages

---

**Lloyd Solomon <LSolomon@spges.com>**                    **Mon, Jun 18, 2007 at 11:51 AM**
To: jpkubicki@gmail.com

As promised.


-----Original Message-----
From: Tamara Proano
To: Lloyd Solomon
Sent: Mon Jun 18 11:48:23 2007
Subject: Joshua P. Kibicki 6-14-07

<<Joshua P. Kibicki 6-14-07.doc>> As per your request

📄 **Joshua P. Kibicki 6-14-07.doc**
44K

---

**JP Kubicki <jpkubicki@gmail.com>**                    **Mon, Jun 18, 2007 at 12:15 PM**
To: mark brunkhorst <mark@brunkmeyer.com>

[Quoted text hidden]

📄 **Joshua P. Kibicki 6-14-07.doc**
44K

---

**JP Kubicki <jpkubicki@gmail.com>**                    **Mon, Jun 18, 2007 at 12:17 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Excellent.  Thank you.  I will call you later today with a formal verbal answer.
[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                    **Mon, Jun 18, 2007 at 12:21 PM**
To: Lloyd Solomon <LSolomon@spges.com>
Cc: mark brunkhorst <mark@brunkmeyer.com>

Also - was thinking about the website and web address.  Would it be possible to use www.spdiscovery.com and
www.splegalstaff.com for the respective businesses?  These can simply "point to" the main legal page for now unitl
more is built.
[Quoted text hidden]

DEF JK00081

---

**JP Kubicki <jpkubicki@gmail.com>**                    **Tue, Jun 19, 2007 at 4:11 PM**

To: Lloyd Solomon <LSolomon@spges.com>

Gentlemen:

I hope you are ready for some business.  We need to move on this ASAP and I need your help/guidance.  One of my clients will have a large project (90% likely) in the next 2 weeks needing 50 to 100 temps for 2 to 3 months.  Ok so that is one challenge which my team can handle. As for the other challenge . . .

They are asking me for space!  I would like to give them some options ASAP on space (10k to 15ksq/ft) near Penn Quarter/Chinatown in DC. How can we proceed?  Who can I contact?

Nothing like getting up and running right away.

Thanks,
Joshua
[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                    **Tue, Jun 19, 2007 at 4:17 PM**
To: JP Kubicki <jpkubicki@gmail.com>

I will Chris Mongeluzo call you...where can he reach you?
[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                             **Tue, Jun 19, 2007 at 4:18 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Cell.  703-855-4380

Thanks

Sent via BlackBerry from Cingular Wireless
[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                    **Tue, Jun 19, 2007 at 4:21 PM**
To: jpkubicki@gmail.com

He will call you within the hour with his DC people from Newmark as Chris is based out of NY.
[Quoted text hidden]

---

**DEF JK00082**

Loading "Gmail - Laundry list"                                                     07/30/2007 02:38 AM



Joshua Kubicki <jpkubicki@gmail.com>

# Laundry list
10 messages

---

**JP Kubicki <jpkubicki@gmail.com>**                     **Wed, Jun 20, 2007 at 8:53 PM**
To: Lloyd Solomon <lsolomon@spges.com>

Lloyd,

First . . . it is done.  My official last day is June 29th.  Until
then I am on vacation.

Second, I would like to get moving as soon as we can on many of the
challenges we have before us as well as the administrative and
operational aspects of our business.

As you can see with the whole space need in DC – my business can be
needy and intense on the time side of things.  You will learn that I
need to move quickly and swiftly many times.  Thank you for getting me
in touch with Newmark so fast.  They are supposed to follow up with me
tomorrow morning with a space survey of the available locations.

Yet another reminder – this business is Global not National – the
Brussels need is still present.  You know I will commit to building DC
and NY but I will also be moving on the west coast and international
as soon as it makes business sense – which may be soon if not already.

Some things to set in motion ASAP:

Brian Ingram's offer – Initially we will want him focused on helping
build the model and deliverables as well as closing business.  I would
like to offer him a base of 175k with either a low percentage override
on our project business or a commission component to be installed when
warranted but not the 15% level – perhaps a 5% level.  Also we should
make this a flexible plan that we can revisit in 6 to 9 months to
reevaluate and tweak if necessary.

Can you send me an electronic version of your benefits?  He has a
child and is obviously interested in our coverage and costs.

Ideally I would come up to NY tomorrow afternoon and be there Friday
to begin working with you and everyone else to get things moving.
Meeting with Al would be quite helpful, as I want to change the
language on the Legal webpage immediately as well as work to secure
more appropriate web addresses.

Also we need to talk about the real possibility of me being sued.
Things went well today but I was reminded of my non-compete and I
learned this evening that the NY office was already told to be alert
about my activity there.  Not sure how they could sue me for NY
considering my contract is based on a 100 mile radius of DC.
Nevertheless, I want to talk about ho to proceed on a number of things

**DEF JK00209**

---

to ensure we are as protected as we can be.

Sorry for "throwing" these things at you but trying to get them out.

Hope you are still excited.

Best,
Joshua

---

**Lloyd Solomon <LSolomon@spges.com>**                           **Thu, Jun 21, 2007 at 5:31 AM**
To: jpkubicki@gmail.com

I left a voicemail on your cell yesterday. Let's talk this morning. I'll be in the office at 8.

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                           **Thu, Jun 21, 2007 at 7:11 AM**
To: jpkubicki@gmail.com

I suggest you come up Monday. I will schedule meetings relating to web, legal, real estate, technology, bring Brian
or any potential team members up, meeting Richard and Chelsea if they are in and handle any administrative
matters. Does that work for you?

[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                             **Thu, Jun 21, 2007 at 12:49 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Lloyd - sorry to bother you with this but for some reason i cannot
find the numbers for Newmark. Would you be so kind to send me Chris's
contact info again?  The DC guy, Larry I believe, was suppose to
follow up with me this morning and I have nto heard anything yet and I
wanted to give him a call to see what he has found thus far.

Thanks,
Joshua

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                           **Thu, Jun 21, 2007 at 12:53 PM**
To: JP Kubicki <jpkubicki@gmail.com>

Chris's office number is (212) 372-2081 and cell is (917)991-7628.  Did
you speak to Joel?

[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                    **Thu, Jun 21, 2007 at 1:08 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Not yet.  I got a vm from him and will be calling him later.  Thanks for that

Sent via BlackBerry from Cingular Wireless

[Quoted text hidden]

**DEF JK00210**

---

**Lloyd Solomon <LSolomon@spges.com>**                                **Thu, Jun 21, 2007 at 1:10 PM**
To: jpkubicki@gmail.com

Very busy day on Monday...lots to accomplish.

[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                    **Thu, Jun 21, 2007 at 1:10 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Indeed
Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Lloyd Solomon" <LSolomon@spges.com>

[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                    **Fri, Jun 22, 2007 at 12:56 PM**
To: Lloyd Solomon <LSolomon@spges.com>

Checking to see if youi got my voicemail from earlier.

Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: jpkubicki@gmail.com

Date: Thu, 21 Jun 2007 17:10:31
To:"Lloyd Solomon" <LSolomon@spges.com>
Subject: Re: Laundry list


Indeed
Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Lloyd Solomon" <LSolomon@spges.com>

[Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                **Fri, Jun 22, 2007 at 1:02 PM**
To: jpkubicki@gmail.com

I'm still shaking!!! Just kidding. We can review Monday.


-----Original Message-----
From: jpkubicki@gmail.com <jpkubicki@gmail.com>
To: Lloyd Solomon

[Quoted text hidden]

**DEF JK00211**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AJILON PROFESSIONAL | * | |
| STAFFING, LLC | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. |
| | * | |
| JOSHUA KUBICKI, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \*

**SUPPLEMENTAL DECLARATION OF JOHN J. MULLENHOLZ**

I, John J. Mullenholz, under the penalties of perjury, declare as follows:

1.      I am the Senior Regional Vice-President of the International Projects and Consulting Group of Ajilon-StaffWise Legal, which is an operating unit of Ajilon Professional Staffing, LLC, Plaintiff in the above-styled and captioned matter.

2.      I make this declaration in support of Plaintiff's Supplemental Memorandum in Support of Preliminary Injunction.

3.      I am over the age of 18 and am competent to testify based on personal knowledge as to the matters described in this declaration.

4.      The documents that comprise Exhibit 6 (a staffing chart for Ajilon's Legal Division as of early 2007) and Exhibit 20 ( a June 2007 payroll register   for former Ajilon employee John Beuker) are records which Plaintiff Ajilon Professional Staffing, LLC maintains in the ordinary course of business pursuant to Ajilon's policies regarding employee and personnel records.

2

5.    The Business Plan (Exhibit 23), to the best of my knowledge, was prepared by Joshua

Kubicki in the course of his activities while employed by Ajilon and was prepared at the request

of Mark Davies.  The Business Plan reflected in Exhibit 23, was provided to me by Joshua

Kubicki for editing and submission to Mark Davies and persons to whom he reported in April or

May of 2007.

6.    I personally prepared the documents which comprise Exhibit 27 (chart and graph

summarizing Defendant Joshua Kubicki's 2007 client billings.)  I prepared this chart and

accompanying graph using information Ajilon's accounting department provided to me at my

request; Ajilon maintains this information in the ordinary course of business pursuant to Ajilon's

policies regarding financial records.

I have read the foregoing declaration, and I declare under the penalties of perjury that its contents

are true and correct, to the best of my knowledge, information and belief.

_____
John J. Mullenholz

Loading "Gmail - Fw: Joshua P. Kibicki 6-14-07"                                                      07/30/2007 02:39 AM



Joshua Kubicki <jpkubicki@gmail.com>

# Fw: Joshua P. Kibicki 6-14-07

8 messages

**Lloyd Solomon <LSolomon@spges.com>**                                  **Mon, Jun 18, 2007 at 11:51 AM**
To: jpkubicki@gmail.com

As promised.


-----Original Message-----
From: Tamara Proano
To: Lloyd Solomon
Sent: Mon Jun 18 11:48:23 2007
Subject: Joshua P. Kibicki 6-14-07

  <<Joshua P. Kibicki 6-14-07.doc>> As per your request

---

📄 **Joshua P. Kibicki 6-14-07.doc**
   44K

---

**JP Kubicki <jpkubicki@gmail.com>**                                    **Mon, Jun 18, 2007 at 12:15 PM**
To: mark brunkhorst <mark@brunkmeyer.com>

  [Quoted text hidden]

---

📄 **Joshua P. Kibicki 6-14-07.doc**
   44K

---

**JP Kubicki <jpkubicki@gmail.com>**                                    **Mon, Jun 18, 2007 at 12:17 PM**
To: Lloyd Solomon <LSolomon@spges.com>

  Excellent.  Thank you.  I will call you later today with a formal verbal answer.
  [Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                                    **Mon, Jun 18, 2007 at 12:21 PM**
To: Lloyd Solomon <LSolomon@spges.com>
Cc: mark brunkhorst <mark@brunkmeyer.com>

Also - was thinking about the website and web address.  Would it be possible to use www.spdiscovery.com and
www.splegalstaff.com for the respective businesses?  These can simply "point to" the main legal page for now unitl
more is built.

  [Quoted text hidden]

DEF JK00081

---

**JP Kubicki <jpkubicki@gmail.com>**                                    **Tue, Jun 19, 2007 at 4:11 PM**

Loading "Gmail – Fw: Joshua P. Kibicki 6–14–07"                                                               07/30/2007 02:39 AM

To: Lloyd Solomon <LSolomon@spges.com>

    Gentlemen:

    I hope you are ready for some business.  We need to move on this ASAP
    and I need your help/guidance.  One of my clients will have a large
    project (90% likely) in the next 2 weeks needing 50 to 100 temps for 2
    to 3 months.  Ok so that is one challenge which my team can handle. As
    for the other challenge . . .

    They are asking me for space!  I would like to give them some options
    ASAP on space (10k to 15ksq/ft) near Penn Quarter/Chinatown in DC.
    How can we proceed?  Who can I contact?

    Nothing like getting up and running right away.

    Thanks,
    Joshua
    [Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                              **Tue, Jun 19, 2007 at 4:17 PM**
To: JP Kubicki <jpkubicki@gmail.com>

    I will Chris Mongeluzo call you...where can he reach you?
    [Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                                       **Tue, Jun 19, 2007 at 4:18 PM**
To: Lloyd Solomon <LSolomon@spges.com>

    Cell.  703-855-4380

    Thanks

    Sent via BlackBerry from Cingular Wireless
    [Quoted text hidden]

---

**Lloyd Solomon <LSolomon@spges.com>**                                              **Tue, Jun 19, 2007 at 4:21 PM**
To: jpkubicki@gmail.com

    He will call you within the hour with his DC people from Newmark as Chris is based out of NY.
    [Quoted text hidden]

---

DEF JK00082

## Jon Pomykala

Page 21

1    A.    Not too long after that.

2    Q.    **Like maybe the same day?**

3    A.    Possibly.

4    Q.    **When you showed up at Solomon Page**

5 **that first day was there already something for**

6 **you to fill?**

7    A.    Yes.

8    Q.    **What was that?**

9    A.    A project.

10    Q.    **What project was that?**

11    A.    The document review attorney

12 project.

13    Q.    **Do you know the client that it was**

14 **for?**

15    A.    Yes.

16    Q.    **Which client was it?**

17    A.    Crowell.

18    Q.    **What project was that?  The name of**

19 **the project, what do you call it?**

20    A.    The AT&T merger project.

21    Q.    **Okay.  Were you aware before you got**

22 **to Solomon Page that that project was active**

**Jon Pomykala**

Page 22

1  and you were going to need to recruit attorneys

2  for it?

3      A.    No.

4      Q.    So you found that out when you

5  showed up?

6      A.    Correct.

7      Q.    Had you ever heard of that project

8  before you showed up at Solomon Page?

9      A.    No.

10     Q.    Do you know who the salesperson was

11  that was responsible for that project?

12     A.    Yes.

13     Q.    Who was that?

14     A.    Joshua Kubicki.

15     Q.    So did you talk to him about it the

16  first day that you got to Solomon Page?

17     A.    Yes.

18     Q.    What did he tell you he wanted you

19  to do?

20     A.    Recruit.

21     Q.    Okay.  How many people were you

22  supposed to recruit and for what time frame?

## Jon Pomykala

Page 23

1    A.    The number it was -- there was no

2 specific number.  And for a time frame within a

3 week to start.

4    Q.    And how long was the position going

5 to be available to the contract attorney?

6    A.    It wasn't specifically defined.

7    Q.    Did Mr. Kubicki tell you when he

8 first found out about this project?

9    A.    He did not.

10    Q.    Do you have any idea when he first

11 found out about the project?

12    A.    I do not.

13    Q.    Do you know who the contact is at

14 Crowell regarding that project?

15    A.    There is no specific one contact for

16 it so...

17    Q.    Who are the contacts that you are

18 aware of?

19    A.    For?

20    Q.    The AT&T merger project.

21    A.    Linda Novosel, Anna Marie Melhado.

22 Linda is probably the main one.

## Jon Pomykala

Page 24

1    Q.    Any others?  Even minor players?

2    A.    Val Hinko, Tori Phillips.  I believe

3 that's all that I thought about.

4    Q.    Did you know any of those people

5 before you went to work for Solomon Page?

6    A.    Yes.

7    Q.    Did you meet them in connection or

8 did you get to know them in connection with

9 your work for Ajilon?

10    A.    Yes.

11    Q.    Did you know them apart from your

12 work at Ajilon?

13    A.    Sometimes.

14    Q.    And in what context did you know

15 them apart from your work at Ajilon?

16    A.    I would see them at different

17 events.

18    Q.    But your first contact with them was

19 through your work at Ajilon and their work at

20 Crowell?

21    A.    Correct.

22    Q.    How many attorneys, contract

**Jon Pomykala**

Page 25

1  attorneys have you recruited since you joined

2  Solomon Page?

3       A.    I don't know the exact number.

4       Q.    More than ten?

5       A.    Yes.

6       Q.    More than 20?

7       A.    Yes.

8       Q.    More than 50?

9       A.    No.

10      Q.    Are any of them still working?

11      A.    Yes.

12      Q.    Are all of them still working?

13      A.    No.

14      Q.    How many have stopped working?

15      A.    I don't know the exact number.

16      Q.    More than ten?

17      A.    Around there.

18      Q.    Okay.  Have you had any projects

19  that started and stopped while you were at

20  Solomon Page?

21      A.    Yes.

22      Q.    What projects?

## Jon Pomykala

1    A.    A document review attorney project.

2    Q.    **What firm was that for?**

3    A.    Mayer Brown.

4    Q.    **What project was that?**

5    A.    John Doe is the name of the project.

6    Q.    **John doe.  How many attorneys were**

7 **involved in that?**

8    A.    Three.

9    Q.    **Where did they work?**

10   A.    For Mayer Brown.

11   Q.    **Did they work at Mayer Brown's**

12 **offices?**

13   A.    Yes.

14   Q.    **Do you have any projects that you**

15 **are aware of for Solomon Page that are in the**

16 **pipeline, that are on the horizon?**

17   A.    Not to my knowledge, no.

18   Q.    **Who do you report to?**

19   A.    For my current position?

20   Q.    **Yes.**

21   A.    Who is my boss at Solomon Page?

22   Q.    **Yes.**

## Joshua Kubicki

Page 36

1 quite sure how to answer that question.

2     Q.    Did Ajilon ask you whether you had

3 any kind of restrictive covenant that would

4 affect your ability to go to work for them?

5     A.    No.

6     Q.    You didn't have one though, did you?

7     A.    No.

8     Q.    Now, you made a lot more money

9 during 2005 and 2006 with Ajilon than you did

10 in 2004; is that correct?

11     A.    Correct.

12     Q.    Was that increase in your pay a

13 result of you actually generating a very large

14 volume of legal business in D.C.?

15     A.    Yes.

16     Q.    And were those clients that you

17 developed relationships with on behalf of

18 Ajilon?

19     A.    I had relationships with certain

20 clients prior to joining Ajilon.  While there

21 they gave Ajilon and myself business.

22     Q.    Did you spend any of Ajilon's money

# Joshua Kubicki

Page 37

1  to develop those relationships?

2      A.      Yes.

3      Q.      Give me an example of money that you

4  spent that was Ajilon's money to develop those

5  relationships?

6      A.      Cab rides to the client's sites,

7  lunches, dinners, your typical business

8  entertainment expenses.   That is all I can

9  really articulate.

10     Q.      So it was entertainment and just the

11 expense that you would associate with going and

12 meeting with the client?

13     A.      Yes.

14     Q.      Did you put together any kind of

15 presentations for clients?

16     A.      What time frame are we speaking of?

17     Q.      After you joined Ajilon?

18     A.      Sure, yes.

19     Q.      And was there time and expense

20 associated with putting those presentations

21 together?

22     A.      My personal time, yes.

# Joshua Kubicki

Page 88

1  business with.

2       Q.      Have you ever done any events at the

3  ESPN Zone for Ajilon?

4       A.      I don't understand the question.

5       Q.      Have you ever sponsored any events

6  at ESPN Zone for Ajilon?

7       A.      Prior to -- no.  This was not my

8  event.

9       Q.      I am not talking about this.  You

10  know what ESPN Zone is?

11      A.      Yes.

12      Q.      Have you ever done anything when you

13  were at Ajilon at ESPN Zone?

14      A.      Yes.

15      Q.      What did you do?

16      A.      I think I rented out a room for --

17  it was an NFL football game that might have

18  been the play offs.  I rented out a room for a

19  cocktail, light hors d' oeuvres sort of

20  reception for clients.

21      Q.      And who did you invite to that?

22      A.      I would have invited clients like

## Joshua Kubicki

Page 89

1  Crowell & Moring, Mayer Brown, Sidley.  We

2  invited some other clients at the time,

3  prospects of other salespeople that were in the

4  office as well.  I don't necessarily remember

5  those.

6  **Q.    How many people attended?**

7  A.    Unfortunately it wasn't a popular

8  event so less than 15.

9  **Q.    But that was something where you**

10 **spent Ajilon money to have clients come over**

11 **and you would entertain them at something like**

12 **that?**

13 A.    Yes.  It was a branch event.

14 **Q.    This was a list that you had; is**

15 **that correct?**

16 A.    That is a list that Lang Carter

17 forwarded to me to my personal e-mail account.

18 **Q.    You still have this list, correct?**

19 A.    Yes, I did as I produced it.

20 **Q.    That's why we have it.  Thank you.**

21      MR. SCHLANGER:  Can I take one

22 minute?

## Joshua Kubicki

Page 107

1  acquisition.

2      Q.    It looked like this.  It just went

3  to Crowell instead of Buckley Kolar?

4      A.    I mean, this looks like an agreement

5  and there was an agreement for AT&T Bellsouth.

6  I just don't know because the Buckley Kolar is

7  sort of throwing me for a loop exactly what

8  this document is.

9            MR. HAHN:  Okay.  Let's mark this as

10 Exhibit 11.

11           (Deposition Exhibit No. 11 was

12 marked for identification.)

13           BY MR. HAHN:

14     Q.    This is a July 27, 04 letter to

15 Rebecca Anderson from you.

16           Do you recall sending this letter?

17     A.    Yes.

18     Q.    Did you know Rebecca Anderson before

19 July of '04?

20     A.    No.

21     Q.    Thank you.

22           MR. HAHN:  Let's mark this as

## Joshua Kubicki

Page 108

1 Exhibit 12.

2          (Deposition Exhibit No. 12 was

3 marked for identification.)

4          BY MR. HAHN:

5     Q.     Did you prepare Exhibit 12 in your

6 capacity as managing director of national legal

7 projects for Ajilon Legal to present to Mayer

8 Brown?

9     A.     Yes.

10     Q.     Did you actually give that to anyone

11 at Mayer Brown?

12     A.     I may have.  I don't specifically

13 recall.

14     Q.     If you did give it to someone who

15 would you have given it to?

16     A.     Again, I remember this is sort of

17 not something that Mayer typically wanted.

18 They didn't like being solicited in this manner

19 so I am not sure who I would have sent it to.

20 I may have prepared it to be sent but I don't

21 specifically recall sending it to anyone at

22 Mayer Brown.

July 27, 2004


Rebecca Anderson
Paralegal Manager
Mayer, Brown, Rowe & Maw LLP
1909 K Street, NW
Washington DC 20006

Ms. Anderson,

Good day. I recently met with your colleague Sherman Lambert and he suggested that I write you to introduce myself and Ajilon Legal. Sherman and I have worked together in the past and have a strong professional respect for one another. He identified you as the person to contact to further develop my relationship with Mayer Brown.

I am the Branch Manager for Ajilon Legal DC branch. We specialize in staffing temporary attorneys and paralegals for law firms and corporate legal departments. Knowing that your firm has had the need for temporary staff in the recent past I would like to learn more about you and the firm. In doing so, I hope to forge a strong professional relationship so that any business conducted between us would operate smoothly and efficiently.

You have my pledge that I will accommodate all your staffing needs as well as the associated administrative needs such as custom accurate invoicing and 24/7 access to me. So often in this industry staffing agencies concentrate their efforts on just getting the business and then forget the details. My service to you would be consistent and thorough throughout the entire process, from your initial call for temps to the last invoice.

In short, I would like arrange a meeting with you. As the Paralegal Manager you are a key person to speak with at your firm about staffing and I would benefit from talking with you. Also, you will learn more about me and Ajilon Legal and what type of service I can provide you with.

Please respond to let me know of your interest in having me come by your office for an introduction. I will happily accommodate your schedule to ensure we have a chance to meet.


Best regards,



Joshua P. Kubicki
Branch Manager/
Legal Placement Consultant



PLAINTIFF'S
EXHIBIT
Kubicki 11
8-2-07

Loading "Gmail - Conflcits"

07/30/2007 02:35 AM



Joshua Kubicki <jpkubicki@gmail.com>

# Conflcits

7 messages

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                          **Wed, Jun 27, 2007 at 4:00 PM**
To: "Rebecca L. Anderson" <RAnderson@mayerbrownrowe.com>

Hi there.  Can you send me the conflicts form to this email?  Also all the other paperwork associated with temps?

Thanks.

Talk soon,
Joshua

Sent via BlackBerry from Cingular Wireless

---

**Anderson, Rebecca L. <RAnderson@mayerbrownrowe.com>**                **Wed, Jun 27, 2007 at 4:08 PM**
To: jpkubicki@gmail.com

[Quoted text hidden]
IRS CIRCULAR 230 NOTICE. Any advice expressed above as to tax matters was neither written nor intended by
the sender or Mayer, Brown, Rowe & Maw LLP to be used and cannot be used by any taxpayer for the purpose of
avoiding tax penalties that may be imposed under U.S. tax law. If any person uses or refers to any such tax advice
in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to any
taxpayer, then (i) the advice was written to support the promotion or marketing (by a person other than Mayer,
Brown, Rowe & Maw LLP) of that transaction or matter, and (ii) such taxpayers should seek advice based on the
taxpayers particular circumstances from an independent tax advisor.

This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they
are addressed. If you have received this email in error please notify the system manager. If you are not the named
addressee you should not disseminate, distribute or copy this e-mail.

---

**4 attachments**

📎 **Conflicts.pdf**
322K

📎 **Confidentiality_Revised.pdf**
611K

📎 **Firm_policies.pdf**
382K

📎 **Gym.pdf**
247K

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                          **Wed, Jun 27, 2007 at 4:10 PM**
To: "Rebecca L. Anderson" <RAnderson@mayerbrownrowe.com>

Thanks.  Stay tuned.

**DEF JK00036**

Sent via BlackBerry from Cingular Wireless

[Quoted text hidden]

---

**Anderson, Rebecca L. <RAnderson@mayerbrownrowe.com>**                  **Wed, Jun 27, 2007 at 4:11 PM**
To: jpkubicki@gmail.com

For what?  A surprise? :-)

-----Original Message-----
From: jpkubicki@gmail.com [mailto:jpkubicki@gmail.com]
Sent: Wednesday, June 27, 2007 4:10 PM
To: Anderson, Rebecca L.
[Quoted text hidden]

---

**jpkubicki@gmail.com <jpkubicki@gmail.com>**                            **Wed, Jun 27, 2007 at 4:15 PM**
To: "Rebecca L. Anderson" <RAnderson@mayerbrownrowe.com>

Perhaps!


Sent via BlackBerry from Cingular Wireless

-----Original Message-----
From: "Anderson, Rebecca L." <RAnderson@mayerbrownrowe.com>

[Quoted text hidden]

---

**Anderson, Rebecca L. <RAnderson@mayerbrownrowe.com>**                  **Wed, Jun 27, 2007 at 4:17 PM**
To: jpkubicki@gmail.com

Are you sending me resumes for new people and letting me know if any of
the people on the list are available?

-----Original Message-----
From: jpkubicki@gmail.com [mailto:jpkubicki@gmail.com]
[Quoted text hidden]

---

**JP Kubicki <jpkubicki@gmail.com>**                                     **Wed, Jun 27, 2007 at 4:23 PM**
To: jkubicki@solomonpage.com

---------- Forwarded message ----------
From: Anderson, Rebecca L. <RAnderson@mayerbrownrowe.com>
[Quoted text hidden]

---

**4 attachments**

📎 **Conflicts.pdf**
     322K

📎 **Confidentiality_Revised.pdf**                                        **DEF JK00037**
     611K

Loading "Gmail – Conflicts"

07/30/2007 02:35 AM

**Firm_policies.pdf**
382K

**Gym.pdf**
247K

DEF JK00038

Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell   1-914-213-0738

www.brunkmeyer.com

---

**JP Kubicki <jpkubicki@gmail.com>**                                    **Thu, May 24, 2007 at 5:51 PM**
To: mark brunkhorst <mark@brunkmeyer.com>

latest draft
--------------------

Lloyd,

Per our conversation earlier, I am providing you with the following list of action items and spend that I am keenly interested in gaining your commitment to prior to my joining SP.  This is meant to be a primer on the needs and demands of my business and business model.  Though not exhaustive it is meant to be as inclusive as can be at this moment.

Please let me know your level of commitment to each and of course any concerns you may have with each.

PRIORITIES:

1.    Project Space in DC.  We will need at least 10,000 sq. ft of project space.  This space cannot be subterranean but does not have to be Class A.   It needs to be in the downtown DC area, relatively close to a Metro.

      COST: $15 to $25k/month plus facilities (defined to include HVAC etc.), furniture, technology, etc. My Current space is roughly 25,000'. Project related revenue for 2006 was 25ML of which I generated 17ML.

2.    Office Space in DC.  We will need an actual permanent address with useful and proprietary office facilities.  Again, this does not have to be Class A space but should reflect our level of investment/commitment into the DC Metro market. Initially we would need 3-5,000' - currently I have 14 staff in the DC branch in roughly 6-7k sq. ft.

      COST: variable

3.    Litigation Support Consultants/Professionals: Initially we will need to secure a high level litigation support consultant capable of both being deployed into client environments to consult as well as being a part of the business development efforts of the legal team.

**DEF JK00294**

The role of the LSC will provide that they will be servicing 25-30% of the Lit Support Business and investing 30% of their time in second and third round sales engagements as they will be providing value add subject matter expertise during the front end evolving through discovery, project definition and fulfillment. Other revenue may be generated through temp assignments and project management.

COST: $150k to $200k/year – commission alterna tive.

4.   Technology: We will need to develop and deploy a web-based technology solution to facilitate and deliver a time keeping, expense tracking, billing, approval, review mechanism for both candidates and clients. Remote password access for clients and temporary staff is vital. The types of transactions that will take place are billing approval, time and attendance approval etc. This is an intricate part of reducing DSO. Further, some of my clients have this type of technology already deployed on their end which we will need to incorporate with. Wherever there is technology that speeds invoicing and payment delivery DSO has been reduced to below 30 days in the majority of cases.

COST: $40k to $80k (cost can vary greatly)

5.   Logistics Support: We will need dedicated resources within HQ to facilitate any and all necessary logistics relating to serving clients. From travel arrangements for travel teams to securing and negotiating real estate for projects to arranging technology support and delivery. This person or persons MUST be dedicated when needed and educated on the Legal mission and personality of the group. This cannot be a 9 to 5 mentality. Possibly a third party travel service could provide assistance for travel related support but only under clear and strict expectation communication as when it does occur it can be high demand. Kym is well-qualified to spearhead this effort and task when it arrives though she is not a travel agent herself so access to SABRE and likewise is limited.

COST: unknown

6.   Marketing: We will need an immediate and potent marketing/branding effort. This should be the initial stages of an overall campaign. This is for web re-design and deployment, print materials, announcements, post cards, etc. Ability to host events in DC and NY to meet and introduce ourselves to clients . - Trade Journals mailing campaigns, Tradeshow booth, Give-a-ways, having a MKT PR firm assist in getting published in targeted trade journals, and the positive synergies affiliated with being able to drive the strategy & investment that I currently do not enjoy.

COST: $100k to $200k/ for the first 6 months

7.   Securing Jon Pomykala: As the lead Project Manager Jon will be invaluable to our initial and ongoing efforts to serve and maintain excellence in delivery of all our project and recruiter.

COST:  $65k - $75k Base + override legal GM and/or commissions on sales

8.   Securing Kym Danowski: As the Legal Operations lead for my current group Kym would be invaluable to SP for bringing the best practices of a back office as well as the client service of the front office. Her attention to detail and high level of client support is unmatched and would truly be an asset to our team and effort.

COST: $55k Base + override legal GM

**DEF JK00295**

9.        Entertainment/Travel: It will be necessary for me to travel throughout the US to meet with and entertain clients. Not that all clients have to have an expensive dinner with a celebrity but I will need to the support and commitment to this effort.

COST: $10k to $25k month (based on historical activity/spend). Examples: in 2006 I secured suites at two major conventions specifically targeting specific clients that they ranged in the 12-15k per event range. We secured business out of this totaling roughly 20k in perm fees and a $500,000 profit project.

10.        Training/Education/Seminars/Subscriptions: Running ads and articles in trade journals, attending E-Discovery, Litigation, Antitrust seminars.

COST: $5k to $7k/month

10.        DC/NY commute: As we discussed initially I would commute more heavily and then transition down to a 2/per month schedule. I would plane to take the train most times and stay NOT in the Waldorf but NOT in the Best Western. Typically a Westin, Hyatt, Marriot or Hilton. Does Solomon Page have an arrangement with some local hotels?

COST:  Seasonal dependant and booking advance

11.        Back Office Upgrade/Automation/Technology Infusion:  Cannot compete nationally or globally or even locally with some clients using the current methods and procedures SP employs. The front end delivery system MUST integrate with the back office functions. Get away from manual operations ! In the recent past I have had input on this and would want it with SP. Also, it is important to incorporate other div heads in the process in soliciting their needs while communicating the platform requirements to Al. Certain important components if not in place will generate excessive cost, inefficiency and service burdens on team members who would be far better suited to be selling and or filling orders.

COST: unknown

12.        Parking/Transportation:  For all Solomon Page Legal employees. Monthly Parking or Metro Check

COST: $250-350/month for parking per employee

13.        Cell phone and Blackberry provided to ALL Solomon Page Business Development employees. Blackberry to Support personnel.

14.        Laptops to all Solomon Page Legal employees.

My Compensation: Mark mentioned to me that there could be a "seat at the table" for me in the future based on growth and profitability of the Legal group. I would like to know more details about this and what it could mean for my compensation.

Further, I want to explain that though generous, the guarantee you have offered (and even discussed with Mark about increasing) is not a major component of my consideration. For the first year, yes, a guarantee is nice while I transition clients and build the business. However, I would like you to understand that if I am not hitting my income expectations by 12 months then something is seriously wrong. I would much prefer discussing incorporating a bonus GP % escalator to 20%, this might be after 12 months or upon achieving certain revenue targets year one then brought closer to my current plan in year two.

DEF JK00296

My goal would be to deliver unto SP my book of clients along with new ones.  In order for me to do this I will need not only my own talent and skills but the above mentioned facets and a commitment from you and SP that we are set to do this.  Guarantees are not my bag – developing true business and making real money is.  That is what I can do and want to do for any organization I work with.  My current employer has suffered in delivering me all the tools I need to truly realize all the benefits and profits that are in this emerging industry.  SP has the potential to do just that.

[Quoted text hidden]

---

**mark brunkhorst <mark@brunkmeyer.com>**                                        **Thu, May 24, 2007 at 9:46 PM**
To: JP Kubicki <jpkubicki@gmail.com>

Joshua,


Well done, (I really like your closing sentence), please send this to Lloyd and lets connect in the morning, let me know what works for you and Lloyd and I will adjust as needed.



Mark P. Brunkhorst

*the brunkmeyer group*

PO Box 1109 Warwick, NY 10990

Direct 1-800-471-9777

Cell   1-914-213-0738

www.brunkmeyer.com


-----Original Message-----
**From:** JP Kubicki [mailto:jpkubicki@gmail.com]
**Sent:** Thursday, May 24, 2007 5:52 PM
**To:** mark brunkhorst
[Quoted text hidden]

[Quoted text hidden]

---

**DEF JK00297**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AJILON PROFESSIONAL STAFFING, LLC | * | |
| | * | |
| Plaintiff, | | |
| | * | |
| v. | | Civil Action No.  07-cv-01281 |
| | * | |
| JOSHUA KUBICKI, et. al. | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*

## PROPOSED ORDER FOR PRELIMINARY INJUNCTION

WHEREFORE, Ajilon respectfully prays that this Court enter an Order that:

1.      Defendant Joshua Kubicki be immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, until further order of this Court, from doing any of the following:

   a.      using any Ajilon trade secrets, customer lists or business information to approach, contact, solicit or induce any individual, corporation or other entity which is a client or customer of Ajilon, in an attempt to: (i) enter into any business relationship with a client or customer of Ajilon, or (ii) reduce or eliminate the business such client or customer conducts with Ajilon;

   b.      divulging, disclosing or using any Ajilon confidential information or trade secrets (as defined in the Employment Agreements signed

by Defendants), including information regarding Ajilon clients, customers, employees, qualified personnel, business affairs, information, relationships, accounts, practices, procedures and dealings;

c.      soliciting, contacting, responding to contacts from, or otherwise communicating in any way with any Ajilon employee, including contract attorneys and paralegals;

d.      having any contact of any kind whatsoever, whether in person, telephonic, Internet or web-based, by letter, correspondence or other mail or hard-copy, direct or indirect, or otherwise, with either Defendant Jon Pomykala or Defendant Kimberly Danowski;

e.      having any contact of any kind whatsoever, whether in person, telephonic, Internet or web-based, by letter, correspondence or other mail or hard-copy, direct or indirect, or otherwise, with the law firms Crowell & Moring, LLP, and Mayer Brown Rowe & Maw, LLP, or anyone employed by, associated with, or representing either of them;

f.      deleting any computer files or other information, including electronic mail messages and attachments, from any computer or other electronic or digital device in his possession, custody or control;

2.      Defendant Jon Pomykala be immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, until further order of this Court, from doing any of the following:

     a.      using any Ajilon trade secrets, customer lists or business information to approach, contact, solicit or induce any individual, corporation or other entity which is a client or customer of Ajilon, in an attempt to: (i) enter into any business relationship with a client or customer of Ajilon, or (ii) reduce or eliminate the business such client or customer conducts with Ajilon;

     b.      divulging, disclosing or using any Ajilon confidential information or trade secrets (as defined in the Employment Agreements signed by Defendants), including information regarding Ajilon clients, customers, employees, qualified personnel, business affairs, information, relationships, accounts, practices, procedures and dealings;

     c.      soliciting, contacting, responding to contacts from, or otherwise communicating in any way with any Ajilon employee, including contract attorneys and paralegals;

     d.      having any contact of any kind whatsoever, whether in person, telephonic, Internet or web-based, by letter, correspondence or other mail or hard-copy, direct or indirect, or otherwise, with either Defendant Joshua Kubicki or Defendant Kimberly Danowski;

e.    having any contact of any kind whatsoever, whether in person, telephonic, Internet or web-based, by letter, correspondence or other mail or hard-copy, direct or indirect, or otherwise, with the law firms Crowell & Moring, LLP, and Mayer Brown Rowe & Maw, LLP, or anyone employed by, associated with, or representing either of them;

f.    deleting any computer files or other information, including electronic mail messages and attachments, from any computer or other electronic or digital device in his possession, custody or control;

3.    Defendant Kimberly Danowski be immediately enjoined and restrained, directly or indirectly, and whether alone or in concert with others, until further order of this Court, from doing any of the following:

a.    using any Ajilon trade secrets, customer lists or business information to approach, contact, solicit or induce any individual, corporation or other entity which is a client or customer of Ajilon, in an attempt to: (i) enter into any business relationship with a client or customer of Ajilon, or (ii) reduce or eliminate the business such client or customer conducts with Ajilon;

b.    divulging, disclosing or using any Ajilon confidential information or trade secrets (as defined in the Employment Agreements signed by Defendants), including information regarding Ajilon clients,

customers, employees, qualified personnel, business affairs, information, relationships, accounts, practices, procedures and dealings;

c.     soliciting, contacting, responding to contacts from, or otherwise communicating in any way with any Ajilon employee, including contract attorneys and paralegals;

d.     having any contact of any kind whatsoever, whether in person, telephonic, Internet or web-based, by letter, correspondence or other mail or hard-copy, direct or indirect, or otherwise, with either Defendant Jon Pomykala or Defendant Joshua Kubicki;

e.     having any contact of any kind whatsoever, whether in person, telephonic, Internet or web-based, by letter, correspondence or other mail or hard-copy, direct or indirect, or otherwise, with the law firms Crowell & Moring, LLP, and Mayer Brown Rowe & Maw, LLP, or anyone employed by, associated with, or representing either of them;

f.     deleting any computer files or other information, including electronic mail messages and attachments, from any computer or other electronic or digital device in his possession, custody or control;

      4.      This Court's Order shall remain in full force and effect until such time as the Court specifically orders otherwise.

Dated this \_\_\_ day of August, 2007

                              _____

                              The Honorable Richard J. Leon

                              United States District Judge